**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

RHODE ISLAND COALITION AGAINST
DOMESTIC VIOLENCE *et al.*,

          *Plaintiffs*,

          v.

PAMELA BONDI, *et al.*,

          *Defendants*.

Case No. 1:25-cv-00279

**<u>MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION AND FOR RELIEF UNDER 5 U.S.C. § 705</u>**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................... 3

    A.  The Violence Against Women Act Creates a Host of Grant Programs To Prevent Domestic Violence and Sexual Assault and To Help Survivors ..................................... 3

    B.  Plaintiffs Rely on OVW Grants To Provide Essential Services ....................................... 7

    C.  Plaintiffs Provide Programs That Serve the Needs of All Domestic Violence or Sexual Assault Victims ..................................................... 9

    D.  The Administration Leverages Federal Grant Funding To Advance the President's Ideological Vision and Expose Grantees to Massive Liability ...................................... 11

    E.  DOJ's Office on Violence Against Women Imposes New Conditions On Grants ........ 15

    F.  The Conditions Harm Plaintiffs ................................................................................. 18

LEGAL STANDARD ................................................................................................. 20

ARGUMENT ............................................................................................................. 20

  I.  The Plaintiffs Are Likely to Succeed On the Merits of Their Claims .............................. 20

    A.  The New Funding Conditions Violate the APA ........................................................... 21

        1.  *The Funding Conditions are Final Agency* Action ................................. 21

        2.  *The Funding Conditions Exceed Defendants' Statutory Authority* ........... 22

        3.  *Many of the Funding Conditions Are Contrary to Law* ............................ 22

        4.  *The Funding Conditions are Arbitrary and Capricious* .......................... 26

    B.  The New Funding Conditions Violate Multiple Constitutional Provisions Safeguarding the Separation of Powers .................................................. 28

    C.  The New Funding Conditions Violate the First Amendment ........................................ 30

    D.  The New Funding Conditions Violate the Fifth Amendment's Due Process Clause .... 33

  II.  The Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief .......................... 38

  III.  The Balance of the Equities and Public Interest Favors Preliminary Relief ..................... 42

  IV.  Relief Should Extend Broadly Enough To Prevent Any Irreparable Harm ...................... 45

CONCLUSION.................................................................................................................. 47

# TABLE OF AUTHORITIES

## CASES

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ........................ 30, 33

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................... 21

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) ................................................. 34

*Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36 (1st Cir. 2010) ........................ 20

*California v. U.S. Dep't of Transp.*, No. 1:25-cv-00208, 2025 WL 1711531 (D.R.I. June 19, 2025) ................................................................... 22, 42

*Career Colleges & Sch. of Texas v. U.S. Dep't of Educ.*, 98 F.4th 220 (5th Cir. 2024) .............. 45

*Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020) ......................................... 45

*Chi. Women in Trades v. Trump*, No. 1:25-cv-02005, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025) ................................................................... 31, 47

*City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ........................................ 28, 29, 30

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ................................................................... 22

*City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020) ................................................ 28, 29, 30

*City of Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017) ................................................ 38

*City of Los Angeles v. Sessions*, No. 2:18-cv-07347, 2019 WL 1957966 (C.D. Cal. 2019) ................................................................... 47

*City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579 (E.D. Pa. 2017) ........................................ 38

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020) ................................................ 22, 23

*Clinton v. City of N.Y.*, 524 U.S. 417 (1998) ................................................................... 29

*Colorado v. U.S. Dep't of Health & Human Servs.*, No. 1:25-cv-00121, 2025 WL 1426226 (D.R.I. May 16, 2025) ................................................................... 28, 29

*DHS v. Regents of the Univ. of California*, 591 U.S. 1 (2020) ................................................ 27

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ................................................ 26

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ................................................ 34

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ................................................ 26

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .......................................................... 34, 37, 38

*Hannon v. Allen*, 241 F. Supp. 2d 71 (D. Mass. 2003) ................................................................. 39

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ................................................................. 22

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ............................... 40, 42

*Louisiana v. Biden*, 622 F. Supp. 3d 267 (W.D. La. 2022) ........................................................ 26

*Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-cv-00814, 2025 WL 1582368
    (W.D. Wash. June 3, 2025) ............................................................................... 21, 26, 28, 44

*Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277 (D. Mass. 2025) .............. 42, 43, 44

*Metro. Transp. Auth. v. Duffy*, No. 2:25-cv-01413, 2025 WL 1513369 (S.D.N.Y. May
    28, 2025) ......................................................................................................................... 39

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ........................................................ 38

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29
    (1983) ............................................................................................................................. 26

*Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243 (D.
    Md. 2025) ......................................................................................................................... 47

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) ...................... 45

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) ............................................................... 30

*NEA v. Finley*, 524 U.S. 569 (1998) ................................................................................. 30, 33

*New Hampshire Hosp. Ass'n v. Burwell*, No. 1:15-cv-00460, 2016 WL 1048023
    (D.N.H. Mar. 11, 2016) .................................................................................................... 20

*Nken v. Holder,* 556 U.S. 418 (2009) ........................................................................................ 20

*North Carolina v. Covington*, 581 U.S. 486 (2017) ................................................................... 46

*Ohio v. EPA*, 603 U.S. 279 (2024) ............................................................................................ 26

*Orr v. Trump*, No. 1:25-cv-10313, 2025 WL 1145271 (D. Mass. Apr. 18, 2025) ...................... 45

*PFLAG, Inc. v. Trump*, No. 8:25-cv-00337, 2025 WL 685124 (D. Md. Mar. 4, 2025) ... 28, 29, 47

*R.I. Latino Arts v. NEA*, No. 1:25-cv-00079, 2025 WL 1009026 (D.R.I. Apr. 3, 2025) ........ 32, 39

*Reno v. ACLU*, 521 U.S. 844 (1997) ......................................................................................... 34

*Rust v. Sullivan*, 500 U.S. 173 (1991) ..................................................................... 30, 33

*S.F. AIDS Found. v. Trump*, No. 4:25-cv-01824, 2025 WL 1621636 (N.D. Cal. June 9, 2025) ............................................................................................................ 32, 33

*Sessions v. Dimaya,* 584 U.S. 148 (2018) ................................................................... 34

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1 (1st Cir. 2012) ................... 39

*Soscia Holdings, LLC v. Rhode Island*, 684 F. Supp. 3d 47 (D.R.I. 2023) ................................. 20

*South Dakota v. Dole*, 483 U.S. 203 (1987) ................................................................. 29

*Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350 (5th Cir. 2021) .................................... 29

*Texans for Free Enterprise v. Texas Ethics Commission*, 732 F.3d 535 (5th Cir. 2013) ............ 44

*United States v. William*s, 553 U.S. 285 (2008) .............................................................. 34

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982) ........................... 34

*Washington v. Trump*, 768 F. Supp. 3d 1239 (W.D. Wash. 2025) .......................................... 28

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................................... 20

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-cv-00097, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) ............................................... 45, 46, 47

## STATUTES

18 U.S.C. § 287 ............................................................................................................. 13

31 U.S.C. § 3729 ...................................................................................................... 12, 19

34 U.S.C. § 10441 ................................................................................................. 4, 5, 23

34 U.S.C. § 10444 ......................................................................................................... 4

34 U.S.C. § 10446 ................................................................................................. 4, 7, 23

34 U.S.C. § 10454 ......................................................................................................... 7

34 U.S.C. § 12291 ................................................................................ 4, 5, 6, 10, 23, 24, 25

34 U.S.C. § 12341 ............................................................................................. 5, 6, 24, 25

34 U.S.C. § 12351 ................................................................................................. 5, 6, 24

34 U.S.C. § 12421 ............................................................................................... 6, 24, 25

34 U.S.C. § 12451 ................................................................................................. 4, 6, 24

34 U.S.C. § 12463 ..................................................................................................... 6, 24

34 U.S.C. § 12464 .............................................................................................. 5, 6, 7, 24

34 U.S.C. § 12475 ..................................................................................................... 6, 24

34 U.S.C. § 12501 ..................................................................................................... 6, 24

34 U.S.C. § 12514 ..................................................................................................... 6, 24

34 U.S.C. § 12551 ..................................................................................................... 4, 23

34 U.S.C. § 20121 .................................................................................................... 5, 6, 7

34 U.S.C. § 20123 ................................................................................................. 5, 6, 25

34 U.S.C. § 20124 ............................................................................................................ 6

34 U.S.C. § 40723 ............................................................................................................ 5

5 U.S.C. § 704 ............................................................................................................... 21

5 U.S.C. § 705 ........................................................................................................ 20, 45

5 U.S.C. § 706 ............................................................................................................... 21

Pub. L. No. 103-322, 108 Stat. 1796 (1994) .................................................................. 3

Pub. L. No. 106-386, 114 Stat. 1464 (2000) .................................................................. 4

Pub. L. No. 109-162, 119 Stat. 2960 (2006) .................................................................. 4

Pub. L. No. 113-4, 127 Stat. 54 (2013) .......................................................................... 4

Pub. L. No. 117-103, 136 Stat. 840 (2022) .................................................................... 4

Pub. L. No. 118-42, 138 Stat. 25 (Mar. 9, 2024) ........................................................... 4

Pub. L. No. 119-4, 139 Stat. 9 (Mar. 15, 2025) ............................................................. 4

## REGULATIONS

28 C.F.R. § 85.5 ........................................................................................................... 19

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ..................................................................................................... 30

U.S. Const., art. I, § 1 ................................................................................................ 28

U.S. Const., art. I, § 7, cl. 2 ....................................................................................... 29

U.S. Const., art. I, § 8, cl. 1 ....................................................................................... 28

U.S. Const., art. I, § 9, cl. 7 ....................................................................................... 28

U.S. Const., art. II, § 3 .................................................................................................

## OTHER AUTHORITIES

Mem. from Ass't Att'y Gen., Brett A. Shumate, to Civil Division Employees, *Civil Division Enforcement Priorities* (June 11, 2025), https://perma.cc/SV3A-NE9F ...................................................................................................................... 14

Mem. from Att'y Gen. Pam Bondi, to DOJ Employees, *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025), https://perma.cc/KH9Y-A2VQ ..................................................................................................................... 13

Mem. from Dep'y Att'y Gen., Todd Blanche, to DOJ Offices, Divisions, and U.S. Attorneys, *Civil Rights Fraud Initiative* (May 19, 2025), https://perma.cc/3W6K-FGHA ................................................................................ 13

Nat'l Ctr. on Domestic & Sexual Violence, *Violence Against Women Act (VAWA) 30th Anniversary, September 2024*, https://perma.cc/9SDP-APGM ............................... 43

S. Rep. No. 103-138 (1993) ............................................................................. 3, 10, 27

The White House, *Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI* (Jan. 22, 2025), https://perma.cc/G8JU-QQ44 .................................................................................. 31

U.S. DOJ, *Justice Department Establishes Civil Rights Fraud Initiative* (May 19, 2025), https://perma.cc/ZS6R-B8E9 .................................................................. 14

U.S. DOJ, OVW, *FY25 General Terms and Conditions*, https://perma.cc/FR3E-FB3H ....... 17, 19

U.S. DOJ, OVW, *Open Notices of Funding Opportunity*, https://perma.cc/XR9P-GA49 ........................................................................................................................ 16

U.S. DOJ, State and Territory Coalitions: FY 2025 Domestic Violence and Sexual Assault Coalition Designations, https://perma.cc/8LNV-FGLY ......................................... 5

# INTRODUCTION

Plaintiffs in this action are seventeen non-profit organizations that are the federally recognized domestic violence and sexual assault coalitions for their respective states. Plaintiffs' mission is to support survivors of domestic violence and sexual assault and to prevent more people from falling victim to these horrific crimes. Plaintiffs provide direct victim services and offer training, education, and information for victims, policymakers, and law enforcement alike. Congress has deemed the work of these coalitions so critical that it has guaranteed them federal funding through formula grants codified in the Violence Against Women Act (VAWA). The coalitions, along with hundreds of member organizations across Plaintiffs' states, apply for and receive other VAWA grants to provide direct victim support.

