# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

RHODE ISLAND COALITION AGAINST
DOMESTIC VIOLENCE, *et al.*

*Plaintiffs*,

v.

PAMELA BONDI, in her official capacity as United
States Attorney General, *et al.*

*Defendants*.

Case No. 1:25-cv-00279

---

**DECLARATION OF SANDRA HENRIQUEZ**

I, Sandra Henriquez, declare as follows:

**I.    Background**

1.     I am the Chief Executive Officer at ValorUS (VALOR), California's federally designated sexual assault coalition.

2.     VALOR was founded in 1980 and is headquartered in Sacramento, California. It is both a state sexual assault coalition and a direct service provider committed to advancing equity and ending sexual violence. Through leadership, prevention, and advocacy, VALOR pursues a world free from violence where the dignity of every person is valued and respected.

3.     VALOR provides training and technical assistance to California's 66 rape crisis centers and other organizations addressing the needs of sexual assault survivors and working to prevent sexual violence. In California, VALOR also supports programs to address sexual violence for people with developmental disabilities, supporting implementation of Prison Rape Elimination Action (PREA) in prisons, and providing legal services to sexual assault survivors.

1

In addition, VALOR is a national technical assistance provider on violence prevention, restorative practices and leadership development.

4.    VALOR has an annual budget of roughly $5.8 million. Of that total amount, roughly $1.8 million comes from Office on Violence Against Women (OVW) grants and another $88,000 from an OVW subcontract.

## II. VALOR Member Organizations

5.    VALOR is a membership organization with approximately 100 member agencies. Members fall into one of two categories. The first category of member encompasses 66 California Rape Crisis Centers, which provide services funded by the California Office of Emergency Services Rape Crisis Program. Rape Crisis Centers are voting members of VALOR. The second category of member includes any other agency addressing issues of sexual assault and individuals who are interested in, sensitive to, and supportive of VALOR's work and the needs of sexual assault victims. These members are not voting members, but they are encouraged to engage in the business of the organization and are eligible for nomination to the Board of Directors.

6.    VALOR's membership includes REACH the Valley ("REACH"), which provides trauma-informed, client-centered services to victims of violent crimes, including sexual and domestic violence; a member that is being identified for purposes of this lawsuit as "VALOR Member Doe 1," which offers support to individuals, couples families, friends, and any other support system affected by sexual violence and human trafficking in one California county; and another member identified for purposes of this lawsuit as "VALOR Member Doe 2," which provides advocacy and educational services to support those impacted by sexualized violence in two California counties.

### III. Grants VALOR Has or Has Intended to Apply For

7.      VALOR has applied for and received a formula grant from OVW for the State and Territory Domestic Violence and Sexual Assault Coalitions Program ("Coalition Grant") every year since the Coalition Grant became available.

8.      Most recently, OVW awarded VALOR a total of $252,846 through the Coalition Grant in FY24. The grant has a period of performance and a budget period of October 1, 2024 through September 30, 2025.

9.      VALOR has used Coalition Grant funds for many purposes. For instance, these funds support VALOR's coordination with other partner organizations, including law enforcement, prosecution, and sex offender treatment providers. Additionally, VALOR offers trainings that address the specific challenges faced by various constituents and community partners. This includes providing training and technical assistance to California Rape Crisis Centers to build and increase their ability to respond to the needs of the victims they serve. VALOR also responds to requests from policy makers and other stakeholders by helping them understand the impact of policies and practices on survivors.

10.     VALOR receives competitive grants from OVW as well. Currently, VALOR has the following OVW grants:

    a.  The OVW FY22 Training and Technical Assistance Grant, which provides a total
        of $400,000 for the period October 1, 2022 through September 30, 2025 to
        support VALOR's Leadership Education and Advancement for Professionals
        (LEAP) program. LEAP strengthens and builds the capacity of justice system
        professionals and victim service providers to effectively respond to sexual
        violence and to foster partnerships among organizations that have not traditionally

worked together to address such crimes. Through LEAP, VALOR provides training and technical assistance to build the capacity of emerging executives and aspiring leaders working in domestic violence, dating violence, sexual assault, and stalking organizations. Since 2012, VALOR's LEAP has had 10 cohorts for a total 185 fellows receiving intensive training in leadership development. In the current grant period, 2 cohorts with a total 42 fellows received training to enhance professional skills in areas such as working with boards, managing finances and budgets, and program development, evaluation, and sustainability.

