# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND COALITION AGAINST
DOMESTIC VIOLENCE, *et al.*

*Plaintiffs*,

v.

PAMELA BONDI, in her official capacity as United States Attorney General, *et al.*

*Defendants*.

Case No. 1:25-cv-00279

**DECLARATION OF HEMA SARANG-SIEMINSKI**

I, Hema Sarang-Sieminski, declare as follows:

**I.   Background**

1. I am the Executive Director at Jane Doe Inc., The Massachusetts Coalition Against Sexual Assault and Domestic Violence ("JDI"), a dual domestic violence and sexual assault coalition membership organization.

2. JDI was founded in 1998 as a dual coalition for domestic violence and sexual assault, and is headquartered in Boston, Massachusetts.

3. JDI is Massachusetts's state domestic violence and sexual assault coalition, comprised of 60 member programs. Through training, policy and systems advocacy, and technical assistance and support for its members, partners, and the public, JDI mobilizes collective power and resources to build a safer, healthier, freer Massachusetts beyond abuse and violence.

4. JDI creates a wide range of resources as a coalition, including toolkits, resource guides, papers, reports, and other documents that inform the field of emerging issues. JDI also

1

convenes regular meetings of program directors and works with external partners to shape public dialogue around issues of sexual violence and domestic violence, ensure accuracy of information, and hold systems accountable.

5. JDI's work with systems such as courts, housing, public safety, child welfare, among others, is informed by deep expertise in domestic violence, sexual assault, and human trafficking. JDI has a deep understanding of what supports and what diminishes access, all in service of improving outcomes for survivors navigating state systems. For example, JDI collaborated with other organizations to advocate for and ultimately pass critical legislation to broaden and modernize the understanding of domestic violence and targeted sexual assault, creating strong protections for survivors of coercive control and image-based sexual assault in state courts. JDI situates itself as a thought partner with its members and state systems, ensuring that the needs of all survivors—with an emphasis on survivors statistically most targeted for violence—are represented in system response and policy development. Additionally, JDI cultivates relationships with a range of community partners to amplify the interconnectedness of the work to end domestic and sexual violence with issues of economic stability, criminal justice reform, criminalization of survivorship, racial equity, disability justice, and the needs and lawful rights of all LGBTQ+ and immigrant people. JDI also uplifts work done at the local level, engages the media to impact public opinion, and works to shift cultural perception.

6. As a statewide coalition, a primary function of JDI is to support the programs and advocates who comprise the bulk of the sexual assault and domestic violence workforce in Massachusetts. To that end, JDI provides regular opportunities for advocates across the state for peer-to-peer support and to receive technical assistance from coalition staff on issues ranging

from the unique needs of sexual assault programs to the housing needs of survivors to navigating burnout or turnover in a high-intensity high-trauma field.

7. JDI has an annual budget of roughly $2.4 million. Of that total amount, roughly $1,070,000 comes from federal direct grants, including $367,379 from Office on Violence Against Women (OVW) grants.

**II. JDI Member Organizations**

8. JDI is a membership organization with over 60 members. Members of JDI are the hubs of expertise in addressing sexual and domestic violence throughout Massachusetts. JDI's members include nonprofit organizations and domestic violence/sexual assault prevention or direct service providers. Membership is open to organizations for which addressing sexual and domestic violence is either the primary purpose or is part of their mission.

9. JDI provides its members with technical assistance, including court-related support for survivors, workforce support, child welfare systems related work, and assistance related to privacy, confidentiality and safety. JDI operates numerous listservs that function as a robust network of advocates. Additionally, JDI creates a wide range of resources such as an online training curriculum, toolkits and resource guides, papers, and reports.

10. JDI's members include New England Women's Support Inc., d.b.a. The Network/La Red, a survivor-led organization that works to end partner abuse in LGBTQIA+ communities, and Safe Passage, Inc., a domestic violence prevention and survivor support organization that serves communities in western Massachusetts.

### III. Grants JDI Has or Has Intended to Apply For

11. JDI has applied for and received a formula grant from OVW for the State and Territory Domestic Violence and Sexual Assault Coalitions Program ("Coalition Grant") every year since it became available, including for Fiscal Year ("FY") 2024.

12. Most recently, OVW awarded JDI a total of $367,379 through the Coalition Grant in FY24. The grant has a period of performance and a budget period of October 1, 2024 through September 30, 2025. The Coalition Grant represented 15.3% of the JDI's total annual budget.

