# EXHIBIT 18

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>PAMELA BONDI, in her official capacity as United States Attorney General, *et al.*,<br><br>*Defendants*. | Case No.    1:25-cv-00279 |

**DECLARATION OF JONATHAN YGLESIAS**

I, Jonathan Yglesias, declare as follows:

I.    **Background**

1.    I am Director of Mission Advancement at the Virginia Sexual and Domestic Violence Action Alliance (Virginia Action Alliance), Virginia's federally designated domestic violence and sexual assault coalition.

2.    The Virginia Action Alliance was founded in 1981 and is headquartered in Richmond, Virginia. The Virginia Action Alliance is a dual state sexual assault coalition and domestic violence coalition that serves as a non-profit network of survivors, sexual and domestic violence agencies, and allies working to strengthen how communities across Virginia respond to and prevent sexual and intimate partner violence. The Virginia Action Alliance uses its diverse and collective voice to create a Virginia free from sexual and domestic violence—inspiring others to join and support values of equality, respect and shared power.

1

3.     The Virginia Action Alliance provides its member sexual and domestic violence agencies statewide with access to resources, training opportunities, technical assistance, and input on policies and practices that advance safety, justice, and healing for survivors.

4.     The Virginia Alliance also provides direct services. For instance, the Virginia Action Alliance operates a 24/7/365 statewide crisis response hotline.

5.     The Virginia Action Alliance has an annual budget of $3,321,500. Of that total amount, roughly $340,000 comes directly from Office on Violence Against Women (OVW) grants, not including pass-through grants. Including pass-through grants, the Virginia Action Alliance's OVW funding totals around $500,000.

## II. Virginia Action Alliance Member Organizations

6.     The Virginia Action Alliance is a membership organization with 73 member agencies. Membership primarily consists of Sexual and Domestic Violence Agencies; however, individual and professional memberships are also available to anyone who supports the coalition's mission and values.

7.     The Virginia Action Alliance's membership includes three members, which are being identified for the purposes of this lawsuit as "Virginia Member Doe 1," "Virginia Member Doe 2," and "Virginia Member Doe 3." Virginia Member Doe 1 is a dual domestic violence and sexual assault agency that is a community-based nonprofit with the core function of eradicating sexual and domestic violence through the empowerment of survivors. Virginia Member Doe 1's primary services include counseling, emergency shelter and transitional housing, legal services, a children's center, sexual and domestic violence outreach and prevention, and systems advocacy. Virginia Member Doe 2 is a dual sexual assault and domestic violence agency that is community-based and provides crisis intervention and emotional support, advocacy with

medical, police, and court systems, short-term individual and group counseling, information and referrals, emergency shelter and transitional housing, and outreach and prevention programming for survivors of sexual and domestic violence, their families, and partners in the community. Finally, Virginia Member Doe 3 is a dual sexual and domestic violence agency that is a community-based nonprofit providing crisis intervention, emergency shelter, court advocacy, medical advocacy, and supportive counseling to survivors of domestic violence and sexual assault and their families.

### III. Grants the Virginia Action Alliance Has or Has Intended to Apply For

8.      The Virginia Action Alliance has applied for and received a formula grant from OVW for the State and Territory Domestic Violence and Sexual Assault Coalitions Program ("Coalition Grant") every year since its inception.

9.      Most recently, OVW awarded the Virginia Action Alliance a total of $367,379 through the Coalition Grant in FY24. The grant has a period of performance and a budget period of October 1, 2024 through September 30, 2025.

10.     The Virginia Action Alliance has used Coalition Grant funds to implement a statewide data system on sexual and domestic violence service delivery in Virginia, which, in addition to serving as a state and federal grant reporting tool for member agencies, enables advocates to identify trends and gaps in service delivery with a focus on the needs and experiences of survivors who request help.  The data informs the Virginia Action Alliance's training and technical assistance, resource and campaign development, public policy and external partnership work, and helps the coalition and member agencies understand disparate impact and common service trends across geography and populations. The Virginia Action Alliance has also used Coalition Grant funds to support a nationally recognized survivors' leadership council,

which provides council members with skills building and, as a primary function, offers training opportunities for advocates, judges, law enforcement, healthcare practitioners, and more. Additionally, OVW Coalition Grant funds have been used to provide tailored training and technical assistance on request to local sexual and domestic violence agencies across the state. This has been particularly important as high turnover in the field, throughout and since the pandemic, has meant an influx of new advocates and staff that require training and support. This grant program has also supported our executive leadership, associate directors and executive director, in providing one-on-one tailored technical assistance and onboarding to new directors at local agencies and those who need assistance with board development, personnel and organizational policies/practices, grant and financial stewardship and auditing best practices.

