# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.*,<br><br>    Plaintiffs,<br><br>*v.*<br><br>PAMELA BONDI, *et al.*,<br><br>    Defendants. | Civil Action No.<br>1:25-cv-00279-WES-AEM |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND FOR RELIEF UNDER 5 U.S.C. § 705**

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................1

BACKGROUND....................................................................................................2

    A.    VAWA's Grant Programs ..........................................................2

    B.    OVW's NOFOs..........................................................................8

    C.    President Trump is Inaugurated and Sets Policy Priorities.................9

    D.    OVW Issues Guidance for 2025 Award Applications ......................10

    E.    This Litigation ...........................................................................11

LEGAL STANDARD............................................................................................12

ARGUMENT .......................................................................................................13

I.    Plaintiffs Are Not Likely To Succeed on the Merits. ....... **Error! Bookmark not defined.**

    A.    The Court Lacks Jurisdiction Where Plaintiff Seeks to Modify the Terms of a Federal Grant. .....................................................................13

    B.    Plaintiffs' APA Claims Are Unlikely to Succeed...............................16

    C.    Plaintiffs' Fifth Amendment Challenges Fail....................................27

    D.    Plaintiffs' First Amendment Challenges Fail....................................34

    E.    Plaintiffs' Separation-of-Powers Claims are not Likely to Succeed on the Merits..................................................................................36

II.    The Remaining Factors Counsel Against Granting the Requested Relief......................39

    A.    Plaintiffs Have Not Shown Irreparable Harm Because Their Claims Are Premature. ...........................................................................39

    B.    The Balance of the Equities and Public Interest Disfavor an Injunction.............40

III.    Any Injunctive Relief Should be Narrowly Tailored and Permit Lawful Agency Activity.................................................................................41

    A.    Injunctive Relief Should Be Limited to the Plaintiffs and Agency Defendants Only. ....................................................................41

B.       Injunctive Relief Pursuant to Section 705 Should Be Denied. ...........................42

IV.    Any Injunctive Relief Should Be Stayed Pending Appeal and Accompany a Bond........44

CONCLUSION ...................................................................................................................45

# TABLE OF AUTHORITIES

**CASES**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013) .......................................................................................... 31

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
  357 F.3d 62 (D.C. Cir. 2004) ............................................................................. 13

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
  103 F.4th 765 (11th Cir. 2024) .......................................................................... 32

*Am. Sci. & Eng'g, Inc. v. Califano*,
  571 F.2d 58 (1st Cir. 1978) ................................................................................ 13

*Bd. of Regents of State Colls. v. Roth*,
  408 U.S. 564 (1972) ..................................................................................... 27, 29

*Bennett v. Ky. Dep't of Educ.*,
  470 U.S. 656 (1985) ........................................................................................... 29

*Bennett v. Spear*,
  520 U.S. 154 (1997) ..................................................................................... 16, 19

*Biden v. Missouri.*,
  595 U.S. 87 (2022) ............................................................................................. 29

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) ............................................................................. 27

*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559 (1996) ........................................................................................... 26

*Boaz Hous. Auth. v. United States*,
  994 F.3d 1359 (Fed. Cir. 2021) ......................................................................... 13

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
  370 F.3d 151 (1st Cir. 2004) ............................................................................. 36

*Citizens Alert Regarding Env't v. EPA*,
  102 F. App'x 167 (D.C. Cir. 2004) .................................................................... 18

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971),
    *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977) ...................... 23

iii

*Cobell v. Kempthorne,*
    455 F.3d 301 (D.C. Cir. 2006) ........................................................................... 17

*Connecticut v. Massachusetts,*
    282 U.S. 660 (1931) ............................................................................................ 37

*Consol. Edison Co. of N.Y. v. U.S. Dep't of Energy,*
    247 F.3d 1378 (Fed. Cir 2001) ........................................................................... 14

*Dalton v. Specter,*
    511 U.S. 462 (1994) ...................................................................................... 17, 34

*Diaz v. Johnson,*
    No. 19-1501, 2020 WL 9437887 (1st Cir. Nov. 12, 2020) ................................. 15

*Draper v. Healey,*
    98 F. Supp. 3d 77 (D. Mass. 2015),
    *aff'd,* 827 F.3d 1 (1st Cir. 2016) ........................................................................ 26

*EPA v. Brown,*
    431 U.S. 99 (1977) .............................................................................................. 18

*Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas,*
    445 F.3d 13 (1st Cir. 2006) ................................................................................ 12

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ............................................................................................ 23

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012) ............................................................................................ 26

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ...................................................................................... 23, 25

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ...................................................................................... 18, 24

*Frederick Douglass Found., Inc. v. District of Columbia,*
    82 F.4th 1122, at  (D.C. Cir. 2023) .................................................................... 33

*Garcia-Gonzalez v. Puig-Morales,*
    761 F.3d 81 (1st Cir. 2014) .......................................................................... 27, 28

*Goldberg v. Kelly,*
    397 U.S. 254 (1970) ............................................................................................ 27

*Grayned v. City of Rockford*,
    408 U.S. 104, at (1972) ................................................................................ 31

*Guardians Ass'n v. Civ. Serv. Comm'n*,
    463 U.S. 582 (1983) ...................................................................................... 31

*Holley v. United States*,
    124 F.3d 1462 (Fed. Cir. 1997) .................................................................... 13

*In re Joliet-Will Cnty. Cmty. Action Agency*,
    847 F.2d 430 (7th Cir. 1988) ........................................................................ 29

*Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*,
    802 F.3d 99 (1st Cir. 2015) ........................................................................... 27

*Jean v. Mass.achusetts State Police*,
    492 F.3d 24 (1st Cir. 2007) ........................................................................... 12

*Johnson v. District of Columbia*,
    71 F. Supp. 3d 155 (D.D.C. 2014) ................................................................ 33

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ...................................................................... 26

*Leathers v. Medlock*,
    499 U.S. 439 (1991) ...................................................................................... 32

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ................................................................................ 19, 20

*Louisiana v. Biden*,
    64 F.4th 674 (5th Cir. 2023) ......................................................................... 17

*Love v. Butler*,
    952 F.2d 10 (1st Cir. 1991) ........................................................................... 26

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ................................................................................. 17, 39

*Matos ex rel. Matos v. Clinton Sch. Dist.*,
    367 F.3d 68 (1st Cir. 2004) ........................................................................... 36

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ................................................................. 13, 14

*Moody v. NetChoice, LLC*,

603 U.S. 707 (2024) .................................................................................................... 31

*Munaf v. Geren*,
   553 U.S. 674 (2008) ............................................................................................. 11

*Narragansett Indian Tribe v. Guilbert*,
   934 F.2d 4, at (1st Cir. 1991) ............................................................................. 36

*Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Hum. Servs.*,
   631 F. Supp. 2d 17 (D.D.C. 2009) ...................................................................... 39

*Nat'l Endowment for the Arts v. Finley*,
   524 U.S. 569 (1998) ................................................................................. 29, 30, 32

*Nat'l Urb. League v. Trump*,
   No. 25-cv-471, 2025 WL 1275613 (D.D.C. May 2, 2025) ................................... 28

*Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*,
   435 F.3d 326, at (D.C. Cir. 2006) ....................................................................... 39

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*,
   287 F.3d 1 (1st Cir. 2002) ................................................................................... 12

*New Vision Photography Program, Inc. v. District of Columbia*,
   54 F. Supp. 3d 12 (D.D.C. 2014) ........................................................................ 28

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................. 12, 38, 39

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ............................................................................................... 16

*Palantir USG, Inc. v. United States*,
   129 Fed. Cl. 218 (Fed. Cl. 2016),
   *aff'd*, 904 F.3d 980 (Fed. Cir. 2018) .................................................................. 24

*Perry Cap. LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) ............................................................................ 13

*Perry v. Sindermann*,
   408 U.S. 593 (1972) ............................................................................................. 27

*Planned Parenthood v. Azar*,
   316 F. Supp.3d 291 (D.D.C. 2018),
   *vacated as moot*, 942 F.3d 512 (D.C. Cir. 2019) .............................................. 18

*Pub. Serv. Co. of N.H. v. Town of W. Newbury*,
  835 F.2d 380 (1st Cir. 1987) ...................................................................... 36

*Rattlesnake Coal. v. EPA*,
  509 F.3d 1095 (9th Cir. 2007) .................................................................... 18

*Rice v. Paladin Enters., Inc.*,
  128 F.3d 233 (4th Cir. 1997) ...................................................................... 32

*Rust v. Sullivan*,
  500 U.S. 173, at (1991) ......................................................................... 31, 32

*Savantage Fin. Servs., Inc. v. United States*,
  595 F.3d 1282 (Fed. Cir. 2010) .................................................................. 23

*Sessions v. Dimaya*,
  584 U.S. 148 (2018) ................................................................................... 25

*Sharp v. Weinberger*,
  798 F.2d 1521 (D.C. Cir. 1986) ................................................................. 15

*Sherley v. Sebelius*,
  689 F.3d 776 (D.C. Cir. 2012) ................................................................... 24

*Smith & Wesson v. United States,*
  782 F.2d 1074 (1st Cir. 1986) .................................................................... 28

*South Dakota v. Dole*,
  483 U.S. 203 (1987) ............................................................................. 35, 36

*Spectrum Leasing Corp. v. United States*,
  764 F.2d 891 (D.C. Cir. 1985) ............................................................. 14, 15

*Sprague Elec. Co. v. Tax Ct. of the U.S.*,
  340 F.2d 947 (1st Cir. 1965) ...................................................................... 13

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ................................................................................... 33

*Town of Castle Rock v. Gonzalez*,
  545 U.S. 748 (2005) ................................................................................... 27

*Trump v. CASA, Inc.*,
  No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025) ............................. 38

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,

770 F. Supp. 3d 155 (D.D.C. 2025),
*appeal dismissed*, No. 25-5066, 2025 WL 1350103 (D.C. Cir. May 2, 2025).......................15

*U.S. Dep't of Educ. v. California*,
145 S. Ct. 966 (2025).......................................................................14, 15, 37, 38

*United Aeronautical Corp. v. U.S. Air Force*,
80 F.4th 1017 (9th Cir. 2023)..................................................................14

*United States v. Am. Libr. Ass'n*,
539 U.S. 194 (2003)..............................................................................32

*United States v. Brennick*,
908 F. Supp. 1004 (D. Mass. 1995)..........................................................30

*United States v. Hansen*,
599 U.S. 762 (2023)..........................................................................31, 33

*Up State Fed. Credit Union v. Walker*,
198 F.3d 372 (2d Cir. 1999).....................................................................14

*Vera Inst. of Just. v. Dep't of Just.*,
25-CV-1643 (APM), 2025 WL 1865160 (D.D.C. July 7, 2025), *appeal filed*, No. 25-5248
(D.C. Cir. July 10, 2025)..........................................................................28

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ............................................................................11, 12

*Worman v. Healey*,
293 F. Supp. 3d 251 (D. Mass. 2018),
*aff'd*, 922 F.3d 26 (1st Cir. 2019)..............................................................26

