UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                     )
RHODE ISLAND COALITION AGAINST       )
DOMESTIC VIOLENCE, et al.,           )
                                     )
          Plaintiffs,                )
                                     )
     v.                              )    C.A. No. 25-279 WES
                                     )
PAMELA BONDI, et al.,                )
                                     )
          Defendants.                )
_____)

### MEMORANDUM AND ORDER

WILLIAM E. SMITH, Senior District Judge.

     Plaintiffs bring this civil action to challenge Defendants'
decision to place allegedly unlawful conditions on all future
grants issued under the Violence Against Women Act.  See generally
Compl. Declaratory & Injunctive Relief ("Compl."), Dkt. No. 1.
Pending before the Court is Plaintiffs' Motion for Preliminary
Injunction and for Relief under 5 U.S.C. § 705 ("Plaintiffs'
Motion"), Dkt. No. 15.  Because the Court concludes that the
challenged conditions run afoul of the prohibition against
arbitrary and capricious agency action, 5 U.S.C. § 706(2)(A), the
Court grants in part and denies in part Plaintiffs' Motion.

## I. BACKGROUND

### A. The Violence Against Women Act and its Grant Programs

     Responding to national concerns about rising crime rates in

the early 1990s, Congress adopted the Violent Crime Control and Law Enforcement Act of 1994 ("1994 Crime Bill"). Pub. L. No. 103-322, 108 Stat. 1796 (1994). The Violence Against Women Act ("VAWA"), passed as Title IV of the 1994 Crime Bill, specifically addressed concerns about incidents of violent crimes against women such as domestic violence, sexual assault, stalking, and dating violence. Pub. L. 103-322, tit. IV, 108 Stat. 1796, 1902-55 (1994). Congress has reauthorized, amended, and supplemented VAWA numerous times over the years.[1]

Among other things, VAWA authorizes federal grant funding for a range of purposes. See, e.g., 34 U.S.C. §§ 10441(b), 10446. Available grants vary across numerous important characteristics, including selection criteria, allowable activities, and eligibility qualifications. See Compl. ¶¶ 64-120, Dkt. No. 1 (describing different VAWA grant program characteristics).

The Office on Violence Against Women (the "Office"), which is situated "within the Department of Justice, under the general authority of the Attorney General," has "sole jurisdiction" to

---

[1] See, e.g., Violence Against Women Act of 2000, Pub. L. 106-386, div. B, 114 Stat. 1464, 1491-1539; Violence Against Women Office Act, Pub. L. 107-273, div. A, tit. IV, 116 Stat. 1758, 1789-91 (2002); Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. 109-162, 119 Stat. 2960; Violence Against Women and Department of Justice Reauthorization Act of 2005 Technical Amendments, Pub. L. 109-271, 120 Stat. 750; Violence Against Women Reauthorization Act of 2013, Pub. L. 113-4, 127 Stat. 54; Violence Against Women Act Reauthorization Act of 2022, Pub. L. 117-103, div. W, 136 Stat. 49, 840-962.

administer each VAWA grant program.  34 U.S.C. § 10442(a), (c); see also id. § 10444(5)-(8).  The Office is "headed by a Director, who" exercises "final authority over all grants . . . awarded by the Office."  Id. § 10442(b).

The Office oversees grant funds issued under the VAWA umbrella, a duty which includes ensuring compliance with applicable statutory and regulatory requirements.  See id. §§ 10442(c)(1), 10444(5).  Two such statutory requirements bear special relevance to this litigation.  First, all grant programs and funding recipients must comply with strict antidiscrimination requirements.  Id. § 12291(b)(13)(A).  And second, grant funds "may be used only for the specific purposes" authorized by statute. Id. § 12991(b)(5).

Many other regulatory requirements are also pertinent to this case.  To name but a few, the Office must announce the availability of a grant award by issuing a Notice of Funding Opportunity ("NOFO").  2 C.F.R. § 200.204.  Every NOFO must contain detailed information about the available grant funding.  Id.  And the grant awards themselves must include certain general terms and conditions, including "[n]ational policy requirements" such as applicable "statutory, executive order, other Presidential directive, or regulatory requirements."  Id. § 200.211(c); see also id. § 200.300.  Grant awards may also include specific conditions, id. §§ 200.208, 200.211(d), and certifications and

3

representations required by the Office, id. § 200.209.

