## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND COALITION AGAINST
DOMESTIC VIOLENCE,

CALIFORNIA PARTNERSHIP TO END
DOMESTIC VIOLENCE,

COLORADO COALITION AGAINST SEXUAL
ASSAULT,

DISTRICT OF COLUMBIA COALITION
AGAINST DOMESTIC VIOLENCE,

END DOMESTIC ABUSE WISCONSIN: THE
WISCONSIN COALITION AGAINST DOMESTIC
VIOLENCE,

GEORGIA COALITION AGAINST DOMESTIC
VIOLENCE,

HAWAI'I STATE COALITION AGAINST
DOMESTIC VIOLENCE,

IDAHO COALITION AGAINST SEXUAL AND
DOMESTIC VIOLENCE,

INDIANA COALITION AGAINST DOMESTIC
VIOLENCE,

IOWA COALITION AGAINST DOMESTIC
VIOLENCE,

JANE DOE INC., THE MASSACHUSETTS
COALITION AGAINST SEXUAL ASSAULT
AND DOMESTIC VIOLENCE,

KANSAS COALITION AGAINST SEXUAL AND
DOMESTIC VIOLENCE,

MAINE COALITION TO END DOMESTIC
VIOLENCE,

Case No. 1:25-cv-00279

MARYLAND NETWORK AGAINST DOMESTIC VIOLENCE,

MONTANA COALITION AGAINST DOMESTIC AND SEXUAL VIOLENCE,

NEW JERSEY COALITION TO END DOMESTIC VIOLENCE,

NORTH CAROLINA COALITION AGAINST DOMESTIC VIOLENCE,

OREGON COALITION AGAINST DOMESTIC AND SEXUAL VIOLENCE,

PENNSYLVANIA COALITION AGAINST DOMESTIC VIOLENCE,

VALORUS,

VERMONT NETWORK AGAINST DOMESTIC AND SEXUAL VIOLENCE,

VIOLENCE FREE MINNESOTA,

VIRGINIA SEXUAL AND DOMESTIC VIOLENCE ACTION ALLIANCE,

WASHINGTON STATE COALITION AGAINST DOMESTIC VIOLENCE, and

WISCONSIN COALITION AGAINST SEXUAL ASSAULT,

*Plaintiffs*,

v.

PAMELA BONDI, in her official capacity as United States Attorney General,

UNITED STATES DEPARTMENT OF JUSTICE,

GINGER BARAN LYONS, in her official capacity as Acting Director of the Office on Violence Against Women,

OFFICE ON VIOLENCE AGAINST WOMEN,

MAUREEN A. HENNEBERG, in her official capacity as acting head of the Office of Justice Programs,

OFFICE OF JUSTICE PROGRAMS,

KATHERINE DARKE SCHMITT, in her official capacity as acting head of the Office for Victims of Crime, *and*

OFFICE FOR VICTIMS OF CRIME,

*Defendants*.

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# I.     <u>INTRODUCTION</u>

1.      Thirty-one years ago, Congress enacted the Violence Against Women Act ("VAWA") to create a unified, national response to violence against women. As Senator Barbara Boxer explained in introducing the bill, speaking of the thousands of women murdered by their current or former partners, we "know … that the criminal justice system is guilty because it routinely turns its back on this form of brutality and leaves too many women out in the cold." 140 Cong. Rec. S30 (daily ed. June 21, 1994). Over the past three decades, VAWA has had significant successes, making people and communities safer. But the crisis VAWA sought to address remains urgent. As the Office on Violence Against Women ("OVW") observed just last month, "over half of the women murdered in the United States are killed by a current or former intimate partner." *See* OVW, *Resource Guide for Addressing the Intersection of Domestic Violence and Firearms*, https://perma.cc/2LX5-WFN3 (last visited June 15, 2025).

2.      Congress passed the Victims of Crime Act ("VOCA") over 40 years ago, with which it established the Crime Victims Fund and directed those funds' use for various purposes, including grants to assist victims of crime.

3.      Since VAWA's and VOCA's inception, Congress has recognized that providing support to organizations and entities working on the ground with victims is critical to accomplishing their statutory goals. Congress thus created a broad range of grant programs to enable nonprofit service providers and local government entities to provide the multi-pronged and time-intensive support that victims of domestic violence and sexual assault need under VAWA and to support direct services to victims under VOCA. Through these grants, service providers support battered women's shelters, transitional housing, and rape and crisis centers, among numerous other programs, making their communities safer and protecting survivors.

4.      VAWA operates in large part through official domestic violence and sexual assault coalitions that exist in every state and territory. Plaintiffs in this action are many of those state coalitions. The coalitions are all nonprofit membership organizations that themselves receive grants from the Department of Justice's Office on Violence Against Women ("OVW"), and/or VOCA or other grants from DOJ's Office for Victims of Crime ("OVC"), a program office within DOJ's Office of Justice Programs ("OJP"). Plaintiffs' member organizations receive OVW and OVC grants as well.

5.      However, Plaintiffs and the victims they serve are now in grave jeopardy. As has been happening at agencies across the federal government, OVW and OJP have begun demanding that grantees certify compliance with conditions that reflect the Administration's broader policy agenda. These new certification requirements are untethered to any condition that Congress thought necessary or appropriate for OVW and OJP grant funding. Many of the conditions are too broadly worded to be deciphered, and to the extent they are intelligible, many appear to actively conflict with VAWA's requirements. OVW grantees must certify that they will not use grant funds to promote "gender ideology," even though VAWA expressly forbids grantees from discriminating based on gender identity. Both OVW and OJP seem to be demanding that grantees promise not to operate any "DEI" programs, in the face of VAWA's requirement to serve underserved racial and ethnic groups. OVW grantees must certify that they will not "prioritize illegal aliens" or "promote or facilitate" immigration violations, despite Congress's directives for certain OVW programs to emphasize assistance to immigrants and despite Congress's direction that OVW programs do not discriminate on the basis of alienage status. The list of vague requirements that run contrary to the letter or spirit of VAWA goes on.

6.      Worse yet, OVW and OJP have structured these certifications with the specific intent of exposing grantees to massive liability under the False Claims Act. Any organization that makes the certifications and accepts grant funds is immediately exposed to potential federal investigations and enforcement actions, which DOJ has said it will prioritize, or harassing lawsuits from private parties that DOJ has openly encouraged.

7.      Plaintiffs and their members are thus left in an impossible position. If they refrain from applying for OVW and OJP grants, they will lose out on funding that is critical to their ability to provide the services they have long promised and offered, that victims and survivors rely on for safety and protection, and that some organizations need to continue operating at all. Yet if they make the required certifications, they will immediately expose their organizations to substantial legal and financial risk, on top of agreeing to statements antithetical to their core values. At minimum, Plaintiffs and their members could face harassing False Claims Act lawsuits, and at worst they could face the False Claims Act's punitive remedies if they stray outside the certifications' bounds. Compounding matters, to mitigate the False Claims Act risks, Plaintiffs and their members may have to alter their programming in ways that contradict the organizations' sincerely held beliefs or even violate VAWA itself. For many, there is no tenable path forward, an obvious outcome, had Defendants cared to consider it.

8.      Plaintiffs file this action to enjoin Defendants' unlawful actions that are causing Plaintiffs' grievous harm. The new OVW and OJP funding conditions violate the Constitution. Congress has the power of the purse, and the Executive Branch may not place conditions on funding that Congress did not authorize, nor can it impose conditions that run contrary to those Congress directly imposed. The challenged funding conditions also violate due process in using incredibly vague terms that provide Plaintiffs and their members no clarity on the actual conduct

that is prohibited. Defendants are violating the First Amendment in leveraging federal funds to force grantees to voice the Administration's views on gender and in attempting to prohibit grantees from promoting diversity, equity, and inclusion even when not using federal funds. The conditions exceed Defendants' statutory authority and in many cases outright conflict with statutory commands—the agencies' decision to implement these conditions is arbitrary and capricious in virtually every way that agency action can be arbitrary and capricious. Defendants' imposition of these funding conditions is clearly unlawful, and it must be brought to an immediate end.

## II. PARTIES

9.      Plaintiff Rhode Island Coalition Against Domestic Violence ("Rhode Island Coalition") is a domestic violence coalition membership organization founded in 1979 and located in Warwick, Rhode Island. The Rhode Island Coalition provides statewide leadership to prevent and address domestic violence, and supports and enhances the work of its 10 member agencies in Rhode Island to provide high quality and victim-focused services, create justice for victims through legislative and systemic advocacy, and raise awareness on the occurrence and prevention of domestic violence in Rhode Island. The Rhode Island Coalition aims to ensure that Rhode Island is a place where domestic violence is not tolerated because communities are enlightened and responsive to the needs of victims and their children.

10.      Plaintiff California Partnership to End Domestic Violence ("California Partnership") is a domestic violence coalition membership organization founded in 1993 as the California Alliance Against Domestic Violence and located in Sacramento, California. The California Partnership represents advocates and domestic-violence or other allied organizations throughout the state, supports service providers, and advances systems change to prevent and end

domestic violence. The California Partnership aims to align prevention and intervention strategies through policy, communications, and capacity-building efforts to advance social change.

11.     Plaintiff Colorado Coalition Against Sexual Assault ("Colorado Coalition") is a sexual assault coalition membership organization founded in 1984 and headquartered in Denver, Colorado. The Colorado Coalition provides leadership, advocacy, and support to address and prevent sexual violence. It is made up of over 100 member sexual assault programs, dual domestic violence and sexual assault programs, college and university campuses, law enforcement agencies, offender treatment programs, public health agencies, medical professionals, prosecutors, sexual assault survivors, victim advocates, as well as other organizations and concerned individuals throughout Colorado.

12.     Plaintiff District of Columbia Coalition Against Domestic Violence ("DC Coalition") is a domestic violence coalition membership organization founded in 1986 and headquartered in Washington, D.C. The DC Coalition provides training and technical assistance for its direct-service member programs, allied organizations, and government partners to understand how to lawfully implement best practices when serving survivors of domestic violence; leads local policy and advocacy efforts on behalf of and along with survivors of domestic violence; and works to build primary prevention efforts into programming available for young people in D.C.

13.     Plaintiff End Domestic Abuse Wisconsin: The Wisconsin Coalition Against Domestic Violence ("End Abuse Wisconsin"), founded in 1978, is a statewide non-profit membership organization of domestic violence victims, survivor programs, and allied partners committed to preventing and ending domestic violence. Headquartered in Madison, Wisconsin,

5

End Abuse Wisconsin promotes practices and policies to prevent and eliminate domestic violence, including by providing technical support and assistance to domestic violence programs across the state, training legal and other professionals on domestic violence dynamics, and engaging in public policy to ensure that survivors' needs are met.

14.     Plaintiff the Georgia Coalition Against Domestic Violence ("Georgia Coalition") is a domestic violence coalition membership organization founded in 1970 and headquartered in Atlanta, Georgia. The Georgia Coalition provides training and technical assistance to its direct-service member programs, allied organizations, law enforcement, and government partners, and survivors of domestic violence; leads policy and advocacy efforts on behalf of and along with survivors of domestic violence; and educates the public on domestic violence. The Georgia Coalition also provides direct services, including services to deaf and hard of hearing survivors.

15.     Plaintiff the Hawaiʻi Coalition Against Domestic Violence ("Hawaiʻi Coalition") is Hawaiʻi's federally designated domestic violence coalition headquartered in Honolulu, Hawaiʻi and has operated as a domestic violence coalition membership organization since 1994. The coalition is dedicated to preventing and ending domestic violence, dating violence, and stalking in Hawaiʻi. It supports survivors and the people who serve them by promoting safety, healing, justice, and lasting change.

16.     Plaintiff Idaho Coalition Against Sexual and Domestic Violence ("Idaho Coalition") is a dual domestic violence and sexual assault coalition membership organization founded in 1980 and headquartered in Boise, Idaho. The Idaho Coalition works to end gender-based violence from its systemic roots, including by providing member organizations

with training and technical assistance, access to statewide and national training and development, and participation in state-level advocacy and systems reform.

17.    Plaintiff Indiana Coalition Against Domestic Violence ("Indiana Coalition") is the state's domestic violence coalition founded in 1980 and headquartered in Indianapolis. A membership organization, the Indiana Coalition serves as a network of survivors, sexual and domestic violence agencies, and allies working to strengthen the ways in which communities across Indiana respond to and prevent intimate partner violence.

18.    Plaintiff Iowa Coalition Against Domestic Violence ("Iowa Coalition") is a domestic violence coalition membership organization founded in 1985 and headquartered in Des Moines, Iowa. The Iowa Coalition operates in support of a network of 23 victim service programs that collectively provide comprehensive services to survivors of violent crimes throughout the state. Through a survivor-centered approach to victim services, it prioritizes the needs, safety, and autonomy of individuals who have experienced domestic violence and other violent crimes, ensuring access to critical resources for underserved and marginalized populations. It serves its member organizations by providing essential training programs, technical assistance, and other resources designed to enhance the capacity and effectiveness of victim service providers, strengthening the statewide response to domestic violence and supporting survivors on their paths to safety and healing.

19.    Plaintiff Jane Doe Inc., the Massachusetts Coalition Against Sexual Assault and Domestic Violence ("JDI") is a dual domestic violence and sexual assault coalition membership organization founded in 1998 and headquartered in Boston, Massachusetts. JDI mobilizes collective power and resources to build a safer, healthier, freer Massachusetts beyond abuse and

violence. JDI provides training, policy and systems advocacy, technical assistance and support for its 60 member programs, system partners, and the public.

20.    Plaintiff Kansas Coalition Against Sexual & Domestic Violence ("Kansas Coalition") has operated as a dual sexual assault and domestic violence coalition membership organization since 1990. Located in Topeka, Kansas, the Kansas Coalition comprises 24 member organizations. The Kansas Coalition is dedicated to preventing and ending sexual and domestic violence, dating violence and stalking in Kansas. The Kansas Coalition supports survivors and the people who serve them by promoting safety, healing, justice, and lasting change.

21.    Plaintiff Maine Coalition to End Domestic Violence ("Maine Coalition"), headquartered in Augusta, Maine, is comprised of ten member programs, including Maine's eight regional domestic violence resource centers and two culturally specific service providers, that together serve as a network of non-profit agencies providing direct services to victims of domestic violence, stalking and sex-trafficking across Maine.

22.    Plaintiff the Maryland Network Against Domestic Violence ("Maryland Network"), headquartered in Annapolis, Maryland, is the domestic violence coalition that serves as a non-profit network of survivors, domestic violence service providers, including comprehensive programs and agencies, and allied professionals working to strengthen how communities across Maryland respond to and prevent intimate partner violence. The Maryland Network's mission is to lead diverse community partners toward the common purpose of reducing the occurrence and impact of intimate partner violence. The Maryland Network provides its statewide membership of domestic violence service providers with access to resources, training opportunities, technical assistance, and input on policies and practices that advance safety, justice, and healing for survivors of intimate partner violence

23.     Plaintiff Montana Coalition Against Domestic and Sexual Violence ("Montana Coalition") is a dual domestic violence and sexual assault coalition membership organization founded in 1986 and headquartered in Helena, Montana. The Montana Coalition provides training and technical assistance to service providers addressing domestic and sexual violence in the state and serves as a resource for member and allied organizations by providing training and technical assistance, conducting statewide planning and needs assessment, developing and enhancing service standards, and gathering and disseminating critical resources and information.

24.     New Jersey Coalition to End Domestic Violence ("New Jersey Coalition") is a domestic violence membership coalition founded in 1980 and headquartered in Hamilton, New Jersey. The New Jersey Coalition serves as a non-profit network of domestic violence service providers, including comprehensive programs and agencies, and allies working to strengthen New Jersey's response to and prevention of domestic violence by providing members with access to resources, training opportunities, technical assistance, and input on policies and practices that advance safety, justice, and healing for survivors.

25.     Plaintiff North Carolina Coalition Against Domestic Violence ("North Carolina Coalition") is a domestic violence coalition founded in 1981 and headquartered in Durham, North Carolina. The North Carolina Coalition provides training and technical assistance to its membership and convenes and participates in meetings across the state with membership and allied professionals with the goal of bridging any gaps in domestic violence services and improving communication and collaboration between service providers.

26.     Plaintiff Oregon Coalition Against Domestic and Sexual Violence ("Oregon Coalition") is a dual domestic violence and sexual assault coalition membership organization composed of rural and urban members, founded in 1978 and headquartered in Portland, Oregon.

The Oregon Coalition provides statewide leadership, technical assistance, and support to its member programs that serve survivors, the public, friends, family and all whose lives are affected by domestic and sexual violence.

27.     Plaintiff Pennsylvania Coalition Against Domestic Violence ("Pennsylvania Coalition") is a domestic violence coalition founded in 1976 and headquartered in Harrisburg, Pennsylvania. The Pennsylvania Coalition serves as both a membership organization and a funder for Pennsylvania's domestic violence service programs, making it the largest domestic violence coalition in the United States. It provides technical assistance, training, and advocacy, as well as development of service standards and monitoring programs for compliance with funding requirements.

28.     Plaintiff ValorUS ("VALOR") is a sexual assault coalition membership organization founded in 1980 and based in Sacramento, California. VALOR is committed to advancing equity and ending sexual violence, including by providing training and technical assistance to support California rape crisis centers; coordinating with partner organizations including law enforcement, prosecution, and sex offender treatment; and offering its members training and conference opportunities.

29.     Plaintiff Vermont Network Against Domestic and Sexual Violence is a dual state sexual assault coalition and domestic violence coalition membership organization founded in 1986 and is headquartered in Waterbury, Vermont. The Vermont Network serves as a non-profit network of survivors, sexual and domestic violence agencies, and allies working to strengthen Vermont's response and prevention of sexual and intimate partner violence.

