**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.* | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-00279 |
| PAMELA BONDI, *et al.*, | |
| *Defendants*. | |

**<u>MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ................................................................................................... 1

FACTUAL AND LEGAL BACKGROUND ................................................................ 3

   A.   The Violence Against Women Act Creates Grant Programs To Prevent Domestic Violence and Sexual Assault and To Help Survivors .......................................... 3

   B.   Plaintiffs Rely on OVW Grants to Provide Essential Services ............................. 7

   C.   The Administration Leverages Federal Grant Funding to Advance the President's Ideological Vision and Expose Grantees to Massive Liability ............................. 9

      1.   Diversity, Equity, and Inclusion ................................................................. 9

      2.   "Gender Ideology" ................................................................................. 14

      3.   Immigration ......................................................................................... 15

   D.   DOJ's Office on Violence Against Women Imposes New Conditions on Grants ........... 16

      1.   General Anti-DEI Certification ................................................................ 17

      2.   "Out-of-Scope" Conditions ..................................................................... 18

   E.   The Conditions Harm Plaintiffs ..................................................................... 22

   F.   Procedural History ...................................................................................... 25

LEGAL STANDARD ............................................................................................ 26

ARGUMENT ...................................................................................................... 26

   I.   Plaintiffs Are Entitled to Summary Judgment on their Claims ............................. 26

     A.   The Court Has Jurisdiction ........................................................................ 26

     B.   The Salerno Standard Does Not Preclude Plaintiffs' Facial Challenges ................... 31

     C.   The New Conditions Violate the APA ........................................................... 34

       1.   The New Conditions Are Final Agency Action ............................................ 34

       2.   The New Conditions Are Arbitrary and Capricious ...................................... 35

       3.   The New Conditions Exceed Defendants' Statutory Authority ........................ 40

i

a. Defendants lack authority to impose the "out-of-scope" conditions ........................41

b. Defendants lack authority to impose the General Anti-DEI Certification................44

4.    Many of the New Conditions Are Contrary to Law ....................................................45

a. All of the New Conditions conflict with the provisions governing coalition
grants .................................................................................................................45

b. Many New Conditions conflict with other provisions of VAWA ...........................46

5.    The New Conditions Violate the Constitution............................................................49

D.  The New Conditions Violate the Spending Clause and Other Constitutional
Provisions Safeguarding the Separation of Powers........................................................50

E.  Two New Conditions Violate the First Amendment ......................................................51

1.    The "Gender Ideology" Condition Violates the First Amendment ..........................51

2.    The General Anti-DEI Certification Violates the First Amendment ........................53

F.  The New Conditions Are Unconstitutionally Vague ......................................................56

G.  Defendants' Actions Were Ultra Vires .........................................................................61

II.    Remedy ..........................................................................................................................62

A.  The Court Should Set Aside the New Conditions Under the APA................................62

B.  The Court Should Enjoin Defendants from Enforcing the New Conditions or
Imposing the Same or Substantially Similar New Conditions in the Future................63

CONCLUSION................................................................................................................68

## TABLE OF AUTHORITIES

**CASES**

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023) .......................... 47

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ................. 52, 53, 54

*Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.,*  No. 25-CV-1923 (JMC), 2025 WL
2615054 (D.D.C. Sept. 10, 2025) ....................................................................... 30

*Ass'n of Am. Univs. v. Dep't of Defense*, No. CV 25-11740-BEM, 2025 WL 2899765 (D.
Mass. Oct. 10, 2025) ............................................................................................. 29

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................ 35

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) ................................................. 56

*Bondi v. VanDerStok*, 604 U.S. 458 (2025) .......................................................... 32

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42 (1st Cir. 2016) ................................ 26

*California v. Trump*, No. 25-CV-10810-DJC, 2025 WL 2663106 (D. Mass. Sept. 17,
2025) ..................................................................................................................... 62

*California v. U.S. Dep't of Transp.*, No. 1:25-cv-00208, 2025 WL 1711531 (D.R.I. June
19, 2025) ............................................................................................................... 40

*Chamber of Com. of U.S. v. CFPB*, 691 F. Supp. 3d 730 (E.D. Tex. 2023) ............................... 63

*Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) .............................................. 29

*Chi. Women in Trades v. Trump*, 778 F. Supp. 3d 959 (N.D. Ill. Apr. 14, 2025) ....................... 54

*City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ........................................ 42, 50, 51

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ................................................... 40

*City of Chi. v. Barr*, 961 F.3d 882 (7th Cir. 2020) ........................................................ 50

*City of Chi. v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017), aff'd, 888 F.3d 272 (7th
Cir. 2018) .............................................................................................................. 65

*City of Fresno v. Turner,* No. 25-cv-7070, 2025 WL 2721390 (N.D. Cal. Sept. 23, 2025) .. *passim*

*City of Los Angeles v. Patel*, 576 U.S. 409 (2015) ............................................... 33, 34

iii

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020) ............................................ 32, 33, 40, 46

*Climate United Fund v. Citibank, N.A.*, No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025) ......................................................................................................................... 30

*Clinton v. City of N.Y.*, 524 U.S. 417 (1998) ................................................................ 51

*Cmty. Legal Servs. in E. Palo Alto v. Dep't of Health & Hum. Servs.*, 137 F.4th 932 (9th Cir. 2025) ...................................................................................................................... 28

*Colorado v. U.S. Dep't of Health & Human Servs.*, No. 1:25-cv-00121, 2025 WL 1426226 (D.R.I. May 16, 2025) ................................................................................. 50, 51

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024).......................... 62

*Dep't of Educ. v. California*, 604 U.S. 650 (2025) ........................................................ 27

*DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) ................................ 39

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)...................................... 35, 39

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)........................................... 56

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ............................................. 35

*Fisher v. United States*, 402 F.3d 1167 (Fed. Cir. 2005)............................................... 27

*Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158 (D.C. Cir. 2021) ............... 61

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ......................................... 57, 60, 61

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020)............................. 47

*Hatzlachh Supply Co., Inc. v. United States*, 444 U.S. 460 (1980) ............................. 28

*Holmes v. United States*, 657 F.3d 1303 (Fed. Cir. 2011) ........................................... 27

*Illinois v. Fed. Emergency Mgmt. Agency*, No. CV 25-206 WES, 2025 WL 2716277 (D.R.I. Sept. 24, 2025)................................................................ 26, 27, 33, 62

*INS v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183 (1991)................................. 32

*King Cnty. v. Turner*, 785 F. Supp. 3d 863 (W.D. Wash. 2025) ...................... 35, 37, 66

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986)................................................. 40

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ............................. 65, 66

*LeBlanc v. United States*, 50 F.3d 1025 (Fed. Cir. 1995) ......................................... 30

*Louisiana v. Biden*, 622 F. Supp. 3d 267 (E.D. La. 2022) ........................................ 37

*Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277 (D. Mass. 2025) .......................... 66

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ........................................ 30

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ...................................... 63

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ............................................... 33

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ...................................... 65

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ............................................................ 31, 35, 36, 37

*Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36 (D.D.C. 2025) ............................. 36

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149 (D.N.H. 2025) ........................ 67

*Nat'l Inst. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) ............................ 27

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) .......................................... 55

*NEA v. Finley*, 524 U.S. 569 (1998) ...................................................... 52, 53

*NIH and Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) ................................... 27, 29

*Ohio Coal Ass'n v. Perez*, 192 F. Supp. 3d 882 (S.D. Ohio 2016) ................................. 32

*Ohio v. EPA*, 603 U.S. 279 (2024) ......................................................... 35

*Ortiz-Bonilla v. Federacion de Ajedrez de Puerto Rico, Inc.*, 734 F.3d 28 (1st Cir. 2013) ......... 64

*PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405 (D. Md. 2025) ..................................... 47, 51

*Planned Parenthood of Greater N.Y. v. Dep't of Health and Human Servs.*, No. CV 25-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025) ....................................... 29

*Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090 (S.D. Cal. 2017) .............. 47

*President & Fellows of Harvard Coll. v. Dep't of Health & Hum. Servs.*, No. 25-CV-10910-ADB, 2025 WL 2528380 (D. Mass. Sept. 3, 2025) ............................... 30

v

*R.I. Coal. Against Domestic Violence v. Kennedy*, No. 25-CV-342, 2025 WL 2899764 (D.R.I. Oct. 10, 2025) .......................................................................... 27, 31, 58

*R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31 (1st Cir. 2002) ..................................... 61

*R.I. Latino Arts v. NEA*, 777 F. Supp. 3d 87 (2025) ............................................... 52, 65

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ...................................................... 55, 56

*Reno v. ACLU*, 521 U.S. 844 (1997) ........................................................................ 56

*Reno v. Flores*, 507 U.S. 292 (1993) ...................................................................... 32

*RICADV v. Bondi*, No. 25-cv-279, 2025 WL 2271867 (D.R.I. Aug. 8, 2025) ..................... *passim*

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ................................. 55

*Rust v. Sullivan*, 500 U.S. 173 (1991) ................................................................ 52, 53

*S.F. AIDS Found. v. Trump*, 786 F. Supp. 3d 1184 (N.D. Cal. 2025) ....................... 46, 47, 52, 53

*Scottsdale Ins. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69 (1st Cir. 2020) ............................ 26

*Sessions v. Dimaya*, 584 U.S. 148 (2018) ................................................................ 56

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1 (1st Cir. 2012) ................... 65

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ......................................................... 55

*South Dakota v. Dole*, 483 U.S. 203 (1987) ............................................................. 50

*Strickland v. United States*, 32 F.4th 311 (4th Cir. 2022) ................................................ 29

*Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350 (5th Cir. 2021) .................................. 50

*Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535 (5th Cir. 2013) ......................... 66

*Texas v. Cardona*, 743 F. Supp. 3d 824 (N.D. Tex. 2024) ........................................... 63

*Thakur v. Trump*, No. 25-CV-04737-RFL, 2025 WL 2696424 (N.D. Cal. Sept. 22, 2025) ........ 30

*Tootle v. Sec'y of Navy*, 446 F.3d 167 (D.C. Cir. 2006) ................................................. 28

*Turping v. United States*, 134 Fed. Cl. 293 (2017) ....................................................... 27

*United States v. Salerno*, 481 U.S. 739 (1987) ....................................................... 31, 33

*United States v. Williams*, 553 U.S. 285 (2008) ............................................... 33, 56, 57

*Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016)............ 11, 45

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982) .............................. 57

*Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78 (1st Cir. 2022)....................................................... 26

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008)............................... 33

*Webster v. Doe*, 486 U.S. 592 (1988) .................................................................... 30

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440 (D.R.I. 2025)........................................................................................................ 36

## U.S. CONSTITUTIONAL PROVISIONS

Amendment I  ................................................................................................ 51

Article I, § 1 ................................................................................................ 50

Article I, § 7, cl. 2 ........................................................................................ 51

Article I, § 8, cl. 1 ........................................................................................ 50

Article I, § 9, cl. 7 ........................................................................................ 50

Article II, § 3 ................................................................................................ 51

## FEDERAL STATUTES

5 U.S.C. § 705................................................................................................ 25

5 U.S.C. § 706................................................................................................ 49, 62

18 U.S.C. § 287............................................................................................ 11

28 U.S.C. § 1491......................................................................................... 27, 28

31 U.S.C. § 3729......................................................................................... 10, 23

31 U.S.C. § 3730......................................................................................... 11

34 U.S.C. § 10441....................................................................................... 3, 4, 46

34 U.S.C. § 10442 ................................................................................................ 7

34 U.S.C. § 10444 ................................................................................................ 7

34 U.S.C. § 10446 ................................................................................... 4, 6, 7, 46

34 U.S.C. § 10450 ................................................................................................ 7

34 U.S.C. § 10454 ................................................................................................ 7

34 U.S.C. § 12291 .......................................................................................... *passim*

34 U.S.C. § 12341 ............................................................................... 5, 6, 48, 49

34 U.S.C. § 12351 .................................................................................. 3, 5, 6, 48

34 U.S.C. § 12421 ......................................................................................... 6, 48

34 U.S.C. § 12451 ......................................................................................... 6, 48

34 U.S.C. § 12463 ...................................................................................... 6, 7, 48

34 U.S.C. § 12464 ................................................................................... 5, 6, 7, 48

34 U.S.C. § 12475 ......................................................................................... 5, 48

34 U.S.C. § 12501 ......................................................................................... 6, 48

34 U.S.C. § 12511 ......................................................................................... 4, 46

34 U.S.C. § 12514 ......................................................................................... 6, 48

34 U.S.C. § 20121 ........................................................................................... 5, 6

34 U.S.C. § 20123 ......................................................................................... 5, 6, 48

34 U.S.C. § 20124 ........................................................................................... 5, 6

Pub. L. No. 103-322, tit. IV, 108 Stat. 1796 (1994) ....................................... 3

Pub. L. No. 118-42, div. C, tit. II, 138 Stat. 25 (Mar. 9, 2024) .......................4

Pub. L. No. 119-4, 139 Stat. 9 (Mar. 15, 2025) ............................................ 4

## FEDERAL REGULATIONS AND EXECUTIVE ORDERS

28 C.F.R. § 85.5 ............................................................................................. 11, 23

Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025).............................................. 9

Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 29, 2025)............................................ 15

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025)............................... 14, 46, 53

Exec. Order No. 14173, 90 Fed. Reg. 8663 (Jan. 21, 2025)...................... 10, 11, 12, 55

Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025) ......................................... 16

## LEGISLATIVE MATERIALS

S. Rep. No. 103-138 (1993) ......................................................................................... 3, 43

## OTHER AUTHORITIES

Black's Law Dictionary (12th ed. 2024)........................................................................ 28

DOJ, State and Territory Coalitions: FY 2025 Domestic Violence and Sexual Assault
    Coalition Designations (updated May 13, 2025), https://perma.cc/8LNV-FGLY ............... 4

OPM, Initial Guidance Regarding President Trump's Executive Order Defending
    Women, https://perma.cc/9YUS-MZKV (Jan. 29, 2025) ..................................................... 15

Ken Dilanian, (@KDilanianMSNOW), X (Aug. 15, 2025, 12:34 PM),
    https://perma.cc/2K33-JPK9 ................................................................................................... 15

Letter from Todd Blanche, Deputy Att'y Gen., to DOJ Offices, Divisions, and U.S.
    Attorneys (May 19, 2025), https://perma.cc/3W6K-FGHA .......................................... 11, 12

Mem. From Ass't Att'y Gen., Brett A. Shumate, to Civil Division Employees, *Civil
    Division Enforcement Priorities* (June 11, 2025), https://perma.cc/SV3A-NE9F.............. 12

Mem. from Att'y Gen. Pam Bondi, Ending Illegal DEI and DEIA Discrimination and
    Preferences (Feb. 5, 2025), https://perma.cc/KH9Y-A2VQ.................................................. 13

Mem. from Att'y Gen. Pam Bondi, *Guidance for Recipients of Federal Funding
    Regarding Unlawful Discrimination* (July 29, 2025),
    https://perma.cc/T4B4-QTYH ....................................................................................... 13, 14

Off. of the Atty. Gen., *Memorandum for All Department of Justice Employees: Eliminating Internal Discriminatory Practices* at 1–3 (Feb. 5, 2025), https://perma.cc/24KA-GFJ6 ................................................................................... 13

The White House, *Fact Sheet: President Donald J. Trump Prevents Illegal Aliens from Obtaining Social Security Act Benefits* (Apr. 15, 2025), https://perma.cc/CW6B-SLL9 ......................................................................................................................... 16

The White House, *Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI* (Jan. 22, 2025), https://perma.cc/G8JU-QQ44 .................................................................................. 54

U.S. DOJ, *Justice Department Establishes Civil Rights Fraud Initiative* (May 19, 2025), https://perma.cc/ZS6R-B8E9 ................................................................................... 12

U.S. DOJ, OVW, *FY 2025 General Terms and Conditions* (updated Sept. 26, 2025), https://perma.cc/P5ZH-TLTL ...................................................... 17, 23, 25, 54

U.S. DOJ, OVW, *Open Notices of Funding Opportunity*, https://perma.cc/XR9P-GA49 ........... 22

## INTRODUCTION

Plaintiffs are twenty-five non-profit organizations that are the federally recognized domestic violence and sexual assault coalitions for their respective states. Their missions are to support survivors of domestic violence and sexual assault and to prevent further harm. Plaintiffs and their hundreds of member programs provide direct victim services and offer training, education, and information for victims, service providers, law enforcement, and policymakers. Recognizing these coalitions' essential role, Congress has guaranteed them funding through formula grants codified in the Violence Against Women Act (VAWA), and has authorized them and their member programs to apply for and receive additional competitive grants to support their lifesaving work.

