IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.* <br><br> *Plaintiffs*, <br><br> v. <br><br> PAMELA BONDI, in her official capacity as United States Attorney General, *et al.*, <br><br> *Defendants*. | Case No.   1:25-cv-00279 |

**DECLARATION OF LAURA BERRY**

I, Laura Berry, declare as follows:

## I. Background

1. I am the Executive Director at the Indiana Coalition Against Domestic Violence (Indiana Coalition), Indiana's federally designated domestic violence coalition.

2. The Indiana Coalition, also known as ICADV, was founded in 1980 and is headquartered in Indianapolis, Indiana. The Indiana Coalition is the state domestic violence coalition that serves as a non-profit network of survivors, sexual and domestic violence agencies, and allies working to strengthen the ways in which communities across Indiana respond to and prevent intimate partner violence. The Indiana Coalition works for the prevention and elimination of domestic violence—until the violence ends. ICADV envisions a world where all people engage in healthy relationships characterized by the mutual sharing of resources, responsibilities and affection; where youth are nurtured with those expectations; and where all people are supported within a society committed to equality in relationships and equity in opportunity as fundamental human rights.

1

3. The Indiana Coalition provides its member agencies statewide with access to resources, training opportunities, technical assistance, and input on policies and practices that advance safety, prevention, justice, and healing for survivors.

4. The Indiana Coalition also provides direct services. For instance, the Indiana Coalition operates a statewide crisis response hotline and a direct legal services program, and it also distributes flexible funding to support survivors in collaboration with member programs.

5. The Indiana Coalition has an annual budget of $3,328,680. Of that total amount, approximately $385,848 (annually) comes directly from Office on Violence Against Women (OVW) grants.

**II. Indiana Coalition Against Domestic Violence Member Organizations**

6. The Indiana Coalition is a membership organization with 48 members. Membership primarily consists of domestic violence and dual domestic violence and sexual assault agencies; however, individual, allied partner, and professional memberships are also available to anyone who supports the coalition's mission and values.

7. The Indiana Coalition's membership includes two members, which are being identified for the purposes of this lawsuit as "Coburn Place" and "Indiana Member Doe 1."

8. Coburn Place is a community-based nonprofit and the largest domestic violence transitional housing provider in Indiana. Coburn Place provides individualized wrap-around services to best meet the needs of survivors of domestic violence and their children, which include family healing, financial literacy, workforce development, safety planning, legal advocacy, support for children, and community life programs.

9. Indiana Member Doe 1 is a dual domestic violence and sexual assault program that is a community-based nonprofit with a mission to support and empower survivors of

violence. Indiana Member Doe 1 operates an emergency shelter and a housing program for survivors of domestic violence, sexual assault, stalking, and human trafficking. Indiana Member Doe 1's survivor-centered, trauma-informed, and culturally competent services include crisis response, case management and resource navigation, advocacy services, support groups, children's programming, rapid rehousing, and legal advocacy.

### III. Grants the Indiana Coalition Has or Has Intended to Apply For

10.     The Indiana Coalition has applied for and received a formula grant from OVW for the State and Territory Domestic Violence and Sexual Assault Coalitions Program ("Coalition Grant") every year since its inception.

11.     The Indiana Coalition uses the Coalition Grant funds to provide tailored training and technical assistance on request to local domestic violence agencies across the state. This grant program has also supported our staff in providing one-on-one tailored technical assistance and onboarding to new directors at local agencies and those who need assistance with board development, personnel and organizational policies/practices. Funds have also been used to collaborate with cohorts of member domestic violence agencies and advocates on emerging service needs and develop and implement new programs and services that are responsive to those needs. ICADV also convened with a statewide survivor advisory board to help ensure that ICADV's programs and service recommendations are relevant and accessible to survivors.

