IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.* <br><br> *Plaintiffs*, <br><br> v. <br><br> PAMELA BONDI, in her official capacity as United States Attorney General, *et al.*, <br><br> *Defendants*. | Case No.   1:25-cv-00279 |

**DECLARATION OF JAN CHRISTIANSEN**

I, Jan Christiansen, declare as follows:

**I.   Background**

1.   I am Executive Director of the Georgia Coalition Against Domestic Violence (GCADV), Georgia's federally designated domestic violence coalition. The Mission of GCADV is to "Collaborate," "Advocate," "Educate," and Empower:" We empower survivors and the programs that serve them; we educate the public; we advocate for responsive public policy; and our strength is in numbers, as we collaborate throughout Georgia to stop domestic violence.

2.   Georgia Coalition Against Domestic Violence (GCADV) is a domestic violence coalition membership organization founded in 1970 and headquartered in Atlanta, Georgia. GCADV uses its diverse and collective voice toward a Georgia free of domestic violence.

3.   GCADV provides training and technical assistance for its direct-service member programs, allied organizations, law enforcement, and government partners, and survivors of domestic violence to understand how to lawfully implement best practices when serving survivors of domestic violence, leads policy and advocacy efforts on behalf of and along with

1

survivors of domestic violence, and educates the religious community and the public on the dynamics of domestic violence. GCADV also provides resources and input on policies and practices that advance safety, justice, and healing for survivors. Additionally, GCADV also provides direct services. For instance, GCADV provides services to Deaf and Hard of Hearing survivors through our BRIDGES program, the only deaf domestic violence program in Georgia, which is run and operated by a Deaf survivor.

4. GCADV has an annual budget of $1,915,765 for the organization's 2026 fiscal year (July 1, 2025 through June 30, 2026). Of that total amount, roughly $220,803 comes directly from Office on Violence Against Women (OVW) grants.

**II. Georgia Coalition Against Domestic Violence Member Organizations**

5. GCADV is a membership organization with 63 member agencies. Membership consists of domestic violence agencies and programs.

6. These include a GCADV member program which is being identified for the purposes of this lawsuit as "GCADV Member Doe." GCADV Member Doe is a domestic violence agency that is a community-based nonprofit with the core function of combatting domestic violence through the empowerment of survivors. GCADV's Member Doe provides primary direct services including counseling, emergency shelter, legal services, children's programming, domestic violence outreach and education, and systems advocacy.

**III. Grants GCADV Has or Has Intended to Apply For**

7. GCADV has applied for and received a formula grant from OVW for the State and Territory Domestic Violence and Sexual Assault Coalitions Program ("Coalition Grant") every year since its inception.

8.      In June 2025, GCADV applied for the FY25 OVW Coalition grant; OVW ultimately awarded GCADV a total of $110,090 through the Coalition Grant. The grant has a period of performance and a budget period of October 1, 2025, through September 30, 2026. GCADV accepted this grant on September 19, 2025.

9.      The Coalition Grant Notice of Funding Opportunity (NOFO) required that applicants submit the final application by June 25, 2025 at 8:59 PM ET. For an application to be considered timely and complete, DOJ required applicants to submit a Certification Regarding Out of Scope Activities. To ensure a timely, complete application, GCADV submitted the required certification.

10.     GCADV has and currently uses Coalition Grant funds to sustain core functions of the state coalition. GCADV uses Coalition Grant funds to provide customized, tailored training and technical assistance on request to 63 member domestic violence agencies across the state to 63 member programs. This has been particularly important as high turnover in the field, throughout and since the pandemic, has brought an influx of new advocates and staff that require training and support. Coalition Grant Funds have helped us to provide quarterly meetings with our member programs, which includes training and workshops identified as important by our Training and Programming Task Force made up of advocates and directors from our member programs. It has also helped us to participate in statewide planning and work with Georgia's STOP Administrator, the Criminal Justice Coordinating Council (CJCC), to identify domestic violence programs in need of additional training and technical assistance or other support to meet state standards of victim services, including culturally appropriate services for underserved populations, and serve on statewide committees and task forces related to family violence, domestic violence, dating violence, and human trafficking, and underserved communities.

