**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>PAMELA BONDI, in her official capacity as United States Attorney General, *et al.*<br><br>*Defendants*. | Case No. 1:25-cv-00279 |

**DECLARATION OF KRISTA COLÓN**

I, Krista Colón, declare as follows:

## I.    Background

1.      I am the Executive Director at the California Partnership to End Domestic Violence ("the Partnership"), a domestic violence coalition membership organization.

2.      The Partnership was founded in 1993 as the California Alliance Against Domestic Violence. In 2005, the organization amended and restated the Articles of Incorporation, including a name change to the California Partnership to End Domestic Violence. It was founded and remains headquartered in Sacramento, California.

3.      The Partnership is California's recognized state domestic violence coalition, representing over 2,000 advocates, organizations, and allied groups throughout the state. The Partnership supports service providers to prevent and end domestic violence. Through public policy, communications, and capacity-building efforts, the Partnership aligns prevention and intervention strategies to advance social change.

4.      The Partnership creates a wide range of technical assistance documents for service providers and provides various trainings, including webinars, toolkits, and curricula. For example, the Partnership has a sample 40-Hour Training Curriculum that helps organizations meet California's domestic violence advocate training requirements under California Evidence Code §1037.1. Another example is the Partnership's "Building Change Together: Prevention Core Competencies" training, which equips advocates with the skills and knowledge to prevent domestic violence through the lens of the social-ecological model and systemic change.

5.      The Partnership provides support to over 100 domestic violence service providers statewide. With seven geographic membership regions, the Partnership consistently convenes in-person and virtual peer-to-peer connection spaces for advocates in their community. Their annual conference provides workshops across a wide array of topic areas and reaches hundreds of advocates every year. The Partnership's communications team works to educate the public and shift the narrative about domestic violence, connecting with the public through traditional media, social media, and awareness month campaigns. The Partnership's prevention team leads the "Building Change Together Training" and convenes Prevention Peer Networking spaces and other trainings to support prevention advocates in building their skills and strengthening their community-based efforts. The Partnership's policy team engages in state and federal legislative and budget advocacy, and advances systemic changes to improve programs and practices impacting survivors' lives. The policy team also focuses on addressing the intersection of housing, homelessness, and domestic violence through systems change work, including supporting a cohort of eleven organizations throughout California to improve the safety and economic security of Californians who are experiencing homelessness due to domestic violence.

6.    The Partnership has an annual budget of roughly $3 million. Of that total amount, roughly $940,000 comes from federal direct grants, including $114,533 from an Office on Violence Against Women (OVW) grant.

**II. The Partnership Member Organizations**

7.    The Partnership is a membership organization with over 2000 member advocates. Members fall into one of two categories. The first category is organizational members, which includes (1) organizations dedicated to domestic violence prevention and/or intervention; (2) organizations with a specific program or project dedicated to domestic violence prevention and/or intervention; (3) governmental agencies, multi-disciplinary committees, and coalitions addressing domestic violence and/or intersecting social justice issues; and (4) organizations dedicated to addressing other intersecting social justice issues that may be related to, but are not specifically, domestic violence, (e.g. homelessness, child welfare, etc.). The second category is individual members.

8.    The Partnership provides its members with various services, including listservs that function as a robust network of advocates and attorneys; policy briefings on relevant budget and legislative items; webinars, events, and trainings; and one-on-one technical assistance.

9.    The Partnership's members include Domestic Violence Solutions for Santa Barbara County (DVS), an organization providing safety, shelter, and support for individuals and families affected by domestic violence; and a member that is being identified for purposes of this lawsuit as "California Member Doe," which is leading domestic violence prevention and survivor support organization serving the greater San Francisco Bay Area.

### III. Grants The Partnership Has or Has Intended to Apply For

10.    The Partnership has applied for and received a formula grant from OVW for the State and Territory Domestic Violence and Sexual Assault Coalitions Program ("Coalition Grant") every year since 2006, and its predecessor organizations received the Coalition Grant before 2006.

