IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>PAMELA BONDI, in her official capacity as United States Attorney General, *et al.*<br><br>*Defendants*. | Case No. 1:25-cv-00279 |

### DECLARATION OF DAWN DALTON

I, Dawn Dalton, declare as follows:

**I.  Background**

1. I am the Executive Director at the District of Columbia Coalition Against Domestic Violence (hereinafter "the D.C. Coalition"), Washington D.C.'s federally designated domestic violence coalition.

2. The D.C. Coalition was founded in 1986 and is headquartered in Washington, D.C.

3. The D.C. Coalition is a membership organization of the domestic violence direct service providers in Washington D.C. It provides training, technical assistance, and a platform for collaboration for its member programs and leads local policy and advocacy efforts on behalf of and along with survivors of domestic violence.

4. The D.C. Coalition is a resource for the thousands of adults and children experiencing domestic violence in Washington, D.C. each year as well as the local organizations that serve them. The D.C. Coalition provides regular training and technical assistance for its

1

member organizations and trainings for community members and business owners--including faith leaders, health centers, educators, local criminal and/or civil legal system representatives, military personnel, beauticians, and bartenders—who are likely to interact with those experiencing domestic violence. It also works to build primary prevention efforts into programming available for young people in D.C.

5. The D.C. Coalition provides information and education to the mayor's administration and D.C. Council on matters that impact survivors of domestic violence. This includes survivor-centered feedback on proposed legislation and the implementation of services to ensure survivors have safe and confidential access to our community's resources.

6. The D.C. Coalition convenes a Survivor Advisory Board comprised of survivors of domestic violence who live in Washington D.C. and/or have received domestic violence services in Washington D.C. This group provides expert advice on the needs and experiences of survivors in D.C. and informs the D.C. Coalition's policy and systems engagement, community outreach, and training offerings.

7. The D.C. Coalition has an annual budget of approximately $2.4 million. Of that total, over 40% of that budget is from direct federal funds (approximately $1 million). In the current fiscal year[1], the D.C. Coalition received approximately $110,090 in grants from the U.S. Department of Justice's Office on Violence Against Women (OVW).

**II. The D.C. Coalition Member Organizations**

8. The D.C. Coalition is a membership organization with 17 member organizations. Members fall into one of three categories: 1) a nonprofit organization whose primary mission is to provide services to survivors of domestic violence, dating violence, or stalking; 2) a nonprofit organization who has a dedicated program that serves survivors of domestic violence, dating

---

[1] The D.C. Coalition's 2024-2025 fiscal year is from October 1, 2024-September 30, 2025.

2

violence, or stalking; 3) a nonprofit organization who does not have a program that serves survivors of domestic violence, dating violence, or stalking but survivors are accessing their services for other social supports. Most of the member organizations fall under the first category.

### III. Grants the D.C. Coalition Has or Has Intended to Apply For

9. For the fiscal year that ended last month[2], the D.C. Coalition received approximately $245,000—or about 11% of its total annual budget—from OVW grants, including the FY25 Coalition Grant (totaling $114,533) and a multi-year Transitional Housing Grant (totaling $497,898, of which approximately $130,000 remains to be spent in this final fiscal year).[3]

10. For the current fiscal year, the D.C. Coalition receives $110,090 from the OVW FY25 Coalition Grant.

11. **Coalition Grants.** The D.C. Coalition has applied for and received a formula grant from OVW for the State and Territory Domestic Violence and Sexual Assault Coalitions Program ("Coalition Grant") every year for more than two decades.

   a. In 2024, OVW awarded the D.C. Coalition a total of $114,533 through the FY25 Coalition Grant. The grant had a performance and a budget period of October 1, 2024 through September 30, 2025.

   b. Most recently, OVW awarded the D.C. Coalition a total of $110,090 through the FY25 Coalition Grant. The grant has a performance and a budget period of October 1, 2025 through September 30, 2026. The Notice of Funding Opportunity (NOFO) for the Coalition Grant required applicants to submit a certification by June 23, 2025 at 11:59 PM ET and submit the final application by June 25, 2025

---

[2] The D.C. Coalition's 2024-2025 fiscal year is from October 1, 2024-September 30, 2025.
[3] This multi-year grant was for a total of $497,898 and will end on September 30, 2025.

