**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

RHODE ISLAND COALITION AGAINST
DOMESTIC VIOLENCE, *et al.*

*Plaintiffs*,

v.

PAMELA BONDI, in her official capacity as United
States Attorney General, *et al.*,

*Defendants*.

Case No.    1:25-cv-00279

**DECLARATION OF JENNIFER POLLITT HILL**

I, Jennifer Pollitt Hill, declare as follows:

## I.    Background

1.    I am the Executive Director of Maryland Network Against Domestic Violence (MNADV), Maryland's federally designated domestic violence coalition.

2.    MNADV was founded in 1981 and is headquartered in Annapolis, Maryland. MNADV is the domestic violence coalition that serves as a non-profit network of survivors, domestic violence service providers, including comprehensive programs and agencies, and allied professionals working to strengthen how communities across Maryland respond to and prevent intimate partner violence. MNADV's mission is to lead diverse community partners toward the common purpose of reducing the occurrence and impact of intimate partner violence. MNADV provides its statewide membership of domestic violence service providers with access to resources, training opportunities, technical assistance, and input on policies and practices that advance safety, justice, and healing for survivors of intimate partner violence.

3.      The Maryland Network Against Domestic Violence has an annual budget of $1,500,000. Of that total amount, roughly $360,000 comes directly from Office on Violence Against Women (OVW) grants.

**II. Maryland Network Against Domestic Violence Member Organizations**

4.      MNADV is a membership organization with 134 total members of which 24 are domestic violence service provider organizations, 16 are allied professional organizations and 94 are individual members who support the coalition's mission, vision, programming and values.

**III. OVW Grants MNADV Has or For Which It Has Applied**

5.      MNADV has applied for and received a formula grant from OVW for the State and Territory Domestic Violence and Sexual Assault Coalitions Program ("Coalition Grant") every year since its inception.

6.      In FY25, OVW awarded MNADV a total of $114,533 through the Coalition Grant. The grant has a period of performance and a budget period of October 1, 2024, through September 30, 2025.

7.      MNADV has used Coalition Grant funds to provide training and technical assistance to programs that provide direct services to victims of domestic violence, dating violence, sexual assault, and stalking; Develop or enhance appropriate standards of services for programs that provide direct services to victims of domestic violence, dating violence, sexual assault, and stalking; Conduct statewide, regional and/or community-based meetings or trainings for victim advocates, legal service providers, criminal and/or civil justice representatives, health care professionals, and professionals from educational institutions; Bring local programs that provide direct services to victims of domestic violence, dating violence, sexual assault, and stalking together to identify gaps in services and to coordinate activities to address gaps and

enhance services for survivors; and Engage in activities that promote coalition-building at the local and/or state and territory level. MNADV receives competitive OVW grant funds as a direct subrecipient as well.

8.      MNADV received the OVW FY24 Transitional Housing Grant, which provides a total of $550,000 for the period October 1, 2024, through September 30, 2027. MNADV uses this grant to provide funding for transitional housing and survivor-identified support services for survivors of domestic and dating violence. This funding pays for initial rent and security deposit and then provides additional rental support for the next six to 24 months, using a step-down model of funding; offers financial education including, but not limited to, credit improvement and debt reduction education, free tax preparation, assistance in opening bank accounts, and referrals to other professionals for more in-depth services; and provides voluntary, survivor-identified support services, including, but not limited to, transportation, economic empowerment, case management, and employment counseling.

9.      Most recently, OVW awarded MNADV the FY25 Coalition grant for the period October 1, 2025, through September 30, 2026. MNADV received $110,090. The Coalition Grant Notice of Funding Opportunity (NOFO) required that applicants submit a certification by June 23, 2025 at 11:59 PM ET and submit the final application by June 25, 2025 at 8:59 PM ET. MNADV uses this grant funding to sustain core functions of the state coalition, including statewide training and technical assistance to new and continuing advocates at 24 domestic violence member programs across the state, support resource development requested in the field, and advance state partnership and the development of best practices to inform and guide the domestic violence field in Maryland. However, if MNADV was not able to use the Coalition Grant funding, it would lose critical agency infrastructure, resulting in the need to terminate staff

and to significantly reduce programming as to have lasting impacts on the coalition's capacity to engage in essential functions.

