IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>PAMELA BONDI, in her official capacity as United States Attorney General, *et al.*<br><br>*Defendants*. | Case No. 1:25-cv-00279 |

**DECLARATION OF MICHELLE McCORMICK**

I, Michelle McCormick, declare as follows:

  **I.  Background**

  1.  I am the Executive Director at the Kansas Coalition Against Sexual and Domestic Violence ("Kansas Coalition"), Kansas's federally designated dual sexual assault and domestic violence coalition.

  2.  The Kansas Coalition has operated as a dual sexual assault and domestic violence coalition membership organization since 1990 and is headquartered in Topeka, Kansas. The coalition is dedicated to preventing and ending sexual and domestic violence, dating violence and stalking in Kansas. It supports survivors and the people who serve them by promoting safety, healing, justice, and lasting change.

  3.  The Kansas Coalition's work includes providing statewide support for domestic violence and sexual assault programs by offering technical assistance, resources, and guidance to agencies that serve survivors. The coalition also offers expert training and individualized support for advocates, counselors, medical staff, law enforcement, and other personnel working with

1

survivors. It raises awareness about sexual assault and domestic violence issues to promote prevention across the state. And it uplifts survivor voices by centering the needs and experiences of victims and survivors in everything it does.

4. Additionally, the Kansas Coalition serves an accrediting function for domestic violence and sexual assault service organizations in the state. The coalition creates service standards in coordination with a committee made up of member programs. These standards support member programs' provision of quality shelter and non-shelter services, and the accreditation process provides a formal mechanism for ensuring the standards are met. Any domestic violence or sexual assault service provider that wishes to receive state general fund grants or sales tax exemptions must receive accreditation of their programs from the Kansas Coalition.

5. The Kansas Coalition has an annual budget of roughly $4,296,500. More than one-fourth of that total amount comes from Office on Violence Against Women (OVW) grants. This year, we received $1,135,551 in direct grants and $30,940 in pass-through grants, for a total of $1,166,501 in OVW grant funds.

**II. Kansas Coalition Member Organizations**

6. The Kansas Coalition is a membership organization with 24 member organizations. There are three types of memberships: (1) an individual membership open to any person, (2) an organizational membership, open to any organization that supports or is engaged in providing services to victims and survivors of domestic violence, sexual assault, dating violence, or stalking, including non-accredited organizations, allied professional organizations, companies, and other organizations aligned with the Kansas Coalition; and (3) Program Council Membership, open to any private, 501(c)(3) non-profit organization providing services in Kansas

with a program established primarily for the purpose of providing advocacy and services to victims of sexual and/or domestic violence, dating violence, and/or stalking and is accredited.

7. The Kansas Coalition's membership includes a member that is being identified for purposes of this lawsuit as "Kansas Member Doe," which is an accredited, Program Council member program serving survivors of sexual and domestic violence, stalking, human trafficking, and teen dating violence in rural Kansas. These services include a 24-hour helpline, 24-hour crisis intervention, support for survivors engaging with the medical system (including support during a forensic exam), support through law enforcement and court processes, emergency shelter, supportive counseling, support groups, children and youth supportive services, community education and awareness about these issues.

### III. Grants the Kansas Coalition Has or Has Intended to Apply For

8. The Kansas Coalition has applied for and received a formula grant from OVW for the State and Territory Domestic Violence and Sexual Assault Coalitions Program ("Coalition Grant") every year since at least 2007.

9. In FY24, OVW awarded the Kansas Coalition a total of $367,379 through the Coalition Grant. The grant had a period of performance of October 1, 2024 through September 30, 2025, but the award was extended to March 2026 through a no-cost extension approved by OVW.

10. Most recently, OVW awarded the Kansas Coalition $353,303 through the Coalition Grant for FY25. This grant has a period of performance of March 1, 2026 (after the no-cost performance period of our FY24 Coalition Grant ends) through September 30, 2026. The Notice of Funding Opportunity (NOFO) for the Coalition Grant required applicants to submit a certification by June 23, 2025 at 11:59 PM ET and submit the final application by June 25, 2025

3

at 8:59 PM ET; pursuant to a stipulation in this matter, the Kansas Coalition applied by that date without submitting a certification.[1]

11. Coalition grant funds are a primary source of funding for the Kansas Coalition to coordinate statewide victim services activities to improve the responses to domestic and sexual violence in Kansas. Over the decades, the Kansas Coalition has used Coalition Grant funds for many purposes: to provide training and technical assistance to member programs to assist them in meeting core service standards to remain accredited; to provide training and technical assistance to allied professionals involved in responding to domestic and sexual violence; to provide oversight of a statewide domestic violence lethality assessment project that supports efforts to reduce domestic violence homicides in Kansas; and to support the online resource library for members of the public, allied professionals, and victim service providers to have access to educational information, public awareness materials, and current information on best practices. The Kansas Coalition has also used these funds in its work co-leading the Kansas Sexual Assault Response Advisory Committee with the Kansas Bureau of Investigation. The Advisory Committee provides standardized guidance and model policies, increases statewide awareness of sexual assault in Kansas, and ensures consistency in access to services and response to sexual assault statewide.

