**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.* | |
| *Plaintiffs*, | |
| v. | Case No.     1:25-cv-00279 |
| PAMELA BONDI, in her official capacity as United States Attorney General, *et al.*, | |
| *Defendants*. | |

**DECLARATION OF FRANCINE GARLAND STARK**

I, Francine Garland Stark, declare as follows:

I.     **Background**

1.     I am the Executive Director of the Maine Coalition to End Domestic Violence (MCEDV), Maine's federally designated domestic violence coalition.

2.     MCEDV was founded in 1977 and is headquartered in Augusta, Maine. MCEDV is comprised of ten member programs, including Maine's eight regional domestic violence resource centers and two culturally specific service providers, that together serve as a network of non-profit agencies providing direct services to victims of domestic violence, stalking and sex-trafficking across Maine.

3.     Each year, MCEDV's network of eight regional domestic violence resource centers (DVRCs) provides holistic and comprehensive supportive services to more than 12,000 victims and survivors of domestic violence and their children in all eight of Maine's counties statewide. MCEDV's two culturally specific service centers provide complementary services in partnership with Maine's DVRCs to support victims of domestic abuse and violence in Maine's

growing immigrant and refugee populations. All providers serve clients in accordance with a set of statewide standards that MCEDV has developed and for which MCEDV monitors compliance.

4.      MCEDV and ten member programs work to strengthen how communities across Maine respond to and prevent intimate partner abuse and violence.

5.      MCEDV provides its member domestic violence agencies statewide with access to resources, training opportunities, technical assistance, and input on policies and practices that advance safety, justice, and healing for survivors.

6.      MCEDV also serves as a pass-through entity for federal grants awarded through OVW through which our member programs and other community partners receive funding to provide direct services to victims of domestic violence in Maine.

7.      MCEDV has an annual total budget of $14,807,000. Of that total, $2,129,000 represents MCEDV's annual operating budget. MCEDV passes through $10,988,000 to the regional domestic violence resource centers providing services statewide and passes through an additional $1,419,000 to other entities to provide related services, such as supervised visitation, legal representation, etc., as well as making rental payments on behalf of survivors directly to landlords.

8.      Of the MCEDV annual total budget, $1,039,000 comes from Office on Violence Against Women (OVW) through direct grants or indirect subgrants.  Of the total MCEDV receives from OVW grants and subgrants, $746,000 is passed through to support services provided by subgrantees.

9.      Member programs of MCEDV also receive additional OVW direct grants or indirect subgrants to support the provision of services to victims of domestic abuse and violence in Maine.

## II. MCEDV Member Organization

10.      MCEDV is a membership organization with 10 member agencies. Membership consists of all eight of Maine's regional domestic violence resource centers, and two culturally specific providers of domestic violence services.

11.      MCEDV's membership includes two members, "Maine Member Doe 1," and "Maine Member Doe 2." Maine Member Doe 1 and Maine Member Doe 2 are DVRCs that are community-based nonprofits with the core function of providing comprehensive and holistic supportive services to any individual experiencing domestic abuse and violence in their region. Maine Member Doe 1's primary services include: the operation of a 24-hour helpline; emergency shelter and transitional housing services; court advocacy and accompaniment; support groups; individualized support and advocacy; an enhanced police intervention collaboration, that partners specialized advocates with local law enforcement partners to inform a best practice response; on-site advocacy and support for victims of domestic violence who are involved in Maine's child welfare system; specialized advocacy for justice-involved survivors of abuse while incarcerated, during the release period, and post release; community education and prevention; and the operation of a Certified Domestic Violence Intervention Program.  Maine Member Doe 2's primary services include: the operation of a 24-hour helpline; emergency shelter and transitional housing services; support groups; individualized support and advocacy; on-site advocacy and support for victims of domestic violence who are involved in Maine's child welfare system; the operation of a Certified Domestic Violence Intervention Program; and civil

legal services for victims of domestic abuse and violence, including supportive advocacy by non-attorney court advocates as well as legal advice and representation by staff attorneys who primarily focus on providing legal services in civil protection order and family court cases.

