## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND COALITION AGAINST
DOMESTIC VIOLENCE, *et al.*

     *Plaintiffs*,

  v.

PAMELA BONDI, in her official capacity as United
States Attorney General, *et al.*,

     *Defendants*.

Case No. 1:25-cv-00279-MRD-PAS

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF UNDER 5 U.S.C. § 705, FOR TEMPORARY RESTRAINING ORDER, AND FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

    A. Congress created grant programs to support victims of domestic violence and other
crimes ....................................................................................................................... 3

        1.    VOCA Victim Assistance Grants............................................................ 3

        2.    Other VOCA Grants................................................................................ 4

        3.    Pet Shelter Grants .................................................................................. 4

    B. DOJ imposes new, unauthorized grant conditions to advance an ideological agenda ...... 6

        1.    Immigrant Exclusion .............................................................................. 6

        2.    OJP Anti-DEI Certification Requirement ............................................... 7

    C. The New Conditions threaten immediate harm to Plaintiffs ........................................... 12

LEGAL STANDARD.............................................................................................................. 15

ARGUMENT .......................................................................................................................... 16

I.    Plaintiffs Are Likely To Succeed on the Merits................................................................ 16

    A. The New Conditions must be set aside under the APA................................................... 16

        1.    The New Conditions exceed Defendants' statutory authority........................... 16

        2.    The New Conditions are arbitrary and capricious............................................. 19

        3.    The Immigrant Exclusion is contrary to law ..................................................... 24

        4.    The New Conditions are contrary to the Constitution........................................ 25

    B. The New Conditions violate the Constitution ................................................................ 25

        1.    The New Conditions are unconstitutionally vague ........................................... 25

        2.    The OJP Anti-DEI Certification Requirement violates the First Amendment.... 27

II.    Plaintiffs Will Suffer Irreparable Harm Absent Emergency Relief ..................................... 29

III.    The Balance of the Equities and Public Interest Favor Preliminary Relief........................... 32

CONCLUSION....................................................................................................................... 33

## TABLE OF AUTHORITIES

**CASES**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013)................................................................................ 27, 28

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
    No. 25-1611, 2025 WL 2017106 (1st Cir. July 18, 2025)................................ 32

*Arizona v. United States*,
    567 U.S. 387 (2012)........................................................................................ 21

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996)........................................................................................ 26

*Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*,
    622 F.3d 36 (1st Cir. 2010)............................................................................. 16

*Chi. Women in Trades v. Trump*,
    778 F. Supp. 3d 959 (2025) ....................................................................... 18, 28

*City of Arlington v. FCC*,
    569 U.S. 290 (2013)........................................................................................ 16

*City of Chicago v. Sessions*,
    961 F.3d 882 (7th Cir. 2020) .......................................................................... 29

*City of Fresno v. Turner*,
    No. 25-cv-07070-RS, 2025 WL 2721390 (2025) .......................................... 18

*City of Providence v. Barr*,
    954 F.3d 23 (1st Cir. 2020)............................................................................. 17

*Cmty. Econ. Dev. Ctr. of Se. Mass. v. Bessent*, No. 1:25-cv-12822,
    2026 WL 309281 (D. Mass. Feb. 5, 2026) .................................................... 24

*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020)............................................................................................ 20

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)................................................................................... 19, 20

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)........................................................................................ 25

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ........................................................................................... 16

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ........................................................................................... 25

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ...................................................................................... 26, 27

*Hannon v. Allen*,
    241 F. Supp. 2d 71 (D. Mass. 2003) ................................................................. 31

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ........................................................................................... 16

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ......................................................................... 16, 32

*Maceira v. Pagan*,
    649 F.2d 8 (1st Cir. 1981) .................................................................................. 31

*Massachusetts v. Nat;l Insts. of Health*,
    770 F. Supp. 3d 277 (D. Mass. 2025) ............................................................... 32

*Martin Luther King, Jr. Cnty. v. Turner*,
    785 F. Supp. 3d 863 (W.D. Wash. 2025) .......................................................... 19

*Michigan v. EPA*,
    576 U.S. 743 (2015) ........................................................................................... 19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................. 19, 20, 23

*NEA v. Finley*,
    524 U.S. 569 (1998) ..................................................................................... 27, 28

*New York v. Kennedy*,
    789 F. Supp. 3d 174 (D.R.I. 2025) .................................................................... 19

*New York v. U.S. DOJ*,
    804 F. Supp. 3d 294 (D.R.I. 2025) .................................................................... 16

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................................... 16

*Ohio v. EPA*,
    603 U.S. 279 (2024)................................................................................................. 19

*Reno v. ACLU*, 521 U.S. 844 (1997)........................................................................... 26

*Rhode Island Coal. Against Domestic Violence v. Bondi*,
    794 F. Supp. 3d 58 (D.R.I. 2025).......................................................................... 15

*Rhode Island Coalition Against Domestic Violence v. Kennedy*,
    2025 No. 25-cv-342; 2025 WL 2988705 (D.R.I. Oct. 23, 2025)................. 19, 27, 29, 33

*Sessions v. Dimaya*,
    584 U.S. 148 (2018)................................................................................................. 26

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
    699 F.3d 1 (1st Cir. 2012)....................................................................................... 31

*Soscia Holdings, LLC v. Rhode Island*,
    684 F. Supp. 3d 47 (D.R.I. 2023).......................................................................... 16

*United States v. Williams*,
    553 U.S. 285 (2008)................................................................................................. 26

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
    579 U.S. 176 (2016)........................................................................................... 10, 18

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982)................................................................................................. 26

*Villas at Parkside Partners v. City of Farmers Branch*,
    726 F.3d 524 (5th Cir. 2013) ................................................................................. 21

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..................................................................................................... 16

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ................................................................................................. 27

## STATUTES

5 U.S.C. § 705............................................................................................................ 10, 28

5 U.S.C. § 706(2)(A)-(C)............................................................................................ 11

5 U.S.C. § 706(2)(B) ................................................................................................ 22

8 U.S.C. § 1229a(c) ........................................................................................... 21, 26

8 U.S.C. § 1229a(e)(2) ................................................................................... 7, 21, 26

18 U.S.C. § 287 ....................................................................................................... 8

18 U.S.C. § 1001(a) ................................................................................................. 8

31 U.S.C. § 3729-3730 ............................................................................................ 5

31 U.S.C. § 3729(a)(1)(A) ...................................................................................... 7

31 U.S.C. § 3730 ................................................................................................. 5, 8

31 U.S.C. § 3801-3812 ........................................................................................... 5

34 U.S.C. § 12291(b)(2) ..................................................................................... 3, 21

34 U.S.C. § 12291(b)(2)(B)(ii) ......................................................................... 3, 4, 21

34 U.S.C. § 12291(b)(2)(D)(ii) .......................................................................... 3, 21

34 U.S.C. § 20101(a)–(b) ................................................................................... 1, 2

34 U.S.C. § 20101(c)(4) .......................................................................................... 1

34 U.S.C. § 20101(d)(4)(B) ..................................................................................... 1

34 U.S.C. § § 20101(d)(4)(C) ................................................................................... 2

34 U.S.C. § 20102 ................................................................................................... 1

34 U.S.C. § 20103(a)(3), (c) ................................................................................... 1

34 U.S.C. § 20103(b),(c) ......................................................................................... 1

34 U.S.C. § 20103(c) ............................................................................................... 2

34 U.S.C. § 20103(c)(1) .......................................................................................... 2

34 U.S.C. § 20103(c)(1)(A) ..................................................................................... 2

34 U.S.C. § 20110(e) ............................................................................................. 19

34 U.S.C. § 20127 ................................................................................................ 2, 3

34 U.S.C. § 20127(1) ............................................................................................... 3

34 U.S.C. § 20127(1)(A)-(B) ................................................................................... 4

34 U.S.C. § 20127(3) ............................................................................................... 3

34 U.S.C. § 20127(8) ............................................................................................... 3

34 U.S.C. § 20127(2)(B)(i) .................................................................................. 3, 21

34 U.S.C. § 20127(2)(B)(i)(I)–(II) ........................................................................... 3

34 U.S.C. § 20127(4)(A) ..................................................................................... 3, 21

34 U.S.C. § 20127(8) ............................................................................................... 3

42 U.S.C. § 200d ................................................................................................... 19

Protecting Animals With Shelter (PAWS) Act., Pub. L. No. 115-334 (2018) ............................... 5

The Judiciary Act, 1 Stat. 73 (1789) ...................................................................... 15

