# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al*., <br><br> Plaintiffs, <br><br> *v.* <br><br> PAMELA BONDI, *et al*., <br><br> Defendants. | Civil Action No. 1:25-cv-00279-MRD-AEM |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 3

    A.    Domestic Violence and Federal Grants................................................. 3

    B.    This Litigation....................................................................................... 4

    C.    Grant Programs at Issue ....................................................................... 6

    D.    Challenged Grant Terms ...................................................................... 9

        1.    Certification Requirement in OJP General Conditions................... 9

        2.    Unlawful Presence Provision in OVC Award Offers................... 10

ARGUMENT ............................................................................................................... 11

I.    PLAINTIFFS' MOTION FOR LEAVE TO AMEND SHOULD BE DENIED. ............... 11

    A.    Legal Standard .................................................................................... 11

    B.    Plaintiffs Unduly Delayed and Amendment Would Prejudice Defendants. ......... 12

II.    PLAINTIFFS' PRELIMINARY INJUNCTION MOTION SHOULD BE DENIED ....... 15

    A.    Legal Standard .................................................................................... 15

    B.    Plaintiffs Are Not Likely to Succeed on the Merits. ........................... 16

        1.    Plaintiffs Lack Standing to Challenge Terms in VOCA Victim Assistance Grants........................................................................ 16

        2.    Plaintiffs' APA Claims Are Unlikely to Succeed. ...................... 18

            i.    The Challenged Terms Are Not Final Agency Action........................... 18

            ii.    Grant terms Are Committed to Agency Discretion by Law. ................ 19

            iii.    The Challenged Terms Are Within Defendants' Statutory Authority... 22

            iv.    The Challenged Terms Survive Arbitrary and Capricious Review ..... 27

        3.    Plaintiffs' Constitutional Claims Fail............................................ 29

            i.  Plaintiffs' Constitutional Claims Need Not Be Reached. ...................... 29

            ii. Plaintiffs' Fifth Amendment Challenges Fail........................................... 30

iii. Plaintiffs' First Amendment Challenge to the Certification Requirement Fails.................................................................................................... 33

C.      The Remaining Factors Counsel Against Granting the Requested Relief ............ 33

III.    PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD ............................................... 39

CONCLUSION.............................................................................................................. 42

# TABLE OF AUTHORITIES

## CASES

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013) ............................................................................................... 34

*Al Otro Lado v. Exec. Off. for Immigr. Rev.*,
    138 F.4th 1102 (9th Cir. 2025),
    *cert. granted by sub. nom. Noem v. Al Otro Lado*, 146 S. Ct. 604 (Nov. 17, 2025) ................ 29

*Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*,
    622 F.3d 36 (1st Cir. 2010) ................................................................................... 41

*Brennan v. Bos. Beer Co.*,
    No. CV 24-10029-GAO, 2025 WL 50365 (D. Mass. Jan. 8, 2025) ........................................ 35

*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973) ............................................................................................... 32

*California v. Texas*,
    593 U.S. 659 (2021) ............................................................................................... 18

*Centro de Trabajadores Unidos v. Bessent*,
    No. 25-5181, 2026 WL 503310 (D.C. Cir. Feb. 24, 2026) ..................................................... 19

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
    370 F.3d 151 (1st Cir. 2004) ................................................................................... 35

*City & Cnty. of S.F. v. U.S. Dep't of Just.*,
    No. 25-CV-09277-JD, 2026 WL 177945 (N.D. Cal. Jan. 21, 2026).......................................... 29

*Clapper v. Amnesty Int'l*,
    568 U.S. 398 (2013)............................................................................................. 17, 18

*Dep't of Educ. v. California*,
    604 U.S. 650 (2025).............................................................................................. 38

*Edgar v. Haines*,
    2 F.4th 298 (4th Cir. 2021) ................................................................................... 29

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211(2016) ............................................................................................... 28

*Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*,
    445 F.3d 13 (1st Cir. 2006) ................................................................................... 16

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012) ..................................................................................... 30

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ..................................................................................... 27

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ..................................................................................... 17

*Foman v. Davis*,
  371 U.S. 178 (1962) ...................................................................................... 11

*Glassman v. Computervision Corp.*,
  90 F.3d 617 (1st Cir. 1996) ......................................................................... 12

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ..................................................................................... 30

*Guardians Ass'n v. Civ. Serv. Comm'n*,
  463 U.S. 582 (1983) ................................................................................ 26, 27

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) ..................................................................................... 17

*In re GTECH Holdings Corp. Sec. Litig.*,
  No. 94-0294P, 1995 WL 500414 (D.R.I. Mar. 16, 1995) ............................ 12

*Indep. Equip. Dealers Ass'n v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004) ..................................................................... 19

*Johnston v. Holiday Inns, Inc.*,
  595 F.2d 890 (1st Cir.1979) .......................................................................... 11

*Katz v. Pershing, LLC*,
  672 F.3d 64 (1st Cir. 2012) ..................................................................... 16, 17

*Kenworth of Bos., Inc. v. Paccar Fin. Corp.*,
  735 F.2d 622 (1st Cir. 1984) ....................................................................... 39

*La Simple Co, Ltd. v. SLP Enters., LLC*,
  No. CV 21-10058-LTS, 2021 WL 1648762 (D. Mass. Apr. 27, 2021) ....................................... 35

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ................................................................................ 20, 23

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ........................................................................... 16, 17

*Matos ex rel. Matos v. Clinton Sch. Dist.,*
  367 F.3d 68 (1st Cir. 2004) ......................................................................... 35

*Maynard v. Cartwright,*
  486 U.S. 356 (1988) ........................................................................................ 32

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024) ........................................................................................ 29

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .......................................................................................... 27

*Mudge v. Bank of Am., N.A.,*
  No. 13-CV-421-JD, 2014 WL 2196899 (D.N.H. May 27, 2014) ........................... 12

*Munaf v. Geren,*
  553 U.S. 674 (2008) ........................................................................................ 15

*Murthy v. Missouri,*
  603 U.S. 43 (2024) ..................................................................................... 17, 41

*Narragansett Indian Tribe v. Guilbert,*
  934 F.2d 4 (1st Cir. 1991) ............................................................................. 35

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,*
  167 F.4th 86 (4th Cir. 2026) ............................................................. 27, 31, 33, 34

*Nat'l Endowment for the Arts v. Finley,*
  524 U.S. 569 (1998) .............................................................................. 30, 31, 32

*Nat'l Urb. League v. Trump,*
  783 F. Supp. 3d 617 (D.D.C. 2025 ............................................................... 26, 33

*Nken v. Holder,*
  556 U.S. 418 (2009) ................................................................................... 16, 36

*O'Connell v. Hyatt Hotels of P.R.,*
  357 F.3d 152 (1st Cir.2004) ........................................................................... 12

*O'Neil v. Q.L.C.R.I., Inc.,*
  750 F. Supp. 551 (D.R.I. 1990) ................................................................... 11, 13

*Pub. Serv. Co. of N.H. v. Town of W. Newbury*,
    835 F.2d 380 (1st Cir. 1987) .................................................................. 35

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ............................................................................... 34

*R.I. Coal. Against Domestic Violence v. Bondi*,
    794 F. Supp. 3d 58 (D.R.I. 2025) ...................................................... 18, 20

*R.I. Coal. Against Domestic Violence v. Kennedy*,
    --- F. Supp. 3d ---, 2025 WL 2988705 (D.R.I. Oct. 23, 2025), *appeal filed by sub. nom.*
    *R.I. Coal. Against Domestic Violence v. U.S. Dep't of Hous. & Urb. Dev.*,
    No. 25-2229 (1st Cir. Dec. 23, 2025) ..................................................... 39

*S.F. A.I.D.S. Found. v. Trump*,
    786 F. Supp. 3d 1184 (N.D. Cal. 2025),
    *appeal filed* No. 25-4988 (9th Cir. Aug. 7, 2025) ............................. 26, 33

*Sabri v. United States*,
    541 U.S. 600 (2004) ............................................................................... 32

*Sampson v. Murray*,
    415 U.S. 61 (1974) ................................................................................. 39

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    591 U.S. 197 (2020) ............................................................................... 36

*Simon v. E. Ky. Welfare Rts. Org.*,
    426 U.S. 26 (1976) ................................................................................. 17

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ............................................................................... 16

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024) ............................................................................... 40

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ............................................................................... 40

*U.S. ex rel. Purcell v. MWI Corp.*,
    807 F.3d 281 (D.C. Cir. 2015) .......................................................... 24, 34

*U.S. ex rel. Schutte v. SuperValu Inc.*,
    598 U.S. 739 (2023) .......................................................................... 24, 34

*United States v. Moriello,*
  980 F.3d 924 (4th Cir. 2020) ........................................................................... 32

*United States v. Orleans,*
  425 U.S. 807 (1976) ......................................................................................... 22

*United States v. Rahimi,*
  602 U.S. 680 (2024), *on remand to* 117 F. 4th 331 (5th Cir. 2024) ......................................... 29

*United States v. Town of Hingham,*
  683 F. Supp. 3d 81 (D. Mass. 2023),
  *aff'd sub nom. U.S. ex rel. Zotos v. Town of Hingham*, 98 F.4th 339 (1st Cir. 2024) ......... 24, 25

*Universal Health Servs., Inc. v. United States ("Escobar I"),*
  579 U.S. 176 (2016) .................................................................................. 24, 25

*Washington State Grange v. Washington State Republican Party,*
  552 U.S. 442 (2008) ......................................................................................... 32

*Webster v. Doe,*
  486 U.S. 592 (1988) ......................................................................................... 22

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ...................................................................................... 15, 16

## CONSTITUTION

U.S. Const. amend. V. ............................................................................................. 30

U.S. Const. art. II ............................................................................................. 36

