**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

RHODE ISLAND COALITION AGAINST
DOMESTIC VIOLENCE, *et al.*

        *Plaintiffs*,

    v.

PAMELA BONDI, in her official capacity as United
States Attorney General, *et al.*,

        *Defendants*.

Case No. 1:25-cv-00279-MRD-PAS

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY RELIEF
UNDER 5 U.S.C. § 705 AND FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.    Plaintiffs Are Likely To Succeed on the Merits ....................................................... 3

    A.  Plaintiffs have standing ..................................................................................... 3

    B.  The New Conditions must be set aside under the APA ...................................... 5

        1.    The New Conditions are reviewable final agency action ..................... 5

        2.    The New Conditions are not committed to Defendants' unreviewable discretion .................................................................................................. 6

        3.    Defendants lack statutory authority to impose the New Conditions ..................... 9

        4.    The New Conditions are arbitrary and capricious ............................... 12

        5.    The Immigrant Exclusion is contrary to law ........................................ 13

    C.  The New Conditions are Unconstitutional ....................................................... 15

        1.    The New Conditions are unconstitutionally vague ............................... 15

        2.    The OJP Anti-DEI Certification Requirement restricts speech outside the scope of the funded program in violation of the First Amendment .............. 17

II.   Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief ...................................... 18

III.  The Balance of the Equities and the Public Interest Favor Preliminary Relief ...................... 22

IV.  A Section 705 Stay and Preliminary Injunction Are Warranted ........................................ 23

V.   The Court Should Not Require Plaintiffs to Post a Bond .................................................... 27

CONCLUSION.................................................................................................................... 27

**TABLE OF AUTHORITIES**

**CASES**

*Am. Academy of Pediatrics v. Kennedy*,
   No. 25-11916-BEM, 2026 WL 733828 (D. Mass. Mar. 16, 2026) ................................... 24, 25

*Am. Fed'n of Gov't Emps. Local 2305 v. U.S. Dep't of Veterans Affairs*,
   No. 25-CV-583-MRD-PAS, 2026 WL 709856 (D.R.I. Mar. 13, 2026) ................................. 27

*Am. Fed'n of Teachers v. Dep't of Educ.*,
   796 F. Supp. 3d 66 (D. Md. 2025) ..................................................................................... 5

*Animal Legal Def. Fund, Inc. v. Glickman*,
   154 F.3d 426 (D.C. Cir. 1998) .......................................................................................... 4

*Assiniboine & Sioux Trib. of Fort Peck Indian Rsrv. v. Bd. of Oil & Gas Conservation
   of State of Mont.*,
   792 F.2d 782 (9th Cir. 1986) ............................................................................................ 7

*Bennett v. Spear*,
   520 U.S. 154 (1997) ...................................................................................................... 5, 6

*Bost v. Ill. State Bd. of Elections*,
   146 S. Ct. 513 (2026) ....................................................................................................... 4

*Braintree Labs, Inc. v. Citigroup Glob. Mkts. Inc.*,
   622 F.3d 36 (1st Cir. 2010) ............................................................................................. 26

*Cabrera v. U.S. Dep't of Lab.*,
   792 F. Supp. 3d 91 (D.D.C. 2025) ............................................................................... 24, 25

*Centro de Trabajadores Unidos v. Bessent*,
   167 F.4th 1218 (D.C. Cir. 2026) ...................................................................................... 6

*Chi. Women in Trades v. Trump*,
   778 F. Supp. 3d 959 (N.D. Ill. 2025) ............................................................................... 18

*City of Fresno v. Turner*,
   No. 25-cv-7070, 2025 WL 2721390 (N.D. Cal. 2025) ......................................................... 5

*Cmty. Econ. Dev. Ctr. of Se. Massachusetts v. Bessent*,
   No. 1:25-cv-12822, 2026 WL 309281 (D. Mass. Feb. 5, 2026) ........................................... 20

*Coalition for Humane Immigrant Rights v. Noem*,
   805 F. Supp. 3d 48 (D.D.C. 2025) ................................................................................... 25

*Const. Party of Pa. v. Aichele*,
757 F.3d 347 (3d Cir. 2014)................................................................................................ 3

*Dep't of Comm. v. New York*,
588 U.S. 752 (2019).......................................................................................................... 6, 9

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025).............................................................................................................. 4

*Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*,
412 F.2d 165 (D.C. Cir. 1969) ........................................................................................... 26

*Dubois v. U.S. Dep't of Agriculture*,
102 F.3d 1273 (1st Cir. 1996)............................................................................................. 4

*Furtado v. Oberg*,
949 F.3d 56 (1st Cir. 2020).............................................................................................. 14

*GoTo.com, Inc. v. Walt Disney Co.*,
202 F.3d 1199 (9th Cir. 2000) ......................................................................................... 26

*Indep. Equip. Dealers Ass'n v. EPA*,
372 F.3d 420 (D.C. Cir. 2004) .......................................................................................... 6

*Kingdom v. Trump*,
No. 25-cv-691, 2025 WL 1568238 (D.D.C. June 3, 2025)................................................. 25

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986).......................................................................................................... 10

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)................................................................................. 20, 21, 22

*Lincoln v. Vigil*,
508 U.S. 182 (1993).......................................................................................................... 9

*Make the Road N.Y. v. Noem,*
No. 25-5320, 2025 WL 3563313 (D.C. Cir.  2025)............................................................ 24

*Massachusetts v. Nat'l Insts. of Health*,
770 F. Supp. 3d 277, at 325 (D. Mass. 2025) .................................................................. 20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)............................................................................................................. 13

*Nat'l Ass'n of Diversity Officers in Higher Education (NADOHE) v. Trump,*
 167 F.4th 86 (4th Cir. 2026) ............................................................................ 16, 17

*Nat'l Endowment for the Arts v. Finley,*
 524 U.S. 569 (1998) ................................................................................................ 15

*New York v. U.S. DOJ,*
 804 F. Supp. 3d 294 (D.R.I. 2025) ........................................................................ 22

*North Carolina v. Covington,*
 581 U.S. 486 (2017) ................................................................................................ 25

*Orr v. Trump,*
 778 F. Supp. 3d 394 (D. Mass. 2025) ............................................................... 23, 24

*R.I. Coalition Against Domestic Violence (RICADV) v. Kennedy,*
 No. 25-cv-342, 2025 WL 2988705 (D.R.I. Oct. 23, 2025) ........... 5, 7, 8, 13, 17, 19, 20, 23, 24

*Shawnee Tribe v. Mnuchin,*
 984 F.3d 94 (D.C. Cir. 2021) .................................................................................. 9

*Simon v. E. Ky. Welfare Rights Org.,*
 426 U.S. 26 (1976) .................................................................................................. 3

*Tel. & Data Sys., Inc. v. FCC,*
 19 F.3d 42 (D.C. Cir. 1994) .................................................................................... 3

*Texas v. Biden,*
 646 F. Supp. 3d 753 (N.D. Tex. 2022) ................................................................. 25

*Trump v. CASA, Inc.,*
 606 U.S. 831 (2025) ........................................................................................... 24, 26

*United States v. Orleans,*
 425 U.S. 807 (1976) ................................................................................................ 10

*Universal Health Servs., Inc. v. United States ex rel. Escobar,*
 579 U.S. 176 (2016) ................................................................................................ 17

