**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.*

*Plaintiffs*,

v.

TODD BLANCHE, in his official capacity as Acting Attorney General, *et al.*,

*Defendants*.

Case No. 1:25-cv-00279-MRD-PAS

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

FACTUAL AND LEGAL BACKGROUND ..... 2

A. Congress tasked DOJ with administering many different grant programs ..... 2

1. Office on Violence Against Women Grant Programs ..... 3

2. Office of Justice Programs Grant Programs ..... 7

a. VOCA Victim Assistance Grants ..... 7

b. Other VOCA Grants ..... 8

c. Pet Shelter Grants ..... 9

B. The Administration leverages federal grant funding to advance the President's ideological vision and expose grantees to massive liability ..... 10

1. Diversity, equity, and inclusion ..... 10

2. "Gender ideology" ..... 15

3. Immigration ..... 16

C. DOJ imposes new conditions on grants ..... 17

1. OJP and OVW Anti-DEI Certifications ..... 17

2. OVW "Out-of-Scope" Conditions ..... 18

3. OJP Immigration Condition ..... 22

D. The New Conditions harm Plaintiffs and their members ..... 24

E. Procedural History ..... 29

LEGAL STANDARD ..... 30

ARGUMENT ..... 31

I. Plaintiffs Are Entitled to Summary Judgment ..... 31

A. The New Conditions must be set aside under the APA ..... 31

1. The New Conditions Are Arbitrary and Capricious ..... 31

a. The OVW "Out-of-Scope" Conditions are arbitrary and capricious ..... 32

b. The OVW and OJP Anti-DEI Certifications are arbitrary and capricious ..... 36

c. The OJP Immigration Condition is arbitrary and capricious ..... 37

2. The New Conditions exceed Defendants' statutory authority ..... 41

a. Defendants lack authority to impose the OVW "Out-of-Scope" Conditions ..... 42

b. Defendants lack authority to impose the OJP Immigration Condition ..... 45

c. Defendants lack authority to impose the OVW and OJP Anti-DEI Certifications ..... 46

3. Many of the New Conditions are contrary to law ..... 48

a. All of OVW's New Conditions conflict with the provisions governing coalition grants ..... 48

b. The OVW "Gender Ideology" Condition conflicts with VAWA's non-discrimination provision ..... 49

c. The OVW Anti-DEI Condition conflicts with VAWA provisions promoting DEI activities ..... 50

d. OVW's immigration-related conditions conflict with provisions expressly authorizing services for immigrants ..... 51

e. The OJP Immigration Condition conflicts with VAWA confidentiality requirements ..... 52

f. The OJP Immigration Condition conflicts with the PAWS Act's prohibition on background checks of victims ..... 53

4. The New Conditions must be set aside under the APA because they violate the Constitution ..... 53

B. The New Conditions are unconstitutional ..... 54

1. The New Conditions violate the Spending Clause and other constitutional provisions safeguarding the separation of powers ..... 54

2. The OVW "Gender Ideology" Condition violates the First Amendment ..... 56

3. The OVW and OJP Anti-DEI Certifications violate the First Amendment ..... 58

4. The New Conditions are unconstitutionally vague ..... 61

C. The New Conditions are ultra vires ..... 67

II. The Court Should Vacate the New Conditions and Permanently Enjoin Defendants from Enforcing Them or Imposing Them Anew ..... 67

A. The Court should set aside the New Conditions under the APA ..... 67

B. The Court should enjoin Defendants from enforcing the New Conditions or imposing the same or substantially similar conditions in the future ..... 68

1. Injunctive relief is warranted ..... 69

2. To afford Plaintiffs complete relief, the injunction should bar Defendants from imposing the Conditions on any OVW and OJP grantees ..... 72

CONCLUSION ..... 74

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*,
75 F.4th 760 (7th Cir. 2023) ........ 49

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ........ 56, 58

*Arizona v. United States*,
567 U.S. 387 (2012) ........ 38

*BMW of N. Am., Inc. v. Gore*,
517 U.S. 559 (1996) ........ 61

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
838 F.3d 42 (1st Cir. 2016) ........ 31

*California v. Trump*,
805 F. Supp. 3d 387 (D. Mass. 2025) ........ 67

*California v. U.S. Dep't of Transp.*,
788 F. Supp. 3d 316 (D.R.I. 2025) ........ 41

*Cent. Maine Power Co. v. Maine Comm'n on Governmental Ethics & Election Pracs.*,
144 F.4th 9 (1st Cir. 2025) ........ 62

*Chamber of Com. of U.S. v. CFPB,*
691 F. Supp. 3d 730 (E.D. Tex. 2023) ........ 69

*Chi. Women in Trades v. Trump*,
778 F. Supp. 3d 959 (N.D. Ill. 2025) ........ 47, 59

*City & Cnty. of S.F. v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ........ 43, 54, 55, 56

*City of Arlington, Tex. v. FCC*,
569 U.S. 290 (2013) ........ 41

*City of Chi. v. Barr*,
961 F.3d 882 (7th Cir. 2020) ........ 54, 56

*City of Chi. v. Sessions*,
264 F. Supp. 3d 933 (N.D. Ill. 2017) ........ 70

*City of Fresno v. Turner*,
No. 25-cv-7070, 2025 WL 2721390 (N.D. Cal. Sept. 23, 2025)........ 43, 46, 47, 50, 62, 63

*City of Los Angeles v. Sessions,*
No. 18-cv-7347, 2019 WL 1957966 (C.D. Cal. Feb. 15, 2019) ..................................... 73

*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020)........................................................................ 41, 48, 49

*Clinton v. City of N.Y.*,
524 U.S. 417 (1998)....................................................................................... 55

*Colorado v. U.S. Dep't of Health & Human Servs.*,
788 F. Supp. 3d 277 (D.R.I. 2025)................................................................ 54

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024)....................................................................................... 68

*DHS v. Regents of the Univ. of California*,
591 U.S. 1 (2020)................................................................................... 35, 37

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)........................................................................... 32, 36, 37

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)....................................................................................... 61

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)....................................................................................... 31

*Freedom Network USA v. Trump,*
No. 25-cv-12419, 2026 WL 800392 (N.D. Ill. Mar. 23, 2026) ....................................... 73

*Frese v. Formella*,
53 F.4th 1 (1st Cir. 2022)..................................................................... 61, 62

*Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*,
987 F.3d 158 (D.C. Cir. 2021)..................................................................... 67

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)..................................................................... 61, 62, 66, 67

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ........................................................................ 49

*Illinois v. FEMA*,
No. 25-cv-206, 2025 WL 2908807 (D.R.I. Oct. 14, 2025) .... 69

*Illinois v. FEMA*,
801 F. Supp. 3d 75 (D.R.I. 2025) .... 68

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) .... 41

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .... 71, 72

*Louisiana v. Biden*,
622 F. Supp. 3d 267 (W.D. La. 2022) .... 33

*Martin Luther King, Jr. Cnty. v. Turner*,
785 F. Supp. 3d 863 (W.D. Wash. 2025) .... 32, 33, 36, 54, 72

*Massachusetts v. Nat'l Insts. of Health*,
770 F. Supp. 3d 277 (D. Mass. 2025) .... 72

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) .... 69

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .... 70

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Aut. Ins. Co.*,
463 U.S. 29 (1983) .... 31, 32, 33, 36, 37, 39

*Nat'l Council of Nonprofits v. OMB*,
763 F. Supp. 3d 36 (D.D.C. 2025) .... 33

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*,
779 F. Supp. 3d 149 (D.N.H. 2025) .... 72

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) .... 60

*NEA v. Finley*,
524 U.S. 569 (1998) .... 56, 58

*O'Connell v. Shalala*,
79 F.3d 170 (1st Cir. 1996) .... 55

*Ohio v. EPA*,
603 U.S. 279 (2024) .......... 31

*Ortiz-Bonilla v. Federacion de Ajedrez de Puerto Rico, Inc.*,
734 F.3d 28 (1st Cir. 2013) .......... 70

*PFLAG, Inc. v. Trump*,
769 F. Supp. 3d 405 (D. Md. 2025) .......... 50, 54, 55

*Prescott v. Rady Children's Hosp.-San Diego*,
265 F. Supp. 3d 1090 (S.D. Cal. 2017) .......... 49

*R.I. Dep't of Env't Mgmt. v. United States*,
304 F.3d 31 (1st Cir. 2002) .......... 67

*R.I. Latino Arts v. NEA*,
777 F. Supp. 3d 87 (D.R.I. 2025) .......... 57

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015) .......... 60, 61

*Reno v. ACLU*,
521 U.S. 844 (1997) .......... 61, 62

*RICADV v. Kennedy*,
812 F. Supp. 3d 180 (D.R.I. 2025) .......... 63

*Rust v. Sullivan*,
500 U.S. 173 (1991) .......... 56, 58

*S.F. AIDS Found. v. Trump*,
786 F. Supp. 3d 1184 (N.D. Cal. 2025) .......... 49, 57, 58

*Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*,
977 F.3d 69 (1st Cir. 2020) .......... 31

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
699 F.3d 1 (1st Cir. 2012) .......... 71

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .......... 60

*South Dakota v. Dole*,
483 U.S. 203 (1987) .......... 55

*Texans for Free Enter. v. Texas Ethics Comm'n*,
732 F.3d 535 (5th Cir. 2013) .......... 72

*Texas v. Cardona*,
743 F. Supp. 3d 824 (N.D. Tex. 2024) .......... 69

*United States v. Facteau*,
89 F.4th 1 (1st Cir. 2023) .......... 61

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016) .......... 12, 47, 48

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) .......... 61

*Villas at Parkside Partners v. City of Farmers Branch, Tex.*,
726 F.3d 524 (5th Cir. 2013) .......... 38

*Viscito v. Nat'l Plan. Corp.*,
34 F.4th 78 (1st Cir. 2022) .......... 30

*Washington v. Trump*,
768 F. Supp. 3d 1239 (W.D. Wash. 2025) .......... 54

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
778 F. Supp. 3d 440 (D.R.I. 2025) .......... 33

**US CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. I .......... 56

U.S. Const. amend. V .......... 61

U.S. Const. art. I § 1 .......... 55

U.S. Const. art. I § 7 .......... 55

U.S. Const. art. I § 8 .......... 55

U.S. Const. art. II § 3 .......... 56

**STATUTES**

5 U.S.C. § 705 .......... 29, 30

5 U.S.C. § 706 .......... 53, 67, 68

8 U.S.C. § 1229a .......... 23, 38, 66

18 U.S.C. § 287 .......... 12

18 U.S.C. § 1001 .......... 12

31 U.S.C. § 3729 .......... 11, 12, 28

31 U.S.C. § 3730 .......... 12

34 U.S.C. § 10441 .......... 3, 4, 5, 48

34 U.S.C. § 10442 .......... 6

34 U.S.C. § 10444 .......... 7

34 U.S.C. § 10446 .......... 4, 6, 48

34 U.S.C. § 12291 .......... 3, 5, 6, 9, 10, 42, 44, 49, 50, 51, 52

34 U.S.C. § 12341 .......... 4, 5, 50, 52

34 U.S.C. § 12351 .......... 4, 5, 50

34 U.S.C. § 12421 .......... 5, 50, 51

34 U.S.C. § 12451 .......... 3, 5, 50

34 U.S.C. § 12463 .......... 5, 50

34 U.S.C. § 12464 .......... 4, 5, 6, 50

34 U.S.C. § 12475 .......... 5, 50

34 U.S.C. § 12501 .......... 5, 50

34 U.S.C. § 12511 .......... 4, 48

34 U.S.C. § 12514 .......... 3, 5, 50

34 U.S.C. § 20101 .......... 7, 8

34 U.S.C. § 20102 .......... 7

34 U.S.C. § 20103 ........ 7, 8, 45

34 U.S.C. § 20110 ........ 39

34 U.S.C. § 20111 ........ 8, 45

34 U.S.C. § 20121 ........ 4, 6

34 U.S.C. § 20124 ........ 5, 6

34 U.S.C. § 40723 ........ 4

34 U.S.C. § 20123 ........ 5, 51

34 U.S.C. § 20127 ........ 9, 10, 52, 53

42 U.S.C. § 2000d ........ 39

Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490 (2018) ........ 9

Consolidated Appropriations Act, Pub. L. No. 118-42, 138 Stat. 25 (2024) ........ 3

Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, Pub. L. No. 119-74, 140 Stat. 5 (2026) ........ 4

Full-Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, 139 Stat. 9 (2025) ........ 3

Violence Against Women Act, Pub. L. No. 103-322, 108 Stat. 1796 (1994) ........ 3

**REGULATIONS**

28 C.F.R. § 85.5 ........ 12, 28

28 C.F.R. § 94.103 ........ 8, 40

28 C.F.R. § 94.116 ........ 8, 40

28 C.F.R. § 94.119 ........ 8

Interim Guidance on Verficiation of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344 (1997) ........ 39

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 115-1072 (2018)........................................................................ 9

S. Rep. No. 103-138 (1993)........................................................................ 3, 44

**OTHER AUTHORITIES**

*Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025)........................................................................ 15

*Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025)........................................ 11

*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025)........................ 11, 12, 13, 14, 17

*Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025)........................................................................ 16

*Protecting the American People from Invasion*, Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 29, 2025)........................................................................ 16

Ken Dilanian, (@KDilanianMSNOW), X (Aug. 15, 2025, 12:34 PM), https://perma.cc/2K33-JPK9........................................................................ 16

Letter from Todd Blanche, Deputy Att'y Gen., to DOJ Offices, Divisions, and U.S. Attorneys (May 19, 2025) https://perma.cc/3W6K-FGHA........................................ 13

Mem. From Ass't Att'y Gen., Brett A. Shumate, to Civil Division Employees, *Civil Division Enforcement Priorities* (June 11, 2025), https://perma.cc/SV3A-NE9F........................................................................ 13

Mem. from Att'y Gen. Pam Bondi, *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025), https://perma.cc/KH9Y-A2VQ........................................ 14

Mem. from Att'y Gen. Pam Bondi, *Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination* (July 29, 2025), https://perma.cc/T4B4-QTYH........................................................................ 14, 15

Memorandum from Joye E. Frost, Acting Director, U.S. DOJ, OJP, OVC to Cassie T. Jones, Alabama Crime Victim's Compensation Commission (July 2, 2010), https://perma.cc/SYE7-S2WJ........................................................................ 41

Office of Personal Management, *Initial Guidance Regarding President Trump's Executive Order Defending Women* (Jan. 29, 2025), https://perma.cc/9YUS-MZKV ........................................................................................................ 16

Office of Public Affairs, *Justice Department Establishes Civil Rights Fraud Initiative*, DOJ (May 19, 2025), https://perma.cc/ZS6R-B8E9 ........................................................ 13

Office of Violence Against Women, *FY 2025 General Terms and Conditions*, DOJ (updated Sept. 26, 2025), https://perma.cc/P5ZH-TLTL .................................................. 30

Office of Violence Against Women, *Open Notices of Funding Opportunity*, DOJ (updated June 12, 2025), https://perma.cc/XR9P-GA49 .................................................. 20

Office of Violence Against Women, *State and Territory Coalitions: FY 2025 Domestic Violence and Sexual Assault Coalition Designations,* DOJ (updated May 13, 2025), https://perma.cc/8LNV-FGLY. ................................................................. 4

The White House, *Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI* (Jan. 22, 2025), https://perma.cc/G8JU-QQ44 ............................................................................................ 59

U.S. Citizen and Immigration Services, *Register an Agency for SAVE* (Oct. 6, 2025) https://perma.cc/DPH5-6P7J.............................................................................................. 38

## INTRODUCTION[1]

Plaintiffs are 25 non-profit organizations that are the federally recognized domestic violence and sexual assault coalitions for their respective states. They and their members are dedicated to supporting survivors of domestic violence and sexual assault and to preventing further harm, both through training and technical assistance and through directly assisting victims with legal advocacy, crisis intervention, safety planning, and more. Congress has created a host of grant programs to support these programs' lifesaving work, and it directed the Department of Justice to administer those programs consistent with their authorizing statutes.

But DOJ has disregarded Congress's direction. Rather than faithfully carry out the programs Congress created, DOJ's Office on Violence Against Women (OVW) and Office of Justice Programs (OJP) have attempted to leverage this critical grant funding to serve the Administration's own ideological goals. They have imposed new grant conditions that, among other things, seek to eradicate "diversity, equity, and inclusion" initiatives and values; to force grantees to disregard survivors' and others' gender identities; to withhold help from victims who cannot prove their citizenship or immigration status; and to stop grantees from recognizing domestic and sexual violence as the systemic problems that Congress deemed them to be. These new conditions have no grounding in the statutes Congress enacted and some outright conflict with Congress's mandates.

In many instances, DOJ has further required organizations to certify both their compliance with the new conditions and their agreement that their compliance is material for False Claims Act (FCA) purposes—all part of DOJ's expressly stated plan to use the FCA as a

[1] Plaintiffs previously filed a motion for partial summary judgment that addressed only certain claims in the case. Dkt. No. 45. This memorandum amends and supersedes the previously filed memorandum (Dkt. No. 45-1).

"weapon" to target work the Administration does not like. These certifications put Plaintiffs and their members to an impossible choice: they must either give up this federal funding that is critical to their ability to carry out their core missions, or they must open themselves to possible criminal investigation and the risk of ruinous litigation and civil liability under the FCA. Faced with this untenable choice, Plaintiffs seek summary judgment, vacatur of these new conditions, and a permanent injunction prohibiting Defendants from imposing or enforcing them.

There is no genuine dispute as to any material fact and Plaintiffs are entitled to judgment as a matter of law on each of their claims. The new funding conditions exceed the defendants' statutory authority, in some instances outright conflict with multiple provisions of the governing statutes, and each are arbitrary and capricious agency action that does not reflect reasoned decisionmaking. They are also unconstitutional in several respects. They violate the Spending Clause and the separation of powers by intruding on Congress's exclusive power over federal funding. The requirements violate the Due Process Clause in their extreme vagueness, leaving grantees guessing at how to comply. And multiple requirements violate the First Amendment by seeking to silence disfavored speech.