In creating these various grant programs, Congress has ensured that VAWA grantees serve marginalized groups, including racial and ethnic minorities, members of the LGBT community, and immigrant populations no matter their citizenship status. Among other measures, Congress has prohibited VAWA grantees from discriminating based on race, ethnicity, and gender identity, and Congress has created programs specifically to serve underserved populations. Topics like respect for gender identity and diversity, equity, and inclusion may be political footballs today, but in VAWA, they are values embedded into the lifesaving work that Congress mandated.

But rather than carry out Congress's direction, the Department of Justice (DOJ) has added new requirements that contravene those very goals. DOJ, and specifically its Office on Violence Against Women (OVW), has demanded that OVW grantees sign a host of vague certifications that, among other things, prohibit grantees from "promoting" "gender ideology" or "DEI," from limiting their engagement with immigration authorities, and even from discussing

domestic violence and sexual assault as the systemic issues Congress recognized them to be. These conditions have nothing to do with furthering the purposes of VAWA—some are directly contrary to VAWA's requirements. Instead, they are a unilateral attempt by the executive branch to pursue its own policies without going through Congress—at great cost to Plaintiffs, their members, and the victims they serve.

If Plaintiffs and their members do not sign the certifications, they will lose access to federal funding that is critical to their ability to carry out their core missions. But if Plaintiffs do sign the certifications, they open themselves to possible criminal investigation and the risk of massive civil liability under the False Claims Act. DOJ has touted that these certifications are intended to expose grantees to False Claims Act liability, and DOJ has made clear that they will use the Act as a "weapon" to target organizations whose work the Administration does not like. For Plaintiffs and their members, their only path out of this Hobson's choice is the preliminary injunction they now seek.

 Plaintiffs are likely to prevail on the merits. The new funding conditions are unconstitutional several times over. They violate the Spending Clause and the separation of powers because Congress has exclusive power over federal funding, and Congress has not authorized the executive branch to adopt the conditions on VAWA funding that OVW seeks to impose. The requirements violate the Due Process Clause in their incredible vagueness, leaving grantees to guess as to how to comply with each requirement. At least two of the requirements violate the First Amendment by seeking to silence disfavored speech. The funding conditions also violate the Administrative Procedure Act because they violate the above constitutional provisions, exceed the agency's statutory authority, outright conflict with multiple provisions of

VAWA, and are arbitrary-and-capricious agency action that does not reflect reasoned decisionmaking.

The irreparable harm that the new funding conditions cause Plaintiffs and their members is irrefutable, and the equities all weigh in favor of an injunction. The individuals who will most suffer from DOJ's certifications gambit are the people that Congress worked so diligently to protect—victims of domestic abuse and sexual assault. The Court should enjoin Defendants from interfering with the critical work that Plaintiffs and their members perform for these victims.

## FACTUAL BACKGROUND

### A. The Violence Against Women Act Creates a Host of Grant Programs To Prevent Domestic Violence and Sexual Assault and To Help Survivors

Congress enacted the Violence Against Women Act (VAWA) in 1994 to address "the escalating problem of violence against women." S. Rep. No. 103-138, at 37 (1993); Pub. L. No. 103-322, tit. IV, 108 Stat. 1796 (1994). Congress found that some crimes like "rape and family violence[] disproportionately burden[ed] women." S. Rep. No. 103-138, at 37–38. This, Congress recognized, was not just a criminal issue, but a social-justice issue stemming from an "underlying attitude that [domestic and sexual] violence is somehow less serious than other crime." *Id.* at 38. Congress sought to address "not only the violent effects of the problem, but the subtle prejudices that lurk behind it," like "blam[ing] women for the beatings and the rapes they suffer." *Id.* at 38, 42. The Act addresses these problems comprehensively—by providing new legal protections, creating education and prevention programs, increasing enforcement and victims' access to legal assistance, and expanding services that help survivors recover. *See generally* Pub. L. No. 103-322, tit. IV.

Since VAWA's enactment, Congress has amended and reauthorized the statute four times, each time strengthening and expanding the Act's protections. Pub. L. No. 106-386, 114

Stat. 1464 (2000); Pub. L. No. 109-162, 119 Stat. 2960 (2006); Pub. L. No. 113-4, 127 Stat. 54 (2013); Pub. L. No. 117-103, div. W, 136 Stat. 840, 840–46 (2022). Today, VAWA addresses not only domestic violence and sexual assault, but also stalking, dating violence, and sex trafficking (collectively, "VAWA crimes"). *See* 34 U.S.C. §§ 10441(b), (d), 12451(a). And, despite the Act's name, it is not limited to addressing violence against women, but applies broadly no matter the identity of the victim. *See, e.g.*, 34 U.S.C. §§ 10441(b)(19), 12291(b)(8).

VAWA is implemented largely through a host of grant programs. These programs fund a broad range of activities, from strengthening effective law enforcement, to preventing domestic violence and sexual assault, to providing survivors with legal assistance, emergency shelter, counseling, and other support. *See, e.g.*, 34 U.S.C. §§ 10441–10455, 12291–12514. Congress has regularly appropriated funds to serve those statutory purposes. *See, e.g.*, 34 U.S.C. §§ 10441–10455, 12291–12514; Pub. L. No. 118-42, div. C, tit. II, 138 Stat. 25, 141–144 (Mar. 9, 2024) (2024 appropriations act); Pub. L. No. 119-4, § 1101(a)(2), 139 Stat. 9, 10 (Mar. 15, 2025) (extending the FY24 appropriations in the same amounts through FY25). By statute, OVW is responsible for administering the vast majority of VAWA grant programs. *See* 34 U.S.C. § 10444(5).

VAWA grant programs include both formula grants and competitive grants. With formula grants, any applicant that meets specified statutory requirements receives an award in an amount determined by a statutory formula. *See, e.g.*, 34 U.S.C. §§ 10446(b)(2), (3), 12551(d)(3). VAWA's formula grants include grants to state domestic violence and sexual assault coalitions designated by the Department of Health and Human Services and Centers for Disease Control and Prevention, respectively, to coordinate victim services and support providers in their state (Coalition Grants). *See id.* § 10441(c). States generally have one domestic violence and one

sexual assault coalition, although in some states a single organization serves as a "dual" coalition.[1] In early June 2025, OVW notified coalitions that, based on FY2025 appropriation levels and the statutory formulas, each domestic violence coalition would receive $113,574 and each sexual assault coalition would receive $243,213 in Coalition Grants awarded later this fiscal year. Declaration of Kirsten Faisal (Faisal Decl.) Ex. A.

For competitive grants, OVW solicits applications through a notice of funding opportunity (NOFO) and then selects which applicants will receive awards and in what amounts. Many of these competitive grant programs are prescribed by statute. *See, e.g.*, 34 U.S.C. §§ 12341, 12351, 20121. These programs cover a range of activities—including helping victims with legal assistance or transitional housing, expanding access to sexual assault forensic exams, and improving the legal system's response to families with a history of VAWA crimes. *Id.* §§ 20121, 12351, 40723, 12464. State domestic violence and sexual assault coalitions can apply for competitive grants, in addition to receiving Coalition Grants. *Id.* § 10441(c)(3).

Throughout, the statute reflects a commitment to equity and inclusion in VAWA grant programs. The statute provides that "[n]o person … shall … be excluded from" a VAWA program on the basis of "race, color, religion, national origin, sex, gender identity … , sexual orientation, or disability." 34 U.S.C. § 12291(b)(13)(A). It also directs programs to populations who may be overlooked. For example, VAWA creates a grant program specifically for "underserved populations"—that is, those "populations who face barriers in accessing and using victim services," including because of their religion, sexual orientation, "gender identity," race or ethnicity, or "special needs" such as language barriers or "alienage status." *Id.* §§ 20123(a)(1), 12291(a)(46). One rural grant program expressly authorizes funding for "assistance in

---

[1] U.S. DOJ, State and Territory Coalitions: FY 2025 Domestic Violence and Sexual Assault Coalition Designations, https://perma.cc/8LNV-FGLY.

immigration matters" to victims in rural communities. *Id.* § 12341(b)(2). Another grant program supports "culturally specific services"—services "primarily directed toward racial and ethnic minority groups" that "include culturally relevant and linguistically specific" components. *Id.* §§ 20124(a)(1), 12291(a)(8)–(9). For some programs, Congress specifically authorized or even required grantees to partner with organizations serving racial or ethnic minorities or other specific underserved populations. *Id.* §§ 12463(c)(2)(B)–(C), (F); 12475(c)(2)(D). And, in still other cases, the statute expressly authorizes grants for programs that serve racial and ethnic minorities, other specific underserved populations, or underserved populations generally—and, in some instances, requires DOJ to prioritize services for those groups in making awards. *See, e.g.*, *id.* §§ 12341(b)(2), (d)(4); 12351(a), (g)(2)(C)(ii); 12421(1)(A)(i), (1)(A)(iv), (2)(A)(iv), (3); 12451(b)(1), (b)(2)(E), (c)(1)(A); 12463(d)(3)(C); 12464(b)(5)(E); 12501(b)(3); 12514(c).

Congress spelled out various statutory conditions for OVW awards. These conditions define the scope of the programs and aim to ensure programs' effectiveness in addressing VAWA crimes. For example, grantees across all VAWA programs may use grant funds "only for the specific purposes described" in the statute; must protect the privacy of people receiving services; and may not use grant funds for tort litigation, lobbying, or excessive expenditures on conferences. *Id.* § 12291(b)(2), (5), (9), (10), (15)(C); *see also, e.g.*, *id.* §§ 20121(b), 20123(h), 20124(g) (applying § 12291 conditions to other grant programs). For certain programs, the statute establishes eligibility requirements that ensure grantees have identified training or other experience necessary to carry out the program effectively. *See, e.g.*, *id.* §§ 20121(d), 20123(b), 20124(c).

In some instances, the statute also requires applicants to certify that they comply with certain conditions. Those certification requirements vary, but all relate to VAWA's purposes. For

instance, applicants for certain grants must certify that their providers have completed relevant training or have specified qualifications. *Id.* §§ 12464(d)(6), 20121(d). In some instances, applicants must certify that they do not have organizational policies requiring mediation or counseling where victims must be physically together with offenders. *Id.* § 20121(d). Other requirements include certifying that the grantee will coordinate with state coalitions and law enforcement, *id.* §§ 20121(d), 10446(c)(2); that federal funds will supplement, not supplant, non-federal funds, *id.* § 10446(c)(4); and that the grantee will use funds for permitted VAWA-crime-related purposes, *id.* § 10446(c)(1); *see also id.* §§ 10450(a), 10454(3), 12464(d)(3) (imposing other certification requirements).

Nowhere does the statute give DOJ carte blanche to impose any additional conditions or certification requirements it wishes.

### B.  Plaintiffs Rely on OVW Grants To Provide Essential Services

The federally recognized state and territory sexual assault, domestic violence, and dual coalitions are a vital part of Congress's scheme to effectuate VAWA. Plaintiffs are state coalitions that carry out VAWA's work through grants from OVW, and whose member organizations also receive OVW grants. Plaintiffs have served as their states' official coalitions for years and have consistently received and relied on Coalition Grants and other OVW funding to offer essential services within their states. Declaration of Brielyn Akins (Akins Decl.) ¶¶ 1–2, 4, 9–10; Declaration of Krista Colón (Colón Decl.) ¶¶ 1–2, 5, 10–12; Declaration of Dawn Dalton (Dalton Decl.) ¶¶ 1–2, 7, 10; Declaration of Kirsten Faisal (Faisal Decl.) ¶¶ 1–8, 14–16; Declaration of Carianne Fisher (Fisher Decl.) ¶¶ 1–2, 9, 11; Declaration of Susan Higginbotham (Higginbotham Decl.) ¶ ¶ 1–2, 10–13; Declaration of Sandra Henriquez (Henriquez Decl.) ¶¶ 1–2, 7–9; Declaration of Kelly Moe Litke (Litke Decl.) ¶¶ 1–2, 6–8; Declaration of Guadalupe Lopez (Lopez Decl.) ¶¶ 1–5, 7–12; Declaration of Michelle McCormick (McCormick Decl.)