b.  The OVW FY22 Legal Assistance for Victims (LAV) Grant, which provides a total of $800,000 for the period October 1, 2022 through September 30, 2025. VALOR has used this grant to provide legal advocacy to 306 survivors of sexual and domestic violence. VALOR has worked in close partnership with victim advocates from local programs in urban settings and across rural communities in Central California. It has also trained and mentored 63 pro bono attorneys, many of whom were new to survivor-centered legal work and who provided direct representation to survivors through this project. This collaborative model expanded access to safety and justice through a trauma-informed approach.

c.  The OVW FY 22 Disabilities Grant, which provides a total of $400,000 for the period October 1, 2022 through September 30, 2025. VALOR uses this grant for California Advocates Leading in Engagement, Accessibility and Development Disability Services (C.A. LEADDS), a multidisciplinary collaborative project between VALOR and another California organization that focuses on serving individuals with developmental disabilities. The project's purpose is to increase

4

organizational capacity of Rape Crisis Centers and organizations serving people with developmental disabilities to provide accessible, safe, and effective services to individuals with developmental disabilities who are victims of sexual assault. C.A. LEADDS has provided over a dozen trainings to sexual assault advocates and disability service providers as well as individual technical assistance; has published five resources to increase capacity to serve survivors with disabilities; and hosts a statewide advisory group quarterly comprised of self-advocates.

d.  The OVW FY23 Emerging Issues and Training and Technical Assistance Grant, which provides a total of $750,000 for the period October 1, 2023 through September 30, 2026. With this grant, VALOR has begun to develop a structured professional assessment of appropriate intervention in order to enhance responses to sexual violence on campus.

e.  The OVW FY24 Restorative Practices Technical Assistance Pilot Program Grant, which provides a total of $200,000 for the period April 1, 2024 through March 31, 2029. VALOR uses this grant to provide training and technical assistance to OVW's restorative practices pilot sites, including one-on-one meetings for pilot sites, coordinating a new grantee orientation, and providing trainings for the pilot sites.

11.  Additionally, VALOR is the rotating host of the National Sexual Assault Conference, which is the nation's largest conference dedicated to addressing sexual violence and building the capacity of advocates and others to support sexual assault survivors and conduct effective prevention efforts. As the rotating host, VALOR was provided (a) $88,000 in OVW funds through a subcontract with Respect Together (which operates the National Sexual

Violence Resource Center), for supporting scholarships and ASL interpretation at the 2025 National Sexual Assault Conference to be held in August 2025, and (b) $300,000 in federal funds from the U.S. Department of Health and Human Services through a subcontract with Respect Together (which operates the National Sexual Violence Resource Center), for supporting scholarships, ASL interpretation, and sessions at the 2025 National Sexual Assault Conference to be held in August 2025.

      12.     For the upcoming OVW grant cycle (October 1, 2025 through September 30, 2026), VALOR has intended to apply for the following grants:

      a.     The FY25 Coalition Grant. If awarded the Coalition Grant, as expected, VALOR would receive $243,213. The Notice of Funding Opportunity (NOFO) for the Coalition Grant requires applicants to submit a certification by June 23, 2025 at 11:59 PM ET and submit the final application by June 25, 2025 at 8:59 PM ET.[1] If awarded this Grant, VALOR would be able to continue supporting constituents, community partners, and Rape Crisis Centers through training and technical assistance; facilitating partnerships with law enforcement, prosecutors, and sex offender treatment providers; and helping policy makers and other stakeholders understand the impacts of policies and practices on survivors. However, if VALOR could not obtain the Coalition Grant, trainings for California Rape Crisis Center programs will be significantly reduced, thereby limiting the ability of local rape crisis center programs to obtain the knowledge and skills required to directly serve survivors of sexual abuse. Further, VALOR would be forced to largely

---

[1] VALOR applied for the Coalition Grant by this deadline. Pursuant to a stipulation filed in this matter, VALOR and its members are not required to submit a certification for any OVW grant until August 12. Absent judicial relief, we will be required to submit a certification at that time.