13. JDI has used Coalition Grant funds to operate effectively as a state coalition, including by providing systems-related technical assistance and raising awareness about sexual assault and domestic violence services, programming, and prevention. Their technical assistance includes building capacity of member programs to navigate and improve court-related support for survivors, workforce sustainability and support, child welfare systems, and assistance related to privacy, confidentiality, and safety.

14. For the upcoming OVW grant cycle (October 1, 2025 through September 30, 2026), JDI has intended to apply for the following grants:

   a. The FY25 Coalition Grant. If awarded the Coalition Grant, as expected, JDI would receive $356,787. The Notice of Funding Opportunity (NOFO) for the Coalition Grant requires applicants to submit a certification by June 23, 2025 at 11:59 PM ET and submit the final application by June 25, 2025 at 8:59 PM ET.[1] If awarded this Grant, JDI would be able to continue to provide technical assistance and support to its member organizations. However, if JDI could not obtain the Coalition Grant, it would need to scale back the assistance that it provides to

---

[1] JDI applied for the Coalition Grant by this deadline. Pursuant to a stipulation filed in this matter, JDI and its members are not required to submit a certification for any OVW grant until August 12. Absent judicial relief, we will be required to submit a certification at that time.

domestic violence and sexual assault service providers and would have reduced staff capacity.

### IV. Grants That JDI Members Currently Have or Have Intended to Apply For

15. JDI's members have also received OVW grants, including grants under the Legal Assistance for Victims ("LAV") Program; the Transitional Housing Assistance Program ; the Engaging Men Program; the Culturally Specific Services Program; and others.

16. Various JDI members have also intended to apply for OVW grants this year.

17. For example, JDI member The Network/La Red intended to apply for the Transitional Housing Program Grant, with an application deadline of June 11, 2025, but was deterred from applying because of its uncertainty about how to comply, and therefore whether it could comply, with OVW's new funding conditions.

18. Similarly, JDI member Safe Passage, Inc., intended to apply for the Transitional Housing Assistance Program Grant and for the Engaging Men Program grant, but chose not to apply because of its uncertainty about how to comply with OVW's new funding conditions.

### V. OVW's New Funding Conditions

19. The NOFOs for the FY25 OVW grants for which JDI and its members have intended to apply include new "out-of-scope" funding conditions that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior fiscal years. Specifically, the NOFOs for the FY25 OVW grants prohibit grant funds from being used for: (1) promoting or facilitating the violation of federal immigration law; (2) inculcating or promoting gender ideology; (3) promoting or facilitating discriminatory programs or ideology, including illegal DEI and "diversity, equity, inclusion, and accessibility" programs that do not advance the policy of equal dignity and respect; (4) activities that frame domestic violence or

5

sexual assault as systemic social justice issues rather than criminal offenses; (5) programs that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women; (6) awareness campaigns or media that do not lead to tangible improvements in prevention, victim safety, or offender accountability; (7) initiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support; and (8) any activity or program that unlawfully violates an Executive Order. In addition to identifying these activities as "out-of-scope activities" for which grant funds may not be used, the NOFOs for the FY25 OVW grants require applicants to submit a certification with their application saying that they will not use the grant funds on the "out-of-scope" activities.

20. In addition, OVW has updated the General Terms and Conditions applicable to its grants and cooperative agreements for fiscal year 2025 to require a separate certification as a term of each award. The term requires a grant recipient to agree that "its compliance with all applicable federal civil rights and nondiscrimination laws is material to the government's decision to make th[e] award and any payment thereunder, including for purposes of the False Claims Act." The term further states that "by accepting the award," the grantee "certifies that it does not operate any programs," including DEI programs, "that violate any applicable federal civil rights nondiscrimination laws."

### VI. OVW's New Funding Conditions Place JDI and its Members in an Untenable Position

21. The new funding conditions present JDI and its members with an impossible choice. JDI could forgo applying for OVW grants and face the direct consequences to its financial health and ongoing operations. Or JDI may apply and jeopardize its mission and

compliance with VAWA requirements, and face enormous risks of litigation and government investigations under the False Claims Act no matter what JDI does.

22. Agreeing to the certifications would cause JDI profound harm. The funding conditions are vague, and several could be read to conflict with JDI's core mission and the activities it has undertaken for decades in furtherance of that mission and in its efforts to serve the purpose of other OVW grants. The funding conditions as phrased may require JDI to cease engaging in activities that it had previously understood OVW grants to plainly support. Thus, JDI does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of domestic abuse and sexual violence. JDI is concerned that the funding limitations around "DEI" could, as phrased, could limit any information or technical assistance it can provide that addresses the needs of diverse communities of survivors.