11.     The Virginia Action Alliance receives competitive OVW grant funds as a subrecipient as well. Currently, the Virginia Action Alliance has the following pass-through OVW grants:

    a.  The Virginia Action Alliance receives the OVW FY21 Training and Services to End Violence Against Women with Disabilities Grant ("Disabilities Grant") through the Disability Law Project of Virginia, which provides a total of $138,994 for the period October 1, 2022 through September 30, 2024, with a 12-month no-cost extension draw-down period through September 30, 2025. The Virginia Action Alliance uses this grant to provide a disability access partnership, focused on building capacity of membership agencies to provide services that are accessible and trauma-informed to survivors with disabilities. This includes both professional and organizational capacity building as well as changing physical environments in order to create greater accessibility.

b.  The Virginia Action Alliance receives the OVW FY22 Improving Criminal Justice Responses Program Grant ("ICJR" Grant) funds as a subrecipient through Virginia's Department of Criminal Justice Services, which provides a total of $268,884 for the period of October 1, 2022 through September 30, 2025. The Virginia Action Alliance uses this grant to provide legal advocacy clinics, engage in work to advance statewide sexual assault response teams at the state and local levels, provide training on the implementation and enforcement of protective orders across legal, law enforcement, and advocacy partners, and cofacilitate Virginia's Lethality Assessment Protocol training and technical assistance.

12.    For the upcoming OVW grant cycle (October 1, 2025 through September 30, 2026), the Virginia Action Alliance has applied for the FY25 Coalition Grant. If awarded the Coalition Grant, as expected, the Virginia Action Alliance would receive approximately $356,787. The Coalition Grant Notice of Funding Opportunity (NOFO) requires that applicants submit a certification by June 23, 2025 at 11:59 PM ET and submit the final application by June 25, 2025 at 8:59 PM ET.[1] If awarded this Grant, the Virginia Action Alliance would be able to sustain core functions of the state coalition, including statewide data collection and reporting, training and technical assistance to new and continuing advocates at 73 member programs across the state, support resource development requested in the field, and advance state partnership and the development of best practices to inform and guide the sexual and domestic violence field in Virginia. However, if the Virginia Action Alliance could not obtain the Coalition Grant, it would lose funding that supports critical agency infrastructure, resulting in the need to terminate staff

---

[1] Pursuant to a stipulation filed in this matter, the Virginia Action Alliance and its members are not required to submit certifications for OVW Grants until August 12. Absent judicial relief, we will be required to submit the certifications at that time.

and to significantly reduce programming as to have lasting impacts on the coalition's capacity to engage in essential functions.

### IV. Grants That Virginia Action Alliance Members Currently Have or Have Intended to Apply For

13.    Virginia Action Alliance members have also received OVW grants, including grants under the Rural Program, the Transitional Housing Program, and the Children and Youth Program.

14.    Various Virginia Action Alliance members have also intended to apply for OVW grants this year.

15.    For example, Virginia Doe 1 is a current recipient of the OVW Transitional Housing Grant. Virginia Doe 1 anticipates that when it needs to reapply for that grant in future years, it will need to agree to the challenged certification conditions.

16.    Virginia Doe 2 recently applied for the FY25 Transitional Housing Grant, but is concerned about its ability to comply with the new certification conditions and how they may impact its work. The Transitional Housing Grant NOFO required applicants to submit a certification by June 9, 2025 at 11:59 PM ET and to submit the final application by June 11, 2025 at 8:59 PM ET.

17.    Finally, Virginia Doe 3 intends to apply for the Rural Program Grant, but is being deterred from doing so by the challenged certification conditions. The Rural Program Grant NOFO requires applicants to submit a certification by July 8, 2025 at 11:59 PM ET and submit the final application by July 10, 2025 at 8:59 PM ET.

### V. OVW's New Funding Conditions

18.    The Notices of Funding Opportunity (NOFOs) for the FY25 OVW grants for which the Virginia Action Alliance and its members have intended to apply include new

"out-of-scope" funding conditions that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior fiscal years. Specifically, the NOFOs for the FY25 OVW grants prohibit grant funds from being used for: (1) promoting or facilitating the violation of federal immigration law; (2) inculcating or promoting gender ideology; (3) promoting or facilitating discriminatory programs or ideology, including illegal DEI and "diversity, equity, inclusion, and accessibility" programs that do not advance the policy of equal dignity and respect; (4) activities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses; (5) programs that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women; (6) awareness campaigns or media that do not lead to tangible improvements in prevention, victim safety, or offender accountability; (7) initiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support; and (8) any activity or program that unlawfully violates an Executive Order. In addition to identifying these activities as "out-of-scope activities" for which grant funds may not be used, the NOFOs for the FY25 OVW grants require applicants to submit a certification with their application saying that they will not use the grant funds on the "out-of-scope" activities.