*Ysursa v. Pocatello Educ. Ass'n*,
555 U.S. 353 (2009).................................................................................32

**STATUTES**

5 U.S.C. § 701(a)(2) ................................................................................19

5 U.S.C. § 704................................................................................16, 17, 19

5 U.S.C. § 705.........................................................................................12

18 U.S.C. § 1001 .................................................................................8, 33

20 U.S.C. § 954(d)(1) ............................................................................................... 29

28 U.S.C. § 1491(a)(1) ............................................................................................... 13

34 U.S.C. § 10441, *et seq* ........................................................................................... 5

34 U.S.C. § 10441(b)(10) ........................................................................................... 23

34 U.S.C. § 10441(c)(1) ............................................................................................... 5

34 U.S.C. § 10441(c)(2) ......................................................................................... 4, 23

34 U.S.C. § 10442 ............................................................................................... 24, 29

34 U.S.C. § 10442(b) ................................................................................... 3, 4, 20, 34

34 U.S.C. § 10444(5)(B)-(C) ............................................................................ *passim*

34 U.S.C. § 10444(8) ......................................................................................... *passim*

34 U.S.C. § 10445 .......................................................................................................... 3

34 U.S.C. § 10461(b)(5) ............................................................................................. 22

34 U.S.C. § 12291(a)(24) ....................................................................................... 5, 22

34 U.S.C. § 12291(a)(51) ....................................................................................... 5, 22

34 U.S.C. § 12291(b)(5) ..................................................................................... 5, 6, 35

34 U.S.C. § 12291(b)(13)(A) ............................................................................. 5, 22, 35

34 U.S.C. § 12291(b)(13)(B) ......................................................................................... 5

34 U.S.C. § 12291(b)(13)(D) ......................................................................................... 5

34 U.S.C. § 12291(a)(51) ..................................................................................... 22, 35

34 U.S.C. § 12341(b)(2) ............................................................................................. 22

34 U.S.C. § 12511 ......................................................................................................... 5

34 U.S.C. § 12511(a) ..................................................................................................... 6

34 U.S.C. § 12511(d)(2) ............................................................................................... 6

42 U.S.C. § 10411 ...................................................................................................4

42 U.S.C. § 280b *et seq.*.........................................................................................4

42 U.S.C. § 280b-1b(a)...........................................................................................4

42 U.S.C. § 280b-1b(d)(4).......................................................................................4

42 U.S.C. § 10411(a)...............................................................................................4

42 U.S.C. § 10411(d)...............................................................................................4


**RULES**

Fed. R. App. P. 8(a)...............................................................................................39

Fed. R. Civ. P. 65(c)..............................................................................................39


**REGULATIONS**

2 C.F.R. pt. 200 ......................................................................................................6

2 C.F.R. pt. 200, app. I(b)(3)(i)(A) .......................................................................7

2 C.F.R. pt. 200, app. I(b)(3)(i)(G) .......................................................................7

2 C.F.R. § 200.211(c)(2) .........................................................................................7

2 C.F.R. § 200.340(a)(4) .........................................................................................7

2 C.F.R. § 2800.101.................................................................................................6

28 C.F.R. § 90.4(c)................................................................................................22


**OTHER AUTHORITIES**

2 Richard J. Pierce Jr., *Administrative Law Treatise* (5th ed. 2010)...........................................28

*Ending Illegal Discrimination and Restoring Merit-Based Opportunity,*
   Exec. Order No. 14,173, 90 Fed. Reg. 8633 (2025)..........................................8, 9

*Ending Radical and Wasteful Government DEI Program and Preferencing,*

Exec. Order No. 14,151, 90 Fed. Reg. 8339 (2025) ........................................................... 8, 9

*Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government,*
Executive Order No. 14,168, 90 Fed. Reg. 8615 (2025) .................................................. 9, 10

*Federal Leadership on Reducing Text Messaging While Driving ,*
Exec. Order No. 13,513, 74 Fed. Reg. 51225 (2009) ........................................................ 8

U.S. DOJ, OVW, *FY25 General Terms and Conditions* § 15, https://perma.cc/FR3E-FB3H ..... 10

## INTRODUCTION

Plaintiffs, all applicants for continued government funding, have run to Court seeking an injunction to excise certain terms included in this year's grant applications. The Court should not entertain Plaintiffs' motion. To start, Plaintiffs' claims face a threshold barrier: this Court lacks subject-matter jurisdiction over them. Plaintiffs' lawsuit asks the Court to require the government to modify the terms of its contracts with Plaintiffs—but the Tucker Act vests exclusive jurisdiction over such disputes with the Court of Federal Claims. If Plaintiffs' claims proceed at all, they must be heard there.

Even if the Court had jurisdiction, Plaintiffs have not satisfied the demanding standard for a preliminary injunction. Plaintiffs cannot show a likelihood of success on the merits. Plaintiffs' APA claims fail at the threshold because Plaintiffs do not challenge a final agency action, and grant terms are committed to agency discretion by law and thus unreviewable. And on the merits, Plaintiffs cannot demonstrate that the grant terms are contrary to law or arbitrary and capricious.

Plaintiffs' constitutional claims fare no better. The First Amendment has long conserved the Federal Government's authority to direct spending of federal funds in conformity with its own viewpoint. The Due Process Clause claims falter because no protected property interest is at issue with respect to federal contracts in this context and, even if it were, the flexible constraints of procedural due process are met. And the "void for vagueness" doctrine is inapplicable in the government funding context. Finally, Plaintiffs' separation of powers claims are ultimately duplicative of their other claims, or otherwise not cognizable.

In addition to lacking success on the merits, Plaintiffs cannot show irreparable harm. The Office on Violence Against Women (OVW), which administers grant programs pursuant to the Violence Against Women Act (VAWA) and its reauthorizations, is currently accepting funding applications for fiscal year (FY) 2025 and expects to issue funding decisions on a rolling basis

1

beginning around September 2025. Plaintiffs' challenge is therefore premature. Only some Plaintiffs have applied for grants that include the specified terms. No Plaintiff has been denied a grant award with these terms—indeed, the application results have not yet been announced. And there is no evidence that Plaintiffs have been threatened with having a grant award terminated for noncompliance with a challenged condition, let alone actually terminated. Revealing the premature nature of their challenge, Plaintiffs construct several hypothetical scenarios they claim might arise were they to agree to the grant terms. But none of these scenarios are presently before the Court. Moreover, the alleged harm from refusing to apply for the grants is monetary, which is quintessential reparable harm. And any alleged harm arising from possible future False Claims Act liability is entirely speculative.

Finally, the public interest and balance of equities do not favor an injunction because much of the disbursement of public funds to Plaintiffs is likely irreversible, and the government has an interest in ensuring federal funds are used in compliance with federal law and policies.

If the Court nonetheless grants Plaintiffs' Motion, any injunctive relief should be narrowly tailored to the parties in this case and the specific terms and grants at issue, should allow for lawful agency activity, and should be secured by an appropriate bond—and regardless, should be stayed pending a determination by the Solicitor General whether to appeal and, if appeal is authorized, pending any appeal.

## BACKGROUND

### A.    VAWA's Grant Programs

The Violence Against Women Act (VAWA) was enacted in 1994 to address congressional concerns about violent crimes that are disproportionately perpetrated against women, including domestic violence, sexual assault, and stalking. S. Rep. 102-197, at 43 (1991); *see also* S. Rep. No. 103-138, at 42 (1993). Among other things, it allowed for enhanced sentencing of repeat

2

federal sex offenders, mandated restitution to victims of specified federal sex offenders, established protections for battered immigrants, and authorized grants to state, local, and tribal law enforcement to investigate and prosecute violent crimes against women, as well as to nonprofit organizations serving victims. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. IV, 108 Stat. 1902-1955 (Sept. 13, 1994). VAWA was reauthorized and amended in 2000, 2006, 2013, and 2022, with each reauthorization amending existing law and enacting new provisions, including revising existing grant programs and creating new ones. Victims of Trafficking and Violence Prevention Act of 2000, Pub. L. No. 106-386, div. B, 114 Stat. 1491-1539; Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960-3135 (2006); Violence Against Women and Department of Justice Reauthorization Act—Technical Corrections, Pub. L. No. 109-271, 120 Stat. 750-69 (2006); Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat. 54-160; Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, div. W, 136 Stat. 49, 840-962.

### 1.     OVW Administers VAWA-Authorized Grant Programs

Many parts of VAWA are administered by the Office on Violence Against Women (OVW) within the Department of Justice (DOJ), which was statutorily established by the Violence Against Women Office Act of 2002 (Office Act). *See* 34 U.S.C. § 10444(5)(B)-(C); Declaration of Virginia Baran, OVW Deputy Director for Grants Development and Management (attached as Exhibit 1) at ¶ 3 (Baran Decl.). OVW administers more than two dozen federal grant programs, most of which are authorized by VAWA and subsequent legislation. Baran Decl. ¶ 3. The Office Act provides that the OVW Director "shall have final authority over *all* grants, cooperative agreements, and contracts awarded by the Office." 34 U.S.C. § 10442(b) (emphasis added). Moreover, the

OVW Director's duties include "the development and management of grant programs and other programs, and the provision of technical assistance under such programs," "the award and termination of grants, cooperative agreements, and contracts[,]" and "[e]stablishing such rules, regulations, guidelines, and procedures as are necessary to carry out any function of the Office." *Id*. § 10444(5)(B)-(C), (8).[1]

OVW administers two types of grant programs pursuant to VAWA: formula and competitive/discretionary.[2]  Relevant here, Plaintiffs are recipients of quasi-formula grants provided by the State and Territory Domestic Violence and Sexual Assault Coalitions Program (the Coalitions Program).[3]  *See* Mem. in Supp. of Pls.' Mot. for Prelim. Inj. & For Relief Under 5 U.S.C. § 705 (Mot.) at 1, 7-9, ECF No. 15-1; Baran Decl. ¶ 35.  The Coalitions Program establishes funding for state coalitions that are recognized by the Department of Health and Human Services (HHS) as a Domestic Violence Coalition, a Sexual Assault Coalition, or both.  *See* 34 U.S.C. § 10441(c)(2) (requiring the Attorney General to award grants to each domestic violence coalition, as determined by HHS under 42 U.S.C. § 10411, and to each sexual assault coalition, as determined by HHS under the Public Health Service Act, 42 U.S.C. §§ 280b *et seq*.).

Plaintiffs are seventeen of the 86 Coalitions currently designated by HHS. Mot at 1, 7-9;

---

[1]  Authorization to carry out the Director's responsibilities extends to the OVW staff.  *See* 34 U.S.C. § 10445 ("The Attorney General shall ensure that the Director has adequate staff to support the Director in carrying out the Director's responsibilities under this subchapter.").