Dating back to Fiscal Year ("FY") 2011, the Office has included in each of its NOFOs "a non-exhaustive list of out-of-scope activities to alert applicants to what [the Office] cannot finance under the statute setting forth the grant program's scope." Defs.' Resp. Opp'n Pls.' Mot. Attach. ("Lyons Decl.") ¶ 7, Dkt. No. 19-1. The Office adjusts these lists over time "to help [grant] applicants develop proposals and ensure [grant] recipients keep costs in line with the statutory purposes of the grant program." Id. According to the Office, "[t]he revision, addition, or removal of out-of-scope activities is not a formalized process, but rather, is typically determined by [Office] staff when they draft NOFOs using a given year's NOFO template." Id. ¶ 8.

**B. The Challenged Conditions**

In approximately May 2025, the Office updated each of its VAWA-authorized grant award NOFO announcements with an expanded list of out-of-scope activities. Pls.' Mem. Supp. Pls.' Mot. ("Pls.' Mem.") 15, Dkt. No. 15-1. An example NOFO expanded out-of-scope activity list reads as follows:

**<u>Out-of-Scope Activities</u>**

The activities listed below are out of the program scope and will not be funded.

  1. Research projects. Funds under this program may not be used to conduct research, defined by 28 C.F.R. § 46.102(d) as a systematic investigation designed to develop or contribute to generalizable

knowledge. However, assessments conducted for internal improvement purposes only may be allowable. For information on distinguishing between research and assessments, see the Application Companion Guide.

2. Promoting or facilitating the violation of federal immigration law.

3. Inculcating or promoting gender ideology as defined in Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.[2]

4. Promoting or facilitating discriminatory programs or ideology, including illegal DEI and "diversity, equity, inclusion, and accessibility" programs that do not advance the policy of equal dignity and respect, as described in Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity.[3]  This prohibition is not intended to interfere with any of [the Office's] statutory obligations, such as funding for HBCUs, culturally specific services, and disability programs.

---

[2]    Executive Order 14168, Section 2(f) defines the term "gender ideology" as follows: "'Gender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex.  Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

[3]    Executive Order 14173, Section 2 provides: "It is the policy of the United States to protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work." Exec. Order 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025). The Order does not separately describe a policy of equal dignity and respect. Thus, the Court is uncertain of what "policy of equal dignity and respect" references.

5. Activities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses (e.g., prioritizing criminal justice reform or social justice theories over victim safety and offender accountability).

6. Generic community engagement or economic development without a clear link to violence prevention, victim safety, or offender accountability.

7. Programs that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women.

8. Awareness campaigns or media that do not lead to tangible improvements in prevention, victim safety, or offender accountability.

9. Initiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support.

10. Excessive funding for consulting fees, training, administrative costs, or other expenses not related to measurable violence prevention, victim support, and offender accountability.

11. Any activity or program that unlawfully violates an Executive Order.

12. Direct services for victims.

13. Prevention efforts (except when funded with SASP dollars).

14. Activities addressing human trafficking unrelated to domestic violence, dating violence, sexual assault, or stalking.

15. Activities addressing missing or murdered indigenous persons (MMIP) unrelated to domestic violence or sexual assault.

**Note:** Recipients should serve all eligible victims as required by statute, regulation, or award condition.

Pls.' Mot. Ex. 1, at 9-10, Dkt. No. 15-3.[4]

Then, on June 12, 2025, the Office began requiring "all grant funding applicants . . . to submit a letter certifying that grant funds will not be used for the out-of-scope activities listed." Pls.' Mem. 16-17 (quoting Off. on Violence Against Women, Open Notices of Funding Opportunity, U.S. Dep't of Just., https://perma.cc/XR9P-GA49).

Separately, the Office also updated its grant awards' General Terms and Conditions to require award recipients to submit a certification stating that they do not "operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable federal civil rights or nondiscrimination laws." Id. at 17 (quoting Off. on Violence Against Women, FY25 General Terms and Conditions § 15, U.S. Dep't of Just., https://perma.cc/FR3E-FB3H).