30.     Plaintiff Violence Free Minnesota ("Violence Free Minnesota") is the Minnesota domestic violence coalition membership organization founded in 1978 and based in Saint Paul,

10

Minnesota. Violence Free Minnesota is composed of over 90 member programs across the state that are aimed at ending relationship abuse. The coalition represents victims and survivors of relationship abuse; leads public policy advocacy and social change efforts; and offers support, education, and opportunities for connection for members.

31.     Plaintiff Virginia Sexual and Domestic Violence Action Alliance ("Virginia Action Alliance") is a dual domestic violence and sexual assault coalition membership organization founded in 1981 and headquartered in Richmond, Virginia. The Virginia Action Alliance serves as a leading voice on sexual and intimate partner violence and as a network of survivors, sexual and domestic violence agencies, and allies that works to strengthen community responses to and prevention of sexual and intimate partner violence in the state. It provides more than 70 member sexual and domestic violence agencies statewide with access to resources, training opportunities, technical assistance, and input on policies and practices that advance safety, justice, and healing for survivors.

32.     Plaintiff Washington State Coalition Against Domestic Violence ("Washington Coalition") is a domestic violence coalition and, as of earlier this year, sexual assault coalition membership organization founded in 1990 and headquartered in Seattle, Washington. The Washington Coalition is a non-profit network of over 70 community-based domestic violence and sexual assault survivor service providers and allies, working to strengthen how communities across Washington respond to and prevent abuse in a unified way. The Washington Coalition serves as the leading voice on behalf of the field across the state, provides its member organizations with training, technical assistance, innovation and best practices, and support; and educates the public, all for the purpose of advancing safety, justice, and healing for survivors and their children.

33.     Plaintiff Wisconsin Coalition Against Sexual Assault ("Wisconsin SA Coalition") is a sexual assault coalition membership organization founded in 1985 and headquartered in Madison, Wisconsin. The Wisconsin SA Coalition works to create social change to end sexual violence by supporting and centering survivors, advocating for systemic and legislative change, and strengthening the capacity of sexual assault service providers across the state. The Wisconsin SA Coalition provides its members with individualized training and technical assistance opportunities, access to support and resources, and invitations to coalition-hosted events.

34.     Defendant Pamela Bondi is the Attorney General of the United States and, as such, is the senior officer at the Department of Justice. She is sued in her official capacity.

35.     Defendant United States Department of Justice is an Executive Agency of the United States, headquartered in Washington, D.C. DOJ is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

36.     Defendant Ginger Baran Lyons is Deputy Director for Grants and Development and is serving as Acting Director of OVW. She is sued in her official capacity as acting Director of the Office on Violence Against Women.

37.     Defendant Office on Violence Against Women is a DOJ component with sole authority over all activities authorized or undertaken under the Violence Against Women Act and reauthorizations, including with respect to grants and cooperative agreements awarded by the office. OVW is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

38.     Defendant Maureen Henneberg is the Deputy Assistant Attorney General for Operations and Management within DOJ currently in charge in an acting capacity of OJP. She is sued in her official capacity as Acting Assistant Attorney General for OJP.

39.     Defendant Office of Justice Programs is the largest grantmaking component of DOJ. In addition to overseeing the work of other subsidiary grantmaking offices within DOJ, OJP oversees various Program Offices that administer grant programs, including OVC. OJP is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

40.     Defendant Katherine Darke Schmitt is the Principal Deputy Director of OVC and is currently in charge of OVC in an acting capacity. She is sued in her official capacity as acting director of OVC.

41.     Defendant Office for Victims of Crime is a Program Office established by statute within OJP, and is authorized to administer the Crime Victims Fund and associated grant programs as well as other grant programs. OVC is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

### III. JURISDICTION AND VENUE

42.     This Court has subject-matter jurisdiction to adjudicate these claims because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331, and because Defendants are United States agencies and officials, 28 U.S.C. § 1346(a)(2).

43.     This Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 705, 706, and the Court's inherent authority to enjoin federal officials from acting unlawfully.

44.     Venue is appropriate under 28 U.S.C. § 1391(e) in the District of Rhode Island because Plaintiff Rhode Island Coalition Against Domestic Violence resides in this district.

## IV. FACTUAL AND LEGAL BACKGROUND

**Violence Against Women Act Grant Programs**

***Congress Enacts the Violence Against Women Act as a National Response to Violent Crimes Against Women***

45.     Congress enacted the Violence Against Women Act as part of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994), seeking to "respond both to the underlying attitude that [violence against women] is somehow less serious than other crime and to the resulting failure of our criminal justice system to address such violence." S. Rep. No. 103-138, at 38 (1993).

46.     Through VAWA, Congress sought a comprehensive response to the issue of violence against women, focusing primarily on legal protections, increased enforcement and access to legal structures and assistance, and expanded services for victims.

47.     Central to this comprehensive approach to addressing violence against women, Congress created a broad set of grant programs for states, federally recognized state and Territory domestic violence and sexual assault coalitions, service providers, and tribes. These programs focus on a broad range of activities, from preventing domestic violence and sexual assault to fostering collaboration between law enforcement and victims service providers, among other activities. 34 U.S.C. §§ 10441, *et seq.*; *id.* §§ 12291, *et seq.*

48.     VAWA recognized that violence against women must be addressed within a broader framework and tailored to the unique needs of different women's experiences. For example, it provides grants for, among other things, "developing or improving delivery of victim services to racial, cultural, ethnic, and language minorities." 34 U.S.C. § 10441(b)(5). It also provides training for judges on a broad range of issues from sexual assault and domestic violence to gender and racial stereotyping. *Id.* § 12372.

49.    Congress directed the Attorney General to develop regulations to "ensure that States will" use grant money under VAWA to, among other things, "recognize and address the needs of underserved populations." Pub. L. No. 103-322, § 40121, 108 Stat. at 1912 (codified at 34 U.S.C. § 10446(e)(2)(D) with subsequent amendments). Congress defined "underserved populations" to include populations "underserved because of geographic location (such as rural isolation), underserved racial or ethnic populations, and populations underserved because of special needs, such as language barriers or physical disabilities." Pub. L. No. 103-322 § 40121, 108 Stat. at 1913 (codified at 34 U.S.C. § 12291(a)(46), with subsequent amendments).

50.    VAWA has, from its inception, included a specific focus on the unique problems faced by immigrant victims of domestic violence and sexual assault. Among other measures, Congress provided for a mechanism for abused spouses and children to self-petition for immigration relief, as well as for suspension of deportation and cancelling of removal. Pub. L. No. 103-322, § 40701(a)(C), 108 Stat. at 1953 (amending the Immigration and Nationality Act, *see* 8 U.S.C. § 1154, which has been further amended through a VAWA reauthorization in 2005).

51.    Congress recognized the unique problem of gender-based violence that disproportionately targets women. And through VAWA, Congress made clear that it considered violence against women to be a systemic issue, not a one-off crime. The Joint Explanatory Statement of the Committee of Conference accompanying VAWA's passage described crimes of violence against women as crimes of "bias" that violate the victim's right to be free from sex discrimination. *See* 140 Cong. Rec. H8871 (daily ed. Aug. 21, 1994). It acknowledged that existing state and federal laws did not adequately protect against the bias element of gender-motivated crimes of violence or allow victims adequate opportunity to vindicate their rights. *Id.* The Committee Statement also stressed that existing bias and discrimination in the

15

criminal legal system often deprived victims of gender-motivated violent crimes equal protection of the laws and the redress to which they were entitled. *Id.*

52.     VAWA recognizes the disproportionate impact of domestic violence and sexual assault on women but has never been limited to responding to violence committed against women; VAWA was written in gender-neutral terms and addresses domestic violence, sexual assault, and stalking, no matter the identity of the victim. *See, e.g.*, 34 U.S.C. § 12291(a)(12) (defining domestic violence, in part, as a crime "committed by a current or former spouse or intimate partner of the victim.").

### *In Reauthorizing the Violence Against Women Act, Congress Continuously Expanded its Scope, Including to Underrepresented Groups*

53.     Congress has reauthorized and amended VAWA four times since its enactment, each time with broad bipartisan support. Congress reauthorized VAWA in 2000 through the Victims of Trafficking and Violence Protection Act, Pub. L. No. 106-386, 114 Stat. 1464 (2000); in 2006 through the Violence Against Women and Department of Justice Reauthorization Act, Pub. L. No. 109-162, 119 Stat. 2960 (2006); in 2013 through the Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat. 54 (2013); and in the Consolidated Appropriations Act of 2022, which contained the Violence Against Women Reauthorization Act of 2022, Pub. L. No. 117-103, div. W, 136 Stat. 49, 840–46 (2022).

54.     In these reauthorizations, Congress expanded VAWA's scope and added to its complex and integrated system of federal and state funding.

55.     In the 2000 reauthorization, Congress created a permanent office at the Department of Justice—the Office on Violence Against Women—and charged it with implementing VAWA and administering its grants programs. *See* 34 U.S.C. § 10442; OVW,

*About the Office on Violence Against Women*, https://perma.cc/J8TW-ET4M (last visited June 15, 2025).

56.     Congress directed that OVW be headed by a Director, who, while reporting to the Attorney General, has "final authority over all grants, cooperative agreements, and contracts awarded by the office." 34 U.S.C. § 10442(b).

57.     As especially relevant to this case, the 2000 reauthorization created a state coalition grant program under VAWA, directing that the Attorney General "shall award grants to each state domestic violence coalition and sexual assault coalition…." Pub. L. No. 106-386, § 1103(b)(1)(B); *see* 34 U.S.C. § 10441. Congress defined "[s]tate domestic violence coalitions" as programs determined by the Administration for Children and Families under the Family Violence Prevention and Services Act. Congress defined "[s]tate sexual assault coalitions" as programs determined by the Center for Injury Prevention and Control of the Centers for Disease Control and Prevention under the Public Health Service Act. *See* 34 U.S.C. §§ 12291(38)–(39). The Plaintiffs in this case are all officially designated State Domestic Violence Coalitions and/or State Sexual Assault Coalitions under VAWA.

58.     The 2000 reauthorization also expanded VAWA's scope, including expanding specific protections for immigrants. Pub. L. No. 106-386, §§ 1109, 1503. For example, it created the "T" visa, allowing for certain noncitizen victims of human trafficking to remain in the United States and apply for legal permanent residency. *See id.* § 107 (describing eligibility for and creation of T visas).

59.     In the 2006 reauthorization, Congress continued to expand VAWA's reach. For example, it revised the definition of "underserved populations"—groups whose needs VAWA seeks to address—to specifically call out "populations underserved because of … disabilities,

alienage status, or age." Pub. L. No. 109–162, § 3 (codified at 34 U.S.C. § 12291(a)(46)). The 2006 reauthorization also created mandatory grant programs to support outreach to tribal, underserved, and immigrant communities, and to provide "culturally and linguistically specific services for victims of domestic violence, dating violence, sexual assault, and stalking. *Id.* §§ 120–21 (codified as amended at 34 U.S.C. §§ 20123–24).

60.     The 2013 reauthorization further expanded protections for particularly vulnerable populations. For example, it closed a jurisdictional gap affecting Native American women's ability to seek justice for crimes that took place on Native American land and expanded the grant program targeted at curbing domestic violence, sexual assault, dating violence, and stalking in Indian Country to also include sex trafficking. Pub. L. No. 113-4, § 901.

61.     The 2013 reauthorization expanded the definition of "underserved populations" specifically to include populations underserved because of their sexual orientation, gender identity, and religion. 34 U.S.C. § 12291(a)(46).

62.     Congress also prohibited, in all VAWA grant programs, discrimination on the basis of race, color, religion, national origin, sex, gender identity, sexual orientation, or disability, while allowing for sex segregation or sex-specific programming that is "necessary to the essential operation of a program." 34 U.S.C. §12291(b)(13).[1]

63.     The 2022 reauthorization further strengthened and expanded the protections and services provided under the law. Through it, Congress reauthorized most of the programs under VAWA, including two large formula grant programs: the STOP ("Services, Training Officers, and Prosecutors") Violence Against Women Formula Grant Program and the Sexual Assault Services Program ("SASP"). And Congress authorized new programs, such as those addressing the

---

[1] Where this applies, grantees must provide "comparable services to individuals who cannot be provided with sex-segregated or sex-specific programming." 34 U.S.C. § 12291(b)(13).

availability of sexual assault forensic exams and the backlog of untested sexual assault kits; provisions to address cybercrime and the nonconsensual dissemination of intimate pictures; new violence prevention efforts; a pilot program focused on restorative and trauma-informed practices; and grants focused on restorative justice. Nathan Kemper, Cong. Rsch. Serv., R47570, The 2022 Violence Against Women Act (VAWA) Reauthorization (May 22, 2023), https://perma.cc/9C53-NFJN.

64.    Although its goals are not yet complete, VAWA has proven effective. Over the 30 years since its enactment, the United States has seen domestic violence and sexual assault drop significantly. For example, between 1993 and 2022, annual domestic violence rates dropped by 67 percent, and the rate of rapes and sexual assaults declined by 56 percent. Nat'l Ctr. on Domestic & Sexual Violence, *Violence Against Women Act (VAWA) 30th Anniversary, September 2024*, https://perma.cc/9SDP-APGM.

### *Congress Directs OVW to Award Formula and Competitive Grants*

65.    OVW administers the vast majority of grants under VAWA. The Department of Housing and Urban Development ("HUD"), the Department of Health and Human Services ("HHS"), and other federal agencies also administer some VAWA grants. Since its creation in 1995, OVW has awarded more than $10.5 billion in grants and cooperative agreements. *See* OVW, *History*, https://perma.cc/EWW7-S9GC.

66.    VAWA sets forth specific purposes for all OVW grant programs, *see* 34 U.S.C. § 10441(b), including:

> a.    training law enforcement and other justice system personnel on how "to more effectively identify and respond to violent crimes against women … including

the appropriate use of nonimmigrant status under" provisions creating visas for victims of violence, including sexual violence, *id.* § 10441(b)(1);

    b.    "developing or improving delivery of victim services and legal assistance to underserved populations," *id.* § 10441(b)(5);

    c.    "providing assistance to victims of domestic violence and sexual assault in immigration matters," *id.* § 10441(b)(10);

    d.    "developing, enlarging, or strengthening programs and projects to provide services and responses targeting male and female victims of" VAWA crimes "whose ability to access traditional services and responses is affected by their sexual orientation or gender identity," *id.* § 10441(b)(19), with "gender identity" defined to mean "actual or perceived gender-related characteristics," 18 U.S.C. § 249(c); and

    e.    other services designed to assist justice system personnel and victim services programs, *see generally* 34 U.S.C. §§ 10441(b)(1)–(24).

67.    OVW's grants are divided between formula grants and competitive grants.

68.    Formula grants are non-competitive—any applicant that meets specified statutory requirements will receive an award in an amount determined by a statutory formula. For competitive grants, applicants who meet published criteria must compete for an award from a limited set of funds. OVW (or another relevant agency) must establish eligibility criteria for competitive awards in accordance with authorizing legislation.

69.    VAWA's formula grant programs include: (1) STOP, 34 U.S.C. §§ 10441, 10446, (2) SASP, *id.* § 12511, (3) State Coalitions, *id.* § 10441(c), and (4) Tribal Coalitions, *id.* § 10441(d). *See also* OVW, *Formula Grant Programs*, https://perma.cc/S7WD-M5H6. For the

State Coalitions formula grants, state sexual assault coalitions receive two different statutory formula amounts, 34 U.S.C. §§ 10446(b)(3), 12511(d)(3), and state domestic violence coalitions receive one statutory formula amount, *id.* § 10446(b)(2). Any coalition that is both a state domestic violence and state sexual assault coalition receives grants under all three statutory formulas. Plaintiffs are all state coalitions that receive these formula grants.

70.    With respect to competitive grants, VAWA creates a wide range of competitive grant programs, each with specific requirements and limitations on the use of funds. These programs include the Legal Assistance for Victims ("LAV") Program, the Justice for Families ("JFF") Program, the Disability Grant Program, the Rural Program, the Culturally Specific Services Program, the Transitional Housing Program, the Sexual Assault Forensic Exam ("SAFE") Hiring and Training Program, and the Underserved Program, among others.

71.    For both formula and competitive grants, VAWA sets forth specific conditions on the receipt of grant funds, including that grantees "protect the confidentiality and privacy of persons receiving services" under a grant, 34 U.S.C. § 12291(b)(2)(A), and provide regular reports to the disbursing agency, *id.* § 12291(b)(6).

72.    Critically, VAWA precludes any grant recipient from discriminating in carrying out their program activities "on the basis of actual or perceived race, color, religion, national origin, sex, gender identity … , sexual orientation, or disability." *Id.* § 12291(b)(13). Under a limited exception, grantees may provide "sex-specific programming" if it "is necessary to the essential operation of a program," as long as they provide "comparable services to individuals who cannot be provided with the sex-segregated or sex-specific programming." *Id.*

73.    VAWA further provides that authorized and appropriated funds "may be used only for the specific purposes described in" VAWA. *Id.* § 12291(b)(5).

21

74.     Each program's governing statutes specify the purposes for which grantees may use program funds, and some set specific certification requirements.

75.     The formula and competitive grants are described below.

***Coalitions Program (Formula)***

76.     The 2000 VAWA reauthorization added a State Coalition Program to VAWA.[2] 34 U.S.C. § 10441. Through that Program, Congress required that the Attorney General award grants to each recognized state domestic violence coalition, state sexual assault coalition, or dual domestic violence and sexual assault coalition, and Congress prescribed the specific amounts of funds that each coalition must receive.