In creating these various grant programs, Congress has ensured that VAWA grantees serve marginalized groups, including racial and ethnic minorities, members of the LGBT community, and immigrant populations no matter their citizenship status. Among other measures, Congress has prohibited VAWA grantees from discriminating based on race, ethnicity, and gender identity, and Congress has created programs specifically to serve underserved populations. Topics like gender identity, diversity, equity, and inclusion are integral to VAWA's design and operation.

Yet the Department of Justice (DOJ) has imposed a series of new funding conditions that contravene Congress's statutory scheme. The DOJ's Office on Violence Against Women (OVW) now demands that grantees sign vague and sweeping certifications prohibiting them from "promoting" "gender ideology" or "DEI," from limiting engagement with immigration authorities, and even from recognizing domestic and sexual violence as the systemic problems that Congress recognized them to be. These requirements have no grounding in VAWA; several

affirmatively conflict with it. Instead, they represent an attempt by the Executive Branch to subvert Congress's requirements in favor of an unauthorized ideological agenda.

DOJ has touted that these certifications are intended to expose grantees to False Claims Act (FCA) liability, making clear that it will use the FCA as a "weapon" to target organizations whose work the Administration does not like. Accordingly, if Defendants are permitted to impose and enforce these certifications, Plaintiffs will be faced with an impossible choice: either they will lose access to federal funding that is critical to their ability to carry out their core missions, or they will open themselves to possible criminal investigation and the risk of massive civil liability under the FCA. Faced with this untenable choice, Plaintiffs seek summary judgment, vacatur of these new conditions, and a permanent injunction prohibiting Defendants from imposing or enforcing them.

There is no genuine dispute as to any material fact and Plaintiffs are entitled to judgment as a matter of law on each of their claims. The new funding conditions exceed the agency's statutory authority, in some instances outright conflict with multiple provisions of VAWA, and are arbitrary and capricious agency action that does not reflect reasoned decisionmaking. They are also unconstitutional several times over. They violate the Spending Clause and the separation of powers because Congress has exclusive power over federal funding, and Congress has not authorized the executive branch to adopt the conditions on VAWA funding that OVW seeks to impose. The requirements violate the Due Process Clause in their incredible vagueness, leaving grantees to guess as to how to comply with each requirement. At least two of the requirements violate the First Amendment by seeking to silence disfavored speech.

The undisputed record also establishes irreparable harm to Plaintiffs, their member organizations, and the survivors they serve. The people who stand to suffer most from DOJ's

unlawful conditions are the very individuals Congress sought to protect. The Court should grant summary judgment, vacate the challenged conditions, and permanently enjoin Defendants from imposing or enforcing them, allowing Plaintiffs to continue their critical work in accordance with Congress's directives.

**FACTUAL AND LEGAL BACKGROUND**

### A.  The Violence Against Women Act Creates Grant Programs To Prevent Domestic Violence and Sexual Assault and To Help Survivors

Congress enacted the Violence Against Women Act (VAWA) in 1994 to address "the escalating problem of violence against women." S. Rep. No. 103-138, at 37 (1993); Pub. L. No. 103-322, tit. IV, 108 Stat. 1796 (1994). Recognizing that crimes like "rape and family violence[] disproportionately burden[ed] women," S. Rep. No. 103-138, at 37, Congress determined that violence against women was not just a criminal issue, but a social-justice issue stemming from an "underlying attitude that [domestic and sexual] violence is somehow less serious than other crime." *Id.* at 38. Congress therefore sought to comprehensively address "not only the violent effects of the problem," but the causes behind it, like "blam[ing] women for the beatings and the rapes they suffer." *Id.* at 38, 42. The Act addresses these problems by providing new legal protections, creating education and prevention programs, increasing enforcement, and victims' access to legal assistance, and expanding services that help survivors recover. *See generally* Pub. L. No. 103-322, tit. IV.

Following multiple amendments and reauthorizations, VAWA addresses not only domestic violence and sexual assault, but also stalking, dating violence, and sex trafficking (collectively, "VAWA crimes"). *See* 34 U.S.C. §§ 10441(b), (d), 12451(a). The Act is not limited to addressing violence against women, but applies broadly—no matter the victim's gender identity. *See, e.g.*, *id.* §§ 10441(b)(19), 12291(b)(8).

3

VAWA is implemented through a host of grant programs that fund a broad range of activities, from strengthening effective law enforcement, to preventing domestic violence and sexual assault, to providing survivors with legal assistance, emergency shelter, counseling, and other support. *See, e.g.*, *id.* §§ 10441–10455, 12291–12514. Congress has regularly appropriated funds to serve those statutory purposes. *See, e.g.*, *id.* §§ 10441–10455, 12291–12514; Pub. L. No. 118-42, div. C, tit. II, 138 Stat. 25, 141–144 (Mar. 9, 2024) (2024 Appropriations Act); Pub. L. No. 119-4, § 1101(a)(2), 139 Stat. 9, 10 (Mar. 15, 2025) (extending the FY24 appropriations in the same amounts through FY25).

VAWA grant programs include formula and competitive grants. With formula grants, any applicant that meets specified statutory requirements receives an award in an amount determined by a statutory formula. *See, e.g.*, 34 U.S.C. §§ 10446(b)(2), (3), 12511(d)(3). VAWA's formula grants include grants to state domestic violence and sexual assault coalitions designated by the Department of Health and Human Services and Centers for Disease Control and Prevention, respectively, to coordinate victim services and support providers in their state (Coalition Grants). *See id.* § 10441(c).[1] For FY2025, appropriation levels and the statutory formulas meant that each domestic violence coalition received $113,574, each sexual assault coalition received $243,213, and each dual coalition received $356,787 in Coalition Grants. Declaration of Kirsten Faisal (Faisal Decl.) Ex. A.

For competitive grants, the Office on Violence Against Women (OVW) solicits applications through a notice of funding opportunity (NOFO) and then selects which applicants

---

[1] States generally have one domestic violence and one sexual assault coalition, although in some states a single organization serves as a "dual" coalition. DOJ, *State and Territory Coalitions: FY 2025 Domestic Violence and Sexual Assault Coalition Designations (updated May 13, 2025)*, https://perma.cc/8LNV-FGLY.

4

will receive awards and in what amounts. Many of these competitive grant programs are prescribed by statute. *See, e.g.*, 34 U.S.C. §§ 12341, 12351, 20121. These programs cover a range of activities—including helping victims with legal assistance or transitional housing, expanding access to sexual assault forensic exams, and improving the legal system's response to families with a history of VAWA crimes. *Id.* §§ 20121, 12351, 40723, 12464. State domestic violence and sexual assault coalitions can apply for competitive grants, in addition to receiving Coalition Grants. *Id.* § 10441(c)(3).

Throughout, the statute reflects a commitment to equity and inclusion in VAWA grant programs. The statute provides that "[n]o person … shall … be excluded from" a VAWA program on the basis of "race, color, religion, national origin, sex, gender identity … , sexual orientation, or disability." *Id.* § 12291(b)(13)(A). It also directs programs to populations who may be overlooked. For example, VAWA creates a grant program specifically for "underserved populations"—that is, those "populations who face barriers in accessing and using victim services," including because of their religion, sexual orientation, "gender identity," race or ethnicity, or "special needs" such as language barriers or "alienage status." *Id.* §§ 20123(a)(1), 12291(a)(46). One rural grant program expressly authorizes funding for "assistance in immigration matters" to victims in rural communities. *Id.* § 12341(b)(2). Another grant program supports "culturally specific services"—services "primarily directed toward racial and ethnic minority groups" that "include culturally relevant and linguistically specific" components. *Id.* §§ 20124(a)(1), 12291(a)(8)–(9). For some programs, Congress specifically authorized or even required grantees to partner with organizations serving racial or ethnic minorities or other specific underserved populations. *Id.* §§ 12463(c)(2)(B)–(C), (F); 12475(c)(2)(D). And, in still other cases, the statute expressly authorizes grants for programs that serve racial and ethnic

5

minorities, other specific underserved populations, or underserved populations generally—and, in some instances, requires DOJ to prioritize services for those groups in making awards. *See, e.g.*, *id.* §§ 12341(b)(2), (d)(4); 12351(a), (g)(2)(C)(ii); 12421(1)(A)(i), (1)(A)(iv), (2)(A)(iv), (3); 12451(b)(1), (b)(2)(E), (c)(1)(A); 12463(d)(3)(C); 12464(b)(5)(E); 12501(b)(3); 12514(c).

Congress spelled out various statutory conditions for OVW awards. These conditions define the scope of the programs and aim to ensure program effectiveness in addressing VAWA crimes. For example, all VAWA grantees may use grant funds "only for the specific purposes described" in the statute; must protect the privacy of people receiving services; and may not use grant funds for tort litigation, lobbying, or excessive expenditures on conferences. *Id.* § 12291(b)(2), (5), (9), (10), (15)(C); *see also, e.g.*, *id.* §§ 20121(b), 20123(h), 20124(g) (applying § 12291 conditions to other grant programs). For certain programs, the statute establishes eligibility requirements that ensure grantees have specified training or experience necessary to carry out the program effectively. *See, e.g.*, *id.* §§ 20121(d), 20123(b), 20124(c).

In some instances, the statute also requires applicants to certify that they comply with certain conditions. Those certification requirements vary, but all relate to VAWA's purposes. For instance, applicants for certain grants must certify that their providers have completed relevant training or have specified qualifications. *Id.* §§ 12464(d)(6), 20121(d). In some instances, applicants must certify that they do not have organizational policies requiring mediation or counseling where victims must be physically together with offenders. *Id.* § 20121(d). Other requirements include certifying that the grantee will coordinate with state coalitions and law enforcement, *id.* §§ 20121(d), 10446(c)(2); that federal funds will supplement, not supplant, non-federal funds, *id.* § 10446(c)(4); and that the grantee will use funds for permitted VAWA-crime-

6

related purposes, *id.* § 10446(c)(1); *see also id.* §§ 10450(a), 10454(3), 12464(d)(3) (imposing other certification requirements).

By statute, OVW within the Department of Justice has "sole jurisdiction" to administer VAWA grant programs. *See* 34 U.S.C. § 10442(a), (c). OVW is headed by a Director vested with "final authority over all grants … awarded by the Office." *Id.* at § 10442(b). The Director's authorities include the "development and management of grant programs," "the award and termination of grants," and "[e]stablishing such rules, regulations, guidelines, and procedures as are necessary to carry out any function of the office." *Id.* § 10444(5)(B), (5)(C), (8). Exercising this authority, since Fiscal Year 2011, OVW has included in each of its NOFOs "a non-exhaustive list of out-of-scope activities." Administrative Record (AR) 280–81 (Decl. of Ginger Baran Lyons ¶ 7). Those "out-of-scope" activities have historically aimed to ensure grantees use the funds "in line with the statutory purposes of the grant program" by alerting them to what OVW "cannot finance under the statute setting forth the grant program's scope." *Id.*

### B. Plaintiffs Rely on OVW Grants to Provide Essential Services

Plaintiffs are state coalitions that carry out VAWA's work through grants from OVW, and whose member organizations also receive OVW grants. Plaintiffs have served as their states' official coalitions for years and have consistently received and relied on Coalition Grants and other OVW funding to offer essential services within their states. Declaration of Brielyn Akins (Akins Decl.) ¶¶ 1–2, 4, 9–10; Declaration of Krista Colón (Colón Decl.) ¶¶ 1–2, 5, 10–12; Declaration of Dawn Dalton (Dalton Decl.) ¶¶ 1–2, 7, 10; Declaration of Kirsten Faisal (Faisal Decl.) ¶¶ 1–8, 14–16; Declaration of Carianne Fisher (Fisher Decl.) ¶¶ 1–2, 9, 11; Declaration of Susan Higginbotham (Higginbotham Decl.) ¶¶ 1–2, 10–13;  Declaration of David Lee (Lee Decl.) ¶¶ 1–2, 7–9; Declaration of Kelly Moe Litke (Litke Decl.) ¶¶ 1–2, 6–8; Declaration of Katie Kramer (Kramer Decl.) ¶¶ 1–5, 7–12; Declaration of Michelle McCormick (McCormick

Decl.) ¶¶ stk1–5, 8–13; Declaration of Monique Minkens (Minkens Decl.) ¶¶ 1–3, 8–12; Declaration of Keri Moran-Kuhn (Moran-Kuhn Decl.) ¶¶ 1–4, 7–12; Declaration of Tai Simpson-Bruce (Simpson-Bruce Decl.) ¶¶ 1–4, 6–9; Declaration of Lucy Rios (Rios Decl.) ¶¶ 1– 8, 14–17; Declaration of Jonathan Yglesias (Yglesias Decl.) ¶¶ 1–2, 7–9; Declaration of Hema Sarang-Sieminski (Sarang-Sieminski Decl.) ¶¶ 1–4, 11–14; Declaration of Kelsen Young (Young Decl.) ¶¶ 1–4, 9–14; Declaration of Jan Christiansen (Christiansen Decl.) ¶¶ 1–2, 7–16; Declaration of Sarah Robinson (Robinson Decl.) ¶¶ 2, 8-15; Declaration of Garland Stark (Stark Decl.) ¶¶ 2, 12–29; Declaration of Angelina Mercado (Mercado Decl.) ¶¶ 2, 8–9; Declaration of Laura Berry (Berry Decl.) ¶¶ 10–12; Declaration of Denise Higgins Bonifanti (Higgins Bonifanti Decl.) ¶¶ 6–8; Declaration of Jennifer Pollitt Hill (Pollitt Hill Decl. ¶¶ 5–7); Declaration of Judy Chen (Chen Decl.) ¶¶ 1–3, 7–9.

Coalitions provide vital information on the ways that domestic violence and sexual assault impact people within their states, including by tracking and communicating critical lethality trends to law enforcement and service providers. Higginbotham Decl. ¶ 12; Rios Decl. ¶ 17. Plaintiffs also use OVW grant funding to train service providers that seek to prevent sexual and domestic violence, helping them more effectively save lives and prevent violence in their communities. *See* Akins Decl. ¶ 9; Colón Decl. ¶¶ 4–5; Faisal Decl. ¶¶ 3, 6; Higginbotham Decl. ¶¶ 12–13; Rios Decl. ¶ 19; Yglesias Decl. ¶ 10; Christiansen Decl. ¶ 10; Robinson Decl. ¶ 10; Stark Decl. ¶ 14; Mercado Decl. ¶ 10; Berry Decl. ¶ 11. Many also serve important centralized functions like providing members with accreditation, thereby ensuring that survivors receive care from providers that meet established professional standards, or providing training required by state law. McCormick Decl. ¶ 4; Faisal Decl. ¶ 6. Some Coalitions also use OVW grants to provide direct services including 24/7 crisis hotlines, legal assistance, housing assistance, and

supervised visitation. Dalton Decl. ¶ 12–13; Lee Decl. ¶ 6; Rios Decl. ¶ 12; Yglesias Decl. ¶ 11; Christiansen Decl. ¶¶ 12–13; Robinson Decl. ¶¶ 11-12; Stark Decl. ¶ 26.

Member organizations respond to survivors in urgent need, such as by operating twenty-four-hour support and resource lifelines and providing counseling to help survivors of sexual assault heal. *See, e.g.,* Fisher Decl. ¶ 8; Faisal Decl. ¶¶ 11–12; Moran-Kuhn Decl. ¶¶ 5–6; McCormick Decl. ¶ 7; Berry Decl. ¶ 8–9. Member organizations work both to prevent violence and to provide services to survivors and their families, including by providing crisis intervention services like emergency shelter and medical advocacy, helping victims secure temporary housing while they locate permanent housing, and advocating for survivors who need help obtaining legal protection or medical care. *See, e.g.*, Akins Decl. ¶ 6; Yglesias Decl. ¶ 7; Higginbotham Decl. ¶ 9; Robinson Decl. ¶ 12; Stark Decl. ¶¶ 30–46; Higgins Bonifanti Decl. ¶ 13.