12.     Most recently, OVW awarded the Indiana Coalition the FY25 Coalition grant for this grant cycle (October 1, 2025, through September 30, 2026). The Indiana Coalition received $110,090. The Coalition Grant Notice of Funding Opportunity (NOFO) required that applicants submit the final application by June 25, 2025 at 8:59 PM ET. For an application to be considered timely and complete, DOJ required applicants to submit a Certification Regarding Out of Scope

Activities. To ensure a timely, complete application, the Indiana Coalition submitted the required certification

13. The Indiana Coalition uses this grant funding to sustain core functions of the state coalition, including training and technical assistance to new and continuing advocates at member programs across the state, advance state partnership and the development of best practices to inform and guide the domestic violence field in Indiana. However, if the Indiana Coalition were not able to use the Coalition Grant funding, it would lose critical agency infrastructure, resulting in the need to terminate staff and to significantly reduce programming. These actions would have lasting impacts on the coalition's capacity to engage in essential functions.

14. The Indiana Coalition intends to apply for the Coalition Grant in FY26 and beyond. If awarded the Coalition Grant in the future, as expected, Indiana Coalition anticipates continuing to provide the services I describe above.

15. The Indiana Coalition receives competitive OVW grant funds as a subrecipient as well. Currently, the Indiana Coalition has the following pass-through OVW grants:

   a. The Indiana Coalition receives the OVW Services Training Officers and Prosecutors (STOP) Grant awarded by the state administering agency which provides a total of $228,758.84 for the period October 1, 2025, through September 30, 2026. The Indiana Coalition uses these grant funds to work in collaboration with the criminal justice system, including law enforcement officers, prosecutors, child welfare, and advocates to implement homicide reduction strategies to prevent domestic violence fatalities. Strategies supported include the oversight of the Governor-appointed Domestic Violence Fatality Review team, implementation of an on-scene Lethality Assessment Project with

4

       law enforcement and advocates, multi-disciplinary strangulation response protocols, and expert witness consultation.

    b. The Indiana Coalition receives a sub award from Kid's Voice, an Indiana non-profit organization that was the prime recipient of the OVW Justice For Families Grant. This sub award provides a total of $47,000 for the period of October 1, 2024, through September 30, 2027. The Indiana Coalition uses these grant funds to provide comprehensive training, technical assistance, and support to Kid's Voice, criminal justice personnel, guardian ad litem, and court appointed special advocates on the impacts of domestic violence.

### IV. Grants That Indiana Coalition Against Domestic Violence Members Currently Have or Have Intended to Apply For

16. Indiana Coalition members have also received OVW grants, including grants under the Rural Program, Transitional Housing Program, Legal Assistance for Victims, Services Training Officers and Prosecutors (STOP), and Sexual Assault Services Program (dual programs only).

17. Various Indiana Coalition members have applied or had intended to apply for OVW grants this year.

18. For example, in FY22, OVW awarded Indiana member program Coburn Place an OVW Transitional Housing Grant. The grant had a period of performance and a budget period of October 1, 2022, through September 30, 2025. This grant provided the organization with approximately $500,000 in funds to support comprehensive transitional housing support, short term housing assistance, and comprehensive support and advocacy service to 35 households per year.

19. Coburn Place applied for the FY25 Transitional Housing Grant with a period of performance and budget period of October 1, 2025, through September 30, 2028. For an application to be considered timely and complete, DOJ required applicants to submit a Certification Regarding Out of Scope Activities. To ensure a timely, complete application, Coburn Place submitted the required certification for a grant that would have provided the organization with $500,000 to support 35 households at a given time with transitional housing support. Coburn Place was notified on November 19, 2025, that it did not receive the grant award. However, Coburn Place intends to apply for this grant again in the future.

20. Indiana Member Doe 1 received the OVW Services Training Officers and Prosecutors (STOP) Grant awarded by the state administering agency, which provides a total of $35,000 for the period October 1, 2025, through September 30, 2026. The Indiana Member Doe 1 uses these grant funds to support advocacy staff training and provision of services to underserved populations as permitted by the funding. The advocacy staff provides culturally and linguistically relevant advocacy, case management, and resource navigation for underserved survivors residing in rural Indiana. The advocacy staff covers a four-county service area. These funds support 60 percent of the salary for the agency's Hispanic Advocate, enabling the provision of a full range of advocacy services to approximately 796 survivors annually across a four-county, largely rural service area. Specialized services supported through these funds include language access, culturally specific services, legal advocacy including assistance with U Visas, and the provision of support groups for Latinx survivors. The NOFO for FY25 STOP funding included the "out-of-scope" OVW conditions described below, and Indiana Doe Member 1 was required to sign the certification to apply. Additionally, the grant award that Member Doe received includes the "out-of-scope" OVW conditions described below.