3

11. However, if GCADV could not use the Coalition Grant funding, it would lose critical agency infrastructure, resulting in the need to terminate staff and to significantly reduce programming as to have lasting impacts on the coalition's capacity to engage in essential functions.

12. GCADV is also the recipient of an OVW Financial Assistance to Victims grant in the amount of $500,000, for a performance period of February 1, 2025 through January 31, 2027. These grant funds are used to provide flexible financial assistance to survivors of domestic violence (DV) who have been criminalized—that is, who were incarcerated or otherwise penalized as a result of their experiences of abuse—and have been released from prison and are on their journey of re-entry into their communities. These funds support clients' self-identified needs for housing, transportation, childcare, household items, groceries, and other needs. Incarceration has negative economic impacts on criminalized individuals and their families, including legal costs, costs of communication with loved ones while incarcerated, low prison wages, and the impact of a criminal record on secure employment. This will allow criminalized domestic violence survivors time and opportunity to find secure footing after release from prison, decreasing their likelihood of returning to an abusive situation, preventing survivors from being put in a position where their only safe option is to commit an act of self-defense that again leads to incarceration, and increasing the chances for stability for themselves and their children. GCADV administers funds through payments to vendors and prepaid gift cards to survivors. Payments are administered directly to vendors through secure online platforms, and checks. Vendors may include, but are not limited to, landlords, utility companies, stores or companies that sell goods, car repair shops, transportation providers, pharmacies, healthcare providers, mental health service providers, and grocery stores. Gift cards are provided through a secure

platform which provides easy access to physical or digital cards with no additional fees to the user. The GCADV team assists clients in paying off their outstanding debt to encourage and support credit repair and financial freedom. And, through GCADV staff and referrals to partner agencies such as financial planners, this programming helps survivors create the infrastructure and mechanisms needed to earn income and achieve financial stability, such as obtaining government-issued identification, opening checking and savings accounts, obtaining a debit card and checkbooks, obtaining credit cards where appropriate, creating a personal financial plan. In the second grant year, GCADV will also be able to distribute funds directly to clients to encourage individualized and survivor centered.

13. In addition, GCADV was recently awarded and accepted a Legal Assistance to Victims Grant (LAV) in the amount of $750,000, for the performance period of October 1, 2025 through September 30, 2028. With these funds, GCADV provides in-house legal representation and coordinates both pro bono attorneys and domestic violence (DV) advocates to provide post-conviction assistance to incarcerated women in Georgia's (GA) prisons with a relevant history of domestic violence. In addition, GCADV's Justice For Incarcerated Project (JFIS) team reviews cases of incarcerated women, investigates their domestic violence history to determine whether their history of abuse was adequately presented and considered in their case, and advocates for the correction of improper convictions and unduly harsh sentences. The JFIS Program, through both in-house and pro bono representation, works to correct attorneys' and lower courts' previous failures to properly investigate and address history of domestic violence as is relevant to a client's case (among other legal issues) by providing representation to clients seeking various forms of post-conviction relief. Through trained attorneys, JFIS offers survivors the best chance of success by providing courts and the Parole Board with information critical to

understanding relevant factors underlying the conviction. LAV funding will support representation to JFIS clients in post-conviction criminal matters, aiming to obtain clients' release from prison through sentence reduction, exoneration, or release on parole. This includes representation in parole consideration, petitions for writ of habeas corpus, petitions for resentencing, extraordinary motions for new trial, and, occasionally, direct appeals. LAV funding will also support petitions for domestic violence survivors who qualify for relief under a Georgia law that allows survivors of human trafficking to petition for vacatur or expungement if they can demonstrate that their conviction is tied to trafficking that they have experienced.

14. Occasionally, the JFIS program will provide services to individuals who are out of prison but under correctional supervision and seeking to reduce the length of their time on probation or parole. Legal services will be provided by the JFIS Legal Director, pro bono attorneys, and program partners.

15. GCADV receives competitive OVW grant passthrough funds from our state administrator, the state's Criminal Justice Coordinating Council. Currently, GCADV receives this funding for training, technical assistance in the amount of $65,000 in a grant with a performance period of January 1, 2025 through December 31, 2025. These funds are used to go directly to programs and advocates to give specialized training and technical assistance throughout Georgia. We provide tailored training and technical assistance on request to 63 member domestic violence agencies across the state.