11.    In FY24, OVW awarded the Partnership a total of $114,533 through the Coalition Grant. The grant had a period of performance and a budget period of October 1, 2024, through September 30, 2025. The Coalition Grant represented 3.8% of the Partnership's total annual budget.

12.    The Partnership has used Coalition Grant funds to provide informational webinars that reach well over 150 attendees per year, to support convening member organizations to coordinate services, and to support the Partnership's participation in State-level convenings and collaboration with State agencies.

13.    Most recently, OVW awarded the Partnership the Partnership $113,574 through the Coalition Grant for FY25. The Notice of Funding Opportunity (NOFO) for the Coalition Grant required applicants to submit a certification by June 23, 2025 at 11:59 PM ET and submit the final application by June 25, 2025 at 8:59 PM ET; pursuant to a stipulation in this matter, the Partnership applied by the date without submitting a certification. [1] With this Grant, the Partnership will be able to continue to provide informational webinars, support both in-person and virtual convenings for member organizations to coordinate services, and participate in State-level convenings that allow collaboration with State agencies. However, if the Partnership were

---

[1] Pursuant to a stipulation filed in this matter, the Partnership and its members were not required to submit a certification for any OVW grant until August 12; the Court granted a stay of the challenged conditions on August 8.

unable to use the Coalition Grant funding, it would need to scale back the number of trainings it provides to domestic violence service providers and would have reduced staff capacity for individualized technical assistance, attending regional meetings, and convening service providers to address needs and gaps.

### IV. Grants That The Partnership Members Currently Have or Have Intended to Apply For

14.     The Partnership's members have also received OVW grants, including grants under the Rural Program; the Transitional Housing Program; the Children and Youth Program; and others.

15.     Various Partnership members have also applied for OVW grants this year.

16.     For example, DVS applied for the Transitional Housing Program Grant.

### V. OVW's New Funding Conditions

17.     The NOFOs for the FY25 OVW grants for which the Partnership and its members have intended to apply include new "out-of-scope" funding conditions that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior fiscal years. Specifically, the NOFOs for the FY25 OVW grants prohibit grant funds from being used for: (1) promoting or facilitating the violation of federal immigration law; (2) inculcating or promoting gender ideology; (3) promoting or facilitating discriminatory programs or ideology, including illegal DEI and "diversity, equity, inclusion, and accessibility" programs that do not advance the policy of equal dignity and respect; (4) activities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses; (5) programs that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women; (6) awareness campaigns or media that do not lead to tangible improvements in prevention, victim safety, or offender

accountability; (7) initiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support; and (8) any activity or program that unlawfully violates an Executive Order. In addition to identifying these activities as "out-of-scope activities" for which grant funds may not be used, the NOFOs for the FY25 OVW grants require applicants to submit a certification with their application saying that they will not use the grant funds on the "out-of-scope" activities.

18.    In addition, OVW has updated the General Terms and Conditions applicable to its grants and cooperative agreements for fiscal year 2025 to require a separate certification as a term of each award. The term requires a grant recipient to agree that "its compliance with all applicable federal civil rights and nondiscrimination laws is material to the government's decision to make th[e] award and any payment thereunder, including for purposes of the False Claims Act." The term further states that "by accepting the award," the grantee "certifies that it does not operate any programs," including DEI programs, "that violate any applicable federal civil rights nondiscrimination laws."

### VI. OVW's New Funding Conditions Place The Partnership and its Members in an Untenable Position

19.    The new funding conditions present the Partnership and its members with an impossible choice. The Partnership could forgo the  OVW grants and face direct consequences to the Partnership's financial health and ongoing operations. Or the Partnership may agree to the conditions and jeopardize its mission and compliance with VAWA requirements, and face enormous risks of litigation and government investigations under the False Claims Act no matter what the Partnership does.