3

at 8:59 PM ET; pursuant to a stipulation in this matter, the D.C. Coalition applied by that date without submitting a certification.[4]

c. The D.C. Coalition has used Coalition Grant funds across its staff and programming, including to provide a range of support to community-based and member organizations serving victims of domestic violence, including training and technical assistance designed to connect survivors with housing and counseling needs and legal services. The D.C. Coalition also convenes membership meetings every other month to identify and address gaps in services for survivors of domestic violence and collaborate to ensure inclusive, responsive, and survivor-centered policies. The D.C. Coalition is also responsive to community needs, that change from year to year, requiring deep engagement in community-related initiatives and subsequent meetings, training requests, and/or guidance to member programs in response to new funding requirements.

d. Using the current Coalition Grant, the D.C. Coalition intends to maintain staffing at its current, necessary level and continue to conduct robust trainings for the community and member organizations, provide necessary technical assistance, convene regular meetings for steering committees and working groups, advocate for necessary local policy reforms, and coordinate with judicial and local law enforcement agencies and other stakeholders to identify gaps in services and share successes and best practices.

---

[4] Pursuant to a stipulation filed in this matter, the D.C. Coalition and its members were not required to submit a certification for any OVW grant until August 12; the Court granted a stay of the challenged conditions on August 8. Pursuant to a stipulation filed in this matter, the D.C. Coalition and its members are not required to submit a certification for any OVW grant until August 12. Absent judicial relief, we will be required to submit a certification at that time.

4

e. If the D.C. Coalition were unable to use the Coalition Grant funding, however, this could result in the loss of at least one full-time employee, a significant impact across its small eleven-person team. The loss of the grant would also contribute to cutting much-needed programing, including the training, technical assistance, and collaboration with allied organizations and government partners that result in a coordinated community response to domestic violence.

12. **Transitional Housing Grants.** The D.C. Coalition has also received a competitive grant from OVW—a Transitional Housing Grant—in 2011, 2017, and 2021.

a. Most recently, OVW awarded the D.C. Coalition a Transitional Housing Grant totaling $497,898 and covering the budget and performance period of October 1, 2021-September 30, 2025 (including a one-year extension).

13. The D.C. Coalition, in partnership with two of their member programs, used this grant to provide: 1) short-term housing assistance for up to twenty-four months for survivors; 2) comprehensive case management and referrals for survivors; and 3) after-care for at least three months after a survivor exits the program to ensure that they are able to maintain not only their housing status but their safety as well. Despite previously having received the Transitional Housing Grant three different times, spanning nearly fifteen years, my organization chose not to apply this year because of concerns about the challenged conditions. Accordingly, the D.C. Coalition had to reduce its operating budget in the current fiscal year by $175,000.

### IV. Grants That D.C. Coalition Members Currently Have or Have Intended to Apply For

14. More than a third of the D.C. Coalition's member organizations have also received OVW grants, including grants under the Legal Assistance for Victims ("LAV") Program. Various D.C. Coalition members have also applied for OVW grants this year, including

the LAV Program, Grants to Enhance Community-based Services for Survivors of Domestic Violence, Dating Violence, Sexual Assault, and Stalking Program, and Transitional Housing Program. As one example of the challenges these organizations are facing--considering the current conditions placed on this funding--D.C. Coalition Member Doe applied for and received both the LAV Grant and a Transitional Housing Grant, but is concerned about how the challenged conditions will conflict with its programs and values and whether it will be able to use the funding to provide the quality services it intends to provide if it receives the grant.

### V. OVW's New Funding Conditions

15. The NOFOs for the FY25 OVW grants for which D.C. Coalition and its members have intended to apply include new "out-of-scope" funding conditions that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior fiscal years. Specifically, the NOFOs for the FY25 OVW grants prohibit grant funds from being used for: (1) promoting or facilitating the violation of federal immigration law; (2) inculcating or promoting gender ideology; (3) promoting or facilitating discriminatory programs or ideology, including illegal DEI and "diversity, equity, inclusion, and accessibility" programs that do not advance the policy of equal dignity and respect; (4) activities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses; (5) programs that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women; (6) awareness campaigns or media that do not lead to tangible improvements in prevention, victim safety, or offender accountability; (7) initiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support; and (8) any activity or program that unlawfully violates an Executive Order. In addition to identifying these activities as "out-of-scope activities" for which

6

grant funds may not be used, the NOFOs for the FY25 OVW grants require applicants to submit a certification with their application saying that they will not use the grant funds on the "out-of-scope" activities.