10.     MNADV has submitted the following three OVW applications for consideration and has not yet heard if its applications have been selected for funding:

a. OVW Fiscal Year 2025 Grants to Improve the Criminal Justice Response Program, which would provide approximately $990,000 for the period October 1, 2025, through September 30, 2028. MNADV would use this grant to implement our Lethality Assessment Program (LAP 2.0) in at least three rural and/or tribal jurisdictions across the United States The initiative will enhance the criminal justice response to domestic violence and reduce intimate partner homicides by developing comprehensive victim service and support collaborations and response protocols. Emphasis will be placed on building the coordinated community response (CCR) protocols that bridge gaps between law enforcement, victim services, courts, and prosecutors particularly in under-resourced rural and Tribal communities through protocol development, training and technical support.

b. OVW FY 2025 Rural Program, which would provide $500,000 for the period of October 1, 2025, through September 30, 2028. MNADV would use this grant to support local domestic violence service providers to create, implement, and provide training and technical assistance for Domestic Violence Fatality Review Teams (DVFRTs), which will identify areas of intervention that could have prevented homicides or near-fatal injuries, and Coordinated Community Response Teams (CCRTs), which will help enhance and improve services to rural survivors of domestic and dating violence; Provide direct victim services, including housing

support, for domestic and dating violence survivors that will increase the number of victims who are able to safely and sustainably leave their abusive partners; and Create jurisdiction and rural-specific prevention strategies to decrease the instances of domestic and dating violence and domestic and dating violence homicides and near-fatal events.

c.  OVW Fiscal Year 2025 Training and Services to End Violence and Abuse Against Individuals with Disabilities and Deaf People Program, which would provide $600,000 for the period October 1, 2025, through September 30, 2028. MNADV would use this grant in partnership with DeafDAWN to Provide interpretation services for Deaf survivors staying in shelters or other housing, going to court or the hospital, etc.; Provide training and technical assistance for hearing professionals working with Deaf survivors to ensure culturally sensitive, trauma-informed, victim-centered services; Make physical environment safe for Deaf survivors by ensuring shelters and housing are accessible; Hire an advocate at DeafDAWN to provide holistic, trauma-informed, victim-centered services to Deaf survivors; Create a Toolkit on working with Deaf survivors and share with domestic violence service professionals; Provide Deaf survivors with their basic needs for food, clothing, childcare, transportation, etc.; Identify potential employment opportunities for Deaf survivors and pay for employment-related costs; Create and distribute outreach materials for the Deaf community that clearly outline what services are available for domestic violence survivors and how to access them; and Create and distribute/present culturally sensitive prevention materials, outreach, and trainings for the Deaf community.

11.     MNADV plans to apply for the Coalition Grant funds in years beyond FY25. If awarded the Coalition Grant in the future, as expected, MNADV anticipates continuing to provide the core services described above.

### IV. OVW's New Funding Conditions

12.     The Notices of Funding Opportunity (NOFOs) for the FY25 OVW grants that MNADV and its members have received, or have applied for, include new "out-of-scope" funding conditions that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior fiscal years. Specifically, the NOFOs for the FY25 OVW grants prohibit grant funds from being used for: (1) promoting or facilitating the violation of federal immigration law; (2) inculcating or promoting gender ideology; (3) promoting or facilitating discriminatory programs or ideology, including illegal DEI and "diversity, equity, inclusion, and accessibility" programs that do not advance the policy of equal dignity and respect; (4) activities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses; (5) programs that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women; (6) awareness campaigns or media that do not lead to tangible improvements in prevention, victim safety, or offender accountability; (7) initiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support; and (8) any activity or program that unlawfully violates an Executive Order. In addition to identifying these activities as "out-of-scope activities" for which grant funds may not be used, the NOFOs for the FY26 OVW grants require applicants to submit a certification with their application saying that they will not use the grant funds on the "out-of-scope" activities.