12. This year, the Coalition intends to use the FY25 funds to continue to coordinate state victim services activities through training and technical assistance; enhance victim services through the implementation of Member Program accreditation to ensure that core services are provided to standard; coordinate the state-level Sexual Assault Response Teams (SARTs); provide technical assistance to judicial and law enforcement agencies; provide educational

---

[1] Pursuant to a stipulation filed in this matter, the Kansas Coalition and its members were not required to submit a certification for any OVW grant until August 12; the Court granted a stay of the challenged conditions on August 8.

resource information to the public about the issues of sexual and domestic violence; and host statewide public awareness events about the response to sexual assault.

    13.    The Kansas Coalition receives competitive grants from OVW as well. Currently, the coalition has:

    a.  The OVW Rural Program Grant, which provides a total of $950,000 for the period October 1, 2023 through September 30, 2026. The coalition uses this grant to increase the capacity of rural victim advocacy programs to reach and meet the needs of survivors of sexual assault through intensive technical assistance, training, and collaboration; coordinate and conduct trainings for rural law enforcement officers on responding to sexual assault; expand the number and effectiveness of Sexual Assault Nurse Examiners (SANEs) and SARTs in rural communities; strengthen collaborations between rural advocacy programs, law enforcement, and criminal justice providers that focus on improving responses to rural survivors; increase rural advocacy programs' capacity for working with survivors from underserved communities; improve language access for rural survivors of sexual assault, domestic violence, and stalking; improve responses to Native survivors of sexual assault, domestic violence, and stalking; and deliver school or youth-based educational programs, utilizing evidence based prevention strategies for the prevention of sexual assault in rural communities in the state.

    b.  The Underserved Program Grant, which provides a total of $600,000 for the period October 1, 2023 through September 30, 2026. The Kansas Coalition uses this grant to support the Kansas BELIEVE Outreach project, which focuses on supporting adults with intellectual and developmental disabilities (I/DD) who

have experienced domestic violence, dating violence, sexual violence, or stalking. The project creates sustainable changes by increasing organizational capacity within victim service providers, disability providers and other allied professionals to provide accessible, safe, and supportive services to survivors with I/DD. This is done by providing training, technical assistance, and access to resources on best practices for effective services that are culturally relevant, trauma-informed, and responsive to the I/DD community. Activities include training and technical assistance for community partners, social and human service providers, and criminal justice professionals to improve their capacity to respond to and serve survivors with I/DD.

14. The Kansas Coalition has previously received the Legal Assistance for Victims and Disability Grants for multiple years as well.

15. If the Kansas Coalition were unable to use funds from any one of the grants it currently receives, it would suffer significant, detrimental consequences that would be felt statewide. The Coalition likely would have to cut staff, including the staff that completes much of the technical assistance and accreditation services for Kansas victim service programs and public awareness outreach. The Coalition would be limited in its capacity to continue public awareness and outreach on the issues of sexual assault, due to the limited capacity of remaining staff to carry out those activities. Additionally, statewide coordination of training and technical assistance to allied professionals would suffer, due to the loss of staff or re-assigning of duties required by other funders as a priority for remaining staff.

16. The Kansas Coalition intends to apply for the Coalition Grant in FY26 and beyond, and it intends to apply for competitive grants in future years as well. If awarded the

Coalition Grant in the future, as expected, the Coalition anticipates continuing to provide the services described above.

### IV. Grants that the Kansas Coalition Members Currently Have or Have Intended to Apply For

17. Kansas Coalition members have also received OVW grants, including the Transitional Housing, Legal Assistance to Victims, and Rural Program Grants.

18. Various Kansas Coalition members have also applied or intended to apply for OVW grants this year. Kansas Member Doe applied for the OVW Grants to Reduce Sexual Assault, Domestic Violence, Dating Violence, and Stalking on Campus Program (Campus Program) Grant, as a co-applicant with the local University. The NOFO for the Campus Program Grant requires applicants to submit a certification by July 8 and submit the final application by July 10; pursuant to the stipulation in this matter, Member Doe applied by that date without submitting a certification. Member Doe is still awaiting a response from OVW on its application.