### III. OVW Grants MCEDV Has Applied for or Has Intended to Apply for

12.     MCEDV has applied for and received a formula grant from OVW for the State and Territory Domestic Violence and Sexual Assault Coalitions Program ("Coalition Grant") every year since the Coalition Grant was first authorized.

13.     For FY26, OVW has awarded MCEDV a total of $110,000 through the Coalition Grant. This grant has a period of performance and a budget period of October 1, 2025 through September 30, 2026.

14.     This formula grant supports MCEDV, the state domestic violence coalition, in providing technical assistance to its membership and state level partners in improving systemic responses to address domestic violence. Without these funds, MCEDV would not be able to provide this essential service to its membership and state partners and would be forced to reduce its staff by 7%, or 1 FTE.

15.     In FY25, MCEDV used Coalition Grant funds to be able to convene our membership's Executive Directors weekly to discuss emerging issues and develop responsive strategies, as well to support peer to peer exchange. MCEDV also uses Coalition Grant funds to participate in a broad range of multi-disciplinary task forces, commissions, and panels, including: the Maine Commission on Domestic and Sexual Abuse; the Domestic Abuse Homicide Review Panel; the Justice Assistance Council, the Elder Justice Coordinating Partnership, the Maine Criminal Justice Academy Board of Trustees; the Maine Child Welfare Advisory Panel; the Statewide Homeless Council; the Maine Consumer Rights Network; and the

Maine Continuum of Care Board of Directors. Participation in these multi-disciplinary groups is essential to ensure a broad range of state system responses are effectively responding to domestic abuse and violence in Maine.

16.     The Coalition Grant Notice of Funding Opportunity (NOFO) required that applicants submit the final application by June 25, 2025 at 8:59 PM ET. For an application to be considered timely and complete, DOJ required applicants to submit a Certification Regarding Out of Scope Activities. To ensure a timely, complete application, MCEDV submitted the required certification.

17.     A loss of Coalition Grant funding would significantly reduce coalition programming and have lasting impacts on the MCEDV's capacity to engage in essential functions. This programming supports MCEDV's ten member organizations that directly serve more than 12,000 survivors of domestic violence each year, who depend on these groups for lifesaving support and resources, including the operation of a 24-7 statewide crisis helpline and 13 emergency shelters; assistance obtaining or retaining safe and stable housing; and help for more than 2,500 survivors each year in getting protective civil court orders in Maine's 27 District Courts. MCEDV's ongoing work with statewide criminal justice system partners supports an information sharing framework between law enforcement agencies statewide and Maine's regional domestic violence resource centers that allows highly trained advocates to follow up with more than 3,000 survivors statewide to address safety and stability needs after police have been called in response to a domestic violence crime. This framework for advocate-initiated outreach would not be sustainable without the continuous programmatic work of MCEDV.

18.     MCEDV is also a direct recipient of competitive discretionary OVW program grants.

19.     MCEDV has applied for and received an OVW Rural Sexual Assault, Domestic Violence, Dating Violence, and Stalking Program (Rural Program) grant since 2006.

20.     For FY23-FY25, OVW awarded MCEDV a total of $750,000 through the Rural Program. $120,004 of this total award supports MCEDV's annual operating budget, divided over the three-year grant cycle, while $629,996 is passed through to four of MCEDV's member programs. This FY23-FY25 grant has a period of performance and a budget period of October 1, 2022 through March 30, 2026, as a result of a no-cost performance extension. For FY26-FY28, in September 2025, MCEDV was again awarded a new Rural Program grant, for a total of $750,000. $145,000 of the total award supports MCEDV's annual operating budget, divided over the three-year grant cycle, while $605,000 is passed through to four of MCEDV's member programs. This FY26-FY28 grant will have performance and budget period of April 1, 2026 through September 30, 2028.

21.     This Rural Program grant partially funds specialized advocacy to support domestic violence survivors and their children who are involved with the child welfare system. The advocates funded through this program provide consultation and training to child welfare staff to support improved systemic response to the complex challenges these families face. Without these funds, this program would be eliminated, and 1,000 survivors would not have this specialized advocacy available to help them build the safety framework necessary for them to safely retain custody of their children.