## REGULATIONS

2 C.F.R. § 200.332(b)(3) ......................................................................................... 8

28 C.F.R. § 85.5 ................................................................................................... 10

28 C.F.R. § 90.4(c) ............................................................................................... 23

28 C.F.R. § 94.103(a) ......................................................................................... 4, 23

28 C.F.R. § 94.116 ............................................................................................. 4, 23

28 C.F.R. § 94.119 ................................................................................................. 4

## OTHER AUTHORITIES

62 Fed. Reg. 61344-02 (1997) .............................................................................. 22

*Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order No. 14151 of January 20, 2025, 90 Fed. Reg. 8339 (Jan. 29, 2025) ...................... 9

*Ending Illegal Discriminaton and Restoring Merit-Based Opportunity*, Exec. Order No. 14173 of January 21, 2025, 90 Fed. Reg. 8633 (Jan. 31, 2025) ................................. 7

Letter from Todd Blanche, Deputy Att'y Gen., to DOJ Offices, Divisions, and U.S. Attorneys, *Civil Rights Fraud Initiative* (May 19, 2025) ................................. 10

Mem. From Ass't Att'y Gen., Brett A. Shumate, to Civil Division Employees, *Civil Division Enforcement Priorities* (June 11, 2025) ............................................. 11

Mem. from Att'y Gen. Pam Bondi, *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025) ................................................................ 11

Mem. for All Department of Justice Employees: *Eliminating Internal Discriminatory Practices* (Feb. 5, 2025) ................................................................ 12

Mem. from Att'y Gen. Pam Bondi, *Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination* (July 29, 2025), ...................................... 12

Office of Public Affairs, *Justice Department Establishes Civil Rights Fraud Initiative*, U.S. DOJ (May 19, 2025) ............................................................... 11

OJP, "*General Conditions" for OJP Awards in FY 2025* (May 12, 2025) .................................. 17

OVC FY25 Emergency and Transitional Pet Shelter and Housing Assistance for Victims of Domestic Violence Program, Funding Opportunity Number O-OVC-2025-172432 ............................................................................... 6

OVC FY25 Services for Victims of Crime, Funding Opportunity Number O-OCV-2025-172427 ............................................................................. 4

The White House, *Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI* (Jan. 22, 2025).................................... 28

U.S. Citizen and Immigration Services, *Register an Agency for SAVE* (Oct. 6, 2025) ............... 22

**INTRODUCTION**

Plaintiffs in this action are seventeen non-profit membership organizations that are the federally recognized domestic violence and sexual assault coalitions for their respective states. Plaintiffs and their members support survivors of domestic violence and sexual assault and work to prevent more people from falling victim to these horrific crimes. Grants from Defendant the Department of Justice (DOJ) provide much of the funding needed to carry out their crucial work.

Yet, once again, DOJ and various subcomponents are leveraging federal grant funding to advance ideological goals that bear no relation to the purposes of the grant programs Congress established—and, worse, that undermine grantees' ability to effectively carry out Congress's goals. The most recent set of grants that DOJ's Office of Justice Programs issued on January 26 all contain a new, and previously unannounced, condition that will cause devastating harm. The new condition bars grantees from using grant funds to provide services to any "removable alien" under the Immigration and Nationality Act and any person who is "otherwise unlawfully present in the United States," subject to certain ill-defined exceptions. Defendants have imposed this new condition (Immigrant Exclusion) on grants that Plaintiffs and their members rely on to help survivors of domestic violence escape abusive situations and to provide therapy, health care, childcare, and other services survivors need to recover.

This new Immigrant Exclusion will gut Plaintiffs' and their members' ability to effectively serve victims of domestic violence and other crimes in their communities. Survivors fleeing domestic violence often are not able to take identification documents with them—and, in fact, abusers commonly maintain control over documents as a way to maintain control over their victims. Even where survivors could produce documents, it is unclear how grantees could determine whether a noncitizen was "removable" or "unlawfully present"—statuses that are not

1

readily ascertainable. And, worse, even just asking survivors about their immigration status will erode the hard-won trust Plaintiffs and their members have built—and will make victims wary of seeking help, no matter their immigration status. The Immigrant Exclusion thus forces Plaintiffs and their members to either forgo critical grant funding or operate under a condition that is impossible to comply with and that will compromise their missions, survivors' safety, and the effectiveness of the grant programs Congress created.

The Immigrant Exclusion is unlawful. Congress did not authorize Defendants to restrict victim services in this way. Defendants acted arbitrarily and capriciously in imposing it—it failed to explain the new condition at all, failed to consider that it would be difficult or impossible for grantees to comply, failed to consider the harmful consequences the condition would have on noncitizen and citizen victims alike, and failed to account for the grantees' and their communities' reliance interests in continued availability of lifesaving services. The Exclusion also conflicts with provisions Congress adopted for certain grants that bar grantees from disclosing client information or undertaking background checks or other activities that compromise victim safety. And it is unconstitutionally vague to boot.

Defendants have also subjected Plaintiffs and their members to a new requirement designed to threaten grantees with False Claims Act litigation and liability to scare them off of conducting entirely lawful activities to promote diversity, equity, and inclusion. In particular, Defendants are requiring OJP grantees to certify that they do not engage in diversity, equity, and inclusion activities that violate nondiscrimination laws—and to agree that compliance with those laws is material to the government's payment decision for False Claims Act purposes. This Court already preliminarily stayed an identical condition that DOJ's Office on Violence Against Women has imposed. OJP's condition should be stayed and enjoined for the same reasons.

Some Plaintiffs and members have already accepted the awards of this critically needed funding and are now struggling to abide by the conditions. At least one member must decide by March 12 whether to accede to the damaging conditions or to forgo the funding they rely on to provide critical services to survivors of domestic violence. Plaintiffs respectfully request preliminary relief by March 11 to protect them and their members from the immediate, irreparable injuries they will suffer from acting under these harmful and unlawful conditions or from declining these needed funds.

## BACKGROUND

### A. Congress created grant programs to support victims of domestic violence and other crimes

Congress has created a host of grant programs to support victims of domestic violence, sexual assault, and other crimes. DOJ's Office of Justice Programs (OJP) administers many of them. Several grant programs administered by the Office for Victims of Crime (OVC), an OJP subcomponent, are of particular relevance here.

### 1. VOCA Victim Assistance Grants

In the Victims of Crime Act (VOCA), Congress established the Crime Victims Fund—a fund principally financed with criminal fines and penalties—and directed OVC to use a portion of the Fund to make grants to support victims of crime. *See* 34 U.S.C. §§ 20101(a)–(b), (c)(4), 20102–20103. One such congressionally created grant program is the VOCA Victim Assistance program, under which OVC makes annual formula grants to states for victim services programs and related activities. *Id.* §§ 20101(d)(4)(B), 20103(a)(3), (c). States then subaward those funds to nonprofits and public agencies in their states to support direct services to crime victims. *Id.* § 20103(b), (c). By statute, states distributing VOCA victim assistance funds must give priority to programs that assist victims of sexual assault, spousal abuse, or child abuse, but funds can be

used for services that assist victims of all manner of crimes, including drunk driving, homicide, and other crimes as well. *See id.* § 20103(a)(2)(A). VOCA Victim Assistance Formula Grant funds support a wide range of assistance to victims, including information and referral services, crisis counseling, temporary housing, safety planning, criminal justice advocacy support, and legal assistance. *See* 28 C.F.R. § 94.119. Binding regulations provide that victims' eligibility for services under any VOCA Victim Assistance program is "not dependent on the victim's immigration status." 28 C.F.R. §§ 94.103(a), 94.116.

### 2. *Other VOCA Grants*

VOCA also authorizes OVC to use a portion of the amounts in the Crime Victims Fund for other grants to serve victims of crime. 34 U.S.C. §§ 20101(d)(4)(C), 20103(c). In particular, 34 U.S.C. § 20103(c) directs OVC to make grants for "victim services," "financial support of services to victims of Federal crime," and for local organizations "to improve outreach and services to victims of crime," among other things. *Id.* § 20103(c)(1). The Director of OVC is authorized to "[e]stablish programs in accordance with § 20103(c) . . . on terms and conditions determined by the Director to be consistent with that subsection." *Id.* § 20111(c)(3).

Exercising that authority, OVC announced in July 2025, that it would award $15.9 million in funding for "Services for Victims of Crime" grants pursuant to § 20103(c)(1)(A). OVC FY25 Services for Victims of Crime, Funding Opportunity Number O-OCV-2025-172427, at 1, 5, https://perma.cc/99GT-DZYE. Per the notice of funding opportunity, those grants would support "projects to provide direct services to child and youth victims of crime, victims of elder abuse, fraud, and exploitation, and other victims of crime." *Id.* at 3.