## STATUTES

5 U.S.C. § 701 ................................................................................................. 19

5 U.S.C. § 705 ......................................................................................... 5, 39, 40

8 U.S.C. § 1229a ............................................................................................... 11

8 U.S.C. § 1252 ............................................................................................... 40

20 U.S.C. § 954 ............................................................................................... 30

31 U.S.C. §§ 3729-3730 ........................................................................................ 9

31 U.S.C. §§ 3801-3812 ........................................................................................ 9

34 U.S.C. § 20101 ................................................................................................ 6

34 U.S.C. § 20103 .......................................................................................... *passim*

34 U.S.C. § 20111 ............................................................................... 6, 7, 20, 22

34 U.S.C. § 20127 ............................................................................. 8, 22, 28, 38

42 U.S.C. § 2000d-1 ................................................................................... 26, 33

Pub. L. No. 115-334, 132 Stat. 4490 (2018) ............................................................ 8

Pub. L. No. 90-351, 82 Stat. 197 (1968) .................................................................. 3

**LEGISLATIVE HISTORIES**

S. Doc. No. 79-248 (1946) ...................................................................................... 40

**RULES**

Fed. R. Civ. P. 15 ............................................................................................ 11, 12

Fed. R. Civ. P. 16 .................................................................................................. 12

Fed. R. Civ. P. 65 .................................................................................................. 42

**REGULATIONS**

2 C.F.R § 200.300 .................................................................................................. 18

2 C.F.R. § 200.303 .......................................................................................... 23, 37

2 C.F.R. § 200.332 ................................................................................................. 18

28 C.F.R. § 94.116 ................................................................................................. 24

28 C.F.R. § 98.103 ................................................................................................. 24

*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*
Exec. Order No. 14,173, 90 Fed. Reg. 8633, (Jan. 21, 2025) ............................ 9, 10

*Improving Oversight of Federal Grantmaking*
Exec. Order No. 14,332, 90 Fed. Reg. 38929 (Aug. 7, 2025) .......................... 10, 28

**OTHER AUTHORITIES**

CDC, *National Intimate Partner and Sexual Violence Survey (NISVS)*, May 16, 2024,
   https://perma.cc/8JAS-5VR6 ................................................................................... 1, 3

THE CURRENT, Louisiana doubles capacity of domestic violence shelters with state funding
   (Oct. 1, 2025)
   https://perma.cc/4PQV-DCRK ....................................................................................... 3

DOJ OJP, *Criminal Victimization 2024*,
   https://perma.cc/PN26-QYWF ................................................................................... 1, 3

NNEDV, *About Us*,
   https://perma.cc/UT87-HQWH ....................................................................................... 4

NNEDV, *Every Survivor Counts: National Network to End Domestic Violence to Conduct 20th
   Annual Domestic Violence Counts Survey* (Sep. 10, 2025),
   https://perma.cc/L4R3-UUVN .......................................................................... 1, 4, 28, 37

NNEDV, *Domestic Violence Counts: 19th Annual Report* (May 2025),
   https://perma.cc/82FZ-39QB (full report: https://perma.cc/GU66-R3C5) ...................... 1, 4, 28

U.S. DOJ, OJP, *FY25 General Terms and Conditions*,
   https://perma.cc/D3NX-3W9R ............................................................................ 5, 9, 10, 26

OVC FY25 Services for Victims of Crime, Funding Opportunity Number O-OCV-2025-172427,
   https://perma.cc/99GT-DZYE ....................................................................................... 8

## INTRODUCTION

Millions of Americans are affected by domestic violence and related crimes each year, and the demand for victim services—including emergency shelter, housing assistance, counseling, and related support—far exceeds the funding available through federal grant programs.[1] Domestic violence service providers routinely report that they must turn away victims because resources are limited.[2] Federal grants administered by grantmaking agencies within the Department of Justice ("DOJ") play a critical role in supporting domestic violence victims across the country, but those funds are finite and must be administered carefully to ensure they are used for their intended purposes and consistent with federal law.

Congress has granted agencies within DOJ broad authority to administer their grant programs and to determine the terms and conditions under which federal funds are awarded. That authority necessarily includes the ability to require grantees to certify compliance with federal civil rights laws and to structure grant programs in a manner reflecting the Executive Branch's judgments about how best to administer limited discretionary funding.

Plaintiffs' preliminary injunction motion challenges two such provisions in grants administered by DOJ component agencies. *See* Pls' Mem. Mot. For a Prelim. Inj., ECF No. 53-1 ("Pls.' Br."). The first provision requires grant recipients to certify that they comply with applicable federal civil rights and nondiscrimination laws when accepting an award ("Certification Requirement"). The second provides that certain discretionary grant funds may not be used to

---

[1] *See* CDC, *National Intimate Partner and Sexual Violence Survey (NISVS)* (May 16, 2024), https://perma.cc/8JAS-5VR6; *see also* DOJ OJP, *Criminal Victimization 2024*, https://bjs.ojp.gov/document/cv24.pdf, at 3, 7 (table 4).

[2] *See* NNEDV, *Every Survivor Counts: National Network to End Domestic Violence to Conduct 20th Annual Domestic Violence Counts Survey* (Sep. 10, 2025), https://perma.cc/L4R3-UUVN; *see also* NNEDV, *Domestic Violence Counts: 19th Annual Report* (May 2025), https://perma.cc/82FZ-39QB (full report: https://perma.cc/GU66-R3C5).

provide services to individuals unlawfully present in the United States, subject to explicit exceptions where such a limitation would conflict with governing law ("Unlawful Presence Provision").

Neither provision exceeds Defendants' statutory authority or violates the Administrative Procedure Act ("APA") or the Constitution. The Certification Requirement merely reiterates longstanding obligations that recipients of federal funds must already satisfy under federal civil rights laws. And the Unlawful Presence Provision reflects a permissible policy judgment, pursuant to Executive Order, about how to allocate limited discretionary grant funding within two competitive grant programs.

Before reaching those merits questions, however, Plaintiffs seek to amend their complaint for the second time, after the Court had already established a schedule to fully resolve the case. Plaintiffs' repeated amendments have delayed resolution of this litigation and prolonged the Court's temporary stay order affecting grants administered by the Office on Violence Against Women ("OVW") within DOJ, which are not challenged in Plaintiffs' present emergency motion. What started as a challenge to a limited number of terms in the Notices of Funding Opportunity ("NOFOs") for OVW grants has now spiraled into a tangled web of challenges to operative terms in various grant programs administered by other DOJ components. This case should not be an endless vehicle of amendments for Plaintiffs to challenge every objectionable grant term they encounter forevermore. Because Plaintiffs unduly delayed in seeking amendment and because amendment is prejudicial to the government, leave to amend should be denied.

Even if amendment were allowed, Plaintiffs cannot meet the demanding standard for preliminary injunctive relief. They cannot show a likelihood of success on the merits. Some Plaintiffs lack standing to challenge one of the terms at issue, their Administrative Procedure Act

claims fail as a matter of law, and their constitutional arguments lack merit. Moreover, Plaintiffs cannot show irreparable harm, or that the balance of equities or the public interest favors Plaintiffs. Finally, the scope of relief Plaintiffs request is overbroad and should not be granted.

## BACKGROUND

### A.    Domestic Violence and Federal Grants.

"[M]illions of Americans are affected by sexual violence, stalking, and intimate partner violence every year."[3] The National Crime Victimization Survey administered by DOJ's Bureau of Justice Statistics reported over 1.1 million reports of domestic or intimate partner violence in 2024, while estimating that only 64% of domestic violence crimes were reported to law enforcement.[4]

States across the country continue to struggle to meet demand for domestic violence services. In Louisiana, for example, domestic violence shelters reportedly turn down roughly 1,300 requests for housing annually despite increased funding.[5]

Congress has authorized DOJ to issue grants to assist victims of crime.[6] *See* Pub. L. No. 90-351, tit. I, 82 Stat. 197 (1968). Through programs administered by the Office for Victims of Crime ("OVC") and OVW, DOJ distributes billions of dollars in grant funding to support services across the country for victims of domestic violence and related crimes and administers hundreds of domestic violence grant programs.

Even with these programs, providers consistently report that funding is insufficient to meet

---

[3] CDC, *National Intimate Partner and Sexual Violence Survey (NISVS)* (May 16, 2024), https://perma.cc/8JAS-5VR6.
[4] *See* DOJ OJP, *Criminal Victimization 2024*, https://bjs.ojp.gov/document/cv24.pdf, at 7, table 4.
[5] *See* THE CURRENT, *Louisiana doubles capacity of domestic violence shelters with state funding* (Oct. 1, 2025), https://perma.cc/4PQV-DCRK.
[6] *See* Grants, U.S. Dep't of Just., https://perma.cc/GP83-Y97V.

3

demand. The National Network to End Domestic Violence ("NNEDV") reported that *on a single day* in September 2024, domestic violence programs nationwide were unable to meet 14,095 requests for help due to resource constraints.[7][8] Housing needs accounted for most of these unmet requests.[9] As the NNEDV report explains, safe and affordable housing is often a survivor's most urgent need, yet barriers such as limited housing supply and long waitlists prevent many victims from obtaining assistance.[10]

These realities underscore the central challenge facing federal grant administrators: demand for services is enormous, but resources are limited. Agencies must therefore decide how to allocate limited funds and what conditions are necessary to ensure those funds are used effectively and lawfully.

### B.    This Litigation

On June 16, 2025, Plaintiffs filed a complaint seeking declaratory and injunctive relief. Compl. The complaint alleged violations of the Separation of Powers, the Spending Clause, the First Amendment, the Fifth Amendment, and the APA based on certain proposed terms in the Fiscal Year 2025 NOFOs issued by OVW. *See id.* at ¶¶ 59–74.

Plaintiffs subsequently moved to enjoin those proposed terms, which included the nondiscrimination certification requirement contained in OVW's general terms and conditions. *See*

---

[7] Several Plaintiffs appear to be members of NNEDV and participate in NNEDV's annual survey on domestic violence services and resources. *See* NNEDV, *About Us*, https://perma.cc/UT87-HQWH ("The National Network to End Domestic Violence (NNEDV) represents the 56 state and U.S. territorial coalitions against domestic violence.").