*W. Virginia v. EPA,*
 577 U.S. 1126 (2016) .............................................................................................. 25

*Wash. State Ass'n of Head Start and Early Childhood Assistance and Educ. Program*
 *v. Kennedy,*
 No. C25-781-RSM, 2026 WL 35858 (W.D. Wash. Jan. 6, 2026) ......................... 5

iv

*Webster v. Doe*,
    486 U.S. 592 (1988).................................................................................................. 7, 9

*Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*,
    256 F.2d 806 (7th Cir. 1958) ................................................................................... 26

*Wong v. Warden*,
    171 F.3d 148 (2d Cir. 1999)...................................................................................... 7

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
    778 F. Supp. 3d 440 (D.R.I. 2025), *appeal pending,* No. 25-1428.......................... 25

## FEDERAL STATUTES

5 U.S.C. § 701................................................................................................................ 6

5 U.S.C. § 705.............................................................................................................. 23

5 U.S.C. § 706.............................................................................................................. 24

8 U.S.C. § 1229a .......................................................................................................... 14

34 U.S.C. § 12291 ........................................................................................................ 14

34 U.S.C. § 20101......................................................................................................... 8

34 U.S.C. § 20103.................................................................................... 7, 8, 9, 10, 11

34 U.S.C. § 20127................................................................................. 8, 9, 10, 13, 21

## OTHER AUTHORITIES

OJP, *"General Conditions" for OJP Awards in FY 2025*, https://perma.cc/D3NX-
3W9R ................................................................................................ 11, 12, 18, 22

## INTRODUCTION

As a result of the Office of Justice Programs' (OJP's) ill-considered and ill-defined Immigrant Exclusion, Plaintiffs and their members face tremendous hurdles to effectively carrying out their programs and will be forced to turn away victims in need or else expose themselves to risk of potentially ruinous False Claims Act liability. And they face similar harms from OJP's anti-DEI certification requirement—a requirement identical to one this Court has already preliminarily enjoined. Preliminary relief is necessary to forestall further injury to Plaintiffs and the victims of domestic violence they serve, and Defendants offer no convincing basis to deny such relief.

The government's defense boils down to an argument that the need for victim services exceeds the resources available, so Defendants reasonably chose to limit services to victims who can prove their immigration status. That is deeply misguided. For one, Defendants utterly fail to explain how their Immigrant Exclusion would even work. Notably absent from Defendants' opposition is any explanation of how service providers could assess whether a person is a "removable alien" or "unlawfully present," given the complexities of immigration law, the unlawfulness of seeking verification from any third-party sources, and the basic fact that victims of domestic violence often do not have needed documents because their abusers destroy or withhold them as a way to exert control. Rather, Defendants specifically argue that they provide no such guidance or required methods of compliance.

Nor do Defendants acknowledge that, given these difficulties, the exclusion will, in practice, also deny needed help to victims who are lawfully present or even citizens. And they fail to consider that even just inquiring about immigration status will undermine providers' standing in their communities and the trust they have built—and will chill victims from seeking

1

help at all. Defendants seem to suggest that none of this is a problem because, given the need, turning away some victims just means that other victims have a chance to get help instead. But that has little grounding in reality. While need for services exceeds supply overall, individual programs often have capacity—so turning a victim away means that a bed or other service goes unused.

At bottom, Defendants did not consider or explain many important aspects of the Immigrant Exclusion—classic arbitrary and capricious decision-making. The Immigrant Exclusion also exceeds Defendants' statutory authority, conflicts with various statutes, and is unconstitutionally vague to boot.

OJP's Anti-DEI Certification Requirement also flunks APA review and is unconstitutional for reasons this Court previously held in granting preliminary relief against an identical condition. While Defendants claim that the certification merely requires compliance with existing laws, that claim cannot be squared with the overwhelming evidence that Defendants have imposed the certification to deter federal funding recipients from engaging in *any* diversity, equity, and inclusion activities—even lawful ones—for fear of facing ruinous False Claims Act litigation and liability.

Plaintiffs and their members serve critical roles in helping victims of domestic violence and sexual assault escape dangerous situations, recover from trauma, and rebuild their lives. The Immigrant Exclusion and Anti-DEI Certification Requirement jeopardize their ability to effectively fulfill that mission. The Court should grant preliminary relief blocking those unlawful grant conditions.

## ARGUMENT

### I.     Plaintiffs Are Likely To Succeed on the Merits

#### A.  Plaintiffs have standing

Plaintiffs have standing to pursue the claims on which they seek preliminary relief. Indeed, Defendants do not dispute that all Plaintiffs have standing to challenge the Immigrant Exclusion or that the Plaintiffs that received direct OJP grants have standing to challenge the OJP Anti-DEI Certification Requirement. The only dispute is over the standing of the two Plaintiffs that received OJP grants as subrecipients—*i.e.*, where OJP made direct grants to states, which then sub-awarded funds to the two Plaintiffs. According to Defendants (at 17-18), the subrecipient Plaintiffs "cannot establish traceability or redressability" because the direct recipients have made "independent decisions" to impose the certification on subrecipients, and Defendants "cannot dictate" what terms its direct recipients impose. This argument—that the agency cannot stop federal grantees from imposing unlawful conditions when they sub-award federal funds—is as mistaken as it sounds.

The subrecipient Plaintiffs' injury—being subject to an anti-DEI certification that exposes them to False Claims Act risk—is traceable to Defendants' unlawful imposition of the OJP Anti-DEI Certification Requirement: OJP has imposed that certification requirement on direct recipients and has also permitted those direct recipients to pass down OJP's requirement by imposing it on their subrecipients. And it "is clear" that a third party's "conduct is fairly traceable to the [government] action contested in the suit if that action authorized the conduct." *Tel. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 47 (D.C. Cir. 1994) (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45 n.25 (1976)); *accord, e.g.*, *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 366 (3d Cir. 2014). Here, as Defendants concede, they have authorized direct recipients to impose the Anti-DEI Certification Requirement on their subrecipients, including Plaintiffs. *See*

Defs.' Opp. to Pls.' Mot. for Preliminary Injunction and for Leave to File Second Am. Compl. (Opp'n) at 17-18 (Dkt. No. 58) (explaining that "the government lets recipients determine" what "requirements to include in its federal subawards").

For the same reason, a favorable decision would redress the subrecipient Plaintiffs' injury. *See Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025) (noting that "causation and redressability[] are usually flip sides of the same coin" (cleaned up)). A favorable decision would bar Defendants from continuing to permit direct recipients to impose that unlawful condition on subrecipients.[1] In such circumstances—where "the relief sought … would make the injurious conduct of third parties" (here, the direct recipients' imposition of the anti-DEI certification on subrecipients) "illegal"—the redressability requirement for standing is satisfied. *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 441 (D.C. Cir. 1998) (cleaned up).

In any event, the Court need not even address the standing of the two subrecipient Plaintiffs because it is well established that "only one plaintiff needs standing for a suit to proceed." *Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 519 n.3 (2026). Defendants do not dispute that at least some plaintiffs have standing to challenge the OJP Anti-DEI Certification Requirement, so the Court can consider the challenges to that requirement without considering the standing of the two Plaintiffs that Defendants single out. *See Dubois v. U.S. Dep't of Agriculture*, 102 F.3d 1273, 1282 (1st Cir. 1996) ("[T]he court need not determine the standing of all plaintiffs if at least one plaintiff has standing to maintain each claim.").