DOJ's new conditions threaten devastating harm to Plaintiffs and their member organizations—and, worse, to the survivors Congress sought to protect. The Court should grant summary judgment, vacate the challenged conditions, and permanently enjoin Defendants from imposing or enforcing them, allowing Plaintiffs to continue their critical work in accordance with Congress's directives.

## FACTUAL AND LEGAL BACKGROUND

### A. Congress tasked DOJ with administering many different grant programs

The Department of Justice administers many different grant programs, including through its Office on Violence Against Women (OVW) and its Office of Justice Programs (OJP).

***1. Office on Violence Against Women Grant Programs***

Congress enacted the Violence Against Women Act (VAWA) in 1994 to address "the escalating problem of violence against women." S. Rep. No. 103-138, at 37 (1993); Pub. L. No. 103-322, tit. IV, §§ 40001–40703, 108 Stat. 1796 (1994). Recognizing that crimes like "rape and family violence[] disproportionately burden[ed] women," S. Rep. No. 103-138, at 37, Congress determined that violence against women was not just a criminal issue, but a social-justice issue stemming from an "underlying attitude that [domestic and sexual] violence is somehow less serious than other crime." *Id.* at 38. Congress therefore sought to comprehensively address "not only the violent effects of the problem," but the causes behind it, like "blam[ing] women for the beatings and the rapes they suffer." *Id.* at 38, 42. The Act addresses these problems by providing new legal protections, creating education and prevention programs, increasing enforcement and victims' access to legal assistance, and expanding services that help survivors recover. *See generally* Pub. L. No. 103-322, tit. IV.

Following multiple amendments and reauthorizations, VAWA addresses not only domestic violence and sexual assault, but also stalking, dating violence, and sex trafficking (collectively, "VAWA crimes"). *See* 34 U.S.C. §§ 10441(b), (d), 12451(a). The Act is not limited to addressing violence against women, but applies broadly—no matter the victim's gender identity. *See, e.g.*, *id.* §§ 10441(b)(19), 12291(b)(8).

VAWA is implemented through a host of grant programs that fund a broad range of activities, from strengthening effective law enforcement, to preventing domestic violence and sexual assault, to providing survivors with legal assistance, emergency shelter, counseling, and other support. *See, e.g.*, *id.* §§ 10441–10455, 12291–12514. Congress has regularly appropriated funds to serve those statutory purposes. *See, e.g.*, *id.* §§ 10441–10455, 12291–12514; Pub. L. No. 118-42, div. C, tit. II, 138 Stat. 25, 141–144 (2024) (2024 Appropriations Act); Pub. L. No.

119-4, § 1101(a)(2), 139 Stat. 9, 10–11 (2025) (extending the FY24 appropriations in the same amounts through FY25); Pub. L. No. 119-74, div. A, tit. II, 140 Stat. 5, 25 (2026) (2026 Appropriations Act).

VAWA grant programs include formula and competitive grants. With formula grants, any applicant that meets specified statutory requirements receives an award in an amount determined by a statutory formula. *See, e.g.*, 34 U.S.C. §§ 10446(b)(2), (3); 12511(d)(3). VAWA's formula grants include grants to state domestic violence and sexual assault coalitions designated by the Department of Health and Human Services and Centers for Disease Control and Prevention, respectively, to coordinate victim services and support providers in their state (Coalition Grants). *See id.* § 10441(c).[2] For FY2025, appropriation levels and the statutory formulas meant that each domestic violence coalition received $113,574, each sexual assault coalition received $243,213, and each dual coalition received $356,787 in Coalition Grants. Declaration of Kirsten Faisal (Faisal Decl.) Ex. A.

For competitive grants, the Office on Violence Against Women (OVW) solicits applications through a notice of funding opportunity (NOFO) and then selects which applicants will receive awards and in what amounts. Many of these competitive grant programs are prescribed by statute. *See, e.g.*, 34 U.S.C. §§ 12341, 12351, 20121. These programs cover a range of activities—including helping victims with legal assistance or transitional housing, expanding access to sexual assault forensic exams, and improving the legal system's response to families with a history of VAWA crimes. *Id.* §§ 20121, 12351, 40723, 12464. State domestic

[2] States generally have one domestic violence and one sexual assault coalition, although in some states a single organization serves as a "dual" coalition. Office of Violence Against Women, *State and Territory Coalitions: FY 2025 Domestic Violence and Sexual Assault Coalition Designations*, DOJ (updated May 13, 2025), https://perma.cc/8LNV-FGLY.

violence and sexual assault coalitions can apply for competitive grants in addition to receiving Coalition Grants. *Id.* § 10441(c)(3).

Throughout, the statute reflects a commitment to equity and inclusion in VAWA grant programs. The statute provides that "[n]o person … shall … be excluded from" a VAWA program on the basis of "race, color, religion, national origin, sex, gender identity … , sexual orientation, or disability." *Id.* § 12291(b)(13)(A). It also directs programs to populations who may be overlooked. For example, VAWA creates a grant program specifically for "underserved populations"—that is, those "populations who face barriers in accessing and using victim services," including because of their religion, sexual orientation, "gender identity," race or ethnicity, or "special needs" such as language barriers or "alienage status." *Id.* § 20123(a)(1); *see also id.* § 12291(a)(46). One grant program expressly authorizes funding for "assistance in immigration matters" to victims in rural communities. *Id.* § 12341(b)(2). Another grant program supports "culturally specific services"—services "primarily directed toward racial and ethnic minority groups" that "include culturally relevant and linguistically specific" components. *Id.* §§ 20124(a)(1), 12291(a)(8)–(9). For some programs, Congress specifically authorized or even required grantees to partner with organizations serving racial or ethnic minorities or other specific underserved populations. *Id.* §§ 12463(c)(2)(B)–(C), (F), 12475(c)(2)(D). And, in still other cases, the statute expressly authorizes grants for programs that serve racial and ethnic minorities, other specific underserved populations, or underserved populations generally—and, in some instances, requires DOJ to prioritize services for those groups in making awards. *See, e.g.*, *id.* §§ 12341(b)(2), (d)(4); 12351(a), (g)(2)(C)(ii); 12421(1)(A)(i), (1)(A)(iv), (2)(A)(iv), (3); 12451(b)(1), (b)(2)(E), (c)(1)(A); 12463(d)(3)(C); 12464(b)(5)(E); 12501(b)(3); 12514(c).

Congress spelled out various statutory conditions for OVW awards. These conditions define the scope of the programs and aim to ensure program effectiveness in addressing VAWA crimes. For example, all VAWA grantees may use grant funds "only for the specific purposes described" in the statute; must protect the privacy of people receiving services; and may not use grant funds for tort litigation, lobbying, or excessive expenditures on conferences. *Id.* §§ 12291(b)(2), (5), (9), (10), (15)(C); *see also, e.g.*, *id.* §§ 20121(b), 20123(h), 20124(g) (applying § 12291 conditions to other grant programs). For certain programs, the statute establishes eligibility requirements that ensure grantees have specified training or experience necessary to carry out the program effectively. *See, e.g.*, *id.* §§ 20121(d), 20123(b), 20124(c).

In some instances, the statute also requires applicants to certify that they comply with certain conditions. Those certification requirements vary, but all relate to VAWA's purposes. For instance, applicants for certain grants must certify that their providers have completed relevant training or have specified qualifications. *Id.* §§ 12464(d)(6), 20121(d). In some instances, applicants must certify that they do not have organizational policies requiring mediation or counseling where victims must be physically together with offenders. *Id.* § 20121(d). Other requirements include certifying that the grantee will coordinate with state coalitions and law enforcement, *id.* §§ 20121(d), 10446(c)(2); that federal funds will supplement, not supplant, non-federal funds, *id.* § 10446(c)(4); and that the grantee will use funds for permitted VAWA-crime-related purposes, *id.* § 10446(c)(1); *see also id.* §§ 10450(a), 10454(3), 12464(d)(3) (imposing other certification requirements).

By statute, OVW within the Department of Justice has "sole jurisdiction" to administer VAWA grant programs. *See* 34 U.S.C. §§ 10442(a), (c). OVW is headed by a Director vested with "final authority over all grants … awarded by the Office." *Id.* § 10442(b). The Director's

authorities include the "development and management of grant programs," "the award and termination of grants," and "[e]stablishing such rules, regulations, guidelines, and procedures as are necessary to carry out any function of the office." *Id.* §§ 10444(5)(B), (5)(C), (8). Exercising this authority, since Fiscal Year 2011, OVW has included in each of its NOFOs "a non-exhaustive list of out-of-scope activities." Administrative Record (AR) 280–81 (Decl. of Ginger Baran Lyons ¶ 7). Those "out-of-scope" activities have historically aimed to ensure grantees use the funds "in line with the statutory purposes of the grant program" by alerting them to what OVW "cannot finance under the statute setting forth the grant program's scope." *Id.*

***2. Office of Justice Programs Grant Programs***

The Office of Justice Programs houses six program offices that administer a variety of grant programs. These include multiple programs providing grants to assist crime victims, including Victim Assistance grants under the Victims of Crime Act (VOCA), other VOCA grants, and Pet Shelter grants, all of which are administered by OJP's Office for Victims of Crime (OVC).

*a. VOCA Victim Assistance Grants*

In VOCA, Congress established the Crime Victims Fund—a fund principally financed with criminal fines and penalties—and directed OVC to use a portion of the Fund to make grants to support victims of crime. *See* 34 U.S.C. §§ 20101(a)–(b), (c)(4), 20102–20103. One such congressionally created grant program is the VOCA Victim Assistance program, under which OVC makes annual formula grants to states for victim services programs and related activities. *Id.* §§ 20101(d)(4)(B), 20103(a)(3), (c). States then subaward those funds to nonprofits and public agencies in their states to support direct services to crime victims. *Id.* §§ 20103(b), (c). By statute, states distributing VOCA Victim Assistance funds must give priority to programs that assist victims of sexual assault, spousal abuse, or child abuse, but funds can be used for services

that assist victims of all manner of crimes, including drunk driving, homicide, and other crimes as well. *See id.* § 20103(a)(2)(A). VOCA Victim Assistance Formula Grant funds support a wide range of assistance to victims, including information and referral services, crisis counseling, temporary housing, safety planning, criminal justice advocacy support, and legal assistance. *See* 28 C.F.R. § 94.119. Binding regulations provide that victims' eligibility for services under any VOCA Victim Assistance program is "not dependent on the victim's immigration status." 28 C.F.R. §§ 94.103(a), 94.116.

*b. Other VOCA Grants*

VOCA also authorizes OVC to use a portion of the amounts in the Crime Victims Fund for other grants to serve victims of crime. 34 U.S.C. §§ 20101(d)(4)(C), 20103(c). In particular, 34 U.S.C. § 20103(c) directs OVC to make grants for "victim services," "financial support of services to victims of Federal crime," and for local organizations "to improve outreach and services to victims of crime," among other things. *Id.* § 20103(c)(1). The Director of OVC is authorized to "[e]stablish programs in accordance with § 20103(c) . . . on terms and conditions determined by the Director to be consistent with that subsection." *Id.* § 20111(c)(3).

Exercising that authority, OVC announced in July 2025, that it would award $15.9 million in funding for "Services for Victims of Crime" grants pursuant to § 20103(c)(1)(A). OJP AR-2 at 23–24.[3] Per the notice of funding opportunity, those grants would support "projects to provide direct services to child and youth victims of crime; victims of elder abuse, fraud, and exploitation; and other victims of crime." OJP AR-2 at 22.

[3] "OJP AR-2" refers to the Administrative Record relating to the OJP Immigration Condition, Dkt. No. 69-3. "OJP AR-1" refers to the Administrative Record relating to the OJP Anti-DEI Certification, Dkt. No. 50-3. And "OVW AR" refers to the Administrative Record relating to the OVW Conditions, Dkt. No. 36-3. Plaintiffs will submit consolidated excerpts of the administrative record following the conclusion of briefing.

*c. Pet Shelter Grants*

OVC also administers the Emergency and Transitional Pet Shelter and Housing Assistance grant program (Pet Shelter program), which Congress created in 2018. *See* Pub. L. No. 115-334, § 12502(b), 132 Stat. 4490, 4983 (2018) (*codified at* 34 U.S.C. § 20127). Congress recognized that domestic violence survivors "often may be reluctant to leave an abusive relationship out of fear for the safety and welfare of their companion animals." H.R. Rep. No. 115-1072, at 778 (2018) (Conf. Rep.). This stems from the fact that "[a]nimal friendly housing can be difficult to secure, and the costs entailed with animal housing can factor into victims' decisions to leave abusive relationships." *Id.* To help address this problem, Congress enacted the Protecting Animals With Shelter (PAWS) Act. Pub. L. No. 115-334, § 12502 (2018).

The PAWS Act authorizes up to $3 million in grants annually to help victims of domestic violence, dating violence, sexual assault, or stalking secure safe housing with or for their pets, service or emotional support animals, or horses. 34 U.S.C. §§ 20127(1), (3), (8). Congress recognized that victim safety was paramount and accordingly barred grantees from seeking funding for "activities that may compromise the safety of a domestic violence victim." *Id.* § 20127(2)(B)(i). Barriers to obtaining help can jeopardize victim safety, so Congress specifically prohibited two activities that it deemed to compromise victim safety—"background checks of domestic violence victims" and "clinical evaluations to determine the eligibility of such a victim for support services." *Id.* §§ 20127(2)(B)(i)(I)–(II).

The statute further protects victim safety by requiring Pet Shelter grantees to agree "to be bound by the nondisclosure of confidential information requirements of [34 U.S.C. § 12291(b)(2)]." *Id.* § 20127(4)(A). Section 12291(b)(2), in turn, requires covered grantees to "protect the confidentiality and privacy of persons receiving services" so as "to ensure the safety" of victims and their families. Among other things, grantees may not "disclose, reveal, or

release individual client information without the informed, written, reasonably time-limited consent" of the relevant person. *Id.* §§ 12291(b)(2)(A), (B)(ii). And "[i]n no circumstances" can a victim "be required to provide" such consent "as a condition of eligibility" for the grantee's services. *Id.* § 12291(b)(2)(D)(ii). Importantly, these restrictions apply across the board: If a grantee receives any grant subject to these confidentiality protections—such as a Pet Shelter grant or any grant under the Violence Against Women Act—the grantee may not disclose, without consent, client information for that grant program or for "*any other* Federal, State, tribal, or territorial grant program." *Id.* § 12291(b)(2)(B)(ii) (emphasis added).

The statute vests responsibility for administering this program in the Secretary of Agriculture, but authorizes the Secretary of Agriculture to enter into a memorandum of understanding with another agency to carry out the program. *Id.* §§ 20127(1)(A)–(B). Pursuant to such a memorandum of understanding, DOJ currently administers this program through OVC. *See* OJP AR-2 at 51, 54.

### B. The Administration leverages federal grant funding to advance the President's ideological vision and expose grantees to massive liability

The current Administration has launched a far-reaching campaign to leverage federal grant funding to advance ideological and policy goals wholly unrelated to the purposes of the grant programs Congress created. Relevant here, President Trump has issued a series of executive orders targeting "diversity, equity, and inclusion" initiatives, so-called "gender ideology," and illegal immigration. The Administration, moreover, has weaponized the False Claims Act to scare grantees into ceasing lawful activities that the Administration disfavors.

#### *1. Diversity, equity, and inclusion*

In his first days in office, President Trump issued multiple executive orders that broadly seek to eradicate "diversity, equity, and inclusion" (DEI) and "diversity, equity, inclusion, and

accessibility" (DEIA) values and initiatives. One order directed agencies to terminate all DEI and DEIA offices, all "equity" programs, and all "equity-related" grants or contracts. *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order No. 14151, § 2(b), 90 Fed. Reg. 8339 (Jan. 20, 2025). Another order aims to end purportedly "illegal" DEI and DEIA in the federal government and the private sector. *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Exec. Order No. 14173, §§ 3–4, 90 Fed. Reg. 8633 (Jan. 21, 2025) (Anti-DEI Order).

Without defining "DEI" or "DEIA," or explaining what might make such programs "illegal," the Anti-DEI Order makes clear that the Administration has a novel and extreme view that diversity, equity, and inclusion is often illegal. Among other things, the Order laments that "dangerous, demeaning, and immoral" DEI or DEIA programs are widespread across the public and private sectors and revokes multiple diversity-related executive actions issued over the last half century. *Id.* § 3.

Among other ways of advancing its goal, the Anti-DEI Order initiates a scheme to use the FCA as a weapon to stop federal funding recipients from engaging in diversity, equity, and inclusion activities. The Order requires agency heads to "include in every contract or grant award" a term requiring the funding recipient (1) to "certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws" and (2) "to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code [the False Claims Act]." *Id.* § 3(iv)(B).

This certification would threaten federal funding recipients with considerable risk of burdensome, and potentially ruinous, FCA litigation and liability if they engage in diversity,

equity, and inclusion activities that the Administration disfavors. The FCA makes it unlawful for anyone to "knowingly present[], or cause[] to be presented," to the government "a false or fraudulent claim for payment." 31 U.S.C. § 3729(a)(1)(A). For a misrepresentation to be actionable under the FCA, the plaintiff must show that it was "material to the Government's payment decision"—a requirement the Supreme Court has emphasized is "rigorous" and "demanding." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181, 192, 194 (2016). Thus, the Anti-DEI Order seeks to make it easier to establish FCA liability by requiring grantees to concede upfront an essential, and otherwise demanding, element of an FCA claim. The Anti-DEI Order's certification, moreover, sweeps beyond what grantees do with their federal grant funding: Grantees must certify that they do not operate "*any* programs promoting DEI," no matter the source of funds. Anti-DEI Order § 3(iv)(B) (emphasis added).