¶¶1–5, 8–13; Declaration of Monique Minkens (Minkens Decl.) ¶¶ 1–3, 8–12; Declaration of

Keri Moran-Kuhn (Moran-Kuhn Decl.) ¶¶ 1–4, 7–12; Declaration of Tai Simpson-Bruce

(Simpson-Bruce Decl.) ¶¶ 1–4, 6–9; Rios Decl. ¶¶ 1–8, 14–17; Declaration of Jonathan Yglesias

(Yglesias Decl.) ¶¶ 1–2, 7–9; Declaration of Hema Sarang-Sieminski (Sarang-Sieminski Decl.)

¶¶ 11–14; Declaration of Kelsen Young (Young Decl.) ¶¶ 1–4, 9–14.

Coalitions serve as vital sources of information on the ways that domestic violence and

sexual assault impact people within their states—for instance, by tracking domestic violence

homicides and communicating critical lethality trends to law enforcement personnel and service

providers who rely on that information to save lives. Higginbotham Decl. ¶ 12; Rios Decl. ¶ 17

(maintaining statewide encrypted database capturing prevalence of domestic violence). Using

OVW grant funding, Plaintiffs train service providers that seek to prevent sexual and domestic

violence, helping them more effectively save lives, prevent violence, and serve survivors and

their families. *See* Akins Decl. ¶ 9; Colón Decl. ¶¶ 4–5; Faisal Decl. ¶¶ 3, 6; Higginbotham Decl.

¶¶ 12–13; Rios Decl. ¶ 19; Yglesias Decl. ¶ 9. And many also serve important centralized

functions like offering members accreditation, which ensures that survivors receive care from

providers that meet established professional standards, or providing training required by state

law. McCormick Decl. ¶ 4; Faisal Decl. ¶ 6. Some coalitions also use OVW grants to administer

direct services—for instance, by operating 24/7 hotlines to respond to survivors in crisis, helping

survivors navigate the legal system, and helping survivors find safe housing. Dalton Decl. ¶ 11;

Faisal Decl. ¶ 17; Henriquez Decl. ¶ 6; Rios Decl. ¶ 12; Yglesias Decl. ¶ 10.

The coalitions' member organizations provide direct services as their core operations.

Member organizations respond to survivors in urgent need, such as by operating twenty-four

hour support and resource lifelines and providing counseling to help survivors of sexual assault

heal. *See, e.g.,* Fisher Decl. ¶ 8; Faisal Decl. ¶¶ 11–13; Moran-Kuhn Decl. ¶¶ 5–6; McCormick Decl. ¶ 7. Member organizations work both to prevent violence and to provide services to survivors and their families, including by providing crisis intervention services, like emergency shelter and medical advocacy, helping victims secure temporary transitional housing while they locate permanent housing, and advocating for survivors who need help obtaining legal protection or medical care. *See, e.g.*, Akins Decl. ¶ 6; Yglesias Decl. ¶ 7; Higginbotham Decl. ¶ 9.

### C. Plaintiffs Provide Programs That Serve the Needs of All Domestic Violence or Sexual Assault Victims

Plaintiffs' lifesaving work requires them to apply principles of diversity, equity, inclusion, and accessibility. To be accurate and effective, the training and education the Plaintiff Coalitions provide takes into account factors that impact survivors based on their race, gender identity, and other characteristics. Colón Decl. ¶¶ 21, 26 ("California is an extremely diverse state, and it is critical that services be culturally responsive and culturally appropriate."). For instance, the Kansas Coalition's training takes an evidence-based public health model approach to preventing domestic violence and sexual assault that addresses societal risk factors that may have disparate impacts on survivors, including the intersection between violence and racism, homophobia, and ableism. McCormick Decl. ¶ 21; *see also* Colón Decl. ¶ 26; Dalton Decl. ¶ 19; Minkens Decl. ¶ 24; Rios Decl. ¶¶ 37–38; Lopez Decl. ¶ 22. Plaintiffs' and their members' direct-services work also may focus on the needs of specific groups. For instance, the Rhode Island Coalition conducts primary programming focusing on engaging male youth of color and male immigrant and refugee youth in Providence as allies in ending violence against women and girls. Rios Decl. ¶ 18(b); *see also* Faisal Decl. ¶¶ 22, 24. Plaintiffs and their members also recognize survivors' race, gender identity, sexual orientation, and other characteristics to provide, for instance, anti-racism training, and to ensure that they are complying with VAWA's

nondiscrimination provisions and to carry out VAWA's culturally-specific services and underserved populations programs. *See* Rios Decl. ¶¶ 37–38; Colón Decl. ¶ 23; McCormick Decl. ¶ 22.

Helping members of the immigrant community, including those who are undocumented, obtain immigration relief is also an important part of Plaintiffs' work under VAWA. This work is all the more crucial because survivors' immigration status can make them particularly vulnerable to abuse. *See* Colón Decl. ¶ 22; McCormick Decl. ¶ 23; Faisal Decl. ¶ 31, Henriquez Decl. ¶ 24; Simpson-Bruce Decl. ¶ 22; *see also* 34 U.S.C. § 12291(a)(46) (recognizing that people may have "special needs" due to their "alienage status").

Recognizing and respecting the dignity of all victims of domestic violence and sexual assault, including people who are transgender, is also an important part of Plaintiffs' and their members' work and values. Plaintiffs and their members provide outreach and services to members of the LGBTQ+ community, including people who are transgender or nonbinary. McCormick Decl. ¶ 24; Minkens Decl. ¶ 25. They train victim service providers on best practices for meeting the needs of transgender and nonbinary crime victims. Colón Decl. ¶ 23, 25; Faisal Decl. ¶ 30; Dalton Decl. ¶ 20; Yglesias Decl. ¶ 25; Rios Decl. ¶ 39; Lopez Decl. ¶ 22. And in providing direct client services and technical assistance, they use clients' preferred pronouns to support people who do not identify with the sex they were assigned at birth. Faisal Decl. ¶ 30; Henriquez Decl. ¶ 26; Higginbotham Decl. ¶ 25; Simpson-Bruce Decl. ¶ 21.

Additionally, consistent with VAWA's purpose, *see* S. Rep. 103–138, at 37–42, Plaintiffs' and their members' very mission statements and the structure of their programs extend beyond the criminal offenses of domestic violence and sexual assault to address the systemic social problems that cause those offenses and that require a systemic response. *See*

Higginbotham Decl. ¶ 24; Litke Decl. ¶ 23; Minkens Decl. ¶¶ 23–24; Simpson-Bruce Decl. ¶ 19; Yglesias Decl. ¶ 23; Lopez Decl. ¶ 23. Plaintiffs' and their members' training programs provide context on, for instance, the root causes and social drivers behind those crimes. Colón Decl. ¶ 22; Faisal Decl. ¶ 8; Henriquez Decl. ¶ 22; McCormick Decl. ¶ 20. Plaintiffs also advocate for alternatives to the criminal justice system, and attempt to stop domestic violence and sexual assault before they rise to the level of a criminal act requiring involvement of the criminal legal system. Dalton Decl. ¶ 22; Faisal Decl. ¶ 32; Lopez Decl. ¶ 23.

Finally, Plaintiffs' work involves public awareness campaigns that draw attention to particular issues and are designed to create lasting change over a longer period of time. Henriquez Decl. ¶ 25 (Plaintiff VALOR promotes "an international day of action [] to demonstrate support for survivors and encourage people to take action to end sexual violence"). Although Plaintiffs "do not have the resources to evaluate the results of every" awareness effort, these campaigns are "critical to making [] services accessible and more effective for survivors." Litke Decl. ¶ 30.

### D. The Administration Leverages Federal Grant Funding To Advance the President's Ideological Vision and Expose Grantees to Massive Liability

Upon taking office in January 2025, President Trump issued a series of executive orders that aim to effect sweeping social changes, including by directing agency heads to terminate or condition federal funding to advance the President's ideological vision.

***Diversity, equity, and inclusion.*** One such executive order is the "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" Order (DEI Order), which launches a broadside attack on diversity, equity, and inclusion (DEI) and diversity, equity, inclusion, and accessibility (DEIA) programs. Exec. Order No. 14173, 90 Fed. Reg. 8663 (Jan. 21, 2025). The Order takes steps to end what it deems "illegal" DEI and DEIA in the federal government and

the private sector. *Id.* §§ 3–4. The Order does not define "DEI" or "DEIA," and provides no guidance on what might make such programs "illegal" on the Administration's understanding. But it evinces a view that "illegal" DEI is widespread: It laments that "critical and influential" institutions—including "the Federal Government, major corporations, financial institutions, the medical industry, large commercial airlines, law enforcement agencies, and institutions of higher education"—have adopted "dangerous, demeaning, and immoral" DEI or DEIA programs "that can violate the civil-rights laws." *Id.* § 1.

The Order marks a radical shift in the executive branch's approach to diversity, equity, and inclusion—and in what it deems unlawful. It revokes multiple diversity-related executive actions issued over the last half-century; orders "[t]erminat[ion of] all 'diversity,' 'equity,'" and similar activities in the federal government; and directs the Office of Management and Budget to "[e]xcise" from federal funding procedures all "references to DEI and DEIA principles, under whatever name they may appear." *Id.* § 3. It also takes aim at "illegal private-sector DEI" by, among other things, directing the entire government to identify large institutions to target for investigation. *Id.* §§ 2, 4.

Most relevant here, the DEI Order requires agency heads to require each contractual counterparty or grant recipient to "certify" (1) "that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws"—this requirement is not limited to recipients' use of federal funds—and (2) that its "compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code," invoking the False Claims Act's (FCA's) prohibition on "material" false claims to the government. *Id.* § 3(iv)(A), (B); *see also* 31 U.S.C. § 3729(a).

12

DOJ began implementing the DEI Order's directives shortly after it was issued. On February 5, 2025, Attorney General Bondi sent all DOJ employees a memo (Bondi Memo) making clear the intent to aggressively target organizations that support DEIA: "[T]he Department of Justice's Civil Rights Division will investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private sector and in educational institutions that receive federal funds." Mem. from Att'y Gen. Pam Bondi, to DOJ Employees, *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025), https://perma.cc/KH9Y-A2VQ. That memo does not define "DEI" or "DEIA" or explain what makes a DEI or DEIA program illegal.

A few months later, on May 19, Deputy Attorney General Todd Blanche issued a memo (Blanche Memo) announcing a new DOJ "Civil Rights Fraud Initiative." Mem. from Dep'y Att'y Gen., Todd Blanche, to DOJ Offices, Divisions, and U.S. Attorneys, *Civil Rights Fraud Initiative* (May 19, 2025), https://perma.cc/3W6K-FGHA. The memo makes plain DOJ's intention to use the FCA as a "weapon" against federal funding recipients who "falsely certif[y] compliance" with civil rights laws. *Id.* at 1. It explains that DOJ will assign a nationwide "team of attorneys to aggressively pursue" enforcement of the FCA—which can result in "treble damages and significant penalties." *Id.* at 1–2. The memo invites the public to report "discrimination by federal-funding recipients" to DOJ, "strongly encourages" private parties to file suits under the FCA's *qui tam* provision, and reminds them that they can "shar[e] in any monetary recovery" on successful claims. *Id.* at 2. The Blanche Memo also states that the initiative will engage the DOJ's Criminal Division, *id.*, suggesting that DOJ will invoke the FCA's criminal penalty provisions, 18 U.S.C. § 287.