reduce its coordination with other partner organizations, reducing cross-sector work, and undermining the efficiency and effectiveness of partnerships with law enforcement, prosecution, and sex offender treatment providers.

b.  OVW previously posted a NOFO for the FY25 Training and Technical Assistance Grant with purpose area 5 for Leadership Education and Advancement for Professionals (LEAP), but subsequently removed the NOFO. Before the NOFO was removed, VALOR had begun preparing an application for this purpose area. Once the NOFO is re-posted, VALOR would intend to apply for an award for this purpose area. VALOR would use this grant to provide training and technical assistance to build the capacity of emerging executives and aspiring leaders working in domestic violence, dating violence, sexual assault, and stalking organizations that would expand such training to more people.

c.  OVW previously posted a NOFO for the FY25 Training and Technical Assistance Grant with purpose area 24 Building Collaboration with Faith-Based Organizations but subsequently removed the NOFO. Before the NOFO was removed, VALOR had begun preparing an application for the purpose of collaborating with faith-based organizations. Once the NOFO is re-posted, VALOR would intend to apply for an award for this purpose area. If awarded this grant, VALOR would provide training and technical assistance to organizations working with a variety of different faith-based communities serving victims of domestic violence, dating violence, sexual assault, and stalking. Topics would focus on building collaborations with faith-communities, including how to connect with faith communities and support the role of faith-based organizations

in coordinated community responses to domestic violence, dating violence, sexual assault, and stalking.

d. VALOR's understanding is that OVW will be inviting some current grantees to reapply for the FY25 Disability Grant. Once the NOFO is released or VALOR is invited to reapply, it will do so. If awarded this grant, VALOR would be able to continue C.A. LEADDS, which supports programs addressing sexual violence among those with developmental disabilities. Without the grant, VALOR would have to eliminate that program work, which would mean that sexual assault survivors with developmental disabilities would not be provided with appropriate services and that California Rape Crisis Centers and programs that provide services to people with developmental disabilities would not receive training on providing appropriate services.

## IV. Grants That VALOR Members Currently Have of Have Intended to Apply For

13.    VALOR's members have also received OVW grants, including grants under the Rural Program, the Underserved Population Program, the LAV Program, the Transitional Housing Program, and others.

14.    Various VALOR members have also intended to apply for OVW grants this year.

15.    For example, REACH plans to apply for the OVW FY25 Sexual Assault Forensic Exam (SAFE) Hiring Training Program. The SAFE Grant NOFO requires applicants to submit a certification by June 24, 2025 at 11:59 PM ET and submit the final application by June 26, 2025 at 8:59 PM ET.

16.    VALOR Member Doe 1 had initially intended to apply for the Transitional Housing grant but chose not to complete an application due to OVW's new funding conditions.

In addition, VALOR Member Doe 1 has intended to apply for (a) the Engaging Men Engaging Men Grant, and (b) the Children and Youth Grant. The NOFO for these grants requires applicants to submit a certification by June 30, 2025 at 11:59 PM ET and submit the final application by July 2, 2025 at 8:59 PM ET.

17.    VALOR Member Doe 2 has intended to apply for at least three grants, including: (a) the Rural Program Grant, (b) the Engaging Men Grant, and (c) the Children and Youth Grant. The NOFO for the Rural Program Grant requires applicants to submit a certification by July 8, 2025 at 11:59 ET and the final application by July 10, 2025 at 8:59 ET.

**V. OVW's New Funding Conditions**

18.    The Notices of Funding Opportunity (NOFOs) for the FY25 OVW grants for which VALOR and its members have intended to apply include new "out-of-scope" funding conditions that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior fiscal years. Specifically, the NOFOs for the FY25 OVW grants prohibit grant funds from being used for: (1) promoting or facilitating the violation of federal immigration law; (2) inculcating or promoting gender ideology; (3) promoting or facilitating discriminatory programs or ideology, including illegal DEI and "diversity, equity, inclusion, and accessibility" programs that do not advance the policy of equal dignity and respect; (4) activities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses; (5) programs that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women; (6) awareness campaigns or media that do not lead to tangible improvements in prevention, victim safety, or offender accountability; (7) initiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support; and (8) any

activity or program that unlawfully violates an Executive Order. In addition to identifying these activities as "out-of-scope activities" for which grant funds may not be used, the NOFOs for the FY25 OVW grants require applicants to submit a certification with their application saying that they will not use the grant funds on the "out-of-scope" activities.