23. For instance, JDI's mission, vision, and values are built upon an understanding of the root causes of sexual assault and domestic violence, which are all forms of oppression. JDI therefore takes a racial and social justice approach to their work to address the harms survivors experience when navigating systems. This is their lens for system reform, workforce sustainability, and for prevention. But the JDI is unclear about whether their framing of these structural barriers would be in conflict with the anti-social justice condition. JDI's work is focused on repairing past harms, where survivors of color, survivors with disabilities, LGBTQIA+ survivors, male survivors, and immigrant survivors were not welcomed into programs serving survivors of sexual assault and domestic violence. Efforts to repair these harms over the past several decades, with support from federal partners at OVW, has created more equitable practices within programs and safer options for all survivors. Now, it is unclear

7

whether JDI' mission and guiding principles violate the anti-social justice part of the certification, and whether JDI could comply with the anti-social justice condition without adopting a view antithetical to its true beliefs.

24. Many of JDI's activities in furtherance of its OVW grant-funded programs may also conflict with the new funding conditions. JDI is unsure how the gender ideology part of the certification will be interpreted, because, as phrased, the relevant language could limit the resources or technical assistance it can provide to lawfully support transgender survivors and survivors of all gender identities. At its core, JDI is designed to end gender-based violence, which includes transgender and queer survivors who are disproportionately targeted for harm because of their gender and gender expression. JDI is concerned that, because of the uncertainty of the certification requirement as phrased, it cannot continue to engage in otherwise lawful practices that respect the dignity of all victims of sexual violence, regardless of gender and sexual orientation, and are consistent with the VAWA mandate not to discriminate on the basis of gender or sexual orientation. It is unclear whether JDI may continue these practices and activities while complying with the vague funding condition that JDI may not not to "inculcat[e] or promot[e] gender ideology."

25. It is also unclear whether JDI may continue providing certain services to the immigrant community, consistent with the funding conditions as currently phrased. JDI is concerned that the vague language in the funding conditions could be interpreted to restrict their ability to provide resources and technical assistance on available immigration remedies for survivors of domestic violence, and to lawfully advance systemic issues related to improving responses to immigrant survivors of domestic violence.

26. Additionally, JDI member The Network/La Red is concerned about the vague requirements that could prohibit providing services to transgender individuals. The Network/La Red is an LGBTQ+ organization serving LGBTQ+ survivors of partner abuse across Massachusetts that also provides training to mainstream domestic and sexual violence programs about partner abuse in LGBTQ+ communities and technical assistance on how to create a safe and accessible environment for LGBTQ+ survivors in their organizations and programs. The funding conditions to not promote "gender ideology" would force The Network/La Red to make substantial changes to its services. They would be effectively forced to stop hiring transgender and other gender nonconforming staff as the funding would threaten their ability to provide a respectful work environment for them and would require The Network/La Red to betray their communities—even putting them potentially in violation of state law. They would be forced to stop appropriately providing services, training, and technical assistance about transgender and other gender nonconforming survivors. And they would be forced to stop promoting leadership development programs for transgender and other gender nonconforming survivors. The Network/La Red is also deterred from applying for or accepting grants that are conditioned on anti-DEI funding requirements. The Network/La Red believes that a diverse staff in an environment that promotes equity and inclusion strengthens the organization and best positions them to serve all members of their communities with cultural competence and with services that do not re-victimize survivors. If they were to accept grants with these challenged funding conditions, they would have to fundamentally change their hiring practices, organizational culture, communities they serve, and their programming.

27. JDI member Safe Passage, Inc., would also have to change or eliminate some of its direct services to survivors in order to comply with the funding conditions. Safe Passage, Inc.