19.    In addition, OVW has updated the General Terms and Conditions applicable to its grants and cooperative agreements for fiscal year 2025 to require a separate certification as a term of each award. The term requires a grant recipient to agree that "its compliance with all applicable federal civil rights and nondiscrimination laws is material to the government's decision to make th[e] award and any payment thereunder, including for purposes of the False Claims Act." The term further states that "by accepting the award," the grantee "certifies that it

does not operate any programs," including DEI programs, "that violate any applicable federal civil rights nondiscrimination laws."

### VI. OVW's New Funding Conditions Place the Virginia Action Alliance and its Members in an Untenable Position

20.     The new funding conditions present the Virginia Action Alliance and its members with an impossible choice. The Virginia Action Alliance could forgo applying for OVW grants and face the direct consequences to its financial health and ongoing operations. Or the Virginia Action Alliance may apply and jeopardize its mission and compliance with VAWA requirements, and face enormous risks of litigation and government investigations under the False Claims Act no matter what the Virginia Action Alliance does.

21.     Agreeing to the certifications would cause the Virginia Action Alliance profound harm. The funding conditions are vague, and several could be read to conflict with the Virginia Action Alliance's core mission and the activities it has undertaken for decades in furtherance of that mission and in reliance on OVW grants. The funding conditions may require the Virginia Action Alliance to cease engaging in activities that it had previously understood OVW grants to plainly support. Thus, the Virginia Action Alliance does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of domestic abuse and sexual violence.

22.     For instance, the Virginia Action Alliance's guiding principles include "[r]ecognizing the historical inequities between resources allocated to address sexual assault and domestic violence," and seeking to "equitably address[] the elimination of both sexual and domestic violence." The guiding principles also include "creat[ing] an Alliance where those who have been traditionally oppressed in society and/or marginalized in anti-violence work have the

opportunity to be full and active participants," "recogniz[ing] that representation of traditionally oppressed groups is only a beginning," and practicing "[i]ntentional diversity," which involves an analysis of oppression and a commitment to challenging and changing the disempowering influences of dominant culture.

23.     The Virginia Action Alliance is unsure whether it may undertake its day-to-day activities reflecting its mission and guiding principles, which reference "equity" and "diversity," without running afoul of the condition not to "promot[e] or facilitat[e] discriminatory programs or ideology, including illegal DEI" as DOJ might interpret those terms. It is also unclear whether The Virginia Action Alliance's mission and guiding principles, which recognize that the criminal offenses of sexual assault and domestic violence carry a systematic social justice element, violate the anti-social justice part of the certification, and whether the Virginia Action Alliance could comply with the anti-social justice condition without adopting a view antithetical to its true beliefs.

24.     Many of the Virginia Action Alliance's activities in furtherance of its OVW grant-funded direct service programs may also conflict with the new funding conditions. For instance, the Virginia Action Alliance currently operates programs and activities that promote access to services, dignity and healing for all people, and that focus on populations of people who traditionally have faced barriers to such access—including with disabilities, people for whom English is not their primary language, and people who have been excluded from specific services such as shelter due to their gender. In addition, the Virginia Action Alliance's statewide data system collects demographic information and history of violence information that has the potential to raise questions about services being provided to people who fall within the very broad group of people who might be included in the "illegal" DEI condition.  The coalition does

not know if these programs' focus would be construed as "promoting or facilitating discriminatory programs or ideology, including illegal DEI" as DOJ might interpret those terms.

25.    The Virginia Action Alliance is also concerned that it cannot continue to engage in certain practices that respect the dignity of all victims of sexual and domestic violence, regardless of gender and sexual orientation, and are consistent with the VAWA mandate not to discriminate on the basis of gender or sexual orientation. The Virginia Action Alliance would continuously run into challenges because we are advocates on behalf of all people, including those who are transgender or otherwise outside of the gender binary, and we train and provide technical assistance, which includes guidance on serving transgender people and people who are nonbinary. For instance, the training that we provide, both to new advocates and for continuing advocacy training, discusses the provision of trauma-informed services to survivors. This includes training providers on issues specific to transgender clients—including recognizing and responding to the unique safety concerns and dynamics of abuse that are faced by these survivors (for instance, the threat of "outing"). In addition, the Virginia Action Alliance's statewide data system, which collects demographic information and scope and history of violence information, also has the potential to raise questions about services being provided to people who are transgender or non-binary. It is unclear whether the Virginia Action Alliance may continue these practices and activities while complying with the funding condition not to "inculcat[e] or promot[e] gender ideology."