[2]  *See* 2 C.F.R. § 200.1 (defining "discretionary award" as "an award in which the Federal agency, in keeping with specific statutory authority that enables the agency to exercise judgment ('discretion'), selects the recipient or the amount of Federal funding awarded through a competitive process or based on merit of proposals" and noting that "[a] discretionary award may be selected on a non-competitive basis, as appropriate").

[3]  The program is a quasi-formula program in that, rather than naming the eligible entities, the statute delegates designation of such entities to the discretion of the Executive Branch.  *See* 34 U.S.C. § 10441(c)(2) (directing the award of Coalitions Program grants to each coalition as determined by the Secretary of Health and Human Services and the Center for Injury Prevention and Control of the Centers for Disease Control and Prevention).

4

Baran Decl. ¶ 39. Each designated Coalition receives an equal amount of the total funds allocated to the Coalitions Program under VAWA, provided that the Coalition submits an application that complies with statutory requirements, including the information that OVW determines to be essential to carry out the statutory purposes of the program. *See* 34 U.S.C. §§ 10446(b)(2)-(3); 12511(d)(1) & (4).

In addition to formula grant programs, OVW administers twenty-two discretionary grant programs. Baran Decl. ¶ 3. Relevant here, Coalitions may also apply for discretionary grants administered by OVW.[4] OVW is responsible for selecting discretionary award recipients based on merit and eligibility, in accordance with authorizing legislation. *Id.*

## 2. VAWA Grant Programs Are Subject to Statutory Requirements

VAWA has requirements that apply across-the-board to all VAWA-funded grant programs. Critical across-the-board provisions include:

- A requirement that recipients not discriminate against individuals "on the basis of actual or perceived race, color, religion, national origin, sex, gender identity, sexual orientation, or disability[.]" 34 U.S.C. § 12291(b)(13)(A). The nondiscrimination requirement allows recipients to provide sex-segregated or sex-specific programming if doing so is necessary for the essential operation of a program (for example, in the case of women's safety), so long as the recipient provides "comparable services" to others, *id.* § 12291(b)(13)(B), and clarifies that the provision does not preempt civil rights laws, *id.* § 12291(b)(13)(D).

- A requirement that program funds "may be used only for the specific purposes described in [VAWA]." *Id.* § 12291(b)(5).

---

[4] In addition to funding through OVW, these Coalitions receive funding from HHS. 42 U.S.C. §§ 10411(a) & (d), 280b-1b(a) & (d)(4).

- A definition of "victim services" or "services" as used in VAWA to include "legal assistance." *Id.* § 12291(a)(51). Relatedly, a definition of "legal assistance" to include assistance provided to victims by, *inter alia*, a licensed attorney or Board of Immigration Appeals accredited representative in a matter relating to immigration. *Id.* § 12291(a)(24).

In addition to adhering to across-the-board requirements, Coalitions must adhere to specific requirements in VAWA that authorize funding for the Coalitions Grant Program. Both Domestic Violence and Sexual Assault Coalitions receive funding set aside under the appropriation for the "Services, Training, Officers, Prosecutors (STOP) Violence Against Women Formula Grant Program." *Id.* § 10441, *et seq.* STOP set-aside funding for Coalitions must be used for: "coordinating state victim services activities, and collaborating and coordinating with federal, state, and local entities engaged in violence against women activities." *Id.* § 10441(c)(1).

Sexual Assault Coalitions also receive funding under the "Sexual Assault Services Program (SASP)." *Id.* § 12511. The overarching purposes of SASP are to assist victims of sexual assault and to offer training and technical assistance relating to sexual assault to governments, law enforcement, professionals, and other individuals and organizations. *Id.* § 12511(a). Specifically, SASP sets aside funding for Coalitions that must be used for six activities, including "work[ing] with judicial and law enforcement agencies to encourage appropriate responses to sexual assault cases" and "work[ing] with courts, child protective services agencies, and children's advocates to develop appropriate responses to child custody and visitation issues when sexual assault has been determined to be a factor[.]" 34 U.S.C. § 12511(d)(2).

### 3.    OVW Ensures Grant Funds Fulfill VAWA's Requirements

OVW is responsible for ensuring that grant funds are used only for activities that comply with VAWA's across-the-board requirements and specific requirements for each grant program.

6

*See id.* §§ 12291(b)(5) (providing that VAWA funds "may be used only for the specific purposes described in [VAWA]"); 10444(5)–(7) (assigning to OVW the functions of the Department of Justice under VAWA, including "the development and management of grant programs," the provision of technical assistance, coordination, and support to grantees, and the establishment "of such rules, regulations, guidelines, and procedures as are necessary to carry out any function of the Office"). But OVW does not leave grant recipients in the dark. Rather, to ensure recipients comply with the law, OVW closely guides them throughout the pre- and post-award process, including by working to ensure programs are compliant with VAWA's requirements. *See* Baran Decl. ¶¶ 26-30. Because OVW's goal is for grantees to successfully further VAWA's purposes, OVW works to ensure any out-of-scope project can get "back on track." *Id.* ¶ 32.

### 4.    VAWA Grant Programs Are Subject to OMB Regulations

Office of Management and Budget ("OMB") regulations also govern VAWA grant programs. *See generally* 2 C.F.R. pt. 200 (titled "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"); *see also* 2 C.F.R. 2800.101 (Department of Justice adoption, except as otherwise provided therein, of "the Office of Management and Budget (OMB) Guidance in 2 CFR part 200").

OMB regulations require agencies to issue a Notice of Funding Opportunity ("NOFO") for all grant programs. The NOFO must include "the general purpose of the funding" and "[i]nformation on program-specific unallowable costs so that the applicant can develop an application and budget consistent with program requirements." *See* 2 C.F.R. pt. 200, app. I(b)(3)(i)(A) & (G). OVW issues therefore NOFOs for both formula and discretionary grant programs. *See, e.g.*, Mot. Ex. A at 4 (describing the document as a NOFO for the Coalition Program). OMB regulations also recognize an agency is obligated to incorporate "national policy

requirements," including executive orders and other Presidential directives, into the terms and conditions of federal grant awards. *See* 2 C.F.R. § 200.211(c)(1)(ii). OMB regulations also require an agency to list "General Terms and Conditions" for grant programs on its website. *Id.* § 200.211(c)(2).

**B.    OVW's NOFOs**

OVW solicits applications for each of their grant programs, including the quasi-formula grants to Coalitions, through NOFOs. The NOFOs have historically emphasized the priorities of different Presidential Administrations in implementing VAWA. Baran Decl. ¶¶ 9-10. For example, the Biden Administration NOFOs frequently included a phrase not found in VAWA—"historically marginalized"—while terms such as "unconscious bias" or "intersectionality" were deemed to be potential indicators of trainings that teach divisive concepts during the first Trump Administration. *Id.*

Since at least 2015, OVW's NOFOs have identified certain out-of-scope activities in order to alert applicants to a grant program's statutory scope. *See id.* at ¶ 10. The list of out-of-scope activities has been revised over time in response to activities commonly proposed by applicants that are noncompliant. *Id.* For example, OVW added an out-of-scope activity to a NOFO for a discretionary grant program focused on crimes on college campuses after learning recipients were using grant funds to distribute materials on topics unrelated to the grant program's statutory scope, including women's empowerment and sex education. *Id.* at ¶ 7(a).

OVW also posts on its website General Terms and Conditions governing grant programs. In keeping with the requirement in 2 C.F.R. § 200.211(c)(1)(ii) that federal awards include national policy requirements, these terms have been updated over time to reflect the Executive Orders of different Presidential Administrations. For example, one general condition encourages recipients

8

to ban text messaging while driving, as required by a 2009 Executive Order No. 13513, *Federal Leadership on Reducing Text Messaging While Driving*. Baran Decl. ¶ 12. And since at least 2017, these general conditions included terms requiring "[c]ompliance with DOJ regulations pertaining to civil rights and nondiscrimination" and notifying applicants that materially false statements relating to an award may lead to criminal prosecution under 18 U.S.C. § 1001 or lead to civil penalties and administrative remedies under the False Claims Act. *Id.* ¶ 12.

### C.    President Trump is Inaugurated and Sets Policy Priorities

On January 20, 2025, President Trump assumed the office of President of the United States. On that day, and in the weeks after, he issued various Executive Orders setting new policy priorities for his administration.

On January 20, the President issued Executive Order No. 14,151, 90 Fed. Reg. 8339, *Ending Radical and Wasteful Government DEI Program and Preferencing* (EO 14,151). Similarly, on January 21, 2025, the President issued Executive Order No. 14,173, 90 Fed. Reg. 8633, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* (EO 14,173). This second Executive Order's "purpose" is to ensure that the federal government is "enforcing our civil-rights laws" by "ending illegal preferences and discrimination." *Id.* § 1. The Executive Order instructed each federal agency to include certain terms in "every contract or grant award" and the OMB Director to "[e]xcise references to DEI and DEIA principles . . . from Federal acquisition, contracting, grants, and financial assistance procedures." *Id.* § 3(b)(iv) & (c)(ii).

Another Executive Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025), entitled *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (EO 14,168), provides, among other things, that "[a]gencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id.* § 3(e).

9

It also includes a Promoting Gender Ideology Provision, which provides that "Federal funds shall not be used to promote gender ideology" and that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* § 3(g).

All the orders make clear that they must be "implemented consistent with applicable law." *See* EO 14,151 § 4(b); EO 14,173 § 8(b); EO 14,168 § 8(b).

### D.    OVW Issues Guidance for 2025 Award Applications

The President having set new policy priorities, agencies with grantmaking authority began considering next steps to implement these priorities within the scope of their statutes.  Defendants carefully considered the policies and the statutory scope of VAWA to draft terms included in its NOFOs for fiscal year 2025, published on a rolling basis starting around May 2025.  Baran Decl. ¶¶ 15-25.

### 1.    OVW Updates its Out-of-Scope Funding Activities for FY 2025

To reflect the President's policy priorities, OVW updated its out-of-scope funding activities listed in its FY 2025 NOFOs.  *See* Mot. Ex. B at 10-11.  Relevant here, Plaintiffs object to eight of fifteen out-of-scope activities included in OVW's FY 2025 NOFOs:

- Promoting or facilitating discriminatory programs or ideology, including illegal DEI and "diversity, equity, inclusion, and accessibility" programs that do not advance the policy of equal dignity and respect, as described in Executive Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity. ("Illegal DEI Term");

- Inculcating or promoting gender ideology as defined in Executive Order No. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government. ("Defending Women Term");

- Promoting or facilitating the violation of federal immigration law ("Immigration Law Violation Term");

- Programs that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women ("Anti-Law Enforcement Term");

10

- Initiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support ("Prioritizing Illegal Aliens Term");

- Activities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses (e.g., prioritizing criminal justice reform or social justice theories over victim safety and offender accountability) ("Systemic Social Justice Term");

- Awareness campaigns or media that do not lead to tangible improvements in prevention, victim safety, or offender accountability ("Campaigns without Improvements Term");

- Any activity or program that unlawfully violates an Executive Order ("EO Term").