**C. This Litigation**

Plaintiffs in this litigation are seventeen non-profit organizations ("the Coalitions").[5]  Compl. ¶¶ 9-25.  In the past,

_____

[4]    The Coalitions refer to this list of out-of-scope activities as "newly expanded."  Pls.' Mem. Supp. Pls.' Mot. 15, Dkt. No. 15-1.  The Court notes that neither the Coalitions' nor the Office's briefings make clear which out-of-scope activities on this list are new and which, if any, previously existed.

[5]  Plaintiffs are (1) Rhode Island Coalition Against Domestic Violence; (2) California Partnership to End Domestic Violence; (3) Colorado Coalition Against Sexual Assault; (4) District of

the Coalitions have consistently received federal funds via numerous VAWA-authorized grants, and they each seek to apply for and receive those same grants in FY 2025.  Id. ¶¶ 146-199.

On June 16, 2025, the Coalitions sued Attorney General Pamela Bondi, the Department of Justice, the Office, and Ginger Baran Lyons (the Office's designated Acting Director) (collectively referenced in this Order as "the Office").  Id. ¶¶ 26-29.  The Coalitions object to the Office's decision to subject all grant funding to (1) the limitations detailed in paragraphs 2-5, 7-9, and 11 of the NOFOs' out-of-scope activities list as provided above, see Pls.' Mot. Ex. 1, at 9-10; (2) a certification of compliance with the out-of-scope activities list; and (3) a certification of compliance with federal civil rights and nondiscrimination laws (together, "the challenged conditions").  See Compl. ¶¶ 135-145, 200-207.  They state Administrative Procedure Act ("APA"), ultra vires, and constitutional claims for

_____

Columbia Coalition Against Domestic Violence; (5) End Domestic Abuse Wisconsin: The Wisconsin Coalition Against Domestic Violence; (6) Idaho Coalition Against Sexual and Domestic Violence; (7) Iowa Coalition Against Domestic Violence; (8) Jane Doe Inc., the Massachusetts Coalition Against Sexual Assault and Domestic Violence; (9) Kansas Coalition Against Sexual and Domestic Violence; (10) Montana Coalition Against Domestic and Sexual Violence; (11) North Carolina Coalition Against Domestic Violence; (12) Oregon Coalition Against Domestic and Sexual Violence; (13) Pennsylvania Coalition Against Domestic Violence; (14) ValorUS; (15) Violence Free Minnesota; (16) Virginia Sexual and Domestic Violence Action Alliance; and (17) Wisconsin Coalition Against Sexual Assault.  Compl. ¶¶ 9-25, Dkt. No. 1.

relief.  Id. ¶¶ 208-281.

## II. LEGAL STANDARDS

The APA provides that, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," a court reviewing challenged agency action "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  Although not definitively decided by the Supreme Court or the First Circuit, it is accepted that Section 705 "'stays' under the APA turn on the same factors as preliminary injunctions."  Immigrant Defs. L. Ctr. v. Noem, No. 25-2581, 2025 WL 2017247, at *4 (9th Cir. July 18, 2025) (first citing Colorado v. EPA, 989 F.3d 874, 883 (10th Cir. 2021); and then citing Cook Cnty. v. Wolf, 962 F.3d 208, 221 (7th Cir. 2020)).

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  A party seeking a preliminary injunction must show (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent preliminary relief, (3) "that the balance of equities tips in [its] favor," and (4) "that an injunction is in the public interest."  Id. at 20.  Where the government is the opposing party, the final two factors merge. Nken v. Holder, 556 U.S. 418, 435 (2009).  "The party seeking the

preliminary injunction bears the burden of establishing that these four factors weigh in its favor." Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006). "The sine qua non of this four-part inquiry is likelihood of success on the merits . . . ." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).

## III. DISCUSSION

Applying these standards to the applicable law and facts, the Court concludes that the Coalitions have shown that (1) they are likely to succeed on at least one of their APA claims, (2) they face irreparable harm absent preliminary relief, (3) the equities of the case presently favor them, and (4) an injunction is in their favor.[6]  The Court's reasoning follows.