77.     Specifically, by statute, "[t]he Attorney General shall award grants to each State domestic violence coalition and sexual assault coalition for the purposes of coordinating State victim services activities, and collaborating and coordinating with Federal, State, and local entities engaged in violence against women activities." *Id.* § 10441(c)(1). "[T]he Attorney General shall award grants to[:] (A) each State domestic violence coalition, as determined by the Secretary of Health and Human Services under section 10411 of title 42; and (B) each State sexual assault coalition, as determined by the Center for Injury Prevention and Control of the Centers for Disease Control and Prevention under the Public Health Service Act (42 U.S.C. 280b et seq.)." *Id.* § 10441(c)(2).

78.     Grants awarded to state domestic violence and sexual assault coalitions ("Coalition Grants") are funded through set-asides from amounts otherwise appropriated for grants to states or territories under two other formula grant programs—STOP and SASP. Formula Coalition Grants to state domestic violence and sexual assault coalitions from STOP

_____

[2] A State Coalition Grant program was previously included in the Family Violence Prevention and Services Act. 42 U.S.C. § 10410 (1993). Before the 2000 program, various Plaintiff coalitions received State Coalition Grant funds under FVPSA.

set-asides are provided for pursuant to 34 U.S.C. § 10441(c) and § 10446(b), and formula Coalition Grants to state sexual assault coalitions from SASP set-asides are provided for pursuant to 34 U.S.C. § 12511.

79. Congress prescribed that, of the total amount appropriated for STOP Grants to states or territories, "2.5 percent shall be available for grants for State domestic violence coalitions under section 10441(c)," with each domestic violence coalition receiving 1/56 of that allocation, and "2.5 percent shall be available for grants for State sexual assault coalitions under section 10441(c)," with each sexual assault coalition receiving 1/56 of that allocation. 34 U.S.C. §§ 10446(b)(2)–(3).

80. For SASP Grants, Congress directed that "[t]he Attorney General shall award grants to State, territorial, and tribal sexual assault coalitions to assist in supporting the establishment, maintenance, and expansion of such coalitions." *Id.* § 12511(d)(1)(A). These grants must collectively comprise at least 10% of the total funds appropriated for SASP Awards to states under section 12511. *See id.* § 12511(d)(1)(B). Of the amounts allocated for these grants, at least 10% must be provided to tribal sexual assault coalitions, with state and territorial coalitions each receiving 1/56 of the remaining amount. *Id.* § 12511(d)(3). Only sexual assault coalitions (and coalitions operating as a dual sexual assault and domestic violence coalition) are eligible for funds under the SASP set-aside to be used for purposes delineated by SASP.

81. On June 9, 2025, OVW notified coalitions that each coalition's FY2025 allocation would be: (i) $ 113,574 under STOP set-asides for state domestic violence coalitions; (ii) $110,498 under STOP set-asides and $132,715 under SASP set-asides state sexual violence coalitions; and (iii) $224,072 under STOP set-asides and $132,715 under SASP set-asides dual state domestic violence and sexual assault coalition. *See also* Pub. L. No. 118-42, 138 Stat. 25,

23

141 (Mar. 9, 2024) ("2024 Appropriations Act") (appropriating amounts for STOP awards to states and territories under subsection (1)); *id.* (appropriating amounts for SASP awards to states and territories under subsection (6)); Pub. L. No. 119-4, § 1101(a)(2), 139 Stat. 9, 10 (Mar. 15, 2025) ("2025 Continuing Resolution") (extending the appropriations in the same amounts through the end of FY25).

82.     Other grant programs require involvement by state coalitions. For example, VAWA directs states and territories applying for grants under SASP to include in their applications a description of "procedures designed to ensure meaningful involvement of the State or territorial sexual assault coalition." 34 U.S.C. § 12511(b)(3)(B)(i). VAWA also directs that the State Justice Institute—a federal grantmaking organization that awards grants for the purpose of developing model programs for states to use to train judges and court personnel on state laws relating to gender-motivated crimes of violence, 42 U.S.C. §§ 10702(a), 10703(k)(6)—to "ensure that model programs … are developed with the participation of" state coalitions. 34 U.S.C. § 12373. For JFF Program Grants, *infra*, if any person at an organization awarded such a grant is providing custody evaluation or guardian ad litem services, the organization must certify that the person has completed or will complete "training developed with input from and in collaboration with" another service provider or a "coalition." *Id.* § 12464(d)(7). And for programs such as SAFE, which are designed to support forensic care for victims of VAWA crimes, OVW "shall give preference to any eligible entity that certifies in the grant application that the entity will coordinate with a rape crisis center or the State sexual assault coalition" for specific purposes. *Id.* § 40723(b)(2).

83.    In 2024, the Coalition Program gave out 86 awards, totaling over $19 million in funds. *See* OVW, *State and Territorial Sexual Assault and Domestic Violence Coalitions Program*, https://perma.cc/2YBM-Z9WD.

### *STOP and SASP (Formula)*

84.    While state coalitions receive Coalition Grants from STOP and SASP appropriations set-asides, the STOP and SASP grants themselves are awarded to states or territories. *See* 34 U.S.C. §§ 10441, 10446–10451, 10455 (STOP); *id.* § 12511(b) (SASP).

85.    States must certify to six specific conditions set forth in the statute to be eligible for grants under the STOP program. The statute requires grantee states to certify that: (1) funds shall be used for any of the purposes provided in 34 U.S.C. § 10441; (2) grantees and subgrantees will develop a plan for implementation and consult and coordinate with a list of required entities; (3) states will coordinate implementation plans with other statutory plans and programs; (4) certain percentages of amounts granted be allocated to specific categories; (5) federal funds supplement, rather than supplant, otherwise-available non-federal funds; and (6) the state will comply with the grant conditions listed in 34 U.S.C. § 12291(b). 34 U.S.C. §§ 10446(c);(d)(1); (d)(6).

86.    In 2024, OVW gave out 56 SASP awards to states and territories totaling $52.04 million, *see* OVW, *Sexual Assault Services Formula Grant Program (SASP),* https://perma.cc/AM3Y-T5B9, and 56 STOP awards to states and territories totaling $171.2 million, *see* OVW, *STOP Violence Against Women Formula Grant Program*, https://perma.cc/TGW7-5KWQ.

*LAV Program (Competitive)*

87.     State domestic violence and sexual assault coalitions are eligible to apply for competitive grants, in addition to the formula grants they receive. 34 U.S.C. § 10441(c)(3). Other non-profit entities that have domestic violence or sexual assault programs or services, including coalition members, may also apply for competitive grants.

88.     One such competitive grant program is the LAV Program. The LAV Program is designed to increase the availability of comprehensive legal assistance—including in family, immigration, consumer, and housing matters, and administrative proceedings—to victims of VAWA crimes. To that end, VAWA authorizes OVW to award "grants to increase the availability of civil and criminal legal assistance necessary to provide effective aid to" victims of VAWA crimes "at minimal or no cost to the victims." 34 U.S.C. § 20121(a).

89.     The LAV Program's authorizing statute provides that, to be eligible for a LAV Program grant, applicants must make four statutorily required certifications—(1) that any person providing legal assistance under the grant program has specified qualifications, (2) that the training program required for certain legal services providers be developed in consultation with service providers or coalitions and law enforcement; (3) that the grantee will inform relevant programs, coalitions, and law enforcement of their funded legal assistance work; and (4) that the grantee's organizational policies do not require mediation or counseling involving offenders and victims physically together. *Id.* § 20121(d).

90.     In the 2024 Appropriations Act and the 2025 Continuing Resolution, Congress appropriated $55 million for the LAV Program for each fiscal year 2024 and 2025. *See* 2024 Appropriations Act, 138 Stat. at 142 (subsection (9)); 2025 Continuing Resolution, 139 Stat. at 10.

91.     In 2024, the LAV Program gave out 54 awards totaling $39.29 million. *See* OVW, *Legal Assistance for Victims Program*, https://perma.cc/72WQ-W5NB.

### Underserved Program (Competitive)

92.     By statute, two percent of the funds appropriated for certain VAWA grant programs must be used to "develop and implement outreach strategies targeted" at victims of VAWA crimes in "underserved populations." 34 U.S.C. § 20123(a)(1). OVW grants for this purpose are referred to as Underserved Program Grants.

93.     VAWA defines "underserved populations" as "populations who face barriers in accessing and using victim services, and includes populations underserved because of," among other things, "sexual orientation, gender identity," "racial and ethnic" identification, and those with "special needs (such as language barriers, disabilities, alienage status, or age)." *Id.* § 12291(a)(46).

94.     Entities are eligible for Underserved Program Grants if they are "population specific organizations[3] that" (a) either "have demonstrated experience and expertise in providing population specific services in the relevant underserved communities" or "work[] in partnership with a victim service provider or domestic violence or sexual assault coalition," (b) "offer[] specific services for a specific underserved population," or (c) "work in partnership with" an "organization that has demonstrated experience and expertise in providing population specific services in the relevant underserved population." *Id.* § 20123(b).

---

[3] "The term 'population specific organization' means a nonprofit, nongovernmental organization that primarily serves members of a specific underserved population and has demonstrated experience and expertise providing targeted services to members of that specific underserved population." 34 U.S.C. § 12291(a)(26). "The term 'population specific services' means victim-centered services that address the safety, health, economic, legal, housing, workplace, immigration, confidentiality, or other needs of victims of domestic violence, dating violence, sexual assault, or stalking, and that are designed primarily for and are targeted to a specific underserved population." *Id.* § 12291(a)(27).

95.    VAWA directs that OVW "shall make grants to eligible entities for the purpose of providing or enhancing population specific outreach and services to adult and youth victims in one or more underserved populations." *Id.* § 20213(d).

96.    This directive specifically includes activities such as working with organizations to develop or enhance population specific services, "strengthening the capacity of underserved populations" or "traditional victim service providers" to provide such services, and "providing population-specific" VAWA-crime training for law enforcement and other justice system personnel. *Id.*

97.    It also includes providing "population-specific training for service providers" working cooperatively "with an underserved population to develop and implement outreach, education, prevention, and intervention strategies … highlight[ing] available resources and the specific issues faced by victims" of VAWA crimes in underserved populations, and supporting "culturally specific programs and projects to provide culturally specific services regarding responses to, and prevention of, female genital mutilation and cutting." *Id.* § 20123(d).

98.    "Culturally specific" "means primarily directed toward racial and ethnic minority groups (as defined in section 1707(g) of the Public Health Service Act (42 U.S.C. § 300u-6(g))." *Id.* § 12291(a)(8). The Public Health Service Act, in turn, defines "racial and ethnic minority groups" to mean "American Indians (including Alaska Natives, Eskimos, and Aleuts); Asian Americans; Native Hawaiʻians and other Pacific Islanders; Blacks; and Hispanics." 42 U.S.C. § 300u-6(g).

99.    "[C]ulturally specific services" is defined to mean "community-based services that include culturally relevant and linguistically specific services and resources to culturally specific communities." 34 U.S.C. § 12291(a)(9).

100.    In the 2024 Appropriations Act and the 2025 Continuing Resolution, Congress appropriated $5 million for this program for each of fiscal years 2024 and 2025. *See* 2024 Appropriations Act, 138 Stat. at 142 (subsection (23)); 2025 Continuing Resolution, 139 Stat. at 10.

101.    In 2024, the Underserved Program gave out 18 awards totaling $10.82 million. *See* OVW, *Underserved Program*, https://perma.cc/6K5F-EKMU.

### Culturally Specific (Competitive)

102.    In 2006, Congress mandated that OVW "establish a new grant program to enhance culturally specific services for victims of domestic violence, dating violence, sexual assault, and stalking" (hereinafter referred to as "VAWA crimes"). 34 U.S.C. § 20124(a)(1). The Culturally Specific Services Program "supports culturally specific community-based organizations in addressing the critical needs of" victims of VAWA crimes "in a manner that affirms a victim's culture." *See* OVW, *Culturally Specific Services Program*, https://perma.cc/ADT9-L2SK.

103.    Specifically, VAWA mandates that OVW "shall make grants to community-based programs for the purpose of enhancing culturally specific services for victims of" VAWA crimes to "address distinctive cultural responses to" such crimes. 34 U.S.C. § 20124(b)(2). Those purposes may be carried out by, among other things, engaging in activities that increase communities' capacity to provide services, strengthening criminal justice interventions, and enhancing traditional services to victims of VAWA crimes through culturally specific responses, and by "examining the dynamics of culture and its impact on victimization and healing." *Id.*

104.    An entity is eligible to receive a Culturally Specific Services Program Grant if it is a "community-based program[] whose primary purpose is providing culturally specific

services" and who either provides those services directly to victims of VAWA crimes or "can partner with a program having demonstrated expertise in serving victims of" VAWA crimes. *Id.* § 20124(c).

105.    Congress appropriated a certain percentage of funds from pre-existing programs to establish the Culturally Specific Services Program. *Id.* §§ 20124(a)(1), (3). In the 2024 Appropriations Act and the 2025 Continuing Resolution, Congress appropriated $19 million for this program for each of fiscal years 2024 and 2025. *See* 2024 Appropriations Act, 138 Stat. at 142 (subsection (19)); 2025 Continuing Resolution, 139 Stat. at 10.

106.    In 2024, the Culturally Specific Services Program gave out 52 awards totaling over $22.97 million. *See* OVW, *Culturally Specific Services Program*, https://perma.cc/ADT9-L2SK.

### *The Rural Program (Competitive)*

107.    Through the Rural Program, OVW awards grants to entities for programs designed to prevent VAWA crimes, and enhance the safety of victims of VAWA crimes, in rural communities. 34 U.S.C. §§ 12341(a), (b).

108.    Rural Program Grants may be used for the purpose of expanding law enforcement efforts, providing treatment to victims, working in cooperation with the community to prevent VAWA crimes, developing and strengthening other victim service programs such as those addressing rape kit backlogs, and developing and strengthening other programs to address the specific needs of rural communities. *Id.* § 12341(b). Such purposes may include "providing, treatment, counseling, advocacy, legal assistance, and other long-term and short-term victim and population specific services to" victims of VAWA crimes, "including assistance in immigration matters." *Id.* § 12341(b)(2).

109.     VAWA requires OVW to "give priority to the needs of underserved populations" when awarding Rural Program Grants. *Id*. § 12341(d)(4).

110.     In the 2024 Appropriations Act and the 2025 Continuing Resolution, Congress appropriated $50 million for this program for each of fiscal years 2024 and 2025. *See* 2024 Appropriations Act, 138 Stat. at 142 (subsection (7)); 2025 Continuing Resolution, 139 Stat. at 10.

111.     In 2024, the Rural Program gave out 54 awards totaling $36.09 million. *See* OVW, *Rural Program*, https://perma.cc/QSG3-7GTX.

### *The Transitional Housing Program (Competitive)*

112.     In furtherance of the Transitional Housing Program, VAWA provides that OVW, in consultation with HUD and HHS "shall award grants" to entities—including state coalitions, population-specific    organizations,    or    community-based    and    culturally    specific organizations—"that have a documented history of effective work concerning" VAWA crimes, "to provide assistance to minors, adults, and their dependents … who are homeless, or in need of transitional housing or other housing assistance, as a result of a situation" involving a VAWA crime and "for whom emergency shelter services or other crisis intervention services are unavailable or insufficient." 34 U.S.C. § 12351(a).

113.     VAWA    provides    that    in    awarding    Transitional    Housing    Program    Grants, "[p]riority shall be given to projects … that primarily serve underserved populations." *Id*. § 12351(g)(2)(C)(ii).

114.     In the 2024 Appropriations Act and the 2025 Continuing Resolution, Congress appropriated $50 million for this program for each of fiscal years 2024 and 2025. *See* 2024

Appropriations Act, 138 Stat. at 142 (subsection (2)); 2025 Continuing Resolution, 139 Stat. at 10.

115.    In 2024, the Transitional Housing Program gave out 78 awards totaling $41.64 million. *See* OVW, *Transitional Housing Program*, https://perma.cc/PQB2-AE6R.

### *Justice for Families Program (Competitive)*

116.    The "JFF Program authorizes grants for the purpose of "improv[ing] the response of all aspects of the civil and criminal justice system to families with a history of" VAWA crimes, "or in cases involving allegations of child sexual abuse." 34 U.S.C. § 12464(a).

117.    JFF Program Grants may be used for various purposes to support improved justice system responses, including by "develop[ing] and promot[ing] … legislation, policies, and best practices for improving civil and criminal functions," *id.* § 12464(b)(2), and "enabl[ing] courts or court-based or court-related programs to develop or enhance" programs and projects such as those designed "to improve community access, including enhanced access for underserved populations," *id.* § 12464(b)(5)(E).

118.    When awarding JFF Program Grants, OVW is required to consider, among other factors, "the extent to which the proposed programs and services serve underserved populations." *Id.* § 12464(c)(1)(B).

119.    To receive a JFF Program Grant, applicants must demonstrate expertise in the area of VAWA crimes, charge fees for certain services based only on an individual's income level, and make certain certifications—such as a certification that any court-based program does not charge victims certain fees, that the grantee has no policy requiring mediation or counseling with offenders and victims physically in the same place, that any person providing certain

services under the funded program complete certain trainings related to VAWA crimes. *Id.* § 12464(d). These certifications are specified in the statute. *Id.* § 12464(d)(3), (5)–(7).

120.    Further, VAWA requires that services provided pursuant to JFF Program Grants "shall be provided in a culturally relevant manner." *Id.* § 12464(g).

121.    In the 2024 Appropriations Act and the 2025 Continuing Resolution, Congress appropriated $22 million in new funds for this program for each of fiscal years 2024 and 2025. *See* 2024 Appropriations Act, 138 Stat. at 142–43 (subsection (11)); 2025 Continuing Resolution, 139 Stat. at 10.