### C.  The Administration Leverages Federal Grant Funding to Advance the President's Ideological Vision and Expose Grantees to Massive Liability

Wholly disregarding the purposes of the myriad grant programs Congress has created, the current Administration has launched a far-reaching campaign to leverage federal grant funding to advance the Administration's own ideological and policy goals. President Trump set this campaign in motion through a series of executive orders targeting "diversity, equity, and inclusion" initiatives, so-called "gender ideology," and illegal immigration.

#### 1.  *Diversity, Equity, and Inclusion*

In his first days in office, President Trump issued multiple executive orders that broadly seek to eradicate "diversity, equity, and inclusion" (DEI) and "diversity, equity, inclusion, and accessibility" (DEIA) values and initiatives. One order directed agencies to terminate all DEI and DEIA offices, all "equity" programs, and all "equity-related" grants or contracts. Exec. Order No. 14151, § 2(b), 90 Fed. Reg. 8339 (Jan. 20, 2025). Another order, "Ending Illegal

Discrimination and Restoring Merit-Based Opportunity," aims to end purportedly "illegal" DEI and DEIA in the federal government and the private sector. Exec. Order No. 14173, §§ 3–4, 90 Fed. Reg. 8663 (Jan. 21, 2025) (Anti-DEI Order).

Without defining "DEI" or "DEIA," or explaining what might make such programs "illegal," the Anti-DEI Order makes clear that the Administration has a novel and extreme view that diversity, equity, and inclusion is often illegal. Among other things, the Order laments that "dangerous, demeaning, and immoral" DEIA or DEIA programs are widespread across the public and private sectors and revokes multiple diversity-related executive actions issued over the last half century. *Id.* at § 3.

Among other ways of advancing its goal, the Anti-DEI Order initiates a scheme to use the False Claims Act (FCA) as a weapon to stop federal funding recipients from engaging in diversity, equity, and inclusion activities. The Order requires agency heads to "include in every contract or grant award" a term requiring each counterparty or grant recipient (1) to "certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws" and (2) "to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code [the False Claims Act]." *Id.* § 3(iv)(B).

This certification would threaten federal funding recipients with considerable risk of burdensome, and potentially ruinous, FCA litigation and liability if they engage in diversity, equity, and inclusion activities that the Administration disfavors. The FCA makes it unlawful for anyone to "knowingly present[], or cause[] to be presented," to the government "a false or fraudulent claim for payment." 31 U.S.C. § 3729(a). For a misrepresentation to be actionable under the FCA, the plaintiff must show that it was "material to the Government's payment

10

decision"—a requirement the Supreme Court has emphasized is "rigorous" and "demanding." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181, 192, 194 (2016). Thus, the Anti-DEI Order seeks to make it easier to establish FCA liability by requiring grantees to concede upfront an essential, and otherwise demanding, element of an FCA claim. The Anti-DEI Order's certification, moreover, sweeps beyond what grantees do with their federal grant funding: Grantees must certify that they do not operate "*any* programs promoting DEI," no matter the source of funds. Anti-DEI Order § 3(iv)(B) (emphasis added).

If they are deemed not to comply with their certification, grantees face potentially massive liability, both civil and criminal. Civil liability under the FCA is so significant that the Supreme Court has described it as "essentially punitive in nature"—potential treble damages (meaning three times the amount of federal funds that the recipient received from the government in connection with the certifications) plus civil penalties of up to approximately $28,600 per false claim. *See Universal Health Servs.*, 579 U.S. at 182 (cleaned up); *see also* 28 C.F.R. § 85.5. Compounding the risks, the FCA authorizes not only DOJ to enforce the Act, but also any private citizen, who then receives a share of any resulting judgment or settlement. 31 U.S.C. § 3730. Liability can be criminal, too: The government can seek up to five years imprisonment for those who knowingly make a "false, fictitious, or fraudulent" claim to any agency in seeking funds. 18 U.S.C. § 287.

Following the Anti-DEI Order, DOJ has tripled down on leveraging the FCA to combat diversity, equity, and inclusion. On May 19, 2025, Deputy Attorney General Todd Blanche announced the formation of a new task force, called the "Civil Rights Fraud Initiative," which will use the False Claims Act as a "weapon" against federal funding recipients. Letter from Todd Blanche, Deputy Att'y Gen., to DOJ Offices, Divisions, and U.S. Attorneys (May 19, 2025)

https://perma.cc/3W6K-FGHA (Blanche Memo). The Blanche Memo specifically focuses on funding recipients that engage in DEI activities as targets for potential investigation and enforcement actions. *Id.* The memo also "strongly encourages" private parties to file suits under the FCA's *qui tam* provision, and encourages the public to report information about "discrimination by federal-funding recipients" to DOJ. *Id.* And it states that the new initiative will engage the DOJ's Criminal Division. The Blanche Memo does not explain when DEI would be considered "illegal," but a press release announcing the Initiative broadly warns institutions not to "promote divisive DEI policies." U.S. DOJ, *Justice Department Establishes Civil Rights Fraud Initiative* (May 19, 2025), https://perma.cc/ZS6R-B8E9.

Further confirming the Administration's plans to aggressively use the FCA to, in DOJ's words, "advance the Administration's policy objectives," a June 11 memo announcing the DOJ Civil Division's enforcement priorities lists using the FCA to combat "illegal private-sector DEI" as the very first priority. Mem. From Ass't Att'y Gen., Brett A. Shumate, to Civil Division Employees, *Civil Division Enforcement Priorities* (June 11, 2025), https://perma.cc/SV3A-NE9F.

At the same time, the Administration has denounced "DEI" generally while doing little to clarify when it will consider "DEI" to be unlawful—making it risky for grantees to do *anything* reflecting diversity, equity, and inclusion values. The Anti-DEI Order itself gives cause to fear that the Administration will deem anything involving diversity, equity, or inclusion to be illegal: In the name of eradicating "illegal" DEI, it directs agencies to stop "[p]romoting 'diversity,'" to "[e]xcise references to DEI and DEI principles," and to "terminate all 'diversity,' 'equity,'" and similar activities. Anti-DEI Order §§ 3(b)(ii)(A), 3(c)(ii), 3(c)(iii). A February 5 letter from Attorney General Bondi to all DOJ employees similarly announced that DOJ intends to

12

aggressively "investigate, eliminate, and penalize" "illegal DEI and DEIA," but without defining "DEI" or "DEIA" or explaining what makes a DEI or DEI program illegal. Mem. from Att'y Gen. Pam Bondi, Ending Illegal DEI and DEIA Discrimination and Preferences (Feb. 5, 2025), https://perma.cc/KH9Y-A2VQ.

A separate memo that the Attorney General issued the same day suggests that even talking about DEI or DEIA can be unlawful in Defendants' view. To "implement th[e President's] directive" to eliminate DEI and DEIA activities that (in the Attorney General's words) "violate … Federal civil-rights laws," the Attorney General instructed staff to "pay particular attention to ending reference to DEI or DEIA" in programs, including "references to 'unconscious bias,' 'cultural sensitivity,' [and] 'inclusive leadership.'" Off. of the Atty. Gen., *Memorandum for All Department of Justice Employees: Eliminating Internal Discriminatory Practices* at 1–3 (Feb. 5, 2025), https://perma.cc/24KA-GFJ6 (AR67–69). As the OVW head later explained to OVW staff, this "memo is clear that this applies to grants," so OVW staff should make sure grantees' materials do not use those specifically forbidden terms. AR 67.

The Attorney General has since issued a memo purporting to provide "guidance for recipients of federal funding regarding unlawful discrimination," but it does little to provide clarity. Mem. from Att'y Gen. Pam Bondi, *Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination* (July 29, 2025), https://perma.cc/T4B4-QTYH (Bondi Discrimination Memo). The memo lists DEI activities and other practices that DOJ cautions would "risk" violating antidiscrimination laws and "recommend[s]" that funding recipients avoid. *Id.* at 1–2, 4–8. But the memo notes that its list is "non-exhaustive," *id.* at 4, and in any event the listed examples provide no guidance for most of the activities that Plaintiffs and their members must undertake (or avoid) in carrying out their grants. And even for the examples

13

provided, the memo confirms that the Administration has a new, expansive, and unsupported view of when "DEI" is (or might be) illegal—warning against conduct like talking about "toxic masculinity," considering "cultural competence," and creating (non-exclusive) "safe spaces" for people of certain demographics. *See id.* at 5, 6, 8.

### 2. *"Gender Ideology"*

On January 30, the President issued the "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" Executive Order ("Gender Ideology" Order), which takes aim at transgender people and their rights. Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) (signed Jan. 20, 2025) (AR10–13). That Order announces that "the policy of the United States" is "to recognize two sexes, male and female," that are "not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. To advance this policy, it promises to exclude transgender people from single-sex spaces and activities that align with their gender identity. *Id.* §§ 1, 4. It also decries "the erasure of sex" in both "policy" and "language," and it commits to using what the Administration considers "accurate language and policies that recognize women are biologically female, and men are biologically male." *Id.* § 1. As part of its campaign to deny the very existence of transgender people, the Order, among other things, requires each agency to "ensure grant funds do not promote gender ideology." *Id.* § 3(g). The Order defines "gender ideology" as a "false" ideology that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity." *Id.* § 2(f).

The Administration has since made clear that, in its view, even so much as acknowledging a person's gender identity "promotes gender ideology" and must be stopped. In a memo that quickly followed the "Gender Ideology" Executive Order, the Office of Personnel

Management (OPM) instructed all federal agencies on how to implement the Order's command to "end federal funding of gender ideology." Initial Guidance Regarding President Trump's Executive Order Defending Women, OPM, https://perma.cc/9YUS-MZKV at 1 (Jan. 29, 2025) (AR26) (capitalization altered). The memo identified various activities that the Administration deems to "promote or reflect gender ideology" and that agencies accordingly should "take prompt actions to end." *Id.* Those actions include not just ensuring that access to intimate single-sex spaces is governed "by biological sex and not gender identity," but also turning off email features "that prompt users for their pronouns"; ensuring that forms that require entry of an individual's sex "list male or female only, and not gender identity"; and ensuring that all documents "use the term 'sex' and not 'gender.'" *Id.* at 1–2 (AR26–27). DOJ has likewise confirmed that it, too, will not tolerate even mere recognition of gender identity: In an August memo on "Implementing [the 'Gender Ideology'] Executive Order," DOJ forbade all DOJ employees from including "preferred pronouns" in their email signature blocks, as that is "at odds with announced administration policies." Ken Dilanian, (@KDilanianMSNOW), X (Aug. 15, 2025, 12:34 PM) https://perma.cc/2K33-JPK9.

### 3. *Immigration*

The Administration has also set out to end illegal immigration through unilateral action without the involvement of Congress. On day one, the President issued an executive order entitled "Protecting the American People from Invasion," which, among many other things, directed federal agencies to review all grants to organizations that "directly or indirectly" provide services to "removable or illegal aliens" to ensure "that they do not promote or facilitate violations of our immigration laws." Exec. Order No. 14159 § 19(a), 90 Fed. Reg. 8443, 8447 (Jan. 29, 2025) (issued Jan. 20, 2025) (AR8). The "Invasion" Executive Order does not explain

when the Administration will deem providing services to undocumented immigrants to "promote or facilitate" immigration law violations, but other statements from the President suggest that providing undocumented immigrants any "taxpayer-funded" support will be deemed to "encourage[] … illegal immigration." The White House, *Fact Sheet: President Donald J. Trump Prevents Illegal Aliens from Obtaining Social Security Act Benefits* (Apr. 15, 2025), https://perma.cc/CW6B-SLL9; *see also* Exec. Order No. 14332 § 1, 90 Fed. Reg. 38929, 38929 (Aug. 7, 2025) (stating that "[t]axpayer-funded grants" to "organizations that provided free services to illegal immigrants" have "worsen[ed] the border crisis").

DOJ has suggested as much as well. In a memo issued shortly after the "Invasion" Executive Order, Attorney General Bondi instructed DOJ grant-making components to collect information on whether grant funds "resulted in the provision of any funds or services to removable or illegal aliens" and whether they "promoted or facilitated the violation of Federal immigration laws." AR61. The memo required existing grantees to certify that they would not use remaining grant funds "to promote or facilitate the violation of Federal immigration law" (without providing any guidance on what would count). AR61. But, for future grants, the memo makes clear that DOJ will no longer tolerate grantees providing *any* services to undocumented immigrants: It states that, effective immediately, and "consistent with law," DOJ will not make any new grants to organizations "that support or provide services, either directly or indirectly …, to removable or illegal aliens." AR61–62.

### D.  DOJ's Office on Violence Against Women Imposes New Conditions on Grants

OVW promptly took action to implement the new Administration's directives. In the first week of February, it withdrew its open NOFOs so it could conform them to the Administration's agenda. *See* AR65. It eventually adopted a host of new funding conditions (collectively, New

16

Conditions), including certification requirements, each of which independently exposes VAWA funding recipients to risk of FCA liability. *See* AR199–239, AR121–132.

### 1. *General Anti-DEI Certification*

OVW amended its General Terms and Conditions to include the Anti-DEI Certification that the Anti-DEI Order directed all federal agencies to impose to expose grantees to False Claims Act liability in relation to "DEI" activities. In particular, the updated General Terms and Conditions now include a requirement that each grantee certify: (1) that it "does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable federal civil rights or nondiscrimination laws" and (2) that "[t]he recipient agrees that its compliance with all applicable federal civil rights and nondiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for purposes of the False Claims Act" (General Anti-DEI Certification). *See* U.S. DOJ, OVW, *FY25 General Terms and Conditions* § 15, https://perma.cc/FR3E-FB3H (General Terms and Conditions) (AR124–125). Grantees must agree to this certification upon accepting any OVW award. *See* Fisher Decl. ¶ 19.

The General Terms and Conditions also require Plaintiffs to certify that the conditions it contains, as well as any other assurances or certifications the recipient submits, "are material requirements of the award"; that OVW may withhold award funds, disallow costs, or suspend or terminate the award as a result of failure to comply with them; and that any "materially false" statements to the government in connection with the award may result in criminal prosecution, civil penalties, or other remedies for false claims. General Terms and Conditions § 1 (AR121).

## 2. *"Out-of-Scope" Conditions*

OVW also adopted a new NOFO template that includes a newly expanded list of "out-of-scope" activities that grantees may not engage in with grant funds. The new template requires applicants to certify, both upon applying for a grant and again when they accept an award, that they will not use grant funds on those "out-of-scope" activities. AR212, 222. Although prior NOFOs listed some out-of-scope activities—conditions that clarified the scope of the grant program, for example by noting that grant funds could not be used for curriculum development or criminal defense—prior NOFOs did not previously require grantees to expressly certify compliance. Akins Decl. ¶ 19.

As relevant to Plaintiffs' claims here, those new "out-of-scope" activities include several conditions that evidently derive from executive orders on DEI, gender ideology, and immigration. In particular, the template forbids using grant funds:

- To "[p]romot[e] or facilitat[e] discriminatory programs or ideology, including illegal DEI and "'diversity, equity, inclusion, and accessibility' programs that do not advance the policy of equal dignity and respect, as described in [the Anti-DEI Order]" (Anti-DEI Condition). The template states that "[t]his prohibition is not intended to interfere with any of OVW's statutory obligations, such as funding for HBCUs, culturally specific services, and disability programs," but does not identify with specificity what grantees are and are not permitted to do. *Id.*

- To "[i]nculcat[e] or promot[e] gender ideology as defined in [the "Gender Ideology"] Executive Order" ("Gender Ideology" Condition);

- To "[p]romot[e] or facilitate[e] the violation of federal immigration law" (Immigration Enforcement Condition);

18

- On "[p]rograms that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women" (Law Enforcement and Immigration Enforcement Condition);

- On "[i]nitiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support" (Immigration Priority Condition);

- On "[a]ny activity or program that unlawfully violates an Executive Order" (EO Condition). *Id.*

AR212, 222.

The template also imposes two additional new conditions that do not obviously stem from any executive order. In particular, it bars:

- "Activities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses (e.g., prioritizing criminal justice reform or social justice theories over victim safety and offender accountability)" (Systemic Framing Condition); and

- "Awareness campaigns or media that do not lead to tangible improvements in prevention, victim safety, or offender accountability" (Awareness Campaigns Condition).

AR212, 222.

The template notes that "[r]ecipients should serve all eligible victims as required by statute, regulation, or award condition." AR212; *see also* AR222. But it does not provide guidance on how to reconcile the conditions with such statutory or other requirements. *See id.* at 212, 222.