### V. OVW's New Funding Conditions

21. The Notices of Funding Opportunity (NOFOs) for the FY25 OVW grants for which the Indiana Coalition and its members have intended to apply include new "out-of-scope" funding conditions that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior fiscal years. Specifically, the NOFOs for the FY25 OVW grants prohibit grant funds from being used for: (1) promoting or facilitating the violation of federal immigration law; (2) inculcating or promoting gender ideology; (3) promoting or facilitating discriminatory programs or ideology, including illegal DEI and "diversity, equity, inclusion, and accessibility" programs that do not advance the policy of equal dignity and respect; (4) activities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses; (5) programs that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women; (6) awareness campaigns or media that do not lead to tangible improvements in prevention, victim safety, or offender accountability; (7) initiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support; and (8) any activity or program that unlawfully violates an Executive Order. In addition to identifying these activities as "out-of-scope activities" for which grant funds may not be used, the NOFOs for the FY25 OVW grants require applicants to submit a certification with their application saying that they will not use the grant funds on the "out-of-scope" activities.

22. In addition, OVW has updated the General Terms and Conditions applicable to its grants and cooperative agreements for fiscal year 2025 to require a separate certification as a term of each award. The term requires a grant recipient to agree that "its compliance with all applicable federal civil rights and nondiscrimination laws is material to the government's

7

decision to make th[e] award and any payment thereunder, including for purposes of the False Claims Act." The term further states that "by accepting the award," the grantee "certifies that it does not operate any programs," including DEI programs, "that violate any applicable federal civil rights nondiscrimination laws."

### VI. The New Funding Conditions Place the Indiana Coalition and its Members in an Untenable Position

23.     The new funding conditions present the Indiana Coalition and its members with an impossible choice. The Indiana Coalition could forgo the OVW grants and face the direct consequences to its financial health and ongoing operations, or the Indiana Coalition could remain subject to the conditions and thereby jeopardize its mission and compliance with VAWA requirements and face enormous risks of litigation and government investigations under the False Claims Act.

24.     Agreeing to the certifications would cause the Indiana Coalition profound harm. The funding conditions are vague, and several could be read to conflict with the Indiana Coalition's core mission and the activities it has undertaken for decades in furtherance of that mission and in reliance on OVW grants. The funding conditions may require the Indiana Coalition to cease engaging in activities that it had previously understood OVW grants to plainly support. Thus, the Indiana Coalition does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and all vulnerable victims and survivors of domestic violence.

25.     For instance, the mission of the Indiana Coalition is "to work for the prevention and elimination of domestic violence-until the violence ends." The Indiana Coalition vision is "a world where all people engage in healthy relationships characterized by the mutual sharing of resources, responsibilities and affection; where youth are nurtured with those expectations; and

where all people are supported within a society committed to safety and equality in relationships."[1] The Indiana Coalition's philosophy includes the belief that every person has the right to safe, stable and nurturing relationships and environments, and that its work for equity, across identities and multiple types of relationships, helps ensure that physical safety and emotional wellbeing are respected in intimate relationships. Finally, the Indiana Coalition, like all domestic violence coalitions, has a statutory mandate to reach out to traditionally underserved populations, and our organization's strategy framework reflects this priority.