16. GCADV intends to apply for the Coalition Grant in FY26 and beyond. If awarded the Coalition Grant in the future, as expected, GCADV anticipates continuing to provide the services I describe above. GCADV also intends to apply for our current OVW grants listed above as well as other OVW grants above.

**IV. Grants That GCADV Members Currently Have or Have Intended to Apply For**

17. GCADV members have also received OVW grants, including Legal Assistance to Victims, the Cultural Specific Program, Rural Grant, Transitional Housing Grant, Underserved Grant, and others.

18. Various GCADV members have applied or had intended to apply for OVW grants for FY25.

19. For example, GCADV Member Doe is a current recipient of the OVW passthrough grants from the State Administrator, CJCC. In FY25, GCADV Member Doe applied for and received a passthrough STOP Program grant of VAWA funds in the range of $100,000 to $150,000 for the performance and budget period of Jan 1, 2025 to December 31, 2025. Member Doe received the grant award on March 14, 2025. GCADV Doe anticipates that when it needs to reapply for that grant in future years, it will need to agree to the challenged certification conditions. GCADV Doe anticipates that when it needs to reapply for that grant in future years, it will need to agree to the challenged certification conditions.

**OVW's New Funding Conditions**

20. The Notices of Funding Opportunity (NOFOs) for the FY25 OVW grants for which GCADV and its members have applied or intended to apply include new "out-of-scope" funding conditions that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior fiscal years. Specifically, the NOFOs for the FY25 OVW grants prohibit grant funds from being used for: (1) promoting or facilitating the violation of federal immigration law; (2) inculcating or promoting gender ideology; (3) promoting or facilitating discriminatory programs or ideology, including illegal DEI and "diversity, equity, inclusion, and accessibility" programs that do not advance the policy of equal dignity and

7

respect; (4) activities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses; (5) programs that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women; (6) awareness campaigns or media that do not lead to tangible improvements in prevention, victim safety, or offender accountability; (7) initiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support; and (8) any activity or program that unlawfully violates an Executive Order. In addition to identifying these activities as "out-of-scope activities" for which grant funds may not be used, the NOFOs for the FY25 OVW grants require applicants to submit a certification with their application saying that they will not use the grant funds on the "out-of-scope" activities.

21.    In addition, OVW has updated the General Terms and Conditions applicable to its grants and cooperative agreements for fiscal year 2025 to require a separate certification as a term of each award. The term requires a grant recipient to agree that "its compliance with all applicable federal civil rights and nondiscrimination laws is material to the government's decision to make th[e] award and any payment thereunder, including for purposes of the False Claims Act." The term further states that "by accepting the award," the grantee "certifies that it does not operate any programs," including DEI programs, "that violate any applicable federal civil rights nondiscrimination laws."

### VI. The New Funding Conditions Place the Georgia Coalition and its Members in an Untenable Position

22.    The new funding conditions present GCADV and its members with an impossible choice. GCADV could forgo the OVW grants and face the direct consequences to its financial health and ongoing operations. Or GCADV could agree to the conditions and thereby jeopardize

8

its mission and compliance with VAWA requirements, and face enormous risks of litigation and government investigations under the False Claims Act no matter what GCADV does.

23. Agreeing to the certifications and conditions would cause GCADV profound harm. The funding conditions are vague, and several could be read to conflict with GCADV's core mission and the activities it has undertaken for decades in furtherance of that mission and in reliance on OVW grants. The funding conditions may require GCADV to cease engaging in activities that it had previously understood OVW grants to plainly support. Thus, GCADV does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of domestic abuse and sexual violence.

24. For instance, GCADV's values include: equity, wholeness, and freedom. With respect to equity, GCADV recognizes that oppression is the root cause of violence. Ending violence must start with building equity for everyone in the community, especially the most marginalized, so that they have access to everything they need to be safe, heal, and thrive. With respect to wholeness GCADV believes that effectively addressing violence requires a recognition that humans are multifaceted and have a range of needs, whether they're healing from or actively working to address trauma. We value this complexity. Both within GCADV and through our work with our members, community organizations, and survivors, we see and honor people's whole selves. Finally, with respect to freedom, GCADV recognizes that everyone deserves to live free from violence and oppression, and to have the power to make decisions about their lives. At GCADV, we aim to foster agency among survivors, our members and partners, and our own team so that they can build the future they want.