20.    Agreeing to the certifications would cause the Partnership profound harm. The funding conditions are vague, and several could be read to conflict with the Partnership's core

6

mission and the activities it has undertaken for decades in furtherance of that mission and in reliance on OVW grants. The funding conditions may require the Partnership to cease engaging in activities that it had previously understood OVW grants to plainly support. Thus, the Partnership does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of domestic violence and sexual violence. The Partnership believes that California is an extremely diverse state, and it is critical that services be culturally responsive and culturally appropriate. The Partnership is concerned that the funding limitations around "DEI" will limit any training or technical assistance it can provide that addresses the needs of diverse communities of survivors.

21.    For instance, the Partnership's mission is to end domestic violence in California and beyond by addressing the issues that contribute to violence, including structural barriers such as access to affordable and safe housing, economic security, and reducing gun violence. But the Partnership is unclear about whether their framing of these structural barriers would be in conflict with the anti-social justice condition. In California, there is an extreme lack of affordable housing and a homelessness crisis, which impacts survivors of domestic violence, who are navigating the impossible choice of leaving an abusive situation and experiencing homelessness or housing insecurity, or staying in an abusive situation. Recognizing that safe housing is key to survivor safety, and to being able to pursue criminal and civil legal remedies, in current and prior grant years, the Partnership has provided training on housing protections and homelessness issues for survivors, with OVW approval. The Partnership is concerned this type of training would no longer be approved. It is unclear whether the Partnership's mission and guiding principles, which recognize that the criminal offense of domestic violence carries a systematic

social justice element, violate the anti-social justice part of the certification, and whether the Partnership could comply with the anti-social justice condition without adopting a view antithetical to its true beliefs.

22.     Many of the Partnership's activities in furtherance of its OVW grant-funded programs may also conflict with the new funding conditions. The Partnership is unsure how the gender ideology part of the certification will be interpreted, and has concerns the language will limit any training or technical assistance it can provide that supports work to serve transgender survivors and survivors of all gender identities, and that recognizes the specific needs of serving these populations of survivors and the disproportionate rates of domestic violence among the transgender community. The Partnership is concerned that it cannot continue to engage in certain practices that respect the dignity of all victims of domestic violence, regardless of gender and sexual orientation, and are consistent with the VAWA mandate not to discriminate on the basis of gender or sexual orientation. In providing training and technical assistance, many Partnership staff use attendees' personal pronouns. The organization also provides information about addressing the needs of the LGBTQ+ community. It is unclear whether the Partnership may continue these practices and activities while complying with the funding condition not to "inculcat[e] or promot[e] gender ideology."

23.     It is also unclear whether the Partnership may continue providing certain services to the immigrant community, consistent with the funding conditions. The Partnership is concerned that the vague language in the funding conditions could be interpreted to restrict their ability to provide training and technical assistance on available immigration remedies for survivors of domestic violence, and to advance systemic issues related to improving responses to immigrant survivors of domestic violence.

8

24.     Additionally, Partnership member DVS is concerned about the vague requirements that could prohibit providing services to transgender individuals or individuals without legal status in the United States. DVS would be forced to make substantial changes to its services, including having to ask intrusive questions about gender and require documentation that many individuals fleeing domestic violence cannot easily access. DVS would be forced to not accept many individuals and their children into shelter. And, once it becomes known that DVS asks invasive questions and has subsequent limits on its services, many survivors may choose not to seek assistance and will either stay with their abusive partner or live on the street as a means of seeking safety. DVS is also concerned that the anti-DEI funding requirements are at odds with California state law funding requirements. DVS has a DEI policy in place to comply with the terms of a grant of federal and state funds that it receives through the State of California, which requires that it annually certify that it has the DEI policy and is following it. It is unclear to DVS how to navigate these conflicting requirements, and it is concerned that it would need to decide to forgo one of the funding sources—which would mean cuts to its programming and potentially its staff positions.