16. In addition, OVW has updated the "General Terms and Conditions" applicable to its grants and cooperative agreements for fiscal year 2025 to require a separate certification as a term of each award. The term requires a grant recipient to agree that "its compliance with all applicable federal civil rights and nondiscrimination laws is material to the government's decision to make th[e] award and any payment thereunder, including for purposes of the False Claims Act." The term further states that "by accepting the award," the grantee "certifies that it does not operate any programs," including DEI programs, "that violate any applicable federal civil rights nondiscrimination laws."

### VI. OVW's New Funding Conditions Place the D.C. Coalition and its Members in an Untenable Position

17. The new funding conditions present the D.C. Coalition and its members with an impossible choice: forgoing critical OVW grants and facing direct consequences to their financial health and ongoing operations or jeopardizing their mission and compliance with Violence Against Women Act (VAWA) anti-discrimination requirements by accepting the conditions, while also facing the extreme risks of litigation and government investigations under the False Claims Act.

18. Agreeing to the certifications now required by OVW would cause the D.C. Coalition significant harm. First, the funding conditions are vague, making it exceedingly challenging to know whether they have been violated. Second, some of the conditions could be read as in conflict with the D.C. Coalition's role, mission, and guiding principles that inform the activities it has undertaken for decades in furtherance of that mission and in reliance on OVW

7

grants. The funding conditions may further require the D.C. Coalition to cease engaging in activities that it had previously understood OVW grants to plainly support, finding itself in a position where it may not know how to comply with these funding conditions while also staying true to its mission and the essential support it has provided to member organizations, advocates, and vulnerable victims and survivors of domestic abuse for nearly four decades.

19. As one example of the potential misalignment between the D.C. Coalition's work and the new conditions imposed by OVW is the Coalition's self-described role on its website: "Our work applies a framework for identifying social, economic, cultural, political, and legal factors that have critical implications for those affected by violence, oppression, subordination, and discrimination." The D.C. Coalition is unsure whether this approach to its work, one that has served it and its community for nearly four decades, would violate the new prohibitions of funds being used for "activities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses."

20. The D.C. Coalition also follows ten guiding principles, including the following: "Social Justice . . . We are dedicated to the inclusion and active participation of individuals and groups that have been traditionally unheard and historically devalued or excluded;" "Cultural Humility. We honor every individual we work with and are committed to learning from and lifting up the voices of the people we serve. We honor culture, tradition, race, ethnicity, religion, age, sexual orientation, gender identity, gender expression, and ability;" and "Accessibility. We advocate for justice, inclusion, and full community participation, removing barriers, real or perceived, to encourage the widest possible participation." Accordingly, the D.C. Coalition is unsure whether it may undertake its day-to-day activities reflecting its mission and guiding principles without running afoul of the condition not to "promot[e] or facilitat[e] discriminatory

programs or ideology, including illegal DEI" or "inculcat[e] or promot[e] gender ideology" as the U.S. Department of Justice (DOJ) might interpret those terms.

21. Many of the D.C. Coalition's activities in furtherance of its OVW grant-funded training programs may also conflict with the new funding conditions. It is unsure if it may operate its current trainings that address explicit and implicit bias in program development, service delivery, and interactions with survivors, and the disparate impacts of societal risks and systems of oppression on survivors. Again, the Coalition does not know if those trainings would be construed as "promoting or facilitating discriminatory programs or ideology, including illegal DEI" as DOJ might interpret those terms.

22. The D.C. Coalition is also concerned that it cannot continue to engage in certain practices that respect the dignity of all victims of domestic violence, regardless of gender and sexual orientation, and are consistent with the VAWA mandate not to discriminate on the basis of gender or sexual orientation. It offers training on how to help advocates be attuned to and appropriately address specific needs of LGBTQ+ survivors, and the technical assistance they provide to D.C. agencies, member programs, and community partners include information about compliance with HUD's and VAWA's anti-discrimination mandates. The D.C. Coalition also regularly asks for and uses pronouns, participates in an LGBTQ+ Budget Coalition, includes information about LGBTQ+ survivors in advocacy and public information, and again, complies with anti-discrimination provisions under VAWA and the D.C. Code. It is unclear whether it may continue these practices and activities while complying with the DOJ's funding condition not to "inculcat[e] or promot[e] gender ideology."