13.     In addition, OVW has updated the General Terms and Conditions applicable to its grants and cooperative agreements for fiscal year 2025 to require a separate certification as a term of each award. The term requires a grant recipient to agree that "its compliance with all applicable federal civil rights and nondiscrimination laws is material to the government's decision to make th[e] award and any payment thereunder, including for purposes of the False Claims Act." The term further states that "by accepting the award," the grantee "certifies that it does not operate any programs," including DEI programs, "that violate any applicable federal civil rights nondiscrimination laws."

### V. OVW's New Funding Conditions Place the MNADV in an Untenable Position

14.     The new funding conditions present MNADV and its members with an impossible choice. MNADV could forgo OVW grants and face the direct consequences to its financial health and ongoing operations. MNADV could agree to the conditions and thereby jeopardize its mission and compliance with VAWA requirements and face enormous risks of litigation and government investigations under the False Claims Act no matter what MNADV does.

15.     Agreeing to the certifications would cause MNADV profound harm. The funding conditions are vague, and several could be read to conflict with MNADV's core mission and the activities it has undertaken for decades in furtherance of that mission and in reliance on OVW grants. The funding conditions may require MNADV to cease engaging in activities that it had previously understood OVW grants to plainly support. Thus, MNADV does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of domestic abuse. and sexual violence.

16.     For instance, MNADV's guiding principles include "[r]ecognizing the historical inequities between resources allocated to address sexual assault and domestic violence," and seeking to "equitably address [] the elimination of both sexual and domestic violence." The guiding principles also include "creat[ing] an alliance where those who have been traditionally oppressed in society and/or marginalized in anti-violence work have the opportunity to be full and active participants," "recogniz[ing] that representation of traditionally oppressed groups is only a beginning," and practicing "[i]ntentional diversity," which involves an analysis of oppression and a commitment to challenging and changing the disempowering influences of dominant culture.

17.     MNADV is unsure whether it may undertake its day-to-day activities reflecting its mission and guiding principles, which reference "equity" and "diversity," without running afoul of the condition not to "promot[e] or facilitat[e] discriminatory programs or ideology, including illegal DEI" as DOJ might interpret the OVW term. It is also unclear whether MNADV's mission and guiding principles, which recognize that the criminal offenses of sexual assault and domestic violence carry a systematic social justice element, violate the anti-social justice part of the certification, and whether MNADV could comply with the anti-social justice condition without adopting a view antithetical to its true beliefs.

18.     Many of MNADV's activities in furtherance of its OVW grant-funded direct service programs may also conflict with the new funding conditions. For instance, MNADV currently operates programs and activities that promote access to services, dignity and healing for all people, and that focus on populations of people who traditionally have faced barriers to such access—including people with disabilities, for whom English is not their primary language, and who have been excluded from services such as shelter due to their gender. In addition,

MNADV's statewide data system collects demographic information and history of violence information that could raise questions about services being provided to people who fall within the very broad group of people who might be included in the "illegal" DEI condition. MNADV does not know if these programs' focus would be construed as "promoting or facilitating discriminatory programs or ideology, including illegal DEI" as DOJ might interpret those terms.

19.     MNADV is also concerned that it cannot continue to engage in certain practices that respect the dignity of all victims of sexual and domestic violence, regardless of gender and sexual orientation, and are consistent with the VAWA mandate not to discriminate on the basis of gender or sexual orientation. MNADV would continuously run into challenges because we are advocates on behalf of all people, including those who are transgender or otherwise outside of the gender binary, and we train and provide technical assistance, which includes guidance on serving transgender people and people who are nonbinary. For instance, the training that we provide, both for new advocates and for continuing advocacy training, discusses the provision of trauma-informed services to survivors. This includes training providers on issues specific to transgender clients—including recognizing and responding to the unique safety concerns and dynamics of abuse that are faced by these survivors (for instance, the threat of "outing"). It is unclear whether MNADV may continue these practices and activities while complying with the funding condition not to "inculcat[e] or promot[e] gender ideology."