### V. OVW's New Funding Conditions

19. The NOFOs for the FY25 OVW grants for which the Kansas Coalition and its members have intended to apply include new "out-of-scope" funding conditions that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior fiscal years. Specifically, the NOFOs for the FY25 OVW grants prohibit grant funds from being used for: (1) promoting or facilitating the violation of federal immigration law; (2) inculcating or promoting gender ideology; (3) promoting or facilitating discriminatory programs or ideology, including illegal DEI and "diversity, equity, inclusion, and accessibility" programs that do not advance the policy of equal dignity and respect; (4) activities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses; (5) programs that discourage collaboration with law enforcement or oppose or limit the role of

7

police, prosecutors, or immigration enforcement in addressing violence against women; (6) initiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support; and (7) any activity or program that unlawfully violates an Executive Order. In addition to identifying these activities as "out-of-scope activities" for which grant funds may not be used, the NOFOs for the FY25 OVW grants require applicants to submit a certification with their application saying that they will not use the grant funds on the "out-of-scope" activities.

20. In addition, OVW has updated the General Terms and Conditions applicable to its grants and cooperative agreements for fiscal year 2025 to require a separate certification as a term of each award. The term requires a grant recipient to agree that "its compliance with all applicable federal civil rights and nondiscrimination laws is material to the government's decision to make th[e] award and any payment thereunder, including for purposes of the False Claims Act." The term further states that "by accepting the award," the grantee "certifies that it does not operate any programs," including DEI programs, "that violate any applicable federal civil rights nondiscrimination laws."

### VI. OVW's New Funding Conditions Place the Kansas Coalition and its Members in an Untenable Position

21. The new funding conditions present the Kansas Coalition and its members with an impossible choice. The Kansas Coalition could forgo OVW grants and face the direct consequences to its financial health and ongoing operations. Or the Kansas Coalition could agree to the conditions and thereby jeopardize its mission and compliance with VAWA requirements, and also face enormous risks of litigation and government investigations under the False Claims Act no matter what the coalition does.

22. Agreeing to the certifications would cause the Kansas Coalition profound harm. The funding conditions are vague, and several could be read to conflict with the Kansas Coalition's core mission and the activities it has undertaken for decades in furtherance of that mission and in reliance on OVW grants. The funding conditions may require the Kansas Coalition to cease engaging in activities that it had previously understood OVW grants to plainly support. Thus, the Kansas Coalition does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of domestic abuse and sexual violence.

23. For instance, the Kansas Coalition is unsure if it may offer training and technical assistance consistent with the restriction on framing domestic violence or sexual assault as systemic social justice issues rather than criminal offenses. The coalition's training and technical assistance has never framed domestic violence and sexual assault as *only* criminal offenses but has included additional context about root causes and social drivers behind instances of domestic violence and sexual assault. The coalition trains advocates on prevention and intervention methods that address verbal and spiritual abuse and other types of coercion and control that goes beyond the criminal elements of domestic violence and sexual assault—the aspects of physical violence and threats of physical violence—that are codified as crimes.

24. The Kansas Coalition also does not know if it may continue in its current form certain training for advocates, allied professionals, and members of the public while complying with the condition not to engage in activities that "promot[e] or facilitat[e] discriminatory programs or ideology, including illegal DEI" as the current Administration would interpret that condition. Some of the coalition's training takes a public health model approach to preventing

9

domestic violence and sexual assault, which is evidence-based and includes components addressing the intersection of violence and oppression, including racism, classism, homophobia, and ableism. The Kansas Coalition does not discriminate against anyone, but the vague term "illegal DEI" makes it impossible for the Kansas Coalition to know if its training would be considered an out-of-scope activity as provided by this funding condition.

25. It is also unclear whether OVW would interpret "inculcating or promoting gender ideology" as prohibiting the coalition from continuing activities that raise awareness about the unique vulnerabilities faced by the transgender community, which experiences disproportionate rates of domestic and sexual violence. The disproportionate harms suffered by the transgender community underscores the Coalition's responsibility to assist victim service providers to provide competent, inclusive, and affirming services to transgender survivors. The coalition has released statements about the effects of legislation on transgender survivors of domestic violence or sexual assault, and used social media to highlight domestic and sexual violence resources specific to that community. The Kansas Coalition has understood that VAWA prohibits discrimination against an individual based on their gender identity, and therefore has assisted member programs to understand their obligations to serve transgender survivors in order to be in compliance with the law.

26. Additionally, the Kansas Coalition frequently responds to technical assistance requests regarding serving both legal immigrant survivors and undocumented survivors, given the increased vulnerability that these survivors face by those who exploit their immigration status. This includes training and technical assistance for advocates on best ways to conduct outreach to those who speak English as a second language, providing training to interpreters to be trauma informed, providing informational products on legal reliefs to survivors such as

U-VISA or T-VISA processes, and assisting shelters to know the appropriate response for the presence of Immigration and Customs Enforcement officials, or related concerns affecting the immigrant community. None of the information the coalition provides promotes violating the law, but it is unclear whether the Department of Justice would consider these activities as "promoting or facilitating the violation of federal immigration law."