22.     For the most recent OVW Rural Program grant cycle (October 1, 2025 through September 1, 2026), the Notice of Funding Opportunity (NOFO) required that all applicants submit a final application by July 10, 2025, at 8:59 PM ET. To complete the application, DOJ required applicants to submit a Certification Regarding Out of Scope Activities. To ensure a

timely, complete application, MCEDV submitted the required Certification Regarding Out of Scope Activities with our application for OVW Rural Program grant funding.

23.     MCEDV has applied for and received an OVW Justice for Families Program grant since 2022.

24.     For FY23-FY25, OVW awarded MCEDV a total of $550,000 through the Justice for Families Program grant. $145,899 of this total award supports MCEDV's annual operating budget, divided over the three-year grant cycle, while $404,101 is passed on to other entities who support program activities. This grant has a performance period and budget period of October 1, 2022 through March 30, 2026, as a result of a no-cost extension.

25.     For FY26-28, in September 2025, OVW awarded MCEDV a total of $600,000 through a new Justice for Families Program grant. $191,393 of this total award supports MCEDV's annual operating budget, divided over the three-year grant cycle, while $408,607 is passed through to other entities to support grant program activities. This grant has a performance period and budget period of January 1, 2026 through September 30, 2028 (a delayed performance and budget period start date as a result of our no-cost performance extension on the FY23-25 Justice for Families Program grant award).

26.     This discretionary Justice for Families Program grant supports the only supervised visitation program specifically structured to attend to the domestic violence related safety concerns of clients in one of Maine's most populous and diverse areas, as well as training and technical assistance for family court professionals, specifically including guardians ad litem and judicial officers to support their ability to successfully screen for and respond to domestic abuse and violence in family court matters. Without these funds, the only supervised visitation program for non-custodial parents ordered to have supervised visitation due to the safety risk they pose to

their child in Androscoggin County would be forced to close. In one six-month period, this program provides more than 350 supervised visits between non-custodial parents and their children, serving more than 15 families who have been affected by domestic violence. MCEDV would also no longer have capacity to provide essential training and technical assistance to family court professionals, which in just the last month has included working with more than 60 family court mediators and guardians ad litem to support their ability to screen for and build a more appropriate response to domestic violence when it is an issue in a family court case. There is no other entity in Maine able to fill this need to work with family court professionals to enhance a survivor-centered response.

27.    For the most recent OVW Justice for Families Program grant cycle (October 1, 2025 through September 1, 2026), the Notice of Funding Opportunity (NOFO) required that all applicants submit a final application by January 22, 2025, at 8:59 PM ET. To complete the application, DOJ required applicants to submit a Certification Regarding Out of Scope Activities. To ensure a timely, complete application, MCEDV submitted the required Certification Regarding Out of Scope Activities with our application for FY26-FY28 OVW Justice for Families Program grant funding.

28.    MCEDV also receives competitive OVW grant funds as a subrecipient. Currently, MCEDV is a recipient under an OVW Improving Criminal Justice Responses (ICJR) Program grant program through an award to the Maine Department of Corrections. This grant provides MCEDV with $315,621 in FY26 for offender intervention programming, of which MCEDV passes through $261,693 to five of its member program DVRCs and two community partners to perform program activities. The performance and budget period for this grant program is October 1, 2024 through September 30, 2026.

29.      The funds received by MCEDV this ICJR Program grant provide some modest, but essential operational support for Certified Domestic Violence Intervention Programs, which are recognized in Maine law as the appropriate intervention for people who have committed domestic violence crimes in Maine. Without these funds, some programs would close, leaving rural communities without these important interventions to try and achieve behavior change for those who have committed domestic violence, and in doing so, improve the safety and well-being of those they have harmed, including their children.

### IV. OVW Grants That MCEDV's Member Programs Currently Have or Have Intended to Apply For

30.      MCEDV members have also consistently applied for and received OVW grants, including grants under the Rural Program, the Transitional Housing Program, the Children and Youth Program, the Legal Assistance for Victims Program, Improving the Criminal Justice Response Program, and the STOP (Services, Training, Officers and Prosecutors) Violence Against Women Formula Grant Program.