### 3. *Pet Shelter Grants*

OVC also administers the Emergency and Transitional Pet Shelter and Housing Assistance grant program (Pet Shelter program), which Congress created in 2018. *See* Pub. L.

No. 115-334, § 12502(b) (2018), *codified at* 34 U.S.C. § 20127. Congress recognized that domestic violence survivors "often may be reluctant to leave an abusive relationship out of fear for the safety and welfare of their companion animals." H.R. Conf. Rep. 115-1072, at 778 (2018). This stems from the fact that "[a]nimal friendly housing can be difficult to secure, and the costs entailed with animal housing can factor into victims' decisions to leave abusive relationships." *Id.* To help address this problem, Congress enacted the Protecting Animals With Shelter (PAWS) Act. Pub. L. No. 115-334, § 12502 (2018).

The PAWS Act authorizes up to $3 million in grants annually to help victims of domestic violence, dating violence, sexual assault, or stalking secure safe housing with or for their pets, service or emotional support animals, or horses. 34 U.S.C. §§ 20127(1), (3), (8). Congress recognized that victim safety was paramount and accordingly barred grantees from seeking funding for "activities that may compromise the safety of a domestic violence victim." *Id.* § 20127(2)(B)(i). Barriers to obtaining help can jeopardize victim safety, so Congress specifically prohibited two activities that it deemed to compromise victim safety—"background checks of domestic violence victims" and "clinical evaluations to determine the eligibility of such a victim for support services." *Id.* § 20127(2)(B)(i)(I)–(II).

The statute further protects victim safety by requiring Pet Shelter grantees to agree "to be bound by the nondisclosure of confidential information requirements of [34 U.S.C. § 12291(b)(2)]." *Id.* § 20127(4)(A). Section 12291(b)(2), in turn, requires covered grantees to "protect the confidentiality and privacy of persons receiving services" so as "to ensure the safety" of victims and their families. Among other things, grantees may not "disclose, reveal, or release individual client information without the informed, written, reasonably time-limited consent" of the relevant person. *Id.* § 12291(b)(2)(B)(ii). And "[i]n no circumstances" can a

victim "be required to provide" such consent "as a condition of eligibility" for the grantee's services. *Id.* § 12291(b)(2)(D)(ii). Importantly, these restrictions apply across the board: If a grantee receives any grant subject to these confidentiality protections—such as a Pet Shelter grant or any grant under the Violence Against Women Act—the grantee may not disclose, without consent, client information for that grant program or for "*any other* Federal, State, tribal, or territorial grant program." *Id.* § 12291(b)(2)(B)(ii) (emphasis added).

The statute vests responsibility for administering this program in the Secretary of Agriculture, but authorizes the Secretary of Agriculture to enter into a memorandum of understanding with another agency to carry out the program. *Id.* § 20127(1)(A)-(B). Pursuant to such a memorandum of understanding, DOJ currently administers this program through OVC. *See* OVC FY25 Emergency and Transitional Pet Shelter and Housing Assistance for Victims of Domestic Violence Program, Funding Opportunity Number O-OVC-2025-172432, https://perma.cc/77GN-H2FT.

**B. DOJ imposes new, unauthorized grant conditions to advance an ideological agenda**

DOJ has recently imposed new, unauthorized grant conditions to advance ideological goals unrelated to the purposes of the grant programs Congress established.

*1. Immigrant Exclusion*

DOJ's Office of Justice Programs appears to have adopted a policy of imposing a new condition requiring OJP grantees to deny services to certain noncitizens (Immigrant Exclusion). OJP did not announce this condition in advance or include it in any notice of funding opportunity, but recently-issued OJP awards—namely, grants issued on January 26, 2026 for the VOCA Services for Victims of Crime program and the Pet Shelter program—contain it. *See* Declaration of Susan Higginbotham (Higginbotham Decl.) ¶¶ 12-15; Declaration of Jennifer Pollitt Hill (Hill Decl.) ¶ 7; Declaration of Krista Colón (Colón Decl.) ¶¶ 11-12. This condition

generally bars grantees from using grant funds to provide services to two ill-defined categories of noncitizens—"removable aliens" under 8 U.S.C. § 1229a(e)(2) (which sets forth complex criteria for immigration judges to apply to determine whether a person is removable in a multi-step adjudicatory process) and people who are "unlawfully present in the United States" (a category that the condition does not define at all). The Immigrant Exclusion also provides that the prohibition does not apply where using grant funds to provide services to such people is "expressly authorized by law (or otherwise expressly allowable under the terms of this award)" or "where the prohibition would contravene any express requirement of any law, or of any judicial ruling, governing or applicable to the award."[1] The Immigrant Exclusion offers no further guidance on how service providers would make any of the determinations necessary to adhere to this condition.

### 2. OJP Anti-DEI Certification Requirement

DOJ's Office of Justice Programs has also updated its "General Terms" for FY 2025 OJP awards to impose an anti-DEI certification requirement (OJP Anti-DEI Certification Requirement) identical to the anti-DEI certification requirement that DOJ's Office on Violence Against Women has also imposed and that the Court in this case has already preliminarily stayed under the APA. *See* Dkt No. 34 at 26-27. In particular in 2025, OJP updated its General Terms so that OJP grantees now must "agree[] that its compliance with all applicable federal civil rights

---

[1] The Immigrant Exclusion states, in full:

> The recipient shall ensure that no funds provided under this award (or any subaward, at any tier) will be used to provide benefits or services to any removable alien (see 8 U.S.C. § 1229a(e)(2)) or any alien otherwise unlawfully present in the United States, but this prohibition shall not apply where such use is expressly authorized by law (or otherwise expressly allowable under the terms of this award) or where the prohibition would contravene any express requirement of any law, or of any judicial ruling, governing or applicable to the award.

and nondiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for purposes of the False Claims Act (31 U.S.C. 3729-3730 and 3801-3812), and, by accepting this award, certif[y] that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable federal civil rights or nondiscrimination laws." OJP, *"General Conditions" for OJP Awards in FY 2025*, https://perma.cc/D3NX-3W9R (OJP General Terms). The certification does not explain when diversity, equity, and inclusion programs would be illegal. And it sweeps beyond what grantees do with their federal grant funding: Grantees must certify that they do not operate "*any* programs" relating to DEI that violate nondiscrimination laws—even if those programs are not federally funded—and that the grantee's actions in those non-federally-funded programs are material for False Claims Act purposes. *Id.*

While the OJP Anti-DEI Certification Requirement requires only "the recipient" to agree to the certification without mentioning subrecipients, *id.*, regulations require recipients to impose requirements on subrecipients to ensure that the recipient meets its responsibilities under the federal award, 2 C.F.R. § 200.332(b)(3). Some direct recipients have accordingly required subrecipients to make the same certification. Declaration of Kirsten Faisal (Faisal Decl.) ¶ 16; *see* Declaration of Kelsen Young (Young Decl.) ¶¶ 7-8. Defendants have permitted recipients to impose the OJP Anti-DEI Certification Requirement on subrecipients. *See* Letter from Kathryn Barragan, U.S. DOJ, to Lynn Eisenberg at 3 (Dkt. No. 42-1).

The OJP Anti-DEI Certification Requirement is part of an administration-wide campaign to use the threat of False Claims Act liability, and the pretense of enforcing nondiscrimination laws, to eradicate diversity, equity, and inclusion activities that are entirely lawful. Starting in his first days in office, President Trump issued multiple executive orders that broadly seek to

eliminate "diversity, equity, and inclusion" (DEI) and "diversity, equity, inclusion, and accessibility" (DEIA) values and initiatives. One order directed agencies to terminate all DEI and DEIA offices, all "equity" programs, and all "equity-related" grants or contracts. *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order No. 14151 of January 20, 2025, § 2(b), 90 Fed. Reg. 8339 (Jan. 29, 2025). Another order aims to end purportedly "illegal" DEI and DEIA in the federal government and the private sector. *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Exec. Order No. 14173 of January 21, 2025, §§ 3–4, 90 Fed. Reg. 8633 (Jan. 31, 2025) (Anti-DEI Order). That order does not explain what might make such programs "illegal," but it makes clear that the Administration has a novel and extreme view that diversity, equity, and inclusion is often illegal. Among other things, the order laments that "dangerous, demeaning, and immoral" DEIA or DEIA programs are widespread across the public and private sectors and revokes multiple diversity-related executive actions issued over the last half century. *Id.* at § 3.