[8] NNEDV, *Domestic Violence Counts: 19th Annual Report* (May 2025), https://perma.cc/82FZ-39QB (full report: https://perma.cc/GU66-R3C5); *see also NNEDV, Every Survivor Counts: National Network to End Domestic Violence to Conduct 20th Annual Domestic Violence Counts Survey* (Sep. 10, 2025), https://perma.cc/L4R3-UUVN.

[9] *See id.* at 2.

[10] *See id.*, at 3.

ECF No. 15. On August 8, 2025, the Court stayed enforcement of certain challenged terms under 5 U.S.C. § 705. ECF No. 34. Based on the preliminary record before the Court at the time, which did not include an administrative record, the Court concluded that the challenged terms were not sufficiently explained in accordance with the requirements of the APA. *See id.* at 17–22. The parties thereafter agreed to a summary judgment briefing schedule, and Defendants produced the relevant administrative record as to the challenged terms in OVW's NOFOs. ECF Nos. 35–36.

Shortly before their initial summary judgment deadline, Plaintiffs sought additional time to assess additional grant conditions. ECF No. 39. In November 2025, Plaintiffs filed a First Amended Complaint challenging a term added in May 2025 to the general conditions for grants administered by different DOJ component, the Office of Justice Programs ("OJP"), which requires award recipients to certify compliance with federal civil rights and nondiscrimination laws when accepting an award offer (the "Certification Requirement"). *See* Am. Compl., ECF No. 41; *see also* OJP, "General Conditions" *for OJP Awards in FY 2025*, https://perma.cc/D3NX-3W9R. Though the Certification Requirement is challenged in the present motion, Plaintiffs did not seek emergency relief at the time of filing their Amended Complaint in November.

The Court entered a revised schedule, and the parties later agreed to resolve all claims through summary judgment briefing. ECF No. 48. Defendants produced the administrative record with respect to the OJP Certification Requirement challenged here on January 23, 2026. ECF No. 50.

One week before Plaintiffs' summary judgment motion was due under the revised scheduling order, Plaintiffs informed Defendants that they intended to seek leave to amend again and requested consent to a stay of the revised summary judgment schedule. Plaintiffs stated that they intended to amend their complaint to challenge a term included in award offer letters OJP

made in January 2026, which states that funds should not be used to provide services to any removable alien or any alien otherwise unlawfully present in the United States unless these services would be allowed by law or under the applicable award ("Unlawful Presence Provision"). They did not disclose to Defendants any intent to seek emergency relief. The Court granted the requested stay on February 9, 2026. ECF No. 51.

On February 20, 2026, nearly a month after learning of the Unlawful Presence Provision and more than three months after amending their complaint to challenge the Certification Requirement, Plaintiffs filed the motions Defendants oppose here: a motion for leave to file a second amended complaint, ECF No. 52, and a motion for a temporary restraining order and preliminary relief, ECF No. 53. Plaintiffs' motion was converted to a motion for a preliminary injunction on March 3, 2026.

### C.     Grant Programs at Issue.

Plaintiffs allege that they receive awards or subawards through states under three grant programs administered by the Office for Victims of Crime ("OVC"), which is part of the Office of Justice Programs ("OJP") within DOJ.

**VOCA Victim Assistance Grants.** The Victims of Crime Act of 1984 ("VOCA") established the Crime Victims Fund within the U.S. Treasury, *see* 34 U.S.C. § 20101. VOCA appropriates funds from the Crime Victims Fund to support programs that assist victims of crime and established OVC to administer those grants. *See* 34 U.S.C. § 20111.

VOCA authorizes two categories of victim assistance grant programs relevant here. *Id.* § 20103. First, OVC provides grants to states. *Id*. § 20103(a). Second, OVC may establish discretionary grant programs to provide grants directly to victim assistance programs. *Id.* § 20103(c).

6

Under the first category, OVC administers the VOCA Victim Assistance Grant program, which provides annual formula grants to states. *See id*. § 20103(a). States receiving these funds subsequently issue separate subawards to victim assistance programs to deliver direct services to victims. Domestic violence and sexual assault coalitions such as Plaintiffs receive VOCA Victim Assistance funding through state pass-through grants rather than through direct federal awards. *See* Pls.' Br. at 13.

VOCA provides the OVC Director with discretion in administering these grants. The statute authorizes the Director to require state grantees to "provide such other information and assurances related to the purposes of this section as the Director may reasonably require." *Id*. § 20103(a)(2)(D).

**The Services for Victims of Crime Grant Program ("Services Program").** VOCA also authorizes discretionary grants funded by the Crime Victims Fund. These discretionary grants are provided directly to victim assistance programs, including domestic violence and sexual assault coalitions such as Plaintiffs. *See id*. § 20103(c).

The OVC Director has broad authority to administer funds and establish grant programs under VOCA. *See* 34 U.S.C. § 20111(c)(1). The statute authorizes the Director to "[e]stablish[] programs in accordance with section 20103(c) . . . on terms and conditions determined by the Director to be consistent with that subsection." *Id.* § 20111(c)(3).

OVC established the Services Program under 34 U.S.C. § 20103(c)(1)(A), which allows the Director to make grants "for victim services, demonstration projects, program evaluation, compliance efforts, and training and technical assistance services to eligible crime victim assistance programs[.]" The FY2025 NOFO for the Services Program states that grants should support "projects to provide direct services to child and youth victims of crime, victims of elder

abuse, fraud, and exploitation, and other victims of crime."[11]

**Emergency and Transitional Pet Shelter and Housing Assistance Grant Program ("PAWS Program").** In 2018, Congress enacted the Protecting Animals with Shelter (PAWS) Act, *see* Agriculture Improvement Act of 2018, Pub. L. No. 115-334, § 12502, 132 Stat. 4490. The PAWS Act established the PAWS Program, which authorizes grant funding to provide domestic violence victims with housing with or for their pets, service or emotional support animals, or horses. *See* Pub. L. No. 115-334, § 12502(b) (2018), *codified at* 34 U.S.C. § 20127.

Grant recipients may use funding to provide a victim with housing with or for his or her pet for up to two years, and the Act allows for extensions if certain conditions are met. *See* 34 U.S.C. § 20127(5)(A). The Act also requires grantees to annually "submit to [OVC] a report" with information on the number of domestic violence victims with pets who were provided such assistance, as well as the "purpose, amount, type of, and duration of such assistance." *Id.* § 20127(6).

The PAWS Program also limits using the grant funding for administrative expenses. A grantee may not use more than five percent of an award in a fiscal year for "evaluation, monitoring, salaries, and administrative expenses." *Id*. § 20127(8)(B).

### D. Challenged Grant Terms.

A subset of Plaintiffs and their members allege that they have received or must imminently accept awards containing the two terms challenged in their preliminary injunction motion. *See generally* ECF Nos. 53-2–53-6.

#### 1. Certification Requirement in OJP General Conditions.

On January 21, 2025, the President issued Executive Order No. 14,173, 90 Fed. Reg. 8633,

---

[11] *See* OVC FY25 Services for Victims of Crime, Funding Opportunity Number O-OCV-2025-172427, at 9, https://perma.cc/99GT-DZYE.

*Ending Illegal Discrimination and Restoring Merit-Based Opportunity* (Jan. 21, 2025) ("EO 14,173"). The Executive Order's "purpose" is to ensure that the federal government is "enforcing our civil-rights laws" by "ending illegal preferences and discrimination." *Id.* § 1. The Executive Order instructed each federal agency to include certain terms in "every contract or grant award" and the OMB Director to "[e]xcise references to DEI and DEIA principles . . . from Federal acquisition, contracting, grants, and financial assistance procedures." *Id.* § 3(b)(iv) & (c)(ii). The Order must be "implemented consistent with applicable law." *See id.* § 8(b).

To comply with EO 14,173, on May 12, 2025, OJP updated the language in the "General Conditions for OJP Awards" page on its website, which provides a legal overview for prospective applicants of certain requirements that apply to OJP grants. *See* U.S. DOJ, OJP, *FY25 General Terms and Conditions* § 15, https://perma.cc/D3NX-3W9R); *see also* Am. Compl., at ¶ 167; OJP Administrative Record, ECF No. 50-3, at 61. The General Terms are applicable to all grant programs administered by OJP, which includes those administered by OVC.

The General Conditions webpage contains the language of a new "Federal Civil Rights and Nondiscrimination Laws" certification requirement (the "Certification Requirement") that requires OJP grantees to "agree[] that its compliance with all applicable [f]ederal civil rights and nondiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for purposes of the False Claims Act (31 U.S.C. 3729-3730 and 3801-3812), and, by accepting this award, certif[y] that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable [f]ederal civil rights or nondiscrimination laws." OJP, General Conditions for OJP Awards in FY 2025, https://perma.cc/D3NX-3W9R ("OJP General Conditions").

The Certification Requirement, in operative effect, is in harmony with longstanding

"Certified Standard Assurances" required of all applicants for grants administered by all DOJ component agencies. Applicants must certify, prior to accepting an award, that they will comply with applicable federal civil rights and nondiscrimination laws and require subrecipients to do the same. *See* OJP Administrative Record, ECF No. 50-3, at 54–56. These laws prohibit discrimination on the basis of race, color, national origin, sex, disability, and age.

The Certification Requirement applies to all three grant programs from which Plaintiffs or their members claim to receive funding: the VOCA Victim Assistance Program formula grant to states, the Services Program, and the PAWS Program grants.

### 2.    The Unlawful Presence Provision in OVC Award Offers.

On August 7, 2025, the President issued Executive Order No. 14,332, *Improving Oversight of Federal Grantmaking*. 90 Fed. Reg. 38929 (Aug. 7, 2025). The Order states that its purpose is to improve federal grantmaking and ensure that taxpayer funds advance American interests. *Id.*

The order directs federal agencies to review discretionary grant programs and ensure that such awards do not promote or fund illegal immigration. *See id.* § 4(ii)(C). Like EO 14,173, the order provides that it must be implemented "consistent with applicable law." *Id.* § 7(b).