---

[1] A favorable decision would also bar Defendants from enforcing the certification or treating any already-agreed-to certification as valid. These actions are fully within Defendants' control, so Defendants could not credibly claim that this relief depends on "how third parties will" act. *See* Opp'n at 18.

4

**B.  The New Conditions must be set aside under the APA**

Plaintiffs are likely to succeed on their APA claims. Contrary to Defendants' contentions (at 18-22), the New Conditions are reviewable because they constitute final agency action and are not committed to agency discretion by law. And they must be set aside under the APA because they exceed Defendants' statutory authority and are arbitrary and capricious, and because the Immigrant Exclusion is contrary to law.

**1.   *The New Conditions are reviewable final agency action***

As this Court (and others) correctly held before, imposing new conditions on grants constitutes final agency action. *See* Order at 13-15 (Dkt. No. 34); *see also, e.g.*, *R.I. Coalition Against Domestic Violence (RICADV) v. Kennedy*, No. 25-cv-342, 2025 WL 2988705, at *5-6 (D.R.I. Oct. 23, 2025), *appeal dismissed*, No. 25-2229 (concluding in another case that "imposition of the Challenged Conditions" on grants was final agency action); *Am. Fed'n of Teachers v. Dep't of Educ.*, 796 F. Supp. 3d 66, 102 (D. Md. 2025), *appeal dismissed*, No. 25-2228; *Wash. State Ass'n of Head Start and Early Childhood Assistance and Educ. Program v. Kennedy*, No. C25-781-RSM, 2026 WL 35858, at *8 (W.D. Wash. Jan. 6, 2026); *City of Fresno v. Turner*, No. 25-cv-7070, 2025 WL 2721390, at *1, *7 (N.D. Cal. 2025), *appeal pending*, No. 25-7378. Defendants offer no persuasive reason to revisit that conclusion.

The only new argument that Defendants offer is that the OJP Anti-DEI Certification Requirement cannot be final agency action because it "merely expresses [the agency's] view of what the law requires." Opp'n at 18-19. But the Certification Requirement does more than that: It requires grantees to make a certification, both that they will not engage in diversity, equity, and inclusion activities that violate anti-discrimination laws and that compliance with those laws is material for False Claims Act purposes. This requirement to certify is final agency action because it both determines "rights or obligations" and produces "legal consequences." *Bennett v.*

*Spear*, 520 U.S. 154, 178 (1997) (cleaned up) (providing that agency action is final in either of those circumstances). The requirement to make the certification affects grantees' rights and obligations, as they cannot obtain grant funds without making the certification. The certification also produces legal consequences because it requires Plaintiffs to concede materiality upfront. As the Court held previously, requiring Plaintiffs "to subject themselves to potential criminal and civil liability under the False Claims Act" produces "legal consequences" that renders the conditions final agency action. Order at 14-15 (Dkt. No. 34).

The OJP Anti-DEI Certification thus is nothing like the actions that were deemed non-final in the cases Defendants cite (at 18-19) because they "merely express[ed the agency's] view of what the law requires." The agencies in those cases did not require private entities to make any certification or to take any action at all. Rather, those cases involved an agency's memorandum of understanding with another agency that "merely clarifi[ed]" the agency's "existing duties under a statute," *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1236 (D.C. Cir. 2026) (cleaned up), or a "purely informational" letter that restated a "longstanding interpretation" of agency regulations and "imposed no obligations" on anyone, *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004). Those cases provide no basis for the Court to break from its earlier conclusion that a certification requirement like this constitutes final agency action.

### 2. The New Conditions are not committed to Defendants' unreviewable discretion

Defendants also err in contending that the Funding Conditions are "committed to agency discretion by law" and thus unreviewable under 5 U.S.C. § 701(a)(2). The Supreme Court has emphasized that this exception to the strong "presumption of judicial review" under the APA is "quite narrow[]." *Dep't of Comm. v. New York*, 588 U.S. 752, 771-772 (2019) (cleaned up). An agency action "is committed to agency discretion by law" only "where a statute is drawn in such

6

broad terms that … the court would have no meaningful standard against which to judge the agency's exercise of discretion." *Webster v. Doe*, 486 U.S. 592, 599-600 (1988) (cleaned up). Only in those "rare instances" in which there is "no law to apply" is it appropriate to deem an action "committed to agency discretion" and therefore unreviewable. *Id.* at 599. In general, those "rare instances" have involved only a few types of decisions, like a "decision related to the allocation of funds from a lump-sum appropriation," a "decision not to initiate an enforcement action," or a decision by the CIA "to terminate a federal employee in the interest of national security." *RICADV v. Kennedy*, 2025 WL 2988705, at *6. As this Court previously held, "the determination of grant terms and conditions is not a category of decision traditionally committed to exclusive agency discretion." Order at 16 (Dkt. No. 34). Indeed, Defendants cite no case holding that the imposition of funding conditions is committed to agency discretion by law.

OJP's grant programs are no different.[2] Statutes govern each of the grant programs under which Plaintiffs have received awards and provide "meaningful standards to judge the agency's decisions." *RICADV v. Kennedy*, 2025 WL 2988705, at *6.

Start with the grant programs under the Victims of Crime Act (VOCA). The statute directs OVC to make annual VOCA Victim Assistance grants to each state in specified amounts and requires the state recipients to make statutorily specified certifications and to use the funds to support victim assistance programs that meet statutorily specified eligibility criteria. 34 U.S.C.

---

[2] Regardless, even if the "committed to agency discretion" exception to judicial review applied here—and it does not—that exception categorically could not preclude review of Plaintiffs' statutory authority, contrary to law, and constitutional claims. *See Assiniboine & Sioux Trib. of Fort Peck Indian Rsrv. v. Bd. of Oil & Gas Conservation of State of Mont.*, 792 F.2d 782, 791-92 (9th Cir. 1986) (noting that courts have "widely held" that courts can review "claims that an agency has acted outside its statutory authority"); *Wong v. Warden*, 171 F.3d 148, 149 (2d Cir. 1999) ("It is well-established that judicial review exists over allegations of constitutional violations even when the agency decisions underlying the allegations are discretionary.").

§ 20103(a)-(b). The statute also directs OVC to use a specified percentage of available funds to make awards for statutorily identified activities (such as victim services), subject to statutory limits on how much funding can go to each category of activity. 34 U.S.C. §§ 20101(d)(4)(C), 20103(c). Those provisions provide "meaningful internal standards by which to judge" the agency's actions. Order at 16 (Dkt. No. 34).

Defendants point out (at 20-21) that Congress gave OVC authority to require assurances or impose other terms and conditions—but far from committing those matters to OVC's unreviewable discretion, those provisions supply meaningful standards cabining OVC's authority. The statute authorizes OVC to direct state recipients of VOCA Victim Assistance grants to provide "assurances *related to the purposes of [34 U.S.C. § 20103]*," the section providing for grants to assist victims. 34 U.S.C. § 20103(a)(2)(D) (emphasis added). And it authorizes OVC to impose on VOCA grants under § 20103(c) such "terms and conditions determined by the Director *to be consistent with that subsection*." 34 U.S.C. § 20111(c)(3) (emphasis added). The requirement that the terms be "consistent with" the statute or "related to" the statute's purposes supplies judicially manageable standards.