If they are deemed not to comply with their certification, grantees face potentially massive liability, both civil and criminal. Civil liability under the FCA is so significant that the Supreme Court has described it as "essentially punitive in nature"—potential treble damages (meaning three times the amount of federal funds that the recipient received from the government in connection with the certifications) plus civil penalties of up to approximately $28,600 per false claim. *See Universal Health Servs.*, 579 U.S. at 182 (quotations omitted); *see also* 28 C.F.R. § 85.5. Compounding the risks, in addition to authorizing DOJ to enforce the Act, the FCA also authorizes private citizens to enforce it and then receive a share of any resulting judgment or settlement. 31 U.S.C. § 3730. Liability can be criminal, too: The government can seek up to five years' imprisonment for those who knowingly make a "false, fictitious, or fraudulent" claim to any agency in seeking funds. 18 U.S.C. § 287; *see also id.* § 1001(a).

Following the Anti-DEI Order, DOJ has tripled down on leveraging the FCA to combat diversity, equity, and inclusion. On May 19, 2025, then-Deputy Attorney General Todd Blanche announced the formation of a new task force, called the "Civil Rights Fraud Initiative," which will use the False Claims Act as a "weapon" against federal funding recipients. Letter from Todd Blanche, Deputy Att'y Gen., to DOJ Offices, Divisions, and U.S. Attorneys (May 19, 2025) https://perma.cc/3W6K-FGHA (Blanche Memo). The Blanche Memo specifically focuses on funding recipients that engage in DEI activities as targets for potential investigation and enforcement actions. *Id.* The memo also "strongly encourages" private parties to file suits under the FCA's *qui tam* provision, and encourages the public to report information about "discrimination by federal-funding recipients" to DOJ. *Id.* And it states that the new initiative will engage the DOJ's Criminal Division. The Blanche Memo does not explain when DEI would be considered "illegal," but a press release announcing the Initiative broadly warns institutions not to "promote divisive DEI policies." Office of Public Affairs, *Justice Department Establishes Civil Rights Fraud Initiative*, DOJ (May 19, 2025), https://perma.cc/ZS6R-B8E9.

Further confirming the Administration's plans to aggressively use the FCA, a June 11 memo announcing the DOJ Civil Division's enforcement priorities lists using the FCA to combat "illegal private-sector DEI" as the very first priority. Mem. From Ass't Att'y Gen., Brett A. Shumate, to Civil Division Employees, *Civil Division Enforcement Priorities* (June 11, 2025), https://perma.cc/SV3A-NE9F.

At the same time, the Administration has denounced "DEI" generally while doing more to confuse than to clarify when it will consider "DEI" to be unlawful—making it risky for grantees to do *anything* reflecting diversity, equity, and inclusion values. The Anti-DEI Order itself gives cause to fear that the Administration will deem illegal anything involving diversity,

equity, or inclusion. In the name of eradicating purportedly "illegal" DEI, it directs agencies to stop "[p]romoting 'diversity,'" to "[e]xcise references to DEI and DEIA principles," and to "terminate all 'diversity,' 'equity,'" and similar activities. Anti-DEI Order §§ 3(b)(ii)(A), 3(c)(ii), 3(c)(iii). A February 5, 2025, letter from then-Attorney General Bondi to all DOJ employees similarly announced that DOJ intends to aggressively "investigate, eliminate, and penalize" "illegal DEI and DEIA," but without defining "DEI" or "DEIA" or explaining what makes a DEI or DEIA program illegal. Mem. from Att'y Gen. Pam Bondi, *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025), https://perma.cc/KH9Y-A2VQ.

An Attorney General memo also suggested that even talking about DEI or DEIA can be unlawful in Defendants' view. To eliminate DEI and DEIA activities that (in the memo's words) "violate … Federal civil-rights laws," the memo instructed staff to "pay particular attention to ending references to DEI or DEIA" in programs, including "references to 'unconscious bias,' 'cultural sensitivity,' [and] 'inclusive leadership.'" OVW AR at 57–59. As the OVW head later explained to OVW staff, this "memo is clear that this applies to grants," so OVW staff should make sure grantees' materials do not use those specifically forbidden terms. OVW AR at 67.

A later memo purports to provide "guidance for recipients of federal funding regarding unlawful discrimination," but provides little clarity. Mem. from Att'y Gen. Pam Bondi, *Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination* (July 29, 2025), https://perma.cc/T4B4-QTYH (Bondi Discrimination Memo). The memo lists DEI activities and other practices that DOJ cautions would "risk" violating antidiscrimination laws and "recommend[s]" that funding recipients avoid. *Id.* at 1–2, 4–8. But the memo notes that its list is "non-exhaustive," *id.* at 4, and in any event the listed examples provide no guidance for most of the activities that Plaintiffs and their members must undertake (or avoid) in carrying out

their grants. And even for the examples provided, the memo confirms that the Administration has a new, expansive, and unsupported view of when "DEI" is (or might be) illegal—warning against conduct like talking about "toxic masculinity," considering "cultural competence," and creating (non-exclusive) "safe spaces" for people of certain demographics. *See id.* at 5, 6, 8.

***2. "Gender ideology"***

The Administration has also launched a broadside attack on the rights and dignity of transgender and nonbinary individuals. Shortly after taking office, the President issued an executive order titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Gender Ideology" Order). Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) (OVW AR at 10–13). That Order announces that "the policy of the United States" is "to recognize two sexes, male and female," that are "not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. To advance this policy, it promises to exclude transgender people from single-sex spaces and activities that align with their gender identity. *Id.* §§ 1, 4. It also decries "the erasure of sex" in both "policy" and "language," and it commits to using what the Administration considers "accurate language and policies that recognize women are biologically female, and men are biologically male." *Id.* § 1. The Order discredits so-called "gender ideology," which the Order defines as a "false" view that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity." *Id.* § 2(f). As part of its campaign to deny the very existence of transgender people, the Order, among other things, requires each agency to "ensure grant funds do not promote gender ideology." *Id.* § 3(g).

The Administration has since made clear that, in its view, even so much as acknowledging a person's gender identity "promotes gender ideology" and must be stopped. In a memo instructing federal agencies on how to implement the "Gender Ideology" Order, the Office

of Personnel Management (OPM) identified various activities that the Administration deems to "promote or reflect gender ideology" and that agencies accordingly should "take prompt actions to end." OPM, *Initial Guidance Regarding President Trump's Executive Order Defending Women* at 1 (Jan. 29, 2025), https://perma.cc/9YUS-MZKV (OVW AR at 26). Those actions include turning off email features "that prompt users for their pronouns"; ensuring that forms that require entry of an individual's sex "list male or female only, and not gender identity"; and ensuring that all documents "use the term 'sex' and not 'gender.'" *Id.* at 1–2 (OVW AR at 26–27). DOJ has likewise confirmed that it, too, will not tolerate even mere recognition of gender identity: In an August memo on "Implementing [the 'Gender Ideology'] Executive Order," DOJ forbade all DOJ employees from including "preferred pronouns" in their email signature blocks, as that is "at odds with announced administration policies." Ken Dilanian, (@KDilanianMSNOW), X (Aug. 15, 2025, 12:34 PM), https://perma.cc/2K33-JPK9.

***3. Immigration***

The Administration has also set out to cut off undocumented immigrants' access to services where Congress has not done so. On day one, the President issued an executive order that, among many other things, directed federal agencies to review all grants to organizations that "directly or indirectly" provide services to "removable or illegal aliens" to ensure "that they do not promote or facilitate violations of our immigration laws." *Protecting the American People from Invasion*, Exec. Order No. 14159 § 19(a), 90 Fed. Reg. 8443, 8447 (Jan. 29, 2025) (issued Jan. 20, 2025) (OVW AR at 8). A later executive order entitled "Improving Oversight of Federal Grantmaking" requires senior political appointees to review all discretionary awards and, among other things, ensure they do not "promote" or "facilitate … illegal immigration." *Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332 § 4(b)(ii), 90 Fed. Reg. 38929, 38931 (Aug. 7, 2025) (Grantmaking Executive Order) (OJP AR-2 at 3). That order announces

that providing "taxpayer-funded grants" to "organizations that provided free services to illegal immigrants" have "worsen[ed] the border crisis" and must be stopped. *Id.* § 1, 90 Fed. Reg. at 38929 (OJP AR-2 at 1).

Consistent with these directives, DOJ has issued an agency-wide directive prohibiting grant funding from helping undocumented immigrants. In particular, in February 2025, Attorney General Bondi issued a memorandum that, "effective immediately" and "consistent with applicable law," bars DOJ grant-making components from making any new grants "to non-governmental organizations that support or provide services, either directly or indirectly …, to removable or illegal aliens." OVW AR at 61–62.

**C. DOJ imposes new conditions on grants**

DOJ's grant-making components have taken action to implement the Administration's directives. Both the Office on Violence Against Women and Office of Justice Programs have adopted a host of new funding conditions (collectively, New Conditions), including certification requirements, each of which exposes funding recipients to risk of FCA liability. *See* OVW AR at 199–239, 121–132; OJP AR-1 at 61; OJP AR-2 at 82.

***1. OJP and OVW Anti-DEI Certifications***

Both OVW and OJP amended their General Terms and Conditions to include the Anti-DEI Certification that the Anti-DEI Order created to expose grantees to False Claims Act liability in relation to "DEI" activities. OVW AR at 124–125; OJP AR-1 at 61. In particular, each component's updated General Terms and Conditions now require grantees to certify: (1) that the recipient "does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable federal civil rights or nondiscrimination laws" and (2) that "[t]he recipient agrees that its compliance with all applicable federal civil rights and nondiscrimination laws is material to the government's

decision to make this award and any payment thereunder, including for purposes of the False Claims Act" (OVW and OJP Anti-DEI Certifications). OVW AR at 124–125; OJP AR-1 at 61. These Anti-DEI Certifications generally apply across-the-board to all grants issued by OVW and OJP. OJP AR-1 at 57; Declaration of Carianne Fisher (Fisher Decl.) ¶¶ 17–18.

The OVW and OJP General Terms and Conditions also require Plaintiffs to certify that the conditions of the award, as well as any other assurances or certifications the recipient submits, are "material requirement[s]" of the award; that the agency may withhold award funds, disallow costs, or suspend or terminate the award as a result of failure to comply with them; that "DOJ," including (but not limited to) the grant-making office, "may take other legal action" to address non-compliance; and that any "materially false" statements to the government in connection with the award may result in criminal prosecution, civil penalties, or other remedies for false claims. OVW AR at 121; OJP AR-1 at 59–60.

***2. OVW "Out-of-Scope" Conditions***

OVW also adopted a new NOFO template imposing a host of new conditions. In particular, the new template includes a newly expanded list of "out-of-scope" activities that grantees may not engage in with grant funds and requires applicants to certify, both upon applying for a grant and again when they accept an award, that they will not use grant funds on those "out-of-scope" activities. OVW AR at 212, 222. Although prior NOFOs listed some out-of-scope activities—conditions that clarified the scope of the grant program, for example by noting that grant funds could not be used for curriculum development or criminal defense—prior NOFOs did not previously require grantees to expressly certify compliance. Declaration of Brielyn Akins (Akins Decl.) ¶ 21.

As relevant to Plaintiffs' claims here, those new "out-of-scope" activities include several conditions that evidently derive from executive orders on DEI, gender ideology, and immigration. In particular, the template forbids using grant funds:

- To "[p]romot[e] or facilitat[e] discriminatory programs or ideology, including illegal DEI and "'diversity, equity, inclusion, and accessibility' programs that do not advance the policy of equal dignity and respect, as described in [the Anti-DEI Order]" (OVW Anti-DEI Condition). The template states that "[t]his prohibition is not intended to interfere with any of OVW's statutory obligations, such as funding for HBCUs, culturally specific services, and disability programs," but does not identify with specificity what grantees are and are not permitted to do.
- To "[i]nculcat[e] or promot[e] gender ideology as defined in [the 'Gender Ideology'] Executive Order" (OVW "Gender Ideology" Condition);
- To "[p]romot[e] or facilitat[e] the violation of federal immigration law" (OVW Immigration Enforcement Condition);
- On "[p]rograms that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women" (OVW Law Enforcement and Immigration Enforcement Condition);
- On "[i]nitiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support" (OVW Immigration Priority Condition);
- On "[a]ny activity or program that unlawfully violates an Executive Order" (OVW E.O. Condition).

OVW AR at 212, 222.

The template also imposes two additional new conditions that do not obviously stem from any executive order. In particular, it bars:

- "Activities that frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses (e.g., prioritizing criminal justice reform or social justice theories over victim safety and offender accountability)" (OVW Systemic Framing Condition); and
- "Awareness campaigns or media that do not lead to tangible improvements in prevention, victim safety, or offender accountability" (OVW Awareness Campaigns Condition).

OVW AR at 212, 222.

The template notes that "[r]ecipients should serve all eligible victims as required by statute, regulation, or award condition." OVW AR at 212; *see also* OVW AR at 222. But it does not provide guidance on how to reconcile the conditions with such statutory or other requirements. *See* OVW AR at 212, 222.

OVW required all applicants to certify that they would not use grant funds for the out-of-scope activities for their applications to be considered, and also included the out-of-scope conditions in grant agreements. *See* OVW, *Open Notices of Funding Opportunity*, DOJ (updated June 12, 2025), https://perma.cc/XR9P-GA49; Declaration of Lucy Rios (Rios Decl.) ¶¶ 28–36 & Ex. 1–3; Akins Decl. ¶ 21.

OVW did not publicly explain the basis for the New Conditions or how they relate to any requirement under VAWA or the statutory criteria for awards under any grant program. And, aside from an after-the-fact declaration prepared to defend against this litigation, the administrative record addresses the reasons for adopting only two of the conditions—and only barely. In particular, in a February 12, 2025, memo to the Attorney General's Chief of Staff seeking approval to release NOFOs, the acting head of OVW proposed to add the OVW "Gender Ideology" Condition and the OVW Immigration Enforcement Condition, and the related certification. OVW AR at 63–64. The memo stated that OVW proposed to impose those two conditions in order to "implement applicable executive orders and Attorney General memoranda" and "ensure that our grantees align their grant-funded activities with federal laws regarding public safety, civil rights, and immigration." OVW AR at 64. The memo does not reflect that OVW considered the impact these conditions would have on programs' effectiveness, the difficulty grantees would have in understanding the conditions, the chilling effect these conditions would have on legitimate activities, or grantees' and survivors' reliance interests. As

for the other six challenged "out-of-scope" conditions, neither that memo, nor any other document in the record, provides even a barebones explanation of the reasons for adopting them.[4]

The administrative record likewise provides scant insight into the meaning of the conditions or what grantees must do to comply. The only information that goes beyond the text of the conditions themselves is an internal talking points document for OVW staff to use in answering applicants' questions about the new "out-of-scope" activities. OVW AR at 87–89. That document does not provide any official agency interpretation or guidance: It is prominently marked "PRE-DECISIONAL" and "DO NOT SHARE," and OVW employees were expressly forbidden from forwarding it and could only cut and paste or relay information from it over the phone. OVW AR at 87. The unofficial information in that document, moreover, provides little clarity. For instance, it states that the prohibition on "promoting or facilitating the violation of federal immigration laws" (the OVW Immigration Enforcement Condition) "means what it says" and that the OVW E.O. Condition "means that recipients must not break the law." OVW AR at 87, 89. For the OVW Awareness Campaigns condition, the talking points "encourage[]" grantees "to determine on their own" whether their projects satisfy the condition and state that, while grantees can "bring questions to OVW," they "should be prepared to make judgment calls, without explicit guidance from OVW," about whether their activities comply. OVW AR at 89.

[4] The administrative record does not say, but OVW may have added the other conditions at the prompting of DOJ's leadership. OVW's February 12 memo proposed adding two new "out-of-scope" activities and sought approval "as soon as possible" given that "further delaying NOFO releases will jeopardize" OVW's ability to timely issue grants. OVW AR at 63. The administrative record does not reveal whether or when DOJ leadership granted the requested approval. But OVW did not actually issue any NOFOs until mid-May, and those NOFOs contained more than just the two new "out-of-scope" activities that the February 12 memo proposed, suggesting that leadership may have provided some additional instructions in the intervening three months.

Other talking points likewise leave critical questions unanswered. For example, for the OVW "Gender Ideology" Condition, the talking points nowhere explain what will be deemed to "inculcate or promote 'gender ideology'"—and whether, for example, grantees would violate the condition if they simply acknowledged victims' gender identity by using preferred pronouns, or if they provided trainings on how to effectively serve transgender and nonbinary victims. *See* OVW AR at 87. Similarly, the talking points on the OVW Law Enforcement and Immigration Enforcement Condition do not explain what will be deemed to "discourage" cooperation with law enforcement—and whether, for example, grantees can inform victims about potential downsides of involving law enforcement, which in some jurisdictions could expose victims to risk of prosecution if they later returned to living with their abuser. *See* OVW AR at 88–89; *see also* Faisal Decl. ¶ 41 (describing how a victim who petitions for a protective order can be found guilty of aiding and abetting the violation of that protective order if they reunite with their abuser).

Even in the few cases where the talking points do provide some limited additional explanation, they offer no assurance on which grantees can safely rely. The talking points do not suggest, for example, that DOJ components that enforce the FCA (whether through the new "Civil Rights Fraud Initiative" or otherwise) have agreed with the interpretation, or that DOJ would block private *qui tam* relators from bringing claims based on a different view.

***3. OJP Immigration Condition***

OJP has implemented the Attorney General's directive barring new grants to organizations that "support or provide services … to removable or illegal aliens," OVW AR at 61–62, by imposing a new condition that generally bars grantees from using grant funds to provide services to two ill-defined categories of noncitizens (OJP Immigration Condition). In particular, the OJP Immigration Condition bars grantees from using grant funds to serve

"removable aliens" under 8 U.S.C. § 1229a(e)(2) (which sets forth complex criteria for immigration judges to apply to determine whether a person is removable in a multi-step adjudicatory process) and people who are "unlawfully present in the United States" (a category that the condition does not define at all). OJP AR-2 at 82. The Condition also provides that the prohibition does not apply where using grant funds to provide services to such people is "expressly authorized by law (or otherwise expressly allowable under the terms of this award)" or "where the prohibition would contravene any express requirement of any law, or of any judicial ruling, governing or applicable to the award."[5] The OJP Immigration Condition offers no guidance on how service providers would make any of the determinations necessary to adhere to this condition.