The Blanche Memo, again, does not explain when DEI is "illegal," but a press release announcing the Initiative broadly warns institutions not to "promote divisive DEI policies." U.S. DOJ, *Justice Department Establishes Civil Rights Fraud Initiative* (May 19, 2025), https://perma.cc/ZS6R-B8E9. And just a few weeks later, in a June 11, 2025 memorandum announcing the Civil Division's enforcement priorities, Assistant Attorney General Brett A. Shumate reinforced the Bondi and Blanche memos' focus on using the False Claims Act as the core weapon of the Department to "advance the Administration's policy objectives." Mem. from Ass't Att'y Gen., Brett A. Shumate, to Civil Division Employees, *Civil Division Enforcement Priorities* (June 11, 2025), https://perma.cc/SV3A-NE9F. While the memo focuses on aggressive use of the FCA throughout, the very first Civil Division priority listed is to use the FCA to "pursue affirmative litigation combatting unlawful discriminatory practices in the private sector," citing to the DEI Order, the Bondi Memo, and initiative outlined in the Blanche Memo. *Id.*

**"Gender Ideology."** Also shortly after taking office, the President issued the "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" Executive Order ("Gender Ideology" Order), which takes aim at transgender people and their rights. Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025). That Order announces that "the policy of the United States" is "to recognize two sexes, male and female," that are "not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. It decries "the erasure of sex" in both "policy" and "language," and it commits to using what the Administration considers "accurate language and policies that recognize women are biologically female, and men are biologically male." *Id.* § 1. The Order, among other things, requires each agency to "ensure grant funds do not promote gender ideology." *Id.* § 3(g). The Order defines

"gender ideology" as an ideology that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity." *Id.* § 2(f).

### E. DOJ's Office on Violence Against Women Imposes New Conditions On Grants

Around the same time that DOJ launched its "Civil Rights Fraud Initiative," OVW began imposing a host of new funding conditions, including certification requirements, each of which independently exposes VAWA funding recipients to FCA liability.

***"Out-of-Scope" Funding Conditions.*** In every NOFO that OVW has posted since in or around May 2025, OVW has included a newly expanded list of "out-of-scope" activities in which grantees may not engage with grant funds. Those NOFOs have also required applicants to certify, both upon applying for a grant and again when they accept an award, that they will not use grant funds on those "out-of-scope" activities. *See, e.g.*, State Coalition Notice of Funding Opportunity Exhibit (NOFO Ex. 1); *see* Declaration of Lucy Rios (Rios Decl.) ¶ 26.

As relevant to Plaintiffs' challenge here, those "out-of-scope" activities include:

a. "Promoting or facilitating discriminatory programs or ideology, including illegal DEI and "'diversity, equity, inclusion, and accessibility' programs that do not advance the policy of equal dignity and respect, as described in [the DEI Order]" (Anti-DEI Condition)[2];

b. "Inculcating or promoting gender ideology as defined in [the "Gender Ideology"] Executive Order" ("Gender Ideology" Condition);

c. "Promoting or facilitating the violation of federal immigration law" (Immigration Enforcement Condition);

---

[2] The NOFOs assert that "[t]his prohibition is not intended to interfere with any of OVW's statutory obligations, such as funding for HBCUs, culturally specific services, and disability programs." NOFO Ex. 1 at 10, 20.

    d.   "Programs that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women" (Law Enforcement and Immigration Enforcement Condition);

    e.   "Initiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support" (Immigration Priority Condition);

    f.   "Activities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses (e.g., prioritizing criminal justice reform or social justice theories over victim safety and offender accountability)" (Systemic Framing Condition);

    g.   "Awareness campaigns or media that do not lead to tangible improvements in prevention, victim safety, or offender accountability" (Awareness Campaigns Condition); and

    h.   "Any activity or program that unlawfully violates an Executive Order" (EO Condition).

NOFO Ex. 1 at 10, 20. Each NOFO notes that "[n]othing in this certification prohibits recipients from serving all eligible victims as required by statute, regulation, or award condition," but does not provide guidance on how to reconcile the conditions with such statutory or other requirements. *Id.* at 20.

    In addition to including these "Out-of-Scope" Funding Conditions in new NOFOs, OVW has required applicants to already-closed NOFOs to submit a certification that they will abide by the "Out-of-Scope" Funding Conditions in order to be considered for previously submitted grant applications. Rios Decl. ¶¶ 28–29; Rios Decl. Ex. A–C.

    On June 12, 2025, OVW formally announced that it now has a generally applicable policy of imposing these "Out-of-Scope" Funding Conditions on all OVW grants. *See* U.S. DOJ, OVW, *Open Notices of Funding Opportunity*, https://perma.cc/XR9P-GA49 ("For Fiscal Year 2025, all grant funding applicants are required to submit a letter certifying that grant funds will

not be used for the out-of-scope activities listed in the Certification Regarding Out-of-Scope Activities section of the notice of funding opportunity.").

Neither the policy announcement nor any individual NOFO explains the basis for the new conditions or how they relate to any requirement under VAWA or the statutory criteria for awards under any grant program.

***General Anti-DEI Certification.*** In addition to the Out-of-Scope certifications, OVW has amended its General Terms and Conditions, to which grantees agree upon accepting any OVW award, to further expose grantees to False Claims Act liability in relation to "DEI" activities. Those updated General Terms and Conditions now include a requirement, hereinafter the "General Anti-DEI Certification Requirement," that each grantee certify: (1) that it "does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable federal civil rights or nondiscrimination laws" and (2) that "[t]he recipient agrees that its compliance with all applicable federal civil rights and nondiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for purposes of the False Claims Act." *See* U.S. DOJ, OVW, *FY25 General Terms and Conditions* § 15, https://perma.cc/FR3E-FB3H (General Terms and Conditions).

The General Terms and Conditions also require Plaintiffs to certify that the conditions it contains "are material requirements of the award"; that OVW may withhold award funds, disallow costs, or suspend or terminate the award as a result of failure to comply with them; and that any "materially false" statements to the government in connection with the award may result in criminal prosecution, civil penalties, or other remedies for false claims. *Id.* § 1.

### F.  The Conditions Harm Plaintiffs

The "Out-of-Scope" Funding Conditions and General Anti-DEI Certification Requirement (collectively, Funding Conditions) put Plaintiffs and their members in an impossible position. If they refrain from applying for OVW grants, Plaintiffs and their members will lose out on funding that in some cases comprise a large percentage of their operating budgets, and that they have used for mission-critical work, including for services that they have long promised and offered to victims and survivors for safety and protection. Akins Decl. ¶ 30; Colón Decl. ¶ 30; Dalton Decl. ¶ 25; Faisal Decl. ¶ 38; Fisher Decl. ¶ 29; Higginbotham Decl. ¶ 30; Henriquez Decl. ¶¶ 30–31; Litke Decl. ¶ 34; Lopez Decl. ¶¶ 1–5, 9–11; McCormick Decl. ¶¶ 13, 28–29; Moran-Kuhn Decl. ¶ 28; Sarang-Sieminski Decl. ¶ 31; Simpson-Bruce Decl. ¶¶ 25–26; Rios Decl. ¶ 46; Yglesias Decl. ¶ 33–34; Young Decl. ¶ 30–31. For Plaintiffs, the Coalition Grant formula funds amount to hundreds of thousands of dollars in coalitions' annual budgets. Losing these funds would require coalitions to make staffing cuts that would threaten their ability to operate their programs. Akins Decl. ¶ 30; Colón Decl. ¶ 30; Dalton Decl. ¶ 25; Fisher Decl. ¶ 29; Litke Decl. ¶ 34; Lopez Decl. ¶ 12; McCormick Decl. ¶¶ 13, 28–29; Moran-Kuhn Decl. ¶ 28; Simpson-Bruce Decl. ¶ 25–26; Rios Decl. ¶ 46; Young Decl. ¶ 31. Forgoing OVW Grant funds would also harm Plaintiffs' members, who would no longer be able to provide the same level of assistance, advocacy, and intervention work on which victims of VAWA crimes rely. Yglesias Decl. ¶ 30; Akins Decl. ¶¶ 26, 27. These losses would be borne most significantly by the thousands of domestic violence and sexual assault victims and their children, who will have more limited or no access to critical, life-saving support. *See, e.g.*, Simpson-Bruce Decl. ¶ 29; Yglesias Decl. ¶¶ 36–37; Young Decl. ¶¶ 32–34.

But if Plaintiffs and their members make the required certifications, they fear immediately exposing their organizations to substantial legal and financial risk, including threatened penalties under the False Claims Act and under various criminal laws, which could jeopardize their ability to provide any services at all. 31 U.S.C. § 3729(a) (FCA treble damages); 28 C.F.R. § 85.5(a) (FCA civil penalties); *see also* General Terms and Conditions § 1 (listing statutes under which grantees could face "criminal prosecution"); *see, e.g.*, Colón Decl. ¶ 28; Faisal Decl. ¶ 36; Fisher Decl. ¶ 29; Young Decl. ¶ 26. Making Plaintiffs' position even more untenable, they are left uncertain how to navigate the conflict between the challenged conditions and VAWA provisions, including VAWA's prohibition on discrimination based on "gender identity" and its various mandates to focus on underserved populations. *See, e.g.*, Dalton Decl. ¶¶ 20–21; Litke Decl. ¶ 26; Young Decl. ¶ 23.

Plaintiffs' members have already had to make these difficult choices for NOFOs whose deadlines have closed. Some members applied, but noted their objections to the conditions— which OVW rejected, requiring them to resubmit "the full certification as requested without caveats." *See* Rios Decl. ¶¶ 31–34. Others applied and made the required certification despite serious concerns about how they will be able to comply with the conditions without compromising their core missions and VAWA's requirements. *See, e.g.*, Dalton Decl. ¶ 12. Still others chose to forgo applying because of their concerns they could not comply with the conditions, losing out on funds critical to their organizations' operations. Dalton Decl. ¶ 11(b); Moran-Kuhn Decl. ¶ 14; Sarang-Sieminski Decl. ¶ 17. Upcoming grants have closing deadlines that range from June 26 through August 12. While the parties' temporary agreement in this case briefly forestalls the difficult decisions that Plaintiffs and their members will need to make, *see* ECF No. 14, once that agreement expires on August 12, they will again immediately face that

untenable choice. And OVW has made clear that applications without certifications or with modified certifications will be rejected. Rios Decl. ¶¶ 31–33; Rios Decl. Ex. A–C.

## LEGAL STANDARD

To obtain a preliminary injunction, Plaintiffs must establish (1) a likelihood of success on the merits; (2) that irreparable harm is likely without preliminary relief; (3) that the balance of equities tips in Plaintiffs' favor; and (4) that a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the government is the opposing party, the final two factors merge. *Nken v. Holder,* 556 U.S. 418, 435 (2009). Irreparable injury operates on "a sliding scale" such that "the greater the likelihood [of success], the less harm must be shown." *Soscia Holdings, LLC v. Rhode Island*, 684 F. Supp. 3d 47, 49 (D.R.I. 2023) (citing *Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42–43 (1st Cir. 2010)).

For APA claims, 5 U.S.C. § 705 also authorizes courts to "issue all necessary and appropriate process to preserve status or rights pending conclusion of the review proceedings" when "necessary to prevent irreparable injury." 5 U.S.C. § 705. "[C]ourts use the same standard to decide" requests for relief under § 705 "as for preliminary injunction determinations." *New Hampshire Hosp. Ass'n v. Burwell*, No. 1:15-cv-00460, 2016 WL 1048023, at *5 n.6 (D.N.H. Mar. 11, 2016).

## ARGUMENT

**II.     The Plaintiffs Are Likely to Succeed On the Merits of Their Claims**

Defendant's imposition of unauthorized and ill-considered conditions on OVW grants violates the APA, constitutional separation-of-powers principles, the First Amendment, and due process. Plaintiffs are likely to prevail on their claims.