19.     In addition, OVW has updated the General Terms and Conditions applicable to its grants and cooperative agreements for fiscal year 2025 to require a separate certification as a term of each award. The term requires a grant recipient to agree that "its compliance with all applicable federal civil rights and nondiscrimination laws is material to the government's decision to make th[e] award and any payment thereunder, including for purposes of the False Claims Act." The term further states that "by accepting the award," the grantee "certifies that it does not operate any programs," including DEI programs, "that violate any applicable federal civil rights nondiscrimination laws."

## VI. OVW's New Funding Conditions Place VALOR and its Members in an Untenable Position

20.     The new funding conditions present VALOR and its members with an impossible choice. VALOR could forgo applying for OVW grants and face the direct consequences to VALOR's financial health and ongoing operations. Or VALOR may apply and jeopardize its mission and compliance with VAWA requirements, and face enormous risks of litigation and government investigations under the False Claims Act no matter what VALOR does.

21.     Agreeing to the certifications would cause VALOR profound harm. The funding conditions are vague, and several could be read to conflict with VALOR's core mission and the activities it has undertaken for decades in furtherance of that mission and in reliance on OVW grants. The funding conditions may require VALOR to cease engaging in activities that it had previously understood OVW grants to plainly support. Thus, VALOR does not know how it may

comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of sexual violence.

22.     For instance, VALOR's mission is "Preventing and ending sexual violence by advancing equity and eradicating oppression," and its tagline is "Advancing Equity. Ending Sexual Violence." VALOR is unsure whether it may undertake its day-to-day activities reflecting its mission and guiding principles, which reference "equity," without running afoul of the condition not to "promot[e] or facilitat[e] discriminatory programs or ideology, including illegal DEI" as DOJ might interpret those terms. It is also unclear whether VALOR's mission and guiding principles, which recognize that the criminal offenses of sexual assault and domestic violence carry a systematic social justice element, violate the anti-social justice part of the certification, and whether VALOR could comply with the anti-social justice condition without adopting a view antithetical to its true beliefs.

23.     VALOR is also concerned that it cannot continue to engage in certain practices that respect the dignity of all victims of sexual violence, regardless of gender and sexual orientation, and are consistent with the VAWA mandate not to discriminate on the basis of gender or sexual orientation. In providing direct client services and technical assistance, many VALOR staff use clients' preferred pronouns to demonstrate support for people who do not identify with the sex they were assigned at birth. The organization also provides information about addressing the needs of the LGBTQ+ community. It is unclear whether VALOR may continue these practices and activities while complying with the funding condition not to "inculcat[e] or promot[e] gender ideology."

24.     It is also unclear whether VALOR may continue providing certain services to members of the immigrant community, including those without legal status, consistent with the funding conditions. VALOR regularly helps immigrant clients understand their rights and obtain appropriate legal assistance, including specific education around the VAWA and crime-victim specific immigration opportunities and protections that may be available regardless of current status.  But doing so now may conflict with the way DOJ interprets the prohibition against "promoting or facilitating the violation of immigration law."

25.     VALOR's work also involves public awareness campaigns designed to draw attention to a particular issue, provide accurate information, shift beliefs, or encourage action. For example, VALOR media campaigns include promoting Denim Day, an international day of action where people wear jeans to demonstrate support for survivors and encourage people to take action to end sexual violence. VALOR also makes efforts to highlight new research that illustrates the prevalence, cost and consequences of sexual violence. These activities are designed to create positive lasting change over a longer period of time. But these critical activities would be in jeopardy under OVW's new funding condition prohibiting engagement in "awareness campaigns or media that do not lead to tangible improvements in prevention, victim, safety, or offender accountability." Measuring whether these activities have led to "tangible improvements" in any given year is complicated and nuanced and therefore VALOR could never know whether its activities comply with this funding condition.