9

believes that changing their programming, however, would run afoul of the underlying principles and conditions of their other major funding sources. Safe Passage, Inc. believes that most importantly, these conditions would create severe barriers to survivors, who will be negatively impacted. Safe Passage, Inc. is located in Hampshire County, one of the areas with the highest concentration of LGBTQ+ individuals in Massachusetts, and Safe Passage Inc. acknowledges a responsibility to be of service to those most marginalized. Safe Passage, Inc. has worked for over a decade to advance their goals of being gender-inclusive in messaging, outreach, and with partners in the community. Safe Passage, Inc. also has a grant from the state Department of Public Health specifically focused on outreach and organizing within Trans+ communities. Safe Passage, Inc. is in an untenable position: it must either compromise its values to secure funding or forgo vital resources to remain mission aligned. If it agreed to the gender ideology funding condition, Safe Passage, Inc. would need to change its entire approach to messaging, outreach, and community partnership. Doing so, however, would compound harms to the Trans+ community. Similarly, the requirement to certify that DEI efforts do not violate vaguely defined nondiscrimination standards creates legal and ethical risk for Safe Passage, Inc., who has a long-held belief that as a community organization, they are responsible to the needs of their community. Safe Passage, Inc. actively encourages people of color, women, identified survivors, and LGBTQ+ individuals to apply for paid positions, board of directors seats, internships, and volunteer opportunities.

28. Safe Passage, Inc. engages in specific strategies that result in expanding the pool of applicants to individuals from underserved and underrepresented communities, which strengthens and solidifies their work. Safe Passage, Inc. employs two staff members who have received partial accreditation to practice before the Department of Homeland Security under

10

8 C.F.R. S 1292.12. This accreditation allows the organization to provide assistance with domestic violence-related visas and asylum cases. This program has provided a pathway to safety and security and is in full compliance with immigration law. However, if this were deemed an out-of-scope activity under the challenged conditions, Safe Passage, Inc. would be in violation of another major funder and would be forced to withhold this support to survivors who are in need and entitled to avail themselves in this process. These visa processes are codified within the Violence Against Women Act.

29. JDI fears that if it agrees to the new funding conditions as currently phrased, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make JDI concerned about applying or accepting an award. To mitigate these risks, JDI would have to change its otherwise lawful practices, in many cases contrary to its core values.

30. Not agreeing to the certifications would result in equally grave harm.

31. Not having access to funds from the Coalition Grant and other competitive grants would severely undermine JDI's ability to function as a state coalition. Losing the Coalition Grant alone would result in a $356,787 loss of funds for the next fiscal year. Without these funds, JDI would need to scale back its work, including reducing technical assistance and staff capacity. If it was unable to receive the grant for the next fiscal year, it would need to terminate 2-3 staff members of an already lean 7-person team.

32. JDI's member programs would lose access to convening spaces, trainings, and comprehensive resources for their staff that are necessary to provide advocacy services to survivors of domestic violence and sexual assault. The state would lose critical technical

11

assistance, and these losses would make JDI less effective as a coalition and undermine its role as an authority on sexual violence prevention, intervention, and response.

### VII. Cuts to JDI's and its Members' Services Would Harm Domestic Violence and Sexual Assault Victims and Survivors

33. The reduction or outright termination of these services would have devastating effects on the community of survivors and victims of sexual violence.

34. In the absence of fully funded JDI services and JDI member services, domestic violence and sexual assault victims will be confronted with more barriers when trying to access services by limiting the reach of trusted organizations. The availability of culturally responsive services for survivors who identify as LGBTQ+ and/or immigrants are already limited. All too often, abusers use survivors' identities as a tactic of abuse—often forcing an already vulnerable survivor into silence. The loss of program services that cater to at-risk populations will leave survivors and their communities more vulnerable. There will be less transitional housing support available in Massachusetts. Survivors needing VAWA self-petitions will have longer wait times to apply for life-saving relief. Programs that employ advocates who are often survivors themselves will have to lay off staff. As the state coalition, JDI will have to scale back its ability to provide training, technical assistance and statewide coordination including involvement with the state Governor's Council Against Sexual and Domestic Violence, membership convenings for directors, civilian police advocates, and high-risk teams. Direct service providers will be unable to maintain high quality services that follow best practice guidance or even that are fully compliant with the myriad federal, state, and local requirements they would now have to navigate on their own, without the critical assistance of coalitions, while desperately trying to keep up with the already increasing demand for services.

35. JDI's operations are essential to permitting the network of direct service providers to focus on lawfully providing the highest-quality services to the survivors they serve and ensuring that the systems that contribute to addressing and responding to the epidemic of sexual violence are operating within lawful frameworks of evidence-based, trauma-informed, survivor-centered policies and practices.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June __26__, 2025.

DocuSigned by:

*Hema Sarang-Sieminski*
2E653BA12CED472...

HEMA SARANG-SIEMINSKI
EXECUTIVE DIRECTOR
JANE DOE INC., THE
MASSACHUSETTS COALITION
AGAINST SEXUAL ASSAULT AND
DOMESTIC VIOLENCE