26.    It is also unclear whether the Virginia Action Alliance may continue providing these services to immigrant survivors of violence, including those without legal status, consistent with the funding conditions. In addition to the training and technical assistance described above, which also supports member agencies in understanding the dynamics of abuse and provision of

trauma-informed services for immigrant survivors, the Virginia Action Alliance assists survivors who are immigrants to access legal remedies to help them gain or maintain legal status when violence has played a role in their immigration experience. The Virginia Action Alliance encourages our member agencies to put safety first and provide services to any person who is experiencing high risk violence without screening that goes beyond basic safety information. The Virginia Action Alliance also encourages advocates to first consider risks of immediate or near-future violence or harm when they must prioritize providing services to clients. This could mean that, based on harm-avoidance prioritization principles, or risk of imminent danger, an immigrant without documentation could be prioritized over a US citizen. Conducting these activities now may conflict with the way that DOJ interprets the prohibition against "promoting or facilitating the violation of immigration law."

27.     Additionally, Virginia Action Alliance Member Doe 1 would also have to change or eliminate some of its direct services to victims to comply with the conditions. If it agreed to the conditions, Member Doe 1 would have to end programming for victims from specific identity categories that have been deemed "out of scope" and therefore ineligible for coverage in facilities and through programming that is paid for by OVW grant funds.

28.     Virginia Action Alliance Member Doe 2 would also have to change or eliminate some of its direct services to victims to comply with the conditions. If it agreed to the conditions, Member Doe 2 would have to end programming for survivors from specific identity categories that have been deemed "out of scope" and therefore ineligible for coverage in facilities and through programming that is paid for by OVW grant funds. Other programming would need to be changed in order to comply with directives that prohibit the framing of sexual and domestic violence as a community issue with social and systemic roots. Member Doe 2 would need to

11

drastically change the nature of their partnership on an OVW grant in order to address the issue of sexual and domestic violence as an unpreventable set of crimes.

29.     Additionally, Virginia Action Alliance Member Doe 3 would also have to change or eliminate some of its direct services to victims to comply with the conditions. If it agreed to the conditions, Member Doe 3 would have to end programming for survivors in order to ensure that services, specific to the region/locality, are limited in scope to non-LGBTQ and non-immigrant survivors. It would also require them to disregard the range of needs and circumstances under which survivors from this region seek services for sexual and domestic violence. For example, survivors who wish to access health, safety, and crisis intervention services but do not wish to proceed with criminal or legal cases would be advised to cooperate with prosecutors, law enforcement, and the legal system regardless of the victim's real or perceived impact on emotional and physical safety and wellbeing. And Doe 3 would need to task staff with the additional burden of navigating which laws to follow where the grants' directives conflict with VAWA and federal statutory obligations. The new conditions would imperil Virginia Doe 3's mission to serve survivors and ensure their safety and autonomy.

30.     If Virginia's members did not accept the grant funds, they would need to cut services including: transitional housing programs that provide 6-24 months of non-emergency housing with support services for victims who are homeless or in need of transitional housing and for whom emergency shelter services or other crisis intervention services are unavailable or insufficient; short-term supportive services intended to help survivors locate permanent housing and employment in the community, including counseling, childcare, transportation, and life skills, educational and/or job training; and training and partnership programs designed to engage law enforcement, judges, attorneys, court personnel, and healthcare and social services providers,

in efforts to enhance the safety of rural victims of sexual assault, domestic violence, dating violence and stalking, with a focus on coordinated community responses and cross-system collaboration.

31.     The Virginia Action Alliance fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make the Virginia Action Alliance concerned about applying or accepting an award. To mitigate these risks, the Virginia Action Alliance would have to change its practices, in many cases contrary to its core values.

32.     Not agreeing to the certifications would result in equally grave harm.

33.     Not having access to funds from the Coalition Grant and other competitive grants would severely undermine the Virginia Action Alliance's ability to function as a state coalition and to provide direct services. Losing the Coalition Grant alone would result in a loss of approximately $360,000 funds for the next fiscal year. Without these funds, The Virginia Action Alliance would have to reduce the size of its staff and, therefore, our services to members, in ways that would have significant and lasting impacts on the coalition's capacity to engage in essential functions. These losses would make the Virginia Action Alliance less effective as a coalition and undermine its role as the state authority on sexual violence prevention, intervention, and response. And if the Virginia Action Alliance lost its federal funding and needed to downsize considerably, it would lose the capacity to provide the infrastructure necessary to operate direct services like the statewide crisis response hotline.