## 2.    OVW Updates its General Terms and Conditions for FY 2025

To comply with EO 14,173, OVW updated the General Terms and Conditions for grants listed on its website. Baran Decl. ¶ 14. Updated terms require a grant recipient (1) "to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws" and (2) "to agree that its compliance in all respects with all applicable federal anti-discrimination laws is material to the government's payment decisions for purposes of [the False Claims Act]." *Id.* ¶ 14 (citing U.S. DOJ, OVW, *FY25 General Terms and Conditions* § 15, https://perma.cc/FR3E-FB3H).

## 3.    The Number of OVW Grant Applications Has Increased in 2025

The out-of-scope certification and updated general terms and conditions for FY 2025 (collectively, the "Revised Grant Terms") have not deterred grant applications. Rather, OVW has seen a significant increase in grant applications in FY 2025 as compared to last year. Specifically, in Plaintiffs' states and the states that joined an amicus brief, (ECF 17), OVW received a net 30% more applications on average under the discretionary grant programs whose application periods have closed. Baran Decl. ¶ 34. These applications include the contested grant terms. *Id.*

## E.    This Litigation

On June 16, 2025, Plaintiffs filed a Complaint for declaratory and injunctive relief against Defendants. Compl. for Decl. & Inj. Relief, ECF No. 1. The Complaint alleges violations of

11

Separation of Powers, the Spending Clause, the First Amendment, the Fifth Amendment, and the Administrative Procedure Act ("APA"). *Id.* at 59-74. On June 26, 2025, Plaintiffs filed the present motion, seeking broad preliminary injunctive relief. Mot. at 46-47. Plaintiffs object to eight out-of-scope activities and one of OVW's General Terms and Conditions that includes certification requirements. Plaintiffs seek to enjoin Defendants from applying these terms to any "pending or future" grant applications or grant awards, to declare "null and void" certifications included in already-submitted applications, and to "enjoin Defendants from disqualifying" applicants based on their refusal to include a certification. Mot. at 46. Plaintiffs also request that the Court enjoin Defendants from including in any future grant terms "that are substantially the same" as those Plaintiffs find objectionable. Compl. at 76.

## LEGAL STANDARD

A "preliminary injunction is an extraordinary and drastic remedy[.]" *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). A district court should enter a preliminary injunction only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Id.* at 20. Finally, when "the Government is the opposing party[,]" the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). Plaintiffs' likelihood of success is "the most important part of the preliminary injunction assessment: '[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors

become matters of idle curiosity.'" *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2007) (alteration in original) (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.,* 287 F.3d 1, 9 (1st Cir. 2002)).

5 U.S.C. § 705 authorizes certain interim relief under the APA. However, Section 705 relief is limited: a reviewing court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

## ARGUMENT

I.     **PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS.**

   A.     **The Court Lacks Jurisdiction Where Plaintiff Seeks to Modify the Terms of a Federal Grant.**

The Court lacks jurisdiction over this matter because Congress has specifically divested federal courts of jurisdiction over matters arising from government contracts. Here, Plaintiffs ask to "set aside" grant terms that they dislike, and "preliminarily and permanently enjoin" Defendants from ever including grant terms that remind grantees to comply with equal protection or immigration laws or the core tenets of VAWA. Compl. at 75-76; Mot. at 45-47. At bottom, Plaintiffs seek to modify the government's grant terms to align with terms they would prefer.

That triggers jurisdiction in the Court of Federal Claims under the Tucker Act, which grants exclusive jurisdiction to the Court of Federal Claims over "any claim against the United States founded" on "any express or implied contract with the United States" involving amounts over ten thousand dollars. 28 U.S.C. § 1491(a)(1). That court may hear "claim[s] against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." *Id.*

As the First Circuit has long recognized, the Court lacks jurisdiction where "the essence of the action is in contract"—and plaintiff "cannot 'by the mystique of a different form of complaint' make it otherwise[.]" *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978) (quoting *Sprague Elec. Co. v. Tax Ct. of the U.S.*, 340 F.2d 947, 948 (1st Cir. 1965)). Thus, regardless of how a claim is styled, a case must proceed only in the Court of Federal claims if a case "is in 'its essence' contractual[.]" *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)); *see also Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004); *Holley v. United States*, 124 F.3d 1462, 1466 (Fed. Cir. 1997) ("The presence of a constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a properly brought claim under the Tucker Act, or bar the court from considering the constitutional issue in the course of determining whether the [challenged action] was wrongful."). This prohibition on district court jurisdiction extends to claims founded on grants that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).

Determining whether "a particular action" is "at its essence a contract action" outside the jurisdiction of district courts requires looking at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968 (citation omitted); *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (applying *Megapulse*). Both prongs point toward a lack of district court jurisdiction here.

First, the source of the rights Plaintiffs assert are the grant agreements themselves. Specifically, Plaintiffs challenge grant terms under various theories, but all ultimately stem from contracts without which no claims would exist. The First Amendment claims allege that the grant

terms would restrict Plaintiff's free speech; the due process claims allege certain grant terms are too vague, or were promulgated without sufficient process to support them; the separation of powers claims rehash the APA claims by asserting that the grant terms were included without authority or were not sufficiently reasoned.

In other words, "it is likely that no cause of action would exist at all" in the absence of the grants. *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 377 (2d Cir. 1999) (citation omitted). That Plaintiffs' claims could not "exist[] prior to and apart from rights created under the [agreements]" weighs sharply against district court jurisdiction. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985)*; see also Consol. Edison Co. of N.Y. v. U.S. Dep't of Energy*, 247 F.3d 1378, 1385-86 (Fed. Cir 2001) (directing court to transfer case asserting constitutional, including due process, claims to the Court of Federal Claims in a case sounding in contract).

The relief prong likewise weighs against jurisdiction. The Supreme Court in *U.S. Department of Education v. California* recently explained that an injunction barring termination of various federal grants was effectively an order "to enforce a contractual obligation to pay money," and thus not covered by the APA's limited waiver of sovereign immunity. 145 S. Ct. 966, 968 (2025) (citation omitted). Instead, the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over such suits. *Id.* In *California*, several plaintiffs brought an APA challenge to termination of federal grants related to DEI, seeking an "injunction against further unlawful terminations" along with a request to reinstate already terminated grants. *Id.* at Opp'n to Application, at 25, *Dep't of Educ. v. California*, No. 24A910 (U.S. Mar. 28, 2025). Relevant here, the Supreme Court concluded the district court lacked jurisdiction over both Plaintiffs' pre- and post-termination claims.

15

This Court should follow the Supreme Court's ruling in *California*. Plaintiffs are current recipients of VAWA grants, and the Plaintiffs' assertions of irreparable harm hinge on continued receipt of funding under the grant agreements. For example, Plaintiffs state they have "relied on Coalition Grant funds" and that a failure to order the requested relief would cause Plaintiffs to "[l]os[e] out on Coalition Grants" and would "drain annual coalition budgets of hundreds of thousands of dollars." Mot. at 40. Plaintiffs' requested relief is inextricably linked to continued grant funding.

In seeking an injunction to prevent the government from exercising contractual discretion over its grants, Plaintiffs "want[] the Government to keep paying up." *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025), *appeal dismissed*, No. 25-5066, 2025 WL 1350103 (D.C. Cir. May 2, 2025). But because the claims here are "founded upon a contract" they "must be heard in Claims Court." *Id.* at 165 (quoting *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 895 (D.C. Cir. 1985)); *see also Sharp v. Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986) (Scalia, J.) ("We know of no case in which a court has asserted jurisdiction . . . to issue an injunction compelling the United States to fulfill its contractual obligations."); *Diaz v. Johnson*, No. 19-1501, 2020 WL 9437887, at *2 (1st Cir. Nov. 12, 2020) (rejecting the plaintiff's attempt "to couch his claims in the language of equitable and declaratory relief, [because] . . . at bottom what he seeks is monetary relief . . . [but plaintiff] cannot manufacture an APA claim by asking the court to declare that the failure to fund his proposal was an arbitrary or capricious act").

**B.     Plaintiffs' APA Claims Are Unlikely to Succeed.**

Even if this Court concludes that Plaintiffs' claims are not precluded by the Tucker Act (they are), their APA claims fail at the threshold and on the merits. Plaintiffs must challenge a final, discrete agency action to establish jurisdiction under the APA. But Plaintiffs fail to do so,

16

instead asserting a broad programmatic attack on all future agency actions and challenging NOFOs, which are notices to apply for grants and are not final agency actions. Plaintiffs' APA claims also fail at the threshold because grant terms are committed to agency discretion by law. And on the merits, OVW's actions did not exceed statutory authority; rather, they were consistent with applicable law. Nor did OVW act arbitrarily or capriciously. For these reasons, Plaintiffs' APA claims should fail.

### i.    *Final Agency Action*

"[F]inal agency action" is a requirement for APA review. 5 U.S.C. § 704. A final agency action must be a "discrete" act, and a plaintiff may not bring a "broad programmatic attack." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). The Supreme Court laid out a two-part test for finality: (1) "the action must mark the 'consummation' of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature[;]" and (2) "the action must be one by which "'rights or obligations have been determined,'" or from which "legal consequences will flow[.]" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). The APA expressly excludes "preliminary, procedural, or intermediate agency action[s] or ruling[s]." 5 U.S.C. § 704.

Plaintiffs' requested relief seeks to encompass *all* future agency action without regard for the agency's decision-making process. Specifically, Plaintiffs seek to "preliminarily and permanently enjoin" Defendants from ever including the terms it finds objectionable "in *any* future NOFO" or "OVW grant award," *see* Compl. at 75 (emphasis added), and from including terms that are "substantially the same" in any future grants, *id.* at 76; *see also* Mot. at 45–47.

Plaintiffs' request is by definition a broad programmatic attack that cannot be based on the consummation of an agency's decision-making process. A plaintiff may not "in a single swipe at

the duly elected executive" seek judicial superintendence over the entire grantmaking structure of the Executive Branch. *Louisiana v. Biden*, 64 F.4th 674, 684 (5th Cir. 2023). Indeed, by Congressional ordering, the APA does not permit Plaintiffs to "seek *wholesale* improvement" of agency management "by court decree"—even in the face of allegations of "rampant" violations of law. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). "Because 'an on-going program or policy is not, in itself, a "final agency action" under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted). "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform." *Id*.

Nor does it matter that the President has set general policy directives that may flow to agencies. The Supreme Court has consistently held that "the President is not an 'agency' under that A[PA]." *Dalton v. Spector*, 511 U.S. 462, 476 (1994). As a result, the APA making "final *agency* action for which there is no other adequate remedy in a court [] subject to judicial review," is inapplicable to the President. 5 U.S.C. § 704 (emphasis added). This conclusion flows from "respect for the separation of powers and the unique constitutional position of the President[.]" *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992). Indeed, the Court in *Franklin* directly confronted what would happen if a statute invested the President with the authority to take an administrative action—there, to make certain calculations and a final apportionment from the census. *Id.* at 800. The Court concluded that the action was simply not subject to the APA's requirements including, for example, arbitrary and capricious requirements. *Id.* at 800–01. As a result, it is only the discrete final actions of agencies, not broad programmatic Presidential prerogatives, which are properly subject to APA review.