### A. Likelihood of Success on the Merits: APA Claims

The Coalitions have made a sufficient showing that they will likely succeed on the merits of at least one of their APA claims. Specifically, they have demonstrated both that the Court likely has jurisdiction to hear their APA claims and that the Office's imposition of the challenged conditions to all VAWA-authorized grant funds likely violates the APA's mandate against agency action that is arbitrary, capricious, or an abuse of discretion, 5 U.S.C.

---

[6]  In light of this finding, the Court declines to address the constitutional claims on their merits and denies preliminary relief on that basis.

§ 706(2)(A).

## 1. Jurisdiction under the APA

The Court begins with jurisdiction.  The Office raises several arguments in support of its position that the Office's decision is not judicially reviewable under the APA.  First, it asserts that the Tucker Act, 28 U.S.C. § 1491(a), bars judicial review of the Office's decision under the APA.  Defs.' Resp. Opp'n Pls.' Mot. ("Defs.' Resp.") 13-16, Dkt. No. 19; see 5 U.S.C. § 702.  Second, it claims that the Office's decision to adopt the challenged conditions was not a final agency action.  Defs.' Resp. 16-20; see 5 U.S.C. § 704.  And third, it says that the VAWA statutes commit grant terms exclusively to the Office's discretion by law.  Defs.' Resp. 20-25; see 5 U.S.C. § 701(a)(2).

The Court takes each of the Office's arguments in turn.

### i. The Tucker Act

"[T]he APA's limited waiver of [sovereign] immunity does not extend to orders 'to enforce a contractual obligation to pay money . . . .'"  Dep't of Educ. v. California, 145 S. Ct. 966, 968 (2025) (quoting Great-West Life & Annuity Ins. v. Knudson, 534 U.S. 204, 212 (2002)).  "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'"  Id. (quoting 28 U.S.C. § 1491(a)(1)).  The Office argues that the Coalitions' suit sounds in contract and thus belongs in the Court of Federal Claims.

Defs.' Resp. 13-16.

The Court need not spend much time on this argument. Like many other courts that have considered similar arguments, the Court finds that the Tucker Act does not cover challenges to grant funding conditions.[7] Importantly, the Coalitions do not challenge conditions, terms, or agency action related to grants that the Office has previously awarded them; they object to the challenged conditions only to the extent that they are or will be placed upon grants for which they seek to apply. Compl. ¶¶ 146-199. Accordingly, the Coalitions' claims are not "founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Nor would success on their claims require enforcement of any contractual obligation to pay money. See Dep't of Educ., 145 S. Ct. at 968. As the Coalitions point out, they "seek to enjoin [the Office] from coercing [them] and their members into making [allegedly] unlawful certifications or agreeing to [allegedly] unlawful conditions, in order to be eligible for an award." Reply Supp. Pls.' Mot. ("Pls.' Reply") 5, Dkt. No. 25.

---

[7] See California v. Dep't of Transp., No. 25-cv-208-JJM-PAS, 2025 WL 1711531, at *1 (D.R.I. June 19, 2025); Martin Luther King, Jr. Cnty. v. Turner, No. 2:25-cv-814, 2025 WL 1582368, at *9 (W.D. Wash. June 3, 2025), appeal docketed, No. 25-3664 (9th Cir. June 10, 2025); S.F. Unified Sch. Dist. v. AmeriCorps, No. 25-cv-02425-EMC, 2025 WL 1180729, at *7-11 (N.D. Cal. Apr. 23, 2025); Chi. Women in Trades v. Trump, No. 25 C 2005, 2025 WL 1114466, at *8-10 (N.D. Ill. Apr. 14, 2025).

The Tucker Act thus poses no bar to the Coalitions' APA challenges.

### ii. Final Agency Action

The APA permits judicial review of "final agency action for which there is no other adequate remedy in a court"; it does not authorize review of "preliminary, procedural, or intermediate agency action" before the action becomes final.  5 U.S.C. § 704. Under this provision, a plaintiff may challenge "discrete agency action" but cannot make a "broad programmatic attack."  Norton v. S. Utah Wilderness All., 542 U.S. 55, 64 (2004).  And that discrete action will be deemed final only when it (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) is an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (first quoting Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948); and then quoting Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71 (1970)).