122.    In 2024, the JFF Program gave out 24 awards totaling $14.66 million. *See* OVW, *Justice for Families Program*, https://perma.cc/G3RH-Y9PM.

### Disability Grant Program (Competitive)

123.    The Disability Grant Program "was created by Congress to address the pressing need to focus on" VAWA crimes perpetrated "against individuals with disabilities and Deaf individuals due to the proliferation of such crimes." *See* OVW, *Disability Grants Program*, https://perma.cc/78HC-B87M.

124.    OVW (in consultation with the Department of Health and Human Services) awards grants under this program to "provide training, consultation, and information on" VAWA crimes "by caregivers against individuals with disabilities … and Deaf people," and "to enhance direct services to such individuals." 34 U.S.C. § 20122(a). VAWA provides that Disability Program Grants "shall be used" for purposes including providing training, advocacy, outreach, and technical assistance designed to meet the needs of VAWA victims with disabilities or who are deaf. *Id.* § 20122(b).

33

125.    OVW "shall ensure that the needs of underserved populations are being addressed" when awarding grants under the Disability Grant Program. *Id.* § 20122(d).

126.    In the 2024 Appropriations Act and the 2025 Continuing Resolution, Congress appropriated $12 million for this program for each of fiscal years 2024 and 2025. *See* 2024 Appropriations Act, 138 Stat. at 142 (subsection (12)); 2025 Continuing Resolution, 139 Stat. at 10.

127.    In 2024, the Disability Grant Program gave out 3 awards totaling $1.42 million. *See* OVW, *Disability Grant Program*, https://perma.cc/78HC-B87M.

### *Technical Assistance Awards (Competitive)*

128.    VAWA sets aside a certain percentage of total funds made available under the statute for training and technical assistance ("TA") "to improve the capacity of grantees, subgrantees, and other entities" in carrying out VAWA program purposes. *See* 34 U.S.C. § 12291(b)(11)(A).

129.    OVW must "make all technical assistance available as broadly as possible to any appropriate grantees, subgrantees, potential grantees, or other entities without regard to whether the entity has received funding from [OVW] for a particular project." *Id.* § 12291(b)(11)(B).

130.    Consistent with this provision's broad authorization of TA programs, OVW has awarded grants for TA on a wide range of projects. These included, for example, an award to Plaintiff VALOR for the Restorative Practices Technical Assistance Pilot Program, which provides technical assistance and training to OVW Restorative Practice Pilot sites.

131.    VAWA provides that, "of the amounts appropriated under" subchapter III of Chapter 121 in Subtitle I of Title 34 of the U.S. Code, "not less than 3 percent and up to 8 percent, unless otherwise noted, shall be available for providing training and technical assistance

34

relating to the purposes of this subchapter to improve the capacity of the grantees, subgrantees, and other entities." *Id.* § 12291(b)(11)(A).

### *Other Competitive Grant Programs*

132.    Other competitive grant programs maintain a focus on underserved populations, population specific services, or culturally competent services:

a.    Under the Abuse in Later Life Program, OVW "shall give priority to proposals providing services to culturally specific and underserved populations." 34 U.S.C. § 12421(3). And grantees must use funds for purposes that include providing training for "population specific organizations," among other entities. *Id.* §§ 12421(1)(A)(i); 12421(1)(A)(iv); 12421(2)(A)(iv).

b.    Under the Campus Program, grants to higher education institutions may be used for purposes including "develop[ing] or adapt[ing] and disseminat[ing] population specific strategies and projects for victims of" VAWA crimes "from underserved populations on campus." *Id.* § 20125(b)(10).

c.    Grants under the Improving Criminal Justice Responses Program may be used "to develop and strengthen policies, protocols, and training for law enforcement officers and prosecutors" that include "the appropriate treatment of … victims among underserved populations." *Id.* § 10461(b)(19).

d.    Under the National Deaf Services Program, OVW "shall ensure that the needs of underserved populations are being addressed." *Id.* § 20122(d).

e.    Under the Sexual Assault Forensic Exam ("SAFE") Hiring and Training Program (which supports efforts to establish and expand access to forensic exams by funding the salaries of SAFEs (sexual assault forensic examiners)

35

and SANEs (sexual assault nurse examiners)), preference must be given for eligible entities that certify they are coordinating with a rape crisis center or state sexual assault coalition to use grant funds for, among a variety of purposes, increasing regional and local availability of SANEs for "an underserved population including efforts to provide culturally competent services." *Id.* § 40723(b)(2)(B).

f.    The Children and Youth & Engaging Men Program, which releases two separate funding opportunities—(1) "Children and Youth" and (2) "Engaging Men"—under a single program, includes authorization for funds to be used to "develop, expand, and strengthen victim-centered interventions and services that target youth, including youth in underserved populations," 34 U.S.C. § 12451(b)(1); a requirement that, when selecting grant recipients, the Attorney General gives "preference to applicants that … include a focus on the unmet needs of underserved populations, *id.* § 12463(d)(3); and authorization to provide population-specific services, *id.* § 1245(b)(1), or to partner with a population-specific organization, *id.* § 12463(c)(2).

g.    A grant program for a national resource center on workplace responses to assist victims of domestic and sexual violence requires applicants to create a plan for developing materials and training for materials for employers "that address the needs of employees in cases of domestic violence, dating violence, sexual assault, stalking, and sexual harassment impacting the workplace, including the needs of underserved communities." *Id.* § 12501(b)(3).

h.   A grant program for grants to combat violence against women in public and assisted housing requires applicants to certify that "plans are developed that establish meaningful consultation and coordination" with entities including "linguistically and culturally specific service providers," and "population-specific organizations." *Id.* § 12475(c)(2)(D).

i.   A pilot program on restorative practices requires that OVW "shall give priority to eligible entities that submit proposals that meaningfully address the needs of culturally specific or underserved populations." *Id.* § 12514(c).

### *Office for Victims of Crime Grant Programs*

133.   DOJ's Office for Victims of Crime also makes grants to help victims of crime, including victims of domestic violence and sexual assault.

134.   OVC is a program office within DOJ's Office of Justice Programs (OJP), DOJ's largest grantmaking component. DOJ, Org., Mission & Functions Manual, Office of Justice Programs, https://perma.cc/D8PK-T9KZ.

135.   One significant program that OVC administers is grants under VOCA. In VOCA, Congress established the Crime Victims Fund—a fund principally financed with criminal fines and penalties—and directed OVC to use those funds for various purposes, including grants to assist victims of crime.

136.   Those congressionally created grant programs include the Victim Assistance Formula Grants Program, which requires OVC to make annual formula grants to states, in amounts determined pursuant to a statutorily prescribed formula, for state- and community-based victim services. States then subaward those funds to nonprofits and public agencies in their states to support direct services to crime victims.

37

137.    By statute, states distributing VOCA victim assistance funds must give priority to programs that assist victims of sexual assault, spousal abuse, or child abuse, but funds can be used for services that assist victims of all manner of crimes, including drunk driving, homicide, and other crimes as well. *See* 34 U.S.C. § 20103(a)(2)(A). The statute requires states to make grants to "programs which serve previously underserved populations of victims of violent crime." *Id.* § 20103(a)(2)(B). States have flexibility to determine what populations are underserved in their states, consistent with guidelines issued by OVC. *Id.*

138.    VOCA Victim Assistance Formula Grant funds support a wide range of assistance to victims, including information and referral services, crisis counseling, temporary housing, safety planning, criminal justice advocacy support, and legal assistance. *See* 28 C.F.R. § 94.119.

139.    Many victim assistance organizations receive funds indirectly from OVC through a subaward from a state that receives a Victim Assistance Formula Grant.

140.    OVC also administers other grants, both under the Victims of Crime Act and other statutes.

### *President Trump Issues Executive Orders Mandating New Conditions on Federal Grant Funding*

141.    Upon taking office in January 2025, President Trump issued a series of executive orders that aim to effect sweeping social changes, including by directing agency heads to impose conditions on federal funding.

#### *DEI Order*

142.    The "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" Executive Order launches a broadside attack on diversity, equity, and inclusion (DEI) and diversity, equity, inclusion, and accessibility (DEIA) programs. Exec. Order No. 14173, 90 Fed. Reg. 8663 (Jan. 21, 2025) ("DEI Order").

143.    The DEI Order takes steps to end what it deems "illegal" DEI and DEIA in the federal government and the private sector. *Id.* §§ 3–4. To that end, the DEI Order revokes multiple diversity-related executive actions issued over the last half century; purports to "streamline[]" the federal contracting process by, among other things, ordering a contracting compliance office to "immediately cease … [p]romoting diversity"; and directs the Office of Management and Budget to "[e]xcise references to DEI and DEI principles, under whatever name they may appear," from federal funding procedures and to "[t]erminate all 'diversity,' 'equity,'" and similar programs and activities. *Id.* § 3.

144.    The DEI Order does not define "DEI" or "DEIA," and provides no guidance on what might make such programs "illegal" in the Administration's understanding. But it evinces a view that "illegal" DEI is widespread: It laments that "critical and influential institutions—including "the Federal Government, major corporations, financial institutions, the medical industry, large commercial airlines, law enforcement agencies, and institutions of higher education"—have adopted "dangerous, demanding, and immoral" DEI or DEIA programs "that can violate the civil-rights laws." *Id.* § 1.

145.    The DEI Order requires agency heads to "include in every contract or grant award" a term requiring each counterparty or grant recipient to "certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* § 3(iv)(B). The requirement that recipients not operate "*any* programs promoting DEI" is not limited to recipients' use of federal funds. *Id.* (emphasis added).

146.    The DEI Order directs agency heads to include terms requiring a grant recipient "to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31,

United States Code," *id.*, invoking the False Claims Act's ("FCA") prohibition on "material" false claims to the government. The FCA imposes civil liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a). The requirement that grant recipients stipulate to the FCA's "demanding" materiality requirement, *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 194 (2016), facilitates the government's use of the FCA to target organizations that have missions or perform work that the government disfavors.

147.    To "combat illegal private-sector DEI," the DEI Order directs the entire government to come up with a plan that, among other things, identifies potential civil investigations that the Administration could target at large institutions "to deter DEI programs or principles … that constitute illegal discrimination or preferences." DEI Order § 4.

### *"Gender Ideology" Order*

148.    The "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" Executive Order takes aim at transgender people and their rights. Exec. Order 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Gender Ideology Order"). It announces that "the policy of the United States" is "to recognize two sexes, male and female," that are "not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. It decries "the erasure of sex" in both "policy" and "language," and it commits to using what the Administration considers "accurate language and policy that recognize women are biologically female, and men are biologically male." *Id.* § 1.

149.    The Order defines "gender ideology" as an ideology that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all

institutions of society to regard this false claim as true." *Id.* § 2(f). It states that "[g]ender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex," and that "[g]ender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id.* § 2(f). And it states that "gender identity reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." *Id.* § 2(g). The Order's definition is ideological, not grounded in science, and does not address the conflicts it creates with policies and procedures that respect the existence, dignity, and rights of transgender people.

150.    To accomplish its ideological vision, the "Gender Ideology" Order makes a host of directives, including requiring federal agency heads to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id.* § 3(e). The "Gender Ideology" Order states that "[f]ederal funds shall not be used to promote gender ideology" and requires each agency to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* § 3(g).

### *The Department of Justice Interprets and Implements the DEI Executive Order*

151.    On February 5, 2025, Attorney General Bondi sent a letter to all DOJ employees on "Ending Illegal DEI and DEIA Discrimination and Preferences." Mem. from Att'y Gen. Pam Bondi, *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025), available at https://perma.cc/KH9Y-A2VQ ("Bondi Letter"). The letter stated that "the Department of Justice's Civil Rights Division will investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private sector and in educational

institutions that receive federal funds." *Id.* The Bondi Letter does not define "DEI" or "DEIA" or explain what makes a DEI or DEIA program illegal. But by threatening penalization of DEI or DEIA "programs" and "activities," the Bondi Letter made clear the DOJ's intent to aggressively target organizations that promote DEIA, broadly construed.

152.    In a May 19, 2025 memorandum, DOJ Deputy Attorney General Todd Blanche announced a new DOJ "Civil Rights Fraud Initiative." The memo describes the FCA as a "weapon" for DOJ to employ, and it promises to "vigorous[ly] enforce[e]" the FCA "against those who defraud the United States by taking its money while knowingly violating civil rights laws." Letter from Todd Blanche, Deputy Att'y Gen., to DOJ Offices, Divisions, and U.S. Attorneys (May 19, 2025), available at https://perma.cc/3W6K-FGHA. ("Blanche Memo"). The memo orders each of the 93 U.S. Attorneys' offices around the country to assign an attorney to the initiative.

153.    The Blanche Memo states that the "FCA is implicated whenever a federal contractor or recipient of federal funds knowingly violates civil rights laws. . .  and falsely certifies compliance with such laws." *Id.* It also broadly characterizes as unlawful any "knowing[] engag[ement] in racist preferences, mandates, policies, programs, and activities, including through diversity, equity, and inclusion (DEI) programs that assign benefits or burdens [based] on race, ethnicity, or national origin." *Id.*

154.    The Blanche Memo also "strongly encourages" private parties to file suits under the FCA's *qui tam* provision, and encourages the public to report information about "discrimination by federal-funding recipients" to DOJ. *Id.*

*Defendants Add Unlawful Funding Conditions to Grant Awards*

OVW Conditions

155.    OVW regularly posts "Notices of Funding Opportunity" (NOFOs), which generally announce the availability of grant funding, invite eligible entities to apply for funding, and specify application requirements and criteria.

156.    OVW began including new funding conditions in its NOFOs published in or around May 2025. The next month, on or around June 12, 2025, OVW announced a generally applicable policy of imposing these funding conditions on all applicants for OVW grants. *See* U.S. Dep't of Just., OVW, *Open Notices of Funding Opportunity*, https://perma.cc/XR9P-GA49 (last visited June 12, 2025) (announcing that "[f]or Fiscal Year 2025, all grant funding applicants are required to submit a letter certifying that grant funds will not be used for the out-of-scope activities listed in the Certification Regarding Out-of-Scope Activities section of the notice of funding opportunity").

157.    OVW also revised NOFOs that had been previously issued for FY25 OVW grants to include the new funding conditions.

158.    The new and revised NOFOs prohibit grantees from using grant funds for a newly expanded list of activities that are "out of the program scope and will not be funded" and require grantees to certify, in their application and again when they accept any award, that the grantee will not use grant funds for those activities. All recent OVW NOFOs include identical or materially similar activities on their list of prohibited "out-of-scope activities":

      a.    Promoting or facilitating the violation of federal immigration law ("Immigration Enforcement Condition").

b.  Inculcating or promoting gender ideology as defined in Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government ("'Gender Ideology' Condition").

c.  Promoting or facilitating discriminatory programs or ideology, including illegal DEI and "'diversity, equity, inclusion, and accessibility' programs that do not advance the policy of equal dignity and respect, as described in Executive Order 14173.("Anti-DEI Condition"). OVW asserts that "[t]his prohibition is not intended to interfere with any of OVW's statutory obligations, such as funding for HBCUs, culturally specific services, and disability programs."

d.  Activities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses (e.g., prioritizing criminal justice reform or social justice theories over victim safety and offender accountability) ("Systemic Framing Condition").

e.  Generic community engagement or economic development without a clear link to violence prevention, victim safety, or offender accountability.

f.  Programs that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women. ("Law Enforcement and Immigration Enforcement Condition").

g.  Awareness campaigns or media that do not lead to tangible improvements in prevention, victim safety, or offender accountability ("Awareness Campaigns Condition").

h.   Initiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support. ("Immigration Priority Condition").

i.   Excessive funding for consulting fees, training, administrative costs, or other expenses not related to measurable violence prevention, victim support, and offender accountability.

j.   Research projects.

k.   Any activity or program that unlawfully violates an Executive Order ("EO Condition").

159.   Plaintiffs challenge all of these conditions except e, i, and j, and this Complaint refers to the challenged conditions as the "'Out-of-Scope' Funding Conditions."

160.   Each NOFO also notes that "[n]othing in this certification prohibits recipients from serving all eligible victims as required by statute, regulation, or award condition." But this disclaimer provides no guidance as to how Plaintiffs can comply with the Out-of-Scope Funding Conditions and also meet statutory obligations to ensure that victims are not subjected to discrimination, to provide services to underserved populations, and to include services that are "primarily directed" toward racial and ethnic minority groups.

161.   OVW has also updated its General Terms and Conditions, which apply to all OVW grants and cooperative agreements. The General Terms and Conditions for Fiscal Year 2025 require a new certification that: "The recipient agrees that its compliance with all applicable federal civil rights and nondiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for purposes of the False Claims Act … , and, by accepting this award, certifies that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that

violate any applicable federal civil rights or nondiscrimination laws." *See* OVW, *FY25 General Terms and Conditions* § 15, https://perma.cc/FR3E-FB3H. (The "OVW General Terms and Conditions Anti-DEI Certification Requirement").

162.    The General Terms and Conditions also require Plaintiffs to certify that the conditions it contains "are material requirements of the award," that OVW may withhold award funds, disallow costs, or suspend or terminate the award as a result of failure to comply with them, and that any "materially false" statements to the government in connection with the award may result in criminal prosecution or the imposition of civil penalties and administrative remedies for false claims. *Id.* § 1.

163.    While Plaintiffs have long complied with federal antidiscrimination laws, the DEI Executive Order, Bondi Letter, and Blanche Memo indicate that DOJ holds—and intends to enforce—a legally unsupported, novel interpretation of federal antidiscrimination law as prohibiting all aspects of programs focused on DEIA. This provision also extends beyond the use of grant funds, requiring recipients to certify that it does not operate any prohibited DEI programs—whether funded by OVW or not.