19

OVW did not publicly explain the basis for the New Conditions or how they relate to any requirement under VAWA or the statutory criteria for awards under any grant program. And, aside from an after-the-fact declaration prepared to defend against this litigation, the administrative record addresses the reasons for adopting only two of the conditions—and only barely. In particular, in a February 12 memo to the Attorney General's Chief of Staff seeking approval to release NOFOs, the acting head of OVW proposed to add the "Gender Ideology" Condition and the Immigration Enforcement Condition, and the related certification. AR63–64. The memo stated that OVW proposed to impose those two conditions in order to "implement applicable executive orders and Attorney General memoranda" and "ensure that our grantees align their grant-funded activities with federal laws regarding public safety, civil rights, and immigration." AR64. The memo does not reflect that OVW considered the impact these conditions would have on programs' effectiveness, the difficulty grantees would have in understanding the conditions, the chilling effect these conditions would have on legitimate activities, or grantees' and survivors' reliance interests. As for the other six challenged "out-of-scope" conditions, neither that memo, nor any other document in the record, provides even a barebones explanation of the reasons for adopting them.[2]

The administrative record likewise provides scant insight into the meaning of the conditions or what grantees must do to comply. The only information that goes beyond the text

---

[2]

 The administrative record does not say, but OVW may have added the other conditions at the prompting of DOJ's leadership. OVW's February 12 memo proposed adding two new "out-of-scope" activities and sought approval "as soon as possible" given that "further delaying NOFO releases will jeopardize" OVW's ability to timely issue grants. AR63. The administrative record does not reveal whether or when DOJ leadership granted the requested approval. But OVW did not actually issue any NOFOs until mid-May, and those NOFOs contained more than just the two new "out-of-scope" activities that the February 12 memo proposed, suggesting that leadership may have provided some additional instructions in the intervening three months.

of the conditions themselves is an internal talking points document for OVW staff to use in answering applicants' questions about the new "out-of-scope" activities. AR87–89. That document does not provide any official agency interpretation or guidance: It is prominently marked "PRE-DECISIONAL" and "DO NOT SHARE," and OVW employees were expressly forbidden from forwarding it and could only cut and paste or relay information from it over the phone. AR87. The unofficial information in that document, moreover, provides little clarity. For instance, it states that the prohibition on "promoting or facilitating the violation of federal immigration laws" (the Immigration Enforcement Condition) "means what it says" and that the E.O. Condition "means that recipients must not break the law." AR87, 89. For the Awareness Campaigns condition, the talking points "encourage[]" grantees "to determine on their own" whether their projects satisfy the condition and state that, while grantees can "bring questions to OVW," they "should be prepared to make judgment calls, without explicit guidance from OVW," about whether their activities comply. AR89.

Other talking points likewise leave critical questions unanswered. For example, for the "Gender Ideology" Condition, the talking points nowhere explain what will be deemed to "inculcate or promote 'gender ideology'"—and whether, for example, grantees would violate the condition if they simply acknowledged victims' gender identity by using preferred pronouns or otherwise, or if they provided trainings on how to effectively serve transgender and nonbinary victims. *See* AR87. Similarly, the talking points on the Law Enforcement and Immigration Enforcement Condition do not explain what will be deemed to "discourage" cooperation with law enforcement—and whether, for example, grantees can inform victims about potential downsides of involving law enforcement, which in some jurisdictions could expose victims to risk of prosecution if they later returned to living with their abuser. *See* AR88–89; *see also* Faisal

Decl. ¶ 34 (describing how a victim who petitions for a protective order can be found guilty of aiding and abetting the violation of that protective order if they reunite with their abuser).

Even in the few cases where the talking points do provide some limited additional explanation, they offer no assurance on which grantees can safely rely. The talking points do not suggest, for example, that DOJ components that enforce the FCA (whether through the new "Civil Rights Fraud Initiative" or otherwise) have agreed with the interpretation, or that DOJ would block private *qui tam* relators from bringing claims based on a different view.

OVW began issuing NOFOs that conformed to the new template in May 2025. Young Decl. ¶ 19. And on June 12, 2025, OVW formally announced that all applicants would be required to submit a letter certifying that grant funds will not be used for the out-of-scope activities listed in the Certification Regarding Out-of-Scope Activities section of the notice of funding opportunity." *See* U.S. DOJ, OVW, *Open Notices of Funding Opportunity*, https://perma.cc/XR9P-GA49. OVW also required applicants to already-closed NOFOs to submit a certification that they will abide by the "Out-of-Scope" Conditions in order to be considered for previously submitted grant applications. Rios Decl. ¶¶ 28–29; Rios Decl. Ex. A–C. And it has begun making grant awards incorporating the template NOFO's out-of-scope conditions. Akins Decl. ¶ 10.

### E.  The Conditions Harm Plaintiffs

The New Conditions put Plaintiffs and their members in an impossible position. If they decline OVW grants, Plaintiffs and their members will lose out on funding that in some cases comprise a large percentage of their operating budgets, and that they have used for mission-critical work, including for services that they have long promised and offered to victims and survivors for safety and protection.

22

For Plaintiffs, the Coalition Grant formula funds amount to hundreds of thousands of dollars in coalitions' annual budgets. Losing these funds would require coalitions to make staffing cuts that would threaten their ability to operate their programs. Akins Decl. ¶ 31; Colón Decl. ¶ 29–30; Dalton Decl. ¶ 27; Fisher Decl. ¶ 29; Litke Decl. ¶ 33; Kramer Decl. ¶ 12; McCormick Decl. ¶¶ 15, 31–32; Moran-Kuhn Decl. ¶ 29; Simpson-Bruce Decl. ¶¶ 25–26; Rios Decl. ¶ 46; Young Decl. ¶ 33; Christiansen Decl. ¶¶ 32, 35; Robinson Decl. ¶¶ 13–14, 37; Stark Decl. ¶¶ 69–71; Mercado Decl. ¶¶ 13, 26–27; Chen Decl. ¶ 28. Forgoing OVW Grant funds would also harm Plaintiffs' members, who would no longer be able to provide the same level of assistance, advocacy, and intervention work on which victims of VAWA crimes rely. *See, e.g.*, Yglesias Decl. ¶ 30; Akins Decl. ¶¶ 27, 28. These losses would be borne most significantly by the thousands of domestic violence and sexual assault victims and their children who will lose access to critical, life-saving support. *See, e.g.*, Simpson-Bruce Decl. ¶ 29; Yglesias Decl. ¶¶ 36–38; Young Decl. ¶¶ 35–37; Kramer Decl. ¶ 32; Christiansen Decl. ¶ 39; Robinson Decl. ¶¶ 40–43; Mercado Decl. ¶ 30; Higgins Bonifanti Decl. ¶ 28–31.

But if Plaintiffs and their members make the required certifications, they fear immediately exposing their organizations to substantial legal and financial risk, including threatened penalties under the False Claims Act and under various criminal laws, which could jeopardize their ability to provide any services at all. 31 U.S.C. § 3729(a) (FCA treble damages); 28 C.F.R. § 85.5(a) (FCA civil penalties); *see also* General Terms and Conditions § 1 (listing statutes under which grantees could face "criminal prosecution"); *see, e.g.*, Colón Decl. ¶ 27; Faisal Decl. ¶ 35; Fisher Decl. ¶ 27; Young Decl. ¶ 26; Christiansen Decl. ¶ 22; Stark Decl. ¶ 52; Higgins Bonifanti Decl. ¶ 16; Berry Decl. ¶ 23. Making Plaintiffs' position even more untenable, they are left uncertain how to navigate the conflict between the challenged conditions and

23

VAWA provisions, including VAWA's prohibition on discrimination based on "gender identity" and its various mandates to focus on underserved populations. *See, e.g.*, Dalton Decl. ¶ 22; Litke Decl. ¶ 25; Young Decl. ¶ 23.

Before the parties brought suit, Plaintiffs' members had to make these difficult choices for NOFOs whose deadlines were closing: Some members applied, but noted their objections to the conditions, which OVW rejected. *See* Rios Decl. ¶¶ 31–34. Others applied and made the required certification despite serious concerns about how they would be able to comply with the conditions without compromising their core missions and VAWA's requirements. *See, e.g.*, Dalton Decl. ¶ 12. Still others chose to forgo applying because of their concerns that they could not comply with the conditions, losing out on funds critical to their organizations' operations. Dalton Decl. ¶ 13; Moran-Kuhn Decl. ¶ 15; Sarang-Sieminski Decl. ¶ 19.

The original parties in this case entered a stipulation that allowed Plaintiffs to apply for OVW grants without submitting a certification until August 12th. Dkt. No. 14.[3] The Court subsequently granted in part Plaintiffs' motion for preliminary relief on August 8th, entering a stay of the conditions pursuant to APA Section 705. *RICADV v. Bondi*, No. 25-cv-279, 2025 WL 2271867 (D.R.I. Aug. 8, 2025). Each Coalition applied for, and was ultimately awarded, the Coalition Grant. Akins Decl. ¶ 10; Colon Decl. ¶ 13; Dalton Decl. ¶ 11; Faisal Decl. ¶ 17; Fisher Decl. ¶ 11; Higginbotham Decl. ¶ 11; Kramer Decl. ¶ 10; Litke Decl. ¶ 12; Lee Decl. ¶ 12; McCormick Decl. ¶ 10; Moran-Kuhn Decl. ¶ 10; Rios Decl. ¶ 14; Sarang-Sieminski Decl. ¶ 16; Simpson-Bruce Decl. ¶ 10; Yglesias Decl. ¶ 12; Young Decl. ¶ 12; Christiansen Decl. ¶ 8; Robinson Decl. ¶ 9; Stark Decl. ¶ 13; Mercado Decl. ¶ 9; Higgins Bonifanti Decl. ¶ 7; Berry Decl. ¶ 12; Pollitt Hill Decl. ¶ 6; Chen Decl. ¶ 10. Plaintiffs and their members also applied to

---

[3] Plaintiffs added by the Amended Complaint submitted the certifications required to apply to OVW grants.

various OVW grants, including Legal Assistance for Victims grants, Transitional Housing grants, Rural grants, Sexual Assault and Forensic Exam grants, and more. *See, e.g.*, Akins Decl. ¶ 15; Lee Decl. ¶ 16; Rios Decl. ¶¶ 23–24; Dalton Decl. ¶ 14; Stark Decl. ¶¶ 20, 25, 39, 41. OVW has issued awards to Plaintiffs and their members for some, but not all, of these grant programs. *See, e.g.*, Akins Decl. ¶ 17.

Pursuant to the Court's Section 705 stay, OVW has treated the New Conditions in any awards as nonenforceable. U.S. DOJ, OVW, *FY 2025 General Terms and Conditions*, § 42 (updated Sept. 26, 2025), https://perma.cc/P5ZH-TLTL. However, OVW has also made clear that it will modify the awards to impose the New Conditions if the stay is lifted. *Id.* Accordingly, without permanent relief precluding Defendants from imposing these conditions on OVW grants and funding opportunities, Plaintiffs and their members will be forced again to make the untenable choice between refusing grant funds and complying with the conditions.

### F.  Procedural History

On June 16, Plaintiffs brought this action challenging Defendants' decision to place unlawful conditions on all future grants issued under the Violence Against Women Act. *See* Dkt. No. 1. Soon thereafter, the parties filed a joint stipulation allowing Plaintiffs and their members to apply for OVW grants without making the otherwise-required certifications to those conditions through August 12. Dkt. No. 14. On June 26, Plaintiffs filed a Motion for Preliminary Injunction and for Relief under 5 U.S.C. § 705, Dkt. No. 15, which this Court granted in part and denied in part on August 8, Dkt. No. 34, finding that Defendants acted arbitrarily and capriciously under the APA and that Plaintiffs would suffer irreparable harm absent preliminary relief. The Court accordingly granted Plaintiffs' motion for a Section 705 preliminary stay and,

reasoning that the stay provided Plaintiffs complete relief, denied Plaintiffs' motion for preliminary injunction. *Id.*

## LEGAL STANDARD

Summary judgment "is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78, 83 (1st Cir. 2022) (quotations omitted). "On cross-motions for summary judgment, each motion is reviewed separately, drawing facts and inferences in favor of the non-moving party." *Scottsdale Ins. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69, 72 (1st Cir. 2020).

For APA claims, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" violates the APA. *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016).

## ARGUMENT

**I.      Plaintiffs Are Entitled to Summary Judgment on their Claims**

### A.  The Court Has Jurisdiction

Defendants will likely argue that the Tucker Act strips this Court of jurisdiction, but that argument would be just as erroneous today as it was at the preliminary injunction stage. As this Court recently held in a similar grant conditions case, the Tucker Act analysis in a challenge to grant conditions is straightforward, because Plaintiffs "challenge the validity of [an agency's] promulgated conditions under the APA and the Constitution, not a termination decision sounding in contract or seeking monetary relief." *Illinois v. Fed. Emergency Mgmt. Agency*, No. CV 25-206 WES, 2025 WL 2716277, at *9 (D.R.I. Sept. 24, 2025). That distinguishes this case from "[t]he recent decisions from the Supreme Court regarding grants," which "have arisen in the specific context of grant terminations and damages claims that fall within the Tucker Act

framework, not the promulgation of grant conditions that govern eligibility for future funding." *Id.* As Judge DuBose concluded in another recent conditions case, "the Supreme Court's shadow docket orders in *NIH* and *Dep't of Educ. . . .* dealt with grant terminations, not grant conditions," and unlike in termination cases, Plaintiffs seeking to block proposed conditions "are not seeking to enforce a contract to obtain payment of money." *R.I. Coal. Against Domestic Violence v. Kennedy*, No. 25-CV-342, 2025 WL 2899764, at *4 (D.R.I. Oct. 10, 2025) (referencing *Nat'l Inst. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) and *Dep't of Educ. v. California*, 604 U.S. 650 (2025)).

Indeed, the Tucker Act could not strip this Court of jurisdiction over Plaintiffs' grant conditions claims for at least five reasons. First, Plaintiffs could not file suit in the Court of Federal Claims. For the Court of Federal Claims to have jurisdiction under 28 U.S.C. § 1491(a)(1), a plaintiff must have "a money-mandating source on which to base his cause of action," meaning a source of law that entitles the plaintiff to a particular amount of money. *See Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005). "A breach of contract claim against the Government is a money-mandating source," and thus Plaintiffs in a contractual relationship with the government may bring breach of contract claims—but only breach of contract claims—in the Court of Federal Claims. *See Turping v. United States*, 134 Fed. Cl. 293, 306 (2017) (citing *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011)).

With grant *terminations*, a grantee may sue in the Court of Federal Claims because an unlawful grant termination can equate to a breach of contract. Justice Kavanaugh wrote in the recent NIH case, for instance, that if "[t]he core of plaintiffs' suit alleges that the Government unlawfully terminated their grants," "[t]hat is a breach of contract claim." *NIH*, 145 S. Ct. at 2665 (2025) (Kavanaugh, J., concurring in part and dissenting in part). In contrast, where the

government has not terminated a contract, and the question is only whether the government may impose or add conditions, there is no possible claim for "breach of contract." Black's Law Dictionary (12th ed. 2024) (defining "Breach of Contract" as "[v]iolation of a contractual obligation"). Plaintiffs thus would have no money-mandating source of law to bring suit in the Court of Federal Claims, and courts have "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Cmty. Legal Servs. in E. Palo Alto v. Dep't of Health & Hum. Servs.*, 137 F.4th 932, 939 (9th Cir. 2025) (quoting *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006)).

Second, for Plaintiffs who had not entered any grant agreement at the time of filing suit, or even still have not today, Plaintiffs' claims cannot possibly be subject to the Tucker Act because there is no "actual contract" underlying the claim, which is a prerequisite for the Tucker Act to apply. *Hatzlachh Supply Co., Inc. v. United States*, 444 U.S. 460, 465 n.5 (1980). As this Court recognized in its prior decision in this case, Plaintiffs' claims cannot be "founded . . . upon any express or implied contract with the United States," 28 U.S.C. § 1491(a)(1), if there was (or is) no contract upon which the claims could be "founded." *RICADV v. Bondi*, 2025 WL 2271867, at *5. And for this reason, "success on" Plaintiffs' claims would not "require enforcement of any contractual obligation to pay money." *Id.* The court would not be ordering OVW to contract with Plaintiffs at all; any payments OVW makes would be based on OVW's independent decision to award Plaintiffs a grant.