26.     The Indiana Coalition is unsure whether it may undertake its day-to-day activities reflecting its vision and guiding philosophy, which reference "equity" and "equality," without running afoul of the condition not to "promot[e] or facilitat[e] discriminatory programs or ideology, including illegal DEI" as DOJ might interpret those terms. It is also unclear whether the Indiana Coalition's philosophy, as reflected in our training materials, mission statement, and programming, which recognizes that intimate partner violence carries a systematic social justice element, violates the anti-social justice part of the certification, and whether the Indiana Coalition could comply with the anti-social justice condition without adopting a view antithetical to its true beliefs.

27.     Many of the Indiana Coalition's activities in furtherance of its OVW grant-funded direct service programs may also conflict with the new funding conditions. For instance, the Indiana Coalition currently operates programs and activities that encourage identifying and implementing programs and services that meet the needs of survivors as defined by 34 USC § 12291(a)(46) and that focus on populations of people who traditionally have faced barriers to

---

[1] *Who We Are*, Indiana Coalition Against Domestic Violence, https://icadvinc.org/who-we-are.

such access—including those with disabilities, survivors for whom English is not their primary language, and survivors that are seeking resources outside of accessing residential shelter. In addition, the Indiana Coalition's statewide data system collects demographic and history of violence information that has the potential to raise questions about services being provided to people who fall within the very broad group of people who might be included in the "illegal" DEI condition. The Indiana Coalition does not know if these program's focus would be construed as "promoting or facilitating discriminatory programs or ideology, including illegal DEI" as DOJ might interpret those terms.

28. The Indiana Coalition is also concerned that it cannot continue to engage in certain practices that respect the dignity of all victims of sexual and domestic violence, regardless of gender and sexual identity or orientation, and remain consistent with the VAWA mandate not to discriminate on the basis of gender or sexual identity or orientation. The Indiana Coalition advocates on behalf of all survivors, including those who are transgender or otherwise outside of the gender binary, and we train and provide technical assistance, which includes the provision of guidance on serving transgender people and people who are nonbinary. For example, the training we provide—both for new advocates and as part of ongoing professional development—covers how to deliver trauma-informed services to survivors. This includes specific instruction on working with transgender clients, such as understanding and addressing the distinct safety risks and abuse dynamics they may face because of their transgender status. In addition, the Indiana Coalition's statewide data system, which gathers demographic and violence-history information, can also raise sensitive questions regarding the provision of services to transgender and non-binary individuals. It is unclear whether the Indiana Coalition

may continue these practices and activities while complying with the funding condition not to "inculcat[e] or promot[e] gender ideology."

29. It is also unclear whether the Indiana Coalition may continue providing services to immigrant survivors of violence, including those without legal status, consistent with the funding conditions prohibiting "promoting or facilitating the violation of immigration law." In addition to the training and technical assistance described above, which also supports member agencies in understanding the dynamics of abuse and provision of trauma-informed services for immigrant survivors, the Indiana Coalition helps immigrant survivors understand and access legal remedies to help them get and stay safe and autonomous. The Indiana Coalition encourages our member agencies to put safety first and provide services to any person who is experiencing high risk violence without screening that goes beyond basic safety information; we also encourage advocates to first consider risks of immediate or near-future violence or harm when they must prioritize providing services to clients. This could mean that, based on harm-avoidance prioritization principles, or risk of imminent danger, an immigrant without documentation could be prioritized over a US citizen. Conducting these activities now may conflict with the way that DOJ interprets the prohibition against "promoting or facilitating the violation of immigration law."

30. Additionally, Indiana member program Coburn Place would also have to change or eliminate certain direct services to victims to comply with the conditions. If it agreed to the conditions, Coburn Place would not know whether it could comply with the anti-DEI conditions while continuing to conduct programming for victims from specific underserved identity categories. Coburn Place centers survivors making their own choices about what is best for their families. For instance, a survivor may not elect to press charges with law enforcement due to

frequent disparities in sentencing or not wanting to lose economic support if the parent can pay child support. A stance compelling criminalization as the only valid redress of domestic violence may harm children's ability to process their trauma and maintain a parental relationship. Other programming would need to be changed to comply with directives that prohibit the framing of intimate partner violence as a community issue with social and systemic roots.