25. GCADV is unsure whether it may undertake its day-to-day activities reflecting its mission and these guiding principles, which reference "equity" and "diversity," without running afoul of the condition not to "promot[e] or facilitat[e] discriminatory programs or ideology, including illegal DEI" as DOJ might interpret those terms. It is also unclear whether GCADV's mission and guiding principles, which recognize that the criminal offenses of domestic violence carry a systematic social justice element, violate the anti-social justice part of the certification, and whether GCADV could comply with the anti-social justice condition without adopting a view antithetical to its true beliefs.

26. Many of GCADV's activities in furtherance of its OVW grant-funded direct service programs may also conflict with the new funding conditions. For instance, GCADV currently operates programs and activities that promote access to services, dignity and healing for all people, and that focus on populations of people who traditionally have faced barriers to such access—including with disabilities, people for whom English is not their primary language, and people who have been excluded from specific services such as shelter. The coalition does not know if these programs' focus would be construed as "promoting or facilitating discriminatory programs or ideology, including illegal DEI" as DOJ might interpret those terms.

27. GCADV is also concerned that it cannot continue to engage in certain practices that respect the dignity of all victims of domestic violence, regardless of gender and sexual orientation, and are consistent with the VAWA mandate not to discriminate on the basis of gender or sexual orientation. GCADV would continuously run into challenges because we are advocates on behalf of all people, including those who are transgender or otherwise outside of the gender binary, and we train and provide technical assistance, which includes guidance on serving transgender people and people who are nonbinary. For instance, the training that we provide both

to new advocates and for continuing advocacy training, discusses the provision of trauma-informed services to survivors. This includes training providers on issues specific to transgender clients—including recognizing and responding to the unique safety concerns and dynamics of abuse that are faced by these survivors (for instance, the threat of "outing"). It is unclear whether GCADV may continue these practices and activities while complying with the funding condition not to "inculcat[e] or promot[e] gender ideology."

28. It is also unclear whether GCADV may continue providing services to immigrant survivors of violence, including those without legal status, consistent with the funding conditions. In addition to the training and technical assistance described above, which also supports member agencies in understanding the dynamics of abuse and provision of trauma-informed services for immigrant survivors, GCADV assists survivors who are immigrants to access legal remedies to help them gain or maintain legal status when violence has played a role in their immigration experience. GCADV encourages our member agencies to put safety first and provide services to any person who is experiencing high risk violence without screening that goes beyond basic safety information. GCADV also encourages advocates to first consider risks of immediate or near-future violence or harm when they must prioritize providing services to clients. This could mean that, based on harm-avoidance prioritization principles, or risk of imminent danger, an immigrant without documentation could be prioritized over a US citizen. Conducting these activities now may conflict with the way that DOJ interprets the prohibition against "promoting or facilitating the violation of immigration law."

29. Additionally, GCDAV's Member Doe has previously received OVW funding and intends to reapply in the upcoming funding cycle. Member Doe has expressed concern that the

challenged conditions conflict with its organizational mission, values, and established methods of providing survivor-centered services.

30. For the same reasons, GCADV Member Doe fears that compliance with these conditions would require fundamental alterations to the manner in which Member Doe delivers services, thereby undermining its ability to meet the needs of survivors in accordance with best practices and professional standards and the Violence Against Women Act. Member Doe is concerned that its programmatic focus on equity and initiatives that focus on underserved populations would be construed as "promoting or facilitating discriminatory programs or ideology, including illegal DEI" as DOJ might interpret those terms, or that DOJ may interpret these programs as conflicting with the systemic social justice condition. Member Doe is concerned that DOJ may interpret the prohibition against "promoting or facilitating the violation of immigration law," to prohibit it from providing services to immigrant survivors of violence, without screening for immigration status. It is also unclear whether Member Doe may continue to serve transgender clients in a trauma-informed way that respects their identities—including by using correct pronouns and providing services in accord with those clients' gender identity—while complying with the funding condition not to "inculcat[e] or promot[e] gender ideology."