25.     California Member Doe would also have to change or eliminate some of its direct services to victims of domestic violence. California Member Doe uses a prevention model that addresses the root causes of domestic and intimate partner violence, including trauma, systemic inequality, and harmful gender norms. California Member Doe's work spans professional trainings, youth leadership, and culturally responsive curricula that center the lived experiences of communities most affected by violence, including Black, Indigenous, immigrant, LGBTQ+, and disabled individuals. California Member Doe is in an untenable position: it must either compromise its values to secure funding or forgo vital resources to remain mission aligned. If it

agreed to the gender ideology funding condition, California Member Doe would need to change sections of its curriculum that challenge rigid gender norms or explore identity development. Doing so, however, would harm students and contradict decades of research linking gender equity education to violence prevention. Similarly, the requirement to certify that DEI efforts do not violate vaguely defined nondiscrimination standards creates legal and ethical risk for California Member Doe, whose DEI work is integral to its public health model. California Member Doe supports equitable access for survivors across various dimensions, including race, gender, ability, and socioeconomic status. California Member Doe is concerned that the ambiguity in the anti-DEI certification requirement discourages honest compliance and undermines the inclusive values California Member Doe upholds.

26.    Under the challenged conditions, California Member Doe would be forced to alter or eliminate critical components of its curriculum and related programming, including lessons that explore how social roles affect relationships (which could be deemed "promoting gender ideology"); lessons linking abuse to racism, classism, and media representation; lessons about harm reduction (which could be misinterpreted as failing to emphasize criminal accountability); lessons about healthy relationships that explore equity and power dynamics (which could be misconstrued as ideological); and lessons about victim blaming, cultural norms, and why survivors stay.

27.    The Partnership fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make the Partnership

concerned about applying or accepting an award. To mitigate these risks, the Partnership would have to change its practices, in many cases contrary to its core values.

28.     Not agreeing to the certifications would result in equally grave harm.

29.     Not having access to funds from the Coalition Grant and other competitive grants would severely undermine the Partnership's ability to function as a state coalition. Losing the Coalition Grant alone would result in a $113,574 loss of funds for the next fiscal year. Without these funds, the Partnership would need to scale back its work, including reducing the number of trainings offered and staff capacity. It would also need to delay hiring for an open position, and if it was unable to receive the grant then in 2026 it would likely need to eliminate a staff position or reduce staff hours or other benefits.

30.     The Partnership's member programs would lose access to core, comprehensive training for their staff necessary to provide legally and ethically compliant advocacy services to clients in addition to regular training on emergent issues that ensure front-line staff are able to provide quality services to all survivors. The state would lose critical technical assistance in systemic response improvements that reduce domestic violence, increase effectiveness of legal responses, and dramatically improve survivor response and support efforts. These losses would make the Partnership less effective as a coalition and undermine its role as the state authority on domestic violence prevention, intervention, and response.

### VII. Cuts to the Partnership's and its Members' Services Would Harm Domestic Violence and Sexual Assault Victims and Survivors

31.     The reduction or outright termination of these services would have devastating effects on the community of survivors and victims of domestic violence.

32.     In the absence of fully funded Partnership services and Partnership member services, domestic violence victims will be confronted with more barriers when trying to access

services by limiting the reach of trusted organizations. This will immediately lead to domestic violence victims losing programs designed to meet their specific needs. Direct service providers will be unable to maintain high quality services that follow best practice guidance or even that are fully compliant with the myriad federal, state, and local requirements they would now have to navigate on their own, without the critical assistance of coalitions, while desperately trying to keep up with the already increasing demand for services. Because service providers would have to end specific programming funded by these grants, survivors will have fewer options to turn to for help.

33.    The Partnership's operations are essential to permitting the network of direct service providers to focus on providing the highest-quality services to the survivors they serve and ensuring that the systems that contribute to addressing and responding to the epidemic of domestic violence are operating with evidence-based, trauma-informed, survivor-centered policies and practices.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 16, 2025.

*Krista Colon*

KRISTA COLÓN
EXECUTIVE DIRECTOR
CALIFORNIA PARTNERSHIP TO
END DOMESTIC VIOLENCE