23. The D.C. Coalition is also unsure whether it may continue providing certain services to the immigrant community, including those without legal status, and the member

organizations that support these communities, while complying with the funding conditions. The D.C. Coalition includes member organizations that help immigrant clients understand their rights and obtain appropriate legal assistance, including specific education around the VAWA and crime-victim specific immigration opportunities and protections that may be available regardless of their current status. But doing so may now conflict with the way DOJ interprets the prohibition against "promoting or facilitating the violation of immigration law."

24. In both its trainings and policy advocacy, the D.C. Coalition recognizes and presents data and evidence showing that the criminal legal system does not always contribute to improving safety for some survivors, and in some cases increases their harm. Accordingly, to effectively implement survivor-centered services it is important to explore alternatives to the criminal legal system and individualized support for survivors in policy, programming, and protocol development. But the D.C. Coalition is unclear about whether continuing to share this information and advocate for systemic solutions to address the limitations of the criminal legal system would violate the DOJ's interpretation of the prohibition on using OVW funds for "activities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses" or "limit the role of police, prosecutors, or immigration enforcement in addressing violence against women."

25. Membership organizations in the D.C. Coalition share some of these concerns as well. For example, D.C. Coalition Member Doe is unsure about whether they will be able to use OVW funding to serve all immigrant survivors regardless of their immigration status—a current commitment of their organization—without the DOJ interpreting this as violating the prohibition against "promoting or facilitating the violation of immigration law." Currently, this organization also uses inclusive language and approaches when working with survivors who are gender-fluid,

10

gender-questioning, and transgender but worries that continuing to do so would violate the prohibition on "inculcating or promoting gender ideology."

26. The D.C. Coalition fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences and vague conditions make the D.C. Coalition concerned about applying for or accepting a grant from OVW, grants that have been critical to sustaining its work for decades. To mitigate these risks, the D.C. Coalition would have to change its practices, in ways that would contradict its mission, guiding principles, and effectiveness.

27. Yet, not agreeing to the certifications would result in equally grave harm. Not having access to funds from the Coalition Grant and other competitive grants would severely undermine the D.C. Coalition's ability to function effectively and provide invaluable training and services to its members and other service providers in the community. Losing the Coalition Grant alone would result in a $113,574 loss of funds for the next fiscal year. Without these funds, the D.C. Coalition would have to reduce the size of its staff and its services to members.

28. The D.C. Coalition member programs would lose access to core, comprehensive training for their staff necessary to provide legally and ethically compliant advocacy services to clients in addition to regular training on emergent issues that ensure front-line staff are able to provide quality services to all survivors. The D.C. Coalition would not be able to train up-and-coming leaders in domestic violence organizations that are doing important work serving culturally-specific communities. The District would lose critical technical assistance in systemic response improvements that reduce domestic violence, increase effectiveness of legal responses, and dramatically improve survivor response and support efforts. These losses would make the

D.C. Coalition less effective and undermine its role as the District's authority on domestic violence prevention, intervention, and response.

### VII. Cuts to the D.C. Coalition and its Members' Services Would Harm Domestic Violence Victims and Survivors

29. The reduction or outright termination of these services would have devastating effects on the community of survivors and victims of domestic violence.

30. In the absence of fully funded D.C. Coalition services, domestic violence victims and survivors will be confronted with more barriers when trying to access services following their assault, including discriminatory treatment from medical, law enforcement or courtroom personnel who have not received anti-bias and other core victim services training. This will immediately lead to more survivors choosing not to participate in the criminal justice system and fewer being connected to and receiving appropriate medical and therapy services. Direct service providers will be unable to maintain high quality services that follow best practices guidance and comply with the myriad federal, state, and local requirements they would now have to navigate on their own, without the critical assistance of the D.C. Coalition, while desperately trying to keep up with the already increasing demand for services.

31. The D.C. Coalition's operations are essential to permitting the network of direct service providers to focus on providing the highest quality services to the survivors they serve and ensuring that the systems that contribute to addressing and responding to the epidemic of domestic violence are operating with evidence-based, trauma-informed, survivor-centered policies and practices.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 17, 2025.

Signed by:

DAWN DALTON
EXECUTIVE DIRECTOR
DISTRICT OF COLUMBIA COALITION
AGAINST DOMESTIC VIOLENCE