20.     It is also unclear whether MNADV may continue providing these services to immigrant survivors of violence, including those without legal status, consistent with the funding conditions. In addition to the training and technical assistance described above, which also supports member agencies in understanding the dynamics of abuse and provision of trauma-informed services for immigrant survivors, MNADV encourages our member agencies to put

safety first and provide services to any person who is experiencing high risk violence without screening that goes beyond basic safety information. MNADV also encourages advocates to first consider risks of immediate or near-future violence or harm when they must prioritize providing services to clients. This could mean that, based on harm-avoidance prioritization principles, or risk of imminent danger, an immigrant without documentation could be prioritized over a US citizen. Conducting these activities now may conflict with the way DOJ interprets the prohibition against "promoting or facilitating the violation of immigration law.

21.     MNADV fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make MNADV concerned about applying for or accepting an award. To mitigate these risks, MNADV would have to change its practices, in many cases contrary to its core values.

22.     Not agreeing to the certifications would result in equally grave harm.

23.     Not having access to funds from the Coalition Grant and other competitive grants would severely undermine MNADV's ability to function as a state coalition. Losing the Coalition Grant alone would result in a loss of approximately $114,533 funds for the next fiscal year. Without these funds, MNADV would have to reduce the size of its staff and, therefore our services to members, in ways that would have significant and lasting impacts on the coalition's capacity to engage in essential functions. These losses would make MNADV less effective as a coalition and undermine its role as the state authority on domestic violence prevention, intervention, and response.

24.    Our member programs would lose access to core, comprehensive training for their staff necessary to provide legally and ethically compliant advocacy services to clients in addition to regular training on emergent issues that ensure front-line staff are able to provide quality services to all survivors. The state would lose critical technical assistance infrastructure at the coalition as this grant allows staff to travel across the state in order to provide on request, one-on-one or team/staff-wide assistance on complex advocacy issues such as building coordinated community response teams, improving systemic responses in legal, medical, and social services settings, shelter policies and practices, confidentiality and trauma-informed advocacy, and more.

25.    MNADV would no longer be able to provide new and continuing advocates across the state with: (1) ongoing training and technical assistance; (2) resources that educate members on best practices, update them on changes to state and federal law, and help survivors and the public recognize violence, find safety, and access available resources; or (3) systems coordination support, including tailored technical assistance, training, and coaching on building and sustaining community partnerships. Additionally, we would not have the funding needed to document and collect data meant to provide localities and the state with critical information on service trends, victim help-seeking behavior, prevention programming, and outcomes for victims and their families who are served by Maryland's domestic violence agencies. The training, technical assistance, data, and best practice building vacuum would undermine the viability and sustainability of organizations across the state, and their ability to meet grant application and management requirements, specifically for culturally specific service providers who tend to be smaller, less resourced organizations that lack historical infrastructure.

26.    Losing Transitional Housing funds would result in a loss of $500,000 which would result in survivors of intimate partner violence not receiving the critical support needed to

leave a violent situation and move into a safe living environment. MNADV would also need to terminate staff due to this loss of funding.  This reduction would be approximately 1 FTE out of a staff of 12.

27.     These are just some of the ways the MNADV's programming and its beneficiaries would suffer.

## VI. Cuts to MNADV's Services Would Harm Domestic Violence and Sexual Assault Victims and Survivors

28.     The reduction or outright termination of these services would have devastating effects on the community of survivors and victims of domestic violence.

29.     In the absence of fully funded MNADV services, domestic violence victims will be confronted with more barriers when trying to access services following their abuse, including discriminatory treatment from medical, law enforcement or courtroom personnel, hotline operators, and therapists who have not received anti-bias and other core victim services training. This will immediately lead to more survivors choosing not to participate in the criminal justice system and fewer being linked to and receiving appropriate medical and therapy services. Direct service providers will be unable to maintain high quality services that follow best practice guidance or even that are fully compliant with the myriad federal, state, and local requirements they would now have to navigate on their own, without the critical assistance of coalitions, while desperately trying to keep up with the already increasing demand for services.

30.     MNADV's operations are essential to permitting the network of direct service providers to focus on providing the highest-quality services to the survivors they serve and ensuring that the systems that contribute to addressing and responding to the epidemic of sexual violence are operating with evidence-based, trauma-informed, survivor-centered policies and practices

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 14, 2025.

_____

Jennifer Pollitt Hill
Executive Director
Maryland Network Against Domestic
Violence (MNADV)