27. Kansas Member Doe is also concerned that the funding conditions—in particular the condition prohibiting the use of grant funds to promote "gender ideology"—would require it to change its programming, because the Member Doe provides outreach and services to members of the LGBTQ+ community, including transgender people who need emergency shelter. Additionally, the program has intentionally created a work environment that is trauma-informed and equitable, including supporting inclusivity for transgender staff. Member Doe is also unsure whether its services to immigrant survivors, such as emergency shelter, crisis intervention, supportive counseling or other core victim services would be construed (wrongfully) by the Department of Justice as promoting the violation of immigration law. Although the program does not promote violating any law, the program has provided information to undocumented survivors about legal reliefs that may be available to them, such as a U-VISA, T-VISA or petitioning for legal status under VAWA.

28. Additionally, the Kansas Coalition makes effort to bring awareness to the public about the services its members provide, to inform victims of strategies they can use to seek safety from a situation involving sexual assault or domestic violence, and to engage the public on ways to respond to domestic and sexual violence in their communities and broader society. For example, each year in April the Coalition engages in a public awareness campaign for the designated sexual assault awareness month. The Coalition participates in media interviews,

generates news articles, and shares social media posts to engage the public in understanding the realities and prevalence of sexual violence in Kansas. It also shares resources, including how people can access sexual assault forensic exams, how to access member program services, or the rights of sexual assault victims who engage in court processes. The Kansas Coalition is concerned about its ability to comply with the funding condition requiring that "awareness campaigns and media" result in "tangible improvements" while carrying out these activities. It would be cost-prohibitive for the Coalition to devise pre- and post-campaign testing to try to measure whether it led to "tangible improvements," as we do not have funds to perform such testing and the funding provided by the Coalition Grant cannot be used on this kind of testing (research) activity. In any event, the vague term "tangible improvements" leaves the Kansas Coalition with no way of knowing whether its activities have met that metric. Therefore, the "awareness campaign" condition threatens the Kansas Coalition's ability to engage in these activities that are important for creating lasting change.

29. The Kansas Coalition fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make the Kansas Coalition concerned about applying or accepting an award. To mitigate these risks, the coalition would have to change its practices, in many cases contrary to its core values.

30. Not agreeing to the certifications would result in equally grave harm.

31. Not having access to funds from the Coalition Grant would severely undermine the Kansas Coalition's ability to function as a state coalition. Losing the Coalition Grant alone

would result in a $356,787 loss of funds for the next fiscal year. Without these funds, the coalition would have to reduce the size of its staff and, therefore, its services to members.

32. Cuts to staff would likely include the Accreditation Coordinator, who plays a key role in ensuring that services provided to survivors in Kansas are high quality, follow best practices, and meet standards. Our member programs would lose access to core, comprehensive training for their staff necessary to provide ethically compliant advocacy services to clients in addition to regular training on emergent issues that ensure front-line staff are able to provide quality services to all survivors. The state would lose critical technical assistance in systemic response improvements that reduce domestic violence and sexual assault, increase effectiveness of legal responses, and dramatically improve survivor response and support efforts. These losses would make the Kansas Coalition less effective as a coalition and undermine its role as the state authority on domestic violence and sexual assault prevention, intervention, and response.

33. These are just some of the ways the Kansas Coalition's programming and its beneficiaries would suffer.

### VII. Cuts to the Kansas Coalition's and its Members' Services Would Harm Domestic Violence and Sexual Assault Victims and Survivors

34. The reduction or outright termination of these services would have devastating effects on the community of survivors and victims of sexual violence.

35. In the absence of fully funded Kansas Coalition services, sexual assault victims will be confronted with more barriers when trying to access services following their assault, including discriminatory treatment from medical, law enforcement or courtroom personnel, hotline operators, and therapists who have not received anti-bias and other core victim services training. This will immediately lead to more survivors choosing not to participate in the criminal justice system and fewer being linked to and receiving appropriate medical and therapy services.

13

Direct service providers will be unable to maintain high quality services that follow best practice guidance or even that are fully compliant with the myriad federal, state, and local requirements they would now have to navigate on their own, without the critical assistance of coalitions, while desperately trying to keep up with the already increasing demand for services.

   36. The Kansas Coalition's operations are essential to permitting the network of direct service providers to focus on providing the highest-quality services to the survivors they serve and ensuring that the systems that contribute to addressing and responding to the epidemic of sexual violence are operating with evidence-based, trauma-informed, survivor-centered policies and practices.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 15, 2025

            */s/ Michelle McCormick*
            Michelle McCormick, LMSW
            Executive Director
            Kansas Coalition Against
            Sexual and Domestic Violence