31.      Various MCEDV members have applied or had intended to apply for OVW competitive, discretionary grants this year.

32.      For example, Maine Member Doe 1 is a current, direct recipient of the OVW Rural Program Grant (Rural Grant) and OVW Transitional Housing Grant Program (Transitional Housing Grant).

33.      Maine Member Doe 1 has received the OVW Rural Grant since 2018. For FY22-FY25, OVW has awarded Maine Member Doe 1 $749,966 with a performance and budget period from October 1, 2021 through March 31, 2026. This grant funds two full time advocates to provide holistic services to victims of domestic violence in the rural areas of their region as well as support for partnering with rural local law enforcement agencies to effectively respond to

9

stalking in particular. Without these funds, survivors who live in rural towns in the region will have to travel greater distances to access services and will encounter less trauma informed responses from the systems that are essential to supporting their safety.

34.    Maine Member Doe 1 has received the OVW Transitional Housing Grant since 2016. For FY23-FY25, OVW awarded $549,676 for a performance and budget period from October 1, 2022 through January 31, 2026. This grant funds a full time advocate to build and maintain relationships with local landlord and to work with survivors to locate safe, affordable housing and remove barriers to securing safe housing, and it provides rental payments to participant families as well as covers the costs associated with moving, transportation, and any needed translation and interpretation costs. Elimination of this funding would leave more than 20 families without this support and likely to become homeless or return to abusive relationships as a result.

35.    Maine Member Doe 1 is also a subrecipient on other OVW competitive, discretionary grants, including: two OVW Improving Criminal Justice Responses Program Grants (ICJR); and a OVW Legal Assistance to Victims Program Grant (LAV).

36.    Maine Member Doe 1 receives $151,427 in one ICJR Grant, with a performance period from October 1, 2024 through September 30, 2027, which partially funds an advocate who convenes a county-wide high-risk response team and supports county prosecutors, law enforcement and other community partners with their response to survivors at high risk for re-assault or lethal violence. Without these funds, survivors at greatest risk of homicide will not have the benefit of involved community partners coming together to coordinate an effective response, and these survivors will need to navigate this coordination on their own.

37.     Maine Member Doe 1 receives $78,000 in a second ICJR Grant, with a performance period from April 1, 2025 through September 30, 2027, which supports the operation of a nationally recognized model for intervening with those who are perpetrating domestic abuse. Without these funds, reduced capacity would mean significantly longer wait lists for this critical intervention and prevention programming, which Maine courts are directed by statute to order in cases ordered to probation in Maine criminal courts.

38.     Maine Member Doe 1 is also a recipient under more than one award through the OVW STOP (Services, Training, Officers, and Prosecutors) Violence Against Women Formula Grant Program (STOP).

39.     Maine Member Doe 1 is a subrecipient of $66,786 through a STOP Grant in partnership with a local law enforcement agency, with a performance period from November 1, 2025 through June 30, 2027, which funds a full time advocate to support law enforcement response to domestic violence in the region, with particular focus on high risk cases. Without this funding, law enforcement agencies would need to spend more time trying to connect these high risk survivors to services necessary to support safety and stability.

40.     Maine Member Doe 1 is a subrecipient of $33,500 through a STOP Grant in partnership with a state agency partner, with a performance and budget period of November 1, 2025 through June 30, 2027, to support the re-entry needs of women who are survivors of domestic abuse and violence who are incarcerated or have recently been released back into the community. Without these funds, more than 170 incarcerated women served each year in this program would not have the support to address their risk of re-assault upon release from incarceration.

41.     Maine Member Doe 1 is a subrecipient of $10,000 through a LAV Grant in partnership with a legal services agency, with a performance and budget period of October 1, 2025 through September 30, 2027, to support capacity of advocacy staff to identify survivors in need of legal representation and to support survivors with getting connected to representation. Without these funds, fewer survivors would get connected to essential civil legal services support in this region of the state.

42.     Maine Member Doe 1 anticipates that when it needs to reapply for these OVW grants in future years, it will need to agree to the challenged certification conditions.