Among other ways of advancing its goal, the Anti-DEI Order initiates a scheme to use the False Claims Act as a weapon to stop federal funding recipients from engaging in diversity, equity, and inclusion activities. The Order requires agency heads to "include in every contract or grant award" a term substantively identical to the OJP Anti-DEI Certification that OJP ultimately adopted. *Id.* § 3(iv)(B). This certification threatens federal funding recipients with considerable risk of burdensome, and potentially ruinous, FCA litigation and liability if they engage in diversity, equity, and inclusion activities that the Administration disfavors. The FCA makes it unlawful for anyone to "knowingly present[], or cause[] to be presented," to the government "a false or fraudulent claim for payment." 31 U.S.C. § 3729(a)(1)(A). For a misrepresentation to be actionable under the FCA, the plaintiff must show that it was "material to the Government's

payment decision"—a requirement the Supreme Court has emphasized is "rigorous" and "demanding." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181, 192, 194 (2016). Thus, the Anti-DEI Order's certification seeks to make it easier to establish FCA liability by requiring grantees to concede upfront an essential, and otherwise demanding, element of an FCA claim.

If they are deemed not to comply with their certification, grantees face potentially massive liability, both civil and criminal. Civil liability under the FCA is so significant that the Supreme Court has described it as "essentially punitive in nature"—potential treble damages (meaning three times the amount of federal funds that the recipient received from the government in connection with the certifications) plus civil penalties of up to approximately $28,600 per false claim. *See Universal Health Servs.*, 579 U.S. at 182 (cleaned up); *see also* 28 C.F.R. § 85.5. Compounding the risks, in addition to authorizing DOJ to enforce the Act, the FCA also authorizes private citizens to enforce it and then receive a share of any resulting judgment or settlement. 31 U.S.C. § 3730. Liability can be criminal, too: The government can seek up to five years imprisonment for those who knowingly make a "false, fictitious, or fraudulent" claim to any agency in seeking funds. 18 U.S.C. § 287; *see also id.* § 1001(a).

Following the Anti-DEI Order, DOJ has tripled down on leveraging the FCA to combat diversity, equity, and inclusion. On May 19, 2025, Deputy Attorney General Todd Blanche announced a new task force, called the "Civil Rights Fraud Initiative," which will use the False Claims Act as a "weapon" against federal funding recipients. Letter from Todd Blanche, Deputy Att'y Gen., to DOJ Offices, Divisions, and U.S. Attorneys, *Civil Rights Fraud Initiative* (May 19, 2025) https://perma.cc/3W6K-FGHA (Blanche Memo). The Blanche Memo specifically focuses on funding recipients that engage in DEI activities as targets for potential investigation

and enforcement actions. *Id.* The memo also "strongly encourages" private parties to file suits under the FCA's *qui tam* provision, and encourages the public to report information about "discrimination by federal-funding recipients" to DOJ. *Id.* at 2. And it states that the new initiative will engage the DOJ's Criminal Division. *Id.* at 2. The Blanche Memo does not explain when DEI would be considered "illegal," but a press release announcing the Initiative broadly warns institutions not to "promote divisive DEI policies." Office of Public Affairs, *Justice Department Establishes Civil Rights Fraud Initiative*, U.S. DOJ (May 19, 2025), https://perma.cc/ZS6R-B8E9.

Further confirming the Administration's plans to aggressively use the FCA, a June 11 memo announcing the DOJ Civil Division's enforcement priorities lists using the FCA to combat "illegal private-sector DEI" as the very first priority. Mem. From Brett A. Shumate, Ass't Att'y Gen., to Civil Division Employees, *Civil Division Enforcement Priorities* (June 11, 2025), https://perma.cc/SV3A-NE9F.

At the same time, the Administration has denounced "DEI" generally, while doing more to confuse than to clarify when it will consider "DEI" to be unlawful—making it risky for grantees to do *anything* reflecting diversity, equity, and inclusion values. The Anti-DEI Order itself gives cause to fear that the Administration will deem illegal anything involving diversity, equity, or inclusion. In the name of eradicating purportedly "illegal" DEI, it directs agencies to stop "[p]romoting 'diversity,'" to "[e]xcise references to DEI and DEI principles," and to "terminate all 'diversity,' 'equity,'" and similar activities. Anti-DEI Order §§ 3(b)(ii)(A), 3(c)(ii), 3(c)(iii). A February 5, 2025, letter from Attorney General Bondi to all DOJ employees similarly announced that DOJ intends to aggressively "investigate, eliminate, and penalize" "illegal DEI and DEIA," but without defining "DEI" or "DEIA" or explaining what makes a DEI

or DEIA program illegal. Mem. from Pam Bondi, Att'y Gen., *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025), https://perma.cc/KH9Y-A2VQ. The Attorney General has suggested that even talking about DEI or DEIA can be unlawful in DOJ's view. To eliminate illegal DEI and DEIA activities, the Attorney General instructed staff to "pay particular attention to ending references to DEI or DEIA" in programs, including "references to 'unconscious bias,' 'cultural sensitivity,' [and] 'inclusive leadership.'" Mem. from Pam Bondi, Att'y Gen., to All Department of Justice Empls., *Eliminating Internal Discriminatory Practices* (Feb. 5, 2025), https://perma.cc/24KA-GFJ6.

In July, the Attorney General issued a memo purporting to provide "guidance for recipients of federal funding regarding unlawful discrimination," but it provides little clarity. Mem. from Att'y Gen. Pam Bondi, *Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination* (July 29, 2025), https://perma.cc/T4B4-QTYH (Bondi Discrimination Memo). The memo lists DEI activities and other practices that DOJ cautions would "risk" violating antidiscrimination laws and "recommend[s]" that funding recipients avoid. *Id.* at 1–2, 4–8. But the memo notes that its list is "non-exhaustive," *id.* at 4, and in any event the listed examples provide no guidance for most of the activities that Plaintiffs and their members must undertake (or avoid) in carrying out their grants. And even for the examples provided, the memo confirms that the Administration has a new, expansive, and unsupported view of when "DEI" is (or might be) illegal—warning against conduct like talking about "toxic masculinity," considering "cultural competence," and creating (non-exclusive) "safe spaces" for people of certain demographics. *See id.* at 5, 6, 8.

### C.  The New Conditions threaten immediate harm to Plaintiffs

Plaintiffs and their members received OJP grants subject to the Immigrant Exclusion and OJP Anti-DEI Certification Requirement in late January. *See* Colón Decl. ¶¶ 9–10;

Higginbotham Decl. ¶¶ 13–14; Hill Decl. ¶ 9. Other Plaintiffs and their members previously received pass-through OJP grants for which they were required to make the OJP Anti-DEI Certification. Faisal Decl. ¶¶ 11, 16; Young Decl. ¶ 7. The New Conditions cause immediate, ongoing harm to Plaintiffs and their members absent relief. The funding conditions have put Plaintiffs and their members in an impossible position: either operate under unlawful funding conditions that will impede their ability to provide core services to protect survivors of domestic abuse and are at odds with their fundamental missions, or forgo federal funds that are essential to their ability to fulfill their missions, and that are necessary to save lives.

The Immigrant Exclusion would force Plaintiffs and their members to attempt to make determinations that private organizations cannot reliably make, and force them to spend their limited resources on setting up new processes to make those determinations rather than helping victims. Higginbotham Decl. ¶ 22; Hill Decl. ¶ 16; Colón Decl. ¶¶ 16-17. Complying with the Immigrant Exclusion, moreover, would ruin trust between Plaintiffs and their communities, as inquiring about immigration status would cause survivors to fear the providers were government informants rather than helpful allies. Higginbotham Decl. ¶ 23; Hill Decl. ¶ 16; *see also* Colón Decl. ¶ 15. This lack of trust will impact not only the providers' work under their OJP grant, but also their "reputation as a whole, including with clients who use other services." Higginbotham Decl. ¶ 24. That will result in losing referrals, and "families who need help … will not seek it." Higginbotham Decl. ¶ 24; *see also* Colón Decl. ¶ 15; Hill Decl. ¶ 16 ("We also expect that many survivors would not be able to provide documentation needed to prove their citizenship or immigration status.")

By operating under the New Conditions, Plaintiffs and their members also face risk of burdensome litigation and liability under the False Claims Act. Plaintiffs and their members take

these threats seriously, because the cost of defending against even a meritless FCA lawsuit could be financially ruinous for small organizations like theirs. *See* Hill Decl. ¶ 12; Faisal Decl. ¶ 21; Young Decl. ¶ 9; Higginbotham Decl. ¶¶ 18–19; Colón Decl. ¶¶ 13-14.