Pursuant to this directive, in January 2026 OJP included the Unlawful Presence Provision in OJP grant awards made under two discretionary grant programs: the Services Program and the PAWS Program. The Unlawful Presence Provision states:

> The recipient shall ensure that no funds provided under this award (or any subaward, at any tier) will be used to provide benefits or services to any removable alien (*see* 8 U.S.C. § 1229a(e)(2)) or any alien otherwise unlawfully present in the United States, but this prohibition shall not apply where such use is expressly authorized by law (or otherwise expressly allowable under the terms of this award) or where the prohibition would contravene any express requirement of any law, or of any judicial ruling, governing or applicable to the award.

*See* Pls.' Br. at 7 n.1. The provision has important limitations: it only applies where the

provision will not "contravene any express requirement of law," and it does not restrict a grantee's ability to use other funding sources to serve unlawfully present individuals. Moreover, it only applies to Services Program and PAWS Program grants and does not apply to VOCA Victim Assistance formula grants to states.

## ARGUMENT

## I.      PLAINTIFFS' MOTION FOR LEAVE TO AMEND SHOULD BE DENIED.

### A.      Legal Standard

The Federal Rules of Civil Procedure allow a party to amend its pleading "once as a matter of course" either (1) within 21 days after filing it, or (2) 21 days after a defendant files a motion to dismiss under Rule 12(b). Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2).

Whether to grant leave to amend is within the trial court's sound discretion, *see Johnston v. Holiday Inns, Inc.,* 595 F.2d 890, 896 (1st Cir.1979), based on the balancing of several factors "including futility, delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previously allowed amendments, and most importantly, prejudice to the opposing party," *O'Neil v. Q.L.C.R.I., Inc.*, 750 F. Supp. 551, 553 (D.R.I. 1990) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)). Leave to amend may be properly denied on futility grounds if the amendment fails to state a valid claim. *See Glassman v. Computervision Corp.*, 90 F.3d 617, 622–23 (1st Cir. 1996). "Although leave to amend is to be 'freely given,' the text of Rule 15(a) makes plain that it should not be granted automatically, but only 'when justice so requires.'" *In re GTECH Holdings Corp. Sec. Litig.*, No. 94-0294P, 1995 WL 500414, at *9 (D.R.I. Mar. 16, 1995) (quoting Fed. R. Civ. P. 15(a)).

11

In addition, "[w]hen a plaintiff seeks to amend the complaint after the scheduling order deadline, the plaintiff also must show good cause to modify the scheduling order." *Mudge v. Bank of Am., N.A.*, No. 13-CV-421-JD, 2014 WL 2196899, at *3 (D.N.H. May 27, 2014) (citing Fed. R. Civ. P. 16(b)(4)). "Good cause, for purposes of modifying the scheduling order, 'focuses on the diligence (or lack thereof), of the moving party more than it does on any prejudice to the party-opponent,' although prejudice to the opposing party caused by the delay is also relevant." *Id.* (citing *O'Connell v. Hyatt Hotels of P.R.,* 357 F.3d 152, 155 (1st Cir.2004)) (cleaned up).

  **B.**  **Plaintiffs Unduly Delayed and Amendment Would Prejudice Defendants.**

  Plaintiffs' request to amend their complaint should be denied because they unduly delayed in seeking amendment and because allowing amendment would substantially prejudice the government.

  The Certification Requirement was promulgated in May 2025. *See* OJP Administrative Record, ECF No. 50-3, at 57–77 (listing May 12, 2025 date of General Conditions, including the Certification Requirement). Plaintiffs amended their complaint in November 2025 to challenge the same provision as applied to VOCA Victim Assistance grants. Plaintiffs nonetheless waited nearly nine months to seek this amendment challenging the requirement as applied to additional grant programs. Yet Plaintiffs were aware that the same requirement applied to the Services Program and the PAWS Program months earlier.

  Plaintiffs' declarations confirm that their members were notified in September 2025 that they had been selected for awards under those programs. *See, e.g.,* Declaration of Krista Colón, ECF No. 53-2 (Colón Decl.), at ¶ 8 ("On September 30, 2025, Member Moe received an email stating it had been selected for the FY2025 OVC Services for Victims of Crime Grant"); *see also* Declaration of Susan Higginbotham dated February 19, 2026, ECF No. 53-4 ("Second Higginbotham Decl."), at ¶ 12 ("On September 30, 2025, CCN was notified that it was selected

for the FY25 Pet Shelter and Housing Assistance grant"). Plaintiffs therefore could have amended their complaint as to these grant programs at least as early as October 2025 and certainly when filing their first amended complaint in November 2025. Plaintiffs' motion offers no explanation for this delay.

Allowing amendment would also prejudice the government. "[P]rejudice to the opposing party" is the "most important[]" factor in considering a motion for leave to amend. *O'Neil,* 750 F. Supp. at 553.

Since August 2025, the Court's preliminary stay has prevented OVW from enforcing certain grant terms intended to ensure that federal funds are used lawfully and within program objectives. *See* ECF Nos. 19 & 34. OVW is not part of the challenge to the Certification Requirement raised by Plaintiffs' first amended complaint or the challenge to the Unlawful Presence Provision raised in Plaintiffs' proposed second amended complaint. These challenges concern grant programs and terms promulgated by other DOJ components.

The Court's previous stay order was explicitly temporary and issued in anticipation of fuller review at summary judgment. *See* ECF No. 34. Indeed, the Court's primary rationale for the stay was that it needed a more fulsome administrative record to assess the legality of the challenged conditions. The order stated that "[t]he Court understands that this matter arises on an expedited basis, and perhaps a fuller administrative record will disclose more of the Office's decisionmaking process." *Id.* at 20. The Court concluded that a stay was "necessary and appropriate, *for now*," plainly contemplating that the case may be resolved differently on summary judgment. *Id.* at 26 (emphasis added). Defendants promptly moved forward with production of the administrative record and the Court set a briefing schedule that likely would have resolved this case in early 2026. *See* ECF No. 35.

Plaintiffs' repeated amendments have disrupted the briefing schedule and delayed final resolution of the case. Under the original scheduling order, summary judgment briefing would have concluded months ago. *See id.* If amendment is permitted now, final resolution could be delayed nearly a year after the Court's stay order was issued, without providing OVW any opportunity to further litigate the challenge to their terms. Moreover, another amendment would mean a new challenged grant term would be rolled into summary judgment proceedings after resolution of these motions, further complicating resolution of this case for the parties and the Court.

Such delay substantially harms the government's ability to administer federal grant programs. Some challenged grants may expire before final resolution, effectively converting a temporary stay into permanent relief by default.

Plaintiffs contend that Defendants "suffer no undue prejudice" because Defendants have not yet filed an answer. *See* ECF No. 52 at 5. But Plaintiffs ignore that the parties agreed Defendants' answer would be waived unless any claims survived summary judgment; if Defendants had not agreed, they would have filed a responsive pleading last year. *See* ECF No. 48, ¶ 15. Because this APA case is expected to be resolved on summary judgment following production of the administrative record, it is unlikely Defendants will ever file a responsive pleading. *Id.* at ¶ 16. Under Plaintiffs' logic, the government would suffer no prejudice even if Plaintiffs amended their complaint after summary judgment briefing was complete, simply because no answer had been filed.

Plaintiffs also argue there is no prejudice because the proposed second amended complaint involves "similar" grant terms already at issue in this case. ECF No. 52 at 5–6. Not so. The Unlawful Presence Provision is unlike any term Plaintiffs have previously challenged, and the

proposed amendment also adds challenges to the Services Program and the PAWS program, which were never previously at issue. Accepting Plaintiffs' theory—that any new term in any of the hundreds of DOJ grant programs may be added to this case—would allow the litigation to expand indefinitely. Because the amendment introduces a new term and new grant programs, it would significantly broaden the scope of the case and prejudice the government.

Finally, Plaintiffs' motion should be denied because the proposed amendment is futile. As explained below, Plaintiffs are not likely to succeed on the merits of their APA and constitutional claims.

## II.    PLAINTIFFS' PRELIMINARY INJUNCTION MOTION SHOULD BE DENIED.

### A.    Legal Standard.

A "preliminary injunction is an 'extraordinary and drastic remedy[.]'" *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). A district court should enter a preliminary injunction only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted). To obtain a preliminary injunction, the moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Id.* at 20. Finally, when "the Government is the opposing party[,]" the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (citation omitted).

B.    **Plaintiffs Are Not Likely to Succeed on the Merits.**

1.    **Plaintiffs Lack Standing to Challenge Terms in VOCA Victim Assistance Grants.**

To establish Article III standing, a plaintiff must show: (i) an "injury in fact," that is, a violation of a legally protected interest that is "concrete and particularized" and "actual or imminent, not 'conjectural or hypothetical'"; (ii) a causal connection between the injury and the defendant's conduct such that the injury is "fairly . . . traceable to the challenged action"; and (iii) that it is "likely, as opposed to merely speculative that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citation modified). Each plaintiff "bears the burden of establishing these elements[,]" and therefore "must 'clearly . . . allege facts demonstrating each.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted).

Traceability "requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm." *Katz v. Pershing, LLC*, 672 F.3d 64 at 71 (1st Cir. 2012); *see, e.g., Lujan*, 504 U.S. at 560. And redressability requires the plaintiff to "show that a favorable resolution of her claim would likely redress the professed injury." *Katz*, 672 F.3d at 72; *see, e.g., Lujan*, 504 U.S. at 561, 568–71. "[C]ausation and redressability[] are often flip sides of the same coin" in that "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024). When seeking a preliminary injunction, Plaintiffs "must make a 'clear showing'" that they are "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation omitted).