The PAWS Act also supplies meaningful standards for courts to apply. That statute directs the agency to award grants to entities that meet statutory eligibility criteria to provide statutorily identified types of assistance to statutorily identified categories of victims, requires applicants to make certain assurances and agree to certain conditions, and bars grantees from engaging in certain activities. 34 U.S.C. § 20127(1)-(5), (9). This, too, provides "meaningful standards" for judicial review. *RICADV v. Kennedy*, 2025 WL 2988705, at *6.

Defendants point out (at 21) that this statute authorizes the agency to require applicants to make assurances that the agency "determines to be necessary to ensure compliance by the entity

8

with the requirements of this section," 34 U.S.C. § 20127(2)(A)(ii)—but, again, this hardly leaves the Court with "no law to apply." *See Webster*, 486 U.S. at 599. A court can readily assess whether any assurance could reasonably be considered necessary to "ensure compliance" with the statute's requirements. And if Defendants mean to suggest (at 21) that the statute commits matters to their unreviewable discretion by referring to assurances that the agency "determines" to be necessary, they are mistaken. The Supreme Court has held that courts could review agency action taken pursuant to a statute that similarly refers to what the agency "determine[s]." *See Dep't of Comm.*, 588 U.S. at 771-73 (holding that Court could review agency action taken pursuant to statutory provision authorizing agency to take census "'in such form and content as [the Secretary] may determine'").

Finally, Defendants miss the mark in attempting to liken this case to *Lincoln v. Vigil*, 508 U.S. 182 (1993). In *Lincoln*, the Court held that an agency had unreviewable discretion to decide how to allocate funds from a "lump-sum appropriation" where the statute did not "restrict[] what can be done with those funds." *Id.* at 192. Here, the relevant statutes do restrict what can be done with the funds, including by requiring the agency to make grants to support certain types of activities. 34 U.S.C. §§ 20103(a)(1), (b)(1), (c)(1), 20127(3). That makes Defendants' actions reviewable. *Cf. Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 100 (D.C. Cir. 2021) (holding that agency funding decisions were reviewable where Congress "circumscribed agency discretion to allocate resources by putting restrictions in the operative statute" (cleaned up)).

### 3. *Defendants lack statutory authority to impose the New Conditions*

Defendants lack statutory authority to impose the Immigrant Exclusion and the OJP Anti-DEI Certification Requirement.[3]

---

[3] At the outset, Defendants misleadingly suggest (at 22) that Supreme Court precedent holds that the government may impose conditions by contract "to implement federal objectives." The case

9

***Immigrant Exclusion.*** Even though an agency "literally has no power to act . . . unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), Defendants fail to identify any statutory provision conferring power on them to impose the Immigrant Exclusion. The only provision Defendants even point to (at 22) is 34 U.S.C. § 20111(c)(3), but that provision does not supply the authority they need. That provision authorizes OVC to "[e]stablish[] programs in accordance with section 20103(c) of this title"— *i.e.*, programs under VOCA for victim services and other specified projects—"on terms and conditions determined by the Director to be consistent with that subsection." 34 U.S.C. § 20111(c)(3). This provision does not authorize the Immigrant Exclusion for either grant program at issue here.

First, the provision does not apply at all to the Pet Shelter grants. The Pet Shelter grant program is not a program under VOCA § 20103(c), but rather is a program created by a separate statute, the PAWS Act, 34 U.S.C. § 20127. The authority to establish terms and conditions for "programs in accordance with section 20103(c)" therefore cannot authorize terms and conditions for Pet Shelter grants.[4]

---

they cite in no way suggests that federal agencies can impose conditions on grants absent relevant statutory authority, and instead addresses whether certain federal funding recipients qualify as federal agencies for purposes of Federal Tort Claims Act liability. *United States v. Orleans*, 425 U.S. 807, 809, 816 (1976).

[4] Defendants elsewhere point to a provision of the PAWS Act authorizing the agency to require applicants to make "such assurances as the [agency] determines to be necessary to ensure compliance by the entity with the requirements of" the PAWS Act, 34 U.S.C. § 20127(2)(A)(ii). Opp'n at 21 (arguing that terms for Pet Shelter grants are committed to OVC's unreviewable discretion). That provision does not authorize the Immigrant Exclusion either. Refusing services to certain noncitizens is in no way "necessary to ensure compliance" with the PAWS Act— which says nothing about noncitizens' eligibility for support—and Defendants do not contend otherwise.

10

Second, the provision does not authorize the Immigrant Exclusion for VOCA grants under § 20103(c) either. It is not "consistent with" § 20103(c) to forbid grantees from providing services to any victim who cannot establish that they are not a "removable alien" or otherwise "unlawfully present." The purpose of § 20103(c) is to provide support for victims of crime, and, as Plaintiffs' opening brief explains (at 20-23), the Immigrant Exclusion seriously undermines that goal—by forcing providers to demand documentation that victims fleeing dangerous situations often will not have (and losing essential trust in the process), by denying help to victims who cannot prove their status, and by chilling noncitizen and citizen victims alike from seeking help at all. Defendants offer no response to these points. Instead, Defendants claim (at 22-23) that, because resources are limited, they can pick and choose which victims can receive help. But the statute does not authorize them to disqualify certain categories of victims from eligibility for services when that would undermine the very purposes of the grant program—and thus be *in*consistent with the statute.

***OJP Anti-DEI Certification Requirement.*** Defendants also fail to point to any statute granting them authority to impose the OJP Anti-DEI Certification Requirement. As Plaintiffs' opening brief explains (at 17-18), while Defendants have authority to require grantees to certify compliance with nondiscrimination laws, they do not have authority (1) to require grantees to concede FCA materiality or (2) to single out diversity, equity, and inclusion activities for disfavor.

On the materiality point, Defendants' principal response (at 24-25) is that the requirement "simply announces, and requires the funding recipient to acknowledge, that the government considers compliance to be a material condition on payment." But the certification in fact requires grantees to "agree[] that [their] compliance … is material" for FCA purposes—not just

11

acknowledge that the government thinks it is. OJP, *"General Conditions" for OJP Awards in FY 2025*, https://perma.cc/D3NX-3W9R. This is a transparent attempt to force grantees to concede this critical element of FCA liability upfront—and Defendants do not have authority to do that. Defendants cannot defend the certification by claiming it does not mean what it says.

Defendants fare no better in attempting to defend the certification's singling out of diversity, equity, and inclusion. Defendants emphasize (at 25-26) that the certification prohibits only unlawful DEI-related practices and does not bar Plaintiffs from "advocat[ing] for" DEI, but this misses the point. The certification singles out a particular category of activity that violates nondiscrimination laws—activities with components relating to diversity, equity, and inclusion. And, at the same time, Defendants make clear both that they have a new and radical view of what DEI activities violate those laws and that they plan to use the FCA as a weapon to punish those activities. *See* Mem. i.s.o. Pls.' Mot. for Preliminary Relief (Pls.' Mem.) at 8-12 (Dkt. No. 53-1). Defendants offer no response to those points.