OJP did not announce this condition in advance or include it in any notice of funding opportunity, but included it in grant agreements issued on January 26, 2026, for the VOCA Services for Victims of Crime program and the Pet Shelter program. OJP AR-2 at 82; *see also* Declaration of Susan Higginbotham (Higginbotham Decl.) ¶ 21, Declaration of Jennifer Pollitt Hill (Pollitt Hill Decl.) ¶ 17, Declaration of Krista Colón (Colón Decl.) ¶ 26.

The administrative record contains no indication that Defendants considered the impact this exclusion would have. Instead, the record contains only a single, one-page email addressing

---

[5] The OJP Immigration Condition states, in full:

> The recipient shall ensure that no funds provided under this award (or any subaward, at any tier) will be used to provide benefits or services to any removable alien (see 8 U.S.C. § 1229a(e)(2)) or any alien otherwise unlawfully present in the United States, but this prohibition shall not apply where such use is expressly authorized by law (or otherwise expressly allowable under the terms of this award) or where the prohibition would contravene any express requirement of any law, or of any judicial ruling, governing or applicable to the award.

OJP AR-2 at 82.

the Condition and concluding (1) that it should apply to VOCA Services for Victims and Pet Shelter grants because the authorizing statutes for those grants do not "expressly require[] the provision of services" to "removable aliens" or other "unlawfully present" individuals; (2) that, consistent with an executive order providing that federal funds "should improve American lives or advance American interests," it is "in the public interest" to direct federal dollars to "services for U.S. citizens and lawful residents"; (3) that this Condition implicated no grantee's reliance interests because the grantees were not guaranteed awards and applied knowing that "a condition such as this may attach"; and (4) that the government's interests would outweigh any reliance interests in any event. OJP AR-2 at 82–83. The record contains no indication that Defendants considered how victims fleeing dangerous situations could prove their citizenship or lawful immigration status, how grantees could reliably comply, or how imposing the condition would erode the trust essential for effectively addressing domestic violence and inevitably lead to less effective services.

**D. The New Conditions harm Plaintiffs and their members**

Plaintiffs are state coalitions that carry out life-saving domestic violence and sexual assault support and prevention work, in large part through grants from OVW and OJP, and whose member organizations also receive OVW and OJP grants. Plaintiffs have served as their states' official domestic violence and sexual assault coalitions for years and have consistently

received and relied on OVW Coalition Grants and other OVW and OJP funding to offer essential services within their states.[6]

Coalitions track and communicate critical lethality trends to law enforcement and service providers; train service providers to more effectively prevent violence; provide accreditation that ensures that survivors receive care from providers meeting established professional standards; and provide trainings required by state law.[7] Coalitions and their members also use DOJ grants to respond to survivors in urgent need, including by operating 24/7 crisis hotlines and providing counseling to help survivors of sexual assault heal.[8] Beyond that, Coalitions and their members provide legal assistance, help with supervised visitation, and offer a range of crisis intervention services like emergency shelter and medical advocacy, helping victims secure temporary housing

[6] Akins Decl. ¶¶ 1–4, 7–14; Colón Decl. ¶¶ 1–2, 5, 13–15; Declaration of Dawn Dalton (Dalton Decl.) ¶¶ 1–3, 8, 11; Faisal Decl. ¶¶ 1–8, 14–16; Fisher Decl. ¶¶ 1–5, 11, 12; Higginbotham Decl. ¶¶ 1–2, 10–14; Declaration of David Lee (Lee Decl.) ¶¶ 1– 2, 7–9; Declaration of Kelly Moe Litke (Litke Decl.) ¶¶ 1–2, 6–8; Declaration of Katie Kramer (Kramer Decl.) ¶¶ 1–12; Declaration of Michelle McCormick (McCormick Decl.) ¶¶ 1–5, 37–39; Declaration of Monique Minkens (Minkens Decl.) ¶¶ 1–3, 8–12; Declaration of Keri Moran-Kuhn (Moran-Kuhn Decl.) ¶¶ 1–4, 7–10, 33–34; Declaration of Terrence Scraggins (Scraggins Decl.) ¶¶ 1–4, 6–9; Rios Decl. ¶¶ 1–8, 14–22; Declaration of Jonathan Yglesias (Yglesias Decl.) ¶¶ 1–2, 7–9; Declaration of Hema Sarang-Sieminski (Sarang-Sieminski Decl.) ¶¶ 1–4, 14–17; Declaration of Kelsen Young (Young Decl.) ¶¶ 1–9; Declaration of Jan Christiansen (Christiansen Decl.) ¶¶ 1–2, 7–15; Declaration of Sarah Robinson (Robinson Decl.) ¶¶ 2, 8–15; Declaration of Garland Stark (Stark Decl.) ¶¶1–2, 53, 67, 69, 72–74; Declaration of Angelina Mercado (Mercado Decl.) ¶¶ 1–5, 7–12; Declaration of Laura Berry (Berry Decl.) ¶¶ 10–13; Declaration of Denise Higgins Bonifanti (Higgins Bonifanti Decl.) ¶¶ 6–8; Hill Decl. ¶¶ 1–2, 6–7; Declaration of Judy Chen (Chen Decl.) ¶¶ 1–3, 7–11.

[7] Higginbotham Decl. ¶ 12; Rios Decl. ¶¶ 17, 19–22; Akins Decl. ¶ 9; Colón Decl. ¶¶ 4–5; Faisal Decl. ¶¶ 2-3, 7; Yglesias Decl. ¶ 10; Christiansen Decl. ¶ 10; Robinson Decl. ¶¶ 10, 16–17; Stark Decl. ¶ 53; Mercado Decl. ¶¶ 10, 12; Berry Decl. ¶ 11; McCormick Decl. ¶ 4; Faisal Decl. ¶ 6.

[8] Dalton Decl. ¶¶ 13–14; Lee Decl. ¶ 17; Rios Decl. ¶ 22; Yglesias Decl. ¶¶ 4, 11; Stark Decl. ¶ 53; Fisher Decl. ¶ 8; Faisal Decl. ¶¶ 10–12; Moran-Kuhn Decl. ¶¶ 5, 33; McCormick Decl. ¶ 7; Berry Decl. ¶¶ 4, 8–9; Sarang-Sieminski ¶¶ 24–25.

while they locate permanent housing, and advocating for survivors who need help obtaining legal protection or medical care.[9]

The New Conditions put Plaintiffs and their members in an impossible position. If they decline OVW and OJP grants, Plaintiffs and their members will lose out on funding that in some cases comprises a large percentage of their operating budgets, and that they have used for mission-critical work, including for services that they have long promised and offered to victims and survivors for safety and protection. For instance, the OVW Coalition Grant formula funds amount to hundreds of thousands of dollars in coalitions' annual budgets—and losing those funds would require coalitions to make staffing cuts that would threaten their ability to operate their programs.[10] Forgoing DOJ grant funds would also harm Plaintiffs' members, who would no longer be able to provide the same level of assistance, advocacy, and intervention work on which victims of domestic violence and sexual assault crimes rely.[11] These losses would be borne most significantly by the thousands of domestic violence and sexual assault victims and their children who will lose access to critical, life-saving support. *See, e.g.*, Scraggins Decl. ¶ 29; Yglesias Decl. ¶¶ 42–45; Young Decl. ¶¶ 38–42; Kramer Decl. ¶ 38; Christiansen Decl. ¶¶ 38–40; Robinson Decl. ¶¶ 48–51; Mercado Decl. ¶¶ 34–36; Higgins Bonifanti Decl. ¶¶ 40–45.

---

[9] *See, e.g.,*Dalton Decl. ¶¶ 12–14; Lee Decl. ¶ 18; Rios Decl. ¶ 22; Yglesias Decl. ¶ 11; Christiansen Decl. ¶¶ 12–13; Robinson Decl. ¶¶ 11–12, 17, 24; Stark Decl. ¶ 53; Akins Decl. ¶ 5; Yglesias Decl. ¶¶ 7, 22; Higginbotham Decl. ¶¶ 4, 7; Stark Decl. ¶¶ 37–53; Higgins Bonifanti Decl. ¶ 12.

[10] Akins Decl. ¶ 38; Colón Decl. ¶ 50; Dalton Decl. ¶¶ 41–42; Fisher Decl. ¶¶ 6, 33–34; Litke Decl. ¶ 39; Kramer Decl. ¶ 33; McCormick Decl. ¶¶ 37–39; Moran-Kuhn Decl. ¶¶ 33–34; Scraggins Decl. ¶¶ 26–29; Rios Decl. ¶¶ 8, 53; Young Decl. ¶ 38; Christiansen Decl. ¶¶ 32, 35; Robinson Decl. ¶¶ 13–14, 37, 45; Stark Decl. ¶¶ 67, 69; Mercado Decl. ¶¶ 30–33; Chen Decl. ¶ 36.

[11] *See, e.g.,* Yglesias Decl. ¶ 30; Akins Decl. ¶¶ 35, 39; Higginbotham Decl. ¶¶ 37–38; Faisal Decl. ¶ 24; Young Decl. ¶ 39.

But operating under the challenged conditions would also cause profound harm. For instance, asking survivors about their immigration status—and attempting to make determinations that no private organization can reliably make, as the OJP Immigration Condition would require—would jeopardize survivors' safety, contrary to Plaintiffs' and their members' values and mission. Hill Decl. ¶¶ 26–27; Colón Decl. ¶ 46; Higginbotham Decl. ¶¶ 42–43. Abiding by the Immigration Condition would also cause providers to lose hard-won trust from their communities. Hill Decl. ¶ 27; Colón Decl. ¶ 44. Operating under the OVW "Out-of-Scope" conditions would require Plaintiffs to compromise their values and mission and hinder their life-saving work. These Conditions would hinder Plaintiffs' ability to provide services tailored to the needs of specific groups; to provide trainings that account for race and gender's impact on survivors; to safely and respectfully serve LGBTQ+ survivors; to address the systemic social problems that cause VAWA offenses; to help immigrant survivors; and even to serve survivors who hope to avoid using law enforcement for their own safety.[12]

The OJP and OVW Anti-DEI Certifications also threaten Plaintiffs with constitutional harms, including censoring speech based on viewpoint and otherwise chilling Plaintiffs' speech due to their vagueness and the threat of serious consequences under the FCA. Given the Administration's stated goal of eradicating DEI entirely, Plaintiffs fear they could face ruinous consequences just for talking about equity and diversity. *See, e.g.*, Hill Decl. ¶ 23; Faisal Decl. ¶¶ 19–20; Dalton Decl. ¶¶ 27–28.

And if Plaintiffs and their members make the required certifications, they fear immediately exposing their organizations to substantial legal and financial risk, including

[12] *See, e.g.*, Rios Decl. ¶ 18; McCormick Decl. ¶ 32; Sarang-Sieminski Decl. ¶ 35; Dalton Decl. ¶¶ 29–31; Faisal Decl. ¶ 41.

threatened penalties under the False Claims Act and under various criminal laws, which could jeopardize their ability to provide any services at all. 31 U.S.C. § 3729(a) (FCA treble damages); 28 C.F.R. § 85.5(a) (FCA civil penalties); *see also* General Terms and Conditions § 1 (listing statutes under which grantees could face "criminal prosecution"); *see, e.g.*, Colón Decl. ¶ 48; Faisal Decl. ¶ 35; Fisher Decl. ¶¶ 23, 31; Young Decl. ¶¶ 33, 36; Christiansen Decl. ¶ 22; Stark Decl. ¶ 65; Higgins Bonifanti Decl. ¶¶ 26, 33, 39; Berry Decl. ¶ 23. Making Plaintiffs' position even more untenable, they are left uncertain how to navigate the conflict between the challenged OVW Conditions and VAWA provisions, including VAWA's prohibition on discrimination based on "gender identity" and its various mandates to focus on underserved populations. *See, e.g.*, Dalton Decl. ¶ 27; Litke Decl. ¶ 31; Young Decl. ¶ 29.

Before the parties brought suit, Plaintiffs' members had to make these difficult choices for OVW NOFOs whose deadlines were closing. Some members applied for those NOFOs, but noted their objections to the conditions, which OVW rejected. *See* Rios Decl. ¶¶ 31–34. Others applied and made the required certification despite serious concerns about how they would be able to comply with the conditions without compromising their core missions and VAWA's requirements. *See, e.g.*, Dalton Decl. ¶ 12. Still others chose to forgo applying because of their concerns that they could not comply with the conditions, losing out on funds critical to their organizations' operations. Dalton Decl. ¶ 13; Moran-Kuhn Decl. ¶ 12; Sarang-Sieminski Decl. ¶ 20.

The original parties in this case entered a stipulation that allowed Plaintiffs to apply for OVW grants without submitting a certification until August 12th. Dkt. No. 14.[13] The Court

[13] Plaintiffs added by the Amended Complaint submitted the certifications required to apply to OVW grants.

subsequently granted in part Plaintiffs' motion for preliminary relief on August 8th, entering a stay of the conditions pursuant to APA Section 705. Mem. & Order at 26–27 (Dkt. No. 34). Each Coalition applied for, and was ultimately awarded, the Coalition Grant.[14] Plaintiffs and their members also applied to various OVW grants, including Legal Assistance for Victims grants, Transitional Housing grants, Rural grants, Sexual Assault and Forensic Exam grants, and more. *See, e.g.*, Akins Decl. ¶¶ 11–20; Lee Decl. ¶ 18; Rios Decl. ¶¶ 20, 23–27; Dalton Decl. ¶¶ 12, 14; Stark Decl. ¶¶ 18–27. Some have received grants, and some are still awaiting decisions. *See, e.g.*, Lee Decl. ¶ 18; Rios Decl. ¶ 20.

### E. Procedural History

On June 16, 2025, Plaintiffs brought this action challenging Defendants' decision to place unlawful conditions on all future grants administered by DOJ's Office on Violence Against Women. *See* Dkt. No. 1. Soon thereafter, the parties filed a joint stipulation allowing the original Plaintiffs and their members to apply for OVW grants without making the otherwise-required certifications to those conditions through August 12, 2025. Dkt. No. 14. On June 26, Plaintiffs filed a Motion for Preliminary Injunction and for Relief under 5 U.S.C. § 705 (Dkt. No. 15), which this Court granted in part and denied in part on August 8, 2025, concluding on the then-existing record that OVW "engaged in a wholly under-reasoned and arbitrary process" and that Plaintiffs were therefore likely to succeed on their claim that Defendants acted arbitrarily and capriciously under the APA. Mem. & Order at 20–22 (Dkt. No. 34). The Court preliminarily

[14] Akins Decl. ¶ 8; Colón Decl. ¶ 13; Dalton Decl. ¶ 11; Faisal Decl. ¶ 17; Fisher Decl. ¶ 10; Higginbotham Decl. ¶ 11; Kramer Decl. ¶ 9; Litke Decl. ¶ 11; Lee Decl. ¶ 9; McCormick Decl. ¶ 9; Moran-Kuhn Decl. ¶ 8; Rios Decl. ¶ 15; Sarang-Sieminski Decl. ¶ 17; Scraggins Decl. ¶ 6; Yglesias Decl. ¶ 8; Young Decl. ¶ 11; Christiansen Decl. ¶ 8; Robinson Decl. ¶ 9; Stark Decl. ¶ 13; Mercado Decl. ¶ 8; Higgins Bonifanti Decl. ¶ 7; Berry Decl. ¶ 12; Pollitt Hill Decl. ¶ 6; Chen Decl. ¶ 8.

stayed all challenged OVW Conditions under Section 705 of the APA. *Id.* at 26–27. The Court, however, declined to impose a preliminary injunction as well, reasoning that such relief was "not necessary" because the Section 705 stay "secures [Plaintiffs all necessary relief]." *Id.* at 27.

Pursuant to the Court's Section 705 stay, OVW has treated the New Conditions in any awards as nonenforceable. OVW, *FY 2025 General Terms and Conditions*, DOJ § 42 (updated Sept. 26, 2025), https://perma.cc/P5ZH-TLTL. However, OVW has also made clear that it will modify the awards to impose the New Conditions if the stay is lifted. *Id.* Accordingly, without permanent relief precluding Defendants from imposing these conditions, Plaintiffs and their members will be forced again to make the untenable choice between refusing grant funds and complying with the Conditions.

Plaintiffs later amended their complaint twice, first to add a challenge to the OJP Anti-DEI Certification and then, once the condition came to light, to add a challenge to the OJP Immigration Condition. Dkt. Nos. 41, 62. Plaintiffs also sought preliminary relief as to those two OJP Conditions, and the Court granted that motion on April 17, 2026. Mem. & Order at 1, 14 (Dkt. No. 63). The Court concluded that "Defendants appear to have failed to justify these grant Conditions *at all*" and "to have wholly failed to consider" multiple consequences of their actions, and that Plaintiffs were therefore likely to succeed on their arbitrary-and-capricious claim. *Id.* at 9–10. As with the OVW order, the Court preliminarily stayed the OJP Conditions under Section 705 of the APA, but did not enter a separate preliminary injunction. *See id.* at 13.

## LEGAL STANDARD

Summary judgment "is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78, 83 (1st Cir. 2022) (quotations omitted). "On cross-motions for summary judgment,

each motion is reviewed separately, drawing facts and inferences in favor of the non-moving party." *Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69, 72 (1st Cir. 2020).

For APA claims, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" violates the APA. *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016).

## ARGUMENT

### I. Plaintiffs Are Entitled to Summary Judgment

Plaintiffs are entitled to summary judgment on their claims under the APA as well as directly under the Constitution.

#### A. The New Conditions must be set aside under the APA

The New Conditions must be set aside under the APA for multiple independent reasons:[15] They are arbitrary and capricious, exceed Defendants' statutory authority, are contrary to law, and violate the Constitution.

##### *1. The New Conditions Are Arbitrary and Capricious*

The New Conditions are quintessentially arbitrary and capricious. Courts must hold unlawful any agency action that is "not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). An agency must offer "a satisfactory explanation for its action" and can neither "rel[y] on factors which Congress has not intended it to consider" nor ignore "an important aspect of the problem . . . ." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Aut. Ins. Co.*, 463 U.S.