## A. The New Funding Conditions Violate the APA

The Funding Conditions are reviewable "final agency action" that violate the APA in four separate ways: they are "in excess of statutory, jurisdiction, authority, or limitations," "not in accordance with law," "arbitrary [and] capricious," and "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. §§ 704, 706(2)(A)–(C).[3]

### 1. The Funding Conditions are Final Agency Action

Defendant's policy of imposing the "Out-of-Scope" Funding Conditions on OVW grants, the inclusion of the "Out-of-Scope" Funding Conditions in each NOFO, and the addition of the General Anti-DEI Certification Requirement to OVW's General Terms and Conditions, are all final agency action reviewable under the APA. For agency action to be "final," it must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

The actions mark the consummation of DOJ's decisionmaking process: Defendants have made a final decision to impose these Funding Conditions on OVW grants this year. The imposition of the Funding Conditions also determines rights or obligations and produces legal consequences. They preclude organizations from receiving an award if they do not agree to the conditions, and once agreed to, they subject grantees to possible FCA liability. It is therefore no surprise that, in a recent case challenging similar funding conditions, the government did "not dispute … the new funding conditions … are 'final agency action.'" *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-cv-00814, 2025 WL 1582368, at *14 n.18 (W.D. Wash. June 3, 2025), *appeal pending*, No. 25-3664 (9th Cir.).

---

[3] The multiple constitutional problems with the Funding Conditions provide grounds for relief both under the APA and as independent claims and are discussed in sections I.B–I.D below.

### 2.    *The Funding Conditions Exceed Defendants' Statutory Authority*

The Funding Conditions exceed Defendants' statutory authority. For agencies charged with administering statutes, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). An agency "literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "Any action that an agency takes outside the bounds of its statutory authority … violates the Administrative Procedure Act." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020).

Nothing in VAWA or any other statute authorizes Defendants to impose the Funding Conditions. Congress has, at times, attached conditions to VAWA grants—conditions that define the scope of the programs and aim to ensure the programs' effectiveness. *See, supra*, Background section A. But Congress has not authorized the executive branch to impose additional substantive conditions designed to advance policy goals wholly unrelated to VAWA's purposes and requirements. *Cf. California v. U.S. Dep't of Transp.*, No. 1:25-cv-00208, --- F. Supp. 3d ----, 2025 WL 1711531, at *2 (D.R.I. June 19, 2025) (holding that agency lacked authority "to impose immigration enforcement conditions on federal dollars specifically appropriated for transportation purposes"). Nor did Defendants identify any such authority in adopting the conditions.

The Funding Conditions must be set aside as exceeding Defendants' statutory authority.

### 3.    *Many of the Funding Conditions Are Contrary to Law*

In addition to exceeding Defendants' statutory authority, many of the Funding Conditions outright conflict with the statutory provisions authorizing VAWA grants and therefore must be set aside as contrary to law.

***All Funding Conditions on Coalition Grants.*** To begin, all of the Funding Conditions conflict with the statutory provisions mandating that OVW award funds to coalitions pursuant to set formulas. As noted, for these formula grants, Congress has mandated that OVW "shall" distribute to recognized coalitions grants in specified amounts once they submit an application meeting congressionally prescribed criteria. 34 U.S.C. §§ 10441(c), 10446(b)(2)–(3), 12511(d). By overlaying additional conditions, and by withholding grant funds from coalitions if they do not make the required certifications, Defendants violate the statutory mandate to make these grants.

The First Circuit has previously rejected a similar effort by DOJ to impose conditions on formula grants. *See City of Providence*, 954 F.3d at 23. In that case, DOJ sought to impose conditions requiring recipients of law enforcement grants to certify that they would take certain actions to aid federal immigration enforcement. The First Circuit rejected it as exceeding DOJ's statutory authority and incompatible with the "formulaic nature" of the program. *Id.* at 29–30, 34, 38. The court concluded that general grants of authority did not "allow the DOJ to impose by brute force conditions on [the] grants to further its own unrelated law enforcement priorities." *Id.* at 34–35. If DOJ had "such discretion," the grants "would no longer function as a formula grant program." *Id.* at 42. The same conclusion applies to the Coalition Grants here.

Individual Funding Conditions also separately conflict with VAWA, for both formula grants and discretionary grants.

***"Gender Ideology" Condition.*** The prohibition on using grant funds to "inculcat[e] or promot[e] gender ideology" as defined in the "Gender Ideology" Executive Order conflicts with the statutory prohibition against discrimination on the basis of "gender identity" in OVW grant programs. 34 U.S.C. § 12291(b)(13)(A). The Order defines prohibited "gender ideology" as the

notion that individuals can have a "self-assessed gender identity" that is "disconnected from one's sex" (as determined by their "reproductive cell[s]"). "Gender Ideology" Order §§ 2(d), (e), (f). The "Gender Ideology" Condition therefore requires grant applicants to act as if transgender people are not transgender, rejecting that fundamental aspect of their identity—contrary to the statutory nondiscrimination requirement. 34 U.S.C. § 12291(b)(13)(A).

*Anti-DEI Condition.* The prohibition on using grant funds to "promot[e] or facilitat[e]" DEI programs conflicts with provisions throughout VAWA that authorize, encourage, and mandate just those sorts of programs. Various statutory provisions specifically authorize grants to organizations and programs that either serve racial and ethnic minorities or other underserved populations or partner with organizations that do so, and in some instances, the statute expressly requires DOJ to prioritize services for racial and ethnic minorities or other underserved populations in awarding grants. *See, e.g.*, 34 U.S.C. §§ 12291(a)(8), (46); 12341(b)(2), (d)(4); 12351(a), (g)(2)(C)(ii); 12421(1)(A)(i), (3); 12421(1)(A)(iv); 12421(2)(A)(iv); 12451(b)(1), (2)(E), (c)(1)(A); 12463(c)(2)(B)–(C), (F), (d)(3); 12464(b)(5)(E); 12475(c)(2)(D); 12501(b)(3); 12514(c); *see also supra* Background section A. Defendants' unilateral decision not to fund programs that promote "DEI" flies in the face of Congress's clear commitment to advancing DEI values through the administration of OVW grants, as reflected in those myriad provisions. While some NOFOs state that this funding condition is not intended to interfere with statutory obligations, it does not appear actually possible for a grantee to comply with both the statute and the funding condition.

*Immigration Priority Condition, Immigration Enforcement Condition, and Law Enforcement and Immigration Enforcement Condition.* The prohibitions on using grant funds to "prioritize illegal aliens … in receiving victim services," to "promot[e] or facilitat[e] the

24

violation of federal immigration law," and to carry out any programs that "limit the role of …

immigration enforcement" all conflict with the statutory authorization for programs that

specifically target services for, and thus prioritize, "underserved" groups. *See, e.g.*, 34 U.S.C.

§§ 12291(a)(46), 20123, 12421(3). In identifying these "underserved" populations, Congress

specifically included those populations that face barriers due to their "alienage status." *See id.*

§ 12291(a)(46). Grantees cannot provide services targeted to this underserved group without

risking being deemed to "prioritize" illegal aliens. Likewise, the prohibitions on limiting the role

of immigration enforcement and on "promoting or facilitating" immigration violations make it

impractical or impossible to offer programs specifically for immigrants as Congress intended.

Many immigrants will avoid services that involve coordination with enforcement bodies that

could take adverse action against them. They will also avoid seeking help from organizations

that probe victims' immigration status or report undocumented victims or family members to

authorities—but those are actions grantees may now be forced to take to avoid being deemed to

"promot[e] or facilitat[e]" immigration violations. *See* Colón Decl. ¶ 25 (once it becomes known

that a member organization "asks invasive questions" to individuals without legal status "and has

subsequent limits on its services," survivors "may choose not to seek assistance and will either

stay with their abusive partner or live on the street").

In addition, the prohibition on "promot[ing]" or "facilitat[ing]" immigration violations

conflicts with the provision expressly authorizing grantees to provide rural victims with

"assistance in immigration matters," 34 U.S.C. § 12341(b)(2). If broadly construed and applied,

that prohibition would prevent grantees from providing the immigration assistance that Congress

specifically authorized.

### 4.    The Funding Conditions are Arbitrary and Capricious

The Funding Conditions are also arbitrary and capricious. Under arbitrary and capricious review, courts must hold unlawful any agency action that is "not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). To pass muster, an agency must offer "a satisfactory explanation for its action" and can neither "rel[y] on factors which Congress has not intended it to consider" nor ignore "an important aspect of the problem . . . ." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While agencies are free to change their existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have taken account of "reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The Funding Conditions fail on multiple fronts.

To begin, they "have not been explained at all." *King Cnty.*, 2025 WL 1582368, at *17 (finding that the government's adoption of new funding conditions, without any explanation, was arbitrary and capricious). Defendants have likewise failed to acknowledge that the new Funding Conditions reflect a change in policy or to reasonably explain the reasons for that change. While a few conditions "make reference to certain Executive Orders," the "rote incorporation of executive orders—especially ones involving politically charged policy matters that are the subject of intense disagreement and bear no substantive relation to the agency's underlying action—does not constitute 'reasoned decisionmaking.'" *Id.*; *accord, e.g.*, *Louisiana v. Biden*, 622 F. Supp. 3d 267, 295 (W.D. La. 2022) ("A decision supported by no reasoning whatsoever in the record cannot be saved merely because it involves an Executive Order.").

Beyond that, Defendants have failed to consider multiple "important aspects of the problem," *State Farm*, 463 U.S. at 43. Defendants simply did not consider how Funding

Conditions advancing unrelated policy goals would impact the efficacy of OVW grant programs or hinder efforts to reduce domestic violence and sexual assault and support survivors. There is no indication, for example, that Defendants considered how grantees could comply with any of the conditions discussed above that conflict with the statutory directives. *See supra* section I.A.3. Nor did they consider how foreclosing grantee efforts to engage with and support particular at-risk communities will effectively exclude those communities from the life-saving benefits of OVW grant programs. They likewise have not considered the serious reliance interests of grantees and the victims they serve that are jeopardized by the Funding Conditions. *See DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020).

Similarly, in barring grantees from "fram[ing] domestic violence or sexual assault as systemic social justice issues rather than criminal offenses," Defendants did not consider or explain how that squares with Congress's express goal of combatting those offenses as a social justice issue by addressing "not only the violent effects of the problem, but the subtle prejudices that lurk behind it," S. Rep. No. 103-138, at 42. Nor have they considered how ignoring the root causes of this violence will reduce the efficacy of OVW programs, with corresponding harms to communities across the country. Beyond that, the Funding Conditions are deterring organizations from continuing OVW-funded programs that grantees—and their communities—have relied on for years. *See* Litke Decl. ¶¶ 13, 18; Moran-Kuhn Decl. ¶ 25; Sarang-Sieminski Decl. ¶ 17; Yglesias Decl. ¶ 17. The suppression of applications will reduce the availability of vital services in certain areas. These potential impacts are quite significant—but there is no indication Defendants even considered them. Nor do Defendants appear to have considered any less disruptive means of advancing any legitimate policy goals they may have.

**B.  The New Funding Conditions Violate Multiple Constitutional Provisions Safeguarding the Separation of Powers**

The new Funding Conditions also violate the Spending Clause and other constitutional provisions safeguarding the separation of powers. As court after court has recognized, imposing "extra-statutory conditions on federal grant awards as a tool to obtain compliance with [the executive's] policy objectives strikes at the heart of … the separation of powers." *City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020) (holding that the executive branch violated separation of powers by conditioning federal funding on recipients' facilitating immigration enforcement).[4] Defendants have done precisely that here. As explained above, *supra* section I.A.1, Congress has not authorized Defendants to impose the new Funding Conditions on OVW grants. In doing so anyway, Defendants have exceeded their constitutional authority and encroached on Congress's power to control federal spending, in violation of foundational separation-of-powers principles.