26.     Additionally, VALOR member REACH would have to fundamentally change its programming or accept new grants and risk running afoul of various funding conditions imposed on those grants. For example, during its client intake process, REACH gathers information about gender identity and the need for legal services, including immigration legal services, to facilitate

proper care and access to available resources. And when carrying out programs under the SAFE Hiring and Training Grant, REACH includes in its medical assessment process questions about gender identity and preferred pronouns to ensure that care is respectful, compassionate, and appropriate for each individual. REACH is concerned that it would have to completely alter this programming in a way that undermines its ability to serve certain underserved populations and runs contrary to the organization's values. Additionally, a fundamental principle guiding REACH's services is that victimization takes place in a social context, which means that victimization is necessarily a social justice issue. The anti-social justice funding condition appears to undercut REACH's entire model of providing services.

27.    VALOR Member Doe 2 would also have to change or eliminate some of its direct services to victims of sexual crimes. The role of a Rape Crisis Advocate is to accept who victims are, support them on their individual healing journey, and validate their experiences. If it agreed to the gender ideology funding condition, Member Doe 2 would cause harm to survivors by not supporting who they are. The vagueness of the certifications may run contrary to Member Doe 2's standard practices of including pronouns in introductions, accepting the pronouns offered by others, and advocating for the safety of victims on school campuses. If Member Doe 2 were to receive the Engaging Men Grant, for instance, it would be unable to provide rape prevention education modules on rape culture, barriers to reporting sexualized violence and the reality of violence against those who identify as non-binary/LGBTQQIA.

28.    VALOR fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make VALOR concerned about applying or

accepting an award. To mitigate these risks, VALOR would have to change its practices, in many cases contrary to its core values.

29.    Not agreeing to the certifications would result in equally grave harm.

30.    Not having access to funds from the Coalition Grant and other competitive grants would severely undermine VALOR's ability to function as a state coalition and to provide direct services. Losing the Coalition Grant alone would result in a $364,025 loss of funds for the next fiscal year. Without these funds, VALOR would have to reduce the size of its staff and, therefore, its services to members and community organizations. If VALOR does not receive Coalition Grant funds, trainings for California Rape Crisis Center programs will be significantly reduced, thereby limiting the ability of local rape crisis center programs to obtain the knowledge and skills required to directly serve survivors of sexual abuse. Further, VALOR would be forced to largely reduce its coordination with other partner organizations, reducing cross-sector work, undermining the efficiency and effectiveness of partnerships with law enforcement, prosecution, and sex offender treatment providers.

31.    California Rape Crisis Centers and other organizations providing services to sexual assault victims would lose access to core, comprehensive training for their staff necessary to provide legally and ethically compliant advocacy services to clients in addition to regular training on emergent issues that ensure front-line staff are able to provide quality services to all survivors. The state would lose critical technical assistance in systemic response improvements that reduce sexual violence, increase effectiveness of legal responses, and dramatically improve survivor response and support efforts. These losses would make VALOR less effective as a coalition and undermine its role as the state authority on sexual violence prevention, intervention, and response.

14

## VII. Cuts to VALOR's and its Members' Services Would Harm Domestic Violence and Sexual Assault Victims and Survivors

32.    The reduction or outright termination of these services would have devastating effects on the community of survivors and victims of sexual violence.

33.    In the absence of fully funded VALOR services, sexual assault victims will be confronted with more barriers when trying to access services following their assault, including discriminatory treatment from medical, law enforcement or courtroom personnel, hotline operators, and therapists who have not received core victim services training. This will immediately lead to more survivors choosing not to participate in the criminal justice system and fewer being linked to and receiving appropriate medical and therapy services. Direct service providers will be unable to maintain high quality services that follow best practice guidance or even that are fully compliant with the myriad federal, state, and local requirements they would now have to navigate on their own, without the critical assistance of VALOR, while desperately trying to keep up with the already increasing demand for services.

34.    VALOR's operations are essential to permitting the network of direct service providers to focus on providing the highest-quality services to the survivors they serve and ensuring that the systems that contribute to addressing and responding to the epidemic of sexual violence are operating with evidence-based, trauma-informed, survivor-centered  policies and practices.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June ____25____, 2025.

Sandra Henriquez

Digitally signed by Sandra Henriquez
Date: 2025.06.25 19:37:08 -07'00'

Sandra Henriquez
CEO
VALOR