34.     Our member programs would lose access to core, comprehensive training for their staff necessary to provide legally and ethically compliant advocacy services to clients in addition

to regular training on emergent issues that ensure front-line staff are able to provide quality services to all survivors. The state would lose critical technical assistance infrastructure at the coalition as this grant allows staff to travel across the state in order to provide on request, one-on-one or team/staff-wide assistance on complex advocacy issues such as building coordinated community response teams and sexual assault response teams, improving systemic responses in legal, medical, and social services settings, shelter policies and practices, confidentiality and trauma-informed advocacy, and more.

35.    The Virginia Action Alliance would no longer be able to provide new and continuing advocates across the state with: (1) ongoing training and technical assistance; (2) resources that educate members on best practices, update them on changes to state and federal law, and help survivors and the public recognize violence, find safety, and access available resources; or (3) systems coordination support, including tailored technical assistance, training, and coaching on building and sustaining community partnerships. Additionally, we would not have the funding needed to document and collect data meant to provide localities and the state with critical information on service trends, victim help-seeking behavior, prevention programming, and outcomes for victims and their families who are served by Virginia's sexual and domestic violence agencies. The training, technical assistance, data, and best practice building vacuum would undermine the viability and sustainability of organizations across the state, and their ability to meet grant application and management requirements, specifically for culturally specific service providers who tend to be smaller, less resourced organizations that lack historical infrastructure. These are just some of the ways the Virginia Action Alliance's programming and its beneficiaries would suffer.

## VII. Cuts to the Virginia Action Alliance's and its Members' Services Would Harm Domestic Violence and Sexual Assault Victims and Survivors

36.    The reduction or outright termination of these services would have devastating effects on the community of survivors and victims of sexual violence.

37.    In the absence of fully funded Virginia Action Alliance services, sexual assault victims will be confronted with more barriers when trying to access services following their assault, including discriminatory treatment from medical, law enforcement or courtroom personnel, hotline operators, and therapists who have not received anti-bias and other core victim services training. This will immediately lead to more survivors choosing not to participate in the criminal justice system and fewer being linked to and receiving appropriate medical and therapy services. Direct service providers will be unable to maintain high quality services that follow best practice guidance or even that are fully compliant with the myriad federal, state, and local requirements they would now have to navigate on their own, without the critical assistance of coalitions, while desperately trying to keep up with the already increasing demand for services.

38.    The Virginia Action Alliance's "VAdata system" produces annual reports highlighting service trends statewide that attest to the impact of OVW-funded member agencies on survivors. Survivors regularly attest to the impact of advocacy and support services on their lives. For instance, a survivor stated of a member program in 2019 that "[w]ithout this program, I wouldn't be able to bring my soon-to-be-born little boy home, because I would not have had a safe home to bring him to. It's because of this shelter . . . that I'm gonna be a mommy." Virginia Sexual & Domestic Violence Action Alliance, *Virginia Statistics and Data Reports*, (last visited June 24, 2025), https://vsdvalliance.org/annual-data-reports/. Survivors stated in 2021 that if domestic violence and sexual assault advocacy services had not existed, they "[w]ouldn't have known my basic rights as a mother to protect my family and kids," and "would have to bounce

around the system until I found answers." *Id.* In 2023, survivors attested that if a shelter had not existed, "I wouldn't have felt like I would've been able to leave." Virginia Sexual & Domestic Violence Action Alliance, 2023 Advocacy in Virginia Report, at 9 (Sept. 2024), https://vsdvalliance.org/wp-content/uploads/2024/09/2023-Advocacy-in-Virginia-Report-2.pdf.

39.     The Virginia Action Alliance's operations are essential to permitting the network of direct service providers to focus on providing the highest-quality services to the survivors they serve and ensuring that the systems that contribute to addressing and responding to the epidemic of sexual violence are operating with evidence-based, trauma-informed, survivor-centered policies and practices.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 25, 2025.

Jonathan Yglesias
Digitally signed by Jonathan Yglesias
Date: 2025.06.25 15:58:24 -04'00'

Jonathan Yglesias
Director of Mission Advancement
Virginia Sexual and Domestic Violence
Action Alliance