18

Plaintiffs' challenge to the terms and scope of specific FY 2025 NOFOs also lacks merit because an agency's mere request for funding applications is not final agency action. Even when "Congress has specified the specific project to which funds should be allocated, the [agency] does not take a final agency action until it completes its review of the grant application and decides to disburse the appropriated funds." *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1104 (9th Cir. 2007); *see also Citizens Alert Regarding Env't v. EPA*, 102 F. App'x 167, 168 (D.C. Cir. 2004) (holding that until the agency "completes its review and reaches a decision [on the grant award], there has been no final agency action . . . and the matter is not ripe for judicial review"); *Planned Parenthood v. Azar*, 316 F. Supp.3d 291, 300 (D.D.C. 2018) (concluding that a notice of funding opportunity that set out intermediate criteria by which applications would be evaluated was not final agency action because it announced only how "an agency decision will be made," and the plaintiffs challenged only "intermediate criteria by which applications will be evaluated") (emphasis omitted)), *vacated as moot*, 942 F.3d 512 (D.C. Cir. 2019).

The NOFOs do not determine rights and obligations, nor do legal consequences flow from them. Because OVW does not complete its review of the grant applications and decide to disburse the funds until after the applications are submitted and reviewed, the mere issuance of the NOFO does not determine rights and obligations to potential applicants. Rather, the NOFO is an interlocutory determination from which no legal consequences flow. *See Bennett*, 520 U.S. at 177–78; *see also* 5 U.S.C. § 704 (explaining that "preliminary, procedural, or intermediate" agency actions are not directly reviewable, but may be reviewed on final agency action). Because the NOFO is merely a document setting out the application process for receiving potential funding, it has no definitive legal effect and cannot be final agency action.

Accordingly, the Court should not exercise authority over future NOFOs or future grant

awards as Plaintiffs request, as "[f]or [courts] to review [agency actions] not yet promulgated, the final form of which has only been hinted at, would be wholly novel." *EPA v. Brown*, 431 U.S. 99, 104 (1977).

### ii.  Grant terms are committed to agency discretion by law.

Plaintiffs' APA claims also fail because they seek to challenge decisions quintessentially "committed to agency discretion by law[,]" for which the APA provides no avenue for review. 5 U.S.C. § 701(a)(2). An agency's determination of how best to condition appropriated funds to fulfill its legal mandates is classic discretionary agency action. *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (including "allocation of funds from a lump-sum appropriation" among the "administrative decision[s] traditionally regarded as committed to agency discretion" that have been held "to be presumptively unreviewable"); *see also Milk Train, Inc. v. Veneman*, 310 F.3d 747, 748–51 (D.C. Cir. 2002).

The fact that VAWA sets forth broad programmatic purposes for the use of grant funding does not take this case outside of the scope of the Supreme Court's decision in *Lincoln*. The statute at issue in *Lincoln* similarly directed the agency to provide funding for a broad statutory purpose, namely, for expenses of the Indian Health Service. *Lincoln*, 508 U.S. at 185. The Supreme Court nonetheless concluded that the agency's decision as to how to use funds within that scope was committed to agency discretion by law and not reviewable under the APA. *See id.* at 193.

The D.C. Circuit's opinion in *Milk Train,* which applied *Lincoln*'s reasoning to a non-lump-sum appropriation, is illustrative. There, Congress authorized the Secretary of Agriculture to distribute funds "in a manner determined appropriate by the Secretary" to compensate dairy producers "for economic losses incurred during 1999." *Milk Train*, 310 F.3d 747 at 750. The D..C. Circuit held the district court lacked jurisdiction to challenge the Secretary's decision-

making, reasoning that, "[i]nsofar as Congress has left to the Secretary's sole judgment the determination of the manner for providing assistance to dairy farmers, we hold that the district court lacked jurisdiction to review Milk Train's challenge." *Id.* at 751; *see also Amica Center for Immigrant Rights v. Dep't of Justice*, Case No. CV 25-298 (RDM), 2025 WL 1852762, at *14 (D.D.C. July 6, 2025) (citing *In re Newport News Shipbuilding & Dry Dock Co.*, 55 Comp. Gen. 812 (1976)) ("Although an agency is required to use earmarked funds for their specified purpose, an agency may still exercise discretion within the earmark.").

OVW similarly has the authority to exercise discretion in how best to further victim services. The Office Act mandates that the OVW Director "shall have final authority over *all* grants, cooperative agreements, and contracts awarded by the Office." 34 U.S.C. § 10442(b) (emphasis added). The OVW Director's duties also include "the development and management of grant programs and other programs, and the provision of technical assistance under such programs," "the award and termination of grants, cooperative agreements, and contracts," and "establishing such rules, regulations, guidelines, and procedures as are necessary to carry out any function of the Office." 34 U.S.C. § 10444(5)(B-C). OVW is further authorized to exercise discretion in awarding all grants—namely, ensuring that the funds are used "only for the specific purposes described in [VAWA]." 34 U.S.C. § 12291(b)(5).

These provisions, coupled with the requirements that Coalitions annually apply for funding through OVW under the Coalitions Program and submit information OVW deems essential to carry out the program's purposes, underscore that OVW is vested with discretionary authority over *all* its grant programs, including Coalitions Program awards. 34 U.S.C. § 12511(d)(4). And the discretionary grant awards at issue here are funded entirely out of appropriations that specify only the total funding for each grant program; therefore, any decisions regarding how much funding to

21

allocate to a particular grant recipient within the statutory framework—or whether to offer the recipient a grant award at all—are committed entirely to OVW's discretion.

### iii.    Statutory Authority

Plaintiffs argue that several VAWA provisions prohibit the grant terms at issue and exceed Defendants' statutory authority with respect to both formula and discretionary grants. *See* Mot. at 22–25.

First, Defendants do not exceed their statutory authority by expressly defining specific activities that fall outside the lawful scope of a grant program. As stated above, part I.B.ii., OVW has statutory authority to define activities that are out-of-scope, which reflects a vesting of authority to determine what will and will not be funded within the confines of a statute. This vesting of authority allows OVW to make extra-statutory, but permissible, decisions about OVW's funding, in order to "carry out" the functions of the Office and to achieve VAWA's "specific purposes." *See* 34 U.S.C. § 12291(b)(5).

Plaintiffs argue that some disputed grant terms conflict with VAWA. Mot. at 23-25. But the disputed grant terms are within the scope of VAWA and simply call attention to recipients' pre-existing obligations to comply with VAWA. *See* Baran Decl. ¶¶ 19-23. The terms impose no new obligations on recipients.

Plaintiffs argue the Illegal DEI term, which prohibits promoting or facilitating discriminatory programs including illegal DEI, conflicts with certain grant programs under VAWA. Mot. at 24. Plaintiffs first claim that VAWA has a "clear commitment to advancing DEI." *Id.* But VAWA never uses the term "DEI" or "DEIA." Rather, VAWA's purpose is to support services to victims of domestic violence, dating violence, stalking, or sexual assault, and to ensure funded programs do not discriminate in providing those services. Baran Decl. ¶ 3. Plaintiffs also seem to

argue that the Illegal DEI term prevents them from assisting racial and ethnic minorities or underserved populations. Mot. at 24. The interpretation misreads the term. The Illegal DEI term states that a grantee cannot promote "discriminatory programs or ideology," which reflects VAWA's requirement that recipients may not discriminate against individuals "on the basis of actual or perceived race, color, religion, national origin, sex, gender identity, . . . sexual orientation, or disability[.]" 34 U.S.C. § 12291(b)(13)(A).

For similar reasons, Plaintiffs' attack on the Defending Women Term fails. *See* Mot. at 23-24. Nothing in the challenged grants "requires grant applicants to act as if transgender people are not transgender[.]" *Id.* at 24. VAWA expressly prohibits OVW grantees from excluding, denying benefits to, or discriminating against any person on the basis of sex, gender identity, and sexual orientation. 34 U.S.C. § 12291(b)(13)(A)). Indeed, a note at the end of the list of out-of-scope activities states "[r]ecipients should serve all eligible victims as required by statute, regulation, or award condition." Baran Decl. ¶ 20.

Plaintiffs also object to the Violating Immigration Law term and Prioritizing Illegal Aliens terms, arguing they conflict with VAWA provisions regarding alienage status and immigration matters. Mot. at 24-25. Plaintiffs seem to suggest that VAWA requires prioritizing services to illegal aliens over United States Citizens, and that the grant terms conflict with the statute. That cannot be a permissible reading of the statute because it would violate nondiscrimination law. The Violating Immigration Law term simply prohibits using federal funds for conduct that would facilitate or promote immigration law violations. It does not prohibit otherwise lawful uses of grant funds to aid immigrant victims. Indeed, it is well within the scope of VAWA's "allowable use" of funds for grant recipients to assist victims in complying with immigration law. *See* 34 U.S.C. § 12291(a)(51), (a)(24). OVW regulations stipulate that a victim's eligibility for services

23

"is not dependent on the victim's immigration status." 28 C.F.R. § 90.4(c). Additionally, recipients may use grant funds to help victims access immigration benefits designed for abused immigrants and other immigrant victims of crime (*i.e.*, VAWA self-petitioning, VAWA cancellation of removal, and T and U visas). *See, e.g.,* 34 U.S.C. § 10461(b)(5) (allowing grant funds under the ICJR Program to be used for strengthening assistance to victims in immigration matters); *id.* § 12341(b)(2) (allowing funds under the Rural Program to be used to assist victims of domestic violence, dating violence, sexual assault, and stalking in immigration matters); *id.* § 10441(b)(10) (allowing STOP Formula Grant Program funds to be used to provide assistance to victims of domestic violence and sexual assault in immigration matters). It would be nonsensical for Plaintiffs to argue that certain VAWA provisions greenlight immigration law violations. Rather, VAWA's provisions show that grant funds can be used to assist victims in complying with the law.

Plaintiffs argue that the Systemic Social Justice Term, which prohibits framing "domestic violence or sexual assault as systemic justice issues *rather than* criminal offenses," violates VAWA. Mot. at 27 (emphasis added). Plaintiffs cannot point to any provision of VAWA to support this claim; rather, Plaintiffs cherry pick legislative history to read in a new statutory purpose. But the Systemic Social Justice Term aligns with the express textual purpose of one of VAWA's largest grant programs: "to improve the criminal justice response to domestic violence, dating violence, sexual assault, and stalking as *serious violations of criminal law*, and to seek safety and autonomy for victims." 34 U.S.C. § 10461(a) (emphasis added).