The Court concludes that the Office's decision to adopt the challenged conditions for all grants issued for FY 2025 qualifies as "final agency action" for the purpose of APA review.  First, imposition of the challenged conditions constitutes discrete agency action and not, as the Office contends, a general policy or

program.[8]  See Defs.' Resp. 17-18.  Thus, granting the Coalitions' requested relief would not require "undue judicial interference with [the Office's] lawful discretion," and would not lead to "judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."  Norton, 542 U.S. at 66.

Further, the adoption of the challenged conditions "mark[s] the 'consummation' of [the Office's] decisionmaking process." Bennett, 520 U.S. at 177-78 (quoting Chi. & S. Air Lines, 333 U.S. at 113).  Indeed, the Government does not argue otherwise.  See Defs.' Resp. 17-20.

Finally, imposition of the challenged conditions both determines the Coalitions' rights and obligations and has attendant legal consequences.  See Bennett, 520 U.S. at 178. Without agreeing to the challenged conditions, the Coalitions are effectively barred from applying for and receiving funds which they are legally entitled to seek.  And the challenged conditions will potentially change the lawful scope of activities permitted with grant funds, lead to the termination of grant awards, and require the Coalitions to "subject themselves to potential

---

[8]  The fact that the challenged conditions may represent several discrete agency actions does not change the Court's analysis.  See New York v. Trump, 133 F.4th 51, 68 (1st Cir. 2025) ("[W]e are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once.").

criminal and civil liability under the False Claims Act." Pls.'
Reply 8. Accordingly, the Court sides with courts that have found
that agency placement of new conditions on grant funding amounts
to final agency action. See, e.g., Martin Luther King, Jr. Cnty.
v. Turner, No. 2:25-cv-814, 2025 WL 1582368, at *14 n.18 (W.D.
Wash. June 3, 2025), appeal docketed, No. 25-3664 (9th Cir. June
10, 2025).

### iii. Exclusive Agency Discretion

The APA, and judicial review thereunder, does not apply when
"agency action is committed to agency discretion by law." 5 U.S.C.
§ 701(a)(2). But because "[t]he [APA] embodies a 'basic
presumption of judicial review,'" the Supreme Court has narrowly
construed this provision, finding that it only applies in "'those
rare circumstances where the relevant statute is drawn so that a
court would have no meaningful standard against which to judge the
agency's exercise of discretion.'" Dep't of Com. v. New York, 588
U.S. 752, 771-72 (2019) (first quoting Abbott Laboratories v.
Gardner, 387 U.S. 136, 140 (1967); and then quoting Weyerhaeuser
Co. v. U.S. Fish & Wildlife Serv., 586 U.S. 9, 23 (2018)).
Historically, these "rare circumstances" have been limited to only
a few specific categories of decisions. Id. at 772 (identifying,
for example, agency decisions regarding enforcement actions and
national security actions).

To be sure, the Office possesses far-reaching authority over

VAWA-authorized grants. The Office's Director has "final authority over all grants . . . awarded by the Office." 34 U.S.C. § 10442(b). And the Director must carry out the Department of Justice's functions under all VAWA legislation, including "the development and management of [VAWA-authorized] grant programs," "the provision of technical assistance under such [grant] programs," and "the award and termination of grants." Id. § 10444(5)(B)-(C). Relevant to this case, the Director must also ensure that grant funds are used "only for the specific purposes described in [VAWA legislation]." Id. § 12291(b)(5). For each of these important "duties and functions," the Office has "sole jurisdiction." Id. § 10442(c)(1).

That said, the relevant VAWA statutes provide meaningful internal standards by which to judge – with proper deference – the actions of the Director and the Office. Among other things, VAWA legislation defines the specific purposes for which grants may or must be used. See, e.g., id. §§ 10441(b)-(c), 12421(1), (3), 20123(a). The Court may also consider a host of statutory grant conditions, id. § 12291(b), and eligibility and certification requirements, see, e.g., id. §§ 20121(d), 20123(b), 20124(c).