164.    The standard inclusion of identical, or materially similar, Out-of-Scope Funding Conditions in the open NOFOs, and its inclusion of the DEI Certification Requirement in the General Terms and Conditions, indicates that OVW plans to impose these conditions on all future grants.

165.    OVW has also required the submission of identical or materially similar "out-of-scope" certifications for NOFOs that did not originally include them and whose deadlines had already passed. For instance, the LAV Program NOFO closed on January 30, 2025, and did not originally include the expanded list of "out-of-scope activities" or a requirement to

certify that grant funds would not be used for them. Since that date, however, OVW has required LAV Program applicants to submit certifications consistent with those required for all currently open NOFOs.

OJP Condition

166.    OJP has also adopted a component-wide policy imposing a funding condition designed to curtail diversity, equity, and inclusion activities under the guise of implementing antidiscrimination laws. This new condition holds out the threat of FCA liability to coerce grantees into avoiding all diversity, equity, and inclusion activities for fear of facing burdensome and potentially ruinous litigation and liability.

167.    Like OVW, OJP has updated the "General Terms" for OJP awards in FY 2025. OJP's revised General Terms contains a new "Federal Civil Rights and Nondiscrimination Laws" term and condition ("OJP Anti-DEI Certification Requirement") identical to the OVW General Terms and Conditions Anti-DEI Certification Requirement. Under the OJP Anti-DEI Certification Requirement, OJP grantees must "agree[] that its compliance with all applicable federal civil rights and nondiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for purposes of the False Claims Act (31 U.S.C. 3729-3730 and 3801-3812), and, by accepting this award, certif[y] that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable federal civil rights or nondiscrimination laws." OJP, "General Conditions" for OJP Awards in FY 2025, https://perma.cc/D3NX-3W9R ("OJP General Terms").

168.    OJP has imposed this new certification requirement on top of preexisting, and long accepted, terms and conditions requiring grantees to comply with antidiscrimination laws.

47

169.    By its terms, the OJP Anti-DEI Certification Requirement requires only "the recipient" to agree to the certification and does not mention subrecipients. Nonetheless, while the condition does not specifically mandate that recipients require subrecipients to make the same certification, by regulation, recipients are expected to impose requirements on subrecipients to ensure that the recipient meets its responsibilities under the federal award. As a result, to ensure their own compliance with the OJP Anti-DEI Certification Requirement, some direct recipients have required subrecipients to make the same certification. Defendants have permitted recipients to impose the OJP Anti-DEI Certification Requirement on subrecipients.

### *Plaintiffs and Their Members Receive and Rely on Office on Violence Against Women Grants and Office of Justice Program Grants*

170.    Plaintiffs have consistently received formula grants for domestic violence and/or sexual assault coalitions, as well as other, competitive grants, and Plaintiffs applied for formula and competitive grants slated for award this year. Plaintiffs' members have also consistently received competitive grants and have applied for competitive grants slated for award later this year.

171.    The Rhode Island Coalition has received the Coalition Grant every year since at least 2001. With this grant, the Rhode Island Coalition advocates for systems change in Rhode Island to prevent domestic violence, protect victims and survivors and hold offenders accountable. Among other things, this grant allows the Rhode Island Coalition to maintain a strong and visible presence on a number of statewide committees that shape the public policy and systems that govern Rhode Island. The Rhode Island Coalition's presence on these committees is essential to raise up the voices and experiences of survivors and ensure the complex needs and safety concerns of survivors of VAWA crimes are considered in planning and decisionmaking. The Rhode Island Coalition has applied for and received the FY25 Coalition

Grant, which is subject to the challenged conditions, as well as grants that are subject to the challenged conditions including the Engaging Men Grant, ICJR, and JFF Program Grants.[4]

172.    Various Rhode Island Coalition members have applied for OVW and OJP grants that are subject to the challenged conditions. For example, Rhode Island Coalition Member Women's Resource Center applied for the LAV Grant with objections and applied to the Transitional Housing Grant with the statement that it agreed to the conditions only to ensure it would not be precluded from receiving the Grant. Women's Resource Center also receives VOCA pass-through grants and has been told by its state pass-through entity that it will soon receive a contract for an OVC grant that will cover the period of October 1, 2025 through September 30, 2026.

173.    The California Partnership has received a Coalition Grant every year since 2006, and its predecessor organizations received the Grant before 2006. The California Partnership is currently operating under the FY25 Coalition Grant. The California Partnership has used the Coalition Grant to provide informational webinars that reach well over 150  attendees per year, to support convening member organizations to coordinate services, and to support the Partnership's participation in state-level convenings and collaboration with state agencies.

174.    Various California Partnership members have intended to apply for OVW Grants that are or will be subject to the challenged conditions. For instance, California Partnership member Domestic Violence Solutions for Santa Barbara County (DVS) has intended to apply for the Rural Program Grant, and applied for OVW Transitional Housing Grant, but may be deterred

---

[4] The original parties in this case entered a stipulation that allowed Plaintiffs to apply for OVW grants without submitting a certification until August 12th., Dkt. No. 14.; the Court subsequently granted in part Plaintiffs' motion for preliminary relief on August 8th, entering a stay of the conditions pursuant to APA Section 705, Dkt. No. 34. Accordingly, the original Plaintiffs have not submitted a certification. The Plaintiffs that are added by this amended complaint submitted the certifications required to apply to OVW grants.

by the challenged conditions from accepting it. Additionally, California Member Doe[5] has intended to apply for the Children and Youth Grant.

175.    The Colorado Coalition has received a Coalition Grant every year since at least 2007. The Colorado Coalition uses the Coalition Grant to address issues related to child sexual abuse, plan and monitor the distribution of grants and grant funds to the state or territory, provide training and technical assistance, and participate in state and national boards, committees, taskforces, and workgroups. The Colorado Coalition's members have also received OVW grants including the LAV and Rural Program Grants. The Colorado Coalition is currently operating under the FY25 Coalition Grant, which is subject to the challenged conditions.

176.    In addition to the FY25 Coalition Grant, the Colorado Coalition applied for an FY25 Restorative Practices Pilot Sites Program Grant, which would also be subject to the challenged conditions.

177.    Various Colorado Coalition members have OVW grants that are or will be subject to the challenged conditions, including the Rural Program, Restorative Practices Pilot Sites Program Grant, and LAV Grants. For example, Colorado Member Doe A has been awarded a FY25 OVW Rural Grant, which the organization uses to serve victims of domestic violence and sexual assault in rural communities in the state. In addition, Colorado Member Doe B would be a subrecipient of the Colorado Coalition's FY25 Restorative Practices Pilot Site Program Grant, if awarded, which would be subject to the challenged conditions.

178.    Colorado Member Rocky Mountain Victim Law Center ("RMVLC") has an FY22 LAV Program grant and has received a no-cost extension, extending this grant's period of performance and budget period through September 30, 2026. Additionally, RMVLC has applied

---

[5] Several membership organizations requested to proceed anonymously to protect against the risk of retaliation.

for an FY25 OVC Services for Victims of Crime grant, which would be subject to the challenged conditions, if awarded.

179.    The DC Coalition likewise has received the Coalition Grant every year since it became available and is currently operating under the FY25 Coalition Grant. With this grant, the DC Coalition provides a range of support to community-based and member organizations serving victims of domestic violence, including training and technical assistance designed to connect survivors with housing and counseling needs and legal services. The DC Coalition also convenes membership meetings every other month to identify and address gaps in services for survivors of domestic violence and collaborate to ensure inclusive, responsive, and survivor-centered policies. The DC Coalition has also received the Transitional Housing Program Grant. The 2024 fiscal year is the last year of this multi-year grant.

180.    Various DC Coalition members have intended to apply for OVW grants that are or will be subject to the challenged conditions, including the LAV Program Grant. For instance, DC Coalition Member Doe has a FY23-26 LAV grant and recently received a FY25 LAV grant. DC Coalition Member Doe uses these grants to fund over a dozen legal staff members who provide free legal advice, counsel, and representation to low-income survivors of domestic violence, sexual assault, dating violence, and stalking. DC Coalition Member Doe also has an OVW SASP grant and has applied for and received a FY25 Transitional Housing Grant that it will use to serve low-income survivors of domestic violence, sexual assault, dating violence, and stalking who are homeless or in need of transitional housing. DC Coalition Member Doe is concerned that the challenged conditions conflict with its programs and values.

181.    DC Coalition members also receive OJP grants. For instance, DC Coalition Member Doe currently receives VOCA funding as a pass-through grant from the Government of

the District of Columbia. DC Coalition Member Doe uses this VOCA funding to provide culturally and linguistically specific immigration legal and social services to low-income immigrant crime victims in the District of Columbia.

182.    The Georgia Coalition has received a Coalitions Grant for every year since it was founded, and it is currently operating under the FY25 Coalition Grant. The Georgia Coalition uses the Coalition Grant to provide training and technical assistance to member domestic violence agencies across the state; to provide quarterly meetings with member programs, which includes training and workshops; statewide planning and committee participation, including work with Georgia's state STOP administrator to identify domestic violence programs in need of support to meet state standards for victim services, including culturally appropriate services for underserved populations. In addition, the Georgia Coalition is currently operating under the FY25 LAV Program grant, which it uses to provide post-conviction legal assistance to incarcerated women with a relevant history of domestic violence.

183.    Various Georgia Coalition members have applied or intended to apply for OVW grants that are or will be subject to the challenged conditions. For instance, Georgia Member Doe receives a STOP Program grant as a pass-through from the state administrator that provides funds for the period of January 1, 2025, to December 31, 2025, and Member Doe plans to reapply for this grant in future years.

184.    The Hawaiʻi Coalition has received a Coalitions Grant every year since at least 2004 and is currently operating under the FY25 Coalition Grant. Coalition grant funds are a primary source of funding for the Hawaiʻi Coalition to coordinate statewide activities to improve the responses to domestic violence in Hawaiʻi. Over the decades, the Hawaiʻi Coalition has used Coalition Grant funds for many purposes: to provide training and technical assistance to member

programs; to provide training and technical assistance to allied professionals involved in responding to domestic violence; to convene a county-level multi-disciplinary team to examine the efficacy of the lethality assessment program in the City and County of Honolulu, and collaboratively address gaps in practice and coordination that support efforts to reduce domestic violence homicides in Hawai'i; to convene a coordinated community response team to improve firearm retrieval and enhance victim safety in domestic violence cases; and to support the online resource library for its member programs to have access to educational information, public awareness materials, and current information on best practices. The Hawai'i Coalition intends to apply for the Coalition Grant in FY26 and beyond.

185.    The Idaho Coalition has received a Coalitions Grant for over two decades and is currently operating under the FY25 Coalition Grant. The Idaho Coalition has used the Coalition Grant to implement strategic, community-rooted initiatives that strengthen the statewide response to gender-based violence, including by providing statewide technical assistance and training to support local and tribal programs in collecting survivor-informed data, engaging in culturally responsive outreach, and refining service delivery models for underserved communities. The Idaho Coalition has also previously applied for and received grants from OVW including the Transitional Housing, Legal Assistance, Rural Program, Training and Technical Assistance, and Disabilities Grants.

186.    The Idaho Coalition has had an OVW Legal Services to Victims grant continuously since 2015. The Idaho Coalition uses this grant to provide comprehensive civil legal services for survivors of sexual assault, dating violence, stalking, and domestic violence, including representation in family law matters, legal support for housing, employment, and education-related safety and retaliation issues, privacy and safety advocacy, immigration

services, and survivors' rights services in the criminal justice systems. The Idaho Coalition does not ask clients about their immigration status before providing them with legal services, unless necessary for immigration-specific services.

187.    Various Idaho Coalition members have intended to apply for OVW grants that are or will be subject to the challenged conditions, including the Transitional Housing Grant, the Rural Program Grant, Engaging Men Grant, Abuse in Later Life Program, and the LAV Program.

188.    The Indiana Coalition has received an OVW Coalition Grant every year since it was founded, and it is currently operating under the FY25 Coalition Grant. The Indiana Coalition uses the Coalition Grant funds to provide tailored training and technical assistance on request to local domestic violence agencies across the state; to collaborate with cohorts of member domestic violence agencies and advocates on service needs and develop and implement new programs and services that are responsive to those needs; and to a statewide survivor advisory board to help ensure that the Indiana Coalition's programs and service recommendations are relevant and accessible to survivors. The Indiana Coalition also receives competitive grants from OVW as a pass-through from the state, including the STOP Grant and the Justice for Families Grant.

189.    The Indiana Coalition also receives a competitive VOCA Grant from OJP as a subrecipient. The Indiana Coalition is currently operating under a VOCA grant that provides funds from October 1, 2024, through September 30, 2026. Among other activities, the Indiana Coalition uses this grant to fund legal advocacy and direct legal representation for survivors, including filing and litigating protective orders and addressing custody, divorce, housing and other legal issues related to the survivor's victimization.

190.     Various Indiana Coalition members also receive OVW grants, including grants under the Rural Program, Transitional Housing Program, LAV Program, STOP Program, and SASP.   For example, Indiana member Coburn Place has historically received and intends to apply in the future for the OVW Transitional Housing grant, which will be subject to the challenged OVW conditions. Indiana Member Doe 1 also applied for and has received an FY25 STOP grant as a pass-through the state. This grant is subject to the challenged OVW conditions.

191.     Various Indiana Coalition members also receive OJP grants. For instance, both Coburn Place and Indiana Member Doe 1 receive VOCA grants as pass-through grants from the state, for the period of October 1, 2024, through September 30, 2026. Both members intend to apply for future awards that will be subject to OJP Anti-DEI Certification Requirement.

192.     The Iowa Coalition has received a Coalition Grant each year since the program first began under VAWA. The Iowa Coalition has used the Coalition Grant to staff a "Safe and Together" child welfare response initiative, which creates a statewide model for child welfare response when there is co-occurring domestic abuse, and to provide training and technical assistance to advocates on child welfare, child abuse, concerns related to child welfare, and more. The Iowa Coalition also uses the Coalition Grant to staff trainings on Shelter/Housing Access and Mobile Advocacy across crime victim shelters. The Iowa Coalition has also previously received a Rural Program Grant.

193.     The Iowa Coalition is currently operating under the FY25 Coalitions Grant, which is subject to the challenged conditions.

194.     Various Iowa Coalition members have applied to OVW grants that are or will be subject to the challenged conditions. For instance, Iowa Member Doe has applied for the FY25 Transitional Housing Grant, for which it submitted a certification on the challenged conditions.

55

195.    The Iowa Coalition also receives OJP grants and is currently operating under a FY25 VOCA grant that it receives as a pass-through from the state of Iowa, which requires that grantees to certify to the OJP Anti-DEI Certification Requirement to accept the grant.

196.    Iowa Coalition members have also applied for and received OJP grants. For instance, Iowa member Family Crisis Center applied for and was awarded an FY25 VOCA grant as a pass-through from the state of Iowa, which requires that grantees certify to the OJP Anti-DEI Certification Requirement to accept the grant.

197.    JDI has received the Coalition Grant every year since it became available, including for FY25. JDI is currently operating under the FY25 Coalition Grant, which is subject to the challenged conditions. JDI relies on the Coalition Grant to provide training and technical assistance to increase local program capacity, to convene regular meetings of program directors, and to work with external partners to shape public dialogue around issues of sexual violence, ensure accuracy of information, and hold systems accountable.

198.    JDI members have intended to apply for the following OVW grants that are or will be subject to the challenged conditions: the LAV Program Grant, the Transitional Housing Program Grant, and the Culturally Specific Services Program Grant. For instance, JDI member Asian Task Force Against Domestic Violence (ATASK) applied for a FY25 STOP grant in October 2025, which is subject to the challenged conditions. And JDI Member Doe 1 applied for the OVW Transitional Housing Grant on or about April 2025, which was subject to the challenged conditions, and was awarded the grant in October 2025.

199.    In addition, a majority of JDI's members receive VOCA grants as pass-through grants through the Commonwealth of Massachusetts. For instance, JDI member New England Women's Support Inc., d.b.a. The Network/La Red has received a VOCA grant for over 20 years

and is currently operating under a VOCA grant. The Network/La Red plans to apply for another VOCA grant every year and expects that future grants will be subject to the OJP Anti-DEI Certification Requirement.

200.    In addition, JDI Member Doe 2 receives OJP funds through a FY23 Services for Victims of Human Trafficking Grant from OVC, which is a 3-year award. Member Doe 2 plans to reapply for this grant and expects that future grants will be subject to the OJP Anti-DEI Certification Requirement.

201.    The Kansas Coalition has received the Coalition Grant every year since at least 2007 and is currently operating under the FY24 Coalition Grant, for which the Coalition received a no-cost extension until March 2026. At that time, the Kansas Coalition will begin operating under the FY25 Coalitions Grant. With this grant, the Kansas Coalition is able to provide training and technical assistance to member programs to assist them in meeting core service standards to remain accredited. The Kansas Coalition also relies on the Coalition Grant to co-lead the Kansas Sexual Assault Response Advisory Committee with the Kansas Bureau of Investigation to provide standardized guidance and model policies, increase statewide awareness in Kansas for the public, and ensure consistency in access to services and response to sexual assault statewide. The Kansas Coalition also currently receives awards from OVW for the Rural Program Grant and the Underserved Grant and has previously received the LAV and Disability Grants.

202.    Kansas Coalition members also receive and have intended to apply for OVW grants that are or will be subject to the challenged conditions. These include Kansas Member Doe, which applied for the OVW Grants to Reduce Sexual Assault, Domestic Violence, Dating Violence, and Stalking on Campus Program (Campus Program) Grant, as a co-applicant with a local University.