Third, Plaintiffs' claims include challenges to OVW's across-the-board *policy* of adding the conditions to NOFOs and imposing the conditions in all OVW grant agreements. In *NIH*, the Supreme Court made clear that grantees *can* bring APA claims in district court against agency

"policies related to grants." 145 S. Ct. at 2661 (Barrett, J., concurring); *id.* at 2663 (Roberts, C.J.) (concurring in part and dissenting in part) (vacating a grants policy, which "has prospective and generally applicable implications beyond the reinstatement of specific grants," and "falls well within the scope of the District Court's jurisdiction under the Administrative Procedure Act"). Several district courts since *NIH* have thus held that grantees may bring APA challenges to grant policies and to the prospective implementation of those policies. *See, e.g.*, *Ass'n of Am. Univs. v. Dep't of Defense*, No. CV 25-11740-BEM, 2025 WL 2899765, at *3 (D. Mass. Oct. 10, 2025); *Planned Parenthood of Greater N.Y. v. Dep't of Health and Human Servs.*, No. CV 25-2453, 2025 WL 2840318, at *13 (D.D.C. Oct. 7, 2025). Here, as in NIH and these other cases, this Court has jurisdiction under the APA to vacate OVW's policy of imposing the challenged conditions, and to preclude the implementing of this policy prospectively, including with respect to Plaintiffs' applications and awards.

Finally, the Tucker Act cannot preclude this Court's jurisdiction over Plaintiffs' constitutional claims brought outside the APA. In both *NIH* and *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025), the claims at issue were solely arbitrary-and-capricious claims under the APA, and the sole basis for the Court's decisions was that the Tucker Act's waiver of sovereign immunity for damages claims impliedly precluded the APA's "limited waiver of sovereign immunity" from applying. *NIH*, 145 S. Ct. at 1 (quoting *California*, 145 S. Ct. at 968) (Barrett, J. concurring) (cleaned up). But with constitutional claims to enjoin federal officials, it is well settled that "sovereign immunity does not apply." *Strickland v. United States*, 32 F.4th 311, 363 (4th Cir. 2022); *accord Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996). The sole basis for the Supreme Court's decisions—sovereign immunity—thus is no barrier to Plaintiffs' freestanding constitutional claims here.

Even more fundamentally, this Court must have jurisdiction over Plaintiffs' constitutional claims because these claims could not be brought in the Court of Federal Claims. In *Webster v. Doe*, 486 U.S. 592 (1988), the Supreme Court imposed a clear-statement rule where the government argues that a statute deprives a party of any forum to assert a constitutional claim, "to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.* at 603. Here, Plaintiffs could not assert any of their constitutional claims under the First Amendment, the Due Process Clause, or the separation of powers in the Court of Federal Claims. *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995). And the Tucker Act does not contain the clear statement on stripping jurisdiction over constitutional claims that *Webster* requires. Several courts have thus held since NIH that they maintained jurisdiction over constitutional claims, even where (unlike here) the claims challenged grant terminations. *See Climate United Fund v. Citibank, N.A.*, No. 25-5122, 2025 WL 2502881, at *1 (D.C. Cir. Sept. 2, 2025); *Thakur v. Trump*, No. 25-CV-04737-RFL, 2025 WL 2696424, at *10 (N.D. Cal. Sept. 22, 2025); *Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*, No. 25-CV-1923 (JMC), 2025 WL 2615054, at *13 (D.D.C. Sept. 10, 2025); *President & Fellows of Harvard Coll. v. Dep't of Health & Hum. Servs.*, No. 25-CV-10910-ADB, 2025 WL 2528380, at *13 (D. Mass. Sept. 3, 2025).

Finally, this Court need not apply the two-part test from *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) given that the Tucker Act categorically cannot strip jurisdiction in this case for the reasons stated above, but even if the test were applied, it would clearly point toward jurisdiction here. As evidenced by the fact that nearly all Plaintiffs did not have a contract when bringing their claims (and those claims have not changed), contracts are not the source of Plaintiffs' rights; rather, the rights asserted are grounded in the relevant statutory constitutional

30

provisions. *See RICADV v. Kennedy*, 2025 WL 2899764, at *3–4. "Nor would success on their claims require enforcement of any contractual obligation to pay money," at this Court previously recognized. *See RICADV v. Bondi*, 2025 WL 2271867, at *5.

In short, for multiple independent reasons, this Court has jurisdiction over Plaintiffs' challenge to the grant conditions that OVW seeks to impose.

### B.   The Salerno *Standard Does Not Preclude Plaintiffs' Facial Challenges*

In its prior opinion, the Court suggested that the so-called "*Salerno* standard" for facial challenges might preclude some of Plaintiffs' claims. *Id.* at *7–8. That standard, if it applied, would require a plaintiff mounting a facial challenge to "establish that no set of circumstances exists under which the [challenged law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). But that is not the governing standard, and Plaintiffs would prevail under a proper application of that standard even if it were the right one.

As this Court implicitly recognized in its prior decision, there is only one standard for addressing arbitrary-and-capricious claims, which is whether the agency met the APA's requirements for reasoned decisionmaking, including by providing a reasoned explanation, considering all important aspects of the problem, acknowledging a change in position, addressing reliance interests, and so on. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The "no-set-of-circumstances" standard self-evidently does not apply to arbitrary-and-capricious claims, which are not based on any applications of the agency action, but rather on the agency's considerations and reasoning for taking the action as reflected in the administrative record.

*Salerno*'s test likewise does not apply to APA claims that an agency action exceeded the agency's statutory authority or is contrary to law. As another court put it, "if the no-set-of-circumstances test applied to APA challenges, it would gut the APA causes of action of their

power, rendering them useless." *Ohio Coal Ass'n v. Perez*, 192 F. Supp. 3d 882, 904 (S.D. Ohio 2016). To be sure, two earlier Supreme Court cases state—in dicta—that *Salerno*'s no-set-of-circumstances test applies to APA challenges to agency action. *Reno v. Flores*, 507 U.S. 292, 301 (1993); *INS v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 188 (1991). But that dicta is not controlling—and, indeed, just this year, the Supreme Court treated the applicable standard as unsettled. *See Bondi v. VanDerStok*, 604 U.S. 458, 467 & n.2 (2025) ("leav[ing] further analysis of the proper test for another day" given that parties' briefing assumed that *Salerno* applied). And as Justices Thomas and Alito explained, there are compelling reasons not to apply that standard. If "no-set-of-circumstances" were the standard, "it is difficult to understand how an agency would ever promulgate an invalid" regulation. *See id.*, 604 U.S. at 496 (Thomas, J., dissenting). So long as the agency included some properly-prohibited conduct within the scope of its prohibition, it could "sweep in whatever additional conduct it wishe[d]." *Id.* Thus, "[a]pplying *Salerno* in the statutory context would seem to dictate that plaintiffs would always lose," and "this extension of *Salerno* would represent a huge boon for the administrative state." *Id.* at 516 (Alito, J., dissenting).

In any event, the relevant standard is largely a distinction without a difference where, as here, a plaintiff alleges that an agency exceeded its statutory authority in imposing new grant conditions. In this context, the question is simply whether the relevant "statutory provisions," on their face, "authorize the imposition of the challenged conditions." *City of Providence v. Barr*, 954 F.3d 23, 32 (1st Cir. 2020). Here, the question is whether any statutory text authorizes OVW to make the New Conditions qualifications for OVW grants. For instance, for the "Gender Ideology" Condition, the question is whether anything in VAWA authorizes Defendants to make the "promotion of gender ideology" an automatic disqualification for receipt of OVW grant

funds. If no VAWA provision authorizes that, then OVW is exceeding its statutory authority, because "an agency may not 'create qualification requirements unrelated to the grant program simply to advance its own policy priorities.'" *Illinois*, 2025 WL 2716277, at *11 n.9 (quoting *City of Providence*, 954 F.3d at 39).

For Plaintiffs' constitutional claims, the Supreme Court last year clarified that *Salerno* does *not*, on its own, provide the standard for any constitutional claims. For non-First Amendment claims, the Court explained in *Moody v. NetChoice, LLC* that a plaintiff bringing a facial challenge must "establish[] 'that no set of circumstances exists under which the law would be valid,' *or* . . . that the law lacks a 'plainly legitimate sweep.'" *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quoting *Salerno*, 481 U.S. at 745, and *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).

For facial First Amendment claims, the bar is lower, and a plaintiff must show that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (quotations omitted). Thus, with a First Amendment claim, "even a law with 'a plainly legitimate sweep' may be struck down in its entirety." *Id.* And a facial vagueness challenge to an action that implicates protected speech prevails if "it is unclear whether [the challenged action] regulates a substantial amount of protected speech"—that is, if in light of the provision's ambiguity, it could potentially reach a substantial amount of protected speech. *United States v. Williams*, 553 U.S. 285, 304 (2008).

In all events, even if *Salerno* supplied the applicable standard, Plaintiffs' facial claims would satisfy it under a proper application of that standard. In applying that standard, the Supreme Court has made clear courts should "consider[] only applications of the [challenged action] in which it actually authorizes or prohibits conduct." *City of Los Angeles v. Patel*, 576

33

U.S. 409, 418 (2015). In other words, the court should disregard applications where the challenged law would prohibit or require conduct that is prohibited or required anyway. *See id.* So, for example, in assessing whether statutes authorizing warrantless searches violated the Fourth Amendment, the Court did not consider scenarios where those statutes "do no work"— like where the subject consents or some exigency justifies the search, as the search would be permissible in those circumstances "irrespective of whether it is authorized by statute." *Id.* at 418–19.

Here, OVW has contended that the conditions do no more than remind grantees of their "preexisting obligations." Dkt. No. 19 at 22. As explained below, that is mistaken. *See infra* section I.C.3.a. But, at any rate, Defendants cannot claim that the permissible applications they tout—like where the conditions just reiterate "preexisting obligations" to comply with nondiscrimination laws or to not unlawfully abet an immigration violation, for example—save the conditions from facial invalidity. Those applications are "irrelevant" to the analysis because they "do not involve actual applications of the" conditions, as the conduct would be prohibited regardless. *Patel*, 576 U.S. at 419. The same analysis holds under the less exacting standards that actually apply. A fortiori, in applying a less "exacting," *see id.* at 418, standard that assesses an action's "plainly legitimate sweep," the Court should likewise consider only those applications where the conditions actually "do … work" by prohibiting conduct that is not already otherwise proscribed.

### C.  The New Conditions Violate the APA

#### 1.  The New Conditions Are Final Agency Action

Defendant's policy of imposing the "Out-of-Scope" Funding Conditions on OVW grants, the inclusion of the "Out-of-Scope" Funding Conditions in each NOFO and award, and the addition of the General Anti-DEI Certification to OVW's General Terms and Conditions, are all

final agency action reviewable under the APA. For agency action to be "final," it must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

As this Court earlier determined, these actions: (1) mark the consummation of DOJ's decisionmaking process, because Defendants have made a final decision to impose these New Conditions on OVW grants; and (2) determine rights or obligations and produce legal consequences by precluding organizations from receiving an award if they do not agree to the conditions and subjecting grantees to possible FCA liability. *RICADV v. Bondi*, 2025 WL 2271867, at *6; *see also* AR212, 222 ("final" NOFO template listing the challenged "out-of-scope" conditions as required elements).

### 2. The New Conditions Are Arbitrary and Capricious

The New Conditions are quintessentially arbitrary and capricious. Courts must hold unlawful any agency action that is "not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). An agency must offer "a satisfactory explanation for its action" and can neither "rel[y] on factors which Congress has not intended it to consider" nor ignore "an important aspect of the problem . . . ." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43. While agencies are free to change their existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have taken account of "reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, Defendants have failed at every turn.

To begin, much less than reasonably explained, the New Conditions for the most part "have not been explained at all." *King Cnty.*, 785 F. Supp. 3d at 17 (finding that the

35

government's adoption of new funding conditions, without any explanation, was arbitrary and capricious). Indeed, aside from a declaration prepared to defend against this litigation months after the conditions were adopted, the administrative record only even mentions two—of nine— of the New Conditions, and only briefly. *See* AR63–64. For the other conditions, the record provides no explanation whatsoever.

Moreover, OVW's explanation for the two conditions the record actually discusses—the prohibitions on promoting "gender ideology" and on "promoting" immigration violations—falls far short of the reasoned decisionmaking the APA demands. OVW's memo says only that OVW proposed those two conditions to "implement applicable executive orders and Attorney General memoranda" and "ensure that our grantees align their grant-funded activities with federal laws regarding public safety, civil rights, and immigration." AR64. This threadbare explanation shows that Defendants failed to consider multiple "important aspect[s] of the problem," even as to these two conditions. *State Farm*, 463 U.S. at 43. There is no indication OVW considered the impact these conditions would have on programs' effectiveness, the difficulty grantees would have in understanding them, the chilling effect these conditions would have on legitimate activities, or grantees' and survivors' reliance interests.

And while the memo refers to executive orders—and the record suggests that OVW also considered several other executive orders, as well as Administration memos instructing agencies on how to implement them—compliance with an executive order does not satisfy the APA's requirement for reasoned decisionmaking. Indeed, courts have made clear that "an agency cannot avert the 'arbitrary and capricious' analysis by simply deferring to the relevant EO." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 471 (D.R.I. 2025), *appeal pending*, No. 25-1428; *see also, e.g.*, *Nat'l Council of Nonprofits v. OMB*,

763 F. Supp. 3d 36, 55 (D.D.C. 2025) ("Furthering the President's wishes cannot be a blank check for OMB to do as it pleases."); *King Cnty. v. Turner*, 785 F. Supp. 3d 863, 888–89 (W.D. Wash. 2025), *appeal pending*, No. 25-3664 ("[R]ote incorporation of executive orders—especially ones involving politically charged policy matters that are the subject of intense disagreement and bear no substantive relation to the agency's underlying action—does not constitute 'reasoned decisionmaking.'"); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 294–95 (E.D. La. 2022) ("A command in an Executive Order does not exempt an agency from the APA's reasoned decision-making requirement.").

The administrative record also makes clear that, for the other conditions as well, Defendants failed to consider multiple "important aspects of the problem." *State Farm*, 463 U.S. at 43. Beyond the Executive Orders themselves and related guidance documents from executive agencies, the Administrative Record does not include any evidence of what, if anything, Defendants considered in making a final decision to add New Conditions to all Fiscal Year 2025 NOFOs. Indeed, all but 86 pages of the 300-page Administrative Record post-dates the decision to implement the New Conditions, *see* AR, and further demonstrates that Defendants had not engaged in any reasoned decisionmaking. Indeed, it includes talking points for staff to respond to questions from grantees, which themselves recognize that it will be difficult for grantees to comply with at least some of the Conditions. *See, e.g.*, AR88–89. For example, with respect to the ill-defined prohibition on awareness campaigns that do not produce "tangible improvements" (AR212, 222) they acknowledged that "the answer might not always be simple and obvious," yet instructed that grantees would have to "make judgment calls, without explicit guidance from OVW." AR89.

Nowhere in the Administrative Record is there any indication that Defendants considered, for example, how grantees could comply with various conditions while also satisfying statutory commands and advancing VAWA's goals. Defendants, for instance, do not appear to have considered how grantees could comply with any of the conditions discussed below that conflict with the statutory directives. *See infra* section I.C.4.b. In some instances, Defendants acknowledged the tension. For instance, the template NOFO states that the Anti-DEI Condition—which prohibits promoting "discriminatory programs or ideology," "illegal DEI," and "'diversity, equity, inclusion, and accessibility' programs that do not advance the policy of equal dignity and respect"—"is not intended to interfere with any of OVW's statutory obligations, such as funding for HBCUs, culturally specific services, and disability programs. AR212, 222. And it also states that "[r]ecipients should serve all eligible victims as required by statute, regulation, or award condition." AR212. But these statements fall far short of clarifying grantees' obligations—and suggest that Defendants did not meaningfully consider how grantees would be able to comply with the Condition's unclear terms, or how the uncertainty would deter grantees from serving immigrants, treating transgender people with respect, offering services to underserved minorities, or engaging in any public awareness campaigns at all, to take just a few examples.