31. Indiana Member Doe 1 would also have to change or eliminate some of its direct services to victims to comply with the conditions. If it agreed to the conditions, Indiana Member Doe 1 would not know whether it could comply with anti-DEI conditions while continuing to conduct programming for survivors from underserved identity categories.

32. Additionally, all Indiana Coalition member programs, including Member Doe 1 and Coburn Place, would have to change or eliminate some of their direct services to victims to comply with the conditions. Programs would likely have to end some existing programming for survivors to ensure that services are limited in scope to non-LGBTQ and non-immigrant survivors. The "gender ideology" condition would also require them to disregard the range of needs and circumstances under which survivors in their region seek services for domestic violence. In addition, survivors who wish to access health, safety, and crisis intervention services but do not wish to proceed with criminal or legal cases would be advised to cooperate with prosecutors, law enforcement, and the legal system regardless of the victim's real or perceived impact on emotional and physical safety and wellbeing. All member programs would need to task their limited staff with the additional burden of navigating which laws to follow when the grants' directives conflict with VAWA and federal statutory obligations. The new conditions would imperil the missions of all member programs of the Indiana Coalition: to serve all survivors to ensure their safety and autonomy.

33. If the member programs of the Indiana Coalition could not access the grant funds, many would need to cut critical services. For instance, member programs would need to cut transitional housing programs that provide 6-24 months of non-emergency housing with support services for victims who are homeless or in need of transitional housing and for whom emergency shelter services or other crisis intervention services are unavailable or insufficient. Member programs would need to cut short-term supportive services intended to help survivors locate permanent housing and employment in the community, including counseling, childcare, transportation, and life skills, educational and/or job training. Member programs would need to cut training and partnership programs designed to engage law enforcement, judges, attorneys, court personnel, and healthcare and social services providers, in efforts to enhance the safety of rural victims of sexual assault, domestic violence, dating violence and stalking, with a focus on coordinated community responses and cross-system collaboration.

34. The Indiana Coalition and its members fear that if they agree to the new funding conditions, they could face federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of operating under a grant subject to the new, vague conditions make the Indiana Coalition and its members concerned about applying for or accepting an award. To mitigate these risks, the Indiana Coalition and its members would have to change their practices, in many cases contrary to its core values, and contrary to federal law.

35. Not agreeing to the certifications would result in equally grave harm.

36. Not having access to funds from the Coalition Grant and other competitive grants would severely undermine the Indiana Coalition's ability to function as a state domestic violence coalition and to provide direct services. Without these funds, the Indiana Coalition would have to

reduce the size of its staff and, therefore, our services to members, in ways that would have significant and lasting impacts on the coalition's capacity to engage in essential functions. These losses would make the Indiana Coalition less effective as a coalition and undermine its role as the state authority on domestic violence prevention, intervention, and response. If the Indiana Coalition lost its federal funding and needed to downsize considerably, it would lose the capacity to provide the infrastructure necessary to operate direct services like the legal resource project and statewide crisis response hotline.

37. Our member programs would lose access to core, comprehensive training for their staff necessary to provide legally and ethically compliant advocacy services to clients in addition to regular training on emergent issues that ensure front-line staff are able to provide quality services to all survivors. The state would lose critical technical assistance infrastructure at the coalition as this grant allows staff to travel across the state in order to provide on request, one-on-one or team/staff-wide assistance on complex advocacy issues such as building coordinated community response teams, improving systemic responses in legal, medical, and social services settings, shelter policies and practices, confidentiality and trauma-informed advocacy, and more.

38. The Indiana Coalition would no longer be able to provide new and continuing advocates across the state with: (1) ongoing training and technical assistance; (2) resources that educate members on best practices, update them on changes to state and federal law, and help survivors and the public recognize violence, find safety, and access available resources; or (3) systems coordination support, including tailored technical assistance, training, and coaching on building and sustaining community partnerships. Additionally, we would not have the funding needed to document and collect data meant to provide localities and the state with critical information on service trends, victim help-seeking behavior, prevention programming, and

outcomes for victims and their families who are served by Indiana's sexual and domestic violence agencies. The lack of training, technical assistance, data, and best practices provided by the Indiana Coalition would undermine the viability and sustainability of organizations across the state, and their ability to meet grant application and management requirements, specifically for culturally specific service providers who tend to be smaller, less resourced organizations that lack historical infrastructure. These are just some of the ways the Indiana Coalition's programming and its beneficiaries would suffer.