31. Conversely, declining to accept OVW funding would result in a significant loss of resources to Member Doe that are essential to the continuation of critical programs, jeopardizing staff positions, reducing the availability of services, and leaving survivors without access to lifesaving support. Accordingly, the challenged conditions place Member Doe—and other GCADV members—in an untenable position, creating immediate and irreparable harm to both the organizations and the survivors they serve.

32. If Georgia's members did not accept the grant funds, they would need to cut services including: transitional housing programs that provide 6-24 months of non-emergency housing with support services for victims who are homeless or in need of transitional housing and for whom emergency shelter services or other crisis intervention services are unavailable or insufficient; short-term supportive services intended to help survivors locate permanent housing and employment in the community, including counseling, childcare, transportation, and life skills, educational and/or job training; and training and partnership programs designed to engage law enforcement, judges, attorneys, court personnel, and healthcare and social services providers, in efforts to enhance the safety of rural victims of sexual assault, domestic violence, dating violence and stalking, with a focus on coordinated community responses and cross-system collaboration.

33. GCADV fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make GCADV concerned about applying or accepting an award. To mitigate these risks, GCADV would have to change its practices, in many cases contrary to its core values.

34. Not agreeing to the certifications would result in equally grave harm.

35. Not having access to funds from the Coalition Grant and other competitive grants would severely undermine GCADV's ability to function as a state coalition and to provide direct services. Losing the Coalition Grant alone would result in a loss of approximately $110,090 funds for the next fiscal year. Without these funds, GCADV would have to reduce the size of its staff and, therefore, our services to members, in ways that would have significant and lasting

13

impacts on the coalition's capacity to engage in essential functions. These losses would make GCADV less effective as a coalition and undermine its role as the state authority on domestic violence intervention, and response. And if GCADV lost its federal funding and needed to downsize considerably, it would lose the capacity to provide the infrastructure necessary to operate direct services like the statewide crisis response hotline.

36. Our member programs would lose access to core, comprehensive training for their staff necessary to provide legally and ethically compliant advocacy services to clients in addition to regular training on emergent issues that ensure front-line staff are able to provide quality services to all survivors. The state would lose critical technical assistance infrastructure at the coalition as this grant allows staff to travel across the state in order to provide on request, one-on-one or team/staff-wide assistance on complex advocacy issues such as improving systemic responses in legal, medical, and social services settings, shelter policies and practices, confidentiality and trauma-informed advocacy, and more.

37. GCADV would no longer be able to provide new and continuing advocates across the state with: (1) ongoing training and technical assistance; (2) resources that educate members on best practices, update them on changes to state and federal law, and help survivors and the public recognize violence, find safety, and access available resources; or (3) systems coordination support, including tailored technical assistance, training, and coaching on building and sustaining community partnerships. The training, technical assistance, data, and best practice building vacuum would undermine the viability and sustainability of organizations across the state, and their ability to meet grant application and management requirements, specifically for culturally specific service providers who tend to be smaller, less resourced organizations that

14

lack historical infrastructure. These are just some of the ways GCADV's programming and its beneficiaries would suffer.

### VII. Cuts to GCADV's and its Members' Services Would Harm Domestic Violence and Sexual Assault Victims and Survivors

38. The reduction or outright termination of these services would have devastating effects on the community of survivors and victims of domestic violence.

39. In the absence of fully funded GCADV services and services from GCADV members, domestic violence victims will be confronted with more barriers when trying to access services following their assault, including discriminatory treatment from medical, law enforcement or courtroom personnel, hotline operators, and therapists who have not received anti-bias and other core victim services training. This will immediately lead to more survivors choosing not to participate in the criminal justice system and fewer being linked to and receiving appropriate medical and therapy services. Direct service providers will be unable to maintain high quality services that follow best practice guidance or even that are fully compliant with the myriad federal, state, and local requirements they would now have to navigate on their own, without the critical assistance of coalitions, while desperately trying to keep up with the already increasing demand for services.

40. GCADV's operations are essential to permit the network of direct service providers to focus on providing the highest-quality services to the survivors they serve and ensuring that the systems that contribute to addressing and responding to the epidemic of domestic violence are operating with evidence-based, trauma-informed, survivor-centered policies and practices.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 14 , 2025.

*Jan Christiansen*
Jan Christiansen
Executive Director
Georgia Coalition Against Domestic Violence