43.     As explained below, Maine Member Doe 1 is concerned about its ability to comply with the new certification conditions and how they may impact its work.

44.     Maine Member Doe 2 is a current, direct recipient of an OVW Legal Assistance to Victims Grant (LAV Grant) and has received that grant since 2007.

45.     Most recently, OVW awarded Maine Member Doe 2 $750,000 through a LAV Grant with a performance and budget period from October 1, 2024 through September 30, 2027. This LAV Grant funds 1.5 full time staff attorneys and 1.2 full time non-attorney court advocacy staff to ensure survivors in their region have access to legal assistance from qualified attorneys knowledgeable about domestic abuse and safety planning and support from experienced court advocates. Maine Member Doe 2's legal service program has been the only source of pro bono legal representation for victims of domestic violence in their region for more than 20 years. In FY24, this program supported the civil legal needs of more than 600 survivors in their region. Without these LAV Grant funds, Maine Member Doe 2 would not be able to sustain this program, leaving hundreds of survivors in their region without any access to legal representation.

46.     Maine Member Doe 2 is a current recipient of two OVW STOP (Services, Training, Officers, and Prosecutors) Violence Against Women Formula Grant Program (STOP grant) grants. Through the Maine Department of Public Safety, as the Maine state administrator of these funds, Maine Member Doe 2 receives a $29,397 STOP grant award, with a performance and budget period of October 1, 2024 through June 30, 2026, and a $33,098 STOP grant award, with a performance and budget period of November 1, 2025 through June 30, 2027. Each of these STOP grants partially fund a staff attorney and a non-attorney court advocate to provide civil legal services for victims of domestic violence in their region, including legal representation in civil protection order and family matter cases and screening, legal advice and referrals on ancillary issues connected to their victimization and safety plan. Maine Member Doe 2 has received STOP grant funds for these services since 2005. Without these funds, Maine Member Doe 2 would be unable to retain their second staff attorney, which would greatly decrease their capacity to provide highly specialized domestic violence legal assistance to survivors in their region.

47.     Maine Member Doe 2 anticipates that when it needs to reapply for these OVW grants in future years, it will need to agree to the challenged certification conditions.

48.     As explained below, Maine Member Doe 2 is concerned about its ability to comply with the new certification conditions and how they may impact its work.

**V. OVW's New Funding Conditions**

49.     The Notices of Funding Opportunity (NOFOs) for the FY25 OVW grants for which MCEDV and its members have applied for include new "out-of-scope" funding conditions that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior fiscal years. Specifically, the NOFOs for the FY25 OVW grants prohibit

grant funds from being used for: (1) promoting or facilitating the violation of federal immigration law; (2) inculcating or promoting gender ideology; (3) promoting or facilitating discriminatory programs or ideology, including illegal DEI and "diversity, equity, inclusion, and accessibility" programs that do not advance the policy of equal dignity and respect; (4) activities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses; (5) programs that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women; (6) awareness campaigns or media that do not lead to tangible improvements in prevention, victim safety, or offender accountability; (7) initiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support; and (8) any activity or program that unlawfully violates an Executive Order. In addition to identifying these activities as "out-of-scope activities" for which grant funds may not be used, the NOFOs for the FY25 OVW grants require applicants to submit a certification with their application saying that they will not use the grant funds on the "out-of-scope" activities.

50.     In addition, OVW has updated the General Terms and Conditions applicable to its grants and cooperative agreements for fiscal year 2025 to require a separate certification as a term of each award. The term requires a grant recipient to agree that "its compliance with all applicable federal civil rights and nondiscrimination laws is material to the government's decision to make th[e] award and any payment thereunder, including for purposes of the False Claims Act." The term further states that "by accepting the award," the grantee "certifies that it does not operate any programs," including DEI programs, "that violate any applicable federal civil rights nondiscrimination laws."

**VI. OVW's New Funding Conditions Place MCEDV and its Members in an Untenable Position**

52.    The new funding conditions presented MCEDV and its members with an impossible choice. MCEDV and its members could forgo the OVW grants and face the direct consequences to their financial health and ongoing operations. Or MCEDV and its members could agree to the conditions and thereby jeopardize its mission and compliance with VAWA requirements and face enormous risks of litigation and government investigations under the False Claims Act no matter what they choose to do.