As a result of these False Claims Act risks, Plaintiffs and their members must consider self-censoring their speech and expressive activity to comply with a vague Anti-DEI certification. The Maryland Coalition, for example, is concerned that undertaking "its day-to-day activities reflecting its mission and guiding principles, which reference 'equity' and 'diversity,'" could expose it to risk of disruptive and potentially ruinous False Claims Act litigation. Hill Decl. ¶ 12. Other grantees have the same concerns that lawful equity-related activities or work with certain populations could expose them to False Claims Act risk. Colón Decl. ¶ 18; Faisal Decl. ¶ 21; Higginbotham Decl. ¶¶ 25–27; Young Decl. ¶ 10.

But declining the grants would cause just as grave harm. Without OJP funding, Plaintiffs and their members would be unable to provide the lifesaving services that survivors of domestic violence in their communities desperately need. For example, VOCA funds from OJP make up 15 percent of the Iowa Coalition's annual budget, and losing that funding would likely force it to lay off staff and would leave it with limited or no ability "to provide dedicated response to shelters, rape crisis centers, and DV programs that call [them] when they are navigating barriers to support survivors." Faisal Decl. ¶¶ 23–24. The consequences would be even worse for Iowa Coalition's member Family Crisis Center, for which a VOCA grant from OJP is traditionally the largest source of funding. *Id.* at ¶ 25. Without its FY25 Services for Victims of Crime Grant, the Maryland Coalition "would no longer be able to provide support to survivors who cannot obtain safe housing and it would also mean that the newly awarded victim services grant would be terminated and survivors would not receive critical, life-saving access to quality health care, job

training, and housing stability." Hill Decl. ¶ 18. For the Pennsylvania Coalition's member Crisis Center North, losing its FY25 Pet Shelter grant funding would mean it could no longer provide clients with "housing support for themselves and their pets, and victims would therefore be forced to stay with their abusers due to lack of housing support and fear for their pets' safety." Higginbotham Decl. ¶ 29. In California, without the Partnership's member's OVC Services for Victims of Crime Grant, it would have to roll back services tailored to victims of crime over age 55, a setback that would be hard to overcome given how difficult it is to find funding for elder abuse work. Colón Decl. ¶ 19. And without its OJP grant, the Montana Coalition's member Domestic and Sexual Violence Services of Carbon County would face the prospect of laying off approximately 50% of its staff and being unable to provide "direct financial assistance funds for clients" that they use "to cover rent, utility costs, transportation, childcare and other costs essential to improving victim safety." Young Decl. ¶ 11.

## LEGAL STANDARD

The Administrative Procedure Act authorizes courts "to postpone the effective date of an agency action" or "preserve status or rights" pending resolution of the proceedings when "necessary to prevent irreparable injury." 5 U.S.C. § 705. Courts also have equitable authority to grant temporary restraining orders and preliminary injunctions. *See* The Judiciary Act, § 11, 1 Stat. 73, 78 (1789). The same standards apply to all those types of preliminary relief. *Rhode Island Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 65 (D.R.I. 2025) ("Although not definitively decided by the Supreme Court or the First Circuit, it is accepted that Section 705 'stays' under the APA turn on the same factors as preliminary injunctions." (cleaned up)).

To obtain preliminary relief of either type, the movant must establish (1) "a likelihood of success on the merits," (2) likely "irreparable harm… absen[t] preliminary relief," (3) "that the

balance of equities tips in [the movant's] favor, and" (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where "the government is the opposing party[,]" the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Irreparable injury operates on "a sliding scale" such that "the greater the likelihood [of success], the less harm must be shown." *Soscia Holdings, LLC v. Rhode Island*, 684 F. Supp. 3d 47, 49 (D.R.I. 2023) (citing *Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42–43 (1st Cir. 2010)). To obtain preliminary relief, Plaintiffs "need only show a substantial likelihood of success on one of their claims," not all of them. *New York v. U.S. DOJ*, 804 F. Supp. 3d 294, 311 (D.R.I. 2025), *appeal pending*, No. 25-2099.

## ARGUMENT

## I.    Plaintiffs Are Likely To Succeed on the Merits

Plaintiffs are likely to succeed on their claims under the Administrative Procedure Act (APA) and under the Constitution.

### A.    The New Conditions must be set aside under the APA

Under the APA, a court must "set aside agency action" if it exceeds the agency's statutory authority, is arbitrary and capricious, is contrary to law, or contrary to the Constitution. 5 U.S.C. § 706(2)(A)-(C). Plaintiffs are likely to succeed on their claims that the New Conditions must be set aside for each of these independent reasons.

#### 1.    *The New Conditions exceed Defendants' statutory authority*

Defendants lack statutory authority to impose the Immigrant Exclusion or the OJP Anti-DEI Certification. For agencies charged with administering statutes, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). An agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "Any action

16

that an agency takes outside the bounds of its statutory authority . . . violates the Administrative

Procedure Act." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020).

> ***a. Immigrant Exclusion.*** No statute authorizes Defendants to impose the Immigrant
Exclusion. Neither VOCA nor the PAWS Act excludes any victims of crime from eligibility for
services based on their immigration status, nor do those statutes authorize defendants to impose
such an exclusion themselves. No other statute grants such authorization either.

> ***b. OJP Anti-DEI Certification.*** Defendants also lack statutory authority to impose the
OJP Anti-DEI Certification—a requirement Defendants have adopted to pave the way for False
Claims Act lawsuits designed to punish and deter diversity, equity, and inclusion activities that
the Administration disfavors. That Certification requires grantees (1) to "certify" that they "do[]
not operate any programs (including any such programs having components relating to diversity,
equity, and inclusion) that violate any applicable federal civil rights or nondiscrimination laws"
and (2) to "agree[]" that their compliance with those laws "is material to the government's
decision to make this award and any payment thereunder, including for purposes of the False
Claims Act." OJP, *"General Conditions" for OJP Awards in FY 2025*, https://perma.cc/D3NX-
3W9R. While Defendants have authority to require grantees to certify compliance with
nondiscrimination laws (and long have, though without unlawfully singling out one category of
generally lawful conduct for special scrutiny), this new certification exceeds their authority for
two separate reasons.

> First, Defendants lack authority to require grantees to agree in advance that compliance
with nondiscrimination laws is material to any payment decision by the government. That
materiality certification undercuts an important part of the FCA's statutory scheme. As the
Supreme Court has emphasized, "strict enforcement" of the FCA's "rigorous" materiality

requirement is important, including because it guards against "open-ended liability" under a law that was not intended to be a "vehicle for punishing garden-variety … regulatory violations." *Universal Health Servs. v. U.S. ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016). Noncompliance with statutory requirements is "not automatically material, even if they are labeled conditions of payment." *Id.* at 191. Nor is materiality automatically established merely because "the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* at 194. More is required. *See id.* at 192-96. OJP's required certification of materiality would gut this by excusing the government (and any qui tam relator) from meeting the "demanding" materiality standard, *id.* at 194, and enabling them to satisfy it automatically instead. No statute authorizes Defendants to effectively remove this critical element of an FCA claim by requiring funding recipients to concede materiality upfront.

Second, Defendants lack authority to single out "diversity, equity, and inclusion" activities that violate federal anti-discrimination laws. As other district courts have held, such conditions' references to DEI activities that violate federal law "act as announcements of policies rather than as limits to the scope of the new conditions." *City of Fresno v. Turner*, No. 25-cv-7070, 2025 WL 2721390, at *8 (N.D. Cal. Sept. 23, 2025), *appeal pending*, No. 25-7378. The Administration has made clear that "the government's view of what is illegal" under antidiscrimination laws "has changed significantly with the new Administration." *See Chi. Women in Trades v. Trump*, 778 F. Supp. 3d 959, 984 (N.D. Ill. 2025); *accord City of Fresno*, 2025 WL 2721390, at *8 (explaining that government's interpretation of anti-discrimination laws "is undergoing significant change"). These certifications improperly "go beyond prohibiting violations of federal law as it is currently understood and pose a real risk of curtailing programs that would not be found violative." *City of Fresno*, 2025 WL 2721390, at *11.