Critically, "standing is not dispensed in gross," and "'plaintiffs must demonstrate standing for each claim they press' against each defendant, 'and for each form of relief.'" *Id.* at 61 (citation omitted).

16

Plaintiffs, who receive VOCA Victim Assistance funds as subrecipients, lack standing to challenge the certification requirement. *See* Decl. of Kirsten Faisal, ECF No. 53-3 ("Faisal Decl."), at ¶¶ 11, 13-14; Decl. of Kelsen Young, ECF No. 53-6 ("Young Decl."), at ¶ 7. States—not Plaintiffs—are the recipients of federal funds under the VOCA Victim Assistance program. Plaintiffs receive pass-through funding only through subawards administered by those states. Because the federal government is not a party to Plaintiffs' subaward agreements, it cannot dictate the precise terms those states impose on subrecipients. *See* Nov. 2025 Ltr. To Pls.' Counsel, ECF No. 42-1.

A "federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" *See Murthy*, 603 U.S. at 57 (quotation omitted). Courts are "'reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment,'" *id.* (quoting *Clapper v. Amnesty Int'l*, 568 U.S.398, 413 (2013)), and have rejected theories of redressability that depend on such guesswork, *id.* at 73; *Haaland v. Brackeen*, 599 U.S. 255, 293–94 (2023). And the Supreme Court has forbidden standing based merely on speculation of how governmental action may encourage harm to Plaintiffs. *See Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–43 (1976) (holding that causation was not met where plaintiffs asserted that the challenged federal regulations "encouraged" the actions of private entities that resulted in the injury complained of). For similar reasons, standing is wanting when an attenuated chain of reasoning is needed to support Plaintiffs' claims. *See Clapper*, 568 U.S. at 409.

The Certification Requirement requires federal grant recipients to certify that they do not operate programs that violate federal civil rights or nondiscrimination laws. In response to Plaintiffs' request in November 2025, Defendants explained that the government lets recipients

determine the appropriate requirements to include in its federal subawards to comply with its federal obligations. *See* Nov. 2025 Ltr. To Pls.' Counsel at 3 (citing 2 C.F.R. § 200.300(a)); *see also* 2 C.F.R. § 200.332(b)(2)–(3). As a result, Plaintiffs' alleged injuries depend on independent decisions by state grant recipients who are not parties to this case. Article III standing does not exist where redress depends on speculative assumptions about how third parties will exercise their discretion. *See California v. Texas*, 593 U.S. 659, 675 (2021).

Even if the Court enjoined the federal certification requirement, states could independently require similar assurances in their subawards. Plaintiffs therefore cannot establish traceability or redressability.

### 2.    Plaintiffs' APA Claims Are Unlikely to Succeed.

### i.    The Challenged Terms Are Not Final Agency Action.

This Court previously concluded that the challenged conditions constituted final agency action because they "determine[] [Plaintiffs'] rights and obligations and ha[ve] attendant legal consequences," reasoning that "[w]ithout agreeing to the challenged conditions, the Coalitions are effectively barred from applying for and receiving funds which they are legally entitled to seek." *R.I. Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 68 (D.R.I. 2025) (citation omitted). Defendants respectfully preserve and reassert their prior arguments that the challenged provisions do not constitute final agency action as to both the Certification Requirement and the Unlawful Presence Provision. *See* ECF No. 17 at 17–20.

In addition, the Certification Requirement is not a final agency action for another reason: "[a]n agency's statement that 'merely expresses its view of what the law requires' is not final, and not reviewable." *Centro de Trabajadores Unidos v. Bessent*, No. 25-5181, 2026 WL 503310, at *12 (D.C. Cir. Feb. 24, 2026) (quoting *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427

(D.C. Cir. 2004)). The Certification Requirement falls squarely within that principle. The provision simply clarifies that grantees must comply with applicable federal civil rights and nondiscrimination laws, which are obligations that already apply to recipients of federal funds. OJP has long highlighted these obligations through its Certified Standard Assurances. *See* OJP Administrative Record, ECF No. 50-3, at 54–56. The Certification Requirement therefore does not impose new legal duties; rather, it reiterates existing requirements and clarifies that certain DEI-related programs may violate federal nondiscrimination laws if structured improperly. By reminding grantees of these preexisting obligations and their relevance to federal funding decisions, the provision merely reflects OJP's interpretation of existing law.

Accordingly, the Certification Requirement does not constitute final agency action because it simply expresses OJP's view regarding applicable requirements for compliance with preexisting legal obligations and does not itself impose new duties on Plaintiffs.

### ii.    Grant Terms Are Committed to Agency Discretion by Law.

The APA, and judicial review thereunder, does not apply when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

In its prior preliminary injunction order, the Court concluded that the specific statutory authority governing the Office on Violence Against Women ("OVW") provided "meaningful internal standards" such that grant term disputes were not committed to agency discretion by law. *R.I. Coal. Against Domestic Violence*, 794 F. Supp. 3d at 69. This case, however, involves different statutes with different terms, and the Court's prior decision regarding VAWA does not control the outcome here. The Court reasoned that the specific VAWA statutory provisions—not at issue here—provided the Court with law to apply. *Id.* But this challenge concerns different grant programs with different authorizing statutes that have been committed grant management to the

agency's discretion.

In deciding how to allocate resources, an agency must engaged in "a complicated balancing of a number of factors" that are uniquely within the agency's "expertise," including "whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (citation omitted). Here, Plaintiffs have failed to demonstrate that any statute or regulation meaningfully constrains the agency's discretion regarding how to allocate or condition grant funding among different potential objectives, projects, and recipients.

***Services Program.*** Grant terms governing the Services Program are plainly committed to agency discretion by law. Indeed, the Services Program was not created directly by Congress; rather, it was established by the Director of OVC pursuant to the Director's discretionary authority under 34 U.S.C. § 20103(c)(1).

Congress granted the Director broad authority to administer VOCA funds and establish grant programs. *See* 34 U.S.C. § 20111(c)(1). The statute specifically authorizes the Director to "[e]stablish[] programs in accordance with § 20103(c) . . . on terms and conditions determined by the Director to be consistent with that subsection." *Id.* § 20111(c)(3). Thus, the Director not only created the Services Program but was expressly authorized by Congress to determine the terms and conditions governing it.

Moreover, the statute provides no substantive criteria that would supply meaningful standards for judicial review of those terms. Section 20103(c)(3) lists certain duties the Director "shall" perform, but those duties largely concern monitoring, coordination, and program administration. The statute also authorizes the Director to "perform such other functions related to

the purposes of this title as the Director deems appropriate." *Id.* § 20103(c)(3)(D).

Taken together, these provisions confirm that Congress vested the OVC Director with broad discretion to administer competitive grant programs under § 20103(c) and to determine the terms governing those programs for entities that provide services to crime victims.

***VOCA Victim Assistance Grant Program.*** The statutory framework governing the VOCA Victim Assistance Grant Program to states similarly demonstrates that its grant terms are committed to agency discretion by law. Congress authorized the OVC Director to require state grantees to "provide such other information and assurances related to the purposes of this section as the Director may reasonably require." 34 U.S.C. § 20103(a)(D).

The statute broadly describes the purposes for which VOCA funds may be used, including assisting victims of sexual assault, spousal abuse, and child abuse, among many other crimes. *See id.* § 20103(a)(2)(A). Given this broad mandate, the Director reasonably exercises her discretion when requiring assurances such as the Certification Requirement to ensure that grant recipients do not unlawfully discriminate against victims of crime and that funds are used consistent with the statute's purposes and not for purposes unrelated to serving victims of crime. *See id.* at § 20103 (a)(2)(D).

***The PAWS Program.*** The PAWS Program statute likewise grants the agency broad discretion to require assurances necessary to ensure compliance with the program's requirements. The statute provides that applicants must submit "such assurances as the Secretary determines to be necessary to ensure compliance by the entity with the requirements of [the statute]." 34 U.S.C. § 20127(2)(A)(ii).

This language "fairly exudes deference" to OVC and "forecloses application of any meaningful judicial standard of review." *Webster v. Doe*, 486 U.S. 592, 600 (1988) (holding that

similar statutory language giving the CIA Director authority over personnel matters whenever he shall "*deem* such termination necessary or advisable in the interests of the United States" was committed to agency discretion). The statute thus gives OVC substantial discretion to determine what assurances are necessary to ensure statutory compliance. The challenged certification requirements fall within that authority.

>        iii.    **The Challenged Terms Are Within Defendants' Statutory Authority.**

Congress granted Defendants substantial discretion in administering discretionary grant programs. *See, e.g.,* 34 U.S.C. § 20111(c)(3) (authorizing the OVC Director to establish programs "on terms and conditions determined by the Director"). In administering these programs, Defendants may establish terms necessary to ensure that federal funds are used consistent with statutory purposes. Moreover, it is well established that "by contract, the Government may fix specific and precise conditions to implement federal objectives." *United States v. Orleans*, 425 U.S. 807, 816 (1976).

**Unlawful Presence Provision.** OVC administers the two grant programs subject to the Unlawful Presence Provision—the Services Program and the PAWS Program—both of which involve discretionary funding. Programs funded through lump-sum appropriations necessarily require agencies to make difficult policy judgments about how best to allocate limited resources. As the Supreme Court has explained, "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192.

Here, OJP determined that one way to allocate limited funding within these programs is to restrict certain services funded by these grants to individuals lawfully present in the United States. That decision reflects a policy judgment regarding the administration of limited federal resources,

which is precisely the type of decision entrusted to agencies administering discretionary grant programs. *See id.* at 193. Plaintiffs themselves acknowledge that no statute expressly prohibits such a limitation. *See* Pls.' Br. at 17.

Plaintiffs also contend that the Unlawful Presence Provision is contrary to law because grantees would need access to immigration databases or documentation that victims may not possess. *See* Pls.' Br. at 24–25. That argument misses the mark for several reasons.