### 4. The New Conditions are arbitrary and capricious

The Immigrant Exclusion and OJP Anti-DEI Certification Requirement are also arbitrary and capricious for the myriad reasons Plaintiffs' opening brief explains. Pls.' Mem. at 19-24. Defendants all but completely ignore Plaintiffs' arguments on this claim.

On the Immigrant Exclusion, Defendants' sole defense is that it was reasonable for the agency to allocate limited resources to those who are lawfully present. Opp'n at 28. This bare assertion does not pass muster. On top of offering no contemporaneous explanation, Defendants also failed to consider multiple important aspects of the problem—including that it would be difficult or impossible for grantees to determine victims' eligibility, that victims will not reliably have documentation to prove anything about their status given that abusers often withhold documents as a form of control, that even asking about status will undermine trust needed to

12

serve victims effectively, or that providers would struggle to comply with the Immigrant Exclusion while also complying with regulations under other funding streams that require grantees to provide services regardless of immigration status. *See* Pls.' Mem. at 20-23.

The OJP Anti-DEI Certification Requirement suffers from similar problems. Defendants claim (at 27) that they did not need to provide an explanation because "the rationale for the condition is self-evident on its face"—to prevent violations of anti-discrimination law. But this Court rejected precisely that argument in another case because "the agency must actually provide some sort of explanation," and in that case, as here, "Defendants have failed to achieve even this basic requirement." *RICADV v. Kennedy*, 2025 WL 2988705, at *7. In addition, as Plaintiffs' opening brief explains (at 20), Defendants also failed to consider how the certification would chill grantees from engaging in lawful activity or how it would result in fewer and less effective services to already-underserved populations. Defendants offer no response to this point.

Defendants' failure to offer any "explanation for [their] action" and their failure to consider multiple "important aspect[s] of the problem" are classic arbitrary and capricious decision-making. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### 5. *The Immigrant Exclusion is contrary to law*

Defendants also offer no persuasive response to Plaintiffs' contentions that the Immigrant Exclusion is contrary to law in two separate ways.

First, as Plaintiffs explained (at 25), imposing the Immigrant Exclusion on Pet Shelter grants is contrary to law because the PAWS Act bars "activities that may compromise the safety of a domestic violence victim, including … background checks of domestic violence victims." 34 U.S.C. § 20127(2)(B)(i). Checking on the citizenship or immigration status of a victim seeking services—as the Immigrant Exclusion would compel grantees to do—would

13

compromise victims' safety. Pls.' Mem. at 25. Defendants do not respond at all to this point so have effectively conceded it. *See Furtado v. Oberg*, 949 F.3d 56, 59 (1st Cir. 2020) (holding that courts may treat a party's failure "to respond to a properly raised argument" as a "waiver").

Second, the Immigrant Exclusion conflicts with 34 U.S.C. § 12291(b)(2)'s prohibition on grantees disclosing individual client information because, to comply, grantees would in at least some instances need to share information with third parties to attempt to assess victims' status. Pls.' Mem. at 24. In response Defendants offer a series of non sequiturs. Defendants contend (at 23) that providers already "conduct basic intake procedures" so determining a victim's immigration status should not "impose a significant additional burden." But the burden that verifying status imposes has no bearing on whether grantees would violate the statutory confidentiality requirements by disclosing information to verify a victim's status. Next, Defendants contend (at 23) that a different requirement—a regulatory requirement that grantees "maintain effective internal control" to ensure "compliance with … the terms and conditions of the Federal award"—"does not conflict with" the statutory prohibition on disclosing client information. That, of course, says nothing about whether *the Immigrant Exclusion* conflicts with the statutory prohibition. Defendants also point out (at 23) that the Immigrant Exclusion contains a "savings clause" providing "that it does not apply where doing so would conflict with governing law." But the Exclusion in fact states—in decidedly vague terms—that the prohibition on serving certain noncitizens does not apply "where the prohibition would contravene any express requirement of any law."[5] And Defendants notably do not actually say that this savings

---

[5] The Immigrant Exclusion states, in full:

> The recipient shall ensure that no funds provided under this award (or any subaward, at any tier) will be used to provide benefits or services to any removable alien (see 8 U.S.C. § 1229a(e)(2)) or any alien otherwise unlawfully present in the United States, but this prohibition shall not apply where such use is expressly authorized by law (or otherwise

14

clause would permit grantees to serve a victim whose status is unverified where verification would require sharing information with third parties. Finally, Defendants suggest (at 23) that grantees could just use other funds to help any victim whose status the grantee cannot verify without disclosing client information to a third party. That suggestion blinks reality. Grantees obtain these grants to fund unmet needs—and generally will not have excess money available to support victims whose status they cannot confirm. *See, e.g.*, Declaration of Jennifer Hill (Hill Decl.) ¶ 18 (Dkt. No. 53-5); Declaration of Susan Higginbotham (Higginbotham Decl.) ¶ 15 (Dkt. No. 53- 4); Declaration of Krista Colón (Colón Decl.) ¶ 19 (Dkt. No. 53-2).

### C. The New Conditions are Unconstitutional

Plaintiffs are also likely to prevail in showing that the New Conditions are unconstitutional under the Fifth and First Amendments, should the Court reach those claims.

#### 1. *The New Conditions are unconstitutionally vague*

Both the Immigrant Exclusion and the OJP Anti-DEI Certification Requirement are unconstitutionally vague in violation of the Fifth Amendment. Defendants miss the mark in claiming (at 30) that the conditions cannot be vague because "there is no constitutional guarantee of clarity in grant … criteria." The case that Defendants cite (at 30) holds only that the "decisionmaking criteria" for how to award funding need not be as clear as terms in a "regulatory scheme." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 572, 588-89 (1998) (considering provision requiring agency to judge grant applications according to "artistic excellence and artistic merit"). That is because "the consequences of imprecision are not constitutionally severe"—such criteria just affect who receives "selective subsidies." *Id.* at 589. The Immigrant

expressly allowable under the terms of this award) or where the prohibition would contravene any express requirement of any law, or of any judicial ruling, governing or applicable to the award.

15

Exclusion and OJP Anti-DEI Certification, however, are not "decisionmaking criteria." They are conditions that organizations that have received awards must adhere to—under penalty of FCA liability if they do not comply. This goes beyond affecting whether an entity receives funding and imposes more "severe" consequences that trigger vagueness concerns.

Defendants claim (at 30-31) that another court held otherwise in *Nat'l Ass'n of Diversity Officers in Higher Education (NADOHE) v. Trump*, 167 F.4th 86 (4th Cir. 2026), but that is mistaken. In *NADOHE*, the Court rejected a vagueness challenge to a directive requiring agencies to "terminate … 'equity-related' grants"—not a challenge to a related anti-DEI certification requirement, or to any other condition restricting what grantees can do. *Id.* at 100-02 (cleaned up). That directive did not "ask anything of" grantees, but rather directed agencies on "how they should allocate federal funding." *Id.* at 101-02. Here, by contrast, the New Conditions do "ask [some]thing of" grantees by requiring them to deny services to certain noncitizen victims and to make a certification that exposes them to risk if they engage in diversity, equity, and inclusion activities.