[15] As this Court already held at the preliminary relief stage, the New Conditions are reviewable under the APA—they are final agency action and not committed to agency discretion by law, and the Tucker Act does not preclude review. Mem. & Order at 11–17 (Dkt. No. 34); Mem. & Order at 7–8 (Dkt. No. 63).

29, 43 (1983). While agencies are free to change their existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have taken account of "reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, Defendants have failed at every turn—for the OVW "Out-of-Scope" Conditions, the OVW and OJP Anti-DEI Certifications, and the OJP Immigration Condition.

*a. The OVW "Out-of-Scope" Conditions are arbitrary and capricious*

To begin, OVW's "Out-of-Scope" Conditions are arbitrary and capricious because OVW not only failed to provide a reasonable explanation, but for the most part failed to "explain[] [them] at all." *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 888 (W.D. Wash. 2025), *appeal pending*, No. 25-3664 (finding that the government's adoption of new funding conditions, without any explanation, was arbitrary and capricious). Indeed, aside from a declaration prepared months after the conditions were adopted to defend against this litigation, the administrative record only even mentions two—of nine—of the New OVW Conditions, and only briefly. *See* OVW AR at 63–64. For the other conditions, the record provides no explanation whatsoever.

Moreover, OVW's explanation for the two conditions the record actually discusses—the prohibitions on promoting "gender ideology" and on "promoting" immigration violations—falls far short of the reasoned decisionmaking the APA demands. OVW's memo says only that OVW proposed those two conditions to "implement applicable executive orders and Attorney General memoranda" and "ensure that our grantees align their grant-funded activities with federal laws regarding public safety, civil rights, and immigration." OVW AR at 64. This threadbare explanation shows that Defendants failed to consider multiple "important aspect[s] of the problem," even as to these two conditions. *State Farm*, 463 U.S. at 43. There is no indication

OVW considered the impact these conditions would have on programs' effectiveness, the difficulty grantees would have in understanding them, the chilling effect these conditions would have on legitimate activities, or grantees' and survivors' reliance interests.

And while the memo refers to executive orders—and the record suggests that OVW also considered several other executive orders, as well as Administration memos instructing agencies on how to implement them—compliance with an executive order does not satisfy the APA's requirement for reasoned decisionmaking. Indeed, courts have made clear that "an agency cannot avert the 'arbitrary and capricious' analysis by simply deferring to the relevant EO." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 471 (D.R.I. 2025), *appeal pending*, No. 25-1428; *see also*, *e.g.*, *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 55 (D.D.C. 2025) ("Furthering the President's wishes cannot be a blank check for OMB to do as it pleases."); *King Cnty.*, 785 F. Supp. 3d at 888–89 ("[R]ote incorporation of executive orders—especially ones involving politically charged policy matters that are the subject of intense disagreement and bear no substantive relation to the agency's underlying action—does not constitute 'reasoned decisionmaking.'"); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 294–95 (W.D. La. 2022) ("A command in an Executive Order does not exempt an agency from the APA's reasoned decision-making requirement.").

The administrative record also makes clear that, for the other conditions as well, Defendants failed to consider multiple "important aspects of the problem." *State Farm*, 463 U.S. at 43. Beyond the Executive Orders themselves and related guidance documents from executive agencies, the Administrative Record does not include any evidence of what, if anything, Defendants considered in making a final decision to add New Conditions to all Fiscal Year 2025 grants. Indeed, all but 86 pages of the 300-page Administrative Record post-dates the decision to

implement the New Conditions and further demonstrates that Defendants had not engaged in any reasoned decisionmaking. Indeed, it includes talking points for staff to respond to questions from grantees, which themselves recognize that it will be difficult for grantees to comply with at least some of the Conditions. *See, e.g.*, OVW AR at 88–89. For example, with respect to the ill-defined prohibition on awareness campaigns that do not produce "tangible improvements" (OVW AR at 212, 222) they acknowledged that "the answer might not always be simple and obvious," yet instructed that grantees would have to "make judgment calls, without explicit guidance from OVW." OVW AR at 89.

In addition, nowhere in the Administrative Record is there any indication that Defendants considered, for example, how grantees could comply with various conditions while also satisfying statutory commands and advancing VAWA's goals. Defendants, for instance, do not appear to have considered how grantees could comply with any of the conditions discussed below that conflict with the statutory directives. *See infra* Section I.A.3.b–d. In some instances, Defendants acknowledged the tension. For instance, the template NOFO states that the OVW Anti-DEI Condition—which prohibits promoting "discriminatory programs or ideology," "illegal DEI," and "'diversity, equity, inclusion, and accessibility' programs that do not advance the policy of equal dignity and respect"—"is not intended to interfere with any of OVW's statutory obligations, such as funding for HBCUs, culturally specific services, and disability programs." OVW AR at 212, 222. And it also states that "[r]ecipients should serve all eligible victims as required by statute, regulation, or award condition." OVW AR at 212. But these statements fall far short of clarifying grantees' obligations—and show that Defendants did not meaningfully consider how grantees would be able to comply with the Condition's unclear terms, or how the uncertainty would deter grantees from serving immigrants, treating transgender people with

respect, offering services to underserved minorities, or engaging in any public awareness campaigns at all, to take just a few examples.

Worse, the Administrative Record contains ample evidence that Defendants recognized the difficulties grantees would face, yet did little to resolve those difficulties, offering talking points with unilluminating explanations that a condition "means what it says," that "recipients must not break the law," and that grantees should "determine on their own" whether a condition is satisfied. OVW AR at 87, 89; *see also supra* Background Section C.2. Indeed, a memo from the OVW official charged with final authority over OVW grant conditions reflects that she, too, needed "[f]urther guidance" to understand what "inculcat[ing] gender ideology" meant, OVW AR at 29—yet the conditions provide no such further guidance to grantees.

Nor is there *any* evidence that Defendants considered the reliance interests of grantees—and the victims that the funds ultimately serve—that would be jeopardized by imposing the new "Out-of-Scope" Conditions. Defendants nowhere considered, for example, the reliance interests of coalitions like Plaintiffs, who are entitled to continued funding under the formula Coalition Grants, and who would be forced to forgo funding, substantially change the services they have provided to vulnerable populations over several years, or face potentially devastating civil and criminal liability. *See, e.g.*, Fisher Decl. ¶¶ 31–34; Kramer Decl. ¶ 24. Defendants did not consider what would happen to Plaintiffs, their members, and the survivors they serve if they could not accept funding with the new conditions. As the Supreme Court has made clear, the failure to consider reliance interests alone renders agency action arbitrary and capricious. *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 33(2020) (agency "was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns").

Moreover, despite these immeasurably high stakes for grantees, there is no evidence that Defendants have considered any less disruptive means of advancing any legitimate policy goals in lieu of the high-stakes certification requirements that will deter grantees from providing important services in line with the statute.

Defendants likewise failed to acknowledge that the New Conditions reflect a change in policy or to reasonably explain the reasons for that change. *See Fox Television Stations*, 556 U.S. 502.

*b. The OVW and OJP Anti-DEI Certifications are arbitrary and capricious*

The OVW and OJP Anti-DEI Certifications are arbitrary and capricious because the administrative record contains no explanation at all for them. *See King Cnty.*, 785 F. Supp. 3d at 888. Instead, it appears that Defendants imposed those certification requirements because the Anti-DEI Executive Order directed them, and all federal agencies, to include such a certification in all federal awards. OVW AR at 15 (including executive order requiring certification in OVW administrative record); OJP AR-1 at 2 (same for OJP). But, again, an executive order does not excuse an agency from the APA's requirement for reasoned decisionmaking. *See supra* Section I.A.1.a.

Defendants' rote implementation of executive orders is all the more problematic because Defendants failed to consider multiple "important aspect[s] of the problem"—a hallmark of arbitrary and capricious decisionmaking. *State Farm*, 463 U.S. at 43. For instance, Defendants did not consider how the certifications—and the associated threat of False Claims Act litigation—would chill grantees from engaging in entirely lawful activity to foster inclusion, diversity, and equity. Nor did they consider or explain how that would result in fewer services to populations that are already underserved, or how that could be reconciled with Congress's

express authorization for programs targeting underserved populations. *See supra* Background Section A.1.

Defendants likewise failed to consider how these certifications jeopardize the "serious reliance interests" of grantees—in using this funding on terms they can understand, and without having to violate their missions to avoid the risk of potentially ruinous FCA exposure—and the members of the public they serve. *See Regents of the Univ. of Cal.*, 591 U.S. at 30 (quotations omitted). Defendants also failed to even "display awareness" that the Certifications represent a change in policy at all, *FCC*, 556 U.S. at 515—despite the new requirement to certify to FCA materiality and the accompanying threats that grantees now must abide by Defendants' novel and unexplained view of nondiscrimination laws.

*c. The OJP Immigration Condition is arbitrary and capricious*

Finally, the OJP Immigration Condition also fails the APA's requirement for reasoned decisionmaking. The most Defendants muster—in a single-page email reflecting the entirety of Defendants' consideration of this Condition—is the conclusion that it is "in the public interest" to direct federal dollars to "services for U.S. citizens and lawful residents," consistent with an executive order's directive to use federal funds to "improve American lives." OJP AR-2 at 82. But this fails to consider multiple "important aspect[s] of the problem," *State Farm*, 463 U.S. at 43.

For one, Defendants did not consider that it will be difficult or impossible for grantees to reliably determine whether a victim seeking services falls within the category of individuals the Immigration Condition requires grantees to exclude—or that this difficulty will mean that, to avoid violating the Condition, grantees will be forced to turn away victims in need who are lawfully in the United States or even U.S. citizens.

Multiple factors make it difficult or impossible for grantees to reliably determine whether a victim is ineligible for services under the OJP Immigration Condition. For one, the categories the Condition identifies—"removable alien[s]" under 8 U.S.C. § 1229a(e)(2) and people who are "unlawfully present"—are ill-defined and not ascertainable by private organizations. Determining "whether a person is removable" involves "significant complexities." *Arizona v. United States*, 567 U.S. 387, 409 (2012). Indeed, whether someone is "removable" must be determined in a proceeding before an immigration judge, and this determination is subject to reconsideration and appeal, and an individual deemed removable can still be granted relief from removal. *See* 8 U.S.C. § 1229a(c)(1)(A), (4)–(7) (describing processes for reconsideration, appeal, and seeking relief from removal). And whether someone is "unlawfully present" cannot be readily ascertained given "the labyrinth of statutes and regulations governing the classification of non-citizens, and the necessity for over 260 immigration judges to oversee individual cases." *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 534 (5th Cir. 2013) (en banc). While the government has a system for looking up noncitizens' immigration statuses—the Systematic Alien Verification for Entitlements (SAVE) database—the system "does not provide an independent, binary determination of an individual's 'lawful presence,'" *Id.* at 533 n.14, and nongovernmental organizations cannot use that system in any event.[16] It is unclear how a grantee could determine whether any noncitizen victim was "lawfully present" and not "removable" such that the grantee could permissibly provide services to them under the Immigration Condition.

[16] U.S. Citizen and Immigration Services, *Register an Agency for SAVE* (Oct. 6, 2025) https://perma.cc/DPH5-6P7J.

Beyond that, victims of crime whom grantees serve will not reliably have documentation to prove *anything* about their citizenship or immigration status—and so could not even show, for example, that they are a citizen born in the United States. Hill Decl. ¶ 27; Higginbotham Decl. ¶ 42; Colón Decl. ¶ 41. Many of the victims of crime that OJP grantees serve are fleeing domestic violence or other dangerous circumstances and will not be able to take documents with them. Hill Decl. ¶ 26; Higginbotham Decl. ¶ 42; Colón Decl. ¶ 46; Fisher Decl. ¶ 28. In some instances, abusers restrict their spouses' access to important documents as a form of control—and so victims could not bring documents with them in any event. Hill Decl. ¶ 27 Higginbotham Decl. ¶ 42; Colón Decl. ¶ 46. And grantees could not navigate these difficulties by requiring documents only from people who "look or sound foreign," as that would likely violate nondiscrimination laws. *See* 62 Fed. Reg. 61344-02, 61346 (1997) (DOJ guidance advising that providers "should not single out individuals who look or sound foreign for closer scrutiny or require them to provide additional documentation of citizenship or immigration status" as that would risk violating nondiscrimination laws); 42 U.S.C. § 2000d; 34 U.S.C. § 20110(e). Defendants did not consider these myriad practical impediments to implementing the Immigration Condition.

Nor did Defendants consider that, given these impediments, grantees will have to either deny services to anyone who cannot affirmatively prove their citizenship or immigration status or risk violating the Immigration Condition—and exposing themselves to potentially ruinous litigation under the False Claims Act. Defendants' failure to consider this impact of the Condition—or how that undermines the very purpose of the grant programs Congress established—is a hallmark of arbitrary and capricious decisionmaking. *See State Farm*, 463 U.S. at 43.

Defendants also failed to consider how asking victims for documentation about their citizenship or immigration status would undermine service providers' ability to build trust in their communities—and how this would undermine their effectiveness at serving victims. Survivors seek help only if they trust the service provider—and this can take time to build. *See* Hill Decl. ¶ 27; Higginbotham Decl. ¶¶ 44–45; Colón Decl. ¶ 44. Asking for immigration documentation would erode that hard-won trust and cause survivors to fear service providers are government informants rather than helpful allies. Hill Decl. ¶ 27; Higginbotham Decl. ¶¶ 44–45; Colón Decl. ¶ 44. Defendants did not consider how this would lead some crime victims not to seek help at all.

Defendants likewise did not consider how service providers would face difficulty complying with the OJP Immigration Condition while also complying with binding regulations that require them to offer some services to all comers, regardless of immigration status. In particular, grantees could use grants subject to the OJP Immigration Condition to support programs also funded by VOCA Victim Assistance grants or Violence Against Women Act grants. But, under binding regulations that apply to those other grants, victims' eligibility for services is expressly "not dependent on the victim's immigration status." 28 C.F.R. §§ 94.103(a), 94.116 (VOCA Victim Assistance); *id.* § 90.4(c) (VAWA). Defendants did not consider or explain how grantees could practicably navigate the Immigration Condition's conflict with these requirements.

Rather than consider these important issues, Defendants appear to have adopted the Immigration Condition to comply with an executive order directing agencies to ensure discretionary awards will not "promote" or "facilitate" "illegal immigration." OJP AR-2 at 3 (executive order); *see also id.* at 82 (decision memo referring to this executive order). But there

is no basis to think that allowing victims of crime to access help will encourage illegal immigration—after all, no one comes to the U.S. hoping to be a victim. *See* Memorandum from Joye E. Frost, Acting Director, U.S. DOJ, OJP, OVC to Cassie T. Jones, Alabama Crime Victim's Compensation Commission at 4 (July 2, 2010), https://perma.cc/SYE7-S2WJ (concluding that assistance "predicated on the recipient's having been a victim of crime" were "unlikely to provide an incentive" for immigration to the U.S.). For the same reasons, Defendants' desire to deter illegal immigration likewise provided no basis for Attorney General Bondi's across-the-board directive to stop providing grants to organizations that serve "removable or illegal aliens," OVW AR at 61–62—a directive from which the OJP Immigration Condition appears to derive and that is itself arbitrary and capricious.

### ***2. The New Conditions exceed Defendants' statutory authority***

The New Conditions exceed Defendants' statutory authority. For agencies charged with administering statutes, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 297 (2013). An agency "literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "Any action that an agency takes outside the bounds of its statutory authority … violates the Administrative Procedure Act." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020).

No statute authorizes Defendants to impose the New Conditions. Congress has often attached conditions to OVW and OJP grants—conditions that define the scope of the programs and aim to ensure the programs' effectiveness. *See supra* Background Section A. But Congress has not authorized the executive branch to impose additional substantive conditions designed to advance policy goals unrelated to the grant programs' purposes and requirements. *Cf. California v. U.S. Dep't of Transp.*, 788 F. Supp. 3d 316, 322 (D.R.I. 2025) (agency lacked authority "to

impose immigration enforcement conditions on federal dollars specifically appropriated for transportation purposes"). Nor did Defendants identify any such authority in adopting the conditions. And while Defendants pointed to a few purported sources of authority in their briefing on Plaintiffs' motions for preliminary relief, none of Defendants' cited statutes actually authorize the Conditions.

##### *a. Defendants lack authority to impose the OVW "Out-of-Scope" Conditions*

Contrary to Defendants' prior contentions, the OVW "Out-of-Scope" Conditions cannot be justified as exercises of Defendants' authority to ensure that grant funds are used only for the "specific purposes" authorized by VAWA, 34 U.S.C. § 12291(b)(5), or to otherwise ensure that grantees comply with "preexisting obligations." *Contra* Dkt. No. 19 at 22. Those conditions do far more than just reiterate grantees' obligations to use grant funds for statutorily authorized purposes or to otherwise comply with the law.

Start with the conditions Defendants have claimed merely require compliance with the law—the OVW Anti-DEI Condition, Immigration Enforcement Condition, Immigration Priority Condition, and E.O. Condition. Those conditions in fact restrain grantees' conduct beyond what existing laws require. The OVW Anti-DEI Condition goes beyond merely requiring compliance with federal nondiscrimination laws and also prohibits "discriminatory … ideology" and "diversity, equity, inclusion, and accessibility programs that do not advance the policy of equal dignity and respect." OVW AR at 212, 222. On its face, this is not limited to otherwise-illegal activity.

Similarly, the OVW Immigration Enforcement Condition—which bars grantees from "[p]romoting or facilitating the violation of federal immigration law" (OVW AR at 212, 222)—goes beyond what the law otherwise requires because it is not illegal to merely "promote or

facilitate" such violations. That is especially true given the Administration's view that merely providing services to undocumented immigrants may promote immigration violations. *See supra* Background Section B.3.

The OVW Immigration Priority Condition—which bars "[i]nitiatives that prioritize illegal aliens over U.S. citizens and legal residents in receiving victim services and support" (OVW AR at 212, 222)—also sweeps more broadly that what the law otherwise requires because it is not illegal, for example, to run programs that necessarily prioritize undocumented immigrants by offering help with procuring visas or other immigration relief that only undocumented survivors need. Nor, as another example, would it be illegal to provide a limited resource (such as a room in a domestic violence emergency shelter) to an undocumented immigrant even if that meant a citizen would not get in—yet this condition causes grantees to fear they could face liability for doing that.