The Constitution "exclusively grants the power of the purse to Congress, not the President." *Colorado v. U.S. Dep't of Health & Human Servs.*, No. 1:25-cv-00121, 2025 WL 1426226, at *18 (D.R.I. May 16, 2025) (quoting *City & Cnty. of S.F.*, 897 F.3d at 1231); *see also* U.S. Const., art. I, § 1 (Spending Clause); *id.,* art. I, § 9, cl. 7 (Appropriations Clause). Among the "legislative powers" the Constitution vests in Congress, *see* U.S. Const., art. I, § 1, is the Spending Clause, which authorizes Congress to distribute funds to states and private entities to

---

[4] *See also, e.g.*, *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231, 1234–35 (9th Cir. 2018) ("withhold[ing] all federal grants from so-called 'sanctuary' cities and counties" violated separation of powers); *King Cnty.*, 2025 WL 1582368, at *6, 15–17 ("gender ideology" and anti-DEI funding conditions violated separation of powers); *PFLAG, Inc. v. Trump*, No. 8:25-cv-00337, --- F. Supp. 3d ----, 2025 WL 685124, at *14–21 (D. Md. Mar. 4, 2025) (conditioning funding on recipients' denying gender-affirming care violated separation of powers); *Washington v. Trump*, 768 F. Supp. 3d 1239, 1261–63 (W.D. Wash. 2025) ("gender ideology" funding conditions violated separation of powers).

promote "the general welfare," *id.*, art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). And because "the ability to place conditions on federal grants ultimately comes from the Spending Clause, which empowers Congress, not the Executive, to spend for the general welfare," *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021), the executive branch may not impose conditions on the distribution of funds that Congress has not authorized, *see Colorado*, 2025 WL 1426226, at *18.

The executive branch's role, rather, is to implement Congress's spending directives and to "take care that the laws be faithfully executed," U.S. Const., art. II, § 3. "When it comes to spending, the President has none of his own constitutional powers to rely upon" and can only exercise authority Congress has delegated. *City & Cnty. of S.F.*, 897 F.3d at 1233–34. He has no power, moreover, "to enact, to amend, or to repeal statutes" on his own. *Clinton v. City of N.Y.*, 524 U.S. 417, 438 (1998); *see also* U.S. Const., art. I, § 7, cl. 2 (Presentment Clause).

Here, because Congress has not delegated to the executive branch the authority to adopt the Funding Conditions, *see supra* section I.A.1, Defendants unconstitutionally "claim[] for [themselves] Congress's exclusive spending power" and "attempt[] to coopt Congress's power to legislate." *See City and Cnty. of S.F.*, 897 F.3d at 1234; *see also PFLAG, Inc.*, 2025 WL 685124, at *21 (concluding that executive order "unilaterally" imposing funding conditions unconstitutionally "circumvent[ed] bicameralism and presentment"). At bottom, the Founders established our system of separated powers to guard against "a concentration of power [that] would allow tyranny to flourish." *City of Chicago*, 961 F.3d at 892. In that system, "the power to wield the purse to alter behavior rests squarely with the legislative branch"—whose "elected representatives and dual chambers [] provide[] institutional protection from the abuse of such

power." *Id.* That "institutional protection from abuse" would disappear if the executive branch could "impose [its] policy preferences regardless of the will of Congress." *Id.* Defendants' attempt to leverage VAWA funding "to effectuate [the executive's] own policy goals" violates the separation of powers. *See City & Cnty. of S.F.*, 897 F.3d at 1235.

### C.  The New Funding Conditions Violate the First Amendment

The General Anti-DEI Certification Requirement and Gender Ideology Condition violate the First Amendment's protection of "the freedom of speech," U.S. Const. amend. I. "At the heart" of this protection is "the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024).

While the government may, in some circumstances, attach conditions to federal funding that "affect the recipient's exercise of its First Amendment rights," there are limits. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). Crucially, the government may not restrict "protected [speech] outside the scope of the federally funded program." *Id.* at 217 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). Nor may it leverage government funding to "aim at the suppression of dangerous ideas." *NEA v. Finley*, 524 U.S. 569, 587 (1998). And imposing a funding condition "not relevant to the objectives of the program" can also violate the First Amendment. *Open Soc'y*, 570 U.S. at 214. The General Anti-DEI Certification Requirement and "Gender Ideology" Condition transgress these limits.

***General Anti-DEI Certification Requirement.*** The General Anti-DEI Certification Requirement impermissibly restricts speech "outside the scope of the federally funded program," *Open Soc'y*, 570 U.S. at 217. The requirement compels grantees to certify that they "do[] not operate *any* programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable federal civil rights or nondiscrimination laws." General Terms and Conditions § 15. That requirement "on its face makes clear" that it applies to

30

"any program ..., irrespective of whether the program is federally funded." *Chi. Women in Trades v. Trump*, No. 1:25-cv-02005, --- F. Supp. 3d ----, 2025 WL 1114466, at *11 (N.D. Ill. Apr. 14, 2025). And it restricts speech, as "diversity, equity, and inclusion" programs almost invariably contain speech promoting those values. Indeed, as the Administration itself has acknowledged, it is restricting work related to "diversity, equity, and inclusion" because of disagreement with its "foundational rhetoric and ideas."[5]

It does not matter that the Condition purports to bar only conduct that violates "federal civil rights or nondiscrimination laws." As another court recently held in preliminarily enjoining a similar certification requirement, "[t]he problem ... is that the meaning of this is left entirely to the grantee's imagination." *Chicago Women*, 2025 WL 1114466, at *11. Neither OVW's terms and conditions nor the Executive Order on which this requirement is based defines "what might make any given 'DEI' program violate Federal anti-discrimination laws." *Id.* What this Administration will claim is illegal "is anything but obvious." *Id.* Indeed, "the thrust" of the underlying DEI Executive Order "is that the government's view of what is illegal in this regard has changed significantly with the new Administration." *Id.* The executive branch now plainly views as unlawful a wide array of DEI programs that, until recently and over several decades, the federal government actively encouraged. *See, e.g.*, DEI Order at § 1 (criticizing diversity, equity, and inclusion practices of a wide variety of "influential institutions of American society"); *id.* § 3 (revoking multiple longstanding diversity-related executive actions and requiring the Office of Management and Budget to "[e]xcise" from federal funding procedures all "references to DEI and DEI principles, under whatever name they may appear," and to "[t]erminate all 'diversity,' 'equity,'" and similar activities). Against this backdrop, the General Anti-DEI Certification

---

[5] The White House, *Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI* (Jan. 22, 2025), https://perma.cc/G8JU-QQ44.

Requirement—and the accompanying exposure to burdensome *qui tam* litigation and potential False Claims Act liability—will predictably chill grantees from speaking in support of diversity, equity, and inclusion, including in their activities unrelated to the use of federal funds. That violates the First Amendment.

*"Gender Ideology" Condition*. The "Gender Ideology" Condition violates the First Amendment as well. As another court recently held in preliminarily enjoining a similar funding condition, this restriction cannot be justified as the government merely refusing to "affirmatively fund[]" the targeted speech. *S.F. AIDS Found. v. Trump*, No. 4:25-cv-01824, --- F. Supp. 3d ----, 2025 WL 1621636, at *16–18 (N.D. Cal. June 9, 2025).

For one, the restriction is "entirely untethered to any 'legitimate objective[s]'" of the VAWA programs it burdens. *Id.* at *16. Instead, it is "directed … towards disfavored speech." *Id.* at *17. Under this Condition, a grantee apparently could not "refer to the clients they serve … by any pronoun" or preferred name that matches their gender identity as opposed to their sex assigned at birth. *Id.* But that "is pure speech that has no relation to," *id.*, the VAWA grant programs' purposes of preventing domestic violence and sexual assault and supporting survivors of those offenses—and in fact would require grantees to forgo the essential work of building trust to provide help to transgender victims of violence. Sarang-Sieminski Decl. ¶¶ 26–27.

Moreover, the "Gender Ideology" Condition impermissibly "withhold[s] subsidies for a censorious purpose—aiming to suppress" what the government views to be "the dangerous idea[] of … 'gender ideology.'" *S.F. AIDS Found.* at *18; *see also R.I. Latino Arts v. NEA*, No. 1:25-cv-00079, --- F. Supp. 3d ----, 2025 WL 1009026, at *13–14 (D.R.I. Apr. 3, 2025) (noting that government cannot "use subsidies to suppress dangerous ideas" and concluding that bar on funding art programs that "promote gender ideology" was "a clear First Amendment violation").

The underlying Executive Order makes clear its goal is "to root out the 'extreme,' 'false claims' of gender identity that contradict the government's view that there is only one 'biological reality of sex,'" namely to erase the recognition of transgender peoples' existence. *S.F. AIDS Found.*, 2025 WL 1621636, at *17 (citing "Gender Ideology" Order §§ 1, 2(f)). By defunding any activities "related to the dangerous ideas it has identified," the "Gender Ideology" Condition effectuates "precisely the kind of 'invidious viewpoint discrimination' that the Supreme Court has suggested would present First Amendment concerns even in the context of federal subsidies." *Id.* (citing *Finley*, 524 U.S. at 587).

The "Gender Ideology" Condition is also unconstitutional because it strays beyond the "scope of the federally funded program," *Open Soc'y*, 570 U.S. at 218. As the Supreme Court has explained, a funding condition "by its very nature affects 'protected conduct outside the scope of the federal funded program'" when it "demand[s] that a funding recipient[] adopt—as their own—the Government's view on an issue of public concern." *Id.* (quoting *Rust*, 500 U.S. at 197). The "Gender Ideology" Condition does just that. Under the Condition, a grantee risks noncompliance if it says anything recognizing someone's gender identity, such as by using a transgender person's preferred pronouns. Rios Decl. ¶ 39. So this Condition leaves grantees with no choice but to use the pronouns corresponding to the person's sex assigned at birth—speech that reflects the Administration's view that gender identity should not be acknowledged or respected—a condition far afield from the scope of OVW programs.

### D. The New Funding Conditions Violate the Fifth Amendment's Due Process Clause

Plaintiffs are likely to succeed in showing that the new Funding Conditions are unconstitutionally vague because they impose unclear, ill-defined prohibitions that give Defendants sweeping discretion over their enforcement. Due process fundamentally requires that

the law give "fair notice of what is prohibited." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citing *United States v. William*s, 553 U.S. 285, 304 (2008)). "This requirement of clarity is implicated whenever the government imposes civil penalties. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574, n.22 (1996). A more demanding fair-notice standard applies here, both because the heavy civil penalties threatened are similar to those found in criminal statutes, and because of the potential for actual criminal penalties for false claims and statements. *See Sessions v. Dimaya,* 584 U.S. 148, 183 (2018) (Gorsuch, J., concurring)*; Reno v. ACLU*, 521 U.S. 844, 871–72 (1997). A "more stringent" standard also applies to those conditions that chill speech, *see supra* I.C. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

A government-imposed requirement is unconstitutionally vague if it fails to "provide a person of reasonable intelligence fair notice of what is prohibited," or if it fails to provide explicit standards for the law's application, opening the door to "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). The challenged conditions are impermissibly vague under both criteria.

For example, the EO Condition is vague in requiring grantees to certify that they will not use program funds for any activity or program that "unlawfully violates an Executive Order." Executive Orders are issued by the president to direct federal agencies and officials on how to implement or enforce the law—they do not impose legal requirements or obligations on federal grantees. The EO Condition requires Plaintiffs to guess at what it requires and how to comply with it, particularly in light of the broad and vague orders that it purports to incorporate, and in light of the many executive orders that predate this Administration and are irrelevant to Plaintiffs.