Similarly, Plaintiffs ignore that the Anti-Law Enforcement Term, which prohibits programs that limit the role of law enforcement, effectuates VAWA's emphasis on coordinated community responses. *See, e.g., id.* § 12341(b)(1) ("The Attorney General . . . may award grants . . . to . . . establish[] cooperative efforts and projects among law enforcement officers, prosecutors, victim

24

service providers, and other related parties to investigate and prosecute incidents of domestic violence, dating violence, sexual assault, and stalking . . . ."); *id.* § 20123(d) ("The Attorney General shall make grants . . . for the purpose of . . . working with Federal, State, tribal, territorial and local governments, agencies, and organizations to develop or enhance population specific services").

### iv.    *Arbitrary and Capricious Review*

Even if the Court applied arbitrary and capricious review, the challenged grant terms survive. Under the arbitrary and capricious standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A court must "uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (citation omitted). An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one[.]" *Id.* at 515. Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* And the judiciary affords a particularly lenient standard of review to agency action in the contracting context. *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) ("[D]etermining an agency's minimum needs is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess." (second and third alterations in

original) (citation omitted); *cf. Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 260-61 (Fed. Cl. 2016) ("Effective contracting demands broad discretion" so contracting decisions are subject to a "highly deferential rational basis review." (citation omitted)), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018).

The OVW Director has the final authority over the awarding of grants and may establish "rules, regulations, guidelines, and procedures" to carry out grant programs. 34 U.S.C. §§ 10442, 10444(5)(B-C), (8). These grant terms were promulgated pursuant to OVW's statutory authority. As set forth in the accompanying declaration of OVW's Deputy Director for Grants Development and Management (Supervisory Official), OVW undertook a thoughtful and considered process in developing the FY 2025 NOFOs, consistent with longstanding practices across different Presidential Administrations to emphasize out-of-scope activities and grant terms that align with current policy priorities. *See generally* Baran Decl; *see also id.* ¶ 13 (discussing examples of grant priorities ranging from "no texting while driving" to training that furthers "Arab-Muslim Engagement"). "As an agency under the direction of the executive branch," OVW "must implement the President's policy directives to the extent permitted by law." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012). It cannot be irrational for OVW to comply with the law in such a manner. Indeed, requiring a federal agency to articulate a rationale for its action—beyond simple compliance with the President's directives—would, in essence, subject the President's directive to arbitrary and capricious review, contrary to the principle that the President is not an agency under the APA. *Franklin*, 505 U.S. at 800-01.

Nor is it arbitrary for a grant program NOFO to provide guidance to applicants about a grant's scope, particularly where OVW is vested discretion to carry out the grant program. 34 U.S.C. §§ 10442, 10444(5)(B-C), (8). Plaintiffs cite no case to support their novel position that

agencies cannot take such action without first considering potential applicants who are not entitled to federal funds. And contrary to Plaintiffs' assertions (*see* Mot. at 27), OVW has seen a significant increase in grant applications in FY 2025 as compared to last year. Baran Decl. ¶¶ 33-34.

The Court should accordingly reject Plaintiffs' arbitrary and capricious claim because the grant terms are "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423.

### C.    Plaintiffs' Fifth Amendment Challenges Fail.

Plaintiffs' void-for-vagueness claims fail at the threshold for three reasons. First, the doctrine applies to statutes and regulations, not grant terms. Second, it is inapplicable to contracts between specific parties. Third, Plaintiffs cannot show a constitutionally protected property interest.

Even putting aside that Plaintiffs' claims fail at the threshold (which is dispositive), the claims are meritless. Plaintiffs assert the contested grant terms are unconstitutionally vague because they do not provide fair notice of what is prohibited. Mot at 33. But the contested grant terms simply require grant recipients to comply with already-existing federal immigration and antidiscrimination laws, and the post-award grant administration process provides ample opportunity for clarification as to what is prohibited. Baran Decl. ¶¶ 26-29.

### i.    *Plaintiffs' Facial Challenges Fail at the Threshold.*

*First*, the void-for-vagueness doctrine under the Fifth Amendment's Due Process Clause does not apply to contracts between specific parties. Rather, the doctrine "guarantees that ordinary people have 'fair notice' of the conduct a *statute* proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 155–56 (2018) (plurality) (emphasis added) (citation omitted). When courts have applied this doctrine beyond the statutory context, they have applied it to mandatory regulations of the general

public's primary conduct. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (applying the doctrine to "[a] conviction or punishment" obtained under a "statute or regulation"); *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (noting the Fifth Amendment's "requirement of clarity" applies when the government imposes "civil penalties" (citations omitted)).

**Second**, the appropriate posture for the void-for-vagueness doctrine under the Fifth Amendment's Due Process clause is as-applied. Facial challenges in the Due Process context "are typically disfavored because they 'often rest on speculation,' which leads to the risk of premature interpretation of statutes and regulations." *Draper v. Healey*, 98 F. Supp. 3d 77, 82 (D. Mass. 2015), *aff'd*, 827 F.3d 1 (1st Cir. 2016). "The First Circuit has similarly recognized that even 'where an enactment is alleged to be "impermissibly vague in all of its applications," . . . it is clear that such an allegation must first be considered in light of the facts of the case—i.e., on an as-applied basis.'" *Worman v. Healey*, 293 F. Supp. 3d 251, 267 (D. Mass. 2018) (alterations in original) (quoting *Love v. Butler*, 952 F.2d 10, 13 (1st Cir. 1991)), *aff'd*, 922 F.3d 26 (1st Cir. 2019).

Tellingly, Plaintiffs' Motion underscores that the appropriate posture for the void-for-vagueness doctrine is as-applied. Plaintiffs note the doctrine "is implicated whenever the government *imposes* civil penalties"—not before. Mot. at 34 (emphasis added) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574, n.22 (1996)). And Plaintiffs' case law involves actions brought after the government had imposed penalties. *See id.* at 33–34. Because Defendants have not sought to enforce any of the challenged terms against Plaintiffs—in fact, no Plaintiff has even been awarded a grant that includes the challenged terms—Plaintiffs' void-for-vagueness claim fails at the threshold.

To the extent Plaintiffs worry Defendants may try to enforce one of these provisions in an

allegedly legally unjustifiable way, such speculation cannot justify facial invalidation. *See Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) ("The mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that . . . is above suspicion in the ordinary course of administration." (citation omitted)). Plaintiffs cannot ask the Court to assume in advance that Defendants will adopt unlawful interpretations of existing laws and ordinary contractual language. In fact, in this posture, the Court is required to assume the opposite. *See Int'l Jr. Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 113 (1st Cir. 2015) ("As we have said before, the agency's actions are presumed to be valid." (citation omitted)).

***Third***, Plaintiffs' void-for-vagueness claim fails at the threshold because Plaintiffs cannot show a protected property interest. To have a property interest protected by the Due Process Clause, "a person clearly must have more than an abstract need or desire" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005) (citation omitted). The Supreme Court has thus identified a narrow set of government benefits, so-called "new property," that are protected under the Due Process Clause. *See Perry v. Sindermann*, 408 U.S. 593 (1972) (tenured teaching position); *Goldberg v. Kelly*, 397 U.S. 254 (1970) (welfare benefits); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) (collected cases).

The Due Process protections afforded to this set of entitlement-like benefits, however, have not been extended to ordinary government contracts. *See Garcia-Gonzalez v. Puig-Morales*, 761 F.3d 81, 88 (1st Cir. 2014). "Dashed hopes of receiving future government work, without more, cannot yield a constitutionally protected property interest." *Id.* (citation omitted). The First Circuit has clarified that "[a]ward procedures are not assigned to establish private entitlements to

public contracts but to produce the best possible contracts for the government." *Id.* (alteration in original) (quoting *Smith & Wesson v. United States,* 782 F.2d 1074, 1081 (1st Cir. 1986)).

"The Supreme Court 'has never held that government contracts . . . create property interests protected by due process.'" *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) (quoting 2 Richard J. Pierce Jr., *Administrative Law Treatise* 764 (5th ed. 2010)). "Outside of the employment context, courts have resisted application of due-process principles to government contracts because '[w]ith scores of millions of government contracts in effect at any point in time, it is unimaginable that all government agencies would be required to provide a hearing before they take any action that is arguably inconsistent with a contract.'" *Id.* (quoting Pierce, *supra*, at 764) (citing cases). Indeed, several courts have recently held that grant recipients lack protected due process property interests. *See Nat'l Urb. League v. Trump*, No. 25-cv-471, 2025 WL 1275613, at *17-19 (D.D.C. May 2, 2025) (denying due process claim challenging termination of contracts and grants related to diversity, equity, and inclusion); *Vera Inst. of Just. v. Dep't of Just.*, No. 25-CV-1643 (APM), 2025 WL 1865160, at *10 (D.D.C. July 7, 2025) ("Having failed to establish even a plausible property interest in the grant awards, Plaintiffs' Fifth Amendment claims must be dismissed."), *appeal filed*, No. 25-5248 (D.C. Cir. July 10, 2025); *see also New Vision Photography*, 54 F. Supp. 3d at 28–29 (denying procedural due process claim based on termination of Medicare provider contract).

This reasoning is particularly applicable where Plaintiffs seek to enforce a supposed property interest in funds they have not yet signed contracts for. If there is no constitutionally protected property interest in goods and services a party has contracted for, there certainly can be none in funds subject to an unexecuted contract. That Plaintiffs largely are hoping to renew previously funded OVW grants does not alter the analysis: while the OVW statute *allows*

recipients to apply to renew their grants, it does not *entitle* them to renewal. *See* 34 U.S.C. § 10441(c)(2) (grants are awarded if the applying entity continues to be determined to be a coalition by either the Secretary of HHS or the Centers for Disease Control and Prevention); *id.* § 12511 (requiring eligible entities to submit an application "containing such information as [OVW] determines to be essential to carry out the purposes of this section"); *see also Roth*, 408 U.S. at 578 (employee whose appointment was not renewed "surely had an abstract concern in being rehired, but he did not have a property interest sufficient" to support a Fifth Amendment claim).

This reasoning is particularly applicable to government grants, because grant funds remain monies of the United States until the purpose of the grant is achieved. *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985); *e.g.*, *In re Joliet-Will Cnty. Action Agency*, 847 F.2d 430, 432 (7th Cir. 1988) (holding grant money, despite being transferred to the grant recipient, remained assets of the federal government). Thus, far from Plaintiffs holding a constitutionally protected property interest in the granted funds, those funds never become Plaintiffs' property at all.

### ii. *Plaintiffs' Fifth Amendment Claims Fail on the Merits.*

Plaintiffs' void-for-vagueness arguments are meritless in any event. As a preliminary matter, the Supreme Court has set a high bar for supposed "vagueness" in government funding requirements. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588–89 (1998). In the context of administering a grant program, the Supreme Court has emphasized that "the Federal Government simply could not prospectively resolve every possible ambiguity concerning particular applications of the [program's statutory] requirements." *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 669 (1985). Moreover, the fact that Plaintiffs have "an opportunity to seek clarification of the program requirements" from the agency undermines their claim for relief. *Id.*; *see* Baran Decl. ¶¶ 31-32.