Further, the determination of grant terms and conditions is not a category of decision traditionally committed to exclusive agency discretion. Many recent cases spanning a range of agencies prove the point. See generally, e.g., Biden v. Missouri, 595 U.S.

87 (2022) (reviewing the Centers for Medicare and Medicaid Services' imposition of new conditions on Medicare and Medicaid grant funds); City of Providence v. Barr, 954 F.3d 23 (1st Cir. 2020) (assessing the Department of Justice's decision to place new conditions on Byrne JAG grant funds).

Considering all the above, the Court finds that "this is not a case in which there is 'no law to apply.'" Dep't of Com., 588 U.S. at 773 (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971)). For that reason, the Court may review the Office's decision to impose the challenged conditions on all FY 2025 VAWA-authorized grants.

### 2. The Coalitions' APA Claims

The Court next proceeds to the merits of the Coalitions' APA claims. The Coalitions argue that the Office's decision to impose the challenged conditions on all VAWA-authorized grant programs violates the APA in multiple ways. First, they contend that the Office exceeded its statutory authority by imposing the challenged conditions. Pls.' Mem. 22; see 5 U.S.C. § 706(2)(C). Second, they say that many of the challenged conditions conflict with applicable statutory provisions. Pls.' Mem. 22-25; see 5 U.S.C. § 706(2)(A). Third, the Coalitions object to all the challenged conditions as arbitrary and capricious. Pls.' Mem. 26-27; see 5 U.S.C. § 706(2)(A). Fourth and finally, they argue that the challenged conditions violate multiple constitutional provisions.

Pls.' Mem. 28-38; see 5 U.S.C. § 706(2)(B).

From the start, an important feature of this litigation looms large: That is, the Coalitions bring this suit to contest the facial validity of the challenged conditions across all VAWA-authorized grants. To that point, the Coalitions have not alleged that they have been denied grant funding, had a grant award terminated, been subject to a False Claims Act proceeding, or experienced any other adverse application of the challenged conditions. The procedural posture of this litigation thus raises a significant question about the applicable standard of review. See Bondi v. VanDerStok, 145 S. Ct. 857, 866 n.2 (2025); see also id. at 892-94 (Alito, J., dissenting). Specifically, under what is commonly known as the Salerno standard, "[t]o prevail in such a facial challenge, [a plaintiff] 'must establish that no set of circumstances exists under which the [challenged agency action] would be valid.'" Reno v. Flores, 507 U.S. 292, 301 (1993) (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)) (noting that this applies to both constitutional and statutory challenges). Under this standard, although "the [challenged conditions] may be invalid as applied in [some] cases," it does not follow that they are necessarily "facially invalid." I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc., 502 U.S. 183, 188

(1991); see also Rust v. Sullivan, 500 U.S. 173, 183 (1991).[9]

Indeed, the facial nature of the Coalitions' lawsuit shapes nearly all their claims.  One the one hand, if the Office was to eventually apply the challenged conditions in the ways that the Coalitions fear, then the challenged conditions would likely violate the APA.  But on the other hand, if the Office was to eventually apply those same challenged conditions in the ways that the Lyons Declaration claims it will, then the challenged conditions would likely not violate the APA.  See generally Lyons Decl.  Given the possibility of both lawful and unlawful applications of the challenged conditions, application of the Salerno standard appears likely to be outcome dispositive of some of the Coalitions' claims.

While the Court deems it worthwhile to note this critical issue, the Court need not resolve the matter at this stage.  That is because, on the present record, it finds that the Office's decision to impose the challenged conditions in such a vague and haphazard manner to be arbitrary, capricious, and an abuse of discretion, in violation of 5 U.S.C. § 706(2)(A).