203.    Kansas Coalition members also receive OVC grants, including Kansas Member Doe, which currently receives an OVC pass-through grant from the Kansas Governor's Grants Program for the period October 1, 2025 through September 30, 2026. Kansas Member Doe uses this OVC pass-through grant to provide emergency accommodations and safe shelter, hotline and in-person crisis response, personal advocacy, meals, and a small amount of shelter maintenance and utilities.

204.    The Maine Coalition has applied for a Coalition Grant every year since the Coalition Grant was first authorized and is currently operating under the FY25 Coalition Grant. The Maine Coalition uses Coalition Grant funds to be able to convene its membership's Executive Directors to discuss emerging issues, develop responsive strategies, and support peer to peer exchange. The Maine Coalition also uses Coalition Grant funds to participate in a broad range of multi-disciplinary task forces, commissions, and panels, including: the Maine Commission on Domestic and Sexual Abuse; the Domestic Abuse Homicide Review Panel; the Justice Assistance Council, the Elder Justice Coordinating Partnership, the Maine Criminal Justice Academy Board of Trustees; the Maine Child Welfare Advisory Panel; the Statewide Homeless Council; the Maine Consumer Rights Network; and the Maine Continuum of Care Board of Directors. Participation in these multi-disciplinary groups is essential to ensure a broad range of state system responses are effectively responding to domestic abuse and violence in Maine.

205.    The Maine Coalition has applied for and received an OVW Rural Program grant since 2006. This Rural Program grant partially funds specialized advocacy to support domestic violence survivors and their children who are involved with the child welfare system. The

advocates funded through this program provide consultation and training to child welfare staff to support improved systemic response to the complex challenges these families face.

206.    The Maine Coalition has applied for and received an OVW Justice for Families Program grant since 2022. The Maine Coalition uses these funds to support the only supervised visitation program specifically structured to attend to the domestic violence related safety concerns of clients in one of Maine's most populous and diverse areas, as well as training and technical assistance for family court professionals, specifically including guardians ad litem and judicial officers to support their ability to successfully screen for and respond to domestic abuse and violence in family court matters.

207.    The Maine Coalition is a recipient of an OVW Improving Criminal Justice Responses Program grant through an award to the Maine Department of Corrections.

208.    Maine Coalition members have applied for and received OVW grants that are or will be subject to the challenged conditions. Among them, Maine Doe Member 1 is a current, direct recipient of the OVW Rural Program Grant and OVW Transitional Housing Grant Program. Maine Member Doe 2 is a current, direct recipient of an OVW LAV Grant, as well as a current recipient of two OVW Services, Training, Officers, and Prosecutors pass-through grants through the Maine Department of Public Safety.

209.    The Maryland Network has applied for and received the Coalition Grant every year since its inception and is currently operating under the FY25 Coalition Grant. The Maryland Network has used Coalition Grant funds to provide training and technical assistance to programs that provide direct services to victims of domestic violence, dating violence, sexual assault, and stalking; develop or enhance appropriate standards of services for programs that provide direct services to victims of domestic violence, dating violence, sexual assault, and stalking; conduct

statewide, regional and/or community-based meetings or trainings for victim advocates, legal service providers, criminal and/or civil justice representatives, health care professionals, and professionals from educational institutions; bring local programs that provide direct services to victims of domestic violence, dating violence, sexual assault, and stalking together to identify gaps in services and to coordinate activities to address gaps and enhance services for survivors; and engage in activities that promote coalition-building at the local and/or state and territory level. The Maryland Network intends to apply for the Coalition Grant in FY26 and beyond.

210.    The Maryland Network also receives a direct OVW FY24 Transitional Housing Grant for $550,000 for the period October 1, 2024, through September 30, 2027. The Maryland Network has used this grant to provide funding for transitional housing and survivor-identified support services for survivors of domestic and dating violence. This funding pays for initial rent and security deposit and then provides additional rental support for the next six to 24 months, using a step-down model of funding; it offers financial education including, but not limited to, credit improvement and debt reduction education, free tax preparation, assistance in opening bank accounts, and referrals to other professionals for more in-depth services; and provides voluntary, survivor-identified support services, including but not limited to transportation, economic empowerment, case management, and employment counseling.

211.    The Maryland Network also applied for the OVW FY25 Grants to Improve the Criminal Justice Response Program, OVW FY25 Rural Grant Program, and the OVW FY25 Training and Services to End Violence and Abuse Against Individuals with Disabilities and Deaf People Program.

212.    The Montana Coalition has received a Coalition Grant each year since at least 2006 and is currently operating under the FY25 Coalition Grant. The Montana Coalition has

used the Coalition Grant to support the development and support of a community and statewide initiative to address the needs of the state's underserved LGBTQ+ community, and collaborates with the Montana Board of Crime Control to provide support to member programs regarding administrative and programmatic capacity. The Montana Coalition has previously received OVW Grants including the Disabilities Grant, LAV Grant, and more.

213.    Montana Coalition members also receive and have intended to apply for OVW grants that are or will be subject to the challenged conditions. For example, Montana Coalition member Domestic and Sexual Violence Services of Carbon County (DSVS) applied for and was awarded the FY2025 OVW Transitional Housing Grant.

214.    Montana Coalition members also receive the OVC grants. Member DSVS has the FY2025 VOCA grant, which is a pass-through grant that contains the OJP Anti-DEI Certification Requirement.

215.    The New Jersey Coalition has received a Coalition Grant each year since its inception and is currently operating under the FY25 Coalition Grant. The New Jersey Coalition uses the Coalition Grant to provide technical assistance to direct service provider programs and to conduct forums and meetings for victim advocates, including those from culturally specific organizations, to identify gaps in services and to coordinate activities to address gaps and enhance services for survivors. The New Jersey Coalition also utilizes these funds to collaborate with courts and law enforcement to enhance access to safety and justice for victims. The New Jersey Coalition has also received discretionary OVW grants in the past, as a pass-through from the state attorney general, including the Byrne Discretionary Community Project Grants Program.

216.    The New Jersey Coalition members also receive and have intend to apply for OVW grants that are or will be subject to the challenged conditions, including member Safe and Sound Somerset, which is a current recipient of pass-through FY24 OVW funds distributed by the New Jersey Office of the Attorney General.

217.    The North Carolina Coalition has received a Coalition Grant each year since at least 2001 and is currently operating under the FY25 Coalition Grant. The North Carolina Coalition has used the Coalition Grant to support legal technical assistance and training; convene regular peer sharing calls for domestic violence service providers; and create and disseminate written technical assistance materials on legal topics of interest to survivors of domestic violence. The North Carolina Coalition also uses this funding to pay for staff time as they participate in state, local, and national committees, boards, and task forces relating to the provision of domestic violence services. The North Carolina Coalition currently receives the OVW Disability Grant and has previously received other OVW Grants, including the Rural Program Grant.

218.    The North Carolina Coalition also receives the OVW Disabilities Program Grant, which is subject to the challenged conditions.

219.    North Carolina Coalition members also receive and have intended to apply for OVW grants that are or will be subject to the challenged conditions. These include North Carolina Member Doe, which applied for the OVW FY2025 Children and Youth Grant.

220.    The Oregon Coalition has received the Coalition Grant every year since it became available and is currently operating under the FY25 Coalition Grant. With this grant, the Oregon Coalition sustains its technical assistance team's ability to respond to TA requests in a timely

manner and also supports participation in external state conferences and activities including a Core Advocate Training and an Annual Oregon Coalition Conference.

221.    Various Oregon Coalition members have applied or intended to apply for the following grants that are subject to the challenged conditions: the LAV Program Grant, the SASP Grant, the Rural Program Grant, the Underserved Program Grant, the Culturally Specific Services Program Grant, and the JFF Program Grant, among others.

222.    Oregon Coalition members also receive OVC grants. Oregon Coalition member Bradley Angle has a direct OVC grant, Meeting the Basic Needs of Underserved Crime Victims, and a pass-through VOCA grant from the Oregon Department of Justice. Bradley Angle uses these OVC grants to support its Economic Empowerment Program and Shelter and Marsha's Folx programs. Oregon Coalition Member Doe receives three direct OVC grants and one VOCA pass-through grant from the Oregon Department of Justice. Oregon Coalition Member Doe uses these funds to, among other services, provide community-based victim advocacy services in a hospital setting to survivors of violence.

223.    The Pennsylvania Coalition, the oldest and largest domestic violence coalition in the United States, has received the Coalition Grant since the grant's inception and is currently operating under the FY25 Coalition Grant. The Pennsylvania Coalition uses Coalition Grant funds to create an annual Lethality Assessment report, which tracks domestic violence homicides in the state and highlights lethality factors and trends useful for law enforcement and local programs serving victims and survivors. It also relies on the Coalition Grant to provide technical assistance and training to member programs and law enforcement. In addition, the funding allows coalition staff to participate in statewide planning with STOP administrators.

63

224.    In addition to the FY25 Coalition Grant, the Pennsylvania Coalition has intended to apply for the following OVW grants which are or will be subject to the challenged conditions: the Rural Program Grant, the Children and Youth Grant, and the Engaging Men Grant.

225.    Pennsylvania Coalition members have intended to apply for OVW grants that are or will be subject to the challenged conditions. For example, Pennsylvania Member Doe intended to apply for the Transitional Housing Grant and the Campus Program grant but was deterred from applying because of concerns about the challenged conditions.

226.    The Pennsylvania Coalition has received a pass-through VOCA grant since 2017. The Pennsylvania Coalition is currently operating under the 2023–2025 VOCA grant and applied in March 2025 for a VOCA grant to begin in October 2025. The Pennsylvania Coalition uses this VOCA grant to operate a Civil Legal Helpline, staffed by attorneys, that provides information and referrals on civil legal matters including protection orders, custody, divorce, child and spousal support, criminal proceedings, and immigration. The Pennsylvania Coalition expects to apply for VOCA pass-through grants in the future and expects those grants to be subject to the OJP Anti-DEI Certification Requirement.

227.    The Rhode Island Coalition has received the Coalition Grant every year since at least 2001, including for FY25. With this grant, the Rhode Island Coalition maintains a strong and visible presence on a number of statewide committees that have produced plans and reports with policy recommendations that guide state-level decisionmakers. The Rhode Island Coalition's presence on these committees is essential to ensuring the complex needs and safety concerns of survivors of VAWA crimes are considered in planning and decisionmaking.

228.    The Rhode Island Coalition has also applied for or received OVW competitive grants that are subject to the challenged conditions. The Rhode Island Coalition was awarded the

FY2025 JFF Program Grant. It has applied for the FY2025 Engaging Men Grant and ICJR Grant; its application is still pending.

229.    The Rhode Island Coalition has received a VOCA pass-through grant since at least 2001. The Coalition has been notified by the state that it will receive level funding for the VOCA grant for FY2025, but it has not received an award yet. That grant will be subject to the OJP Anti-DEI Certification Requirement. The Rhode Island Coalition uses the VOCA grant to collaborate with other organizations to operate a 24/7 helpline and textchat for victims, to fund a victim advocacy center that provides core direct services for victims of abuse in community and residential settings nationwide, and to provide training and technical assistance to advocates implementing these core services.

230.    Various Rhode Island Coalition members have intended to apply for OVW grants that are or will be subject to the challenged conditions. For example, Rhode Island Coalition Member Women's Resource Center applied for the LAV Grant with objections and was awarded the grant. It also applied to the Transitional Housing Grant with the statement that it agreed to the conditions only to ensure it would not be precluded from receiving the grant, and it was awarded that grant. Rhode Island Coalition Member BVAC receives the OVW Transitional Housing Grant and member Progreso Latino Inc. receives the OVW Culturally specific Services Grant.

231.    VALOR has received the Coalition Grant every year since the program began and is currently operating under the FY25 Coalition Grant. VALOR uses Coalition Grant funds to support its training and technical assistance to California Rape Crisis Centers that provide victim services. Coalition Grant funds also support VALOR's coordination with other partner organizations, including law enforcement, prosecution, and sex offender treatment providers. VALOR receives competitive grants from OVW as well. Currently, VALOR has OVW grants to

provide technical assistance for various purposes, and it has received an LAV Program Grant and a Disability Program Grant.

232.  Various VALOR's members have also applied for OVW grants that are or will be subject to the challenged conditions. Among them, VALOR member organization REACH the Valley applied for the SAFE Program grant. VALOR member Doe 1 was deterred from applying for the Transitional Housing Grant because of the challenged conditions. VALOR Member Doe 2 applied for the Rural Program Grant.

233.  The Vermont Network has received the OVW Coalition Grant every year since the program began and is currently operating under the FY25 grant. The Vermont Network has used Coalition Grant funds to provide technical assistance and learning opportunities for member organizations, including consultation and statewide meetings to update service standards that ensure that member organizations provide comparable services and that victims of domestic violence, sexual assault and stalking can reliably access services in every community in Vermont, regardless of geography. The grant also funds assistance to members on direct services practices, personnel and organizational policies/practices, and grant and financial management best practices.

234.  The Vermont Network also receives discretionary grants directly from OVW and as a pass-through recipient. As a direct recipient, the Vermont Network receives the LAV Program grant, a "Restorative Practices Pilot Sites" Program grant, and a "Firearms Technical Assistance Project" grant. As a pass-through recipient, the Vermont Network receives the Rural Grant.

235.    The Vermont Network's members also receive OVW grants. For instance, Vermont Network member Mosaic applied for and received an FY25 SASP grant passed through the state that is subject to the challenged conditions.

236.    The Vermont Network also receives grants from OJP. As a direct recipient, the Vermont Network receives a Byrne Discretionary Community Project award, which provides funds for the period October 1, 2023 through September 30, 2027. The Vermont Network also receives subgrantee funds from OJP and received three VOCA subgrants in 2025 passed through state agencies. These include a VOCA subgrant that the Vermont Network uses to fund a statewide legal clinic that provides direct representation and legal advice to victims of domestic violence, sexual assault, and stalking. The Vermont Network plans to apply for another VOCA grant every year and expects that future grants will be subject to the challenged conditions.

237.    The Vermont Network's members all receive OJP grants, as subrecipient VOCA grants through the Vermont Center for Crime Victim Services. Vermont Network member Mosaic has received subrecipient VOCA funds for the past 20 years and is currently operating under a VOCA grant for the period of July 1, 2025, through June 30, 2026. Mosaic plans to apply for another VOCA grant every year and expects that future grants will be subject to OJP Anti-DEI Certification Requirement.

238.    Violence Free Minnesota has received the Coalition Grant every year since at least the mid-2000s. With this grant, Violence Free Minnesota has provided policy education and training for the benefit of domestic violence survivors, supported capacity building for staff and member programs, and held quarterly regional meetings with member programs, and provided technical assistance to member programs. Violence Free Minnesota is currently operating under the FY25 Coalition Grant, which is subject to the challenged conditions.

239. Violence Free Minnesota members have intended to apply for OVW Grants that are or will be subject to the challenged conditions, including for the LAV Grant and the Technical Assistance Grant.

240. The Virginia Action Alliance has received a Coalition Grant every year since 2008 and is currently operating under the FY25 Coalition Grant. The Virginia Action Alliance has used the Coalition Grant to implement a statewide data system on sexual and domestic violence service delivery in Virginia, as well as a survivors' leadership council, which provides council members skills building and, as a primary function, offers training opportunities for advocates, judges, law enforcement, healthcare practitioners, and more. The Virginia Action Alliance has also previously received the Disability Program Grant and pass-through funding through the Improving the Criminal Justice Response Program Grant, the SASP Grant, the Disability Program Grant, and the STOP Grant.

241. Many of Virginia Action Alliance's 70 members have either applied or intended to apply for OVW Grants that will be subject to the challenged conditions, including the Rural Program, Transitional Housing, and Children and Youth Grants. Virginia Member Doe 1, which is a current Transitional Housing grantee, is concerned about signing new certification conditions when it needs to reapply for that grant in 2027. Virginia Member Doe 2 applied to the Transitional Housing Grant but is concerned about complying with the challenged conditions. Despite their eligibility and the general lack of funding assistance for rural localities, Virginia Member Doe 3 made the difficult decision not to apply for the Rural Program Grant because of concerns about the challenged conditions and the assessment that the burden of interpretation and compliance with new conditions would fall squarely on the shoulders of program staff funded under the grant.

242.    Several of Virginia Action Alliance's 70 members have current OVC pass-through grants from the Virginia Department of Criminal Justice Services, including Virginia Member Doe 1 and Virginia Member Doe 2. Virginia Member Doe 1 uses this OVC pass-through grant to provide legal services and Virginia Member Doe 1 does not screen for immigration status. Virginia Member Doe 2 also uses its OVC pass-through grant to provide legal services, including to undocumented survivors. Though Virginia has not attached the OJP Anti-DEI Certification Requirement to its current OVC pass-through grants, Virginia is not currently using FY25 OVC funding to fund these grants. Virginia Member Doe 1 and Virginia Member Doe 2 intend to apply for future OVC pass-through grants from the Virginia Department of Criminal Justice Services.

243.    Virginia Member Doe 1 and Virginia Member Doe 2 Virginia Member Doe 1 and Virginia Member Doe 2 also both applied for the OVC FY25 Services for Crime Victims grant.

244.    Plaintiff End Abuse Wisconsin has received a Coalition Grant every year since at least 2007 and is currently operating under the FY25 Coalition Grant. End Abuse Wisconsin has used the Coalition Grant to maintain and expand its legal training and technical assistance efforts, ensuring continued support for advocates and the survivors they serve, and to conduct an annual homicide report that sheds light on domestic violence homicide in the state. End Abuse Wisconsin has also received OVW grants including the LAV Grant, Rural Program Grant, Training and Technical Assistance Grant, and more.