Worse, the Administrative Record contains ample evidence that Defendants recognized the difficulties grantees would face, yet did little to resolve those difficulties, offering talking points with unilluminating explanations that a condition "means what it says," that "recipients must not break the law," and that grantees should "determine on their own" whether a condition is satisfied. AR87, 89; *see also supra* Background section D. Indeed, a memo from the OVW official charged with final authority over OVW grant conditions reflects that she, too, needed

38

"[f]urther guidance" to understand what "inculcat[ing] gender ideology" meant, AR29,—yet the conditions provide no such further guidance to grantees.

Nor is there *any* evidence that Defendants considered the reliance interests of grantees—and the victims that the funds ultimately serve—that would be jeopardized by imposing the new conditions. Defendants nowhere considered, for example, the reliance interests of coalitions like Plaintiffs, who are entitled to continued funding under the formula Coalition Grants, and who would be forced to forgo funding, substantially change the services they have provided to vulnerable populations over several years, or face potentially devastating civil and criminal liability. *See, e.g.*, Fisher Decl. ¶ 20; Kramer Decl. ¶ 20. Defendants did not consider what would happen to Plaintiffs, their members, and the survivors they serve if they could not accept funding with the new conditions. As the Supreme Court has made clear, the failure to consider reliance interests alone renders agency action arbitrary and capricious. *DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020) (agency "*was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns").

Moreover, despite these immeasurably high stakes for grantees, there is no evidence that Defendants have considered any less disruptive means of advancing any legitimate policy goals in lieu of the high-stakes certification requirements that will deter grantees from providing important services in line with the statute.

Defendants likewise failed to acknowledge that the New Conditions reflect a change in policy or to reasonably explain the reasons for that change. *See Fox Television Stations*, 556 U.S. 502.

### 3.   The New Conditions Exceed Defendants' Statutory Authority

The New Conditions exceed Defendants' statutory authority. For agencies charged with administering statutes, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). An agency "literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "Any action that an agency takes outside the bounds of its statutory authority … violates the Administrative Procedure Act." *City of Providence*, 954 F.3d at 31.

Nothing in VAWA or any other statute authorizes Defendants to impose the New Conditions. Congress has, at times, attached conditions to VAWA grants—conditions that define the scope of the programs and aim to ensure the programs' effectiveness. *See, supra*, Background section A. But Congress has not authorized the executive branch to impose additional substantive conditions designed to advance policy goals wholly unrelated to VAWA's purposes and requirements. *Cf. California v. U.S. Dep't of Transp.*, No. 1:25-cv-00208, 2025 WL 1711531, at *2 (D.R.I. June 19, 2025) (agency lacked authority "to impose immigration enforcement conditions on federal dollars specifically appropriated for transportation purposes"). Nor did Defendants identify any such authority in adopting the conditions.

In briefing on Plaintiffs' motion for preliminary relief, Defendants claimed the conditions are permissible under Defendants' "statutory authority to define activities that are out-of-scope" to ensure that grants funds are used only for the "specific purposes" authorized by VAWA, 34 U.S.C. § 12291(b)(5), or to otherwise ensure that grantees comply with "preexisting obligations." Dkt. No. 19 at 22. But neither the "out-of-scope" conditions nor the General Anti-DEI Certifications can be so justified.

40

*a. Defendants lack authority to impose the "out-of-scope" conditions*

The "out-of-scope" conditions likewise cannot be justified as merely limiting the use of grant funds to statutorily authorized purposes. Those conditions do far more than just "call attention to" grantees' "preexisting obligations" to use grant funds for permissible purposes and otherwise comply with the law. *Contra* Dkt. No. 19 at 22. The conditions do not merely require grantees to comply with the law.

Start with the conditions Defendants have claimed merely require compliance with the law—the Anti-DEI Condition, Immigration Enforcement Condition, Immigration Priority Condition, and EO Condition. Those conditions in fact restrain grantees' conduct beyond what existing laws require. The Anti-DEI Condition goes beyond merely requiring compliance with federal nondiscrimination laws and also prohibits "discriminatory programs," "discriminatory … ideology," and "diversity, equity, inclusion, and accessibility programs that do not advance the policy of equal dignity and respect." AR212, 222. On its face, this is not limited to otherwise-illegal activity.

Similarly, the Immigration Enforcement Condition—which bars grantees from "[p]romoting or facilitating the violation of federal immigration law" (AR212, 222)—goes beyond what the law otherwise requires because it is not illegal to merely "promote or facilitate" such violations. That is especially true given the Administration's view that merely providing services to undocumented immigrants may promote immigration violations. *See supra* Background section C.3.

The Immigration Priority Condition—which bars "[i]nitiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support" (AR212, 222)—also sweeps more broadly that what the law otherwise requires because it is not illegal, for example, to run programs that necessarily prioritize undocumented immigrants by offering help

with procuring visas or other immigration relief that only undocumented survivors need. Nor would it be illegal, as another example, to provide a limited resource (such as a room in a domestic violence emergency shelter) to an undocumented immigrant even if that meant a citizen would not get in—yet this condition causes grantees to fear they could face liability for doing that.

And the EO Condition—which bars "[a]ny activity or program that unlawfully violates an Executive Order"—is not limited to barring otherwise-unlawful conduct. Indeed, Executive Orders generally can only direct federal agencies on what to do; they cannot impose obligations on the public. Nor does it help Defendants that the condition bars only "unlawfully" violating Executive Orders. Such a "savings clause" does not "magically ensure" that the condition is lawful. *City of Fresno v. Turner*, No. 25-cv-7070, 2025 WL 2721390, at *10 (N.D. Cal. Sept. 23, 2025) (holding that clause stating "'… which violate [relevant federal] law'" did not "magically ensure that the conditions incorporating that language only operate in so far as they are within Congress's grant of authority" (alterations in original)); *see also City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1238–1240 (9th Cir. 2018) (holding that the phrase "consistent with law" did not save certain executive orders).

Other conditions do not even arguably address only illegal conduct—and Defendants apparently seek to justify those as implementing VAWA's command that appropriated funds "may be used only for the specific purposes described in" VAWA, 34 U.S.C. § 12291(b)(5). That justification also falls short.

The prohibited activities are all wholly compatible with performing the many activities that VAWA authorizes. Take the prohibition on "promoting gender ideology"—which, as Administration statements show, bars grantees from allowing transgender bathroom access or

even just using pronouns and other language that recognizes transgender individuals' identity. *See supra* Background section C.2. Grantees can and do engage in such conduct while also carrying out the victim services or other activities that VAWA authorizes. *See, e.g.*, Higgins Bonifanti Decl. ¶ 19.

So too with the Law Enforcement and Immigration Enforcement Condition, which bars "[p]rograms that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women." AR212, 222. Grantees can provide, and historically have provided, information that could be interpreted as discouraging collaboration with law enforcement—like informing survivors about potential negative consequences of involving law enforcement—while fully performing crisis counseling or other services that VAWA funds. *See* Faisal Decl. ¶ 31.

Likewise, grantees can "frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses"—conduct the Systemic Framing Condition prohibits—while carrying out their VAWA-authorized activities. Indeed, in adopting VAWA, Congress recognized that domestic and sexual violence was a systemic issue, not just a criminal one, and it explicitly aimed to tackle it as such. *See supra* Background section A.; S. Rep. No. 103-138, at 38, 42 (1993) (finding that gender-based violence stemmed in part from an "underlying attitude that [domestic and sexual] violence is somehow less serious than other crime" and explaining that the law would address "not only the violent effects of the problem, but the subtle prejudices that lurk behind it").[4]

---

[4] Defendants may have statutory authority to adopt the Awareness Campaigns Condition—which bars grantees from using grant funds on awareness campaigns "that do not lead to tangible improvements in prevention, victim safety, or offender accountability"—but that condition is arbitrary and capricious for the reasons explained in Section I.B.2 above.

> *b. Defendants lack authority to impose the General Anti-DEI Certification*

Defendants likewise lack authority to impose the General Anti-DEI Certification—a condition Defendants have adopted to pave the way for FCA lawsuits designed to punish and deter diversity, equity, and inclusion activities that the Administration disfavors. Defendants have suggested that this "simply call[s] attention to recipients' pre-existing obligations" (Dkt. No. 19 at 22), but that is mistaken for two separate reasons.

First, it strains credulity to contend that the requirement that grantees certify that they "do[] not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable federal civil rights or nondiscrimination laws" merely reflects grantees' existing obligation to comply with such laws. Another district court recently held as much. *See City of Fresno*, 2025 WL 2721390, at *8 (holding that the inclusion of "language such as '…DEI programs that violate federal anti-discrimination law'" in funding conditions "does not transform them into pre-existing conditions to comply with federal law that were merely unspoken"). As that court explained, given the context, the "references to federal law act as announcements of policies rather than as limits on the scope of the new conditions." *Id.* The conditions "go beyond prohibiting violations of federal law as it is currently understood and pose a real risk of curtailing programs that would not be found violative." *Id.* at *11.

Second, the General Anti-DEI Certification is also unlawful for the independent reason that it requires grantees to "agree[]" that their compliance with antidiscrimination laws "is material to the government's decision to make this award and any payment thereunder, including for purposes of the False Claims Act." While Defendants have authority to require grantees to certify compliance with nondiscrimination laws—and long have (though without unlawfully

singling out one category of generally lawful conduct for special scrutiny)—they cannot require grantees to agree in advance that compliance with those laws is material to any payment decision by the government.

That materiality certification undercuts an important part of the FCA's statutory scheme. As the Supreme Court has emphasized, "strict enforcement" of the FCA's "rigorous" materiality requirement is important, including because it guards against "open-ended liability" under a law that was not intended to be a "vehicle for punishing garden-variety … regulatory violations." *Escobar*, 579 U.S. at 192, 194. Noncompliance with statutory requirements is "not automatically material, even if they are labeled conditions of payment." *Id.* at 191. Nor is materiality automatically established merely because "the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* at 194. More is required. *See id.* at 192–96. The required certification of materiality would gut this by excusing the government (and any *qui tam* relator) from meeting the "demanding" materiality standard, *id.* at 194, and enabling them to satisfy it automatically instead. No statute authorizes Defendants to effectively write the materiality element out of the FCA in this way.

### 4.  Many of the New Conditions Are Contrary to Law

In addition to exceeding Defendants' statutory authority, many of the New Conditions outright conflict with the statutory provisions authorizing VAWA grants and therefore must be set aside as contrary to law.

#### a. All of the New Conditions conflict with the provisions governing coalition grants

To begin, all of the New Conditions conflict with the statutory provisions mandating that OVW award funds to coalitions pursuant to set formulas. For these formula grants, Congress has mandated that OVW "shall" distribute grants in specified amounts to recognized coalitions

once they submit an application meeting congressionally prescribed criteria. 34 U.S.C. §§ 10441(c), 10446(b)(2)–(3), 12511(d). By overlaying additional conditions, and by withholding grant funds from coalitions if they do not make the required certifications, Defendants violate the statutory mandate to make these grants.

The First Circuit has previously rejected a similar effort by DOJ to impose conditions on formula grants. *See City of Providence*, 954 F.3d at 23. In that case, DOJ sought to impose conditions requiring recipients of law enforcement grants to certify that they would take certain actions to aid federal immigration enforcement. The First Circuit rejected it as incompatible with the "formulaic nature" of the program. *Id.* at 29–30, 34, 38. The court concluded that general grants of authority did not "allow the DOJ to impose by brute force conditions on [the] grants to further its own unrelated law enforcement priorities." *Id.* at 34–35. If DOJ had "such discretion," the grants "would no longer function as a formula grant program." *Id.* at 42. The same conclusion applies to the Coalition Grants here.

### b. Many New Conditions conflict with other provisions of VAWA

Individual New Conditions also separately conflict with VAWA, for both formula grants and discretionary grants.

**"Gender Ideology" Condition.** The prohibition on using grant funds to "inculcat[e] or promot[e] gender ideology" as defined in the "Gender Ideology" Executive Order conflicts with the VAWA provision prohibiting discrimination on the basis of "gender identity" in OVW grant programs. 34 U.S.C. § 12291(b)(13)(A). The Order defines prohibited "gender ideology" as the "false" notion that individuals can have a "self-assessed gender identity" that is "disconnected from one's sex" (as determined by their "reproductive cell[s]"). "Gender Ideology" Order §§ 2(d), (e), (f). As another court recently observed, that Order's "express purpose is to disapprove of transgender people" and "to deny the existence of transgender persons entirely." *S.F. AIDS*

46

*Found. v. Trump*, 786 F. Supp. 3d 1184, 1216 (N.D. Cal. 2025). Beyond that, Administration officials at DOJ and elsewhere have made clear that this condition would force grantees to avoid using pronouns that reflect a person's gender identity and exclude transgender individuals from the bathroom that aligns with their gender identity. *See supra* Background section C.2. But that is discriminatory, as court after court has recognized.[5] Indeed, as another court held in addressing the "Gender Ideology" Order, it is difficult to "fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 444 (D. Md. 2025). The "Gender Ideology" Condition therefore compels discrimination that violates VAWA's prohibition on discrimination, 34 U.S.C. § 12291(b)(13)(A)—and therefore must be set aside as contrary to law.

  ***Anti-DEI Condition.*** The prohibition on using grant funds to "promot[e] or facilitat[e]" DEI programs conflicts with provisions throughout VAWA that authorize, encourage, and mandate just those sorts of programs. Various statutory provisions specifically authorize grants to organizations and programs that either serve racial and ethnic minorities or other underserved populations or partner with organizations that do so, and in some instances, the statute expressly requires DOJ to prioritize services for racial and ethnic minorities or other underserved populations in awarding grants. *See, e.g.*, 34 U.S.C. §§ 12291(a)(8), (46);

---

[5] *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616–17 (4th Cir. 2020) (transgender student's exclusion from bathroom constituted Title IX discrimination); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 771 (7th Cir. 2023) (same); *S.F. AIDS Found*, 786 F. Supp. 3d at 1200, 1214 (holding that "Gender Ideology" Order's requirement that agencies not fund programs that "promote gender ideology" likely violated Equal Protection Clause); *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1099 (S.D. Cal. 2017) (concluding that allegations that defendants referred to transgender boy "with female pronouns" stated a claim for discrimination).

12341(b)(2), (d)(4); 12351(a), (g)(2)(C)(ii); 12421(1)(A)(i), (3); 12421(1)(A)(iv);

12421(2)(A)(iv); 12451(b)(1), (2)(E), (c)(1)(A); 12463(c)(2)(B)–(C), (F), (d)(3);

12464(b)(5)(E); 12475(c)(2)(D); 12501(b)(3); 12514(c); *see also supra* Background section A.

The Anti-DEI Condition flies in the face of Congress's clear commitment to advancing DEI

values through the administration of OVW grants, as reflecting in those myriad provisions.

The fact that the condition is limited to barring "illegal" DEI programs and other

"discriminatory programs or ideology" does not save the condition given the overwhelming

indications that this Administration views any programs that focus on certain groups or

recognize marginalized populations as unlawful. *See supra* Background section C.1. And that

sort of "savings clause" limiting the condition to purportedly "illegal" activity does not

"magically ensure" that the condition is lawful. *City of Fresno*, 2025 WL 2721390, at *10. Nor

does it help that the condition states that it "is not intended to interfere with any of OVW's

statutory obligations, such as funding for HBCUs, culturally specific services, and disability

programs." AR212. This leaves grantees to guess at what is permitted—and puts them at great

risk if they serve underserved communities and racial and ethnic minorities and other

underserved communities as VAWA contemplates.

*Immigration-Related Conditions.* The prohibitions on using grant funds to "prioritize

illegal aliens … in receiving victim services," to "promot[e] or facilitat[e] the violation of

federal immigration law," and to carry out any programs that "limit the role of … immigration

enforcement" (Immigration Priority Condition, Immigration Enforcement Condition, and Law

Enforcement and Immigration Enforcement Condition) all conflict with the statutory

authorization for programs that specifically target services for, and thus prioritize,

"underserved" groups. *See, e.g.*, 34 U.S.C. §§ 12291(a)(46), 20123, 12421(3). In identifying

these "underserved" populations, Congress specifically included those populations that face barriers due to their "alienage status." *See id.* § 12291(a)(46). Grantees cannot provide services targeted to this underserved group without risking being deemed to "prioritize" illegal aliens. Likewise, the prohibitions on limiting the role of immigration enforcement and on "promoting or facilitating" immigration violations make it impractical or impossible to offer programs specifically for immigrants as Congress intended. Many immigrants will avoid services that involve coordination with enforcement bodies that could take adverse action against them or their families. They will also avoid seeking help from organizations that probe victims' immigration status or report undocumented victims or family members to authorities—but those are actions grantees may now be forced to take to avoid being deemed to "promot[e] or facilitat[e]" immigration violations. *See* Colón Decl. ¶ 24 (once it becomes known that a member organization "asks invasive questions" to individuals without legal status "and has subsequent limits on its services," survivors "may choose not to seek assistance and will either stay with their abusive partner or live on the street").