### VII. Cuts to the Indiana Coalition and its Members' Services Would Harm Domestic Violence Survivors

39. The reduction or outright termination of these services would have devastating effects on the community of domestic violence survivors. The loss of a fully funded Indiana Coalition would result in fewer safety options for survivors seeking to separate from an abusive relationship and to rebuild safe lives in the community, including the loss of critical legal services to survivors, which would increase lethality for the clients that we serve.

40. Direct service providers will be unable to maintain high quality services that follow best practice guidance or even that are fully compliant with the myriad federal, state, and local requirements they would now have to navigate on their own, without the critical assistance of coalitions. Support for the Indiana Coalition and member programs is particularly critical as we observe escalations in the prevalence of violence and demand for services at a time when federal funding for the work is increasingly inconsistent. Member programs report that nearly 70 percent of their advocacy staff is supported through OVW grant funds.

41. The supportive services provided by the Indiana Coalition and member programs are becoming more important than ever as we track increasing rates of domestic violence lethality in Indiana. Domestic violence homicides surged during the pandemic period with 98

15

DV-related deaths reported for the 2020 fiscal year; this represented an 181 percent increase over fatality rates prior to the pandemic. The incidence of domestic violence fatalities has remained above pre-pandemic rates with 83 identified deaths in 2024 (reports available at: https://icadvinc.org/what-we-do/state-homicide-reduction-plan). Additionally, community advocates, prosecutors and SANE nurses report that they are seeing increasing rates of lethal behaviors, including strangulation. The Indiana Coalition leads statewide efforts to identify and prevent domestic violence homicides with activities including the convention of state and community domestic violence fatality review teams, training on strangulation identification and response protocols, firearm removal collaborations and the broad implementation of the evidence-based lethality assessment protocol.

42. The Indiana Coalition and member programs work to prevent domestic violence homicides and to help survivors implement safety plans before violence escalates to that level. The Indiana Coalition provides legal advocacy and low bono representation to over 240 new survivors annually with over 500 points of service. The Indiana Coalition works with member programs to distribute emergency flexible funding to support survivors working to recreate safe lives in the community. In the past fiscal year, the Indiana Coalition distributed over $214,000 in emergency funds to support survivors' basic safety needs including housing, transportation, food and security technologies. In addition to implementing best-evidence programs to prevent domestic violence homicides, and adopting innovative strategies for supporting survivors' safety needs, the Indiana Coalition works to prevent violence across Indiana communities.

43. The Indiana Coalition's operations are essential to permitting the network of direct service providers to focus on providing the highest-quality services to the survivors they serve and ensuring that the systems that contribute to addressing and responding to the epidemic

of domestic violence are operating with evidence-based, trauma-informed, survivor-centered policies and practices.

44. The Indiana Coalition and member programs share deep concern about the impacts of the loss of survivor services—both for those victims experiencing immediate harm and for the negative impacts on future public health and public safety in Indiana. Absent accessible, high quality domestic violence services, victims are more likely to remain in dangerous homes. They are more vulnerable to poverty, homelessness and domestic violence homicide. Children living within these families are exposed to a range of adverse childhood experiences (ACEs) including witnessing domestic violence, increased vulnerability to child abuse, increased likelihood of exposure to parents with mental health or substance use disorders, poverty and the possibility of losing a parent. Children exposed to multiple ACEs report a range of negative health outcomes across the lifespan and have a greater likelihood of experiencing or perpetrating violence in the future. The potential loss of domestic violence programs and services in Indiana would increase multiple risks for victims in the present and would compromise the future health and safety of our communities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 19, 2025.

_____
Laura Berry
Executive Director
Indiana Coalition Against Domestic Violence