53.    Enforcement of the certifications would cause MCEDV profound harm. The funding conditions are vague, and several could be read to conflict with the MCEDV's core mission and the activities it has undertaken for decades in furtherance of that mission and in reliance on OVW grants. The funding conditions may require MCEDV to cease engaging in activities that it had previously understood OVW grants to plainly support. Thus, MCEDV does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of domestic abuse and violence, dating violence, and stalking.

54.    For instance, MCEDV's mission is to "advocate for the right of all people to live free from domestic abuse and all forms of violence." To advance this mission, MCEDV has framed as central to its mission, "creat[ing] and encourag[ing] a social, political, and economic environment that fosters communities where the diversity, dignity, and contributions of all are respected and celebrated, and domestic abuse and violence no longer exist," and the understanding that the "elimination of the social frameworks that privilege the rights of some over those of others, including racism, misogyny, and other forms of oppression, is essential to advancing basic human rights, public safety, and health, and specifically as foundational to the

prevention of domestic abuse and violence." MCEDV has also committed to "exploring and/or supporting alternatives in addition to or in place of the strategies of arrest and incarceration as safety enhancing responses," recognizing that, "in practice, the criminal justice system has a clear and disproportional impact on communities of color and those who are poor" and that additional or alternative strategies for safety are needed to ensure the well-being of all members of our communities.

55.     MCEDV is unsure whether it may undertake its day-to-day activities reflecting its mission and framing principles, which reference concepts of equity and diversity, without running afoul of the condition not to "promot[e] or facilitat[e] discriminatory programs or ideology, including illegal DEI" as DOJ might interpret the OVW term. It is also unclear whether MCEDV's framing principles, which recognize that the criminal offenses of domestic violence can carry a systematic social justice element, violate the anti-social justice part of the certification, and whether MCEDV could comply with the anti-social justice condition without adopting a view contrary to its framing principles.

56.     Many of MCEDV's activities in furtherance of its OVW grant-funded direct service programs may also conflict with the new funding conditions. For instance, MCEDV currently operates programs and activities that promote access to services, dignity and healing for all people, and that focus on populations of people who traditionally have faced barriers to such access, such as individuals with disabilities, people for whom English is not their primary language, and people who are transgender or identify as non-binary. In addition, MCEDV's data system, used by each of our member programs, collects demographic information and history of violence information that has the potential to raise questions about services being provided to people who fall within the very broad group of people who might be included in the "illegal"

DEI condition. The coalition does not know if these programs' focus would be construed as "promoting or facilitating discriminatory programs or ideology, including illegal DEI" as interpreted by DOJ.

57.     MCEDV is also concerned that it cannot continue to engage in certain practices that respect the dignity of all victims of domestic violence, regardless of gender and sexual orientation, consistent with VAWA's mandate not to discriminate on the basis of gender or sexual orientation. MCEDV would run into challenges because we advocate on behalf of all people who experience domestic abuse and violence, including those who are transgender or otherwise outside of the gender binary, and we train and provide technical assistance, which includes guidance on serving transgender people and people who are nonbinary. For example, the training that we provide to advocates at our member programs and for community partners, discusses the provision of trauma-informed services to survivors. This includes training on recognizing and responding to the unique safety concerns and dynamics of abuse that are faced by transgender and non-binary survivors (for instance, the threat of "outing"). In addition, MCEDV's statewide data system, which collects demographic information and scope and history of violence information, also has the potential to raise questions about services being provided to people who are transgender or non-binary. Collection of this data is essential to understanding accessibility of our services to anyone experiencing domestic abuse and violence in our state. It is unclear whether MCEDV may continue these practices and activities while complying with the funding condition not to "inculcat[e] or promot[e] gender ideology."