18

### 2.   *The New Conditions are arbitrary and capricious*

The New Conditions are also arbitrary and capricious. Under arbitrary and capricious review, courts must hold unlawful any agency action that is "not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). For a challenged agency action to pass muster, the agency must offer "a satisfactory explanation for its action" and can neither "rel[y] on factors which Congress has not intended it to consider" nor ignore "an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While agencies are free to change their existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have taken account of "reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In assessing the reasonableness of an agency's explanation for its action, "the Court must look to 'the grounds that the agency invoked when it took the action.'" *New York v. Kennedy*, 789 F. Supp. 3d 174, 205 (D.R.I. 2025) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). The New Conditions fail on multiple fronts.

To begin, Defendants' imposition of both New Conditions fails the most basic requirement of agency decision-making: the Conditions "have not been explained at all." *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 888 (W.D. Wash. 2025), *appeal pending*, No. 25-3664. Defendants provided no explanation for their actions, let alone the "reasoned explanation" the APA requires. *See Fox Television*, 556 U.S. at 515. For this reason, the Court has found DOJ's and other agencies' imposition of materially similar anti-DEI certification requirements likely to be arbitrary and capricious. *See* Mem. and Order at 20–22 (Dkt No. 34); *Rhode Island Coalition Against Domestic Violence v. Kennedy*, No. 25-cv-342, 2025 WL 2988705, at *7 (D.R.I. Oct. 23, 2025). Defendants likewise failed to acknowledge that the New

19

Conditions reflect a change in policy or to reasonably explain the reasons for that change. *See Fox Television*, 556 U.S. 502.

Defendants also failed to consider how both New Conditions jeopardize the "serious reliance interests" of grantees and the victims of crime they serve. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). The Supreme Court has made clear that the failure to "consider[] potential reliance interests," standing alone, renders agency action arbitrary and capricious. *Id.* Defendants did not consider the reliance interest of grantees in funding on terms they can comply with and that do not undermine their missions, nor did Defendants consider the reliance interests of the communities those grantees serve in having victim services available.

Defendants have also failed to consider multiple other "important aspect[s] of the problem," *State Farm*, 463 U.S. at 43. In imposing the OJP Anti-DEI Certification Requirement, Defendants did not consider or explain how the requirement to certify to not engaging in any (purportedly illegal) DEI-related activity—and to certify that this is material for False Claims Act purposes—would chill grantees from engaging in entirely lawful activity to foster inclusion, diversity, and equity. Nor did they consider or explain how that would result in fewer and less effective services to populations that are already underserved. Defendants appear to have adopted the OJP Anti-DEI Certification Requirement to comply with the Anti-DEI Executive Order's instructions, but, as this Court already held in preliminarily staying an identical certification requirement for Office on Violence Against Women grants, Defendants "cannot avert the arbitrary and capricious analysis by simply deferring to the relevant Executive Order." Mem. and Order at 20–21 (Dkt. No. 34) (cleaned up) (collecting cases).

As for the Immigrant Exclusion, Defendants do not appear to have considered, for example, that it will be difficult or impossible for grantees to reliably determine whether a victim

seeking services falls within the category of individuals the Immigrant Exclusion requires grantees to exclude—or that this difficulty will mean that, to avoid violating the Immigrant Exclusion, grantees will be forced to turn away victims in need who are lawfully in the United States or even U.S. citizens.

Multiple factors make it difficult or impossible for grantees to reliably determine whether a victim is ineligible for services under the Immigrant Exclusion. For one, the categories the Exclusion identifies—"removable alien[s]" under 8 U.S.C. § 1229a(e)(2) and people who are "unlawfully present"—are ill-defined and not ascertainable by private organizations. Determining "whether a person is removable" involves "significant complexities." *Arizona v. United States*, 567 U.S. 387, 409 (2012). Indeed, whether someone is "removable" must be determined in a proceeding before an immigration judge, and this determination is subject to reconsideration and appeal, and an individual deemed removable can still be granted relief from removal. *See* 8 U.S.C. § 1229a(c)(1)(A), (4)–(7) (describing processes for reconsideration, appeal, and seeking relief from removal). And whether someone is "unlawfully present" cannot be readily ascertained given "the labyrinth of statutes and regulations governing the classification of non-citizens, and the necessity for over 260 immigration judges to oversee individual cases." *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 534 (5th Cir. 2013) (en banc). While the government has a system for looking up noncitizens' immigration statuses—the Systematic Alien Verification for Entitlements (SAVE) database—the database "does not provide an independent, binary determination of an individual's 'lawful presence,'" *Villas at Parkside*, 726 F.3d at 533 n.14, and nongovernmental organizations cannot use that system in

any event.[2] It is unclear how a grantee could determine whether any noncitizen victim was "lawfully present" and not "removable" such that the grantee could permissibly provide services to them under the Immigrant Exclusion.

Beyond that, victims of crime whom OVC grantees serve will not reliably have documentation to prove *anything* about their citizenship or immigration status—and so could not even show, for example, that they are a citizen born in the United States. Higginbotham Decl. ¶ 21; Colón Decl. ¶ 16. Many of the victims of crime that OVC grantees serve are fleeing domestic violence or other dangerous circumstances and will not be able to take documents with them. Higginbotham Decl. ¶ 21; Colón Decl. ¶ 16. In some instances, abusers restrict their spouses' access to important documents as a form of control—and so victims could not bring documents with them in any event. Higginbotham Decl. ¶ 21; Colón Decl. ¶ 16. And grantees could not navigate these difficulties by requiring documents only from people who "look or sound foreign," as that would likely violate nondiscrimination laws. *See* 62 Fed. Reg. 61344-02, 61346 (1997) (DOJ guidance advising that providers "should not single out individuals who look or sound foreign for closer scrutiny or require them to provide additional documentation of citizenship or immigration status" as that would risk violating nondiscrimination laws); 42 U.S.C. § 2000d; 34 U.S.C. § 20110(e). Defendants do not appear to have considered these myriad practical impediments to implementing the Immigrant Exclusion.

Nor do Defendants appear to have considered that, given these impediments, grantees will have to either deny services to anyone who cannot affirmatively prove their citizenship or immigration status or risk violating the Immigrant Exclusion—and exposing themselves to

---

[2] U.S. Citizen and Immigration Services, *Register an Agency for SAVE* (Oct. 6, 2025) https://perma.cc/DPH5-6P7J.

potentially ruinous litigation under the False Claims Act. Defendants' failure to consider this impact of the Immigrant Exclusion—or how that undermines the very purpose of the grant programs Congress established—is a hallmark of arbitrary and capricious decisionmaking. *See State Farm*, 463 U.S. at 43.

Defendants also failed to consider how asking victims for documentation about their citizenship or immigration status would undermine service providers' ability to build trust in their communities—and how this would undermine their effectiveness at serving victims. Survivors seek help only if they trust the service provider—and this can take time to build. *See* Hill Decl. ¶ 16; Higginbotham Decl. ¶¶ 23–24; Colón Decl. ¶ 15. Asking for immigration documentation would erode that hard-won trust and cause survivors to fear service providers are government informants rather than helpful allies. Hill Decl. ¶ 16; Higginbotham Decl. ¶¶ 23–24; Colón Decl. ¶ 15. Defendants did not consider how this would lead some crime victims not to seek help at all.

Defendants likewise did not consider how service providers would face difficulty complying with the Immigrant Exclusion while also complying with binding regulations that require it to offer some services to all comers, regardless of immigration status. In particular, grantees could use grants subject to the new Immigrant Exclusion to support programs also funded by VOCA Victim Assistance grants or Violence Against Women Act grants. But, under binding regulations that apply to those other grants, victims' eligibility for services is expressly "not dependent on the victim's immigration status." 28 C.F.R. §§ 94.103(a), 94.116 (VOCA Victim Assistance); *id.* § 90.4(c) (VAWA). Defendants did not consider or explain how grantees could practically navigate the Immigrant Exclusion's conflict with these requirements.

23

For all these reasons, Plaintiffs are likely to prevail on their claim that the New Conditions must be set aside as arbitrary and capricious.