First, Domestic violence service providers likely already conduct basic intake procedures when assisting victims, such as collecting names and other identifying information. *See, e.g.,* 34 U.S.C. § 20127(6) (PAWS Program's reporting requirements). Determining a victim's immigration status therefore does not impose a significant additional burden. Second, to comply with a grant provision, federal regulations provide that a grantee must "establish, document, and maintain effective internal control over the Federal award that provides reasonable assurance that the recipient or subrecipient is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award." 2 C.F.R. § 200.303(a). That requirement does not conflict with the statutory prohibition identified by Plaintiffs. *See* Pls.' Br. at 24–25. Third, the challenged provision includes an explicit savings clause ensuring that it does not apply where doing so would conflict with governing law. The provision also allows grantees the option to provide services using a non-Federal source of funds where a grantee cannot confirm that a victim is a U.S. citizen or is lawfully present.

Finally, Plaintiffs rely on regulations governing VOCA Victim Assistance grants that state that assistance eligibility does not depend on immigration status. *See* Pls.' Br. at 12 (citing 28 C.F.R. §§ 98.103(a), 94.116). But the Unlawful Presence Provision is not operative in VOCA Victim Assistance grants. Plaintiffs cannot import eligibility rules from one program into separate

discretionary grant programs such as the Services Program or the PAWS Program.

**Certification Requirement.** Plaintiffs also argue that the Certification Requirement exceeds Defendants' statutory authority. *Id.* Plaintiffs concede, however, that Defendants may require grantees to certify compliance with nondiscrimination laws. *Id.* Plaintiffs instead contend that the requirement is unlawful because it identifies compliance with those laws as a "material" term, and "single[s] out" DEI program as potentially violating nondiscrimination laws. *Id.* at 17–18. Both arguments fail.

***First,*** the federal government routinely designates certain provisions as conditions of payment through express language in federal contracts and grant agreements to clarify which obligations are particularly important to the government's payment decisions. Courts routinely consider express contractual language when evaluating materiality. Indeed, the First Circuit has recognized that "whether the government expressly identified compliance with particular requirements as a condition of payment" is a non-dispositive factor in the materiality assessment. *See, e.g., United States v. Town of Hingham*, 683 F. Supp. 3d 81, 89 (D. Mass. 2023), *aff'd sub nom. U.S. ex rel. Zotos v. Town of Hingham*, 98 F.4th 339 (1st Cir. 2024) (emphasis added) (citing *Universal Health Servs., Inc. v. United States ("Escobar I")*, 579 U.S. 176, 193 n.5 (2016)). Flagging material terms therefore helps clarify expectations for grantees and does not exceed the government's authority. There is nothing remotely unlawful about requiring recipients of federal grants to affirm that that the government considers compliance with antidiscrimination laws material to its payment decisions.

However, identifying compliance with a particular term as material does not "gut" the False Claims Act materiality standard, as Plaintiffs contend. Pls.' Br. at 18. The Certification Requirement simply announces, and requires the funding recipient to acknowledge, that the

government considers compliance to be a material condition on payment. The Supreme Court has held that materiality is a "demanding" and "rigorous" standard that cannot be satisfied merely because the government labels a requirement as a condition of payment. *Escobar I*, 579 U.S. at 194; *see also Town of Hingham*, 683 F. Supp. at 89 (holding that "even if particular provisions had been expressly identified" as a condition of payment under a contract, "the alleged noncompliance" would not be material). Courts consider multiple factors in evaluating materiality, and express designation is only one of them. *See Escobar I*, 579 U.S. at 194 (explaining that the "Government's decision to expressly identify a provision as a condition of payment is relevant," though "not automatically dispositive," as evidence of materiality).

Moreover, Plaintiffs' speculation that grantees could face False Claims Act liability based on good faith misunderstandings of the law is misplaced. The False Claims Act is "a fraud statute" that requires proving a culpable mental state. *U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749–52 (2023). It does not reach "an innocent, good-faith mistake about the meaning of an applicable rule," nor claims based on reasonable but erroneous interpretations of legal obligations. *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287–88 (D.C. Cir. 2015).

**Second,** Defendants acted within their authority in noting that certain DEI programs may violate nondiscrimination laws. The certification provision requires grantees to certify that they do not operate programs "that violate any applicable Federal civil rights or nondiscrimination laws," including programs "having components relating to diversity, equity, and inclusion." OJP, *General Conditions*, https://perma.cc/D3NX-3W9R. The provision therefore prohibits only DEI-related practices that violate nondiscrimination laws, not every DEI program across the board.

Nor does the provision require Plaintiffs to certify that they do not advocate for DEI. *See Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 96–97 (D.D.C. 2025); *S.F. A.I.D.S. Found. v.*

*Trump*, 786 F. Supp. 3d 1184, 1200 (N.D. Cal. 2025) (finding that the plaintiffs "have not demonstrated that they [are] likely to succeed in their challenge to the Certification Provision because they have not shown at this juncture that the provision goes beyond targeting DEI programs that violate federal antidiscrimination law"), *appeal filed* No. 25-4988 (9th Cir. Aug. 7, 2025). Rather, it simply requires award recipients (in the case of VOCA Victim Assistance Grants at issue here, the state recipients) to certify compliance with existing legal obligations under "applicable" federal civil rights laws such as Title VI of the Civil Rights Act of 1964, which already applies to all recipients of federal assistance, 42 U.S.C. § 2000d-1. Accordingly, the legality of a general certification of compliance with antidiscrimination laws cannot be disputed. And Plaintiffs never explain why such general certification somehow becomes unlawful when it simply adds more detail to highlight a certain category of programs—unlawful DEI—that violate antidiscrimination laws.

Certification requirements of this kind are longstanding. It has been true for decades that "[e]very application for Federal financial assistance must, 'as a *condition* to its approval and the extension of any Federal financial assistance,' contain assurances that the program will comply with Title VI *and* with all requirements imposed pursuant to the executive regulations issued under Title VI." *Guardians Ass'n v. Civ. Serv. Comm'n*, 463 U.S. 582, 629–30, 630 n.22 (1983) (Marshall, J., dissenting) (citing regulations from Departments of Agriculture, Commerce, Defense, Education, Energy, Health and Human Services, Housing and Urban Development, Interior, Justice, Labor, State, Transportation, and Treasury). These "assurance[s]" of compliance are "given in consideration of federal aid, and the federal government extends assistance in reliance on the assurance of compliance"—but the obligations of Title VI apply regardless of any certification. *Id.* at 630 (citation modified). The requirement here is no different: although

26

recipients must certify specifically that any DEI programs they run comply with federal antidiscrimination law, this certification "does not place upon a recipient [any] unanticipated burdens because any recipient must anticipate having to comply with the law." *Id.*

        **iv.**    **The Challenged Terms Survive Arbitrary and Capricious Review.**

OJP's adoption of the challenged provisions was not arbitrary or capricious. Judicial review under the APA's arbitrary-and-capricious standard is "deferential," and courts may not substitute their own policy judgment for that of the agency. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The inquiry is "narrow" and asks only whether the agency acted within a "zone of reasonableness." *Id.*; *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

There is nothing arbitrary or capricious about requiring federal grantees to comply with federal antidiscrimination laws or to certify that they are doing so. To the contrary, as explained above, "existing federal law already demands such compliance." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 167 F.4th 86, 104 (4th Cir. 2026). Thus, even assuming that the imposition of the condition is subject to arbitrary-and-capricious review, notwithstanding the absence of any statutory standards governing the choice of conditions, the conditions are "rational," *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 42–43.

Agencies have not typically been compelled to provide a more extensive explanation when setting funding priorities. Rather, an agency's determination must be upheld if "its path may reasonably be discerned." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (citation omitted). Here, the rationale for the condition is self-evident on its face, reflecting DOJ's desire to prevent violations of federal anti-discrimination law and to prohibit the use of federal grant funds for certain things that are unlawful.

Similarly, there is nothing irrational or contrary to law about prioritizing limited federal grant funding for the benefit of persons with lawful presence in the United States. Indeed, none of the statutes authorizing the grant programs at issue here expressly requires the provision of services to individuals who are removable aliens or aliens who are otherwise unlawfully present in the United States.

As noted above, domestic violence funding is insufficient to meet existing demand, particularly with respect to victims' housing needs.[12] The government therefore may lawfully exercise its discretion in administering grant programs to allocate these limited resources. The PAWS Program, in particular, is specifically dedicated to providing housing that accommodates pets—a resource for which demand is especially high and victims' requests are most likely to go unmet.[13] *See* 34 U.S.C. § 20127. Accordingly, the agency acted well "within a zone of reasonableness" in imposing conditions of funding that "improve American lives or advance American interests." *Improving Oversight of Federal Grantmaking,* Exec. Order No. 14,332, 90 Fed. Reg. at 38929, 38929 (Aug. 7, 2025).

In sum, Plaintiffs seek extraordinary emergency relief on a preliminary record that remains limited and contested. On such a record, Plaintiffs cannot demonstrate that OJP's decisions were arbitrary or capricious.

### 3. Plaintiffs' Constitutional Claims Fail.

#### i. Plaintiffs' Constitutional Claims Need Not Be Reached.

The "fundamental and longstanding principle of judicial restraint" instructs courts to

---

[12] NNEDV, *Domestic Violence Counts: 19th Annual Report* (May 2025), https://perma.cc/82FZ-39QB (full report: https://perma.cc/GU66-R3C5).

[13] *Id.* at 2 (noting that in a single day in 2024, "victims made 14,095 requests for services that programs could not provide . . . [t]he majority of these unmet requests (60%) were for emergency shelter, hotels, motels, transitional housing, and other housing").

"avoid reaching constitutional questions in advance of the necessity of deciding them." *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1123 (9th Cir. 2025) (citation omitted), *cert. granted by sub. nom. Noem v. Al Otro Lado*, 146 S. Ct. 604 (Nov. 17, 2025); *see also City & Cnty. of S.F. v. U.S. Dep't of Just.*, No. 25-CV-09277-JD, 2026 WL 177945, at *7 (N.D. Cal. Jan. 21, 2026).