Defendants also err in claiming (at 31) that the New Conditions are not vague because they "incorporate[] established federal law." Plaintiffs' opening brief explains (at 26-27) why the references to existing law are inadequate and why, for example, grantees cannot reasonably determine whether a victim fits the definition of a "removable alien" or "unlawfully present" or whether any of the Exclusion's carveouts applies. Defendants do not respond to those points.

Finally, Defendants also miss the mark in contending (at 31) that Plaintiffs cannot assert a facial challenge but should instead raise "concerns about how to verify individuals' immigration status" via "case-by-case, fact-specific adjudication." It is unclear how that would even be workable—because, of course, when a victim comes in seeking help, there is no time to

16

seek a "case-by-case" adjudication. And Defendants do not explain why grantees should have to take the risk of providing services to a victim of uncertain status, in the hope of obtaining a favorable "case-by-case" determination later on.

### 2. *The OJP Anti-DEI Certification Requirement restricts speech outside the scope of the funded program in violation of the First Amendment*

The OJP Anti-DEI Certification Requirement also violates the First Amendment because it restricts speech outside the scope of the federally funded program. Pls.' Mem. at 27-29. This Court has already held that a materially identical anti-DEI certification violates the First Amendment, and Defendants have offered no persuasive reason why a different conclusion would be warranted here. *See RICADV v. Kennedy*, 2025 WL 2988705, at *7-8, *12.

Contrary to Defendants' insistence (at 33) that the certification "simply requires grant recipients to certify compliance with existing legal obligations," the OJP Anti-DEI Certification Requirement is transparently designed to chill grantees from engaging in *any* diversity, equity, and inclusion activities, even lawful ones. The certification singles out diversity, equity, and inclusion for explicit mention—while the Administration simultaneously makes clear that it will now seek to punish DEI activities that have long been considered lawful. *See* Pls.' Mem. at 8-12. And it dramatically increases the risks of engaging in lawful DEI initiatives by requiring grantees to concede FCA materiality—an otherwise "demanding" element of any future FCA claim against them. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016).[6]

---

[6] Defendants point out (at 33) that another court rejected a First Amendment challenge to a similar anti-DEI certification provision because it required only that grantees "certify compliance with federal antidiscrimination laws." *NADOHE*, 167 F.4th at 103. That case, however, did not consider the impact of the required concession of materiality.

Defendants respond (at 33) that Plaintiffs would not face FCA liability "based on good faith misunderstandings" of what nondiscrimination laws require, but that is cold comfort. Merely facing an FCA lawsuit would be devastating for nonprofits that do not have the resources to mount a legal defense. Even having to respond to litigation—by the government or by qui tam relators that the government has encouraged—could be ruinous. And although Plaintiffs believe in good faith that their diversity, equity, and inclusion activities are lawful, Defendants have telegraphed that they have a very different view. *See* Pls.' Mem. at 9, 11-12. Particularly given the severe penalties the FCA imposes and Defendants' stated plans to aggressively use the FCA to combat DEI, *see* Pls.' Mem. at 10-11, grantees cannot take the gamble that their good-faith beliefs will insulate them from liability.

Finally, Defendants contend (at 34) that the Anti-DEI Certification is constitutional because it does not "restrict recipients' activities outside the scope of federally funded programs," but that cannot be reconciled with the actual language of the certification. OJP requires grantees to certify that they "do[] not operate *any* programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable federal civil rights or nondiscrimination laws." OJP, *"General Conditions" for OJP Awards in FY 2025*, https://perma.cc/D3NX-3W9R (emphasis added). Defendants do not, and could not, explain how this prohibition on operating "any" programs could be read as limited to federally funded programs. *See Chi. Women in Trades v. Trump*, 778 F. Supp. 3d 959, 984 (N.D. Ill. 2025) (holding that identical requirement "on its face makes clear" that it applies to "any program …, irrespective of whether the program is federally funded").

## II.    Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief

Defendants fail to rebut Plaintiffs' showing of imminent, irreparable injury from the New Conditions. *See* Pls.' Mem. at 29-32. *First*, Defendants failed to engage with Plaintiffs' argument

that the "New Conditions [] put Plaintiffs and their members 'between a rock and a hard place.'" Pls.' Mem. at 29 (quoting *RICADV*, 2025 WL 2988705, at *11). As this Court has held before, "surely such a high stakes dilemma constitutes irreparable harm." *RICADV*, 2025 WL 2988705, at *11.

*Second*, Defendants argue (at 36) that Plaintiffs are not harmed by the Immigrant Exclusion because it "does not mandate any specific verification procedure." Defendants misunderstand the problem they have created. The harm is not that Defendants have prescribed one specific screening mechanism; the harm is that they have required grantees to make complex immigration-status determinations at all—a requirement that is impossible to reliably meet for a host of reasons, that will drain scarce resources and staff time away from providing services, and that will harm Plaintiffs' standing in and trust within their communities. *See* Pls.' Mem. at 13, 30.

*Third*, Defendants miss the mark in insisting (at 37) that, because the demand for services exceeds the supply, Plaintiffs will always be able to provide their "core services" and therefore suffer no harm. Turning away victims in need harms Plaintiffs' missions, full stop—particularly where, for example, they must further traumatize or endanger the victim by turning the victim away because they cannot produce documents that their abuser may be withholding. Plus, if Plaintiffs ask survivors about their immigration status, Plaintiffs' communities will fear that Plaintiffs and their members are now acting as immigration screeners rather than trusted service providers. That would destroy hard-won trust, reduce referrals, and deter survivors from seeking help in the first place. Pls.' Mem. at 13, 30; Higginbotham Decl. ¶ 23; Hill Decl. ¶ 16; *see also* Colón Decl. ¶ 15. Regardless of whether Plaintiffs have other victims to serve, the loss of trust, referrals, and accessibility by vulnerable victims in certain communities are paradigmatic

19

irreparable injuries because they cannot be repaired after the fact with money damages. *Cmty. Econ. Dev. Ctr. of Se. Massachusetts v. Bessent*, No. 1:25-cv-12822, 2026 WL 309281, at *17 (D. Mass. Feb. 5, 2026).

Nor does it make a difference that providers must sometimes make difficult allocation decisions in light of scarce resources anyway. *Contra* Opp'n at 37. The fact that domestic-violence providers already operate under severe scarcity magnifies the harm from the Immigrant Exclusion. When resources are already stretched thin, forcing providers to restructure intake, segregate funds, and absorb administrative burdens strains Plaintiffs' resources and harms their ability to fulfill their missions. Pls.' Mem. at 13. And, costs aside, just forcing Plaintiffs to inquire about immigration status is "contrary to Plaintiffs' … mission[s]." *Id.* at 30. That is irreparable harm. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016).

*Fourth*, Defendants miss the mark in suggesting (at 36) that Plaintiffs could avoid harm by just using unspecified other funding to serve victims whose status cannot be verified. Plaintiffs' declarations establish that they do not have substitute pots of money waiting to cover these services. *See* Hill Decl. ¶ 18; Higginbotham Decl. ¶ 15; Colón Decl. ¶ 19.

*Fifth*, Defendants err in asserting (at 37) that "the possibility that [Plaintiffs] might forgo grant funding" cannot establish irreparable harm. This Court has already held that having to choose between accepting unlawful conditions and forgoing grants causes harm. Order at 24 (Dkt. No. 34); *see also RICADV v. Kennedy*, 2025 WL 2988705, at *11. Indeed, it would be "impossible to accurately measure or compensate" for the losses in lifesaving services and the inability for Plaintiffs to carry out their missions if they are forced to give up federal funding. *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 325 (D. Mass. 2025).