And the OVW E.O. Condition—which bars "[a]ny activity or program that unlawfully violates an Executive Order"—is not limited to barring otherwise-unlawful conduct. Indeed, Executive Orders generally can only direct federal agencies on what to do; they cannot impose obligations on the public. Nor does it help Defendants that the condition bars only "unlawfully" violating Executive Orders. Such a "savings clause" does not "magically ensure" that the condition is lawful. *City of Fresno v. Turner*, No. 25-cv-7070, 2025 WL 2721390, at *10 (N.D. Cal. Sept. 23, 2025) (holding that clause stating "'… which violate [relevant federal] law'" did not "magically ensure that the conditions incorporating that language only operate in so far as they are within Congress's grant of authority" (alterations in original)); *see also City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1238–1240 (9th Cir. 2018) (holding that the phrase "consistent with law" did not save certain executive orders).

Other conditions do not even arguably address only illegal conduct—and Defendants apparently seek to justify those as implementing VAWA's command that appropriated funds "may be used only for the specific purposes described in" VAWA, 34 U.S.C. § 12291(b)(5). That justification also falls short because the prohibited activities are all wholly compatible with performing the many activities that VAWA authorizes. Take the prohibition on "promoting gender ideology"—which, as Administration statements show, bars grantees from allowing transgender bathroom access or even just using pronouns and other language that recognizes transgender individuals' identity. *See supra* Background Section B.2. Grantees can and do engage in such conduct while also carrying out the victim services or other activities that VAWA authorizes. *See, e.g.*, Higginbotham Decl. ¶ 32.

So too with the OVW Law Enforcement and Immigration Enforcement Condition, which bars "[p]rograms that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women." OVW AR at 212, 222. Grantees can provide, and historically have provided, information that could be interpreted as discouraging collaboration with law enforcement—like informing survivors about potential negative consequences of involving law enforcement—while fully performing crisis counseling or other services that VAWA funds. *See* Faisal Decl. ¶ 31.

Likewise, grantees can "frame domestic violence or sexual assault as systemic social justice issues rather than criminal offenses"—conduct the OVW Systemic Framing Condition prohibits—while carrying out their VAWA-authorized activities. Indeed, in adopting VAWA, Congress recognized that domestic and sexual violence was a systemic issue, not just a criminal one, and it explicitly aimed to tackle it as such. *See supra* Background Section A; S. Rep. No. 103-138, at 38, 42 (1993) (finding that gender-based violence stemmed in part from an

"underlying attitude that [domestic and sexual] violence is somehow less serious than other crime" and explaining that the law would address "not only the violent effects of the problem, but the subtle prejudices that lurk behind it").[17]

*b. Defendants lack authority to impose the OJP Immigration Condition*

No statute authorizes the OJP Immigration Condition—and Defendants have not pointed to any statutory provision authorizing Defendants to impose that Condition on OJP grants. In responding to Plaintiffs' motion for preliminary relief on the OJP Immigration Condition, Defendants pointed to a single provision—34 U.S.C. § 20111(c)(3)—but that provision does not supply the authority Defendants need. That provision authorizes OVC to "[e]stablish[] programs in accordance with section 20103(c) of this title"—*i.e.*, programs under VOCA for victim services and other specified projects—"on terms and conditions determined by the Director to be consistent with that subsection." 34 U.S.C. § 20111(c)(3). This provision does not authorize the OJP Immigration Condition for two independent reasons.

First, the provision only addresses grant programs under VOCA § 20103(c)—and thus categorically does not supply authority to impose the Immigration Condition on other OJP grants, including the Pet Shelter grants that Defendants issued in January with that Condition.

Second, the provision does not even authorize the Immigration Condition for VOCA grants under § 20103(c). It is not "consistent with" § 20103(c) to forbid grantees from providing services to any victim who cannot establish that they are not a "removable alien" or otherwise "unlawfully present." The purpose of § 20103(c) is to provide support for victims of crime, and, as explained above, *supra* Section I.A.1.c, the Immigration Condition seriously undermines that

[17] Defendants may have statutory authority to adopt the OVW Awareness Campaigns Condition—which bars grantees from using grant funds on awareness campaigns "that do not lead to tangible improvements in prevention, victim safety, or offender accountability"—but that condition is arbitrary and capricious for the reasons explained in Section I.A.1.a.

goal—by forcing providers to demand documentation that victims fleeing dangerous situations often will not have (and losing essential trust in the process), by denying help to victims who cannot prove their status, and by chilling noncitizen and citizen victims alike from seeking help at all. Defendants previously claimed that, because resources are limited, they can pick and choose which victims can receive help. Dkt. No. 59 at 22–23. But the statute does not authorize them to disqualify certain categories of victims from eligibility for services when that would undermine the very purposes of the grant program—and thus be *in*consistent with the statute.

*c. Defendants lack authority to impose the OVW and OJP Anti-DEI Certifications*

Defendants likewise lack authority to impose the OVW and OJP Anti-DEI Certifications—conditions Defendants have adopted to pave the way for FCA lawsuits designed to punish and deter diversity, equity, and inclusion activities that the Administration disfavors. Defendants have suggested that these requirements "simply call attention to recipients' pre-existing obligations" (Dkt. No. 19 at 22; *see also* Dkt. No. 58 at 25–27), but that is mistaken for two separate reasons.

First, it strains credulity to contend that the requirement that grantees certify that they "do[] not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable federal civil rights or nondiscrimination laws" merely reflects grantees' existing obligation to comply with such laws. *See* OVW AR at 124–125; OJP AR-1 at 61. Another district court recently held as much. *See City of Fresno*, 2025 WL 2721390, at *8 (holding that the inclusion of "language such as '…DEI programs that violate federal anti-discrimination law'" in funding conditions "does not transform them into pre-existing conditions to comply with federal law that were merely unspoken"). As that court explained, given the context, the "references to federal law act as announcements of

policies rather than as limits to the scope of the new conditions." *Id.* The Administration has made clear that "the government's view of what is illegal" under antidiscrimination laws "has changed significantly with the new Administration." *See Chi. Women in Trades v. Trump*, 778 F. Supp. 3d 959, 984 (N.D. Ill. 2025); *accord City of Fresno*, 2025 WL 2721390, at *8 (explaining that the government's interpretation of antidiscrimination laws "is undergoing significant change"). The conditions "go beyond prohibiting violations of federal law as it is currently understood and pose a real risk of curtailing programs that would not be found violative." *City of Fresno*, 2025 WL 2721390, at *11.

Second, the Anti-DEI Certifications are also unlawful for the independent reason that they require grantees to "agree[]" upfront that their compliance with antidiscrimination laws is "material …, including for purposes of the False Claims Act." OVW AR at 124–125; OJP AR-1 at 61. While Defendants have authority to require grantees to certify compliance with nondiscrimination laws—and long have (though without unlawfully singling out one category of generally lawful conduct for special scrutiny)—they cannot require grantees to agree in advance that compliance with those laws is material to any payment decision by the government.

That materiality certification undercuts an important part of the FCA's statutory scheme. As the Supreme Court has emphasized, "strict enforcement" of the FCA's "rigorous" materiality requirement is important, including because it guards against "open-ended liability" under a law that was not intended to be a "vehicle for punishing garden-variety … regulatory violations." *Escobar*, 579 U.S. at 192, 194. Noncompliance with statutory requirements is "not automatically material, even if they are labeled conditions of payment." *Id.* at 191. Nor is materiality automatically established merely because "the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* at 194. More is required. *See id.* at 192–96.

The required certification of materiality would gut this by excusing the government (and any *qui tam* relator) from meeting the "demanding" materiality standard, *id.* at 194, and enabling them to satisfy it automatically instead. No statute authorizes Defendants to effectively write the materiality element out of the FCA in this way.

#### ***3. Many of the New Conditions are contrary to law***

In addition to exceeding Defendants' statutory authority, many of the New Conditions outright conflict with governing statutes and therefore must be set aside as contrary to law.

##### *a. All of OVW's New Conditions conflict with the provisions governing coalition grants*

To begin, all of OVW's New Conditions conflict with the statutory provisions mandating that OVW award funds to coalitions pursuant to set formulas. For these formula grants, Congress has mandated that OVW "shall" distribute grants in specified amounts to recognized coalitions once they submit an application meeting congressionally prescribed criteria. 34 U.S.C. §§ 10441(c), 10446(b)(2)–(3), 12511(d). By overlaying additional conditions, and by withholding grant funds from coalitions if they do not make the required certifications, Defendants violate the statutory mandate to make these grants.

The First Circuit has previously rejected a similar effort by DOJ to impose conditions on formula grants. *See City of Providence*, 954 F.3d at 23. In that case, DOJ sought to impose conditions requiring recipients of law enforcement grants to certify that they would take certain actions to aid federal immigration enforcement. The First Circuit rejected it as incompatible with the "formulaic nature" of the program. *Id.* at 29–30, 34, 38. The court concluded that general grants of authority did not "allow the DOJ to impose by brute force conditions on [the] grants to further its own unrelated law enforcement priorities." *Id.* at 34–35. If DOJ had "such

discretion," the grants "would no longer function as a formula grant program." *Id.* at 42. The same conclusion applies to the Coalition Grants here.

*b. The OVW "Gender Ideology" Condition conflicts with VAWA's non-discrimination provision*

OVW's prohibition on using grant funds to "inculcat[e] or promot[e] gender ideology" as defined in the "Gender Ideology" Executive Order conflicts with the VAWA provision prohibiting discrimination on the basis of "gender identity" in OVW grant programs. 34 U.S.C. § 12291(b)(13)(A). The "Gender Ideology" Executive Order defines prohibited "gender ideology" as the "false" notion that individuals can have a "self-assessed gender identity" that is "disconnected from one's sex" (as determined by their "reproductive cell[s]"). "Gender Ideology" Order §§ 2(d), (e), (f). As another court recently observed, that Order's "express purpose is to disapprove of transgender people" and "to deny the existence of transgender persons entirely." *S.F. AIDS Found. v. Trump*, 786 F. Supp. 3d 1184, 1216 (N.D. Cal. 2025). Beyond that, Administration officials at DOJ and elsewhere have made clear that this condition would force grantees to avoid using pronouns that reflect a person's gender identity and exclude transgender individuals from the bathroom that aligns with their gender identity. *See supra* Background section B.2. But that is discriminatory, as court after court has recognized.[18] Indeed, as another court held in addressing the "Gender Ideology" Order, it is difficult to "fathom discrimination more direct than the plain pronouncement of a policy resting on the

[18] *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616–17 (4th Cir. 2020) (transgender student's exclusion from bathroom constituted Title IX discrimination); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 771 (7th Cir. 2023) (same); *S.F. AIDS Found*, 786 F. Supp. 3d at 1200, 1214 (holding that "Gender Ideology" Order's requirement that agencies not fund programs that "promote gender ideology" likely violated Equal Protection Clause); *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1099 (S.D. Cal. 2017) (concluding that allegations that defendants referred to a transgender boy "with female pronouns" stated a claim for discrimination).

premise that the group to which the policy is directed does not exist." *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 444 (D. Md. 2025). The "Gender Ideology" Condition therefore compels discrimination that violates VAWA's prohibition on discrimination, 34 U.S.C. § 12291(b)(13)(A)—and therefore must be set aside as contrary to law.

*c. The OVW Anti-DEI Condition conflicts with VAWA provisions promoting DEI activities*

OVW's prohibition on using grant funds to "promot[e] or facilitat[e]" DEI programs conflicts with provisions throughout VAWA that authorize, encourage, and mandate just those sorts of programs. Various statutory provisions specifically authorize grants to organizations and programs that either serve racial and ethnic minorities or other underserved populations or partner with organizations that do so, and in some instances, the statute expressly requires DOJ to prioritize services for racial and ethnic minorities or other underserved populations in awarding grants. *See, e.g.*, 34 U.S.C. §§ 12291(a)(8), (46); 12341(b)(2), (d)(4); 12351(a), (g)(2)(C)(ii); 12421(1)(A)(i), (1)(A)(iv),(2)(A)(iv), (3); 12451(b)(1), (2)(E), (c)(1)(A); 12463(c)(2)(B)–(C), (F), (d)(3); 12464(b)(5)(E); 12475(c)(2)(D); 12501(b)(3); 12514(c); *see also supra* Background Section A.1. The OVW Anti-DEI Condition flies in the face of Congress's clear commitment to advancing DEI values through the administration of OVW grants, as reflected in those myriad provisions.

The fact that the condition is limited to barring "illegal" DEI programs and other "discriminatory programs or ideology" does not save the condition given the overwhelming indications that this Administration views any programs that focus on certain groups or recognize marginalized populations as unlawful. *See supra* Background Section B.1. And that sort of "savings clause" limiting the condition to purportedly "illegal" activity does not "magically ensure" that the condition is lawful. *City of Fresno*, 2025 WL 2721390, at *10. Nor

does it help that the condition states that it "is not intended to interfere with any of OVW's statutory obligations, such as funding for HBCUs, culturally specific services, and disability programs." OVW AR at 212. This leaves grantees to guess at what is permitted—and puts them at great risk if they serve underserved communities and racial and ethnic minorities and other underserved communities as VAWA contemplates.

*d. OVW's immigration-related conditions conflict with provisions expressly authorizing services for immigrants*

OVW's prohibitions on using grant funds to "prioritize illegal aliens … in receiving victim services," to "promot[e] or facilitat[e] the violation of federal immigration law," and to carry out any programs that "limit the role of … immigration enforcement" (Immigration Priority Condition, Immigration Enforcement Condition, and Law Enforcement and Immigration Enforcement Condition) all conflict with the statutory authorization for programs that specifically target services for, and thus prioritize, "underserved" groups. *See, e.g.*, 34 U.S.C. §§ 12291(a)(46), 20123, 12421(3). In identifying these "underserved" populations, Congress specifically included those populations that face barriers due to their "alienage status." *See id.* § 12291(a)(46). Grantees cannot provide services targeted to this underserved group without risking being deemed to "prioritize" illegal aliens. Likewise, the prohibitions on limiting the role of immigration enforcement and on "promoting or facilitating" immigration violations make it impractical or impossible to offer programs specifically for immigrants as Congress intended. Many immigrants will avoid services that involve coordination with enforcement bodies that could take adverse action against them or their families. They will also avoid seeking help from organizations that probe victims' immigration status or report undocumented victims or family members to authorities—but those are actions grantees may now be forced to take to avoid being deemed to "promot[e] or facilitat[e]" immigration

violations. *See* Colón Decl. ¶ 41 (once it becomes known that a member organization "asks invasive questions" to individuals without legal status "and has subsequent limits on its services," survivors "may choose not to seek assistance and will either stay with their abusive partner or live on the street").

In addition, the prohibition on "promot[ing] or facilitat[ing]" immigration violations conflicts with the provision expressly authorizing grantees to provide rural victims with "assistance in immigration matters," 34 U.S.C. § 12341(b)(2). Given the Administration's statements suggesting that providing *any* services to undocumented immigrants promotes violations of immigration law, *see supra* Background Section B.3, this condition would prevent grantees from providing the immigration assistance that Congress specifically authorized.

*e. The OJP Immigration Condition conflicts with VAWA confidentiality requirements*

The OJP Immigration Condition conflicts with the nondisclosure of confidential information requirements in 34 U.S.C. § 12291(b)(2) insofar as grantees could need to seek information from third-party sources to attempt to assess victims' status and thereby avoid violating the Condition's prohibition on serving certain categories of non-citizens. Under § 12291(b)(2), VAWA grantees "shall not … disclose reveal or release individual client information" without the client's consent—"whether for [a VAWA] program *or any other* Federal, State, tribal, or territorial grant program." 34 U.S.C. § 12291(b)(2)(B)(ii) (emphasis added). The statute further provides that "[i]n no circumstances" may a victim "be required to provide" such consent "as a condition of eligibility for the services provided by the grantee or subgrantee." *Id.* § 12291(b)(2)(D)(ii). The PAWS Act applies these restrictions to Pet Shelter grants as well. *Id.* § 20127(4)(A).

Because the confidentiality provisions bar grantees from disclosing client information for "any" grant program, they prohibit any grantee that receives a VAWA or Pet Shelter grant (or certain other grants) from disclosing information about OJP grants as well. The OJP Immigration Condition would conflict with these requirements by, in some instances, effectively requiring grantees to disclose client information in order to verify the client's citizenship or immigration status. Grantees would have to either disclose that information without the client's consent or require the client to provide consent in order to receive services—either way violating the statute. In all events, Defendants acted arbitrarily and capriciously by failing to consider or explain how grantees' obligations under the Immigration Condition could be squared with these confidentiality requirements.

*f. The OJP Immigration Condition conflicts with the PAWS Act's prohibition on background checks of victims*

Finally, the OJP Immigration Condition is contrary to law as applied to Pet Shelter grants because the PAWS Act bars "activities that may compromise the safety of a domestic violence victim, including … background checks of domestic violence victims." 34 U.S.C. § 20127(2)(B)(i). Implementing the Immigration Condition would compromise the safety of domestic violence victims, contrary to this statutory command. Assessing a victim's citizenship or immigration status would compromise victims' safety by requiring them to produce documents that could be dangerous for them to obtain and by excluding them from needed services if they cannot provide necessary proof. *See* Hill Decl. ¶ 27; Higginbotham Decl. ¶ 42; Colón Decl. ¶¶ 41, 44.

***4. The New Conditions must be set aside under the APA because they violate the Constitution***

The New Conditions also must be set aside because they are "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B). For the reasons

explained in Section I.B below, the New Conditions violate the Spending Clause and other constitutional separation-of-powers provisions, the First Amendment, and the Fifth Amendment's Due Process Clause. That warrants relief under the APA.