Other conditions similarly fail to provide any guidance on what may be prohibited, and fail to specify any standards for enforcement. For instance, the Immigration Enforcement Condition fails to explain what it means to "promote" or "facilitate" immigration law violations, leaving unknown, for instance, whether Defendants would deem it a violation to help undocumented victims obtain immigration relief, including through pathways provided by VAWA. *See* Faisal Decl. ¶ 31 (expressing concern about whether the Iowa Coalition could continue providing "legal humanitarian immigration relief under [VAWA] such as U-visa, T-visa, and VAWA self-petitioners"); McCormick Decl. ¶ 23 (expressing concern about whether the Kansas Coalition could continue "providing informational products on legal reliefs to survivors such as U-VISA or T-VISA processes"); *see also* Simpson-Bruce Decl. ¶ 22. Similarly, the Law Enforcement and Immigration Enforcement Condition fails to explain what it might mean to "discourage" collaboration with law enforcement, or to "oppose," or "limit" the role of police, prosecutors, or immigration enforcement in addressing violence against women, and whether Defendants would consider it a violation of that condition to advocate for or offer prevention programs that serve as alternatives to the criminal justice system. Dalton Decl. ¶ 22 (expressing concern that the DC Coalition would not be able to share information "explor[ing] alternatives to the criminal legal system" and addressing the criminal legal system's limits); Faisal Decl. ¶ 34 (expressing concern that "a community-based violence prevention program for men" intended to intervene before abuse reaches the level of a criminal act might "be framed as discouraging engagement with the criminal legal system").

The Systemic Framing Condition fails to explain how or under what circumstances "fram[ing]" domestic violence or sexual assault as "systemic social justice issues" could result in "prioritizing" criminal justice reform or social justice issues over victim safety and offender

accountability, and whether it would violate this condition to offer training and education programs that acknowledge the systemic factors that cause domestic violence and sexual assault. *See* Colón Decl. ¶ 22; Faisal Decl. ¶ 33; Henriquez Decl. ¶ 22; McCormick Decl. ¶ 20. The Awareness Campaigns Condition likewise fails to explain what kinds of "campaigns or media" would not lead to "tangible improvements in prevention, victim safety, or offender accountability," or how such improvements would be measured or assessed, especially given that it is seemingly impossible to know whether an awareness campaign will produce "tangible improvements" before that campaign has even happened. *See* Litke Decl. ¶ 31; Henriquez Decl. ¶ 25.

The Anti-DEI Condition fails to explain what it means to "promote" or "facilitate" "discriminatory programs or ideology," or provide any guidance as to what "discriminatory programs or ideology" even are. The prohibition "includ[es] illegal DEI," seemingly indicating that it also prohibits DEI that is not illegal (and what makes DEI "illegal" is itself entirely unclear). Indeed, the examples of prohibited activities are illegal DEI *or* "'diversity, equity, inclusion, and accessibility' programs that do not advance the policy of equal dignity and respect." And with the latter example, it is difficult to imagine a more vague, more subjective standard than whether something advances "equal dignity and respect." This condition provides Plaintiffs and their members with no guidance on whether they may, for example, train service providers on risk factors that affect survivors differently based on race or gender, or operate the programs designed to meet culturally specific needs that VAWA expressly authorizes. *See* McCormick Decl. ¶ 21; Dalton Decl. ¶ 19; Minkens Decl. ¶ 24; Rios Decl. ¶ 18(b); Faisal Decl. ¶¶ 30, 32; Sarang-Sieminski ¶ 23; Young Decl. ¶ 21.

The General Anti-DEI Certification requirement is likewise vague in that it requires grantees to certify that they will not operate DEI programs "that violate any applicable federal civil rights and nondiscrimination laws," but does not explain when a DEI program would violate such laws. And the DEI Order, Bondi Letter, and Blanche Memo reveal that DOJ has, and intends to aggressively enforce, a novel and legally incorrect interpretation of federal antidiscrimination law that would prohibit all programs related to diversity, equity, and inclusion. Certifying the materiality of their compliance with antidiscrimination law, combined with the Administration's extreme enforcement strategy, leaves Plaintiffs vulnerable to the kind of "arbitrary and discriminatory" application of the law that due process prohibits. *Grayned*, 408 U.S. at 108–09.

The Funding Conditions' vagueness is reinforced by their lack of guidance regarding their apparent conflict with VAWA's statutory requirements. They leave grant recipients guessing as to how to avoid "[p]romot[ing]" "gender ideology," while also not discriminating on the basis of gender identity. Grantees will have no idea how to avoid violating the DEI conditions while also providing services to underserved racial and ethnic populations and including services that are "primarily directed" toward racial and ethnic minority groups. And Defendants leave unanswered how to comply with the Systemic Framing Condition given VAWA's foundational recognition that domestic violence is a systemic issue. *See supra* Background section A.

Each of these conditions requires people of ordinary intelligence to guess at what is prohibited. *See Grayned*, 408 U.S. at 108. And by failing to provide guidance or standards to determine what activities this Administration considers newly prohibited, each of the conditions also subjects Plaintiffs' funding to the Administration's unlimited discretion and exposes them to

potentially arbitrary and discriminatory enforcement. Faced with threatened civil penalties and potential criminal liability under the False Claims Act, recipients are forced to curtail their activities by "steer[ing] far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Id.* at 109 (cleaned up). Plaintiffs are likely to succeed on their Fifth Amendment challenge.

## III.    The Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief

The fast-approaching OVW grant application deadlines force the coalitions and their members into an imminent Hobson's choice. Coalitions and their members must decide whether to: (a) accept unconstitutional and otherwise unlawful funding conditions that are inconsistent with VAWA, will impede their ability to provide core services, and are at odds with their fundamental missions; or (b) forgo federal funds that are essential to their ability to fulfill their mission. OVW has made clear that, once the parties' temporary agreement expires, they will not accept applications that do not unequivocally make the required certifications. *See* Rios Decl. ¶ 31–34. And because of OVW's inflexible demand, some Plaintiffs have already been deterred from pursuing certain OVW grants because of the funding conditions. *See, e.g.*, Sarang-Sieminski Decl. ¶ 18; Dalton Decl. ¶ 11(b); Moran-Kuhn Decl. ¶ 14.

This imminent "choice itself demonstrates irreparable harm." *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017). "[F]orcing [a plaintiff] either to decline the grant funds based on what it believes to be unconstitutional conditions or accept them and face an irreparable harm, is the type of 'Hobson's choice' that supports irreparable harm." *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017), *aff'd*, 888 F.3d 272 (7th Cir. 2018) (subsequent proceedings omitted) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)); *see also, e.g.*, *City of Philadelphia*, 280 F. Supp. 3d at 657 (finding irreparable

harm when City was "faced with a 'Hobson's Choice' between, on the one hand, complying with a law it credibly believe[d]" to be "unconstitutional, and on the other hand, foregoing funds it plan[ned] to use for life-saving projects"); *cf. Metro. Transp. Auth. v. Duffy*, No. 2:25-cv-01413, 2025 WL 1513369, at *45 (S.D.N.Y. May 28, 2025) ("Plaintiffs can cease operation of the Tolling Program or else may brace for impact and prepare to suffer the effects of Defendants' threatened compliance measures. Either option would irreparably harm Plaintiffs.").

Here, either option—accepting the conditions or forgoing funds—is untenable. Agreeing to the Funding Conditions would cause profound harm. Accepting conditions that are unconstitutional, including because they are vague and infringe on the speech of Plaintiffs and their members, causes irreparable harm without more. *See, e.g.*, *R.I. Latino Arts*, 2025 WL 1009026, at *15 ("Irreparable harm is … *presumed* upon a determination that [Plaintiffs] are likely to prevail on their First Amendment claim." (emphasis added) (quoting *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 11 (1st Cir. 2012)); *Hannon v. Allen*, 241 F. Supp. 2d 71, 78 (D. Mass. 2003) ("Even the temporary loss of a constitutional right may be a form of irreparable harm.").

The harm from accepting the funding conditions is especially acute here given that Defendants have intentionally crafted the conditions to expose grantees to False Claims Act and false-statements liability. It is invariably harmful for an organization to expose itself to criminal investigation or prosecution, or lawsuits that could bankrupt the organization, and it is far from speculative that these risks could come to fruition. DOJ has formed a nationwide task force specifically to target grantees that sign these certifications, has described potential FCA liability as a "weapon" it will deploy, and has "strongly encouraged" private parties to bring civil suits. Plaintiffs and their members have no choice but to take the threats seriously. *See e.g.*, Colón

39

Decl. ¶ 28; Faisal Decl. ¶ 36; Fisher Decl. ¶ 27; Young Decl. ¶ 30. Plaintiffs and their members should not be forced to agree to this trap that the government has set; they should not need to wait for the "Damoclese[] sword" of FCA liability "to actually fall" before the Court enters preliminary relief. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016).

If the coalitions or their members instead forgo OVW funds, that, too, would cause irreparable harm. Coalitions have relied on Coalition Grant funds for many years, and even decades, to provide essential services to their members and the broader community. *See supra* Background section B. Losing out on Coalition Grants would drain annual coalition budgets of hundreds of thousands of dollars. *See, e.g.*, Henriquez Decl. ¶ 12(a) (noting a loss of $243,213 for the next fiscal year, without the Coalition Grant); Akins Decl. ¶ 30 (noting a loss of $243,213); Higginbotham Decl. ¶ 25 (noting a loss of $113,574); Young Decl. ¶ 10 (noting that the Coalition Grant amounts to roughly 50% of the Montana Coalition's annual budget). Coalitions that receive competitive grants to provide direct services beyond their coalition-specific programs would lose out on even more. *See* Rios Decl. ¶ 46. Coalitions are already anticipating the substantial changes to their services that the loss of these funds would force them to make.

Without these funds, coalitions would have to cut staff and therefore scale back or entirely eliminate programs that are critical to serving survivors and equipping service providers with the resources they need to effectively intervene and prevent future instances of domestic violence and sexual assault—precisely the services Congress created the Coalition Grant to fund. VALOR, for instance, would have to significantly trim training for its 66 member California Rape Crisis Centers, thereby limiting the ability of those centers to most effectively serve

survivors of sexual abuse. Henriquez Decl. ¶ 30. The Montana Coalition—Montana's only statewide entity specializing in sexual assault—would have to discontinue all of its work related to assisting survivors of sexual assault and stalking. Young Decl. ¶ 14. The Kansas Coalition would likely have to terminate its Accreditation Coordinator, who plays a crucial role in ensuring that services provided by its 24 member organizations are high quality, follow best practices, and meet accreditation standards. McCormick Decl. ¶ 29. The Virginia Action Alliance would not be able to document and collect data that provides localities and the state with critical information on service trends, victim help-seeking behavior, prevention programming, and outcomes for victims and their families who are served by Virginia's sexual and domestic violence agencies. Yglesias Decl. ¶ 35. And the Iowa Coalition would need to cut services that provide essential technical support to improve programs that respond to and attempt to reduce domestic violence. Faisal Decl. ¶ 39; *see also* Sarang-Sieminski ¶ 34; Litke Decl. ¶ 11 (Wisconsin SA Coalition would have to eliminate 30–40% of staff).

Coalition member organizations would also suffer grave harms from being compelled to give up seeking competitive grants for direct services. Without these grants, member organizations would no longer be able to provide the same level of assistance, advocacy, and intervention work on which victims of VAWA crimes rely—including, for example, access to 24-hour helplines, 24-hour crisis intervention, support for survivors engaging with the medical system, support through law enforcement and court processes, emergency shelter, supportive counseling, support groups, and children and youth supportive services. Yglesias Decl. ¶ 30; Rios Decl. ¶¶ 49–50.

Such interference with the organizations' services "is not accurately measurable or adequately compensable by money damages." *Massachusetts v. Nat'l Insts. of Health*, 770 F.

41

Supp. 3d 277, 325 (D. Mass. 2025). The inability of an organization to "accomplish [its] primary mission" constitutes irreparable harm. *Newby*, 838 F.3d at 9. Even more so here—"[i]t is impossible to accurately measure or compensate" for the losses in life-saving services to vulnerable victims of domestic violence and sexual assault if organizations are unable to carry out their mission because they are forced to give up federal funds. *Nat'l Insts. of Health*, 770 F. Supp. 3d at 325.