31

In *Finley*, plaintiffs brought vagueness challenges under the First and Fifth Amendments to a funding provision that required the National Endowment for the Arts to "take[] into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id.* at 572 (quoting 20 U.S.C. § 954(d)(1)). The Supreme Court acknowledged that these terms were "undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns." *Id.* at 588. But the Court reasoned, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id.* at 589.

Plaintiffs advance three examples from the contested grant terms, asserting that these examples are unconstitutionally vague—but Plaintiffs' arguments fail under the *Finley* standard.

First, Plaintiffs assert that specifying grant funds may not be used for "any activity or program that unlawfully violates an Executive Order" is vague, because the Executive Orders themselves are vague. Mot at 16. Plaintiffs improperly scrutinize the EOs as if they were criminal statutes that sought to identify *new* conduct as illegal. To reiterate, the grant terms do not target any conduct that is not already illegal under existing laws. All Plaintiffs must do is comply with federal law itself—longstanding federal statutes that are not challenged here on vagueness grounds or any other.

Second, Plaintiffs argue that certain out-of-scope activities fail to give proper notice of prohibited conduct and provide for arbitrary enforcement. Mot. at 35-36. Plaintiffs take issue with everyday words in the challenged terms such as "facilitate," "discourage," "promote," and "cooperate." *Id.* But even criminal statutes need not define every ordinary word they use. Where challenged language does not define a word, it is simply read with its "ordinary meaning." *United States v. Brennick*, 908 F. Supp. 1004, 1012 (D. Mass. 1995) (holding the word "corruptly" in a

criminal statute was not unconstitutionally vague). And, again, the standard is far lower for government grant provisions. *See Finley*, 524 U.S. at 589 (holding that funds awarded for "subjective criteria such as 'excellence'" are selective subsidies not void for vagueness). If the word "corruptly" in a criminal statute is not unconstitutionally vague, the words "facilitate," or "promote" in a government grant agreement surely cannot be.

Third, and finally, Plaintiffs argue the requirement that applicants certify they will not operate programs "that violate any applicable federal civil rights and nondiscrimination laws" is ambiguous because it fails to explain when a program would violate these laws. Mot. at 37. But this argument fails because a requirement that a grantee abide by existing law cannot be vague. Nor do Plaintiffs challenge any civil rights or nondiscrimination laws as unconstitutionally vague. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189, Dkt. 29, at 7 (4th Cir. Mar. 14, 2025) (Harris, J., concurring) ("The Executive Orders do not purport to establish the illegality of all efforts to advance diversity, equity or inclusion, and they should not be so understood."). Plaintiffs thus have no legitimate concern that they will not be given a "reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

The certification requirements to comply with nondiscrimination and civil rights laws are not novel. Since 2017, OVW's general conditions have included compliance with DOJ regulations pertaining to civil rights and nondiscrimination. Baran Decl. ¶ 11. It has been true for decades that "[e]very application for Federal financial assistance must, as a *condition* to its approval . . . contain assurances that the program will comply with Title VI *and* . . . the executive regulations issued under Title VI." *Guardians Ass'n v. Civ. Serv. Comm'n*, 463 U.S. 582, 629–30 & n.22 (1983) (Marshall, J., dissenting) (quotations removed) (citing regulations from thirteen federal agencies, including the Department of Justice). And of course, the obligations of Title VI apply

33

regardless of any certification. *Id.*

### D.     Plaintiffs' First Amendment Challenges Fail.

Facial challenges are generally disfavored in the First Amendment context. *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024); *United States v. Hansen*, 599 U.S. 762, 770 (2023). Nor is Government spending subject to traditional First Amendment scrutiny. *Rust v. Sullivan*, 500 U.S. 173, 193 (1991); *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc. (AID)*, 570 U.S. 205, 214 (2013) (collecting cases). The Supreme Court has rejected the argument that a First Amendment violation exists where Plaintiffs must censor their speech to conform to the government's views in order to receive funding. *Finley*, 524 U.S. at 588. The government does not prohibit speech simply by choosing not to pay for it. *See, e.g., Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that government "is not required to assist others in funding the expression of particular ideas"); *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 212 (2003) (plurality) (a "'decision not to subsidize the exercise of a fundamental right does not infringe the right'" (quoting *Rust*, 500 U.S. at 193)); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (government "is not required to subsidize First Amendment rights").

Plaintiffs' First Amendment argument is primarily that certain terms, including the Illegal DEI Term and the Defending Women term, require them to censor their speech when administering grant-funded projects, and in the case of the Illegal DEI Term, even with non-federal funds. Mot. at 30-33. As an initial matter, Plaintiffs' hypotheticals of what conduct may or may not be prohibited by these terms are entirely speculative given the numerous steps OVW takes to work with grantees to avoid conduct that falls outside the permissible scope of authorized grant activity. Baran Decl. ¶¶ 31-32. Moreover, the law has made clear that refraining from speaking to receive federal funding is not a First Amendment violation, *Finley*, 524 U.S. at 588, and Plaintiffs do not have a First Amendment right to discriminate based on race, even if they believe that their mission

34

statements and guiding principles allow them to do so.

Plaintiffs also essentially restate their previous statutory argument: that the grant terms they object to fall outside the scope of VAWA. Mot. at 30-33. But not only are the grant terms within VAWA's scope, they merely prohibit already-illegal conduct, including discrimination and violating immigration laws. Plaintiffs have no First Amendment right to engage in illegal conduct, particularly funded by taxpayer money. *See Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 243-44 (4th Cir. 1997); *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 777-79 (11th Cir. 2024).

Plaintiffs argue that the exposure to potential False Claims Act liability for violating discrimination laws under the Illegal DEI term chills speech. Mot. at 31-32. But potential False Claims Act liability is nothing new. Since 2017, OWV's grant awards have contained a provision that "any materially false, fictitious, or fraudulent statement to the federal government related to the award may, among other things, be subject to criminal prosecution under 18 U.S.C. § 1001 or lead to civil penalties and administrative remedies under the False Claims Act." Baran Decl. ¶ 31. Plaintiffs with prior OVW grants have been subject to this condition for years and they provide no explanation why it is suddenly unconstitutional now.

Plaintiffs' False Claims Act alarm is also speculative and premature. Plaintiffs fail to identify a "credible threat" of erroneous enforcement. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *see also Johnson v. District of Columbia*, 71 F. Supp. 3d 155, 160 (D.D.C. 2014) ("When plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible, they do not allege a dispute susceptible to resolution by a federal court." (citation omitted)). The fact that the Department of Justice has recently emphasized enforcement of the False Claims Act does not somehow transform

the grant terms at issue here into unconstitutional First Amendment violations.  *See* Mot. at 14.

Mere speculations about bad faith future enforcement action cannot sustain a facial challenge.  *Cf.*

*Hansen*, 599 U.S. at 782, 785 (rejecting First Amendment overbreadth challenge because plaintiff

relied on "hypotheticals" and "speculative shot at the bad").  Finally, focusing enforcement

resources on particular categories of unlawful conduct does not amount to viewpoint

discrimination.  *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1136

(D.C. Cir. 2023).

For these reasons, Plaintiffs' First Amendment challenges fail.

**E.    Plaintiffs' Separation-of-Powers Claims are not Likely to Succeed on the Merits.**

Plaintiffs' separation-of-powers argument is based entirely on the premise that Defendants

have allegedly acted in excess of statutory authority because "Congress has not authorized" the

challenged grant terms in this case.  *See* Mot. at 28.  This claim is simply a re-packaging of their

statutory APA claim dressed up in constitutional language.  As the Supreme Court has confirmed,

"claims simply alleging that the President has exceeded his statutory authority are not

'constitutional' claims[.]"  *Dalton v. Specter*, 511 U.S. 462, 473 (1994).  In *Dalton*, the Supreme

Court rejected the proposition that "whenever the President acts in excess of his statutory authority,

he also violates the constitutional separation of powers doctrine."  *Id.* at 471.  Not "every action

by the President, or by another executive official, in excess of his statutory authority is ipso facto

in violation of the Constitution."  *Id.* at 472 (emphasis omitted).  In reaching this conclusion, the

Supreme Court carefully "distinguished between claims of constitutional violations and claims

that an official has acted in excess of his statutory authority."  *Id.* (collecting cases).  The

Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or

if the officers rely on an unconstitutional statute.  *Id.* at 473 & n.5.  Because Plaintiffs' separation-

of-powers claims focus entirely on their contentions that OVW has not acted consistent with its statutory obligations, such claims are untenable under *Dalton*.

In any event, Plaintiffs' claims fail because the challenged terms are imposed pursuant to Defendants' statutory authority and implement VAWA's directives.  Plaintiffs contend that Congress "has not authorized Defendants to impose the new Funding Conditions on [] grants." Mot. at 28.  That is wrong.  VAWA and the Office Act give OVW discretion to set requirements designed to ensure that grants are used for statutorily authorized purposes.  The Office Act provides that the OVW Director "shall have final authority over *all* grants, cooperative agreements, and contracts awarded by the Office."  34 U.S.C. § 10442(b) (emphasis added).  Moreover, the OVW Director's duties include "the development and management of grant programs and other programs, and the provision of technical assistance under such programs[,]" "the award and termination of grants, cooperative agreements, and contracts[,]" and "establishing such rules, regulations, guidelines, and procedures as are necessary to carry out any function of the Office." *Id*. § 10444(5)(B)-(C), (8).  The disputed terms also implement VAWA's directives, which include a nondiscrimination provision, *id*. § 12291(b)(13)(A), and a requirement that grant program funds "be used only for the specific purposes described in [VAWA]," *id*. § 12291(b)(5).

Plaintiffs also invoke the Spending Clause to challenge out-of-scope activities that they characterize as "funding conditions." Mot. at 29.  But this case in no way resembles quintessential Spending Clause cases like *South Dakota v. Dole*, where federal highway funds were conditioned on States raising the drinking age.  483 U.S. 203 (1987).  Rather, the grant terms at issue here are requirements, consistent with OVW's statutory authorities and responsibilities, designed to ensure that grant funds are used for authorized purposes under law.

In any event, even accepting Plaintiffs' misplaced framing, their argument fails.  As the

Supreme Court has held, "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *Dole*, 483 U.S. at 206 (quotation marks omitted). The *Dole* court outlined certain limitations including that "the exercise of the spending power must be in pursuit of 'the general welfare'" and that conditions on the receipt of federal funds must be stated "unambiguously" so that recipients can "exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207. Nor does the Spending Clause doctrine require Congress to set out by statute every requirement of a grant program in order for the requirement to be enforceable. *See Biden v. Missouri*, 595 U.S. 87, 90, 94 (2022) (per curiam) (holding that a funding condition requiring staff to be vaccinated against COVID-19 was lawful and the HHS secretary's "authority extends beyond imposing a list of bureaucratic rules regarding technical administration")). The federal government may constitutionally create incentives for outside parties to act in accordance with federal law and policies. *See Dole*, 483 U.S. at 210 (rejecting the argument that the Spending Clause imposes "a prohibition on the indirect achievement of objectives which Congress is not empowered to achieve directly"). Congress gave OVW the authority to fund many different grant programs, and by allowing OVW to administer these programs, Congress has necessarily given the agency the authority to apply appropriate terms and conditions in line with policy and program goals. Plaintiffs do not argue that Congress has in any way prohibited the grant terms at issue. The simple fact that Congress did not spell out every conceivable term or condition by statute is not a basis on which to declare terms unconstitutional and thus is not a sufficient basis for the entry of preliminary injunctive relief.