Under Section 706(2)(A), the Court's "scope of review is 'narrow': [it] determines only whether [the Office] examined 'the

---

[9]    The Coalitions contend a lower bar applies to facial challenges such as this one.  See Hr'g Tr. 12:10-13:5, 60:16-62:4, Dkt. No. 32.  The Court need not resolve this question here and proceeds with the analysis using the Salerno standard for now.

relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'"  Dep't of Com., 588 U.S. at 773 (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983)).  The Court concerns itself only with ensuring that the Office "remained 'within the bounds of reasoned decisionmaking.'"  Id. (quoting Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 105 (1983)).  The Office's action must be both "reasonable and reasonably explained."  Ohio v. EPA, 603 U.S. 279, 292 (2024) (quoting FCC v. Prometheus Radio Project, 592 U.S. 414, 423, (2021)).

The Court understands that this matter arises on an expedited basis, and perhaps a fuller administrative record will disclose more of the Office's decisionmaking process.  But on the present record, the Court can only conclude that the Office engaged in a wholly under-reasoned and arbitrary process.  The Office provides, as the only basis for its decision, a single declaration by an Office supervisory official.  See generally Lyons Decl.  While helpful, that declaration is not a substitute for an administrative record.  The Lyons Declaration likewise fails to speak to any Office considerations outside of presidential executive orders and a memorandum from the Attorney General.  Id.  But the Office "cannot avert the 'arbitrary and capricious' analysis by simply

20

deferring to the relevant [Executive Order]." Woonasquatucket River Watershed Council v. USDA, No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157, at *18 (D.R.I. Apr. 15, 2025), appeal docketed, No. 25-1428 (1st Cir. May 1, 2025); see also, e.g., Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, 763 F. Supp. 3d 36, 55 (D.D.C. 2025) (explaining the same).

The Office cannot plausibly claim that it examined the relevant data or articulated a satisfactory reason for its actions. See Dep't of Com., 588 U.S. at 773. And judging by the Lyons Declaration alone, the Office appears to have "entirely failed to consider" many of the impacts of its decision, especially to the extent that the vague and confusing language in the challenged conditions would cause significant adverse effects on the Coalitions and the vulnerable populations that they serve. Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43; see also Pls.' Mem. 38-42 (listing possible harms of accepting or forgoing funds subject to the challenged conditions).

To be clear, the Court "do[es] not hold that the agency decision here was substantively invalid." Dep't of Com., 588 U.S. at 785. But "[t]he reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." Id. Based on the present record, the Office failed to meet this baseline

requirement.

Accordingly, the Coalitions have met their burden to show that they are likely to succeed on the merits of at least one of their APA claims.

**B. Irreparable Harm**

Because the Court concludes that the Office's decision violates the APA, it need not evaluate the Coalitions' constitutional claims at this time; instead, it turns next to considering whether the Coalitions have shown irreparable harm.

A party that seeks a preliminary injunction must "demonstrate that irreparable injury is <u>likely</u> in the absence of an injunction." <u>Winter</u>, 555 U.S. at 22 (emphasis in original). "[D]istrict courts have broad discretion to evaluate the irreparability of alleged harm . . . ." <u>Ross-Simons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d 12, 19 (1st Cir. 1996) (quoting <u>K-Mart Corp. v. Oriental Plaza, Inc.</u>, 875 F.2d 907, 915 (1st Cir. 1989)). "[T]he plaintiff's showing must possess some substance" and "the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem." <u>Id.</u>

The Coalitions assert that without preliminary relief, they must choose between two distinct irreparable harms, because they "must decide whether to: (a) accept unconstitutional and otherwise unlawful funding conditions that are inconsistent with VAWA, will impede their ability to provide core services, and are at odds

with their fundamental missions; or (b) forgo federal funds that are essential to their ability to fulfill their mission." Pls.' Mem. 38; see also id. at 18-20.