245.    End Abuse Wisconsin members also intend to apply for OVW grants that are or will be subject to the challenged conditions. For example, End Abuse Wisconsin Member Doe 1 applied for the Children and Youth Grant. Its application is still pending. End Abuse Wisconsin

Doe 2 intended to apply for several OVW grants but did not because it was deterred by the proposed conditions.

246.    The Washington Coalition receives the Coalition Grant. The Washington Coalition is currently operating under a FY25 Coalition Grant. The Washington Coalition is using this grant to sustain core functions of the state coalition including: training and help for domestic violence emergency shelters, domestic violence and sexual assault legal advocacy, support groups, and victim advocacy; strengthening culturally responsive, survivor-centered advocacy practices statewide for survivors from all walks of life; and strengthening judicial and law enforcement responses to sexual assault to ensure survivor voices influence systemic improvements. This year's Coalition Grant will fund the Washington Coalition's new work to assist rape crisis centers and sexual assault victim advocates and build back a network of statewide help and collaboration—which has been a gap for roughly five years in Washington state—as the newly federally-designated sexual assault state coalition.

247.    Washington Coalition members also receive OVW grants that are or will be subject to the new conditions. For example, member YWCA Clark County is currently operating under Justice for Families, Legal Advocacy for Victims, and Transitional Housing Awards. The YWCA Clark County anticipates that when it needs to reapply for these grants in future years, it will need to agree to the challenged certification conditions. YWCA Clark County has also applied for a FY25 Grants to Engage Men and Youth in Preventing Domestic Violence, Dating Violence, Sexual Assault, and Stalking grant. Washington Coalition Member Doe 1 is operating under an LAV grant.

248.    The Wisconsin SA Coalition has received a Coalition Grant every year since at least 2007, including the FY25 Coalition Grant. The Wisconsin SA Coalition has used the

Coalition Grant to coordinate with funders and other partners to improve services and responses to sexual assault providers, and to provide technical assistance, training, and support to stakeholders across the state on diverse sexual assault topics. The Wisconsin SA Coalition has also previously received OVW competitive grants including a Rural Program Grant.

249.    The Wisconsin SA Coalition was deterred from applying for the Transitional Housing and Rural Program Grants because of the challenged conditions.

250.    Wisconsin SA Coalition members also intend to apply for OVW grants that are or will be subject to the challenged conditions. For example, Wisconsin SA Coalition Member Doe 1 has applied for OVW funding through the Children and Youth Grant Program and the ICJR Program.  Members Doe 2 and 3 have intended to apply for OVW grants. Member Doe 2 intends to apply for the VAWA SASP and STOP Grants when they become competitive again. Member Doe 3 intended to apply for OVW grants but was deterred from doing so because of the proposed conditions.

251.    Wisconsin SA Coalition Members also have applied for or receive OJP grants subject to the funding conditions. Members Doe 2 and 3 receive VOCA pass-through grants. Each member has applied for a continuation award, and their applications are still pending. They anticipate applying for VOCA pass-through funds for future fiscal years as well and expect those future grants to be subject to the OJP Anti-DEI Certification Requirement.

### Plaintiffs and Their Members Face an Impossible Choice of Certifying Compliance with Illegal Conditions or Forgoing Critical Federal Funding

252.    Defendants' imposition of the "Out-of-Scope" Funding Conditions, the OVW General Terms and Conditions Anti-DEI Certification Requirement, and the OJP Anti-DEI Certification Requirement place Plaintiffs and their members in an impossible position. They must choose between forgoing funding essential to their ability to fulfill their missions—and in

some cases to their ability to operate at all—and accepting and certifying compliance with conditions that are in tension with their statutory duties, unlawfully vague, restrictive of speech, in violation other constitutional and statutory requirements, and at odds with their values and missions.

253.    Plaintiffs and their members genuinely fear that in performing their lawful activities, including in some cases those not funded by OVW or OJPgrants, they will be accused of violating the certifications that OVW and OJP are insisting they make. This fear is amplified by the government's stated goal of using the False Claims Act as a "weapon" against grantees' conduct.

254.    For example, Plaintiffs fear that their efforts to implement VAWA's protections for the undocumented people they serve could be seen as "promoting" violations of federal immigration law. They fear that refusing to discriminate based on gender identity—a requirement of their OVW grants and VAWA itself—could be viewed as promoting "gender ideology." And they fear the chilling effect that the certifications will have on their ability to carry out their missions.

255.    Yet choosing to refuse the grants with the illegal funding conditions will also cause enormous harm.

256.    Without the Coalition Grant, coalitions would be severely limited in the services they could provide to members and others who benefit from their domestic-violence and sexual-assault intervention and response work. The coalitions would lose hundreds of thousands of dollars in irreplaceable federal funds. The loss of funds means the coalitions would not be able to provide the same level of training and technical assistance to members, who rely on that assistance in providing trauma-informed, ethically, and legally-compliant, and, in many cases,

life-saving direct services to victims. Many coalitions would have to end entire programs and cut staff, drastically reducing their abilities to provide personalized advice and services to members seeking their support as they provide essential services to victims and survivors.

257.    Some coalitions that also act as direct service providers through funds using competitive grants—including the LAV Grant and the Disability Program Grant—would no longer be able to provide critical support for victims in legal proceedings. That includes supporting prosecutions of their abusers or cases to ensure the physical safety of the victims' children and their own physical safety. It also includes ensuring that their abusers cannot use the threat of immigration enforcement to coerce them back into an unsafe environment, and that victims' privacy is protected. The loss of funds would also affect Plaintiffs' ability to ensure adequate housing opportunities, forcing victims to choose between returning to an abuser or homelessness.

258.    Coalition members likewise would be severely harmed by a loss of grants that go to their coalitions, and a loss of grants to the members themselves. If a member's coalition cuts its services because it loses a Coalition Grant or a competitive grant, members would no longer be able to receive personalized advice, training, technical assistance, and in some cases, accreditation itself. A key function of a statewide coalition is to serve as a reliable source of information on issues of domestic violence and sexual assault, not only to educate the public and raise awareness, but also to foster communication, share resources, and promote networking and collaboration among member agencies.

259.    Coalition member organizations would suffer grave harms from losing their own grant opportunities. A member forced to give up a competitive grant for direct services would no longer be able to provide the same level of—or perhaps any—assistance, advocacy, and

intervention work on which victims of VAWA crimes (many of whom belong to underserved populations) rely. This means less training for police and court staff who interact with families affected by VAWA crimes on critical issues like courthouse safety and trauma-informed witness interview techniques. It means survivors lose access to the counseling, legal assistance, and housing necessary to leave a domestic violence situation before it escalates to homicide. It means more survivors are forced to choose between homelessness and returning to an abuser. The impact of the loss of these core funds for direct services will reverberate across each affected community.

## CLAIMS FOR RELIEF[6]

### COUNT I
### Violation of the Administrative Procedure Act: Contrary to Law and Exceeds Statutory Authority

260.    The paragraphs above are incorporated and reasserted as if fully set forth here.

261.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

262.    An agency action is reviewable under the APA if it is a final agency action. 5 U.S.C. § 704. An agency action is final if it "mark[s] the consummation of the agency's decisionmaking process" and is an action by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

---

[6] Claims regarding the OVW "Out-of-Scope" Funding Conditions and OVW General Terms and Conditions Anti-DEI Requirement are asserted against Defendants Bondi, DOJ, Lyons, and OVW. Claims regarding the OJP Anti-DEI Certification Requirement are asserted against Defendants Bondi, DOJ, Henneberg, OJP, Schmitt, and OVC.

263.    Defendants have made a final decision to maintain a policy of imposing the "Out-of-Scope" Funding Conditions on OVW grants. The decision to maintain this policy is final agency action reviewable under 5 U.S.C. § 704, as it determines applicants' rights and obligations and produces legal consequences.

264.    The inclusion of the "Out-of-Scope" Funding Conditions in each individual NOFO is also final agency action reviewable under 5 U.S.C. § 704. OVW made a final decision to impose these funding conditions in each NOFO. The inclusion of those conditions in each NOFO determines the rights and obligations of prospective applicants for those grants and produces legal consequences because it requires them to agree to the certifications to obtain or be considered for a grant award under that NOFO and limits what they can do with the funds if they obtain the award.

265.    OVW's and OJP's policies of requiring grantees, as a condition of receiving a grant, to make the OVW General Terms and Conditions Anti-DEI Certification or OJP Anti-DEI Certification are final agency action reviewable under 5 U.S.C. § 704. OVW and OJP have made a final decision to impose those certification requirements on grantees. Those certification requirements determine grantees' rights and obligations and produce legal consequences because they require any prospective grantee, as a condition of accepting an award, to agree to a certification that will expose the grantee to significant new potential liability and risk of burdensome litigation, require them to concede an essential element of FCA claims upfront, and chill the grantee from engaging in lawful DEI activities.

266.    Nothing in the Violence Against Women Act or any other statute authorizes Defendants to impose the "Out-of-Scope" Funding Conditions or the OVW General Terms and Conditions Anti-DEI Certification Requirement on applicants or awardees. Likewise, no statute

authorizes OJP to impose the OJP Anti-DEI Certification Requirement. Defendants therefore acted in excess of their statutory authority in imposing them.

267.    In addition, multiple of the "Out-of-Scope" Funding Conditions conflict with the statutes authorizing the grants and therefore must be set aside as contrary to law:

a.   Under 34 U.S.C. § 12291(b)(13)(A), OVW grant programs may not discriminate against any person on the basis of "gender identity." The requirement that grant applicants and awardees certify that they will not use grant funds to "inculcat[e] or promot[e] gender ideology" as defined in the "Gender Ideology" E.O., and the prohibition on using grant funds for that purpose, conflicts with this statutory command.

b.   Various statutory provisions expressly contemplate grants targeting "underserved populations"—a group that Congress defined to include those who face barriers to accessing and using victim services, including because of their "gender identity," race or ethnicity, or "alienage status"—as well as grants for "culturally specific" services "primarily directed toward racial and ethnic minority groups." *See* 34 U.S.C. §§ 12291(a)(8), (46). For some grant programs, Congress specifically authorized grants to organizations and programs that serve racial and ethnic minorities, other specific underserved populations, or underserved populations generally. *See, e.g.*, *id.* §§ 12341(b)(2);   12351(a);   12421(1)(A)(i);   12421(1)(A)(iv);   12421(2)(A)(iv); 12451(b)(1); (2)(E); (c)(1)(A); 12464(b)(5)(E); 12501(b)(3). In some cases, Congress authorized or even required grantees to partner with organizations serving racial or ethnic   minorities   or   other   specific   underserved   populations.   *Id.*   §§ 12463(c)(2)(B)–(C), (F); 12475(c)(2)(D). For other programs, Congress expressly

required DOJ to prioritize services for racial and ethnic minorities or other underserved populations in awarding grants. *See, e.g., id.* §§ 12341(d)(4); 12351(g)(2)(C)(ii); 12421(3); 12463(d)(3); 12514(c). The requirement that grant applicants and awardees certify that they will not use grant funds to "promot[e] or facilitat[e]" DEI programs, and the prohibition on using grant funds for that purpose, conflicts with these statutory directives.

c. The statute authorizes programs that target populations that face barriers to accessing victim services due to their "alienage status," 34 U.S.C. § 12291(a)(46), and expressly authorizes grants to support providing "assistance in immigration matters" to rural domestic violence and sexual assault victims, *id.* § 12341(b)(2). The following "Out-of-Scope" Funding Conditions conflict with these statutory provisions.

   i. The requirement that grant applicants and awardees certify that they will not use grant funds to "prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support," and the prohibition on using grant funds for that purpose, conflicts with the statutory authorization for programs that specifically target services for, and thus prioritize, undocumented immigrants to help overcome the barriers they face in accessing victim services due to their "alienage status."

   ii. The requirement that grant applicants and awardees certify that they will not use grant funds to "promot[e] or facilitat[e] the violation of federal immigration law," and the prohibition on using grant funds for that purpose, if broadly construed or applied, would prevent grantees from offering programs

77

specifically for undocumented immigrants or from providing assistance in immigration matters, two activities that Congress specifically authorized.

    iii.    The requirement that grant applicants and awardees certify that they will not use grant funds on any programs that "limit the role of … immigration enforcement" and other law enforcement "in addressing violence against women," and the prohibition on using grant funds for that purpose, make it impractical or impossible to offer programs specifically for undocumented immigrants as Congress intended, because undocumented immigrants will avoid services that involve coordination with enforcement bodies that could take adverse action against them.

d.   VAWA mandates that DOJ award grants to each state domestic violence coalition and sexual assault coalition for the purpose of coordinating activities within the state. 34 U.S.C. § 10441(c) (domestic violence and sexual assault coalitions); *id.* §12511(d) (sexual assault coalitions). And it mandates the specific amount that each coalition must receive. *Id.* §§ 10446(b)(2)–(3); § 12511(d). Defendants' actions conflict with these statutory commands by adding conditions that Congress did not require for each state coalition's entitlement to its formula funding, and by withholding the congressionally mandated formula amounts from state coalitions if they do not agree to the funding conditions and make the required certifications.

268.    OVW's policies of imposing the "Out-of-Scope" Funding Conditions, and its imposition of "Out-of-Scope" Funding Conditions in individual NOFOs and grant awards, must be declared unlawful and set aside as "contrary to law" and "in excess of statutory jurisdiction, authority, or limitations."

269.    The OVW General Terms and Conditions Anti-DEI Certification Requirement and the OJP Anti-DEI Certification Requirement must be declared unlawful and set aside as "in excess of statutory jurisdiction, authority, or limitations."

**COUNT II**
**Violation of the Administrative Procedure Act: Arbitrary and Capricious**

270.    The paragraphs above are incorporated and reasserted as if fully set forth here.

271.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

272.    Defendants provided no reasoned explanation for the decision to adopt a policy of imposing the "Out-of-Scope" Funding Conditions and the OVW General Terms and Conditions Anti-DEI Certification Requirement on all OVW grants, nor did Defendants offer any reasoned explanation for including these conditions in individual NOFOs.

273.    Defendants also provided no reasoned explanation for the decision to adopt a policy of imposing the OJP Anti-DEI Certification Requirement on OJP grants.

274.    Defendants failed to acknowledge that it has changed its policy to impose new requirements that grantees abide by these funding conditions, and it has failed to reasonably explain the reasons for the change in policy.

275.    Defendants ignored the factors that Congress required Defendants to consider and considered factors that Congress did not permit Defendants to consider.

276.    Defendants failed to consider the serious reliance interests of grantees, applicants, and the victims they serve that are jeopardized by the imposition of the conditions and requirements.

277.    In imposing the new funding conditions, Defendants failed to consider multiple important aspects of the problem. There is no indication that Defendants considered how

grantees could comply with various of the newly imposed conditions that conflict with services authorized or required by Congress, the detrimental impact of these requirements on the communities served by grantees, or any alternative more limited policy change.

278.    The funding conditions are also arbitrary and capricious because they are so vague that they do not give grantees adequate notice of what they must do to comply.

279.    Defendants' policy of imposing the "Out-of-Scope Funding Conditions," the OVW General Terms and Conditions Anti-DEI Certification Requirement, and the OJP Anti-DEI Certification Requirement, and their inclusion of those funding conditions in individual NOFOs and grant awards, must be declared unlawful and set aside as arbitrary and capricious.

**COUNT III**
**Violation of the Administrative Procedure Act: Contrary to Constitutional Right**

280.    The paragraphs above are incorporated and reasserted as if fully set forth here.

281.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

282.    As described in Counts IV-V and VII-X, Defendants' policies of imposing the "Out-of-Scope" Funding Conditions, the OVW General Terms and Conditions Anti-DEI Certification Requirement, and the OJP Anti-DEI Certification Requirement, and their imposition of the "Out-of-Scope" Funding Conditions in individual NOFOs and awards, violates multiple constitutional commands, including the First Amendment, Fifth Amendment, the Spending Clause, and the constitutional separation of powers and associated constitutional provisions.

283.    Defendants' policies of imposing the "Out-of-Scope" Funding Conditions, the OVW General Terms and Conditions Anti-DEI Certification Requirement, and the OJP Anti-DEI

Certification Requirement, and their imposition of the "Out-of-Scope" Funding Conditions in individual NOFOs and awards, must be declared unlawful and set aside as "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

## COUNT IV
### Violation of the Separation of Powers

284.    The paragraphs above are incorporated and reasserted as if fully set forth here.

285.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution, including the separation of powers. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

286.    The Constitution empowers Congress to make laws, U.S. Const. art. I, § 1, and requires the President to faithfully execute those laws, *id.* art. II, § 3. The President lacks the unilateral authority to modify or amend duly enacted Legislation—the President may only "approve all the parts of a Bill, or reject it in toto." *Clinton v. City of New York*, 524 U.S. 417, 439–40 (1998) (citation omitted); *see* U.S. Const. art. I, § 7, cl. 2. The President cannot delegate powers to other executive branch officials that violate the Constitution.

287.    Congress's powers to set the policies of the nation are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *Colorado v. U.S. Dep't of Health & Human Servs.*, No. 1:25-cv-00121, 2025 WL 1426226, *18 (D.R.I. May 16, 2025) (quoting *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018)); *see* U.S. Const., art. I, § 8, cl. 1; *id.*, § 9, cl. 7.

288.    VAWA and related statutes establish grant programs for specified purposes, and Congress has consistently appropriated funding for those programs. Nothing in those laws authorizes the Executive Branch to impose conditions on that funding that Congress did not impose, including conditions intended to advance the President's unrelated policy goals.