In addition, the prohibition on "promot[ing] or facilitat[ing]" immigration violations conflicts with the provision expressly authorizing grantees to provide rural victims with "assistance in immigration matters," 34 U.S.C. § 12341(b)(2). Given the Administration's statements suggesting that providing *any* services to undocumented immigrants promotes violations of immigration law, *see supra* Background section C.3, this condition would prevent grantees from providing the immigration assistance that Congress specifically authorized.

### 5. *The New Conditions Violate the Constitution*

The New Conditions also must be set aside because they are "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B). For the reasons explained in Sections I.D-I.F below, the New Conditions violate the Spending Clause and other

49

constitutional separation-of-powers provisions, the First Amendment, and the Fifth

Amendment's Due Process Clause. That warrants relief under the APA.

### D. The New Conditions Violate the Spending Clause and Other Constitutional Provisions Safeguarding the Separation of Powers

The New Conditions violate the Spending Clause and other constitutional provisions

safeguarding the separation of powers. Imposing "extra-statutory conditions on federal grant

awards as a tool to obtain compliance with [the executive's] policy objectives strikes at the

heart of … the separation of powers." *City of Chi. v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020)

(holding that the executive branch violated separation of powers by conditioning federal

funding on recipients' facilitating immigration enforcement). Defendants have done precisely

that, as Congress did not impose any of the New Conditions, nor did it authorize Defendants to

do so.

The Constitution "exclusively grants the power of the purse to Congress, not the

President." *Colorado v. U.S. Dep't of Health & Human Servs.*, No. 1:25-cv-00121, 2025 WL

1426226, at *18 (D.R.I. May 16, 2025) (quoting *City & Cnty. of S.F.*, 897 F.3d at 1231); *see*

*also* U.S. Const., art. I, § 8, cl. 1 (Spending Clause); *id.*, art. I, § 9, cl. 7 (Appropriations

Clause). Among the "legislative powers" the Constitution vests in Congress, *see* U.S. Const.,

art. I, § 1, is the authority to distribute funds to states and private entities to promote "the

general welfare" under the Spending Clause, *id.*, art. I, § 8, cl. 1. "Incident to this power,

Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483

U.S. 203, 206 (1987). Because "the ability to place conditions on federal grants ultimately

comes from the Spending Clause, which empowers Congress, not the Executive, to spend for

the general welfare," *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir.

2021), the executive branch may not impose conditions on the distribution of funds absent authorization from Congress, *see Colorado*, 2025 WL 1426226, at \*18.

The executive branch's role, rather, is to implement Congress's spending directives and to "take care that the laws be faithfully executed," U.S. Const., art. II, § 3. "When it comes to spending, the President has none of his own constitutional powers to rely upon" and can only exercise authority Congress has delegated. *City & Cnty. of S.F.*, 897 F.3d at 1233–34. He has no power, moreover, "to enact, to amend, or to repeal statutes" on his own. *Clinton v. City of N.Y.*, 524 U.S. 417, 438 (1998); *see also* U.S. Const., art. I, § 7, cl. 2 (Presentment Clause).

Here, Defendants have usurped Congress's exclusive power to impose conditions on federal funding. Congress did not prescribe any of the New Conditions as relevant to the awarding of grants under VAWA or any of its specific programs. Nor did Congress authorize the executive to adopt these conditions. *Supra* section I.C.3. Defendants thus unconstitutionally "claim[] for [themselves] Congress's exclusive spending power" and "attempt[] to coopt Congress's power to legislate." *See City & Cnty. of S.F.*, 897 F.3d at 1234; *see also PFLAG, Inc.*, 769 F. Supp. 3d at 431 (concluding that executive order "unilaterally" imposing funding conditions unconstitutionally "circumvent[ed] bicameralism and presentment").

### E.  Two New Conditions Violate the First Amendment

The Gender Ideology Condition and Anti-DEI Certification Requirement violate the First Amendment's protection of "the freedom of speech," U.S. Const. amend. I, and Plaintiffs are accordingly entitled to summary judgment on Counts VII-IX.

#### 1.  The "Gender Ideology" condition violates the First Amendment

The "Gender Ideology" Condition unconstitutionally restricts speech under the unconstitutional conditions doctrine. Under that doctrine, while the government may, in some circumstances, attach conditions to federal funding that "affect the recipient's exercise of its

First Amendment rights," there are limits. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). Crucially, the government may not restrict "protected [speech] outside the scope of the federally funded program." *Id.* at 217 (*citing Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). Nor may it leverage government funding to "aim at the suppression of dangerous ideas." *NEA v. Finley*, 524 U.S. 569, 587 (1998). And imposing a funding condition "not relevant to the objectives of the program" can also violate the First Amendment. *Open Soc'y*, 570 U.S. at 214.

The "Gender Ideology" Condition transgresses these limits in multiple ways. This condition cannot be justified as the government merely refusing to "affirmatively fund[]" the targeted speech. *See S.F. AIDS Found.*, 786 F. Supp. 3d at 1218–20.

For one, the "Gender Ideology" Condition is "entirely untethered to any 'legitimate objective[s]'" of the VAWA programs it burdens. *Id.* at 1218. Instead, it is "directed … towards disfavored speech." *Id.* at 1219. Under this Condition, a grantee apparently could not "refer to the clients they serve … by any pronoun" or preferred name that matches their gender identity as opposed to their sex assigned at birth. *Id.* But that "is pure speech that has no relation to," *id.*, the VAWA grant programs' purposes of preventing domestic violence and sexual assault and supporting survivors of those offenses—and in fact would require grantees to forgo the essential work of building trust to provide help to transgender victims of violence. Sarang-Sieminski Decl. ¶¶ 27, 29.

Moreover, the "Gender Ideology" Condition impermissibly "withhold[s] subsidies for a censorious purpose—aiming to suppress" what the government views to be "the dangerous idea[] of … 'gender ideology.'" *S.F. AIDS Found.*, 786 F. Supp. 3d at 1220; *see also R.I. Latino Arts v. NEA*, No. 1:25-cv-00079, 777 F. Supp. 3d 87, 109–10 (D.R.I. 2025) (noting that

government cannot "use subsidies to suppress dangerous ideas" and concluding that bar on funding art programs that "promote gender ideology" was "a clear First Amendment violation"). The underlying Executive Order makes clear its goal is "to root out the 'extreme,' 'false claims' of gender identity that contradict the government's view that there is only one 'biological reality of sex,'" namely to erase the recognition of transgender peoples' existence. *S.F. AIDS Found.*, 786 F. Supp. 3d at 1220 (citing "Gender Ideology" Order §§ 1, 2(f)). By defunding any activities "related to the dangerous ideas it has identified," the "Gender Ideology" Condition effectuates "precisely the kind of 'invidious viewpoint discrimination' that the Supreme Court has suggested would present First Amendment concerns even in the context of federal subsidies." *Id.* (citing *Finley*, 524 U.S. at 587).

The "Gender Ideology" Condition is also unconstitutional because it strays beyond the "scope of the federally funded program," *Open Soc'y*, 570 U.S. at 218. As the Supreme Court has explained, a funding condition "by its very nature affects 'protected conduct outside the scope of the federally funded program'" when it "demand[s] that a funding recipient[] adopt—as their own—the Government's view on an issue of public concern." *Id.* (*quoting Rust*, 500 U.S. at 197). The "Gender Ideology" Condition does just that. Under the Condition, a grantee risks noncompliance if it says anything recognizing someone's gender identity, such as by using a transgender person's preferred pronouns. *See supra* Background section C.2. So this Condition leaves grantees with no choice but to use the pronouns corresponding to the person's sex assigned at birth—speech that reflects the Administration's view that gender identity should not be acknowledged or respected—a condition far afield from the scope of OVW programs.

> 2. *The General Anti-DEI Certification violates the First Amendment*

The General Anti-DEI Certification also violates the First Amendment, for two separate reasons.

First, the Certification impermissibly restricts speech "outside the scope of the federally funded program," *Open Soc'y*, 570 U.S. at 217 (Count VIII). The requirement compels grantees to certify that they "do[] not operate *any* programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable federal civil rights or nondiscrimination laws." General Terms and Conditions § 15. That requirement "on its face makes clear" that it applies to "any program …, irrespective of whether the program is federally funded." *Chi. Women in Trades v. Trump*, No. 1:25-cv-02005, 778 F. Supp. 3d 959, 984 (N.D. Ill. Apr. 14, 2025). And it restricts speech, as "diversity, equity, and inclusion" programs almost invariably contain speech promoting those values. Indeed, as the Administration itself has acknowledged, it is restricting work related to "diversity, equity, and inclusion" because of disagreement with its "foundational rhetoric and ideas." The White House, *Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI* (Jan. 22, 2025), https://perma.cc/G8JU-QQ44.

It does not matter that the Condition purports to bar only conduct that violates "federal civil rights or nondiscrimination laws." As another court held in preliminarily enjoining a similar certification requirement, "[t]he problem … is that the meaning of this is left entirely to the grantee's imagination." *Chi. Women*, 778 F. Supp. 3d at 984. Neither OVW's terms and conditions nor the Executive Order on which this requirement is based defines "what might make any given 'DEI' program violate Federal anti-discrimination laws." *Id.* What this Administration will claim is illegal "is anything but obvious." *Id.* Indeed, "the thrust" of the underlying DEI Executive Order "is that the government's view of what is illegal in this regard has changed significantly with the new Administration." *Id.* The executive branch now plainly views as unlawful a wide array of DEI programs that, until recently and over several decades,

54

the federal government actively encouraged. *See, e.g.*, DEI Order at § 1 (criticizing diversity, equity, and inclusion practices of a wide variety of "influential institutions of American society"); *id.* § 3 (revoking multiple longstanding diversity-related executive actions and requiring the Office of Management and Budget to "[e]xcise" from federal funding procedures all "references to DEI and DEI principles, under whatever name they may appear," and to "[t]erminate all 'diversity,' 'equity,'" and similar activities). Against this backdrop, the General Anti-DEI Certification—and the accompanying exposure to burdensome *qui tam* litigation and potential False Claims Act liability—will predictably chill grantees from speaking in support of diversity, equity, and inclusion, including in their own, non-federally-funded activities. That violates the First Amendment.

Second, the General Anti-DEI Certification impermissibly discriminates based on viewpoint (Count IX). It is axiomatic that the government may not regulate speech based on "the specific motivating ideology or the opinion or perspective of the speaker." *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)); *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024) (stating that "[a]t the heart" of the First Amendment is "the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society"). Such government targeting is a "'blatant' and 'egregious form of content discrimination.'" *Reed*, 576 U.S. at 158 (quoting *Rosenberger,* 515 U.S. at 820). A finding that the government has discriminated based on viewpoint is "all but dispositive" in a First Amendment challenge. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011).

As made particularly evident by the chorus of Administration statements disparaging "DEI," the requirement that grantees certify that they do not engage in "programs having

components relating to diversity, equity, and inclusion" that violate civil rights laws discriminates based on grantees' "opinion or perspective," *Reed*, 576 U.S. at 168—in particular, the view that diversity, equity, and inclusion are laudable values. This discrimination is designed to silence support for diversity, equity, and inclusion principles, and to chill grantees from supporting policies and perspectives that this Administration disfavors.

Because Defendants' actions facially discriminate based on viewpoint, they are subject to strict scrutiny and therefore unconstitutional unless the government demonstrates that its actions "further[] a compelling interest and [are] narrowly tailored to achieve that interest." *Id.* at 171. There is no legitimate governmental interest, much less a "compelling" one, in making grantees fear potentially massive FCA liability for engaging in "diversity, equity, and inclusion" programs. Quite the opposite, deterring such programs directly undermines VAWA's important goals of ensuring underserved communities get the resources and support they need. *See supra* Background section A. The General Anti-DEI Certification therefore unconstitutionally discriminates based on viewpoint.

## F. The New Conditions Are Unconstitutionally Vague

Due process fundamentally requires that the law give "fair notice of what is prohibited." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citing *William*s, 553 U.S. at 304. This requirement of clarity is implicated whenever the government imposes civil penalties. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 n.22 (1996). The New Conditions fail this basic test. Still, a more demanding fair-notice standard applies here, both because the heavy civil penalties threatened are similar to those found in criminal statutes, and because of the potential for actual criminal penalties for false claims and statements. *See Sessions v. Dimaya,* 584 U.S. 148, 183 (2018) (Gorsuch, J., concurring)*; Reno v. ACLU*, 521 U.S. 844, 871–72 (1997).

56

And importantly, as mentioned, a "more stringent" standard applies to those conditions that chill speech, *see supra* section I.E; *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). A regulation that impacts speech is unconstitutional where "it is unclear whether it regulates a substantial amount of protected speech." *Williams*, 553 U.S. at 304. This standard applies to at least the "Gender Ideology" Condition and General Anti-DEI Certification, as they regulate grantees' own, protected First Amendment speech.[6]

The New Conditions are unconstitutionally vague under the less stringent, non-First Amendment standard regardless. First, they fail to "provide a person of reasonable intelligence fair notice of what is prohibited" or provide explicit standards, opening the door to "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

For example, the EO Condition requires grantees to certify that they will not use program funds for any activity or program that "unlawfully violates an Executive Order." But Executive Orders are issued by the president to direct federal agencies and officials on how to implement or enforce the law—they do not impose legal requirements or obligations on federal grantees. The EO Condition thus requires Plaintiffs to guess at what it requires and how to comply with it, particularly in light of the broad and vague orders that it purports to incorporate, and in light of the many executive orders that predate this Administration and are irrelevant to Plaintiffs. Indeed, for just these sorts of reasons, another court recently held that similar conditions requiring compliance with executive orders were unconstitutionally vague. *City of Fresno*, 2025 WL 2721390, at *15 (finding EO conditions vague for a host of reasons including that "they do not explain how the EOs are applicable to grantees").

---

[6] As discussed *supra* I.B., the fact that conditions implicate the First Amendment bears on the standard for a facial challenge as well.

Other conditions similarly fail to provide any guidance on what may be prohibited, and

fail to specify any standards for enforcement. For instance, as another court recently held in

considering a nearly identical condition, the prohibition on "promot[ing]" "gender ideology"

"obscure[s] meaning like Russian dolls stacked inside each other," leaving grantees unsure

"whether using preferred pronouns to refer to a non-binary person" is prohibited. *RICADV v.*

*Kennedy*, 2025 WL 2899764, at *9; *accord City of Fresno*, 2025 WL 2721390, at *17 (likewise

finding such a condition unconstitutionally vague).

Similarly, the Immigration Enforcement Condition fails to explain what it means to

"promote" or "facilitate" immigration law violations—as another court recently concluded in

finding a similar condition unconstitutionally vague. *City of Fresno*, 2025 WL 2721390, at *18.

This condition leaves unknown, for instance, whether Defendants would deem it a violation

merely to provide services to undocumented immigrants, *see supra* Background section C.3, or

to help undocumented victims obtain immigration relief, including through pathways provided

by VAWA. *See* Faisal Decl. ¶ 30 (expressing concern about whether the Iowa Coalition could

continue providing "legal humanitarian immigration relief under [VAWA] such as U-visa, T-

visa, and VAWA self-petitioners"); McCormick Decl. ¶ 26 (expressing concern about whether

the Kansas Coalition could continue "providing informational products on legal reliefs to

survivors such as U-VISA or T-VISA processes"); *see also* Simpson-Bruce Decl. ¶ 23.

Similarly, the Law Enforcement and Immigration Enforcement Condition fails to explain what it

might mean to "discourage" collaboration with law enforcement, or to "oppose," or "limit" the

role of police, prosecutors, or immigration enforcement in addressing violence against women,

and whether Defendants would consider it a violation of that condition to advise victims about

relevant legal risks in involving law enforcement, or to offer prevention programs that serve as

58

alternatives to the criminal justice system. Faisal Decl. ¶ 31; Dalton Decl. ¶ 24; Higgins Bonifanti Decl. ¶ 22. In Iowa, for example, a petitioner on a restraining order can be arrested for "aiding and abetting" the violation of a protective order if they return to their abuser, and this condition leaves grantees unsure whether they can inform survivors of this risk. Faisal Decl. ¶ 31.