58.     It is also unclear whether MCEDV may continue providing these services to immigrant survivors of violence, including those without legal status, consistent with the funding conditions. In addition to the training and technical assistance described above, which also

supports member agencies and community partners in understanding the dynamics of abuse and provision of trauma-informed services for immigrant survivors, MCEDV encourages our member agencies to put safety first and provide services to any person who is experiencing high risk violence without screening that goes beyond basic safety information. This could mean that, based on harm-avoidance prioritization principles, or risk of imminent danger, and without regard for legal status, an immigrant without documentation could be prioritized over a US citizen. These activities may conflict with the way that DOJ interprets the prohibition against "promoting or facilitating the violation of immigration law."

59.     Additionally, Maine Member Doe 1 would also have to change or eliminate some of its direct services to victims to comply with the conditions. If it agreed to the conditions, Member Doe 1 would have to end programming for victims from specific identity categories that have been deemed "out of scope" and therefore ineligible for coverage in facilities and through programming that is paid for by OVW grant funds. For example, given the growth in the number of immigrant and refugee victims of domestic abuse and violence who have reached out for support services in recent years, Maine Member Doe 1 has created specialized advocacy services for these populations. This has been essential to Member Doe 1's ability to support these survivors who experience additional vulnerabilities and difficulties achieving safety and stability due to inexperience with local systems and cultures, limited English proficiency, complicated legal status, insecure housing and a general lack of resources. Maine Member Doe 1 is concerned that its specialized staffing approach would be seen as prioritization, though in fact it is merely creating a helpful response to families with specific needs. If challenged conditions are enforced, Maine Member Doe 1 is concerned it would be required to lose one full time employee.

60.     Maine Member Doe 1 does not currently require victims of domestic violence who access its services to provide their biological gender. Given the vagueness of the executive order, Maine Member Doe 1 is concerned that they could be found in violation by providing services to an individual victim who identifies as transgender or non-binary. To not provide safe access to these services to anyone in its community who may need them is antithetical to the mission of Maine Member Doe 1 and a violation of their obligations under both the Violence Against Women Act and the Family Violence Prevention and Services Act.

61.     Maine Member Doe 1 also routinely includes in training and community outreach materials the fact that, over a 20-year period, Maine's Domestic Abuse Homicide Review Panel has found that 85% of domestic abuse homicides are committed by male perpetrators killing their female partner. Maine Member Doe 1 is concerned that continuing to include this factual information would be a violation of the challenged certification conditions; yet, not including this information is antithetical to their mission of educating their community about domestic abuse and violence.

62.     If required to comply with the Legal Services Restriction in the DOJ Grants Financial Guide, Maine Member Doe 2 would have to fundamentally change their processes for screening and prioritizing survivors that are served by their legal services program by asking a survivor's immigration status. Currently, Maine Member Doe 2 does not ask survivors about their immigration status.

63.     A requirement that the program ask about the legal status of survivors seeking help to ensure compliance with the Legal Services Restriction is expected to chill outreach from immigrant survivors, who already experience significant additional barriers to accessing civil courts, not only from Maine Member Doe 2's legal services but for the broad range of other

supportive services provided by Maine Member Doe 2. This would undermine Maine Member Doe 2's ability to provide lifesaving services in their community and negatively impact their standing in their community.

64.     Maine Member Doe 2 also expects that it will be difficult to obtain confirmation of a survivor's legal status. As such, this requirement would likely delay the ability of their legal services program to timely and effectively respond to the needs of victims in crisis.

65.     Maine Member Doe 2 is also unsure how to comply with the Legal Services Restriction in the DOJ Grants Financial Guide, specifically whether they can provide legal services to survivors without legal status in family court matters apart from civil protection orders or related orders. This lack of clarity would result in Maine Member Doe 2 providing assistance in family court cases to fewer survivors, which would be detrimental to the long-term safety and stability of survivors and their children.

66.     If MCEDV's member programs did not accept OVW grant funds, they would need to significantly cut services including: court advocacy and accompaniment services that are noted by Maine's District Courts as essential to facilitating safe, efficient outcomes for victims of domestic violence who seek civil protection orders; transitional housing programs that provide non-emergency housing with support services for victims who are homeless or in need of transitional housing; short-term supportive services intended to help survivors achieve safety and stability in their community, including counseling and advocacy to achieve childcare, transportation, financial literacy, needed educational and/or job training; and training and partnership programs designed to engage law enforcement, judges, attorneys, court personnel, and healthcare and social services providers, in efforts to enhance the safety of victims of

domestic abuse and violence, dating violence and stalking, with a focus on coordinated community responses and cross-system collaboration.