### 3. *The Immigrant Exclusion is contrary to law*

The Immigrant Exclusion must also be set aside for the additional reason that it conflicts with the authorizing statute in two separate ways. First, the Immigrant Exclusion conflicts with the nondisclosure of confidential information requirements in 34 U.S.C. § 12291(b)(2) insofar as grantees could need to seek information from third-party sources to attempt to assess victims' status. Under § 12291(b)(2), VAWA grantees "shall not … disclose reveal or release individual client information" without the client's consent—"whether for [a VAWA] program *or any other* Federal, State, tribal, or territorial grant program." 34 U.S.C. § 12291(b)(2)(B)(ii) (emphasis added). The statute further provides that "[i]n no circumstances" may a victim "be required to provide" such consent "as a condition of eligibility for the services provided by the grantee or subgrantee." *Id.* § 12291(b)(2)(D)(ii). The PAWS Act applies these restrictions to Pet Shelter grants as well. 34 U.S.C. § 20127(4)(A). And because the confidentiality provisions bar grantees from disclosing client information for "any" grant program, they prohibit any grantee that receives a VAWA or Pet Shelter (or certain other) grant from disclosing information about OJP grants as well. The Immigrant Exclusion would conflict with these requirements by, in some instances, effectively requiring grantees to disclose client information in order to verify the client's citizenship or immigration status. Grantees would have to either disclose that information without the client's consent or require the client to provide consent in order to receive services—either way violating the statute. In all events, Defendants acted arbitrarily and capriciously by failing to consider or explain how grantees' obligations under the Immigrant Exclusion could be squared with these confidentiality requirements.

Second, the Immigrant Exclusion is contrary to law as applied to Pet Shelter grants because the PAWS Act bars "activities that may compromise the safety of a domestic violence victim, including … background checks of domestic violence victims." 34 U.S.C. § 20127(2)(B)(i). Implementing the Immigrant Exclusion would compromise the safety of domestic violence victims, contrary to this statutory command. Assessing a victim's citizenship or immigration status would compromise victims' safety by requiring them to produce documents that could be dangerous for them to obtain and by excluding them from needed services if they cannot provide necessary proof. *See* Hill Decl. ¶ 16; Higginbotham Decl. ¶¶ 23–24; Colón Decl. 16.

### 4. *The New Conditions are contrary to the Constitution*

The New Conditions also must be set aside because they are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). For the reasons explained in Section I.B below, the New Conditions violate the Fifth Amendment, and the OJP Anti-DEI Certification violates the First Amendment. That warrants relief under the APA as well as directly under the Constitution.

## B. The New Conditions violate the Constitution

The New Conditions also violate the Constitution in multiple ways. That is a reason they must be set aside under the APA. *See supra* Section I.A.4. And it is also grounds to enjoin them directly under the Constitution. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing courts' authority to grant equitable relief to prevent unconstitutional executive action).

### 1. *The New Conditions are unconstitutionally vague*

Plaintiffs are likely to succeed in showing that the New Conditions are unconstitutionally vague because they impose unclear, ill-defined prohibitions that give Defendants sweeping

discretion over their enforcement. Due process fundamentally requires that the law give "fair notice of what is prohibited." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citing *United States v. William*s, 553 U.S. 285, 304 (2008)). This requirement of clarity is implicated whenever the government imposes civil penalties. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 n.22 (1996). A more demanding fair-notice standard applies here, both because the heavy civil penalties threatened are similar to those found in criminal statutes, and because of the potential for actual criminal penalties for false claims and statements. *See Sessions v. Dimaya*, 584 U.S. 148, 183 (2018) (Gorsuch, J., concurring)*; Reno v. ACLU*, 521 U.S. 844, 871–72 (1997). A "more stringent" standard also applies to the OJP Anti-DEI Certification given that condition's chilling of protected speech, *see Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

A government-imposed requirement is unconstitutionally vague if it fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited," or if it fails to provide "explicit standards" for the law's application, opening the door to "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The New Conditions are impermissibly vague under both criteria.

The Immigrant Exclusion does not define what it means for a person to be "unlawfully present." Nor does it explain how a private entity could possibly determine whether a person was a "removable alien" under 8 U.S.C. § 1229a(e)(2), when the statute provides that that is a determination that an immigration judge makes after an adjudicatory proceeding, that is subject to further review, and for which various forms of relief exist. *See* 8 U.S.C. § 1229a(c)(1)(A), (4)–(7). It likewise offers no guidance on when using funds for "removable aliens" and people who are "unlawfully present" (whoever they may be) would be "expressly authorized by law" or how

grantees would determine whether the prohibition "would contravene any express requirement of any law, or of any judicial ruling."

The General Anti-DEI Certification requirement is likewise vague in that it requires grantees to certify that they will not operate DEI programs "that violate any applicable federal civil rights and nondiscrimination laws," but does not explain when a DEI program would violate such laws. And the Anti-DEI Order, Bondi Letter, and Blanche Memo reveal that DOJ has, and intends to aggressively enforce, a novel and legally incorrect interpretation of federal antidiscrimination law that would prohibit all programs related to diversity, equity, and inclusion. Certifying the materiality of their compliance with antidiscrimination law, combined with the Administration's extreme enforcement strategy, leaves Plaintiffs vulnerable to the kind of "arbitrary and discriminatory" application of the law that due process prohibits. *Grayned*, 408 U.S. at 108–09.

### 2. The OJP Anti-DEI Certification Requirement violates the First Amendment

The OJP Anti-DEI Certification Requirement violates the First Amendment's protection of "the freedom of speech," U.S. Const. amend. I. Indeed, this Court recently held that materially similar conditions requiring grantees to certify that they do not engage in illegal DEI activities violated the First Amendment. *See RICADV v. Kennedy*, 2025 WL 2988705, at *8, *12. There, as here, the condition went "'beyond preventing recipients from using funds in a way that would undermine the federal program'" and improperly "telegraph that the Defendants will deny federal funding to a whole class of programs based on viewpoint alone." *Id.* at *8 (quoting *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 220 (2013)).

It is well established that the government may not restrict "protected [speech] outside the scope of the federally funded program." *Open Soc'y*, 570 U.S. at 217. Nor may it leverage

government funding to "aim at the suppression of dangerous ideas." *NEA v. Finley*, 524 U.S. 569, 587 (1998). The OJP Anti-DEI Certification transgresses these limits.

To begin, the Certification impermissibly restricts speech "outside the scope of the federally funded program," *Open Soc'y*, 570 U.S. at 217. The requirement compels grantees to certify that they "do[] not operate *any* programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable federal civil rights or nondiscrimination laws." That requirement "on its face makes clear" that it applies to "any program …, irrespective of whether the program is federally funded." *Chi. Women in Trades v. Trump*, 778 F. Supp. 3d 959, 984 (2025). And it restricts speech, as "diversity, equity, and inclusion" programs almost invariably contain speech promoting those values.

In addition, the Certification uses federal funding to "aim at the suppression" of ideas that the Administration disfavors, *Finley*, 524 U.S. at 587. Indeed, the Administration itself has acknowledged that it seeks to restrict "diversity, equity, and inclusion" because of disagreement with its "foundational rhetoric and ideas."[3]

It does not matter that the OJP Anti-DEI Certification purports to bar only conduct that violates "federal civil rights or nondiscrimination laws." As another court recently held in preliminarily enjoining a similar certification requirement, "[t]he problem … is that the meaning of this is left entirely to the grantee's imagination." *Chicago Women*, 778 F. Supp. 3d at 984. Neither the Certification itself nor the Executive Order on which it is based define "what might make any given 'DEI' program violate Federal anti-discrimination laws." *Id.* What this Administration will claim is illegal "is anything but obvious." *Id.* Indeed, "the thrust" of the

---

[3] The White House, *Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI* (Jan. 22, 2025), https://perma.cc/G8JU-QQ44.

underlying Anti-DEI Executive Order "is that the government's view of what is illegal in this regard has changed significantly with the new Administration." *Id.* Given that DOJ has announced its plans to pursue criminal and civil claims against grantees under the False Claims Act if they violate (DOJ's view of) the antidiscrimination laws—and given that the challenged DEI-related certifications require grantees to concede FCA materiality—these certifications will predictably chill grantees from speaking in support of diversity, equity, and inclusion, including in their activities unrelated to the use of federal funds. That violates the First Amendment.

## II.    Plaintiffs Will Suffer Irreparable Harm Absent Emergency Relief

The New Conditions put Plaintiffs in an impossible position. Plaintiffs must either: (a) accept unconstitutional and otherwise unlawful funding conditions that are inconsistent with congressional directives, will impede their ability to provide core services, and are at odds with their fundamental missions; or (b) forgo federal funds that are essential to their ability to fulfill their missions, and that are necessary to protect people in their communities and save lives. The New Conditions thus put Plaintiffs and their members "between a rock and a hard place," and, as this Court has held before, "surely such a high stakes dilemma constitutes irreparable harm." *RICADV v. Kennedy*, 2025 WL 2988705, at *11.