That principle applies with particular force where, as here, Plaintiffs assert facial constitutional challenges. Plaintiffs contend that the challenged provisions "are unconstitutional not as applied to [Plaintiffs'] own conduct, but rather, on their face, as they apply to the population generally." *Edgar v. Haines*, 2 F.4th 298, 313 (4th Cir. 2021); *see* Pls.' Br. at 25. But facial challenges are "disfavored" because they "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (citation omitted). Indeed, facial challenges are "the most difficult challenge to mount successfully," *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (citation omitted), *on remand to* 117 F. 4th 331 (5th Cir. 2024), and for "a host of good reasons," *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).

Given that principle, should the Court determine that the terms Plaintiffs challenge violate the Administrative Procedure Act, this Court need not and should not reach Plaintiffs' constitutional claims.

### ii.    Plaintiffs' Fifth Amendment Challenges Fail.

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. Because "clarity in regulation is essential to the protections provided by the Due Process Clause," *FCC v. Fox Television Stations,*

*Inc.*, 567 U.S. 239, 253 (2012), a law is "void for vagueness if its prohibitions are not clearly defined," *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The relevant question is whether a regulation "provide[s] a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Fox Television*, 567 U.S. at 253 (citation omitted).

The Supreme Court has squarely held that there is no constitutional guarantee of clarity in grant or contract criteria, even if these criteria are set by statute. In *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), the Court rejected a vagueness challenge to the National Foundation on the Arts and Humanities Act, which provides that grants shall be awarded according to "artistic excellence and artistic merit . . . , taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public," 20 U.S.C. § 954(d)(1). The Court recognized that these standards were "undeniably opaque," such that they would raise "substantial vagueness concerns" in the context of a "criminal statute or regulatory scheme." *Finley*, 524 U.S. at 588.

In the context of competitive grants, however, the Court explained that this imprecision raised no such concerns. That is because "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id.* at 589. The challenged statute "merely add[ed] some imprecise considerations to an already subjective selection process," and neither these considerations nor the underlying selection process "impermissibly infringe[d] on First or Fifth Amendment rights." *Id.* at 590. A contrary conclusion would render unconstitutional "all Government programs awarding scholarships and grants on the basis of subjective criteria such as 'excellence,'" which the Supreme Court declined to do. *Id.* at 589. Relying on *Finley*, the Fourth Circuit recently denied a Fifth Amendment challenge to grant

conditions. *See Nat'l Ass'n of Diversity Officers in Higher Educ.*, 167 F.4th at 102 ("We're also guided by *Finley*'s refrain that courts should afford greater latitude for vagueness in funding decisions than they would 'in a criminal statute or regulatory scheme.'" (quoting *Finley*, 524 U.S. 588)).

Plaintiffs' Fifth Amendment vagueness challenge fails under these precedents. Plaintiffs largely repeat the arguments made in their arbitrary and capricious section, but for the reasons explained above, the challenged terms provide fair notice and workable standards.

First, the Unlawful Presence Provision incorporates established federal law governing immigration status and includes explicit savings clauses and legal carveouts where application of the provision would conflict with other statutory obligations. By referencing existing legal definitions and incorporating exceptions where required by law, the provision provides fair notice of its scope.

Plaintiffs raise potential concerns about how to verify individuals' immigration status, but any such concerns can be addressed through case-by-case, fact-specific adjudication. As noted above, Plaintiffs bring a facial challenge, which is "disfavored for several reasons," including that they "often rest on speculation" and "consequen[tly] ... raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) (quoting *Sabri v. United States*, 541 U.S. 600, 609 (2004)). And given its scope, "[f]acial invalidation 'is, manifestly, strong medicine' that 'has been employed by the Court sparingly and only as a last resort.'" *Finley*, 524 U.S. at 580 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)).

As a general rule, a vagueness claim under the Fifth Amendment "must be examined in light of the facts of the case at hand," not on an abstract, facial basis. *United States v. Moriello*,

980 F.3d 924, 931 (4th Cir. 2020) (citation omitted). That is because "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). Here, Plaintiffs' fears about the inability to verify the immigration status of unknown individuals who might seek services at some point in the future cannot be examined in light of any relevant facts because they are not challenging any particular application of the condition.

Second, the Certification Requirement simply requires compliance with "applicable federal civil rights and nondiscrimination laws." That is a familiar and well-established compliance standard for recipients of federal funding. Federal grantees have long been subject to similar certification and assurance requirements under statutes such as Title VI of the Civil Rights Act of 1964 and related implementing regulations. Requiring recipients to certify compliance with those existing obligations does not create an indeterminate or open-ended prohibition that violates the constitution.

Because both provisions rely on well-established legal standards and incorporate existing statutory frameworks, they provide more than adequate notice of what conduct is required. Plaintiffs therefore cannot establish a Fifth Amendment vagueness violation.

### iii. Plaintiffs' First Amendment Challenge to the Certification Requirement Fails.

Plaintiffs' First Amendment challenge restates their argument that the Certification Requirement exceeds Defendants' statutory authority. But that argument fails for the same reasons explained above.

The Certification Requirement does not impose any new substantive obligations on Plaintiffs' conduct. Nor does it require Plaintiffs to certify that they do not support or advocate for

diversity, equity, or inclusion. *See Nat'l Ass'n of Diversity Officers in Higher Educ.*, 167 F.4th at 97–100; *Nat'l Urb. League*, 2025 WL 1275613, at *24; *S.F. A.I.D.S. Found.*, 2025 WL 1621636, at *19. Instead, the provision simply requires grant recipients to certify compliance with existing legal obligations under "applicable" federal civil rights and nondiscrimination laws, including statutes such as Title VI of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000d-1. Those legal obligations apply to recipients of federal assistance regardless of any certification requirement. None of this implicates the First Amendment.

The provision does not restrict speech regarding DEI, as Plaintiffs contend. *See* Pls.' Br. at 28. Nothing in the text of the provision purports to adopt a new interpretation of federal antidiscrimination law or to penalize advocacy regarding DEI. Federal civil rights laws already govern the conduct of federal funding recipients. The Certification Provision simply requires recipients to acknowledge those existing obligations and their materiality to federal funding decisions.

As the Fourth Circuit recently held in rejecting a similar challenge, "the Provision requires only that plaintiffs certify compliance with federal antidiscrimination laws, which the First Amendment doesn't confer a right to violate." *See Nat'l Ass'n of Diversity Officers in Higher Educ.*, 167 F.4th at 103. "Put another way, plaintiffs have no protectable speech interest in operating, and no constitutional right to operate, DEI programs that violate federal antidiscrimination law." *Id.* at 103–04 (cleaned up).

Plaintiffs' speculation that the provision could expose them to False Claims Act liability based on good faith misunderstandings of the law is likewise misplaced. *See* Pls.' Br. at 28–29. As stated above, the False Claims Act is "a fraud statute" that requires proof of a culpable mental state. *SuperValu Inc.*, 598 U.S. at 749–52. It does not reach "an innocent, good-faith mistake about

the meaning of an applicable rule," nor claims based on "reasonable but erroneous interpretations of a defendant's legal obligations." *MWI Corp.*, 807 F.3d at 287–88. Those protections foreclose the speculative liability concerns raised by Plaintiffs.

Finally, the Supreme Court's decision in *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205 (2013), does not support Plaintiffs' argument. That decision stands for the straightforward proposition that the government may not condition funding on a requirement that effectively prohibits recipients from engaging in protected conduct outside the scope of the federally funded program. *Id.* at 218–19.

No such condition exists here. The Certification Provision does not prohibit advocacy, speech, or viewpoints regarding DEI. Nor does it restrict recipients' activities outside the scope of federally funded programs. It simply requires compliance with federal civil rights laws—a requirement that applies to recipients of federal funding regardless of the certification. And because there is no First Amendment right to violate federal civil rights laws, *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 389–90 (1992), the certification requirement raises no First Amendment concern.

## C.    The Remaining Factors Counsel Against Granting the Requested Relief.

A motion for a preliminary injunction can, and should, be denied if the plaintiff has failed to demonstrate irreparable harm. "Preliminary injunctions are strong medicine" and "should not issue except to prevent a real threat of harm." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) ("In most cases—and the case at hand is no outlier—irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief."); *see also Narragansett Indian Tribe v.*

*Guilbert*, 934 F.2d 4, 6–7 (1st Cir. 1991) ("[S]peculative injury does not constitute a showing of irreparable harm." (quoting *Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987))). Plaintiffs cannot make that showing here.

As a threshold matter, Plaintiffs' delay in seeking emergency relief "detracts from the movant's claim of irreparable harm." *Charlesbank Equity Fund II*, 370 F.3d at 163. Courts in this Circuit routinely hold that monthslong delays undermine claims of urgency. *See also Brennan v. Bos. Beer Co.*, No. CV 24-10029-GAO, 2025 WL 50365, at *2 (D. Mass. Jan. 8, 2025) (three-month delay undercuts a finding of irreparable harm); *La Simple Co, Ltd. v. SLP Enters., LLC*, No. CV 21-10058-LTS, 2021 WL 1648762, at *8 (D. Mass. Apr. 27, 2021) (two-month delay detracts from an irreparable harm claim). Plaintiffs delayed three months in seeking emergency relief as to the Certification Requirement. They added that claim in November 2025 but never sought interim relief despite ongoing grant activity. Plaintiffs likewise delayed nearly a month after learning of the Unlawful Presence Requirement on January 26, 2026 before filing this motion on February 20. Such delay is incompatible with a claim that emergency relief is required. There is no reason why this case cannot be litigated on normal summary judgment schedule for a typical APA case.