Defendants are also mistaken to the extent they suggest (at 37-38) that forgoing the particular grants here would not be harmful because it would not result in an "existential threat" to Plaintiffs' organizations. Losing this funding would harm their ability to provide core services and their missions, and that is irreparable harm regardless of whether the organizations would be entirely forced out of business. *See League of Women Voters*, 838 F.3d at 8-9. Defendants are also mistaken in disputing (at 38) that the Pennsylvania coalition's member would have to cut three staff members if it lost the Pet Shelter grant. Defendants claim that, under 34 U.S.C. § 20127(8)(B), grantees cannot meaningfully use Pet Shelter grants to fund staff positions, but that fundamentally misunderstands the provision. That provision authorizes appropriations for the program and provides that, "[o]f the amount made available under [that authorization] …, not more than 5 percent may be used for evaluation, monitoring, salaries, and administrative expenses." 34 U.S.C. § 20127(8)(B). This limits the amount of appropriated funds the *government* can use for salaries and administrative expenses, not the amount that grantees can use on salaries for staff that directly carry out the funded programs. *Compare* 34 U.S.C. § 20127(8) (governing funds appropriated to run the program), *with* 34 U.S.C. § 20127(2)-(6) (governing grantee requirements). Indeed, OVC approved a budget for the Pennsylvania coalition's member's grant that includes a total of nearly $260,000 in personnel expenses over three years—well over 5 percent of their total grant amount. Supp. Decl. of Susan Higginbotham (Supp. Higginbotham Decl.) ¶ 3.

*Sixth*, Defendants' view (at 36) that the anti-DEI Certification "merely confirms that recipients of federal funds must comply with existing federal civil rights and nondiscrimination laws" is wrong for the reasons explained above. *See supra* Sections I.B.3, I.C.2. Critically, Plaintiffs are faced with a new certification requirement that expressly singles out programs with

"components relating to diversity, equity, and inclusion" and requires certification to materiality under the False Claims Act. OJP, *"General Conditions" for OJP Awards in FY 2025*, https://perma.cc/D3NX-3W9R. Those provisions are new, not mere restatements of existing law. Nor should the Court ignore that Defendants newly require these certifications at a time when DOJ is increasing enforcement under the False Claims Act. Pls.' Mem. at 11. Plaintiffs are thus left in a position where they need to presently self-censor and change conduct today to avoid future liability. *Id.* at 14, 31.

*Finally*, Plaintiffs did not delay bringing this motion. *Contra* Opp'n at 35. Plaintiffs took only 3.5 weeks to evaluate the scope and impact of the Immigrant Exclusion and bring the pending motion. That timing does not match the months-long delay in Defendants' cited cases. *Id*. at 35. As to the anti-DEI Certification, though Plaintiffs were aware in the Fall that DOJ would impose the condition on future grants, some Plaintiffs only received awards subject to the condition in late January. *See* Colón Decl. ¶ 9; Higginbotham Decl. ¶ 13; Hill Decl. ¶ 9. Besides, any "delay" posed no prejudice to Defendants, as they have had a full chance to respond to Plaintiffs' motion for preliminary relief.

## III.  The Balance of the Equities and the Public Interest Favor Preliminary Relief

The balance of equities and public interest favor preliminary relief. Defendants cannot overcome the basic point that, "[i]n life-or-death scenarios—times of crisis, when someone faces domestic violence, homelessness or a mental health crisis—it practically goes without saying that 'there can be no do over and no redress' if services are unlawfully denied and someone suffers for it." *New York v. U.S. DOJ*, 804 F. Supp. 3d 294, 330 (D.R.I. 2025) (quoting *League of Women Voters*, 838 F.3d at 9). Defendants appear to argue that it poses no harm at all to prevent Plaintiffs' members from  providing safe housing to individuals who, when fleeing domestic violence, did not bring sufficient documentation of their immigration status, because someone

22

else can take their spot. *See* Opp'n at 17 (noting that Plaintiffs will continue to be able to serve survivors because demand for services exceeds supply). But that is not how it works in the real world. Although overall need exceeds the services available, that does not mean that providers are always turning someone away, or that there will be another victim waiting to take the place of a victim who is turned away. Supp. Higginbotham Decl. ¶ 4. In addition, if survivors preparing to flee emergency situations have to take the time to prepare to establish their immigration status so they can get help, that harm will befall people who are unlawfully and lawfully present alike, particularly because abusers often control victims' legal documents as part of their abuse. *See* Hill Decl. ¶ 16; Higginbotham Decl. ¶¶ 23–24; Colón Decl. ¶ 15.

Moreover, Defendants' concern (at 35-36) that an injunction would "interfere with [the] core executive function" to "take care that the laws be faithfully executed" as well as the public interest in the "lawful and effective administration of federal programs" rings hollow where, as here, it is the government itself attaching unlawful conditions to the administration of those very programs. Rather, as this Court previously held,

"the public has an interest in the Executive respecting the Legislature's spending decisions." Order at 26 (Dkt. No. 34); *accord RICADV v. Kennedy*, 2025 WL 2988705, at *12.

As such, the balance of equities and public interest weigh in Plaintiffs' favor.

## IV.  A Section 705 Stay and Preliminary Injunction Are Warranted

This Court should stay the New Conditions under 5 U.S.C. § 705 and enter a preliminary injunction barring Defendants from implementing or enforcing them in any way, including by permitting recipients to impose them on subrecipients, during the pendency of this action. That is the appropriate relief to protect Plaintiffs from irreparable harm.

Section 705 "operates upon the [agency action] itself by halting or postponing some portion of [it], or by temporarily divesting a rule or policy of enforceability." *Orr v. Trump*, 778

23

F. Supp. 3d 394, 430 (D. Mass. 2025) (cleaned up). Accordingly, "just as vacatur under § 706 is not a party-specific remedy, neither is a stay under § 705." *Cabrera v. U.S. Dep't of Lab.*, 792 F. Supp. 3d 91, 106 (D.D.C. 2025) (cleaned up). Courts thus routinely grant stays of unlawful agency action under § 705. *See, e.g.,* Order at 26-27 (Dkt. No. 34); *Am. Academy of Pediatrics v. Kennedy*, No. 25-11916-BEM, 2026 WL 733828, at *21 (D. Mass. Mar. 16, 2026); *RICADV v. Kennedy*, 2025 WL 2988705, at *15. The same relief is appropriate here.

Contrary to Defendants' contention (at 39), a stay under § 705 need not be limited to the parties before the Court, and the Supreme Court's decision in *Trump v. CASA* does not suggest that limitation applies. *See, e.g.*, *Make the Road N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313 (D.C. Cir. 2025) (Millett, J. and Childs, J.) (concluding that the government was "unlikely to succeed in its argument that Section 705 stays must be confined to the plaintiffs"). The *CASA* Court expressly declined to address the scope of APA relief, noting that "[n]othing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Trump v. CASA, Inc.,* 606 U.S. 831, 847 n.10 (2025). Justice Kavanaugh's *CASA* concurrence likewise made clear that APA relief was still available: "[I]n cases under the [APA], plaintiffs may ask a court to preliminarily 'set aside' a new agency rule." *CASA*, 606 U.S. at 869 (Kavanaugh, J., concurring); *accord e.g.*, *Cabrera v. Dep't of Lab.*, 792 F. Supp. 3d at 106. That distinction follows from the APA's statutory authorization of vacatur. Unlike universal injunctions, which the Court held in *CASA* have no basis in the jurisdictional authority Congress gave to federal courts under the Judiciary Act of 1789, Congress did provide courts in the APA the broad authority to "hold unlawful and set aside agency action" that violates the APA's standards. 5 U.S.C. § 706(2)(A).