### B. The New Conditions are unconstitutional

#### *1. The New Conditions violate the Spending Clause and other constitutional provisions safeguarding the separation of powers*

The New Conditions violate multiple constitutional provisions safeguarding the separation of powers. As court after court has recognized, imposing "extra-statutory conditions on federal grant awards as a tool to obtain compliance with [the executive's] policy objectives strikes at the heart of … the separation of powers." *City of Chi. v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020) (holding that the executive branch violated separation of powers by conditioning federal funding on recipients' facilitating immigration enforcement).[19] Defendants have done precisely that here. As explained above, *supra* Section I.A.2, Congress has not authorized Defendants to impose any of the New Conditions. In imposing them anyway in order to carry out executive orders, Defendants have exceeded their constitutional authority and encroached on Congress's power to control federal spending, in violation of foundational separation-of-powers principles.

The Constitution "exclusively grants the power of the purse to Congress, not the President." *Colorado v. U.S. Dep't of Health & Human Servs.*, 788 F. Supp. 3d 277, 308 (D.R.I.

[19] *See also, e.g.*, *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231, 1234–35 (9th Cir. 2018) ("withhold[ing] all federal grants from so-called 'sanctuary' cities and counties" violated separation of powers); *King Cnty.*, 785 F. Supp. 3d at 874–75, 885–88 (agencies violated separation of powers by barring grant recipients from "us[ing] grant funds to promote 'gender ideology'" and by requiring recipients to cooperate with federal immigration enforcement); *PFLAG, Inc.*, 769 F. Supp. 3d at 432–41 (conditioning funding on recipients' denying gender-affirming care violated separation of powers); *Washington v. Trump*, 768 F. Supp. 3d 1239, 1261–63 (W.D. Wash. 2025) ("gender ideology" funding conditions violated separation of powers).

2025) (quoting *City & Cnty. of S.F.*, 897 F.3d at 1231); *see also* U.S. Const. art. I, § 8, cl. 1 (Spending Clause); *id.* art. I, § 9, cl. 7 (Appropriations Clause). Among the "legislative [p]owers" the Constitution vests in Congress, *see* U.S. Const. art. I, § 1, is the authority to distribute funds to states and private entities to promote "the general welfare" under the Spending Clause, *id.* art. I, § 8, cl. 1. Exercising these powers, Congress may, within limits, "attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

The executive branch may not. Rather, "[w]hen it comes to spending, the President has none of his own constitutional powers to rely upon" and can only exercise authority Congress has delegated. *City & Cnty. of S.F.*, 897 F.3d at 1233–34 (quotations omitted). Here, because Congress has not delegated to the executive branch the authority to impose the New Conditions, *see supra* Section I.A.2, Defendants unconstitutionally "claim[] for [themselves] Congress's exclusive spending power" and "attempt[] to coopt Congress's power to legislate." *See City & Cnty. of S.F.*, 897 F.3d at 1234.

Defendants also violate the Presentment Clause, "which requires that all federal laws … be passed by both houses of Congress and signed by the President." *O'Connell v. Shalala*, 79 F.3d 170, 173 n.2 (1st Cir. 1996); *see also* U.S. Const. art. I, § 7, cl. 2. Nothing in the Constitution "authorizes the President to enact, to amend, or to repeal statutes" on his own. *Clinton v. City of N.Y.*, 524 U.S. 417, 438 (1998). Defendants' imposition of the New Conditions attempts to amend unilaterally the statutes governing the myriad grant programs in violation of the Presentment Clause. *See PFLAG*, 769 F. Supp. 3d at 441 ("Article I does not allow the President to circumvent bicameralism and presentment by unilaterally amending … federal appropriations through an executive order.").

The New Conditions also violate the Take Care Clause, under which the President is obliged to "take care that the laws be faithfully executed," U.S. Const. art. II, § 3. Congress enacted statutes requiring Defendants to disburse funds Congress appropriated to carry out purposes Congress identified. By failing to follow those commands, Defendants fail to faithfully execute the law.

At bottom, the Founders established our system of separated powers to guard against "a concentration of power [that] would allow tyranny to flourish." *City of Chicago*, 961 F.3d at 892. In that system, "the power to wield the purse to alter behavior rests squarely with the legislative branch"—whose "elected representatives and dual chambers" supply "institutional protection from the abuse of such power." *Id.* That "institutional protection from abuse" would disappear if the executive branch could "impose [its] policy preferences regardless of the will of Congress." *Id.* Defendants' attempt to leverage federal funding "to effectuate [the executive's] own policy goals" violates the separation of powers. *See City & Cnty. of S.F.*, 897 F.3d at 1235.

***2. The OVW "Gender Ideology" Condition violates the First Amendment***

OVW's "Gender Ideology" Condition violates the First Amendment's protection of "the freedom of speech," U.S. Const. amend. I, and Plaintiffs are accordingly entitled to summary judgment on Count VII. While the government may, in some circumstances, attach conditions to federal funding that "affect the recipient's exercise of its First Amendment rights," there are limits. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, Inc., 570 U.S. 205, 214–15 (2013). Crucially, the government may not restrict "protected [speech] outside the scope of the federally funded program." *Id.* at 217 (*citing Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). Nor may it leverage government funding to "aim at the suppression of dangerous ideas." *NEA v. Finley*, 524 U.S. 569, 587 (1998) (cleaned up). And imposing a funding condition "not relevant to the objectives of the program" can also violate the First Amendment. *Open Soc'y*, 570 U.S. at 214.

The "Gender Ideology" Condition transgresses these limits in multiple ways. This condition cannot be justified as the government merely refusing to "affirmatively fund[]" the targeted speech. *See S.F. AIDS Found.*, 786 F. Supp. 3d at 1218–20.

For one, the "Gender Ideology" Condition is "entirely untethered to any 'legitimate objective[s]'" of the VAWA programs it burdens. *Id.* at 1218. Instead, it is "directed … towards disfavored speech." *Id.* at 1219. Under this Condition, a grantee apparently could not "refer to the clients they serve … by any pronoun" or preferred name that matches their gender identity as opposed to their sex assigned at birth. *Id.* But that "is pure speech that has no relation to," *id.*, the VAWA grant programs' purposes of preventing domestic violence and sexual assault and supporting survivors of those offenses—and in fact would require grantees to forgo the essential work of building trust to provide help to transgender victims of violence. Sarang-Sieminski Decl. ¶¶ 35, 37.

Moreover, the "Gender Ideology" Condition impermissibly "withhold[s] subsidies for a censorious purpose—aiming to suppress" what the government views to be "the dangerous idea[] of … 'gender ideology.'" *S.F. AIDS Found.*, 786 F. Supp. 3d at 1220; *see also R.I. Latino Arts v. NEA*, 777 F. Supp. 3d 87, 109–10 (D.R.I. 2025) (noting that government cannot "use subsidies to suppress dangerous ideas" and concluding that bar on funding art programs that "promote gender ideology" was "a clear First Amendment violation"). The underlying Executive Order makes clear its goal is "to root out the 'extreme,' 'false claims' of gender identity that contradict the government's view that there is only one 'biological reality of sex,'" namely to erase the recognition of transgender peoples' existence. *S.F. AIDS Found.*, 786 F. Supp. 3d at 1220 (citing "Gender Ideology" Order §§ 1, 2(f)). By defunding any activities "related to the dangerous ideas it has identified," the "Gender Ideology" Condition effectuates

"precisely the kind of 'invidious viewpoint discrimination' that the Supreme Court has suggested would present First Amendment concerns even in the context of federal subsidies." *Id.* (citing *Finley*, 524 U.S. at 587).

The "Gender Ideology" Condition is also unconstitutional because it strays beyond the "scope of the federally funded program," *Open Soc'y*, 570 U.S. at 218 (quoting *Rust*, 500 U.S. at 197). As the Supreme Court has explained, a funding condition "by its very nature affects 'protected conduct outside the scope of the federally funded program'" when it "demand[s] that funding recipients adopt—as their own—the Government's view on an issue of public concern." *Id.* (*quoting Rust*, 500 U.S. at 197). The "Gender Ideology" Condition does just that. Under the Condition, a grantee risks noncompliance if it says anything recognizing someone's gender identity, such as by using a transgender person's preferred pronouns. *See supra* Background Section B.2. So this Condition leaves grantees with no choice but to use the pronouns corresponding to the person's sex assigned at birth—speech that reflects the Administration's view that gender identity should not be acknowledged or respected—a condition far afield from the scope of OVW programs.

***3. The OVW and OJP Anti-DEI Certifications violate the First Amendment***

OVW's and OJP's Anti-DEI Certifications also violate the First Amendment, for two separate reasons.

First, the Certifications impermissibly restrict speech "outside the scope of the federally funded program," *Open Soc'y*, 570 U.S. at 217 (Count VIII). The Certifications compel grantees to certify that they "do[] not operate *any* programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable federal civil rights or nondiscrimination laws." OVW AR at 124–125; OJP AR-1 at 61. That requirement "on its face makes clear" that it applies to "any program …, irrespective of whether

the program is federally funded." *Chi. Women in Trades*, 778 F. Supp. 3d at 984. And it restricts speech, as "diversity, equity, and inclusion" programs almost invariably contain speech promoting those values. Indeed, as the Administration itself has acknowledged, it is restricting work related to "diversity, equity, and inclusion" because of disagreement with its "foundational rhetoric and ideas." The White House, *Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI* (Jan. 22, 2025), https://perma.cc/G8JU-QQ44.

It does not matter that the Anti-DEI Certifications purport to bar only conduct that violates "federal civil rights or nondiscrimination laws." As another court held in preliminarily enjoining a similar certification requirement, "[t]he problem … is that the meaning of this is left entirely to the grantee's imagination." *Chi. Women*, 778 F. Supp. 3d at 984. Neither the terms of the certification requirements nor the Executive Order on which those requirements are based defines "what might make any given 'DEI' program violate Federal anti-discrimination laws." *Id.* What this Administration will claim is illegal "is anything but obvious." *Id.* Indeed, "the thrust" of the underlying DEI Executive Order "is that the government's view of what is illegal in this regard has changed significantly with the new Administration." *Id.* The executive branch now plainly views as unlawful a wide array of DEI programs that, until recently and over several decades, the federal government actively encouraged. *See, e.g.*, DEI Order § 1 (criticizing diversity, equity, and inclusion practices of a wide variety of "influential institutions of American society"); *id.* § 3 (revoking multiple longstanding diversity-related executive actions and requiring the Office of Management and Budget to "[e]xcise" from federal funding procedures all "references to DEI and DEI principles, under whatever name they may appear," and to "[t]erminate all 'diversity,' 'equity,'" and similar activities). Against this backdrop, the

Anti-DEI Certifications—and the accompanying exposure to burdensome *qui tam* litigation and potential False Claims Act liability—will predictably chill grantees from speaking in support of diversity, equity, and inclusion, including in their own, non-federally-funded activities. That violates the First Amendment.

Second, the Anti-DEI Certifications impermissibly discriminate based on viewpoint (Count IX). It is axiomatic that the government may not regulate speech based on "the specific motivating ideology or the opinion or perspective of the speaker." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 168 (2015) (quotations and citation omitted); *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024) (stating that "[a]t the heart" of the First Amendment is "the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society"). Such government targeting is a "blatant and egregious form of content discrimination." *Reed*, 576 U.S. at 168 (cleaned up). A finding that the government has discriminated based on viewpoint is "all but dispositive" in a First Amendment challenge. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011).

As made particularly evident by the chorus of Administration statements disparaging "DEI," the requirement that grantees certify that they do not engage in "programs having components relating to diversity, equity, and inclusion" that violate civil rights laws discriminates based on grantees' "opinion or perspective," *Reed*, 576 U.S. at 168 (quotations omitted)—in particular, the view that diversity, equity, and inclusion are laudable values. This discrimination is designed to silence support for diversity, equity, and inclusion principles, and to chill grantees from supporting policies and perspectives that this Administration disfavors.

Because Defendants' actions facially discriminate based on viewpoint, they are subject to strict scrutiny and therefore unconstitutional unless the government demonstrates that its actions

"further[] a compelling interest and [are] narrowly tailored to achieve that interest." *Id.* at 171 (quotations omitted). There is no legitimate governmental interest, much less a "compelling" one, in making grantees fear potentially massive FCA liability for engaging in "diversity, equity, and inclusion" programs. The Anti-DEI Certifications therefore unconstitutionally discriminate based on viewpoint.

***4. The New Conditions are unconstitutionally vague***

The New Conditions are unconstitutionally vague in violation of the Due Process Clause. U.S. Const. amend. V. Due process fundamentally requires that the law give "fair notice of what is prohibited." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quotations omitted). A government-imposed requirement violates due process if it fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," or if it fails to provide explicit standards for the law's application, opening the door to "arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). This requirement of clarity is implicated whenever a party potentially faces civil penalties for noncompliance. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 n.22 (1996).

In addition, "heightened" and "stricter" standards for potentially vague regulations are applied in two circumstances, both of which are present here. *Frese v. Formella*, 53 F.4th 1, 6 (1st Cir. 2022) (cleaned up). First, "vagueness review is more stringent when the challenged laws implicate the First Amendment's protections for speech," as the OVW "Gender Ideology" Condition and OVW and OJP Anti-DEI Certifications do. *United States v. Facteau*, 89 F.4th 1, 33 n.20 (1st Cir. 2023); *see also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). With any "content-based regulation of speech," "[t]he vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997). "First Amendment freedoms need

breathing space to survive, and therefore government may regulate in the area only with narrow specificity." *Cent. Maine Power Co. v. Maine Comm'n on Governmental Ethics & Election Pracs.*, 144 F.4th 9, 36 (1st Cir. 2025) (Aframe, J., concurring) (cleaned up).

Second, "a stricter standard is applied" for vagueness where "criminal penalties may be imposed." *Frese*, 53 F.4th at 6 (cleaned up). This standard applies given the potential for criminal penalties under the False Claims Act. *See supra* Background Section B.1. And where, as here, there is "content-based regulation of speech," vagueness is of "special concern" given its "obvious chilling effect." *Reno*, 521 U.S. at 871–72.

The New Conditions are unconstitutionally vague even under the less stringent standard, and certainly fail under the higher standards that apply when First Amendment rights and criminal sanctions are at issue. The conditions fail to provide a person of reasonable intelligence fair notice of what is prohibited or provide explicit standards, opening the door to "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 108–09.

***OVW Out-of-Scope Conditions.*** OVW's Out-of-Scope Conditions lack the required clarity. For example, the OVW E.O. Condition requires grantees to certify that they will not use program funds for any activity or program that "unlawfully violates an Executive Order." But Executive Orders direct federal agencies and officials on how to implement or enforce the law—they do not impose legal requirements or obligations on federal grantees. The OVW E.O. Condition thus requires Plaintiffs to guess at what it requires and how to comply with it, particularly in light of the broad and vague orders that it purports to incorporate, and in light of the many executive orders that predate this Administration and are irrelevant to Plaintiffs. Indeed, for just these sorts of reasons, another court recently held that similar conditions requiring compliance with executive orders were unconstitutionally vague. *City of Fresno*, 2025

WL 2721390, at *15 (finding E.O. conditions vague for a host of reasons including that "they do not explain *how* the EOs are applicable to grantees").

As another example, as this Court recently held in considering a nearly identical condition, OVW's prohibition on "promot[ing]" "gender ideology" "obscure[s] meaning like Russian dolls stacked inside each other," leaving grantees unsure "whether using preferred pronouns to refer to a non-binary person" is prohibited. *RICADV v. Kennedy*, 812 F. Supp. 3d 180, 197 (D.R.I. 2025); *accord City of Fresno*, 2025 WL 2721390, at *17 (likewise finding such a condition unconstitutionally vague).

Similarly, the OVW Immigration Enforcement Condition fails to explain what it means to "promote" or "facilitate" immigration law violations—as another court recently concluded in finding a similar condition unconstitutionally vague. *City of Fresno*, 2025 WL 2721390, at *18. This condition leaves unknown, for instance, whether Defendants would deem it a violation merely to provide services to undocumented immigrants, *see supra* Background Section B.3, or to help undocumented victims obtain immigration relief, including through pathways provided by VAWA. *See* Faisal Decl. ¶ 39 (expressing concern about whether the Iowa Coalition could continue providing "legal humanitarian immigration relief under [VAWA] such as U-visa, T-visa, and VAWA self-petitioners"); McCormick Decl. ¶ 31 (expressing concern about whether the Kansas Coalition could continue "providing informational products on legal reliefs to survivors such as U-VISA or T-VISA processes"); *see also* Scraggins Decl. ¶ 23. Similarly, OVW's Law Enforcement and Immigration Enforcement Condition fails to explain what it might mean to "discourage" collaboration with law enforcement, or to "oppose," or "limit" the role of police, prosecutors, or immigration enforcement in addressing violence against women, and whether Defendants would consider it a violation of that condition to advise victims about

relevant legal risks in involving law enforcement, or to offer prevention programs that serve as alternatives to the criminal justice system. Faisal Decl. ¶ 43; Dalton Decl. ¶¶ 30–33, 44; Higgins Bonifanti Decl. ¶ 32. In Iowa, for example, a petitioner on a restraining order can be arrested for "aiding and abetting" the violation of a protective order if they return to their abuser, and this condition leaves grantees unsure whether they can inform survivors of this risk. Faisal Decl. ¶ 41.

The OVW Systemic Framing Condition fails to explain how or under what circumstances "fram[ing]" domestic violence or sexual assault as "systemic social justice issues" could result in "prioritizing" criminal justice reform or social justice issues over victim safety and offender accountability, and whether it would violate this condition to offer training and education programs that acknowledge the systemic factors that cause domestic violence and sexual assault. *See* Colón Decl. ¶ 38; Faisal Decl. ¶ 42; Lee Decl. ¶¶ 27, 31; McCormick Decl. ¶ 28; Christiansen Decl. ¶ 29; Stark Decl. ¶ 56; Higgins Bonifanti Decl. ¶ 30. The OVW Awareness Campaigns Condition likewise fails to explain what kinds of "campaigns or media" would not lead to "tangible improvements in prevention, victim safety, or offender accountability," or how such improvements would be measured or assessed, especially given that it is seemingly impossible to know whether an awareness campaign will produce "tangible improvements" before that campaign has even happened. *See* Litke Decl. ¶ 36; Lee Decl. ¶ 30. Indeed, the Administrative Record makes clear that even OVW leadership did not understand how to implement this restriction. OVW AR at 89 ("Because, however, the answer might not always be simple and obvious, applicants and recipients should be prepared to make judgment calls, without explicit guidance from OVW, about whether an awareness campaign or media production is likely to have tangible results.").