## IV.    The Balance of the Equities and Public Interest Favors Preliminary Relief

The balance of equities and public interest strongly favor a preliminary injunction. As another judge in this district recently recognized, if Defendants are prevented from imposing new funding conditions, "they would merely have to consider the applicant's application and make the awards as usual." *California*, 2025 WL 1711531, at *4. Meanwhile, absent relief, the applicants would be forced to comply with the likely unlawful conditions "or sacrifice securing" critical "federal funding that Congress intended to be used" to address domestic violence and sexual assault. *Id.* Indeed, "[t]he fact that [Plaintiffs] have shown a likelihood of success on the merits strongly suggests that an injunction would serve the public interest," *id.*, for "there is substantial public interest in having governmental agencies abide by the federal laws," *Nat'l Insts. of Health*, 770 F. Supp. 3d at 326 (cleaned up).

To be clear: the interests at stake here are not the mere receipt of federal funds or the government's technical compliance with federal laws. Lives hang in the balance. VAWA grants support life-saving services for the most vulnerable victims of domestic violence and sexual assault. Forcing Plaintiffs to fundamentally alter their programs or give up those funds thus puts society's most vulnerable at greater risk. Organizations would not be able to provide transitional housing for victims of domestic violence and their children, forcing victims to choose between

returning to an abuser or homelessness. Rios Decl. ¶ 50. Victims would lose access to legal

advocacy and assistance in seeking restraining orders against their abusers. *Id.* Those seeking to

leave abusive relationships and for whom utilizing the justice system would put them at even

higher risk may lose access to safety planning resources and counseling. *See* Faisal Decl. ¶ 33.

And domestic abuse and sexual assault survivors would have severely limited options for

counseling services and other support services, as there would be fewer advocates available to

provide these critical resources to support healing and wellness after abuse. Rios Decl. ¶ 50.

These threats to public health and safety are at least as grave as those that courts have found

strongly favor a preliminary injunction. *See Nat'l Insts. of Health*, 770 F. Supp. 3d at 287, 326

(finding a preliminary injunction was appropriate to halt funding cuts for biomedical research

awards that created the imminent risk that "life-saving clinical trials" would be halted, which

could result "in the loss of life for those" relying on those "clinical trials as their last hope,"

among other grievous outcomes).

And these harms are anything but speculative. Time has proven that providing these

services through grant programs funded by OVW has created concrete, positive changes. Over

the decades that VAWA has been reauthorized with bipartisan support, annual domestic violence

rates have dropped by 67 percent, and the rate of rapes and sexual assaults has declined by 56

percent. Nat'l Ctr. on Domestic & Sexual Violence, *Violence Against Women Act (VAWA) 30th

Anniversary, September 2024*, https://perma.cc/9SDP-APGM. Allowing Defendants' unlawful

Funding Conditions to stand would reverse these trends. Consider the number of services offered

and victims assisted by the Rhode Island Coalition in 2024 alone. Because of the work of the

Rhode Island Coalition and its members, 9,661 individual victims of domestic violence received

help, 296 adults and children were able to stay in shelters or safe homes, 2,738 victims were

43

assisted by a Court Advocate in obtaining a restraining order, 12,716 helpline or hotline calls were answered, 480 victims of domestic violence received counseling services, and 303 children who witnessed domestic violence received support. Rios Decl. ¶ 13. The loss of these services would have devastating effects on vulnerable victims.

Virginia survivors have attested to the impact of OVW-funded member programs in their own words. Without shelter provided by a Virginia Action Alliance member organization, one survivor stated that she "wouldn't [have been] able to bring my soon-to-be-born little boy home, because I would not have had a safe home to bring him to." Yglesias Decl. ¶ 38. Without Virginia Action Alliance members' domestic violence and sexual assault advocacy services, another survivor said that she "[w]ouldn't have known my basic rights as a mother to protect my family and kids." *Id.* And yet another survivor "wouldn't have felt like I would've been able to leave" a dangerous situation without the shelter that a member program provided. *Id.*

Thus, the balance of the equities and the public interest is clear. On the one hand, "the government cannot suffer harm from an injunction that merely ends an unlawful practice." *Nat'l Insts. of Health*, 770 F. Supp. 3d at 326 (cleaned up); *see also Texans for Free Enterprise v. Texas Ethics Commission*, 732 F.3d 535, 539 (5th Cir. 2013) ("[I]njunctions protecting First Amendment freedoms are always in the public interest."). On the other, a loss of funds to Plaintiff Coalitions and their member programs would reverberate to vulnerable victims of domestic violence and sexual assault through a loss of life-saving services. Particularly here, where so much is at stake, the government should not be permitted to "leverag[e] the needs of our most vulnerable fellow humans" by conditioning federal funds on the acceptance of unlawful funding conditions. *King Cnty.*, 2025 WL 1582368, at *19. The Court should enter a preliminary injunction.

## V.    Relief Should Extend Broadly Enough To Prevent Any Irreparable Harm

This Court should both stay the Funding Conditions under 5 U.S.C. § 705 and enter a preliminary injunction barring Defendants from implementing them or enforcing them in any way during the pendency of this action.

Under 5 U.S.C. § 705, a court addressing an APA claim may stay the challenged agency action pending judicial review when "necessary to prevent irreparable injury." 5 U.S.C. § 705 (authorizing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings"). A § 705 stay "operates upon the [agency action] itself by halting or postponing some portion of [it], or by temporarily divesting a rule or policy of enforceability." *Orr v. Trump*, No. 1:25-cv-10313, --- F. Supp. 3d ----, 2025 WL 1145271, at *23 (D. Mass. Apr. 18, 2025), *appeal pending*, No. 25-1579; *accord, e.g.*, *Career Colleges & Sch. of Texas v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (holding that "[n]othing in the text of Section 705" suggests that preliminary relief under that provision "needs to be limited" to plaintiffs), *cert. granted on other question*, 145 S. Ct. 1039 (2025); *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 971 (D. Md. 2020). This corresponds to the "normal" scope of final relief in a successful APA challenge, which is vacatur of the [challenged agency action] and its applicability to all who would have been subject to it." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-cv-00097, --- F. Supp. 3d ----, 2025 WL 1116157, at *25 (D.R.I. Apr. 15, 2025); *see also, e.g.*, *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998).

Because the Funding Conditions violate the APA for the multiple reasons described above[6] and threaten irreparable harm, relief under § 705 is warranted. This Court should stay the Funding Conditions—such that no applicant or awardee is required to submit the challenged certifications, no application is disqualified for failure to include those certifications, and no grantee is prohibited from using grant funds on the challenged "out-of-scope" activities—during the pendency of this action.

In addition, preliminary injunctive relief is warranted. In crafting "equitable relief, courts must consider 'what is necessary, what is fair, and what is workable.'" *Woonasquatucket*, 2025 WL 1116157, at *25 (quoting *North Carolina v. Covington*, 581 U.S. 486, 488 (2017)). Here, it is necessary, fair, and workable for the Court to enter the following preliminary relief:

1) For any pending or future applications, preliminarily enjoin Defendants from applying the "Out-of-Scope" Funding Conditions, from requiring applicants or awardees to certify upon submitting an application or accepting an award that they will comply with those conditions, and from requiring awardees to agree to the General Anti-DEI Certification;

2) For applicants who already submitted an application with a certification, preliminarily enjoin Defendants from treating that certification as effective and require them, in making any award, to clarify that the previously made certification is null and void and that the Funding Conditions do not apply; and

3) For applicants who already submitted an application without a compliant certification, preliminarily enjoin Defendants from disqualifying the applicant from consideration or otherwise disadvantaging the applicant based on the applicant's failure to submit a compliant certification pursuant to the Funding Conditions.

---

[6] The APA claims here encompass all substantive grounds for relief because, as Plaintiffs plead in their complaint, Defendants' violations of the separation of powers, First Amendment, and Fifth Amendment also violate the APA.

This relief should extend to all OVW applicants and grantees, not just Plaintiffs and their members. "[T]here are appropriate circumstances during which nationwide injunctions are not only appropriate, but necessary." *Woonasquatucket*, 2025 WL 1116157, at *25. This case presents just such circumstances.

For one, extending relief broadly helps ensure "complete relief" to Plaintiffs. *City of Los Angeles v. Sessions*, No. 2:18-cv-07347, 2019 WL 1957966, at *6 (C.D. Cal. 2019). For competitive OVW grants, Plaintiffs and their members would be at a competitive disadvantage if all other applicants submit the certifications that DOJ desires but Plaintiffs and their members have not. Thus, "to ensure an even playing field" and "provide complete relief" to Plaintiffs, the Court should "enjoin[] Defendants from imposing the Conditions as to all competitors." *Id.*

Moreover, "[n]onparties in exactly the same circumstances should not be forced to suffer the harms just because there was not enough time or resources for them to join the suit." *Woonasquatucket*, 2025 WL 116157, at *25. The reasons why the Funding Conditions are unlawful "appl[y] to all" would-be grantees. *Chicago Women*, 2025 WL 1114466, at *20. Yet many organizations may not bring suit for fear of "put[ting] their organizations at risk." *Id.*

Other courts confronting similar funding restrictions have granted universal relief. *See, e.g.*, *id.* at *20-21; *Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 290 (D. Md. 2025), *stayed pending appeal on other grounds*, No. 25-1189 (Mar. 14, 2025); *PFLAG, Inc.*, 769 F. Supp. 3d at 451–54. This Court should follow the same course.

## CONCLUSION

The Court should stay the Funding Conditions under 5 U.S.C. § 705 and enter a preliminary injunction.

June 26, 2025                              Respectfully submitted,

                                          */s/ Kyla M. Snow*
                                          Daniel F. Jacobson (D.C. Bar # 1016621)[+]
                                          Lynn D. Eisenberg (D.C. Bar No. 1017511)[+] *
                                          Kyla M. Snow (OH Bar No. 96662)[+] ^
                                          Nina Cahill (D.C. Bar No. 1735989)[+]
                                          Jacobson Lawyers Group PLLC
                                          1629 K Street NW, Suite 300
                                          Washington, DC 20006
                                          (301) 823-1148
                                          kyla@jacobsonlawyersgroup.com


                                          */s/ Kristin Bateman*
                                          Kristin Bateman (Cal. Bar No. 270913)[+] ^
                                          Robin F. Thurston (D.C. Bar No. 1531399)[+]
                                          Skye L. Perryman (D.C. Bar No. 984573)[+]
                                          Democracy Forward Foundation
                                          P.O. Box 34553
                                          Washington, D.C. 20043
                                          (202) 448-9090
                                          kbateman@democracyforward.org
                                          rthurston@democracyforward.org
                                          sperryman@democracyforward.org


                                          */s/ Amy R. Romero*
                                          Amy R. Romero (RI Bar # 8262)
                                          DeLuca, Weizenbaum, Barry & Revens, Ltd.
                                          199 North Main Street
                                          Providence, RI 02903
                                          (401) 453-1500
                                          Amy@dwbrlaw.com
                                          Cooperating counsel, Lawyers' Committee for RI


                                          */s/ Lynette Labinger*
                                          Lynette Labinger (RI Bar # 1645)
                                          128 Dorrance St., Box 710
                                          Providence, RI 02903
                                          (401) 465-9565
                                          ll@labingerlaw.com
                                          Cooperating counsel, ACLU Foundation of RI

_/s/ Lauren A. Khouri_
Lauren A. Khouri (D.C. Bar No. 10282288)[+]
National Women's Law Center
1350 I Street NW, Suite 700
Washington, DC 20005
Telephone: (202) 588-5180
Fax: (202) 588-5185
lkhouri@nwlc.org

[+] Admitted _pro hac vice_
* Of Counsel
^ Not admitted in the District of Columbia. Practice supervised by members of the D.C. bar.

_Counsel for Plaintiffs_