## II.    THE REMAINING FACTORS COUNSEL AGAINST GRANTING THE REQUESTED RELIEF.

### A.    Plaintiffs Have Not Shown Irreparable Harm Because Their Claims Are Premature.

A motion for a preliminary injunction can, and should, be denied if the plaintiff has failed to demonstrate irreparable harm.  "Preliminary injunctions are strong medicine" and "should not issue except to prevent a real threat of harm." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004).  "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc*., 370 F.3d 151, 162 (1st Cir. 2004) ("In most cases—and the case at hand is no outlier—irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief."); *see also Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6-7 (1st Cir. 1991) ("[S]peculative injury does not constitute a showing of irreparable harm." (quoting *Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987))).

Plaintiffs allege two theories of irreparable harm: first, the loss of grant funding if Plaintiffs refuse to apply, and second, Plaintiffs may face potential enforcement proceedings for failure to comply with the grant funding requirements.  These theories are entirely speculative, and neither passes muster.  *See Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931) (An injunction "will not be granted against something merely feared as liable to occur at some indefinite time in the future.").

***First***, the potential harm from a loss of grant funding is a monetary injury that is generally not considered irreparable.  And if the Plaintiffs refuse to even apply for the grant programs and shut down their programs, "then any ensuing irreparable harm would be of their own making." *Dep't of Educ. v. California*, 145 S. Ct. 966, 969 (2025).

39

While Plaintiffs assert that they will be harmed by agreeing to "illegal" grant terms or foregoing federal funding, they have not even tried to explain how most of these grant terms are "illegal" on their face. Plaintiffs do not explain how they face imminent harm by agreeing to comply with and not violate federal nondiscrimination laws (as they have regularly agreed to do in the past because it is required under VAWA), or by agreeing not to violate federal immigration law.

***Second***, Plaintiffs' argument of potential False Claims Liability is likewise premature. It is speculative for plaintiffs to assume they will face enforcement proceedings for failure to comply with the grant funding requirements, particularly given OVW's efforts to ensure grant recipients operate within the lawful scope of VAWA. And all federal grant recipients are subject to False Claims Act liability; therefore, by accepting Plaintiffs' theory that potential False Claims Act liability constitutes irreparable harm, this prong of the preliminary injunction analysis would always be satisfied when any federal grant recipient seeks to enjoin agency action.

### B.    The Balance of the Equities and Public Interest Disfavor an Injunction.

A preliminary injunction is inappropriate here because the balance of the equities and the public interest tip in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding "[t]hese factors merge when the Government is the opposing party"). While Plaintiffs could be compensated for any lost money after a ruling on the merits, the same may not be true of the federal government if an injunction is imposed. Plaintiffs' motion hinges on the importance of their federal grant money, suggesting many of them may not be able to reimburse the government if it later prevails. The Supreme Court's decision in *Department of Education* underscores why equities factors tip in Defendants' favor. As that order noted, the harm Defendants would face if the Court were to require grant award contracts pending final resolution of the case—which is what Plaintiffs

effectively demand—would be irreparable given that Defendants would be "unlikely to recover the grant funds once they are disbursed." 145 S. Ct. at 969. The public also has an interest in the judiciary respecting the Executive Branch's ability to lawfully direct and guide agencies' spending decisions, and, in particular, ensuring that tax dollars are allocated to grant programs that most effectively advance the priorities of the Department of Justice.

## III. ANY INJUNCTIVE RELIEF SHOULD BE NARROWLY TAILORED AND PERMIT LAWFUL AGENCY ACTIVITY.

### A. Injunctive Relief Should Be Limited to the Plaintiffs and Agency Defendants Only.

For the reasons explained above, Plaintiffs are not entitled to any preliminary relief. But in the event the Court concludes otherwise, the relief should be limited to the grants awarded to Plaintiffs. The Supreme Court recently clarified that "[b]ecause the universal injunction lacks a historical pedigree, it falls outside the bounds of a federal court's equitable authority under the Judiciary Act." *Trump v. CASA, Inc.,* No. 24A884, 2025 WL 1773631, at *8 (U.S. June 27, 2025). In light of *CASA*, Plaintiffs' injunctive relief must be limited to the parties to this case.

And any preliminary relief the Court grants should be further limited in at least two respects.

First, the scope of any preliminary injunction should be limited to the specific agency actions Plaintiffs challenge in their Complaint—the eight out-of-scope activities and one General Condition. Any broader relief would impermissibly enjoin unrelated agency conduct whose lawfulness is not before the Court. *See Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (concluding that a district court abused its discretion by vacating agency policy announcements that the plaintiff did not directly challenge); *cf. Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Hum. Servs.*, 631 F. Supp. 2d 17, 21 (D.D.C. 2009) (concluding that a preliminary injunction was "more burdensome than

necessary" because it enjoined certain conduct that did not "cause the harms of which plaintiffs complain[ed]").

Second, the relief sought should not encompass future NOFOs or grant awards as Plaintiffs request. Future agency actions are by definition not final and the Court should not "seek *wholesale* improvement" of agency management "by court decree[.]" *Lujan*, 497 U.S. at 891.

**B.    Injunctive Relief Pursuant to Section 705 Should Be Denied.**

The Court should also reject Plaintiffs' request that the Court "stay the Funding Conditions" pursuant to Section 705 of the APA. *See* Mot. at 45-46. As an initial matter, Plaintiffs cannot rely on Section 705 for relief because their APA claims fail for the reasons explained above. Additionally, consistent with the plain text of Section 705, courts have held that the phase "postpone the effective date" of an agency action authorizes postponement of "the effective date of a *not yet effective rule*, pending judicial review," but not suspension of a rule that is already in effect. *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324, at *2-3 (D.C. Cir. Jan. 19, 1996) (per curium) (emphasis added); *accord Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 204 (D.D.C. 2022) (collecting cases); *Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017). Although these cases addressed an agency's own decision to "postpone the effective date" of an action, Section 705 uses identical language in the context of "the reviewing court . . . postpon[ing] the effective date of an agency action." 5 U.S.C. § 705.[5] Here, Plaintiffs base their theory of injury around the contention that challenged

---

[5] That Section 705 also authorizes reviewing courts to "preserve status or rights pending conclusion of the review proceedings" does not change the result. An order staying a rule after it has taken effect would not preserve, but rather alter, the status quo. *See, e.g.*, *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*, 473 U.S. 1301, 1305 (1985) (explaining that a temporary

grant terms are already in effect.  Thus, Section 705 does not apply.

In any event, a Section 705 stay is subject to the same equitable limits as a preliminary injunction, including that relief be limited solely to the parties before the Court.  Section 705 was designed "to reflect existing law . . . and not to fashion new rules of intervention for District Courts."  *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974).  Indeed, the House Report that accompanied the APA explained that relief under Section 705 should "normally, if not always, be limited the parties' complainant."  Administrative Procedure Act, S. Doc. No. 79-248, at 277 (1946).

The Supreme Court's recent decision in *CASA* confirms that the limitation on courts' equitable authority constrains relief granted under Section 705.  In *CASA*, the Supreme Court held that universal injunctions "fall[] outside the bounds of a federal court's equitable authority under the Judiciary Act [of 1789]."  *CASA*, 2025 WL 1773631, at *8.  Section 705 is constrained by the same traditional principles of equity.  Section 705 authorizes "all necessary and appropriate process" to postpone agency action or "preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.  The Supreme Court interpreted analogous language in the National Labor Relations Act—permitting "temporary relief" that a court "deems just and proper"—to "empower courts to grant equitable relief . . . in a manner consistent with traditional principles of equity."  *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (quoting 29 U.S.C. § 160(j)).  Section 705's similar references to "all necessary and appropriate process" and "irreparable harm" are best understood to reference traditional equitable principles, and "[n]othing" in § 705 "displaces the presumption" that "equitable principles govern" § 705's scope. *Id.* Reflecting

_____

restraining order that would have prevented implementation of regulations "would . . . have disturbed the status quo," rather than "preserv[ing]" it) (internal quotation marks omitted)).

43

the remedy's equitable constraints, district courts use the traditional injunction test to evaluate whether to issue a § 705 stay.  *See id.*; *see also D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing cases)

Thus, § 705's text, precedent, and the applicability of the injunction standard confirm that § 705 is constrained by the same traditional equitable principles as the Judiciary Act of 1789.  *See CASA*, 2025 WL 1773631 at *13.  And just as those principles foreclose universal preliminary injunctions, they also foreclose universal relief under § 705.  *See id.* at *11 ("'Complete relief' is not synonymous with 'universal relief.'  It is a narrower concept:  The equitable tradition has long embraced the rule that courts generally may administer complete relief *between the parties*.") (cleaned up).  Because *CASA*'s equitable limitations apply here, this Court should limit any relief, whether as part of a § 705 stay or a preliminary injunction, solely to the named Plaintiffs in this case.  *See CASA*, 2025 WL 1773631 at *13-15.

**IV.    ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND ACCOMPANY A BOND.**

If the Court decides to grant preliminary injunctive relief, it should stay any such injunction pending any appeal authorized by the Solicitor General.  *See* Fed. R. App. P. 8(a).  For the reasons explained above, Defendants have, at a minimum, satisfied the requirements for a stay of any injunction pending appeal.  *See Nken*, 556 U.S. at 434 (describing the standard for obtaining such a stay and noting the "substantial overlap" between that standard and "the factors governing preliminary injunctions").

Finally, the Court should order security with any preliminary injunction.  Under Federal Rule of Civil Procedure 65(c), the Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or

44

restrained." If the Court grants an injunction here, it should require Plaintiffs to post a bond for the value of the specific grants subject to the injunction.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction and for Relief Under 5 U.S.C. § 705.


Dated: July 18, 2025                          Respectfully submitted,

                                              BRETT A. SHUMATE
                                              Assistant Attorney General
                                              Civil Division

                                              ERIC J. HAMILTON
                                              Deputy Assistant Attorney General

                                              ANDREW WARDEN
                                              Assistant Branch Director


                                              */s/ Kathryn Barragan*
                                              KATHRYN BARRAGAN (BBO #714075)
                                              Trial Attorney, U.S. Department of Justice
                                              Civil Division, Federal Programs Branch
                                              1100 L Street, N.W.
                                              Washington, D.C. 20005
                                              Tel.: (202) 305-3246
                                              Email: kathryn.e.barragan@usdoj.gov

                                              *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2025, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

*/s/ Kathryn Barragan*