Two concrete examples of fears faced by the Coalitions illustrate the uncertainty associated with accepting the challenged conditions. First, many of the Coalitions that provide services to eligible victims who are transgender question whether they will now be permitted to provide the same quality of services, including acts such as: (1) providing trainings on servicing transgender and nonbinary crime victims, and (2) using those victims' preferred pronouns, in basic recognition of those victims' gender identity, because doing so would run afoul of the so-called "gender ideology" Executive Order. See id. at 10. Second, some of the Coalitions worry that they will no longer be permitted to discuss with victims options for responding to incidents of domestic or sexual violence other than reaching out to law enforcement, which in some jurisdictions can involve collateral consequences that might not be the preferred course for particular victims, because doing so would arguably violate the challenged condition regarding collaboration with law enforcement. See id. at 35. These examples are simply two of many activities that the Coalitions engage in that they reasonably fear will now subject them to loss of grant funding or False Claims Act liability. See, e.g., id. at 30-38. The Office's assurances that

23

these and other activities that might run afoul of the challenged conditions pose no threat to the Coalitions because the Office will be reasonable in its interpretation of the conditions is cold comfort. See generally Lyons Decl. In the context of this case and the present Administration, the words of President Ronald Reagan have never rang more true: "[T]he nine most terrifying words in the English language are: I'm from the Government, and I'm here to help." President Ronald Reagan, The President's News Conference (Aug.                    12,                    1986), https://www.reaganlibrary.gov/archives/speech/presidents-news-conference-23.

Considering the dilemma confronting the Coalitions, the Court agrees that they face irreparable harm. Contrary to the Office's claims, the Coalitions' claims of harm are not premature or overly speculative. See Defs.' Resp. 39-40. Accepting grant funds subject to the challenged conditions, in their present form, would unfairly require the Coalitions to guess at what formerly unobjectionable activities are now proscribed by a given grant award. And that uncertainty, created by the Office, comes with serious risks of enhanced and aggressive False Claims Act prosecutions. See Pls.' Mem. 39-40. But declining to apply for or accept grants, which they would otherwise be eligible to receive, would cause the Coalitions just as much harm. See id. at 40-42 (describing likely loss of "hundreds of thousands of

dollars," staff cuts, and the elimination of crucial programs and services for the vulnerable populations they work with).

Based on these considerations, the Court finds that the Coalitions have met their burden on this factor.

### C. Balance of the Equities and Public Interest

The Court proceeds to the final two showings that the Coalitions must make: that the balance of equities favors granting injunctive relief and that such relief is in the public interest. Winter, 555 U.S. at 20. These factors merge when, as here, the Government is the opposing party. Nken, 556 U.S. at 435.

On the one hand, if the Court does not grant preliminary relief, then the Coalitions will face real and immediate irreparable harm from the challenged conditions, conditions which the Court has already concluded likely violate the APA. This could result in the disruption of important and, in some cases, life-saving services to victims of sexual assault and domestic violence. On the other hand, if the Court grants preliminary relief, then the Office will simply have to consider grant applications and award funding as it normally does.

Faced with the apparent imbalance in the relative equities and public interest, the Office's only arguments are that it "would be 'unlikely to recover the grant funds once they are disbursed,'" and that "[t]he public . . . has an interest in the judiciary respecting the Executive Branch's ability to lawfully direct and

guide agencies' spending decisions." See Defs.' Resp. 40-41 (quoting Dep't of Educ., 145 S. Ct. at 969). These arguments are unconvincing. For one, the relief sought by the Coalitions does not itself require the disbursement of any grant funds. And speaking of respect, the public has an interest in the Executive respecting the Legislature's spending decisions. See U.S. Const. art. I, § 8, cl. 1.

Upon consideration of the relative equities of this case and the public interest, the Court determines that the Coalitions have also met their burden as to these factors.

**D. Remedy**

The Court thus concludes that the Coalitions have adequately demonstrated that they are entitled to preliminary relief. Because the Court has assessed that they are likely to succeed on at least one of their APA claims, relief under that statute is most appropriate here.

Section 705 of the APA permits the Court, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Accordingly, the Court finds that it is necessary and appropriate, for now, to grant the Coalitions' request for a preliminary stay of the challenged

conditions on all FY 2025 grants.  Id.

Because the Court finds that a Section 705 preliminary stay secures the Coalitions all necessary relief, their application for separate injunctive relief is not necessary and is therefore denied.

**IV.  CONCLUSION**

For all the reasons stated above, the Court grants in part and denies in part the Plaintiffs' Motion for Preliminary Injunction and for Relief under 5 U.S.C. § 705, Dkt. No. 15.


IT IS SO ORDERED.

William E. Smith
Senior District Judge
Date: August 8, 2025