Defendants may not lawfully condition OVW's funding on the "Out-of-Scope" Funding Conditions or OVW the General Terms and Conditions Anti-DEI Certification Requirement, which are nowhere to be found in VAWA or the other relevant duly enacted laws and which Congress did not authorize Defendants to impose.

289.    VOCA also establishes grant programs for specified purposes and provides funding for those programs, and other statutes establish other OJP grant programs. Nothing in VOCA or any other law authorizes the Executive Branch to impose the OJP Anti-DEI Certification Requirement. Defendants may not lawfully condition funding on the OJP Anti-DEI Certification Requirement, which is nowhere to be found in VOCA or other relevant duly enacted laws and which Congress did not authorize Defendants to impose.

290.    Defendants' imposition of the "Out-of-Scope" Funding Conditions, the OVW General Terms and Conditions Anti-DEI Certification Requirement, and the OJP Anti-DEI Certification Requirement violates the separation of powers in infringing on Congress's legislative authority and power of the purse, in failing to faithfully execute Congress's laws, and in attempting to amend, modify, or partially veto duly enacted legislation.

291.    To prevent Defendants' violations of the separation of powers, Defendants must be enjoined from implementing or enforcing the "Out-of-Scope" Funding Conditions, the OVW General Terms and Conditions Anti-DEI Certification Requirement, and the OJP Anti-DEI Certification Requirement.

## COUNT V
### Violation of the Spending Clause

292.    The paragraphs above are incorporated and reasserted as if fully set forth here.

293.    The Spending Clause of the Constitution provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for

the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1. The Spending Clause vests the power of the purse, including the power to attach conditions to the expenditure of federal funds, exclusively with Congress.

294.    Congress has not authorized DOJ to attach conditions to OVW grants that are unrelated to the purpose of the grant programs.

295.    The "Out-of-Scope" Funding Conditions, the OVW General Terms and Conditions Anti-DEI Certification Requirement, and the OJP Anti-DEI Certification Requirement infringe Congress's power under the Spending Clause, and Defendants must be enjoined from implementing or enforcing them.

## COUNT VI
## Ultra Vires

296.    The paragraphs above are incorporated and reasserted as if fully set forth here.

297.    This Court has inherent equitable power to enjoin and declare unlawful executive ultra vires conduct. *R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002). An agency acts ultra vires when it "plainly acts in excess of its delegated powers." *Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158, 162 (D.C. Cir. 2021) (cleaned up).

298.    No statute, constitutional provision, or other source of law authorizes Defendants to impose the "Out-of-Scope" Funding Conditions, the OVW General Terms and Conditions Anti-DEI Certification Requirement, or the OJP Anti-DEI Certification Requirement.

299.    The "Out-of-Scope" Funding Conditions, the OVW General Terms and Conditions Anti-DEI Certification Requirement, and the OJP Anti-DEI Certification Requirement are ultra vires, and Defendants must be enjoined from implementing or enforcing them.

**COUNT VII**
**Violation of the First Amendment – Free Speech Clause (Unconstitutional Condition) –**
**"Gender Ideology" Funding Condition**

300.    The paragraphs above are incorporated and reasserted as if fully set forth here.

301.    The First Amendment to the United States Constitution provides that the government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

302.    While the government may in some circumstances attach conditions to federal funding that "affect the recipient's exercise of its First Amendment rights," there are limits. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). Where the government imposes a funding condition "not relevant to the objectives of the program," that can violate the First Amendment. *See id.* at 214. And, even in providing government funding, "the Government may not aim at the suppression of dangerous ideas." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998). In addition, the government may not restrict "protected [speech] outside the scope of the federally funded program." *Alliance for Open Soc'y*, 570 U.S. at 217 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)).

303.    The "Gender Ideology" Condition runs afoul of those limits.

304.    The "Gender Ideology" Condition is not relevant to the objectives of the funded programs—to address domestic violence and sexual assault and supporting survivors. The "gender ideology" funding condition curtails grantees' speech with respect to gender identity broadly, without advancing any legitimate objectives of the programs. It accordingly violates the First Amendment.

305.    The "Gender Ideology" Condition is designed to suppress ideas that the Administration deems dangerous—namely, that a person can have a "self-assessed gender

identity" distinct from their biological sex assigned at birth. The censorious purpose of this funding condition renders it unconstitutional in violation of the First Amendment.

306.    The "Gender Ideology" Condition restricts protected speech outside the scope of the grants. The "Gender Ideology" Condition impermissibly demands that grantees adopt as their own the government's view that "there are two sexes, male and female," and that the "immutable biological reality of sex" cannot and should not be displaced by anyone's "self-assessed gender identity." Gender Ideology Order § 2. Although framed as a requirement not to "inculcat[e] or promot[e]" a contrary view using grant funds, the "gender ideology" requirement in fact requires grantees to adopt the government's view because there is no way to avoid the topic during day-to-day interactions with people.

307.    For these reasons, the "Gender Ideology" Condition violates the First Amendment, and Defendants must be enjoined from enforcing or implementing it.

**COUNT VIII**
**Violation of the First Amendment – Free Speech Clause (Unconstitutional Condition) –**
**OVW General Terms and Conditions Anti-DEI Certification Requirement and OJP**
**Anti-DEI Certification Requirement**

308.    The paragraphs above are incorporated and reasserted as if fully set forth here.

309.    The OVW General Terms and Conditions Anti-DEI Certification Requirement and OJP Anti-DEI Certification Requirement compel grantees to certify that they "do[] not operate *any* programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable federal civil rights or nondiscrimination laws" and that this is "material" for False Claims Act purposes. (Emphasis added.) This follows the DEI Order's instruction that agencies must include such a certification requirement in every grant. DEI Order § 3(b)(iv).

310.    DEI programs include First Amendment-protected speech and advocacy.

311.    No OVW or OJP NOFO or other DOJ document, nor the DEI Order, provides any guidance on what might make any given DEI program violate civil rights or nondiscrimination laws. Yet the DEI Order clearly signals that the Executive Branch now views as unlawful a wide array of DEI programs that, until recently, the federal government not only regarded as lawful but actively encouraged.

312.    The OVW General Terms and Conditions Anti-DEI Certification Requirement and OJP Anti-DEI Certification Requirement expose grantees to potential adverse consequences under the False Claims Act—both a significant risk of burdensome litigation by *qui tam* relators or by the government itself and a risk of significant liability (liability that exceeds liability the nondiscrimination laws would themselves impose) should a court determine that a DEI program was unlawful.

313.    The OVW General Terms and Conditions Anti-DEI Certification Requirement and OJP Anti-DEI Certification Requirement thus both directly censor speech outside the scope of the federally funded program, and have the natural effect of forcing grantees to refrain from engaging in protected speech even outside the scope of the federally funded program. They therefore violate the First Amendment, and Defendants must be enjoined from enforcing or implementing them.

**COUNT IX**
**Violation of the First Amendment – Free Speech Clause (Viewpoint Discrimination) – OVW General Terms and Conditions Anti-DEI Certification Requirement and OJP Anti-DEI Certification Requirement**

314.    The paragraphs above are incorporated and reasserted as if fully set forth here.

315.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution. *See Free Enter. Fund*, 561 U.S. at 491.

316.    The First Amendment to the United States Constitution provides that the government "shall make no law . . . abridging the freedom of speech." U.S. Const. Amend. I.

317.    The OVW General Terms and Conditions Anti-DEI Certification Requirement and OJP Anti-DEI Certification Requirement violate the Free Speech Clause of the First Amendment because they impermissibly regulate and chill the exercise of Plaintiffs' and their members' constitutionally protected speech based on its content and viewpoint. As the larger context shows, those requirements are meant to suppress programs that promote a particular viewpoint—namely, that diversity, equity, and inclusion are laudable goals. The certifications single out "programs having components relating to diversity, equity, and inclusion" for specific mention. And the Executive Order underlying these certification requirements makes clear that the Administration is not focused on unlawful discrimination generally, but rather specifically on "DEI"—a set of "principles" that the Administrative deems "corrosive" and "pernicious" and seeks to "excise" from the federal government.

318.    No compelling government interest justifies Defendants' viewpoint-based targeting of speech, and the OVW General Terms and Conditions Anti-DEI Certification Requirement and OJP Anti-DEI Certification Requirement are not the least restrictive means available to advance whatever interest the requirement serves.

319.    Accordingly, the OVW General Terms and Conditions Anti-DEI Certification Requirement and OJP Anti-DEI Certification Requirement violate the First Amendment by targeting and chilling speech based on its viewpoint, and Defendants must be enjoined from enforcing or implementing them.

## COUNT X
### Fifth Amendment Due Process (Vagueness)

320.    The paragraphs above are incorporated and reasserted as if fully set forth here.

87

321.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

322.    Due process requires that parties "know what is required of them so they may act accordingly." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citing *United States v. Williams*, 553 U.S. 285, 304 (2008)).

323.    Many of the "Out-of-Scope" Funding Conditions, the OVW General Terms and Conditions Anti-DEI Certification Requirement, and the OJP Anti-DEI Certification Requirement are unconstitutionally vague. The "Out-of-Scope" Funding Conditions, OVW General Terms and Conditions Anti-DEI Certification Requirement, and OJP Anti-DEI Certification Requirement fail to provide grantees with notice of what conduct is prohibited and fail to specify clear standards for enforcement, encouraging arbitrary and discriminatory application of the law.

324.    The Immigration Enforcement Condition is unconstitutionally vague because, among other reasons, it fails to define the terms "promoting" or "facilitating" with respect to "violations of federal immigration law."

325.    The Systemic Framing Condition is unconstitutionally vague because it fails to define "prioritizing" or to explain how or under what circumstances "fram[ing]" domestic violence or sexual assault as a "systemic social justice issue" could result in "prioritizing" criminal justice reform or social justice issues over victim safety and offender accountability. This condition is rendered additionally vague by the lack of any clarity on how to harmonize it with VAWA's foundational recognition of domestic violence as a systemic issue.

326.    The "Gender Ideology" Condition is unconstitutionally vague because, among other reasons, it fails to define the terms "inculcating" or "promoting" with respect to "gender ideology."

327.    The Anti-DEI Condition  is unconstitutionally vague because, among other reasons: (i) it fails to define the terms "promoting or facilitating" with respect to "discriminatory programs or ideology"; (ii) it fails to define "discriminatory programs or ideology," except to state that that category "includ[e]s," but is not necessarily limited to, "illegal DEI" or "'diversity, equity, inclusion, and accessibility' programs that do not advance the policy of equal dignity and respect"; (iii) it does not define the terms "illegal DEI" or "'diversity, equity, inclusion, and accessibility' programs that do not advance the policy of equal dignity and respect."

328.    The OVW General Terms and Conditions Anti-DEI Certification Requirement and OJP Anti-DEI Certification Requirement are unconstitutionally vague because, among other reasons, they and the DEI Executive Order on which they are based signal that the Administration has a novel and expanded view of when "programs having components relating to diversity, equity, and inclusion" will "violate … applicable federal civil rights and nondiscrimination laws" but provide no guidance on when they do.

329.    The Law Enforcement and Immigration Enforcement Conditions are unconstitutionally vague because, among other reasons, they fail to define the terms "discourage" with respect to collaboration with law enforcement, and the terms "oppose," or "limit," with respect to the role of police, prosecutors, or immigration enforcement in addressing violence against women.

330. The Awareness Campaigns Condition is unconstitutionally vague because, among other reasons, it does not explain what a "tangible" improvement in "prevention, victim safety, or offender accountability" is or how to measure it.

331. The EO Condition is unconstitutionally vague because, among other reasons, it requires grantees to certify that they will not use program funds for any activity or program that "unlawfully violates an Executive Order." Executive Orders are issued by the President to direct the Executive Branch—they do not on their own impose legal requirements or obligations on private parties like federal grantees, leaving grantees to guess as to what it means to violate an Executive Order. It also does not provide any limit on applicable executive orders, leaving grantees uncertain how to treat executive orders entirely irrelevant to their programs, that predate this administration.

332. The Immigration Priority Condition is unconstitutionally vague because, among other reasons, it prohibits "initiatives that prioritize illegal aliens over U.S. citizens and legal residents" in receiving services, but fails to define "prioritiz[ing]" or provide guidance on what activities might be prohibited.

333. These conditions are rendered additionally vague by their potential conflict with Plaintiffs' various statutory obligations, including requirements to not discriminate, 34 U.S.C. § 12291, to serve "underserved populations" (defined to include racial and ethnic populations and those underserved because of gender identity), and to provide "culturally specific" services. *Id*. § 12291(a)(8), (46).

334. The OVW NOFOs' acknowledgment of VAWA's nondiscrimination requirements provides no explanation of how Plaintiffs should comply with VAWA obligations without running afoul of the funding conditions.

335.    The vagueness of the "Out-of-Scope" Funding Conditions, the OVW General Terms and Conditions Anti-DEI Certification Requirement, and the OJP Anti-DEI Certification Requirement threatens the property interests of grantees in their grant funds and in their own, non-federal funds that could be subject to FCA damages and penalties.

336.    The "Out-of-Scope" Funding Conditions, the OVW General Terms and Conditions Anti-DEI Certification Requirement, and the OJP Anti-DEI Certification Requirement are unconstitutionally vague in violation of Fifth Amendment Due Process guarantee and Defendants must be enjoined from enforcing or implementing them.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.    Declare unlawful, vacate, and set aside Defendants' policy of including the "Out-of-Scope" Funding Conditions, the OVW General Terms and Conditions Anti-DEI Certification Requirement, and the OJP Anti-DEI Certification Requirement in grant awards and notices of funding opportunities;

B.    Declare unlawful, vacate, and set aside the "Out-of-Scope" Funding Conditions in each OVW notice of funding opportunity in which they appear;

C.    Stay the policies of imposing the "Out-of-Scope" Funding Conditions, the OVW General Terms and Conditions Anti-DEI Certification Requirement, and the OJP Anti-DEI Certification Requirement, and the inclusion of those conditions in any individual notices of funding opportunities and awarded grants, pursuant to 5 U.S.C. § 705;

D.    Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from including the "Out-of-Scope" Funding Conditions in any future NOFO, and from imposing the "Out-of-Scope" Funding Conditions, the

OVW General Terms and Conditions Anti-DEI Certification Requirement, or the OJP Anti-DEI Certification Requirement as a condition of applying for, or accepting or receiving funds under, a DOJ grant;

E.      Declare that any certification that any organization made pursuant to the "Out-of-Scope" Funding Conditions or pursuant to the OVW General Terms and Conditions Anti-DEI Certification Requirement or OJP Anti-DEI Certification Requirement, in applying for or accepting a DOJ grant, is null and void and shall not be enforced or in any way held against the applicant;

F.      Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from enforcing or encouraging or facilitating enforcement of the "Out-of-Scope" Funding Conditions, the OVW General Terms and Conditions Anti-DEI Certification Requirement or the OJP Anti-DEI Certification Requirement, where a grantee has agreed to such conditions;

G.      Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants to clarify in any current or future OVW or OJP grant award or disbursement of funds that any certification that any applicant made pursuant to the "Out-of-Scope" Funding Conditions does not apply and that the awardee is not making such a certification in accepting and using the funds, even if the awardee previously made that certification;

H.      Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants to reopen any notices of funding opportunity in which the unlawful "Out-of-Scope" Funding Conditions appeared so as to provide a reasonable opportunity for prospective applicants who were deterred from applying because of

those conditions to apply and for applicants to submit amended applications without the unlawful certifications;

      I.      Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from imposing any certification requirements or funding conditions for future grants that are substantially the same as the "Out-of-Scope" Funding Conditions, the OVW General Terms and Conditions Anti-DEI Certification Requirement, or the OJP Anti-DEI Certification Requirement.

      J.      Award Plaintiffs reasonable costs and attorneys' fees; and

      K.      Grant any other relief that the Court deems fit and proper.


November 19, 2025            Respectfully submitted,


                /s/ Kristin Bateman
                Kristin Bateman (D.C. Bar No. 90037068)[+]
                Robin F. Thurston (D.C. Bar No. 1531399)[+]
                Skye L. Perryman (D.C. Bar No. 984573)[+]
                Democracy Forward Foundation
                P.O. Box 34553
                Washington, D.C. 20043
                (202) 448-9090
                kbateman@democracyforward.org
                rthurston@democracyforward.org
                sperryman@democracyforward.org

                */s/ Daniel F. Jacobson*
                Daniel F. Jacobson (D.C. Bar # 1016621)
                Lynn D. Eisenberg (D.C. Bar No. 1017511)[+]
                Brian C. Rosen-Shaud (ME Bar No. 006018)+ ^
                Kyla M. Snow (D.C. Bar No. 90036400)[+]
                Nina Cahill (D.C. Bar No. 1735989)[+]
                Jacobson Lawyers Group PLLC
                1629 K Street NW, Suite 300
                Washington, DC 20006
                (301) 823-1148
                dan@jacobsonlawyersgroup.com

*/s/ Amy R. Romero*
Amy R. Romero (RI Bar # 8262)
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
Amy@dwbrlaw.com
Cooperating counsel, Lawyers' Committee for RI

*/s/ Lynette Labinger*
Lynette Labinger (RI Bar # 1645)
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation of RI

*/s/ Lauren A. Khouri*
Lauren A. Khouri (D.C. Bar No. 10282288)[+]
Elizabeth E. Theran (D.C. Bar No. 90030162)[+]
National Women's Law Center
1350 I Street NW, Suite 700
Washington, DC 20005
Telephone: (202) 588-5180
Fax: (202) 588-5185
lkhouri@nwlc.org

[+] Admitted *pro hac vice*

[^] Not admitted in the District of Columbia. Practice supervised by members of the D.C. bar.

*Counsel for Plaintiffs*

94