The Systemic Framing Condition fails to explain how or under what circumstances "fram[ing]" domestic violence or sexual assault as "systemic social justice issues" could result in "prioritizing" criminal justice reform or social justice issues over victim safety and offender accountability, and whether it would violate this condition to offer training and education programs that acknowledge the systemic factors that cause domestic violence and sexual assault. *See* Colón Decl. ¶ 21; Faisal Decl. ¶ 32; Lee Decl. ¶ 23; McCormick Decl. ¶ 23; Christiansen Decl. ¶ 36; Stark Decl. ¶ 55; Higgins Bonifanti Decl. ¶ 20. The Awareness Campaigns Condition likewise fails to explain what kinds of "campaigns or media" would not lead to "tangible improvements in prevention, victim safety, or offender accountability," or how such improvements would be measured or assessed, especially given that it is seemingly impossible to know whether an awareness campaign will produce "tangible improvements" before that campaign has even happened. *See* Litke Decl. ¶ 30; Lee Decl. ¶ 26.  Indeed, the Administrative Record makes clear that even OVW leadership did not understand how to implement this restriction. AR    89 ("Because, however, the answer might not always be simple and obvious, applicants and recipients should be prepared to make judgment calls, without explicit guidance from OVW, about whether an awareness campaign or media production is likely to have tangible results.").

The Anti-DEI Condition fails to explain what it means to "promote" or "facilitate" "discriminatory programs or ideology," or provide any guidance as to what "discriminatory programs or ideology" even are. The prohibition "includ[es] "illegal DEI," seemingly indicating that it also prohibits DEI that is not illegal (and what makes DEI "illegal" is itself entirely unclear). Indeed, the examples of prohibited activities are illegal DEI *or* "'diversity, equity, inclusion, and accessibility' programs that do not advance the policy of equal dignity and respect." And with the latter example, it is difficult to imagine a more vague, more subjective standard than whether something advances "equal dignity and respect." This condition provides Plaintiffs and their members with no guidance on whether they may, for example, train service providers on risk factors that affect survivors differently based on race or gender, or operate the programs designed to meet culturally specific needs that VAWA expressly authorizes. *See* McCormick Decl. ¶ 24; Dalton Decl. ¶ 21; Minkens Decl. ¶ 26; Rios Decl. ¶¶ 36-37; Faisal Decl. ¶ 29; Sarang-Sieminski ¶ 26; Young Decl. ¶ 21; Higgins Bonifanti Decl. ¶ 26.

The General Anti-DEI Certification requirement is likewise vague in that it requires grantees to certify that they will not operate DEI programs "that violate any applicable federal civil rights and nondiscrimination laws," but does not explain when a DEI program would violate such laws. And DOJ has otherwise made clear that it intends to aggressively enforce a novel and legally incorrect interpretation of federal antidiscrimination law that would prohibit all programs related to diversity, equity, and inclusion. *See supra* Background section C.1. Certifying the materiality of their compliance with antidiscrimination law, combined with the Administration's extreme enforcement strategy, leaves Plaintiffs vulnerable to the kind of "arbitrary and discriminatory" application of the law that due process prohibits. *Grayned*, 408 U.S. at 108–09.

60

The New Conditions' vagueness is reinforced by their lack of guidance regarding their apparent conflict with VAWA's statutory requirements. They leave grant recipients guessing as to how to avoid "[p]romot[ing]" "gender ideology," while also not discriminating on the basis of gender identity. Grantees will have no idea how to avoid violating the DEI conditions while also providing services tailored for underserved racial and ethnic populations and including services that are "primarily directed" toward racial and ethnic minority groups. And Defendants leave unanswered how to comply with the Systemic Framing Condition given VAWA's foundational recognition that domestic violence is a systemic issue. *See supra* Background section A.

Each of these conditions requires people of ordinary intelligence to guess at what is prohibited. *See Grayned*, 408 U.S. at 108. The internal talking points that Defendants created to help grantees understand the conditions—besides being unofficial and offering no assurances on which grantees could rely—simply restate their language, and in some cases, acknowledge their vagueness. *See* AR87–89. By failing to provide guidance or standards to determine what activities this Administration considers newly prohibited, each of the conditions also subjects Plaintiffs' funding to the Administration's unlimited discretion and exposes them to potentially arbitrary and discriminatory enforcement. Faced with threatened civil penalties and potential criminal liability under the False Claims Act, recipients are forced to broadly curtail their activities by "steer[ing] far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109 (cleaned up).

### G. Defendants' Actions Were Ultra Vires

Defendants' imposition of the New Conditions is ultra vires. This Court has inherent equitable power to enjoin and declare unlawful executive ultra vires conduct. *R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002). An agency acts ultra vires when it "plainly acts in excess of its delegated powers." *Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*,

987 F.3d 158, 162 (D.C. Cir. 2021) (cleaned up); *see California v. Trump*, No. 25-CV-10810-DJC, 2025 WL 2663106, at *7 (D. Mass. Sept. 17, 2025). "To act ultra vires a government official is either acting in a way that is impermissible under the Constitution or acting outside of the confines of his statutory authority." *California*, 2025 WL 2663106, at *7 (quotation omitted). As explained above, *supra* section I.C.3, Defendants acted without statutory authority in imposing the New Conditions on OVW grants. Because no statute, constitutional provision, or other source of law authorizes Defendants to impose the New Conditions, the New Conditions are ultra vires, and Defendants must be enjoined from implementing or enforcing them.

## II.    Remedy

The Court should set aside the New Conditions under the APA and issue a permanent injunction to prevent Defendants from enforcing any past certifications and from imposing the same or substantially similar conditions by other means in the future.

### A.   The Court Should Set Aside the New Conditions Under the APA

The Court should set aside the New Conditions pursuant to 5 U.S.C. § 706(2). The APA directs courts to "set aside agency action" when the court determines the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory … authority," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(C). "[T]he text and history of the APA, [and] the longstanding and settled precedent adhering to that text and history," makes clear that to "set aside" an unlawful agency action means to "*vacate*" that action. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 829 (2024) (Kavanaugh, J., concurring) (emphasis added). This Court has held the same. *Illinois*, 2025 WL 2716277, at *15. APA vacatur is not a party-specific remedy. *Corner Post*, 603 U.S. at 830 (Kavanaugh, J., concurring).

APA vacatur is warranted here because the New Conditions violate the APA for the multiple reasons described above. This Court should set aside the New Conditions—such that no applicant or awardee is required to submit the challenged certifications, no application is disqualified for failure to include those certifications, no grantee is prohibited from using grant funds on the challenged "out-of-scope" activities, and no condition is enforced against any grantee.

### B. The Court Should Enjoin Defendants from Enforcing the New Conditions or Imposing the Same or Substantially Similar New Conditions in the Future

Equitable relief in the form of a permanent injunction is additionally warranted to fully protect Plaintiffs from irreparable injury. Injunctive relief on top of vacatur is warranted where setting aside an agency action alone is not "sufficient to redress [the plaintiffs'] injury." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). So, for example, an injunction is warranted where the agency could attempt to take similar action again "as an end-run to the Court's relief." *Texas v. Cardona*, 743 F. Supp. 3d 824, 897 (N.D. Tex. 2024). In such circumstances, injunctive relief can appropriately "restrain agency officials from … conduct based on the disputed agency [action]." *Chamber of Com. of U.S. v. CFPB*, 691 F. Supp. 3d 730, 745 (E.D. Tex. 2023), *appeal dismissed*, No. 23-40650, 2025 WL 1304573 (5th Cir. May 1, 2025); *see also Cardona*, 743 F. Supp. 3d at 898 (enjoining defendants from "implementing or enforcing" the guidance documents at issue, as well as any future guidance documents promoting a similar interpretation against plaintiffs).

Here, injunctive relief is necessary because merely setting aside the policies imposing the New Conditions would not on its own prevent Defendants from (1) attempting to enforce certifications in applications that grantees signed before the New Conditions were stayed or (2) adopting a similar new policy or imposing the same or similar conditions via a new agency

action. And this Administration has attempted to evade vacatur of funding conditions, imposing them even after this Court entered final judgment. *See* Order, 25-cv-206 (Oct. 14, 2025).

A permanent injunction is warranted here. The issuance of a permanent injunction is appropriate where: "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief (i.e., an injury for which there is no adequate remedy at law); (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Ortiz-Bonilla v. Federacion de Ajedrez de Puerto Rico, Inc.*, 734 F.3d 28, 40 (1st Cir. 2013) (cleaned up). First, Plaintiffs prevail on the merits for the reasons explained above. *See supra* section I.

Second, absent permanent injunctive relief, Plaintiffs risk irreparable injury. To begin, some Plaintiffs or their members agreed to certifications when they submitted applications that were due before Plaintiffs obtained preliminary relief in this case. Defendants must be enjoined from holding grantees to those certifications, lest Plaintiffs ultimately face the same irreparable harm that led this Court to stay the conditions in the first place. *See RICADV v. Bondi*, 2025 WL 2271867, at *9–10.

In addition, if Defendants are able to take a new agency action to impose the New Conditions again, or substantially similar ones, Plaintiffs and their members would once again need to decide whether to: (a) accept unconstitutional and otherwise unlawful funding conditions that are inconsistent with VAWA, will impede their ability to provide core services, and are at odds with their fundamental missions; or (b) forgo federal funds that are essential to their ability to fulfill their mission. As this Court already held, that is irreparable harm. *Id.* "[F]orcing [a plaintiff] either to decline the grant funds based on what it believes to be unconstitutional

conditions or accept them and face an irreparable harm, is the type of 'Hobson's choice' that supports irreparable harm." *City of Chi. v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017), *aff'd*, 888 F.3d 272 (7th Cir. 2018) (subsequent proceedings omitted) (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381 (1992)). Either option is untenable here. Accepting conditions that are unconstitutional, including because they are vague and infringe on the speech of Plaintiffs and their members, causes irreparable harm without more. *See, e.g.*, *R.I. Latino Arts*, 777 F. Supp. 3d at 111 ("Irreparable harm is … presumed upon a determination that [Plaintiffs] are likely to prevail on their First Amendment claim." (quoting *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 11 (1st Cir. 2012)). And the harm from accepting the New Conditions is especially acute here given that Defendants have intentionally crafted the conditions to expose grantees to False Claims Act and false-statements liability—exposure to criminal liability that is invariably harmful. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (Plaintiffs need not wait for the "Damoclese[] sword" "to actually fall" before the Court enters preliminary relief).

If the coalitions or their members instead forgo OVW funds, that, too, would cause irreparable harm. Without these funds, coalitions would have to cut staff and scale back or entirely eliminate programs that are critical to serving survivors and equipping service providers with the resources they need to effectively prevent domestic violence and sexual assault— precisely the services Congress created the Coalition Grant to fund. *See, e.g.*, Simpson-Bruce Decl. ¶ 10; Akins Decl. ¶ 10; Colon Decl. ¶ 13; Christiansen Decl. ¶¶ 35–36; Mercado Decl. ¶¶ 26–27; Higgins Bonifanti Decl. ¶ 30; Berry Decl. ¶ 13; Pollitt Hill Decl. ¶ 9. Plaintiffs' member organizations would also suffer grave harms from losing funding for direct services. Without these funds, member organizations would no longer be able to provide the same level of

assistance, advocacy, and intervention work on which victims of VAWA crimes rely. *See, e.g.*, Dalton Decl. ¶¶ 29–30; Faisal Decl. ¶¶ 40–42; Fisher Decl. ¶¶ 31–33; Christiansen Decl. ¶ 32; Robinson Decl. ¶¶ 33–35; Higgins Bonifanti Decl. ¶ 29; Pollitt Hill Decl. ¶¶ 28–30. Such interference with the organizations' services "is not accurately measurable or adequately compensable by money damages." *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 325 (D. Mass. 2025). The inability of an organization to "accomplish [its] primary mission" constitutes irreparable harm. *Newby*, 838 F.3d at 9.

Finally, the balance of equities and the public interest weigh decisively in Plaintiffs' favor for the same reasons they did at the preliminary relief stage. *See RICADV v. Bondi*, 2025 WL 2271867, at *10. On the one hand, "the government cannot suffer harm from an injunction that merely ends an unlawful practice." *NIH*, 770 F. Supp. 3d at 326 (cleaned up); *see also Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) ("[I]njunctions protecting First Amendment freedoms are always in the public interest."). By contrast, the loss of funding to Plaintiff Coalitions and their member programs would directly harm victims of domestic violence and sexual assault, depriving them of critical, life-saving services, including safe housing away from their abusers, legal assistance in seeking protective orders, safety planning and counseling, and much more. *See, e.g.*, Rios Decl. ¶ 49; Faisal Decl. ¶¶ 41–42. Especially here—where the stakes are so high—the government should not be allowed to "leverag[e] the needs of our most vulnerable fellow humans" by conditioning federal grants on compliance with unlawful requirements. *King Cnty.*, 785 F. Supp. 3d at 19.

The Court should therefore grant a permanent injunction barring Defendants and anyone acting in concert or participation with them from the following:

66

1.       For applicants who already submitted an application with a certification, permanently enjoin Defendants from treating that certification as effective and require them, in making any award, to clarify that the previously made certification is null and void and that the New Conditions do not apply;

2.       For applicants who already submitted an application without a compliant certification, permanently enjoin Defendants from disqualifying the applicant from consideration or otherwise disadvantaging the applicant based on the applicant's failure to submit a compliant certification pursuant to the New Conditions; and

3.       For any pending or future applications or awards, permanently enjoin Defendants from imposing or enforcing the New Conditions or any substantially similar conditions via any new agency action.

This permanent injunction should extend to all OVW applicants, because doing so is necessary to afford complete relief to Plaintiffs. *See, e.g.*, *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 202 (D.N.H. 2025) (enjoining agency action to non-parties to prevent harm to plaintiffs). If the Court issued a plaintiff-specific injunction, Defendants could choose to award discretionary grants to organizations that accept the New Conditions if Defendants imposed them anew. This difference could make OVW more likely to award grants to those other applicants, whom, absent universal relief, the Administration could hold to its ideological goals.

If the Court limits permanent injunctive relief to the parties, the Court's injunction should extend to Plaintiffs' members based on Plaintiffs' associational standing.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Plaintiffs on all their claims, vacate the New Conditions under the APA, and permanently enjoin Defendants from imposing or enforcing the New Conditions or substantially similar conditions in connection with any OVW grant.

November 19, 2025                     Respectfully submitted,

*/s/ Kristin Bateman*
Kristin Bateman (D.C. Bar No. 90037068)[+]
Robin F. Thurston (D.C. Bar No. 1531399)[+]
Skye L. Perryman (D.C. Bar No. 984573)[+]
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kbateman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson (D.C. Bar No. 1016621)[+]
Lynn D. Eisenberg (D.C. Bar No. 1017511)[+]
Brian C. Rosen-Shaud (ME Bar No. 006018)[+^]
Kyla M. Snow (D.C. Bar No. 90036400)[+]
Nina C. Cahill (D.C. Bar No. 1735989)[+]
Jacobson Lawyers Group PLLC
5100 Wisconsin Ave NW, Suite 301
Washington, DC 20016
(301) 823-1148
dan@jacobsonlawyersgroup.com

*/s/ Amy R. Romero*
Amy R. Romero (RI Bar No. 8262)
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
Amy@dwbrlaw.com
Cooperating counsel, Lawyers' Committee for RI

*/s/ Lynette Labinger*
Lynette Labinger (RI Bar No. 1645)
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation of RI

*/s/ Lauren A. Khouri*
Lauren A. Khouri (D.C. Bar No. 10282288)[+]
Elizabeth E. Theran (D.C. Bar No. 90030162)[+]
National Women's Law Center
1350 I Street NW, Suite 700
Washington, DC 20005
Telephone: (202) 588-5180
Fax: (202) 588-5185
lkhouri@nwlc.org
etheran@nwlc.org

[+] Admitted *Pro hac vice*
[^] Not admitted in the District of Columbia. Practice supervised by members of the D.C. bar.

*Counsel for Plaintiffs*

69

**CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2025, I electronically filed the within document and it is available for viewing and downloading from the Court's CM/ECF System, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

*/s/ Kristin Bateman*
Kristin Bateman