67.     MCEDV fears that if the challenged funding conditions are enforced, it and its member programs could face not only the loss of grant funds, but also federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make MCEDV and our member programs concerned about applying or accepting an award. To mitigate these risks, MCEDV and our member programs would have to change its practices, in many cases contrary to its core values.

68.     Not agreeing to the certifications would result in equally grave harm.

69.     Not having access to funds from the Coalition Grant and other OVW competitive grants would severely undermine MCEDV's ability to function as a state coalition and to provide direct services. Losing the Coalition Grant alone would result in a loss of approximately $110,000 funds in MCEDV's annual operating budget for the next fiscal year. Without these funds, MCEDV would have to reduce the size of its staff and, therefore, our services to members, in ways that would have significant and lasting impact on the coalition's capacity to engage in essential functions. These losses would make MCEDV less effective as a coalition and undermine its role as the state authority on the prevention of, intervention in and response to domestic abuse and violence, dating violence and stalking. And if MCEDV lost its significant federal funding and needed to downsize considerably, it would lose the capacity to provide the infrastructure necessary to operate direct services like the statewide crisis response hotline.

70.     Our member programs would lose access to core, comprehensive training for their staff necessary to provide legally and ethically compliant advocacy services to clients in addition

to regular training on emergent issues that ensure front-line staff are able to provide quality services to all survivors. The state would lose critical technical assistance infrastructure at the coalition as this grant allows staff to travel across the state in order to provide on request, one-on-one or team/staff-wide assistance on complex advocacy issues such as building coordinated community response teams, improving systemic responses in legal, medical, and social services settings, shelter policies and practices, confidentiality and trauma-informed advocacy, and more.

71.    MCEDV would no longer be able to provide advocates across the state with: (1) ongoing training and technical assistance; (2) resources that educate members on best practices, update them on changes to state and federal law, and help survivors and the public recognize violence, find safety, and access available resources; or (3) systems coordination support, including tailored technical assistance, training, and coaching on building and sustaining community partnerships. Additionally, we would not have the funding needed to document and collect data meant to provide the state with critical information on service trends, victim help-seeking behavior, prevention programming, and outcomes for victims and their families who are served by Maine's domestic violence agencies. The training, technical assistance, data, and best practice building vacuum would undermine the viability and sustainability of organizations across the state, and their ability to meet grant application and management requirements, specifically for culturally specific service providers who tend to be smaller, less resourced organizations that lack historical infrastructure.

72.    These are just some of the ways MCEDV's programming and that of its beneficiaries would suffer.

### VII. Cuts to MCEDV's Programming and its Members' Services Would Harm Domestic Violence Survivors

73.     The reduction or outright termination of these services would have devastating effects on the community of survivors and victims of domestic abuse and violence in Maine and their children.

74.     In the absence of fully funded MCEDV services, victims of domestic abuse and violence will be confronted with more barriers when trying to access services and get what they need to support their safety and stability, including treatment from medical, law enforcement or courtroom personnel, hotline operators, and therapists that is not trauma informed and in alignment with best practices. This will immediately lead to more survivors choosing not to participate in the criminal and civil justice systems and fewer being linked to and receiving appropriate medical, mental health, legal, and supportive services. Direct service providers will be unable to maintain high quality services that follow best practice guidance or even that are fully compliant with the myriad federal, state, and local requirements they would now have to navigate on their own, without the critical assistance of coalitions, while desperately trying to keep up with the already increasing demand for services.

75.     MCEDV's operations are essential to permitting the network of direct service providers who represent our membership to focus on providing the highest-quality services to the survivors they serve and ensuring that the systems that contribute to addressing and responding to the epidemic of domestic abuse and violence operate with evidence-based, trauma-informed, survivor-centered policies and practices.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 13, 2025.

_____

Francine Garland Stark

Executive Director
Maine Coalition to End Domestic Violence