In preliminarily staying similar DOJ funding conditions earlier in this case, this Court held that Plaintiffs faced irreparable harm because "[a]ccepting grant funds subject to the challenged conditions … would unfairly require [Plaintiffs] to guess at what formerly unobjectionable activities are now proscribed by a given grant award." Mem. and Order at 24 (Dkt. No. 34). That "uncertainty," the Court explained, "comes with serious risks of enhanced and aggressive False Claims Act prosecutions." *Id.* At the same time, however, declining the grants "would cause [Plaintiffs] just as much harm." *Id.*; *accord, e.g.*, *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017) (subsequent proceedings omitted)

("[F]orcing [a plaintiff] either to decline the grant funds based on what it believes to be unconstitutional conditions or accept them and face an irreparable harm, is the type of 'Hobson's choice' that supports irreparable harm."). The same holds true now.

Operating under the New Conditions would cause profound harm. Asking survivors about their immigration status—and attempting to make determinations that no private organization can reliably make—would jeopardize survivors' safety, contrary to Plaintiffs' and their members' values and mission. *See supra* Background Section C; Hill Decl. ¶¶ 16–17; Colón Decl. ¶¶ 15–17; Higginbotham Decl. ¶¶ 20-24. It would also cause providers to lose hard-won trust from their communities, itself an irreparable harm. Hill Decl. ¶ 16; Young Decl. ¶ 10; *Cmty. Econ. Dev. Ctr. of Se. Massachusetts v. Bessent*, No. 1:25-cv-12822, 2026 WL 309281, at *17 (D. Mass. Feb. 5, 2026) (finding "erosion of trust" was irreparable harm).

Certifying that they will not engage in any diversity, equity, and inclusion activities that the Administration would deem unlawful—and agreeing that their compliance with nondiscrimination laws is material for False Claims Act purposes—will also cause harm by making Plaintiffs and their members fearful of engaging in entirely lawful DEI activities given the risk of potentially ruinous FCA litigation and liability. The harm from is especially acute here given that Defendants have intentionally crafted the conditions to expose grantees to FCA liability. It is invariably harmful for an organization to expose itself to criminal investigation or prosecution, or lawsuits that could bankrupt the organization. That risk is heightened here given that DOJ has formed a nationwide task force specifically to target grantees that sign these certifications, has described potential FCA liability as a "weapon" it will deploy, and has "strongly encouraged" private parties to bring civil suits. *See supra* Background Section B.2. Plaintiffs and their members have no choice but to take the threats seriously. Hill Decl. ¶ 12;

Faisal Decl. ¶ 21; Young Decl. ¶ 9; Higginbotham Decl. ¶¶ 18–19; Colón Decl. ¶¶ 13–14.

Plaintiffs and their members need not wait for the "Damoclese[] sword" of FCA liability "to actually fall" before the Court enters preliminary relief. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016).

The OJP Anti-DEI Certification also causes immediate constitutional harms, including censoring speech based on viewpoint and otherwise chilling Plaintiffs' speech due to its vagueness and the threat of serious consequences under the FCA. "[I]rreparable injury is presumed upon a determination that the movants are likely to prevail on their First Amendment claim," *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 11 (1st Cir. 2012), including where government action produces a "'chilling effect' on the exercise of [] rights of expression," *Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981); *Hannon v. Allen*, 241 F. Supp. 2d 71, 78 (D. Mass. 2003) ("Even the temporary loss of a constitutional right may be a form of irreparable harm."). Faisal Decl. ¶¶ 19–20; Hill Decl. ¶ 12 (The Maryland Coalition "is unsure whether it may undertake its day-to-day activities reflecting its mission and guiding principles, which reference 'equity' and 'diversity,' without violating the OJP certification").

The alternative—forgoing OJP grant funds—would also cause irreparable harm. Plaintiffs rely on DOJ grant funds to provide essential services to members, individuals, and communities. *See supra* Background Section C. Losing out on these grants would leave holes in Plaintiffs' budgets and require them and their members to lay off staff and cut services, harming the organizations and their missions, and on the most vulnerable people in their communities. *See* Hill Decl. ¶¶ 8–19; Faisal Decl. ¶¶ 23–24; Higginbotham Decl. ¶¶ 27–28; Young Decl. ¶ 11. These harms are not speculative: Maryland Network Against Domestic Violence and its members would cut services and survivors of domestic violence "would not receive critical, life-

31

saving access to quality health care, job training, and housing stability." Hill Decl. ¶ 18. MNADV's Executive Director "do[es] not expect that these needs would be met if we lost access to the OVC FY25 Services for Victims of Crime grant." *Id.* The Pennsylvania Coalition's member CCN would have to terminate services under the OVC Pet Shelter grant, forcing many victims to stay with abusers for lack of housing support and fear for their pets' safety. Higginbotham Decl. ¶¶ 28–29. The Iowa Coalition would lose 15% of its budget without access to its VOCA grant. Faisal Decl. ¶ 24. The Montana Coalition's Member DSVS would have to turn away victims needing financial support (to cover rent and other costs essential to their safety), and would have to reduce or eliminate key support tools including emotional support for victims and training for hotline volunteers. Young Decl. ¶ 11.

Such interference with the organizations' services "is not accurately measurable or adequately compensable by money damages." *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 325 (D. Mass. 2025); *see also Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, No. 25-1611, 2025 WL 2017106, at *11 (1st Cir. July 18, 2025). The inability of an organization to "accomplish [its] primary mission" constitutes irreparable harm. *Newby*, 838 F.3d at 9. Even more so here—"[i]t is impossible to accurately measure or compensate" for the losses in life-saving services to homeless individuals and vulnerable victims of domestic violence and sexual assault if organizations are unable to carry out their mission because they are forced to give up federal funds. *Nat'l Insts. of Health*, 770 F. Supp. 3d at 325.

## III.   The Balance of the Equities and Public Interest Favor Preliminary Relief

The balance of equities and public interest favor preliminary relief for the same reason it did before: the Plaintiffs "face real and immediate irreparable harm from the challenged conditions," which "could result in the disruption of important and, in some cases, life-saving services." Mem. and Order at 25 (Dkt. No. 34). Survivors will lose access to support they need to

escape dangerous situations if they have to establish their immigration status, and that harm will befall people who are unlawfully and lawfully present alike. *See* Hill ¶ Decl. 16; Higginbotham Decl. ¶¶ 23–24; Colón Decl. ¶ 15. On the other side of the balance, granting relief will just require Defendants to "award funding as it normally does." Mem. and Order at 25 (Dkt. No. 34); *accord RICADV v. Kennedy*, 2025 WL 2988705, at *11. Moreover, as this Court previously held, "the public has an interest in the Executive respecting the Legislature's spending decisions." Mem. and Order at 26 (Dkt. No. 34); *accord RICADV v. Kennedy*, 2025 WL 2988705, at *12. For all these reasons, as before, the balance of equities and public interest support preliminary relief. *See* Mem. and Order at 26 (Dkt. No. 34); *accord RICADV v. Kennedy*, 2025 WL 2988705, at *12.

## CONCLUSION

For these reasons, the Court should stay the New Conditions under 5 U.S.C. § 705 and enter a temporary restraining order and preliminary injunction barring Defendants from imposing or enforcing them.

February 20, 2026                              Respectfully submitted,

/s/ Kristin Bateman
Kristin Bateman (D.C. Bar No. 90037068)[+]
Robin F. Thurston (D.C. Bar No. 1531399)[+]
Skye L. Perryman (D.C. Bar No. 984573)[+]
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kbateman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

Daniel F. Jacobson (D.C. Bar No. 1016621)[+]
Lynn D. Eisenberg (D.C. Bar No. 1017511)[+]

Brian C. Rosen-Shaud (D.C. Bar No. 90042065)[+]
Nina C. Cahill (D.C. Bar No. 1735989)[+]
Kyla M. Snow (D.C. Bar No. 90036400)[+]
Jacobson Lawyers Group PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(301) 823-1148
dan@jacobsonlawyersgroup.com
lynn@jacobsonlawyersgroup.com
brian@jacobsonlawyersgroup.com
nina@jacobsonlawyersgroup.com
kyla@jacobsonlawyersgroup.com


Amy R. Romero (RI Bar # 8262)
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
Amy@dwbrlaw.com
Cooperating counsel, Lawyers' Committee for RI


Lynette Labinger (RI Bar # 1645)
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation of RI


Lauren A. Khouri (D.C. Bar No. 10282288)[+]
Elizabeth E. Theran (D.C. Bar No. 90030162)[+]
National Women's Law Center
1350 I Street NW, Suite 700
Washington, DC 20005
Telephone: (202) 588-5180
Fax: (202) 588-5185
lkhouri@nwlc.org
etheran@nwlc.org


[+] Admitted *pro hac vice*

*Counsel for Plaintiffs*