If the Court were to grant Plaintiffs' requested relief, the government would be indefinitely restrained from implementing lawful policies governing the administration of grant funding. Such an injunction irreparably injures both the government and the public, whose interests "merge" where the government is a party. *Nken*, 556 U.S. at 435. Preventing the government from implementing grant conditions designed to ensure compliance with federal civil rights laws and to allocate limited federal resources to individuals lawfully present in the country would directly undermine the public interest in lawful and effective administration of federal programs.

"Under our Constitution, the 'executive power'—all of it—is vested in a President," who

must "take Care that the laws be faithfully executed." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). An injunction here would interfere with that core executive function because by preventing Defendants from enforcing civil rights laws and from exercising its discretion to manage limited grant funds for which there is significant demand, including by prioritizing services for individuals lawfully present in the United States.

By contrast, Plaintiffs' alleged harms are limited and largely speculative. With respect to the Certification Requirement, Plaintiffs' alleged harms are premised on a fundamental misreading of the requirement. As explained above, the requirement merely confirms that recipients of federal funds must comply with existing federal civil rights and nondiscrimination laws—obligations that apply regardless of any certification. Ensuring compliance with those laws is plainly in the public interest. And Plaintiffs have no cognizable interest in receiving federal funding while operating programs that violate federal antidiscrimination laws.

Plaintiffs' alleged harm relating to the Unlawful Presence Provision similarly depends on incorrect assumptions about how the provision operates. *See* Pls.' Br. at 30. The term does not mandate any specific verification procedure. Rather, federal regulations simply require grant recipients to "[e]stablish, document, and maintain effective internal control over the Federal award that provides reasonable assurance that the recipient or subrecipient is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award." 2 C.F.R. § 200.303(a). Moreover, the provision does not prevent a grantee from using other funding sources to serve a victim who is not a U.S. citizen or is not lawfully present in the country.

Plaintiffs' allegation that compliance with the Unlawful Presence Provision will impede

their ability to provide services is unfounded. As noted, requests for domestic violence housing and other services go unmet every day across the country, and there is more demand for those services than there is supply.[14] Providers routinely turn away victims because available housing and support services are limited.[15] Programs funded by the PAWS Act and related grants therefore already require difficult decisions about how to allocate scarce resources among individuals seeking assistance. Limiting the use of those funds to individuals lawfully present in the country does not prevent Plaintiffs from providing their core services; it simply governs how limited federal funds may be used.

Plaintiffs also cannot establish irreparable harm based on the possibility that they might forgo grant funding. The loss of grant funding, even if it occurs, constitutes a monetary injury that is not irreparable. And if Plaintiffs elect to discontinue programs that they could otherwise continue operating, "then any ensuing irreparable harm would be of their own making." *Dep't of Educ. v. California*, 604 U.S. 650, 652 (2025).

In any event, the grant statutes governing the programs at issue require that recipients maintain significant sources of funding independent of these grants. For example, programs funded by the Victims of Crime Fund, including the VOCA Victim Assistance Grants and the Services Program, require direct service providers to demonstrate both "a record of providing effective services to victims of crime and financial support from sources other than [Victims of Crime Fund grants]" and "substantial financial support from sources other than" those grants. 34 U.S.C. § 20103(b)(1)(B). In other words, service providers must demonstrate that their operations are not substantially dependent on funding from these federal grant programs. Thus, if Plaintiffs elect to

---

[14] NNEDV, *Domestic Violence Counts: 19th Annual Report* (May 2025), https://perma.cc/82FZ-39QB (full report: https://perma.cc/GU66-R3C5).

[15] *Id.*

forgo grant funding, any resulting monetary harm is limited.

The PAWS Program contains similar statutory limitations. PAWS funding must primarily be used to support housing for individuals with pets or to provide services for those pets. *See* 34 U.S.C. § 20127. Congress specified that only five percent of annual PAWS grant funding may be used for "evaluation, monitoring, salaries, and administrative expenses." *Id.* § 20127(8)(B).

Yet the only potential PAWS Program grant recipient identified by Plaintiffs—a single Pennsylvania coalition member—asserts that it would suffer irreparable harm because the grant funds the salaries of five staff members and that three employees could lose their positions without the grant. Higginbotham Decl., ¶ 28. If true, however, that assertion would appear inconsistent with the statute's limitation on using grant funds salary expenditures. *See* 34 U.S.C. § 20127(8)(B). According to Plaintiffs' declaration, the organization expects to receive $499,404 over a 36-month period under the PAWS program. Higginbotham Decl., ¶ 12. Because only five percent of those funds may be used for salaries and other administrative expenses, only a small fraction of the grant could be used for employee compensation. That is seemingly far less than would be required to fund multiple full-time staff positions. Thus, even on Plaintiffs' own account, the alleged risk to staffing is difficult to reconcile with the statutory limits governing PAWS funding. In any event, Plaintiffs have not established the type of the existential threat to their business that amounts to irreparable harm. *See Kenworth of Bos., Inc. v. Paccar Fin. Corp.*, 735 F.2d 622, 625 (1st Cir. 1984) ("business closure can constitute irreparable harm").

In short, Plaintiffs' claims of irreparable harm rest on speculation, misunderstandings of the challenged provisions, or limited monetary concerns. Those allegations are insufficient to justify the extraordinary remedy of a preliminary injunction.

## III.    PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD.

Even if the Court is inclined to grant Plaintiffs relief, it should reject the terms of Plaintiffs'

overbroad requested relief. Any relief under either the Administrative Procedure Act or traditional equitable principles must be narrowly tailored to address the specific injury shown by the parties before the Court.

A stay under 5 U.S.C. § 705 is subject to the same equitable limitations that govern preliminary injunctions. Section 705 authorizes a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings," but only "to the extent necessary to prevent irreparable injury." *See also R.I. Coal. Against Domestic Violence v. Kennedy*, --- F. Supp. 3d ---, 2025 WL 2988705, at \*15 (D.R.I. Oct. 23, 2025), *appeal filed by sub. nom. R.I. Coal. Against Domestic Violence v. U.S. Dep't of Hous. & Urb. Dev.*, No. 25-2229 (1st Cir. Dec. 23, 2025).

Section 705 was intended "to reflect existing law . . . and not to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). Consistent with that principle, the House Report that accompanied the APA explained that relief under Section 705 should "normally, if not always, be limited the parties' complainant." Administrative Procedure Act, S. Doc. No. 79-248, at 277 (1946). The Supreme Court recently instructed that "[w]hen interpreting a statute that authorizes federal courts to grant" preliminary relief, courts "do not lightly assume that Congress has intended to depart from established principles" of equity. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (citation omitted).

In limiting such relief "to the extent necessary to prevent irreparable injury," 5 U.S.C. § 705, the statue directs courts to apply traditional equitable principles, which include tailoring relief to be no more intrusive than necessary to prevent irreparable harm to the parties. Thus, Section 705's text, precedent, and the applicability of the injunction standard confirm that Section 705 is constrained by the same traditional equitable principles as the Judiciary Act of 1789. *See Trump v.*

*CASA, Inc.*, 606 U.S. 831, 844–47 (2025). And just as those principles foreclose universal preliminary injunctions, they also foreclose universal relief under Section 705. *See id.* at 851–53.

Section 705's text also demonstrates that it is not the appropriate vehicle for the relief Plaintiffs seek here. The statute authorizes courts to "postpone the effective date of an agency action" or "preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. But unlike the OVW NOFO terms that were subject to this Court's preliminary stay in August 2025, *see* Mem. & Order, ECF No. 34, the grant terms challenged here are already operative. With the exception of a single member of the Pennsylvania coalition, every Plaintiff coalition or member challenging these provisions has already accepted grant funding that incorporates the challenged terms into executed agreements. The "effective date" of the agency action has therefore already passed, and the relevant status quo is one in which those terms are currently operative. Relief under Section 705 that extends beyond the single Pennsylvania coalition member who has not yet accepted the challenged terms would therefore exceed the statute's limited function of postponing effective dates or preserving existing rights pending review.

Plaintiffs' alternative request for a preliminary injunction suffers from the same defect. A preliminary injunction ordinarily preserves the status quo; it should not be used to impose a mandatory injunction that alters the parties' existing contractual relationships. *See Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 40 (1st Cir. 2010). Because nearly all Plaintiffs have already accepted grant awards containing the challenged terms, an injunction prohibiting enforcement of those terms would change rather than preserve the status quo.

Any relief must also be limited to the specific parties who establish standing. Because "standing is not dispensed in gross," plaintiffs must establish standing "for each form of relief that they seek." *Murthy*, 603 U.S. at 61 (citation omitted). Even if the Court were to conclude that some

form of preliminary relief is warranted to particular Plaintiffs or their members, the relief could only extend to those parties, not to all grant recipients nationwide.

Plaintiffs' requested relief would sweep far beyond that limit. For example, staying the Certification Requirement would effectively invalidate the provision across all OJP and OVC grant programs, because the requirement appears in OJP's general terms and conditions governing federal awards generally. Yet Plaintiffs challenge the requirement only as applied to three specific grant programs. Pls.' Br. at 3–6. Similarly, Plaintiffs receive VOCA Victim Assistance funding through pass-through grants administered by state entities, not directly from the federal government. *Id.* at 3. Any injunction affecting those funds would therefore extend relief to states that are not parties to this case.

Finally, if the Court were to grant preliminary injunctive relief, it should require Plaintiffs to post security. Under Federal Rule of Civil Procedure 65(c), the Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." If the Court were to issue an injunction here, it should require Plaintiffs to post a bond for the value of the specific grants subject to the injunction.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motions.


Dated: March 13, 2026                    Respectfully submitted,
                                         BRETT A. SHUMATE
                                         Assistant Attorney General
                                         Civil Division

                                         ERIC J. HAMILTON
                                         Deputy Assistant Attorney General

                                         ANDREW WARDEN

Assistant Branch Director

*/s/ Kathryn Barragan*
KATHRYN BARRAGAN (BBO #714075)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 598-7696
Fax: (202) 616-8460
Email: kathryn.e.barragan@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2026, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

*/s/ Kathryn Barragan*