24

Defendants are also incorrect in arguing (at 40) that § 705 relief is precluded because the challenged conditions "are already operative" given that many grantees have already accepted their awards. It is irrelevant whether a challenged agency action is already operative. "Courts—including the Supreme Court—routinely stay already-effective agency action." *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D. Tex. 2022) (citing, *e.g.*, *W. Virginia v. EPA*, 577 U.S. 1126 (2016)); *see also Kingdom v. Trump*, No. 25-cv-691, 2025 WL 1568238, at *5 (D.D.C. June 3, 2025) (observing that "various courts have interpreted § 705 to permit a 'stay'—which may be more aptly described as a temporary rollback—even of already-consummated agency action"). Courts in this district have recently applied this principle to stay already-effective agency action. *See Am. Academy of Pediatrics*, 2026 WL 733828 at *21 (granting § 705 stay of January 2026 CDC revision of childhood immunization schedules). Accordingly, the fact that for some members, the accepted grant conditions are "already in effect does not bar this Court from staying them—and returning things to the status quo ante while this case proceeds—under section 705." *Coalition for Humane Immigrant Rights v. Noem*, 805 F. Supp. 3d 48, 74 (D.D.C. 2025), *appeal pending*, No. 25-5289; *see also Cabrera*, 792 F. Supp. 3d at 106.

In addition to a stay under § 705, a preliminary injunction is warranted to guard against irreparable harm. In crafting "equitable relief, courts must consider 'what is necessary, what is fair, and what is workable.'" *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 478 (D.R.I. 2025), *appeal pending,* No. 25-1428 (quoting *North Carolina v. Covington*, 581 U.S. 486, 488 (2017)). Here, it is necessary, fair, and workable for the Court to enjoin Defendants from imposing or enforcing the New Conditions, including by enjoining Defendants from permitting direct recipients from imposing the conditions on subrecipients, and from treating any certification that any grantee has already made as valid and enforceable.

25

Defendants' objections to this relief fall flat. *See* Opp'n at 40-41. They object (at 40) that this injunction would "impose a mandatory injunction" that alters "the status quo," but that is incorrect. The requested injunction is prohibitory, not mandatory: It would bar Defendants from taking action—enforcing or imposing the conditions or treating certifications as valid—rather than requiring Defendants to take "affirmative action." *See Braintree Labs, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 40-41 (1st Cir. 2010). The requested injunction also would not alter the status quo. The relevant status quo for the purposes of a preliminary injunction is "the last uncontested status which preceded the pending controversy." *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969) (quoting *Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*, 256 F.2d 806, 808 (7th Cir. 1958)); *see also GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000). Here, the last uncontested status was when Defendants did not impose the challenged conditions. In any event, "a mandatory preliminary injunction [that] alters rather than preserves the status quo" is entirely permissible and may be granted "when the exigencies of the situation demand such relief." *Braintree Labs*, 622 F.3d at 41 (cleaned up). Even if the preliminary injunction that Plaintiffs seek were properly considered mandatory or status quo-altering, the exigencies would support entering it.

Defendants also err in contending (at 40-41) that the preliminary injunction must be limited to the parties in the case. The Supreme Court acknowledged in *CASA* that universal injunctions are appropriate where necessary to "award[] complete relief" to a plaintiff. 606 U.S. at 850-51. Here, barring Defendants from imposing or enforcing the Immigrant Exclusion against anyone is necessary to grant Plaintiffs complete relief because victim service providers do not operate in silos. If organizations serving victims of domestic violence start asking victims

26

to prove their immigration status, that deters victims from seeking help anywhere, not just from that particular organization. Supp. Higginbotham Decl. ¶ 5. And that in turn jeopardizes all service providers' ability to fulfill their missions.

Finally, Defendants miss the mark in claiming (at 41) that a preliminary injunction could not reach grants that non-party direct recipients then subaward. The requested injunction would not bind those non-parties, but rather would bar *Defendants* from permitting the direct recipients to impose the conditions on subawardees and would bar *Defendants* from treating already-signed certifications as valid and enforceable.

## V.    The Court Should Not Require Plaintiffs to Post a Bond

The Court should reject Defendants' request for a bond. As this Court recently recognized, "[i]n the face of litigation challenging the current presidential administration's policies and implementation thereof, the district courts in this Circuit have either required a nominal bond or waived bond in its entirety." *Am. Fed'n of Gov't Emps. Local 2305 v. U.S. Dep't of Veterans Affairs,* No. 25-CV-583-MRD-PAS, 2026 WL 709856, at *11 (D.R.I. Mar. 13, 2026). The Court should follow that practice here. The bond Defendants request—for the full value of the grants at issue—would undercut the nonprofit Plaintiffs' access to judicial review because they do not have the resources to post such a significant bond and even a modest bond would require Plaintiffs to divert resources from their critical programs.

## CONCLUSION

The Court should grant Plaintiffs' motion for preliminary relief.

March 20, 2026

Respectfully submitted,

*/s/ Kristin Bateman*
Kristin Bateman (D.C. Bar No. 90037068)[+]
Robin F. Thurston (D.C. Bar No. 1531399)[+]
Skye L. Perryman (D.C. Bar No. 984573)[+]
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kbateman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

Daniel F. Jacobson (D.C. Bar No. 1016621)[+]
Lynn D. Eisenberg (D.C. Bar No. 1017511)[+]
Brian C. Rosen-Shaud (D.C. Bar No. 90042065)[+]
Nina C. Cahill (D.C. Bar No. 1735989)[+]
Kyla M. Snow (D.C. Bar No. 90036400)[+]
Jacobson Lawyers Group PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(301) 823-1148
dan@jacobsonlawyersgroup.com
lynn@jacobsonlawyersgroup.com
brian@jacobsonlawyersgroup.com
nina@jacobsonlawyersgroup.com
kyla@jacobsonlawyersgroup.com

Amy R. Romero (RI Bar # 8262)
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
Amy@dwbrlaw.com
Cooperating counsel, Lawyers' Committee for RI

Lynette Labinger (RI Bar # 1645)
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation of RI

28

Lauren A. Khouri (D.C. Bar No. 10282288)[+]
Elizabeth E. Theran (D.C. Bar No. 90030162)[+]
National Women's Law Center
1350 I Street NW, Suite 700
Washington, DC 20005
Telephone: (202) 588-5180
Fax: (202) 588-5185
lkhouri@nwlc.org
etheran@nwlc.org

[+] Admitted *pro hac vice*

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2026, I electronically filed the within memorandum and it is available for viewing and downloading from the Court's CM/ECF System, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

*/s/ Kristin Bateman*
Kristin Bateman