The OVW Anti-DEI Condition fails to explain what it means to "promote" or "facilitate" "discriminatory programs or ideology," or provide any guidance as to what "discriminatory programs or ideology" even are. The prohibition "includ[es] illegal DEI," seemingly indicating that it also prohibits DEI that is not illegal (and what makes DEI "illegal" is itself entirely unclear). Indeed, the examples of prohibited activities are illegal DEI *or* "'diversity, equity, inclusion, and accessibility' programs that do not advance the policy of equal dignity and respect." And with the latter example, it is difficult to imagine a more vague, more subjective standard than whether something advances "equal dignity and respect." This condition provides Plaintiffs and their members with no guidance on whether they may, for example, train service providers on risk factors that affect survivors differently based on race or gender, or operate the programs designed to meet culturally specific needs that VAWA expressly authorizes. *See* McCormick Decl. ¶ 29; Dalton Decl. ¶¶ 30–31; Minkens Decl. ¶ 31; Rios Decl. ¶¶ 43–44; Faisal Decl. ¶ 46; Sarang-Sieminski ¶ 26; Young Decl. ¶ 39; Higgins Bonifanti Decl. ¶ 31.

The New Conditions' vagueness is reinforced by their lack of guidance regarding their apparent conflict with VAWA's statutory requirements. They leave grant recipients guessing as to how to avoid "[p]romot[ing]" "gender ideology," while also not discriminating on the basis of gender identity. Grantees will have no idea how to avoid violating the DEI conditions while also providing services tailored for underserved racial and ethnic populations and including services that are "primarily directed" toward racial and ethnic minority groups. And Defendants leave unanswered how to comply with the Systemic Framing Condition given VAWA's foundational recognition that domestic violence is a systemic issue. *See supra* Background Section A.1.

***OVW and OJP Anti-DEI Certifications.*** The OVW and OJP Anti-DEI Certification requirements are likewise vague in that they require grantees to certify that they will not operate

DEI programs "that violate any applicable federal civil rights and nondiscrimination laws," but do not explain when a DEI program would violate such laws. And DOJ has otherwise made clear that it intends to aggressively enforce a novel and legally incorrect interpretation of federal antidiscrimination law that would prohibit all programs related to diversity, equity, and inclusion. *See supra* Background Section B.1. Certifying the materiality of their compliance with antidiscrimination law, combined with the Administration's extreme enforcement strategy, leaves Plaintiffs vulnerable to the kind of "arbitrary and discriminatory" application of the law that due process prohibits. *Grayned*, 408 U.S. at 108–09.

***OJP Immigration Condition.*** Finally, the OJP Immigration Condition is vague because it does not define what it means for a person to be "unlawfully present." Nor does it explain how a private entity could possibly determine whether a person was a "removable alien" under 8 U.S.C. § 1229a(e)(2), when the statute provides that that is a determination that an immigration judge makes after an adjudicatory proceeding, that is subject to further review, and for which various forms of relief exist. See 8 U.S.C. §§ 1229a(c)(1)(A), (4)–(7). It likewise offers no guidance on when using funds for "removable aliens" and people who are "unlawfully present" (whoever they may be) would be "expressly authorized by law" or how grantees would determine whether the prohibition "would contravene any express requirement of any law, or of any judicial ruling."

Each of these conditions requires people of ordinary intelligence to guess at what is prohibited. *See Grayned*, 408 U.S. at 108. By failing to provide guidance or standards to determine what activities are prohibited, each of the conditions also subjects Plaintiffs' funding to the Administration's unlimited discretion and exposes them to potentially arbitrary and discriminatory enforcement. Faced with threatened civil penalties and potential criminal liability under the False Claims Act, recipients are forced to broadly curtail their activities by "steer[ing]

far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Id.* at 109 (cleaned up).

**C. The New Conditions are ultra vires**

Defendants' imposition of the New Conditions is also ultra vires. This Court has inherent equitable power to enjoin and declare unlawful executive ultra vires conduct. *R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002). An agency acts ultra vires when it "plainly acts in excess of its delegated powers." *Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158, 162 (D.C. Cir. 2021) (quotations omitted); *see California v. Trump*, 805 F. Supp. 3d 387, 403 (D. Mass. 2025). "To act *ultra vires* a government official is either acting in a way that is impermissible under the Constitution or acting outside of the confines of his statutory authority." *California*, 805 F. Supp. 3d at 403 (quotations omitted). As explained above, *supra* Section I.A.2, Defendants acted without statutory authority in imposing the New Conditions on OVW and OJP grants. Because no statute, constitutional provision, or other source of law authorizes Defendants to impose the New Conditions, the New Conditions are ultra vires, and Defendants must be enjoined from implementing or enforcing them.

**II. The Court Should Vacate the New Conditions and Permanently Enjoin Defendants from Enforcing Them or Imposing Them Anew**

The Court should (1) set aside the New Conditions under the APA and (2) issue a permanent injunction to prevent Defendants (a) from enforcing any conditions to which grantees previously agreed and (b) from imposing the same or substantially similar conditions in the future.

**A. The Court should set aside the New Conditions under the APA**

The Court should set aside the New Conditions pursuant to 5 U.S.C. § 706(2). The APA directs courts to "set aside agency action" when the court determines the action is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory … authority," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(C). "[T]he text and history of the APA, [and] the longstanding and settled precedent adhering to that text and history," makes clear that to "set aside" an unlawful agency action means to "*vacat[e]*" that action. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 829 (2024) (Kavanaugh, J., concurring) (emphasis added). APA vacatur is not a party-specific remedy. *Corner Post*, 603 U.S. at 830 (Kavanaugh, J., concurring); *accord, e.g.*, *Illinois v. FEMA*, 801 F. Supp. 3d 75, 97 (D.R.I. 2025).

APA vacatur is warranted here because the New Conditions violate the APA for the multiple reasons described above. This Court should set aside the New Conditions—such that no applicant or awardee is required to agree to or comply with them and no Conditions are enforced against any grantee.

### B. The Court should enjoin Defendants from enforcing the New Conditions or imposing the same or substantially similar conditions in the future

In addition to vacating the New Conditions, the Court should also permanently enjoin Defendants (1) from attempting to enforce any New Condition in any agreement that a grantee already signed or from otherwise treating any such New Condition as effective and (2) from imposing or enforcing the New Conditions or any substantially similar conditions via any new agency action in the future. That injunctive relief is warranted to fully protect Plaintiffs from irreparable injury. Moreover, to ensure that Plaintiffs receive complete relief—and do not suffer competitive disadvantage or harm to their missions from the erosion of trust in service providers—the injunction should bar Defendants from taking these actions against any grantee, not just Plaintiffs and their members.

### *1. Injunctive relief is warranted*

To start, injunctive relief on top of vacatur is warranted where setting aside an agency action alone is not "sufficient to redress [the plaintiffs'] injury." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). So, for example, an injunction is warranted where the agency could attempt to take similar action again "as an end-run to the Court's relief." *Texas v. Cardona*, 743 F. Supp. 3d 824, 897 (N.D. Tex. 2024). In such circumstances, injunctive relief can appropriately "restrain agency officials from … conduct based on the disputed agency [action]." *Chamber of Com. of U.S. v. CFPB*, 691 F. Supp. 3d 730, 745 (E.D. Tex. 2023), *appeal dismissed*, No. 23-40650, 2025 WL 1304573 (5th Cir. May 1, 2025); *see also Cardona*, 743 F. Supp. 3d at 898 (enjoining defendants from "implementing or enforcing" the guidance documents at issue, as well as any future guidance documents promoting a similar interpretation against plaintiffs).

Here, injunctive relief is necessary because merely setting aside the New Conditions and the policies imposing them might not on its own prevent Defendants from (1) attempting to enforce certifications in applications that grantees signed before the New Conditions were stayed or (2) adopting a similar new policy or imposing the same or similar conditions via a new agency action. The need for this relief is all the more clear because this Administration has previously sought to re-impose funding conditions that a court had vacated. *See Illinois v. FEMA*, No. 25-cv-206, 2025 WL 2908807, at *1 (D.R.I. Oct. 14, 2025), *appeal pending*, No. 25-2131.

A permanent injunction is warranted here. The issuance of a permanent injunction is appropriate where: "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief (i.e., an injury for which there is no adequate remedy at law); (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an

injunction." *Ortiz-Bonilla v. Federacion de Ajedrez de Puerto Rico, Inc.*, 734 F.3d 28, 40 (1st Cir. 2013) (cleaned up). First, Plaintiffs prevail on the merits for the reasons explained above. *See supra* Section I.

Second, absent permanent injunctive relief, Plaintiffs risk irreparable injury. To begin, some Plaintiffs or their members signed certifications or grant agreements containing the New Conditions when they submitted applications or accepted awards before Plaintiffs obtained preliminary relief in this case. *See, e.g.*, Berry Decl. ¶ 12; Pollitt Hill Decl. ¶ 6; Christiansen Decl. ¶ 9; Yglesias Decl. ¶ 18. An injunction would remove any doubt that Defendants cannot hold grantees to those conditions—and ensure that Plaintiffs do not ultimately face the same irreparable harm that led this Court to stay the conditions in the first place. *See* Mem. & Order at 22–25 (Dkt. No. 34); Mem. & Order at 10–12 (Dkt. No. 63).

Plaintiffs would also face irreparable harm absent an injunction barring Defendants from taking a new agency action to impose the New Conditions, or substantially similar conditions, again. Such a re-imposition of the conditions would once again force Plaintiffs and their members to decide whether to: (a) accept unconstitutional and otherwise unlawful funding conditions that are inconsistent with statutory mandates, will impede their ability to provide core services, and are at odds with their fundamental missions; or (b) forgo federal funds that are essential to their ability to fulfill their mission. As this Court already held, that is irreparable harm. Mem. & Order at 22–25 (Dkt. No. 34); Mem. & Order at 10–12 (Dkt. No. 63).

"[F]orcing [a plaintiff] either to decline the grant funds based on what it believes to be unconstitutional conditions or accept them and face an irreparable harm, is the type of 'Hobson's choice' that supports irreparable harm." *City of Chi. v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017), *aff'd*, 888 F.3d 272 (7th Cir. 2018) (subsequent proceedings omitted) (citing *Morales*

*v. Trans World Airlines, Inc.,* 504 U.S. 374, 381 (1992)). Either option is untenable here. Accepting conditions that are unconstitutional, including because they are vague and infringe on the speech of Plaintiffs and their members, causes irreparable harm. *See, e.g.*, *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 11 (1st Cir. 2012) ("Irreparable injury is presumed upon a determination that [Plaintiffs] are likely to prevail on their First Amendment claim."). And the harm from accepting the New Conditions is especially acute here given that Defendants have intentionally crafted the conditions to expose grantees to False Claims Act liability. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (Plaintiffs need not wait for "Damocles's sword … to actually fall" before the Court enters preliminary relief).

If the coalitions or their members instead forgo OVW or OJP funds, that, too, would cause irreparable harm. Without OVW funds, coalitions would have to cut staff and scale back or entirely eliminate programs that are critical to serving survivors and equipping service providers with the resources they need to effectively prevent domestic violence and sexual assault—precisely the services Congress created the Coalition Grant to fund. *See, e.g.*, Scraggins Decl. ¶ 27; Akins Decl. ¶ 38; Colón Decl. ¶ 50; Christiansen Decl. ¶¶ 30–36; Mercado Decl. ¶¶ 30–33; Higgins Bonifanti Decl. ¶ 40; Berry Decl. ¶ 49; Pollitt Hill Decl. ¶ 30. Plaintiffs' member organizations would also suffer grave harms from losing funding for direct services. Without these funds, member organizations would no longer be able to provide the same level of assistance, advocacy, and intervention work on which victims of VAWA crimes rely. *See, e.g.*, Dalton Decl. ¶¶ 40–42; Faisal Decl. ¶¶ 49–55; Fisher Decl. ¶¶ 30, 34; Christiansen Decl. ¶ 36; Robinson Decl. ¶¶ 42–43; Higgins Bonifanti Decl. ¶ 41; Pollitt Hill Decl. ¶¶ 30–32. Such interference with the organizations' services "is not accurately measurable or adequately

compensable by money damages." *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 325 (D. Mass. 2025), *aff'd*, 164 F.4th 1 (1st Cir. 2026) (quotation omitted). The inability of an organization to "accomplish [its] primary mission" constitutes irreparable harm. *Newby*, 838 F.3d at 9.

Finally, the balance of equities and the public interest weigh decisively in Plaintiffs' favor for the same reasons they did at the preliminary relief stage. *See* Mem. & Order at 25–26 (Dkt. No. 34); Mem. & Order at 12 (Dkt. No. 63). On the one hand, "the government cannot suffer harm from an injunction that merely ends an unlawful practice." *NIH*, 770 F. Supp. 3d at 326 (cleaned up); *see also Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) ("[I]njunctions protecting First Amendment freedoms are always in the public interest."). By contrast, the loss of funding to Plaintiff Coalitions and their member programs would directly harm victims of domestic violence and sexual assault, depriving them of critical, life-saving services, including safe housing away from their abusers, legal assistance in seeking protective orders, safety planning and counseling, and much more. *See, e.g.*, Rios Decl. ¶ 56; Robinson Decl. ¶ 50; Faisal Decl. ¶¶ 55–57. Especially here—where the stakes are so high—the government should not be allowed to "leverag[e] the needs of our most vulnerable fellow human beings" by conditioning federal grants on compliance with unlawful requirements. *King Cnty.*, 785 F. Supp. 3d at 891.

#### *2. To afford Plaintiffs complete relief, the injunction should bar Defendants from imposing the Conditions on any OVW and OJP grantees*

This permanent injunction should extend to all OVW and OJP applicants and grantees, because doing so is necessary to afford complete relief to Plaintiffs, for two reasons. *See, e.g.*, *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 202 (D.N.H. 2025) (enjoining agency action to non-parties to prevent harm to plaintiffs). First, Plaintiffs would face a

competitive disadvantage if the Court applied the injunction only to them. In that event, there would be two categories of potential grantees: organizations against which Defendants could impose their New Conditions and organizations against which it could not. Defendants would naturally favor those grantees that it could hold to its preferred ideological conditions—meaning that Plaintiffs and their members would lose out on funding opportunities or even face cancellation of grants they have already been awarded. The injunction must extend to all grantees to protect Plaintiffs and their members from this unfair disadvantage. As another court put it in similar circumstances, to "provide complete relief" to Plaintiffs, the Court must "enjoin[] Defendants from imposing the Conditions as to all competitors" because an injunction limited to Plaintiffs "does little to ensure an even playing field." *City of Los Angeles v. Sessions*, No. 18-cv-7347, 2019 WL 1957966, at *6 (C.D. Cal. Feb. 15, 2019).

Second, leaving Defendants free to impose these New Conditions on other grantees would undercut Plaintiffs' and their members' ability to pursue their missions. Plaintiffs and their members do not operate in silos. If organizations serving victims of domestic violence were required to start following the New Conditions—for example, by requiring victims to prove their citizenship or immigration status, turning victims away, halting culturally appropriate responses, or denying victims' gender identities—that undermines trust victims will have in service providers in general. Dalton Decl. ¶ 31. That, in turn, deters victims from seeking help anywhere, not just from that particular organization—and thereby jeopardizes the ability of Plaintiffs and their members to fulfill their missions. Dalton Decl. ¶ 31. Indeed, another court recently recognized that grantees' work is interconnected, and so placing a condition on one grantee harms others, including by chilling grantees from associating with or supporting grantees whose conduct could be considered violative. *See, e.g.*, *Freedom Network USA v. Trump*, No. 25-cv-

12419, 2026 WL 800392, at *22 (N.D. Ill. Mar. 23, 2026) (holding that, to provide "complete relief" to the plaintiff, it was necessary to enjoin the defendants from enforcing an anti-DEI certification against any grant recipients because other grantees would be "likely to avoid any association with speech that could violate the [certification]").

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Plaintiffs on all their claims, vacate the New Conditions under the APA, and permanently enjoin Defendants from attempting to enforce any New Condition in any agreement that a grantee already signed or from otherwise treating any such New Condition as effective and from imposing or enforcing the New Conditions or any substantially similar conditions in the future.

June 12, 2026

Respectfully submitted,

*/s/ Kristin Bateman*
Kristin Bateman (D.C. Bar No. 90037068)+
Robin F. Thurston (D.C. Bar No. 1531399)+
Skye L. Perryman (D.C. Bar No. 984573)+
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kbateman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

Daniel F. Jacobson (D.C. Bar No. 1016621)+
Lynn D. Eisenberg (D.C. Bar No. 1017511)+
Brian C. Rosen-Shaud (D.C. Bar No. 90042065)+
Kyla M. Snow (D.C. Bar No. 90036400)+
Nina C. Cahill (D.C. Bar No. 1735989)+
Jacobson Lawyers Group PLLC
5100 Wisconsin Ave NW, Suite 301
Washington, DC 20016
(301) 823-1148
dan@jacobsonlawyersgroup.com

Amy R. Romero (RI Bar No. 8262)
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
Amy@dwbrlaw.com
Cooperating counsel, Lawyers' Committee for RI

Lynette Labinger (RI Bar No. 1645)
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation of RI

Lauren A. Khouri (D.C. Bar No. 10282288)[+]
Elizabeth E. Theran (D.C. Bar No. 90030162)[+]
National Women's Law Center
1350 I Street NW, Suite 700
Washington, DC 20005
Telephone: (202) 588-5180
Fax: (202) 588-5185
lkhouri@nwlc.org
etheran@nwlc.org

[+] Admitted *Pro hac vice*

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2026, I electronically filed the within document and it is available for viewing and downloading from the Court's CM/ECF System, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

*/s/ Kristin Bateman*
Kristin Bateman